```
 1   you questions, and I'm at line 15.
 2                And (as read):  Question: "You think
 3           she may have been on drugs or something?"
 4                16, answer: "I had an assumption that
 5           possibility."
 6                Question --
 7                MS. MARTINEAU:  Objection.  It says,
 8   "that possibly."
 9                MS. PFEIFFER:  Sorry.
10       Q.   (By Ms. Pfeiffer)  "I had assumption that
11           possibly."
12                Question: "And her mother also was
13           concerned?"
14                Answer:  "Uh-huh."
15                And then if you -- and that's what you
16   testified to in 1997, right?
17       A.   Yes.
18       Q.   That possibly she was on drugs, right?
19                MS. MARTINEAU:  Objection; leading.
20                You can answer.
21       A.   Anything's possible.
22       Q.   Well, is that what it says in the
23   transcript, or --
24       A.   That's what it --
25       Q.   -- did I misread it?
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**Jeffery D. Shrock on 05/09/2023**
Page 141

1     A.    That's what it says in the transcript.

2     Q.    And if you turn to page 110, at line 15,

3 when you were describing her, you said (as read):

4     "She was belligerent.  Angry about

5 something.  Gave me the impression that she

6 could have possibly been on some type of

7 medication or drugs."

8     That's what you testified to, right?

9     A.    Yes.

10    Q.    So you believed it was possible she was on

11 drugs when you interacted with her, right?

12    A.    It was possible.

13    Q.    And would that be the kind of thing that

14 you would tell Detective Best, or any detective in a

15 murder investigation, when you were presenting them

16 information about a potential eyewitness?

17    A.    Yes, but back with the transcript, is her

18 going to the hospital.  And that being found, as far

19 as what was in the transcript, that she wasn't.  It

20 was possible.  But being that all that occurred prior

21 to Ricky, me talking to him, telling him about

22 Charlene, I didn't tell him because it -- she wasn't.

23    Q.    What you testified to in 1997 is that when

24 she lunged at your car and was belligerent with

25 you --

```
 1        A.     Yes.
 2        Q.     -- so you thought she was possibly on
 3    drugs.  That's what you testified --
 4        A.     Possibly.
 5        Q.     -- to, right?
 6        A.     Possibly.
 7        Q.     And within two days of this interaction,
 8    you talked to Ricky Best, correct?
 9        A.     Yes.
10               MS. MARTINEAU:  Objection; leading,
11    argumentative.
12               You can answer.
13        Q.     (By Ms. Pfeiffer)  And my question is: At
14    that time did you tell him that you thought she was
15    on drugs?
16        A.     No.
17        Q.     And you said no.  Why would you not tell
18    him that?
19        A.     Because she wasn't.
20        Q.     You didn't know that, did you?
21        A.     No.  Yes, I did -- I mean, by the
22    transcript.  Right now, I don't remember it, but by
23    the transcript and what I testified back then, I did
24    know that she wasn't.
25        Q.     Let's get on the same page.
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.

Jeffery D. Shrock on 05/09/2023                            Page 143

```
 1      A.    Because she left the -- she left the
 2  hospital.
 3              MS. MARTINEAU:  Let him finish,
 4  please.
 5      Q.    (By Ms. Pfeiffer)  Yeah, let's get on the
 6  same --
 7              MS. MARTINEAU:  Let him finish.
 8      Q.    (By Ms. Pfeiffer)  -- timeline here, okay?
 9      A.    Mm-hm.
10      Q.    In 1997, you testified about what you
11  thought when Charlene lunged at your car when you
12  took her home.
13      A.    Yes.
14      Q.    What you testified to under oath in 1997
15  was that you thought she might be on drugs, right?
16      A.    Yes.
17      Q.    Okay.  What you also testified to in 1997
18  is that you told Detective Best that when it was two
19  days later.  Okay.
20      A.    Yes.
21      Q.    When you told Detective Best two days
22  later, had you checked Charlene's medical records by
23  that point in time?
24      A.    When she was released, yes.  I mean, by the
25  transcript, I knew that she wasn't.
```

1    Q.    When you say "by the transcript, I knew she

2  wasn't," what do you mean?

3    A.    That -- I thought I had stated in here from

4  my testimony back then that I had discovered that she

5  wasn't.

6    Q.    Okay.  I'm sorry.  Do we need to take a

7  break so you can find that in your transcript?

8         MS. MARTINEAU:  It's right here.  It's

9  right above it.  It's right above where you showed

10  him.

11    Q.    (By Ms. Pfeiffer)  Where are you on your

12  transcript?  And explain -- I -- I don't understand

13  your answer.

14    A.    You're asking for the timeline of my

15  interaction with Charlene.

16    Q.    Right.

17    A.    First there was, she jumped out in front of

18  me at the car.  I took her home.  She goes to the

19  hospital.  And two days later, I've talked with Ricky

20  Best.

21         By the time she left -- took her to

22  the hospital, she left the hospital prior to me

23  talking to Ricky Best.  And it was discovered that

24  she was not on any.

25    Q.    I see.  Okay.  Your testimony is that she

www.huseby.com        Huseby Global Litigation        800-333-2082
Case 4:21-cv-00185-BO  Document 196-4  Filed 09/12/24  Page 145 of 357
J.A. 1119

```
 1   left the hospital the same day you took her there?

 2       A.    Yes.

 3       Q.    And your testimony is she left the hospital

 4   before you talked to Ricky Best?

 5       A.    Best I --

 6       Q.    Okay.

 7       A.    -- can remember.

 8       Q.    Have you viewed her medical records in this

 9   case?

10       A.    No, I have not.

11       Q.    Okay.  If her medical records reveal that

12   that's not accurate, would it be fair to say you had

13   no idea when you talked to Detective Best whether or

14   not she was on drugs?

15             MS. MARTINEAU:  Objection to the form

16   of the question.

17             You can answer.

18       A.    Would it be fair to say that I did not

19   know?  Best that I can remember from the transcript,

20   I was told that she didn't have any drugs in her

21   system.

22       Q.    And who told you that?

23       A.    I can't recall.

24       Q.    At what point in time did you view her

25   medical records?
```

```
 1                        MS. MARTINEAU:  Objection --

 2          A.     I didn't review --

 3                        MS. MARTINEAU:  -- to the form of the

 4     question.

 5          A.     -- her medical records.

 6          Q.     When did you get any information about

 7     whether it was determined that she had drugs in her

 8     system?

 9          A.     When she was released --

10          Q.     Were --

11          A.     -- best that I know.

12          Q.     Were you there when she was released?

13          A.     I don't remember.

14          Q.     Did you tell Detective Best that you spoke

15     with Charlene's mother?

16          A.     Yes.

17          Q.     Why was it important to give him that

18     information?

19          A.     That's where the interaction began.

20          Q.     And did you tell Detective Best that you

21     and Corporal Davis encouraged her mom to take her to

22     the hospital to be committed?

23          A.     I don't remember.

24          Q.     Would that be important information for

25     Detective Best to have?
```

1      A.      Yes.

2      Q.      **Why?**

3      A.      So he would've known what actually happened

4   during that interaction.

5      Q.      It's fair to say that if somebody had been

6   taken to a hospital to be evaluated mentally, it

7   would be important for a homicide detective to know

8   that, if that detective were going to rely on that

9   person and what they said about potentially being an

10  eyewitness to a murder, right?

11              MS. MARTINEAU:  Objection; leading.

12              You can answer.

13     A.      Yes.

14     Q.      Did you tell Detective Best that you

15  actually drove her to the hospital for an evaluation?

16     A.      I don't recall.

17     Q.      Did you tell Detective Best that you were

18  worried about Charlene?

19     A.      I don't recall.

20     Q.      If you go to page 113 on your transcript,

21  and at line 10, this is where you're responding that

22  (as read): "Her mother obtained commitment papers,

23          and we went to the hospital and she was

24          evaluated."

25              Question: "But, I mean, why did you

```
 1   take her home?  Let me ask that way -- let
 2   me ask you that way.  I didn't phrase it
 3   right before."
 4               Answer: "The way she was acting.  Her
 5   attempting, acting like she was going to
 6   jump out in front of my car two times.  Her
 7   attitude in general.  Her reactions."
 8               Question: "You were worried about
 9       her?"
10               Answer: "Yes."
11               So would it be fair to say that,
12   based upon those interactions with Charlene, you were
13   worried about her?
14       A.    I had a concern.
15       Q.    And would that be the kind of thing that
16   would be important to tell Detective Best?
17       A.    It -- it would've been, possibly.
18       Q.    Why would that have been important?
19       A.    Hindsight.  And he needed to know.
20       Q.    Why did he need to know?
21       A.    Because he was investigating the homicide.
22   And if, in all actuality, her being a genuine witness
23   to -- to the murder, and her -- him seeking to obtain
24   information from her, well, there could be good or
25   bad information, whether it be worth his while to
```

```
 1   know what happened in that interaction with me.
 2        Q.     In other words, all important information
 3   to help judge her credibility, right?
 4        A.     Yes.
 5               MS. MARTINEAU:  Objection; leading.
 6               You can answer.
 7        A.     Yes.  Yes.
 8        Q.     If we go back to page 108 -- and before I
 9   go back to this, I just want to follow up a little
10   bit on -- you had said that Detective Best told you
11   he would do an addendum, right --
12        A.     Mm-hm.
13        Q.     -- when you left?
14        A.     Best I remember.
15        Q.     Okay.  Is there anything else you remember
16   about that interaction with Detective Best when you
17   gave him the information about Charlene?
18        A.     No.  Not that I can say right offhand, no.
19        Q.     What was your understanding of what he was
20   going to do with the information that you gave him?
21        A.     His job.
22        Q.     And what was his job?
23        A.     He was the detective, lead detective on the
24   homicide investigation.  To follow the lead, pursue
25   any information that he could get pertaining to the
```

```
 1    murder.
 2         Q.      And that would include trying to
 3    corroborate the statement, right?
 4                 MS. MARTINEAU:  Objection; leading.
 5                 You can answer.
 6         A.      Her statement?
 7         Q.      Right.
 8         A.      Yes.
 9         Q.      And one way to do that would be comparing
10    her statement to physical evidence that had been
11    gathered in the case, right?
12         A.      It's possible.
13         Q.      That would be something a detective could
14    do, right?
15                 MS. MARTINEAU:  Objection; leading.
16                 You can answer.
17         A.      Honestly, some of it, possibly.  Not all of
18    it.
19         Q.      I'm not talking about all of it.  But if
20    there's physical evidence, and there's physical
21    evidence that could be used to corroborate someone's
22    statement, that's something that a detective should
23    do, right?
24         A.      Yes.  But that's not to say that there was
25    -- her information could be corroborated by physical
```

```
 1   evidence.
 2        Q.    But if it could, that's something a
 3   detective should do, right?
 4        A.    Yes.
 5              MS. MARTINEAU:  Objection.
 6              You can answer.
 7        Q.    (By Ms. Pfeiffer)  And if the physical
 8   evidence conflicts with her statement, that would be
 9   a red flag, wouldn't it?
10              MS. MARTINEAU:  Same objection.
11              You can answer.
12        A.    Well, if her information of what she said
13   she saw and physical evidence could be corroborated,
14   then yes.
15        Q.    I mean, for instance, if -- if she said
16   that she saw someone throw the keys to the car, but
17   then physical evidence shows that the keys were in
18   the ignition, her statement would not match the
19   physical evidence, correct?
20              MS. MARTINEAU:  Objection to the form
21   of the question.
22              You can answer.
23        A.    No.
24        Q.    And that might be something to look into
25   further for a detective, right?
```

```
 1        A.      Yes.

 2        Q.      And if her statement conflicted with

 3   another witness's statement, that would be a red flag

 4   for a detective, right?

 5                MS. MARTINEAU:  Objection to the form

 6   of the question.

 7                You can answer.

 8        A.      Possibly.

 9        Q.      It certainly is something that should be

10   further investigated, right?

11        A.      Yes.

12        Q.      Because you can't just take a statement at

13   face value, can you?

14                MS. MARTINEAU:  Objection.

15                You can answer.

16        A.      No.

17        Q.      Back to 108 where I was directing you on

18   your transcript, I want to direct your attention to

19   line 10 on page 108.

20                And there's a question: "Did you take

21        her back home at some point?"

22                And the answer is, "Yes, sir."

23                Did you take Charlene home from the

24   hospital?

25        A.      I don't remember.
```

```
 1        Q.     Do you have any recollection --

 2               MS. MARTINEAU:  Are you okay?

 3               THE WITNESS:  Yeah.  I can --

 4               MS. PFEIFFER:  Do we need to take a

 5   little break?

 6               THE WITNESS:  A little while -- a

 7   little -- little while longer.

 8               MS. PFEIFFER:  Let me know when you

 9   need to take a break, and I'm happy to, okay?  And if

10   we're in the middle of a series of questions, I'll

11   just ask that you be patient with me to get through

12   them.

13               THE WITNESS:  Okay.

14        Q.     (By Ms. Pfeiffer)  Other than the

15   interaction that we talked about, based on your

16   testimony from 1997 about Charlene in the hospital,

17   do you have any memory of being at the hospital with

18   Charlene?

19        A.     No.

20        Q.     Okay.

21               MS. PFEIFFER:  I'm going to mark our

22   next exhibit, Exhibit 40.

23               (WHEREUPON, EXHIBIT NUMBER 40

24               WAS MARKED FOR IDENTIFICATION.)

25               MR. CLEMENTS:  Did you say 40?
```

J.A. 1128

```
 1                    MS. PFEIFFER:  40.
 2        Q.    (By Ms. Pfeiffer)  And what I've handed you
 3   is a medical record from Pitt County Memorial
 4   Hospital.  And up at the top is the basic information
 5   about this record.  It's to the psych unit from the
 6   emergency department -- that's ED -- and the request
 7   date is 2/17/94.  That's February 17th, 1994.
 8                    And then below, it says, "Reason for
 9   consult: Patient involuntarily committed."
10                    You see that?
11        A.    Yes.
12        Q.    Okay.  Then under "Findings and
13   Recommendations" it says (as read): "13-
14   year-old BF" -- that's black female --
15   "brought to ED" -- that's emergency
16   department -- "by Greenville PD after
17   playing game of running in front of police
18   car."
19                    You see that, right?
20        A.    Mm-hm.
21        Q.    So this record relates to the day that
22   Charlene ran in front of your police car, right?
23                    MR. ELLIS:  Objection.
24                    MS. MARTINEAU:  Same objection.
25                    You can answer.
```

J.A. 1129

```
 1        A.     Yes.
 2        Q.     And at the bottom of the page, right --
 3   lower right-hand corner, do you see the name Johnson,
 4   Charlene?  And there's an address under there.  Stone
 5   Charles.  I'm not sure what the next one is.  Can you
 6   see that address?
 7        A.     Mm-hm.
 8        Q.     Do you recognize that as an address in
 9   Greenville?
10        A.     No.
11        Q.     Is it -- is it familiar to you as a -- and
12   I don't know if that's an address.  I'm asking you
13   whether you recognize that or whether that's her --
14   maybe her --
15        A.     It looks --
16        Q.     -- treating physician.
17        A.     -- like -- it looks like it might've been a
18   doctor's name.
19        Q.     Okay.  You don't recognize that --
20        A.     No
21        Q.     -- as a street?
22        A.     No.  No.
23        Q.     I'm asking because I can't make out the
24   stamp.
25        A.     No, it looks like it might've been a
```

```
 1   doctor's name.

 2        Q.    Okay.  Up at the top where it says

 3   "Involuntarily committed," do you recall whether she

 4   was, in fact, involuntarily committed that day?

 5        A.    I don't remember.  But back to what you

 6   just asked, Keith, as MD, that's the doctor.

 7        Q.    Okay.  All right.  Thank you.  Do you

 8   remember what street she lived on when you picked her

 9   up?

10        A.    When I picked her up, and what she told me,

11   I mean, because -- yeah.

12        Q.    What street was that?

13        A.    Fleming.

14        Q.    Okay.

15              MS. PFEIFFER:  I'm going to mark this

16   next exhibit as 41.

17                   There's two there.

18                   (WHEREUPON, EXHIBIT NUMBER 41

19                   WAS MARKED FOR IDENTIFICATION.)

20        Q.    (By Ms. Pfeiffer)  And up at the top,

21   again, this is Pitt County Memorial Hospital.  And

22   you'll see down at the bottom, Charlene Johnson,

23   lower right-hand corner.

24        A.    Okay.

25        Q.    The date on this is also in the lower
```

```
 1   right-hand corner.  It's February 23rd, 1994.

 2                   And then back up to the top, it says

 3   (as read): "Patient/family dynamics and history."

 4                   "Legal history: Patient was recently

 5   picked up by police when she was playing,

 6   quote, 'chicken' with a police car in

 7   intoxicated state, and mother voluntarily

 8   signed patient in."

 9                   Do you see that there?  It's up at the

10   top under "Patient/family dynamics and history."  Do

11   you need me to read that again?

12        A.    I've got Exhibit 41, but --

13        Q.    Okay.  So Section c, it says (as read):

14   "Patient/family dynamics and history."  And

15   then there's handwriting that says, "Legal

16   History: Patient was recently picked up by

17   police when she was playing, quote,

18   'chicken' with a police car in intoxicated

19   state, and mother voluntarily signed

20   patient in."

21                   Do you see that?

22        A.    Yes.

23        Q.    So this is another description of that same

24   incident that we just saw on the previous record,

25   right?
```

```
 1                    MS. MARTINEAU:  Objection to the form.

 2                    You can answer.

 3        A.     So this is a medical record from Pitt and

 4    Duke and the different dates.

 5        Q.     The date is different.  But I'm just

 6    talking about the incident -- that the incident

 7    describing her playing chicken --

 8        A.     Yes.

 9        Q.     -- the same incident as when she -- we just

10    looked at the other record, just described

11    differently, right?

12        A.     Yes.

13                    MR. ELLIS:  Objection.

14                    MS. MARTINEAU:  Same objection.

15        A.     I -- I guess.

16                    MS. MARTINEAU:  Well, don't guess.

17        A.     Yes.

18        Q.     Okay.  If you go down to, one, two,

19    three, four, five -- the fifth line on that first

20    paragraph, middle of the line, it says (as read):

21               "She reports that she filed, quote,

22               'missing person's reports when patient

23               ran away.'"

24                    You see that there?

25        A.     Yes.
```

```
 1        Q.      Okay.  Were you aware of any missing

 2   person's reports for Charlene Johnson when you first

 3   encountered her back in March of '94?

 4        A.      Not that I remember, no.

 5        Q.      How -- when a missing person's report comes

 6   in, how is that information disseminated to the

 7   Greenville PD?  Like, how -- how does that

 8   information get passed around?

 9        A.      At roll call, we're notified of any missing

10   persons.

11        Q.      And walk me through that procedure.  Is it

12   -- like, the sergeant has the information?  What do

13   you learn?

14        A.      Yes.  The sergeant has the information from

15   what was reported, and reads it out, along with

16   stolen vehicles.

17        Q.      So are patrol officers, is that the

18   department within the GPD, expected to respond to

19   missing person's reports?

20        A.      Department -- what --

21        Q.      So I'm just trying to figure out whose job

22   it is to respond.  Like, is that a patrol officer's

23   job to respond to a missing person's report?

24        A.      Well, the infor- -- yes.  But that

25   information passed around to the different shifts, as
```

1   -- so that we could be on the lookout for him, as
2   well as stolen vehicles.
3        Q.    And so is that something that happens at
4   the start of every shift, if there's an active
5   missing person's report?
6        A.    Yes.
7        Q.    And are there times when a patrol officer
8   might recognize a person's name and say, "Hey, I know
9   where that person lives.  I'll go check it out"?  I
10  mean, how -- how do you -- how does -- they decide
11  who's going to respond?
12       A.    Well, by that time, there's -- I mean, when
13  this -- that information is passed, it's already
14  occurred.  There's nothing for us to actually
15  investigate.
16             But to be in that area where there
17  possible -- which, the information of where they
18  might've gone, it would be in our district to turn
19  around and look for them, to keep an eye out and see
20  if they do show up, pop up.
21             I mean, certainly, West Greenville,
22  everybody's walking the streets.  It's just that we
23  -- us, as patrol officers, get that information and
24  look for them.
25       Q.    What do you do if you find the person?  If

J.A. 1135

```
 1   you know the name that's given at roll call, and then

 2   you find that person when you're out on your shift,

 3   what do you do?

 4        A.    I don't know.  I didn't never find anyone.

 5        Q.    Is there a protocol for what you're

 6   supposed to do?

 7        A.    Not that I know of.  I don't know.

 8              THE WITNESS:  Can -- can we take a

 9   break?

10              MS. PFEIFFER:  Yes.  Now is a fine

11   time to take a break.  Ten minutes okay?

12              THE VIDEOGRAPHER:  Off record at 2:52

13   p.m.

14        (WHEREUPON, A SHORT BREAK WAS TAKEN.)

15              THE VIDEOGRAPHER:  On record at 3:13

16   p.m.

17        Q.    (By Ms. Pfeiffer)  Mr. Shrock, before we

18   took a break, one of the -- I want to circle back to

19   one of the answers you gave me in response to a

20   question about talking to Charlene Johnson, and when

21   she shared information with you about the George

22   Radcliffe murder.

23              And you had testified, that's while

24   she was in the car with you when you were driving her

25   to her mom's house, correct?
```

J.A. 1136

1      A.      Yes.

2      Q.      Did you tell her mom that she told you she

3  had information about that murder?

4      A.      I don't remember.

5      Q.      Would that be the kind of thing that you

6  would tell her mom?

7              MS. MARTINEAU:  Objection to the form

8  of the question.

9              You can answer.

10     A.      No.

11     Q.      Why not?

12     A.      I -- why I wouldn't tell her?  I can't

13  answer that.

14     Q.      Do you think it would be important for a

15  14-year-old's mom to know that the 14-year-old had

16  said they witnessed a murder?

17     A.      Yeah.

18     Q.      So would that be something you would tell

19  Charlene's mom, if that's what she told you in the

20  car on the way to her house?

21             MS. MARTINEAU:  Same objection.

22             You can answer.

23     A.      I -- I don't remember if I did or didn't,

24  or why -- why I did or didn't.  I can't answer it.

25     Q.      But given the circumstances of what you say

```
 1    she said to you, wouldn't that be the kind of thing

 2    that you would tell her mom?

 3                   MS. MARTINEAU:  Same objection.  Asked

 4    and answered.

 5                   You can answer.

 6        A.    I can't remember if I did or didn't, as far

 7    as assuming that her testi- -- what -- what she had

 8    told me.  I listened to it.  But as far as me telling

 9    her mom, I -- I didn't find it pertinent in -- in my

10    conversation, you know, as far as assuming why -- or

11    why I did or why I didn't.

12        Q.    I'm going to ask my question again because

13    you haven't answered the precise question.

14                   The question is: Would that be the

15    kind of thing that you would tell her mom?

16        A.    Yes.

17        Q.    Before we took the break, we were also

18    talking about missing person's reports and how that

19    was referenced in the medical records.

20                   I'm going to hand you what I've marked

21    as Exhibit 42.

22                   (WHEREUPON, EXHIBIT NUMBER 42

23                   WAS MARKED FOR IDENTIFICATION.)

24        Q.    (By Ms. Pfeiffer)  And Exhibit 42 is a log

25    of calls for service to the Greenville Police
```

J.A. 1138

```
 1    Department in April of 1994.  And if you flip to page

 2    4 on this document, and then on that page, look over

 3    on the left side and go down four lines, one, two,

 4    three -- four, April 7th, 1994, and the CFSID is

 5    -117080.  Are we on the same line there?

 6         A.    Yeah.

 7         Q.    And then you go across, the call type is

 8    "Follow-up."  And then the narrative gives a case

 9    number, and it says, "Missing person, Charlene

10    Johnson located."

11               Did I read that right?

12         A.    Yeah.

13         Q.    Do you recall, at any time, responding to a

14    missing person's report for Charlene Johnson after

15    the date that you talked to her when she went to the

16    hospital?

17         A.    No.

18         Q.    There's a house number after that.  631

19    Dickinson Avenue, do you see that?

20         A.    Yes.

21         Q.    Is that a familiar address to you?

22         A.    No.

23         Q.    Do you know whether it's in Greenville?

24         A.    I -- I believe it to be.

25         Q.    But you're not familiar with it?
```

J.A. 1139

```
 1        A.     No.

 2                      (Discussion off record.)

 3        Q.     (By Ms. Pfeiffer)  I'm going to mark and

 4   show you our next exhibit, Exhibit 43.

 5                      (WHEREUPON, EXHIBIT NUMBER 43

 6                      WAS MARKED FOR IDENTIFICATION.)

 7        Q.     (By Ms. Pfeiffer)  And what I've given you

 8   as Exhibit 43 is a Pitt County Memorial Hospital

 9   record.  And this is a discharge summary.  You see at

10   the top it says Charlene Johnson?  Date of admission,

11   2/18/94.  Date of discharge 3/10/94.

12                      You see that there?

13        A.     Yes.

14        Q.     Okay.  Can we agree that if Charlene was

15   hospitalized from February 18th, 1994, to March 10th,

16   1994, there's no way that you spoke to her on March

17   3rd or 4th when she ran out in front of your car?

18        A.     Ask that again, please.

19        Q.     Sure.  In 1997 -- we went through your

20   transcript testimony --

21        A.     Mm-hm.

22        Q.     -- and you testified that it was March 3 or

23   4, 1994, when she ran out in front of your car,

24   right?

25        A.     Mm-hm.
```

J.A. 1140

 1       Q.      This is the discharge summary from Charlene

 2    Johnson at Pitt County Memorial.  The date of

 3    admission is 2/18/94.

 4       A.      Okay.

 5       Q.      The date of discharge is 3/10/94.  My

 6    question is: If she was in the hospital from February

 7    18th, 1994, to March 10th, 1994, can we agree that it

 8    was impossible for you to have that interaction with

 9    her, that you previously described and testified to,

10    on March 3 or 4, 1997?

11       A.      In the transcript of when I said it was, is

12    when it was.  Yes.  As far as the dates on this, I do

13    not know.

14       Q.      Assuming these dates are accurate, and she

15    was continuously hospitalized from February 18th,

16    1994, to March 10th, 1994, it would be impossible for

17    her to be running in front of your car on March 3 or

18    4, 1994, correct?

19       A.      Mm-hm.  Correct.

20       Q.      Do you recall -- moving ahead now to 2014

21    -- meeting with an attorney and a student from Duke?

22       A.      I -- I met with someone.  I don't -- can't

23    remember if they were who you're saying.

24       Q.      When you say "I met with someone," what are

25    you referring to?

```
 1       A.     While I was incarcerated, they identified

 2   themselves as being from the Duke something.

 3       Q.     What do you remember about how they

 4   contacted you?

 5       A.     How I was contacted?

 6       Q.     Mm-hm.  By -- by those Duke lawyers.

 7       A.     Like I said, I was incarcerated.  And they

 8   came --

 9              MR. ELLIS:  Objection to the form of

10   the question.

11       A.     -- to the prison.

12       Q.     Did they write you in advance?

13       A.     Not that I'm aware of.

14       Q.     Do you know how they found you there?

15       A.     I have no idea.

16       Q.     What do you remember about when they first

17   showed up?

18       A.     I don't remember.

19       Q.     Do you remember meeting with them?

20       A.     Yes.

21       Q.     Did they have any documents with them?

22       A.     I believe they did.  I can't remember what.

23       Q.     Do you remember if they showed you any of

24   those documents?

25       A.     I can't remember.  I know they had a tape
```

1    recorder and recorded it.

2         Q.    You knew they were recording the

3    conversation?

4         A.    Yes.  It was on the table right in front of

5    me.  But as far as the documents -- I know they had a

6    bunch of paperwork, files and all.  And I can't

7    remember what it was that they were showing me and

8    looking at; just like now, I can't remember what all

9    they were.

10        Q.    Was it a contact visit?

11        A.    Excuse me?

12        Q.    Was it a contact visit, or were you behind

13   glass?

14        A.    Contact.

15        Q.    And did they take notes while they were

16   talking to you?

17        A.    I guess.

18              MS. MARTINEAU:  Well, don't guess.

19   She's asking -- if you know, you know.  If you don't

20   know, you don't know.  But don't guess.

21        A.    I can't remember them writing anything

22   down.

23        Q.    When they were asking you questions that

24   they were recording, did you do your best to give

25   them honest answers?

J.A. 1143

```
 1        A.      Yes.
 2        Q.      Was there anything that you said to them
 3   that you were purposely misrepresenting?
 4        A.      After going back and reading the transcript
 5   of -- between what was presented -- I mean, what the
 6   attorneys prepared, the transcripts from my
 7   testimony, and the other one of where I was recorded,
 8   and there -- there were some things that, I mean,
 9   kind of altered my memories to some degree.
10               I don't believe anything and
11   everything that was actually even said in that
12   recorded transcript were completely accurate.
13        Q.      All I'm asking you is when you were talking
14   to the Duke lawyers --
15        A.      Mm-hm.
16        Q.      -- were you being honest with them?
17        A.      Yes.  That's --
18        Q.      Was there any follow-up from the Duke
19   lawyers after that meeting with you?
20        A.      No.
21        Q.      Did you ever talk to anybody from Duke
22   again after that?
23        A.      No.
24        Q.      Okay.  Later in 2014 that same year, you
25   were interviewed by two Greenville police officers,
```

```
 1    Detective Baxter and Sergeant Groccia.  Do you recall

 2    that?

 3         A.    No.

 4         Q.    Do you know either one of those officers?

 5    Do you know --

 6         A.    No.

 7         Q.    -- Detective Baxter?

 8         A.    No.

 9         Q.    Do you know Sergeant Groccia?

10         A.    Yes.

11         Q.    How do you know Sergeant Groccia?

12         A.    We -- we worked together.

13         Q.    What position was she in when you worked

14    together?

15         A.    He.

16         Q.    Oh.  He.  Sorry.

17         A.    We were in patrol division together.

18         Q.    Okay.  So he was a patrol officer?

19         A.    Yes.

20         Q.    And did you ever patrol together?

21         A.    No.

22         Q.    Do you know when he was first hired?

23         A.    No.

24         Q.    Was he at the department when you started?

25    Was he already at the department when you started?
```

1       A.      No.

2       Q.      So he came on after you?

3       A.      Yes.

4       Q.      Did you have any interactions with Groccia

5   when you worked together on patrol?

6       A.      Yes.

7       Q.      Tell me about those.

8       A.      We worked together, and having to respond

9   to different calls together.  That's about the most

10  interaction that we had.  It depended on the call.

11      Q.      So you responded to calls together?

12      A.      Yes.

13      Q.      Did you ever have a case assigned to the

14  two of you to work together?

15      A.      Not that I remember.

16      Q.      Do you remember whether you knew you were

17  going to be visited by Groccia and Baxter in 2014?

18  Like, did they give you a heads-up?  Did you get a

19  phone call or anything like that?

20      A.      No.

21      Q.      What do you remember about them first

22  coming to see you?

23      A.      I really don't remember.

24      Q.      I'm going to show you what we've marked as

25  Exhibit 44.

```
 1                    (WHEREUPON, EXHIBIT NUMBER 44

 2               WAS MARKED FOR IDENTIFICATION.)

 3        Q.    (By Ms. Pfeiffer)  And Exhibit 44 is a

 4    transcript of your conversation with Sergeant Groccia

 5    and Detective Baxter from July of 2014.  Have you had

 6    an opportunity to review this before today?

 7        A.    Yes.

 8        Q.    And when did you review this?

 9        A.    This past week.  This past week.

10        Q.    Okay.  If you take a look at line 16 on the

11    first page (as read): Question: "My name is Jeff

12              Baxter.  We met before and, uh, this is,

13              uh, Sergeant Groccia.  What are you workin'

14              on, Bud?"

15                  Answer: "(Unintelligible.)"

16                  Baxter says: "We met before."

17                  When did he previously meet you?

18        A.    I don't know.  I don't remember.

19        Q.    Do you remember whether they tried to come

20    interview you before this day?

21        A.    Not that I'm aware of.

22        Q.    From the time you testified at the MAR

23    hearing in 1997 to the time that Baxter and Groccia

24    showed up at your house in July of 2014, had you been

25    contacted by anyone about the Sharpe case, other than
```

```
 1   the Duke lawyers?

 2        A.    No.

 3        Q.    I'm sorry?

 4        A.    No.

 5        Q.    Have you spoken with anyone about the

 6   Dontae Sharpe case from the time you testified in

 7   1997 to the time they showed up in July of 2014,

 8   other than to the Duke lawyers?

 9        A.    Have I talked to anyone else, other than

10   the Duke lawyers?  My wife.

11        Q.    And what did you talk to your wife about,

12   as it relates to the Sharpe case in that --

13        A.    About --

14        Q.    -- time frame?

15        A.    -- Rudolf and his little thing on --

16   whatever it was, YouTube or TV, about Dontae Sharpe.

17        Q.    What thing are you talking about?

18        A.    Something that was on TV that Rudolf did.

19   I don't know what it was.

20        Q.    A show or something about --

21        A.    Yeah.

22        Q.    -- Dontae Sharpe?

23        A.    Yeah.

24        Q.    And when you say "Rudolf," are you talking

25   about David Rudolf?
```

```
 1        A.      Yeah.

 2        Q.      So you think there was a show that involved

 3   him and Dontae Sharpe?

 4        A.      I thought it was.  And something about --

 5   it was about Dontae, or I think it had something to

 6   do with Rudolf.  I can't rightly remember.  It's

 7   certainly been some time ago.

 8        Q.      Did you see something on television about

 9   it?

10        A.      I seen something.  I can't remember what it

11   was.

12        Q.      Was it something that you came across on

13   TV, or was it something that somebody brought to your

14   attention?

15        A.      I can't remember.  Honestly, I -- I can't

16   remember.

17        Q.      Do you have any memory of the time frame in

18   which you either heard or saw this television show?

19        A.      No.

20        Q.      Did you talk to Ricky Best at all between

21   1997 and 2014?

22        A.      Was that -- I mean, I have to ask -- the

23   time in Elizabeth City?  I don't know what date that

24   was.  But I spoke to Ricky outside the courtroom in

25   Elizabeth City, "Hey, how you doing?  Good to see
```

```
 1   you."  And I was told "You can leave."  And I left.
 2   That was it.
 3        Q.    And when you're referring to Elizabeth
 4   City, are you talking about the time that you
 5   testified in 1997?
 6        A.    No.
 7        Q.    What time are you talking about?
 8        A.    I was subpoenaed to go to court in
 9   Elizabeth City and appear on something having to do
10   with Dontae.
11        Q.    Do you recall when that was?
12        A.    I don't know.
13        Q.    And Ricky was there as well?
14        A.    Yeah.
15        Q.    And other than saying hello in the hallway,
16   did you have any other conversation with him at that
17   time?
18        A.    No.
19        Q.    Did you have any conversation with him any
20   other time between 1997 and 2014?
21        A.    No.
22        Q.    Did you talk with him after you talked to
23   the Duke lawyers?
24        A.    No -- after the Duke lawyers?  Oh.  That
25   was before -- no.
```

J.A. 1150

```
 1        Q.     When Baxter and Groccia showed up in 2014,
 2   what did they say to you about why they were coming
 3   to talk to you?
 4        A.     As it says in the transcript.  They talked
 5   to me about -- follow-up about Dontae Sharpe.
 6        Q.     What was your understanding about what they
 7   were following up on and why talking to you mattered?
 8   What was your understanding about this whole
 9   interview?
10        A.     I really don't remember what my perception
11   was about them showing up at that point in time,
12   which I didn't know they were recording it.  But...
13        Q.     Did you say you didn't know they were
14   recording?
15        A.     Hm-mm.
16        Q.     So they didn't ask you for your permission
17   to record?
18        A.     Hm-mm.  Not that I remember.
19        Q.     Did they tell you who was supervising their
20   investigation?
21        A.     I can't remember.
22        Q.     Did they tell you if anyone else was
23   involved in this investigation besides the two of
24   them?
25        A.     No, not that I remember.
```

```
 1        Q.    If you take a look at lines 31 through 37.

 2   Line 31, this is you responding, when he says, "Can I

 3   have a few minutes to talk?"

 4               You say (as read): "Yeah, it's fine.

 5   Uh, I tell you 20 years ago to, well, when

 6   -- when I got subpoenaed back to court, um,

 7   I had to go to Elizabeth City and to and

 8   all that shit."

 9               Question: "Yeah."

10               Answer: "I never got paid for nothin'.

11         No gas, no nothin', no time, all day.  I

12         mean..."

13               When -- when you were talking about

14   getting paid, what were you referring to?

15        A.    Well, being subpoenaed and having to drive

16   from Greenville to Elizabeth City, and certainly

17   being self-employed, having to leave -- far as my

18   businesses and all, and as far as what I was -- had

19   been told, that my -- I would get paid for gas, or

20   something along that lines so you can go.

21        Q.    Did someone tell you you were going to be

22   paid?

23        A.    Yeah.  I want to say it was Clark.

24        Q.    And do you remember when that was?

25        A.    Back then, at -- at Elizabeth City.
```

```
 1        Q.     Do you remember him calling you or meeting
 2   with you?  When -- when was that conversation?
 3        A.     It was there at Elizabeth City, same time
 4   when I seen Ricky.
 5        Q.     And do you remember meeting with Everett
 6   when you were in Elizabeth City?
 7                    MS. MARTINEAU:  Objection to the form
 8   of the question.
 9                    You can answer.
10        A.     All I can do is -- I remember him being
11   there, I believe.  That was -- that's about it.  As
12   far as the -- our conversation, I -- I can't really
13   say.
14        Q.     You remember being at Clark Everett's
15   office?
16                    MS. MARTINEAU:  Same objection.
17                    You can answer.
18        A.     I don't remember.
19        Q.     If you turn to page 2, on line 60, and
20   they're asking you about the case.
21                    And you answer (as read): "...the most
22   I can tell you about it, and without, I
23   mean, cause I ain't goin' get a headache
24   over it, and I don't -- I mean, as far as
25   I'm concerned, I mean (Charlene), she said
```

```
 1    what she said, did what she did, and that's

 2    it."

 3                 Question: "Did you have contact with

 4         her that night?"

 5                 Answer: "No, not that night.  It was

 6         after the fact."

 7                 Question: "Okay."

 8                 Question 1: "When she jumped out in

 9         front of your car?"

10                 Answer: "No.  That, um, that was

11         before the shooting.  If I remember

12         correctly, I mean, 20 years ago."

13                 Did I read that correctly?

14    A.    Yes.

15    Q.    And so what you told Groccia and Baxter was

16    that Charlene jumped in front of your car before the

17    shooting, right?

18    A.    Yeah, that's what it's saying.  But if you

19    go back -- well, it's -- I remember reading in the

20    transcript, I was working on a lawnmower out in my

21    driveway with my son.  And I was a little pissed at

22    the time, if memory serves me right, and they -- I --

23    I wasn't really giving it a whole lot of thought, as

24    far as them talking to me about something that was 20

25    years after the fact.
```

```
 1        Q.     I mean, we can agree that that's not --

 2        A.     So --

 3        Q.     -- what you testified to in 1997?

 4        A.     Yeah.

 5        Q.     Right?

 6        A.     Yeah.

 7        Q.     It's different than what you said in 1997,

 8   right?

 9               MR. ELLIS:  Objection.

10               MS. MARTINEAU:  Same objection.

11               You can answer.

12        A.     You said -- it's not the same as what I

13   testified to.

14        Q.     And if you go to page 3, and I'm on line

15   98.  And your answer is (as read): "What I remember

16          about that night, I was only a couple

17   blocks away when it -- when it happened.

18   Um, (Robby), I mean, he was right there.  I

19   don't know.  I think I beat (Robby) there.

20   But."

21               Question: "(Robby Williams)?"

22               Answer: "Yeah."

23                Questioner 1: "Yeah."

24               Answer: "I mean, there was a truck in

25   the lot wrapped up in the fence, and -- and
```

J.A. 1155

```
 1   he shot and bleeding, layin' -- sittin' in

 2   the truck."

 3                  Did I read that correctly?

 4       A.    Yes.

 5       Q.    Did you actually respond to the scene of

 6   the George Radcliffe murder?

 7       A.    Yes.

 8       Q.    And was that something that you wrote any

 9   report about?

10       A.    No.

11       Q.    What about Robby?

12       A.    Robby.  Well, on scene, it was questioned

13   that -- I think me and him both were dispatched.  It

14   was Robby's assigned area, and mine was right beside

15   him.  But me and him both, in that area that night.

16                  And when the call was sent out, I -- I

17   come from one way and Robby come from another, and I

18   beat him there by seconds.  And I seen the truck

19   wrapped up into the fence that was around that old

20   graveyard.  And I went over to the truck, and he's

21   laid over and bleeding.

22       Q.    And what activities, if any, did you engage

23   in that night at the scene?

24       A.    I -- I ended up -- well, Robby was assigned

25   the investigation, the accident investigation,
```

J.A. 1156

```
 1   because major crimes was coming to do the incident
 2   report.
 3                   I went down -- down that -- the street
 4   that it actually occurred on and started asking folks
 5   at the houses what -- what they seen and heard, and
 6   anything like that, you know.  And nobody offered up
 7   anything.
 8        Q.    So you did some canvassing?
 9        A.    Mm-hm.
10        Q.    Did you do any kind of searching in the
11   neighborhood?
12        A.    No, I didn't.
13        Q.    Anything specific as it relates to the
14   scene where the car was and where the body was found?
15        A.    No.  I didn't do anything.
16        Q.    Did you talk to anyone who claimed to be an
17   eyewitness that night?
18        A.    No.
19        Q.    Did you see anyone at the scene who you
20   recognized from that area of town?
21        A.    I don't remember seeing anyone there.
22        Q.    You said you don't remember?
23        A.    No, I don't remember seeing anyone there.
24   As far as onlookers or anything like that, as soon as
25   it happened, the streets were clean.
```

```
 1        Q.      So how soon did you arrive after the car
 2   crashed?
 3        A.      I didn't hear it.  I didn't see it.  And, I
 4   mean, once the call was given, it was, I mean, a
 5   minute, maybe.
 6        Q.      And when you say "a minute," you mean from
 7   the time the call for service came?
 8        A.      Yeah.
 9        Q.      And when you arrived, you said there was
10   not really anybody around the scene?
11        A.      No, nobody that I remember.  I mean, that
12   night, and having been riding in the area, certainly
13   there was a number of people out on the streets.  And
14   certainly, that happened, everybody hauled ass.
15        Q.      So it was different from earlier in the
16   night?
17        A.      Yeah.
18        Q.      What other officers do you remember being
19   on the scene that night?
20        A.      I don't remember.
21        Q.      Were you still on the scene when a
22   detective was assigned?
23        A.      I remember radio traffic about somebody
24   asked if major crimes was called.  And -- now I can't
25   remember.
```

```
 1        Q.    Okay.  Back on the transcript, page 3,
 2   lines 11 -- 111 and 112, the question is (as read):
 3             "Well, really, the only thing that -- that
 4   they're wantin' us to clear up is when it
 5   was that -- that (Charlene) told you, uh,
 6   that she knew."
 7             What did you understand them to be
 8   talking about when they say, "the only thing they
 9   wantin' us to clear up"?  What was your understanding
10   of that?
11        A.    I don't know.
12        Q.    Do you know who the "they" was?
13        A.    No.
14        Q.    Did they tell you?
15        A.    No.
16        Q.    Then if you turn the page, page 4, and then
17   line 159.  And you say (as read): "I tell you, I was
18             really a little pissed, and the mere fact
19             that, uh, here I was locked up, and them
20             motherfucking attorneys come up in there."
21             Who were you talking about here?
22        A.    The Duke fellows.
23        Q.    Were you upset that they were investigating
24   a possible wrongful conviction?
25        A.    Showing up out there interviewing me, yeah,
```

1  I was.  Because I -- actually, I could've ended up

2  dead.

3        Q.    Did you tell them you were upset about them

4  being there?

5        A.    Yes, I -- I did.

6        Q.    And what did they say?

7        A.    I -- I can't remember.  Because, I mean, at

8  the time I was extremely pissed.  I mean, then,

9  coming to find out that -- I didn't find this out

10  until recently, that his -- Dontae's co-defendant was

11  in the damn prison right beside me.  He could've

12  easily made his way right to me, in -- in medical

13  transport, or whatever, if they had it on or found

14  out.

15        Q.    And did you say that to the Duke lawyers?

16        A.    Yeah, I did.

17        Q.    And what did they say?

18        A.    I was pissed.  I mean, I can't remember

19  exact words.  But they didn't really seem to care.

20        Q.    But you continued to answer their

21  questions, nonetheless?

22        A.    I was ready for them to get on out of

23  there, because I couldn't go nowhere.

24        Q.    But you stayed and answered their

25  questions, right?

```
 1                    MS. MARTINEAU:  Objection to the form
 2    of the question.
 3                    You can answer.
 4        A.     They had me detained.  I wasn't going
 5    anywhere.
 6        Q.     How did they have you detained?
 7        A.     I was in prison.
 8        Q.     Well, you're allowed to walk out of a
 9    contact visit at any time?
10        A.     Not where they had me at.
11        Q.     Why is that?
12        A      Because they ended up taking me to the damn
13    warden's office.  Like, I mean, if it had got out
14    that I was once a police officer, regardless of how
15    long it had been --
16        Q.     So the --
17        A.     -- do you know what kind of danger I would
18    have been put in?
19        Q.     So they did your visit in the warden's
20    office?
21        A.     Yes.
22        Q.     In other words, they took precautions to
23    take you out of the general population for the
24    interview, correct?
25                    MS. MARTINEAU:  Objection.
```

```
 1                    MR. ELLIS:  Objection.

 2                    MS. MARTINEAU:  Objection.

 3                    You can answer.

 4      A.    That wasn't precautions.  That was alarms.

 5      Q.    Well, there's one way to have a visit,

 6   which is between the glass, right?

 7      A.    Not there.

 8      Q.    Well, there's also contact visits, correct?

 9      A.    There's only contact visits there.

10      Q.    This was at Neuse at the time?

11      A.    Yes.

12      Q.    And in the contact visit area, that's where

13   you can see other people, right?

14      A.    Yeah.  And it's -- but there's no close

15   contact at Neuse.

16      Q.    But you weren't taken to the contact area,

17   correct?

18      A.    No.

19      Q.    You were brought up to the warden's office,

20   right?

21      A.    Mm-hm.

22      Q.    And when you came to the warden's office,

23   that's when you met with the Duke lawyers, right?

24                    MS. MARTINEAU:  Objection; leading.

25                    You can answer.
```

```
 1        A.     Yeah.

 2        Q.     And then when you left the warden's office,

 3   that's when you went back to your cell, or whatever

 4   you had, whether it was a class or a job.  Right?

 5                MS. MARTINEAU:  Same objection.

 6                You can answer.

 7        A.     Yeah.

 8        Q.     And at Neuse, the warden's office is not

 9   near the general population, right?

10        A.     It's right smack in the middle.

11        Q.     The warden's office is protected from the

12   general population at Neuse, correct?

13        A.     To describe it to you: A black guy that

14   slept in the same room as me, with 54 others, he

15   worked and cleaned the warden's office and the

16   secretary's office.  He's right there in the hallway

17   outside the door looking through the glass at me, and

18   them pushing papers and talking and all.

19                But it ain't going to change nothing

20   now.  But, yeah, at the time I was extremely pissed

21   and upset, because I -- I was scared there for a

22   while.

23        Q.     But my question is, taking you to the

24   warden's office.  It's the location of the warden's

25   office, that's not within the general population at
```

```
 1   Neuse?

 2       A.    It --

 3             MS. MARTINEAU:  Objection; asked and

 4   answered.

 5             You can answer.

 6       A.    It is.

 7       Q.    If you go down a couple lines to 168 and

 8   169.  And this is after a question, started to

 9   interrupt you, and you said (as read): "I was -- I

10          mean -- I about to slap shit out of both of

11          them attorneys that were there."

12             You talking about the Duke lawyers

13   again?

14       A.    Yes.

15       Q.    And if you were in the warden's office,

16   what stopped you from doing that?

17       A.    It still would be an assault.  It wouldn't

18   have got me out no sooner.

19       Q.    If you turn to page 6.

20             MS. MARTINEAU:  Can you just tell me

21   what Bates number?  I'm sorry.

22             MS. PFEIFFER:  Sorry?

23             MS. MARTINEAU:  The Bates number, just

24   for me.

25             MS. PFEIFFER:  I don't have a Bates on
```

```
 1   this --

 2                MS. MARTINEAU:  Oh, you don't?

 3                MS. PFEIFFER:  Yeah, if you -- this --

 4   my -- well, I don't have it on mine.  It's page 6 --

 5   up in the right-hand corner, it's the page 6.

 6                MS. MARTINEAU:  Oh, I see it.

 7                MS. PFEIFFER:  Yeah.

 8        Q.    (By Ms. Pfeiffer)  And then I'm going to go

 9   down to line 262.  You with me there?  You with me,

10   sir?

11        A.    2...

12        Q.    Line 262 --

13        A.    Yeah.

14        Q.    -- on page 6.

15        A.    Yeah.

16        Q.    Okay.  Your answer (as read): "Talked to

17              me, mainly, but then there was another one

18              too.  He only asked me a couple things.  We

19              talked..."

20              Question: "Okay."

21              "... about it.  Uh, I'm gonna -- right

22              now, I'm a -- I felt like I told him more

23              and remembered more with him than I -- I'm

24              actually right now."

25              Did I read that correctly?
```

```
 1        A.      Yes.

 2        Q.      And so when you talked with the Duke

 3   lawyers, did you have a better memory of the events

 4   than you did at this time?

 5        A.      It was -- it seemed to me, at the time, it

 6   was like I was having another memory, but it wasn't

 7   the same as what the original transcript was.

 8               Or just like what the original

 9   transcript was, and this interview here.  I mean, I

10   wish we did have a transcript from their interviews

11   that they recorded.

12               Well -- I told Bruce that, what it

13   seemed like at the time, what I was remembering.  Had

14   some additional details in it.  But right now --

15   that's from reading this transcript.  But right now,

16   I can't remember what those are.

17        Q.      If you turn to page 7.

18        A.      We were on 7.

19        Q.      Page 7.

20        A.      Oh, okay.

21        Q.      You with me?

22        A.      Yeah.

23        Q.      Okay.  And I'm on lines 2- -- wait -- 278,

24   okay?

25        A.      Mm-hm.
```

```
 1        Q.    And this is a response about what
 2   information you gave them.  And you -- you say (as
 3   read): "And then too, uh, what's the name?  The, um,
 4         the black guy, the detective in" --
 5              Question: "(Carolyn Melvin)?"
 6              Answer: "(Carolyn Melvin) and the
 7         black guy, um, lieutenant."
 8              Question: "Was it Willy?"
 9              Answer: "Um, him and (Carolyn Melvin)
10         were screwin'."
11              Question 1: "(Reed)?"
12              "No."
13              Answer -- sorry.  Answer:  "No."
14              Question 1:  "No?"
15              Answer:  "No, not (Reed).  The, um,
16         damn."
17              Q 1: "Oh, the (For)."
18              A: "Fo-uh, um."
19              Question:  "(Fordum) or?"
20              Answer:  "Yes, I think so (Fordum)."
21              MS. MARTINEAU:  I'm just going to
22   object to the extent the parentheses, I don't know if
23   that's something that was spoken or just appears on a
24   transcript.
25              MS. PFEIFFER:  Sure.
```

J.A. 1167

```
 1                         MR. ELLIS:  Same objection.
 2         Q.      (By Ms. Pfeiffer)  Did you know Carolyn
 3    Melvin when you were working as a patrol officer in
 4    1994?
 5         A.      No.
 6         Q.      You did not know her?
 7         A.      No.  You could say I just knew her name.
 8    She was a detective.  We didn't interact in any way.
 9         Q.      What are you referring to when you were
10    talking about --
11         A.      That her and Lieutenant Fordum were having
12    an affair for the longest time at the department.
13         Q.      And how did you know that?
14         A.      Just folks running their mouth talking
15    about it.
16         Q.      Was it something that people talked about
17    within the department?
18         A.      Mm-hm.
19         Q.      And did that impact how people acted around
20    her?
21         A.      I don't know.  Because like I said, I
22    didn't have any interaction with her.
23         Q.      Did you have any opinion about what kind of
24    detective she was?
25         A.      I hadn't been around her enough to form --
```

 1    to formulate that.

 2         Q.    Did you work on any cases where she was the

 3    lead detective?

 4         A.    I can't remember.

 5         Q.    Did you work with her at any time when she

 6    wasn't a detective, when she was on patrol, or

 7    anything like that?

 8         A.    No.

 9         Q.    Did her having an affair with another

10    officer impact the working environment, generally, at

11    the GPD?

12              MS. MARTINEAU:  Objection to the form

13    of the question.

14              You can answer if you know.

15         A.    I don't know.

16         Q.    What do you mean, you don't know?

17         A.    I don't -- I don't know if it did.  It

18    didn't have anything to do with me.

19         Q.    But it was something that people talked

20    about?

21         A.    Yes.

22              MR. ELLIS:  Objection.

23         Q.    (By Ms. Pfeiffer)  Did you know that

24    Carolyn Melvin was an alcoholic?

25              MR. ELLIS:  Objection.

```
 1                      MS. MARTINEAU:  Objection; foundation.

 2                      You can answer.

 3         A.     No, I don't -- didn't know it, hadn't heard

 4    it.

 5         Q.     That was -- was that something talked about

 6    in the department?

 7         A.     There was something that was talked about,

 8    as far as that was concerned.

 9         Q.     About her being an alcoholic?

10         A.     No.  Others that were.

11         Q.     Alcoholics?

12         A.     Mm-hm.

13         Q.     Who were some of those other people who

14    were alcoholics in the department?

15                      MS. MARTINEAU:  Objection.

16                      You can answer.

17         A.     I can remember faces.  I can't remember

18    names now.

19         Q.     Okay.  Were there a number of people?

20         A.     There was a few.

21         Q.     Still on page 7, if you go down to line

22    307, and you're still talking about Carolyn Melvin

23    here.

24                      And your answer is: "Yeah."

25                      MR. ELLIS:  Objection.
```

```
 1         Q.      (By Ms. Pfeiffer)  (As read): "Yeah.  But
 2              they -- he left, and when she -- when she
 3     quit and went P.I., I mean, he quit for
 4     somethin' happenin'.  I mean, the -- the
 5     two of them.  Because of the two of them,
 6     and, uh, when (Carolyn)" -- and Carolyn is
 7     in parens -- "left and got her PI mess, and
 8     then she got back involved in -- in the
 9     case, and basically she was rebukin' her
10     initial investigation."
11                 Do you see that?
12         A.      Yes.
13         Q.      How did you learn about Carolyn Melvin
14     becoming a private investigator?
15         A.      I can't remember.
16         Q.      How did you learn that she was -- well, let
17     me ask this: What did you mean when you said,
18     basically, she was rebuking her initial
19     investigation?
20         A.      Well, from her having the investigation,
21     and then leaving the department to go and work as a
22     PI, and working for Dontae Sharpe, that's...
23         Q.      That's what you meant by "rebuking the
24     investigation"?
25         A.      Mm-hm.
```

```
 1        Q.      Do you have any idea why she did that?

 2        A.      No.  For more money, I guess.

 3        Q.      And do you know how it was you learned this

 4    information about her rebuking her initial

 5    investigation about, as you put it, working for

 6    Sharpe?

 7                MR. ELLIS:  Objection.

 8                MS. MARTINEAU:  Same objection.

 9                You can answer.

10        A.      I don't remember.

11        Q.      Did you talk with anybody at GPD about this

12    when you learned it?

13        A.      When I -- when I learned about her being a

14    PI?

15        Q.      Correct.

16        A.      No.  I've never talked to anybody at the

17    police department about her, period.

18        Q.      Did you talk to Ricky Best about her --

19    about her --

20        A.      I can't remember.

21        Q.      -- looking into the Dontae Sharpe case?

22        A.      I can't remember.

23        Q.      If you turn the page to page 8, line 315,

24    up at the top.  This is your answer (as read): "After

25            the fact of now bein' a PI.  And that --
```

J.A. 1172

```
 1   that caused some problems, if I'm not

 2   mistaken, with -- with the case and the

 3   conviction and -- and everything else."

 4              What did you mean by that, by causing

 5   some problems?

 6       A.    Well, about her doing the initial

 7   investigation, and then turning into a PI to figure

 8   out a way of getting him off.

 9       Q.    And how did that cause problems?

10       A.    I'm not sure.  I was just saying that she

11   turned around and did the initial investigation, and

12   turned around and knew it inside and out, and what,

13   who.  And she interviewed, and -- what evidence there

14   was, and the -- the holes in the investigation on how

15   to handle his conviction.

16       Q.    I'm not sure I understand your answer.

17       A.    Like I said, she did the investigation

18   while at the police department, then goes, gets her

19   -- leaves the department, becomes a PI, and goes to

20   work for him to get him off.  What conflict don't you

21   see?

22              I mean, she was working for Dontae to

23   get him off after knowing all the information that

24   she did, and everybody she interviewed, and -- and so

25   forth.
```

```
 1      Q.      Does it make sense to you that if she
 2  looked at the case and thought that it was pretty
 3  thin, that she ought to reinvestigate it if she felt
 4  some guilt about it?
 5                  MS. MARTINEAU:  Objection --
 6                  MR. ELLIS:  Objection.
 7                  MS. MARTINEAU:  -- lack of foundation.
 8                  You can answer.
 9      A.      I have no idea --
10                  MR. ELLIS:  Move to strike.
11      A.      -- her thoughts.
12      Q.      Do you think it's appropriate for somebody
13  who's been wrongfully convicted to fight that
14  conviction?
15                  MS. MARTINEAU:  Same objection.
16                  You can answer.
17      A.      That's for them to decide.
18      Q.      Well, do you think it's appropriate?
19                  MS. MARTINEAU:  Same objection.
20                  You can answer.
21      A.      If someone believes themselves to be
22  wrongfully convicted, and that there's no evidence to
23  support the conviction, then they should fight.
24      Q.      On this same page, lines 333, and starting
25  at 332, it says (as read): "I can't remember all that
```

```
 1              she said.  There was some other folks out
 2              there with him."
 3                    Do you see that?
 4                    MS. MARTINEAU:  Can you show me again?
 5    I lost you.
 6                    MS. PFEIFFER:  Yeah.  Page 8 still,
 7    tail end of line 332 and to 333.  At 332, it starts
 8    (as read): "I can't remember all that she said.
 9               There was some other folks out there with
10              him."
11                    You see that?
12                    MS. MARTINEAU:  You can go ahead and
13    read it.
14       A.    Yeah.
15       Q.    Okay.  Do you know who the "other folks"
16    were?
17       A.    No.
18       Q.    It goes on to say (as read): "They were
19              hangin' out, and had been hangin' out on
20    that corner, whatever, because they were
21    sellin', and -- and she was back and forth,
22    and with a -- a crowd, another crowd of
23    younguns.  I mean, there was more than just
24    her saw him pull the truck."
25                    Who were the other crowd of younguns
```

```
 1    that you're referring to?

 2         A.    I don't know.

 3         Q.    What are --

 4         A.    I don't know them.

 5         Q.    What are you talking about here?

 6         A.    The other kids hanging out there with her.

 7    With her --

 8         Q.    Are you --

 9         A.    -- with Charlene.

10         Q.    Are you talking about on the night of the

11    Radcliffe murder?

12         A.    Yes.

13         Q.    And is that something that she told you?

14               MS. MARTINEAU:  Objection to the form

15    of that question, as to who "she" is.

16               But you can answer.

17         A.    Yes.

18         Q.    When did Charlene tell you that?

19               MS. MARTINEAU:  Same objection.

20               You can answer.

21         A.    I can't remember.

22         Q.    And when you say "...there was more than

23    just her saw him pull the truck," what are you

24    talking about there?

25         A.    I don't know what -- what that is there.
```

```
 1        Q.      Unclear to you?

 2        A.      Yeah.  I mean, as far as the -- I have no

 3   idea.

 4        Q.      Charlene never said anyone about pulling a

 5   truck -- said anything about pulling a truck to you,

 6   right?

 7        A.      It's in this transcript.  I didn't take it,

 8   so I don't know.  I didn't --

 9        Q.      But I'm saying --

10        A.      -- record it.

11        Q.      -- when you talked to Charlene, she didn't

12   say anything about somebody pulling a truck, right?

13        A.      No.

14        Q.      Turn a couple pages to page 10, and I'm at

15   line 415 here.  I'm going to read this down to 429.

16             So at line 415, the question is (as

17   read): "One more question.  Can you remember, um,

18             whether she told you when you took her to

19             the hospital that night?"

20             Answer: "What about when I..."

21             Question: "When you were takin' her to

22             the hospital."

23             Answer: "Yeah."

24             Question: "Did she tell ya -- was she

25             talkin' to you that night about it?"
```

```
 1                    Answer:  "Uh-uh, no.  I mean, it
 2              wasn't that night when she told me.  Um,
 3    she told me it was one day that I stopped
 4    by her house, and, uh -- and, I mean, just
 5    was talking to her about this, that, and
 6    the other.  And it just popped in my head,
 7    well, shit, let me ask her and see if she's
 8    heard anything through the grapevine about
 9    that."
10                    Question:  "Mm-hm."
11                    Answer: "Mm-hm.  I mean, and that's
12              all I do.  I mean, I can't, uh, even -- it
13    -- it was still daylight, if I remember,
14    when I stopped by there."
15                    Did I read that correctly?
16        A.    Yeah.
17        Q.    So you told Baxter and Groccia that
18    Charlene did not talk to you when you took her to the
19    hospital, right?  That's what you told them?
20        A.    Well, what's in the transcript.  I don't
21    remember what I told them.
22        Q.    But if that's what they recorded and
23    transcribed here, that's -- that's what you said,
24    right?
25        A.    Yeah.
```

```
 1        Q.      And what's in this transcript is that you

 2    told them that you just stopped by her house one day,

 3    and that's when she told you, right?

 4                    MS. MARTINEAU:  Objection; leading.

 5                    You can answer.

 6        A.      I don't know.

 7        Q.      Well, is that what it says here?

 8        A.      That's what it says here.

 9        Q.      And if they transcribed this from an audio

10    recording with you, that's what you told them, right?

11        A.      I guess so.

12        Q.      And what you said is, you were just talking

13    with her, and it popped into your head to see if she

14    had heard anything through the grapevine, right?

15    That's what you told Groccia and Baxter?

16        A.      I'm trying to remember this.  And this is

17    from my original -- original transcript in -- in

18    court.  And now, however long it may have been in

19    between the two, some sequence is not adding up to

20    me, thinking about it.

21        Q.      Right.  I mean --

22        A.      So it's -- it's in the transcript, but I

23    don't believe it to be accurate.

24        Q.      So in other words, what you told Baxter and

25    Groccia was different from what you testified to in
```

```
 1   1997, right?

 2        A.     Yeah.

 3        Q.     I mean, nothing in here says anything about

 4   Charlene running in front of cars on the day that she

 5   talked to you, right?

 6               MS. MARTINEAU:  Objection to the form

 7   of that question.  Leading.

 8               You can answer.

 9        A.     It does not -- in this transcript, it

10   doesn't say anything about it.

11        Q.     It doesn't say anything in this section we

12   just read, does it?

13        A.     In this section, no.  But you're saying in

14   the transcript.

15        Q.     Well, you're welcome to read it later.

16        A.     Yeah.

17        Q.     But my question is right here in this

18   section, whether there's anything about Charlene

19   running in front of cars on the day that she talked

20   to you.

21        A.     In that section, it doesn't.

22        Q.     Is there anything in this section about you

23   worrying that she was on drugs that day that she

24   talked to you?

25        A.     In -- in that section, it doesn't.
```

```
 1        Q.     Okay.  Nothing in here about you talking to
 2    Charlene's mother about involuntary commitment,
 3    right?
 4                    MS. MARTINEAU:  Objection.
 5                    You can answer.
 6        A.     If you start at the beginning of the
 7    transcript and the questions they asked me about, it
 8    isn't.
 9        Q.     This description that we've just gone
10    through here, it's fair to say it is very different
11    from the description that you gave in 1997, right?
12        A.     Yes.
13        Q.     If you turn to page 11, and if you go down
14    to 452 to 464.  And your answer is (as read): "Well,
15            the best that I can remember, which, when I
16    testified -- I don't -- well, I don't even
17    think, I mean, I had any kind of notes or
18    anything, or got -- heard that right.  So
19    -- okay.  You say you saw this dude.  Put
20    it on paper for me.  I mean, I didn't do
21    that shit.  I mean..."
22                    Question 1: "You just turned it in."
23                    Answer: "I just told him.  Yeah."
24                    Question: "Right."
25                    Answer: "I just passed on whatever,
```

```
 1               whether it was legit or not.  Now it was up

 2               to the detective."

 3                    And this is what we just talked about

 4     before, right, that you gave this to Ricky Best

 5     because you believed he was going to follow up on it,

 6     right?

 7          A.     Mm-hm.  Yes.

 8          Q.     And it wasn't your job to verify what she

 9     had said.  That was the job of the detective, right?

10                    MS. MARTINEAU:  Objection.

11                    You can answer.

12          A.     That's what I believed.

13          Q.     And then on that same page, if we go to

14     472.  And your answer is (as read): "I mean, I cou-

15               -- I mean, if, um, the lieutenant or

16     captain, or whoever, if the answer, which,

17     uh, (John Ennis)" -- and that's in parens

18     -- "was the lieutenant at the time, I

19     think.  But I for- -- I remember correctly.

20     Um, if he had said, okay, well, look, you

21     gonna work with Detective (Best) on this

22     case, and your -- I'm assigning you to do

23     it, and duh, duh, duh.  I mean, if that had

24     a happened, yeah, I would've been more

25     thorough, more persistent and
```

```
 1    consistent..."

 2                    Did I read that correctly?

 3    A.    Yes.

 4    Q.    And, again, this is what we talked about

 5    before.  You weren't assigned to this case, right?

 6    A.    No.

 7    Q.    And if you had been assigned to the case,

 8    that's when you would've been more thorough, right?

 9              MS. MARTINEAU:  Objection.

10              You can answer.

11    A.    I could have been.

12    Q.    Well, this is what you said, right?

13              MS. MARTINEAU:  Same objection.

14              You can answer.

15    Q.    (By Ms. Pfeiffer)  That if you had been

16    assigned to the case, you would've been more

17    thorough?

18              MS. MARTINEAU:  Same objection.

19              You can answer.

20    A.    Yes.

21    Q.    And if you had been assigned to the case,

22    you would've been more persistent, right?

23              MS. MARTINEAU:  Same objection.

24    A.    Yes.

25    Q.    And if you had been assigned to the case,
```

```
 1   you would've been more consistent, right?

 2                MS. MARTINEAU:  Same objection.

 3        A.    Yes.

 4        Q.    Was there some policy or understanding at

 5   the GPD that you should only be thorough if you are

 6   assigned specifically to a case?

 7        A.    Thorough.  I shared the information I

 8   acquired with Ricky Best.  And as far as it being

 9   thorough, I -- I passed on to him what I knew.

10        Q.    But my question is different.  My question

11   is: Was there a policy or some understanding at the

12   GPD --

13        A.    No policy --

14        Q.    -- that --

15        A.    -- that I'm aware of.

16                MS. MARTINEAU:  You guys are talking

17   over each other.

18        Q.    (By Ms. Pfeiffer)  Let me finish my

19   question.

20                MS. MARTINEAU:  Let her finish, and

21   then you answer.

22        Q.    (By Ms. Pfeiffer)  Was there a policy or

23   understanding at the GPD, that the only time needed

24   to be thorough was if you had been assigned to a

25   case?
```

```
 1        A.      No.
 2        Q.      Was there a policy or practice at the GPD
 3   that you only had to be thorough if -- or, rather,
 4   persistent, if you were assigned to a case?
 5        A.      No.
 6        Q.      Was there a policy or understanding at the
 7   GPD that you should only be consistent if you were --
 8   unless -- if you were assigned to the case?
 9        A.      No.
10        Q.      What was the policy around what to do if
11   you received information from someone who claimed to
12   be an eyewitness to a murder?
13        A.      Policy?
14        Q.      (Nodded.)
15        A.      I don't know.
16        Q.      Was there a policy?
17        A.      I don't know.
18        Q.      Why don't you know?
19        A.      It was 30 years ago.
20        Q.      When you worked at the GPD, did you follow
21   the policies?
22        A.      I attempted to.
23        Q.      So if you didn't give any information to
24   Ricky Best about the circumstances under which you
25   met Charlene, would that have been following policy?
```

1                    MS. MARTINEAU:  Objection;

2    argumentative.

3                    You can answer.

4        A.    I don't -- ask your question again.

5        Q.    **Would it have been following the policy if**

6    **you didn't provide Ricky Best with any of the details**

7    **surrounding your interaction with Charlene?**

8        A.    I wouldn't have been doing my job.  As far

9    as it being a policy, I -- I can't answer that.

10       Q.    **Because that would be important information**

11   **for Ricky Best to have, right?**

12       A.    Yes.

13                   MS. MARTINEAU:  Objection.

14                   You can answer.

15                   THE WITNESS:  Can we take a break now,

16   please?

17                   MS. PFEIFFER:  Actually, yep, now is a

18   good time to take a break.  Ten minutes?

19                   MS. MARTINEAU:  Yes.

20                   THE VIDEOGRAPHER:  Off record at 4:13

21   p.m.

22         (WHEREUPON, A SHORT BREAK WAS TAKEN.)

23                   THE VIDEOGRAPHER:  On record at 4:27

24   p.m.

25       Q.    **(By Ms. Pfeiffer)  Mr. Shrock, I'm going to**

J.A. 1186

```
 1   mark Exhibit 45 and ask you a couple questions about

 2   this.

 3                  (WHEREUPON, EXHIBIT NUMBER 45

 4                  WAS MARKED FOR IDENTIFICATION.)

 5       Q.    (By Ms. Pfeiffer)  I've handed you what's

 6   labeled "Employee Conference Report."  And the name

 7   is Jeffery Shrock, and the date is January 10th,

 8   1993.

 9                  That date up -- up at the top, though,

10   is the date of the conference report.  The subject of

11   the conference is described below under "Reason for

12   conference."  And it says (as read): "On 24 December,

13           1992, Officer Friday and Shrock were

14   dispatched to 2245 Stantonburg Road, i.e.,

15   Greenville Plastic Surgery, P.A.

16                  "Officer Friday and Shrock mistakenly

17   responded to 2577 Stantonburg Road,

18   Greenville Aesthetic and Plastic Surgery

19   Associates.  The keyholder at 2245

20   Stantonburg had to secure his business

21   without police assistance.  This was a

22   violation of policy number 301.11.A.11

23   [sic]."

24                  Did I read that correctly?

25       A.    Yes.
```

```
 1      Q.      Do you remember this occurrence?

 2      A.      Some.  Not -- not entirely.

 3      Q.      Do you have any idea why you showed up at a

 4  different address that doesn't look to be similar in

 5  number to the one above?

 6      A.      I can't remember.

 7      Q.      Did this result in any sort of consequence

 8  for you?

 9      A.      No.

10      Q.      Okay.  You didn't receive any points or

11  anything like that?

12      A.      No.

13      Q.      I'm going to --

14      A.      Might have.  I -- I can't remember.

15              MS. PFEIFFER:  I'm going to mark the

16  next exhibit as 46.

17              (WHEREUPON, EXHIBIT NUMBER 46

18              WAS MARKED FOR IDENTIFICATION.)

19      Q.      (By Ms. Pfeiffer)  Exhibit 46 is another

20  employee conference report.  This is named Jeffery

21  Shrock and the date is January 4th, '93, for the

22  conference.

23              The reason for the conference reads

24  (as read): "Officer Shrock violated Policy Number 301

25              C.1. on 2 January '93, by falling asleep
```

J.A. 1188

```
1              while on duty and assigned a patrol

2              district."

3                   Do you remember why it was you fell

4    asleep while you were on duty?

5         A.    Well, best I remember, we had just switched

6    to 12-hour shifts.  And we had talked about it, it

7    was, like, we worked two nights, and then we had a

8    few days off, and then we had to work three days, 12

9    hours.

10                  I come back the first day of having

11   just switched.  And what we had previously talked

12   about with the supervisors and all, you know you're

13   going to get sleepy or whatever, and if you find

14   yourself getting sleepy, come on back to the

15   department, and lay down on the conference table, if

16   you have to, whatever.

17                  Well, I -- I ended up -- I caught

18   myself where, I didn't even know it, I was sitting

19   still and dozed off.  Somebody called me, and I

20   didn't answer them the first time.  Then I -- asked

21   for me the second time and I answered.

22                  And when I got back in the office, I

23   told my supervisor what had happened, not that he

24   questioned it or anything of that nature.  And Phil

25   was, like, "You know I got to tell the sergeant."
```

```
 1    And it rolled downhill from there, even though I told
 2    on myself.  So that was that.
 3         Q.    So this is an example of what you were
 4    talking about earlier, when you said it was
 5    exhausting to be --
 6         A.    Yes.
 7         Q.    -- to be working a 12-hour shift?
 8         A.    Yeah.
 9         Q.    And once you started the 12-hour shifts,
10    did those remain for the period of time that you
11    were --
12         A.    Yeah.
13         Q.    -- employed --
14         A.    Yeah.
15         Q.    -- at GPD?
16         A.    It was a matter of, certainly, getting used
17    to it.
18         Q.    And had you been drinking at all?
19         A.    No.
20         Q.    Any drugs or anything?
21         A.    No.  Hm-mm.  At that period of time, I
22    hadn't drank anything in eight years.
23         Q.    So you were just plain exhausted?
24         A.    Mm-hm.  Yep.  Just the switching over,
25    going from 8 to 12, and it being basically the third
```

```
 1   night of night shift on 12, and having been off for
 2   two, and trying to get that rotation of sleeping,
 3   well, I need to go to bed at this time, and wake up
 4   at this time to go to work.  And it was hard.
 5       Q.    Fair to say it's not like the normal body
 6   clock?
 7       A.    No.
 8             MS. PFEIFFER:  I'm going to mark our
 9   next exhibit as 47.
10             (WHEREUPON, EXHIBIT NUMBER 47
11             WAS MARKED FOR IDENTIFICATION.)
12       A.    The thing was, I told on myself.  I mean, I
13   have no reason to lie about it.
14       Q.    Exhibit -- Exhibit 47 is from -- a letter
15   from Lieutenant Sawyer to Chief Hinman dated May
16   10th, 1993.  And the subject is "Officer J.D.
17   Shrock's evaluation."
18             It reads (as read): "on February 18th,
19   1993, Officer J.D. Shrock's evaluation was
20   stayed due to violations of policy.
21   Officer Shrock has accepted the staying of
22   his evaluation in a truly professional
23   manner.  He has used this most unfortunate
24   incident to make himself a better police
25   officer.
```

```
 1                    "Officer Shrock has kept a very good

 2     attitude and continues to serve in a

 3     professional manner.  As his immediate

 4     supervisor, I would recommend his merit

 5     increase be processed at this time."

 6                    What was -- what were the violations

 7     of policy that stayed --

 8         A.    That was the previous one that you read.

 9         Q.    It was related to the sleeping?  Okay.  And

10     were you told that because you self-reported, that

11     you were to be commended?

12         A.    I can't remember anything about that one.

13                    MS. PFEIFFER:  The next exhibit is 48.

14                    (WHEREUPON, EXHIBIT NUMBER 48

15                    WAS MARKED FOR IDENTIFICATION.)

16         Q.    (By Ms. Pfeiffer)  Exhibit 48 is a letter

17     to you from the chief of police, Chief Hinman, on

18     June 14th, 1995.

19                    And the chief says (as read): "I

20     appreciate your participation in the review

21     process for police sergeant.  I regret to

22     inform you that you were not selected.

23     Your score was 65 out of a possible 159

24     points.  If you would like to review your

25     test results, please contact Captain Randy
```

```
 1    Nichols."
 2                    Do you remember what test you had to
 3    take when applying to be a sergeant?
 4         A.    No, I don't.
 5         Q.    I'm sorry?
 6         A.    No, I don't.
 7         Q.    Do you have any idea what the evaluation
 8    criteria was to be sergeant?
 9         A.    I can't remember.
10         Q.    Did you follow up with Captain Randy
11    Nichols to look at your test results?
12         A.    No.  I definitely would've remembered that.
13    But...
14         Q.    What would you have done --
15         A.    I said I would have -- would've remembered,
16    if I had to talk to Randy about it.  But I don't
17    remember at all.
18         Q.    Why do you say that?
19         A.    Well, somewhat memorable moment to find out
20    why I didn't -- why I scored as low as I did.
21         Q.    I'm sorry.  I didn't hear your answer.
22         A.    I would've liked to have known why I scored
23    as low as I did, if I had've asked him.  But I don't
24    remember it, and I don't believe I talked to him
25    about it.  So...
```

```
 1        Q.      Would that be a conversation that you would
 2   remember?  Going --
 3        A.      Yeah.
 4        Q.      -- to Captain Nichols?
 5        A.      Yeah.  Yeah.
 6        Q.      Why would that be something you'd remember?
 7        A.      Because of the test for a sergeant, and
 8   only scored 65 out of 159, because I would've thought
 9   I'd have done a whole hell of a lot better than that.
10        Q.      But you don't recall --
11        A.      Hm-mm.
12        Q.      -- inquiring about why?
13        A.      No.  I don't even remember this, as far as
14   this letter.
15        Q.      Okay.  The next exhibit I'm handing you is
16   49.
17                 (WHEREUPON, EXHIBIT NUMBER 49
18                 WAS MARKED FOR IDENTIFICATION.)
19                 MS. MARTINEAU:  Thank you.
20        Q.      (By Ms. Pfeiffer)  Exhibit 49 is a letter,
21   again, from the chief of police to you.  This is
22   dated August 28th, 1995.  The subject is "Criminal
23   intelligence position."
24                 And the chief writes (as read): "After
25   a thorough review process, I regret to
```

**J.A. 1194**

```
 1    inform you you were not selected for the
 2    criminal intelligence position.  Thank you
 3    for your interest and for your support at
 4    the Greenville Police Department."
 5                  What was the criminal intelligence
 6    position?
 7        A.    I'm really not sure what they're referring
 8    to here.
 9        Q.    Was that a -- was there a specific division
10    called criminal intelligence?
11        A.    I don't recall.
12        Q.    Do you remember applying for a promotion?
13        A.    No, I don't.
14        Q.    Do you recall any follow-up conversations
15    about this rejection?
16        A.    No.
17        Q.    The next exhibit I'm going to hand you is
18    Exhibit 50.
19                  MS. MARTINEAU:  Thank you.
20                  (WHEREUPON, EXHIBIT NUMBER 50
21                  WAS MARKED FOR IDENTIFICATION.)
22        Q.    (By Ms. Pfeiffer)  Exhibit 50 is an
23    employee conference report.  The name is Jeffery D.
24    Shrock, and the date of the conference report is
25    April 12th, 1996.
```

1                    The reason for the conference details

2     the date on which the conference is based.  And it

3     reads (as read): "On March 15th, 1996, Officer Shrock

4                was negligent in the performance of his

5                duties, which allowed for the escape of a

6                prisoner from his custody while at the

7                magistrate's office."

8                    Do you recall this?

9        A.    No, I do not.  I believe I would've

10    remembered this.  I do not.

11       Q.    You see in the lower left-hand corner sort

12    of midway up, it says "Employee," and then there's a

13    signature there?

14       A.    Yeah, but...

15       Q.    That's your signature?

16       A.    Yeah.  I don't -- I can't remember the

17    incident that this was.  That's -- I don't remember.

18       Q.    The second paragraph talks about the action

19    taken, and refers to neglect of duty as a Class II

20    violation under Chapter 26 of the Greenville Police

21    policy and procedures?

22                "Disciplinary action for a Class II

23                offense is a written reprimand and the

24                assessment of 10 points."

25                    Do you remember being assessed 10

```
 1    points for this?

 2         A.      I don't remember any of it.

 3         Q.      You don't remember meeting with anyone

 4    about this either?

 5         A.      Hm-mm.  I don't --

 6         Q.      Or any --

 7         A.      I don't remember the incident itself.

 8         Q.      Nor do you remember the meeting with

 9    anyone?

10         A.      Hm-mm.

11         Q.      The next exhibit I've marked is Exhibit 51.

12                 (WHEREUPON, EXHIBIT NUMBER 51

13                 WAS MARKED FOR IDENTIFICATION.)

14         Q.      (By Ms. Pfeiffer)  And on the first page of

15    this, there is an employee complaint file card.  So

16    these two pages contain copies of employee complaint

17    file cards from your internal affairs file.

18                 The first one, in the upper left-hand

19    corner, is dated 3/15/96, and it's "Neglect of Duty."

20    Do you recall, is this -- whether this is the same

21    neglect of duty that we just discussed in that

22    reprimand, or was there a second time when there was

23    a neglect of duty complaint?

24         A.      By the date, I guess that was -- the first

25    one was Exhibit 50.
```

```
 1        Q.    Okay.  The next one over, the occurrence

 2   date is April 4th, 1996.  The allegation is

 3   "Attitude/Demeanor."  What, if anything, do you

 4   remember about this complaint?

 5        A.    I don't know.

 6        Q.    Do you recall any of your superiors

 7   complaining about your attitude or your demeanor?

 8        A.    Hm-mm.

 9        Q.    Do you recall any other patrol officers

10   complaining about your attitude or demeanor?

11        A.    No.  It says, "Unfounded."  I have no idea

12   what it -- what it was or what it was about.

13        Q.    The next one down, the allegation -- date

14   of occurrence is November 13th, 1993.  The allegation

15   is "Unjust arrest and excessive force.

16   Officer/employee, J.D. Shrock."

17              Do you remember anything about this

18   complaint?

19        A.    No.

20        Q.    Do you remember whether there were any

21   complaints against you by fellow officers for unjust

22   arrest or excessive force?

23        A.    No.

24        Q.    Do you still have the transcript of your

25   conversation with Baxter in front of you?
```

J.A. 1198

```
 1        A.     Yeah.

 2        Q.     If you turn to page 12, and down on line

 3   519 -- sorry, no, let me back up.  517.  "My first --

 4   my damn first day working I worked in," do you see

 5   that?  It's three lines down.  It might even be line

 6   516.  Do you see where I am in the paragraph?  It

 7   says, "My damn first day working."  Do you see that?

 8               MS. MARTINEAU:  Give him a second.

 9        A.     It's 517.

10        Q.     Do you see that --

11        A.     Yeah.

12        Q.     -- where I am?  Okay.  And it says (as

13   read): "My damn first day workin' I worked

14   in Williamston a year before I came to

15   Greenville, and, uh, shit, my first day,

16   um, m- (Marie)" -- that's in parens -- "uh,

17   (Jersey)'s" -- that's in parens -- "was

18   supposed to be my training officer at the

19   time, and shit, uh, but I mean, first day,

20   probably weren't two hours within the

21   shift, had a shoplifter at Piggly -- was a

22   Piggly Wiggly down on 10th Street.

23               "Uh, got there, and a big black woman

24   had all grades of steaks and shit crammed

25   in her pants and all over the place.  And
```

```
 1    the manager was kinda -- trying to get her

 2    to stop, and she went in -- which, me and

 3    (Maria)" -- in parens -- "saw it.

 4                    "We were goin' back, and we ended up

 5    in the very back of the store in a hallway.

 6    She had nowhere to go.  Next thing I know,

 7    she took a damn box cutter and cut me

 8    across -- I mean, I think -- I mean, I had

 9    my vest on, thank goodness.

10                    "But at that point in time, I grabbed

11            her by the throat, jumped on her ass, and

12            put my gun right between her eyes."

13                    Did I read that correctly?

14        A.    Yes.

15        Q.    Is it possible that this is the excessive

16    force complaint?

17        A.    No.

18        Q.    Do you recall whether --

19        A.    That was my first day of working at

20    Greenville.  And if you look at the dates, that's

21    not...

22        Q.    Do you recall whether any complaint was

23    made about --

24        A.    No.

25        Q.    -- this interaction?
```

```
 1        A.     Oh, no.
 2        Q.     Do you recall what happened to the woman on
 3   whom you jumped and put a gun --
 4        A.     Mm-hm.
 5        Q.     -- between her eyes?  What happened?
 6        A.     Mm-hm.  She had a box cutter in her hand.
 7   I put my gun to her head, made her drop the knife --
 8   the box cutter, as she split my uniform wide open.
 9   And I charged her with everything I could.  And she
10   went to jail.  Went to prison.
11        Q.     What did you charge her with?
12        A.     Shoot.  The larceny, and I think at that
13   point in time it went over into a felony larceny, the
14   assault with a deadly weapon on me.  Shoot, I can't
15   remember what else it was.  But it was -- it was
16   several charges on her.  I think it was drug
17   paraphernalia as well.  But...
18        Q.     At that point in time when you had just
19   started your job at the GPD, did you recognize that
20   this behavior was classic drug addict behavior?
21               MS. MARTINEAU:  Objection; lack of
22   foundation.
23               You can answer.
24               MR. ELLIS:  Drug addict behavior by
25   whom?
```

```
 1                    MS. PFEIFFER:  Let me rephrase the

 2   question.

 3        Q.    (By Ms. Pfeiffer)  At the time you had just

 4   began your job at the GPD in 1990, did you recognize

 5   that the behavior by this woman, who was stuffing her

 6   clothes with food and had a box cutter, and was later

 7   found with PCP, did you recognize at that point in

 8   time that this was classic --

 9        A.    No.

10        Q.    -- drug user behavior?

11                    MS. MARTINEAU:  Objection.

12                    MR. ELLIS:  Objection.

13                    MS. MARTINEAU:  You can answer.

14        A.    Did I recognize it as classic?  No.

15        Q.    Had you had any training in drug

16   enforcement at that time in 1990?

17                    MS. MARTINEAU:  Objection.

18                    You can answer.

19        A.    No.

20        Q.    If you go back to Exhibit 51, in the upper

21   left-hand corner, the first card is dated May 10th,

22   1992.  The allegation is harassment.  Do you remember

23   this harassment allegation against you in 1992?

24        A.    No.

25        Q.    Do you recall any complaints by fellow
```

1   employees about harassment against you?

2        A.    No.

3        Q.    Do you recall any of your supervisors

4   complaining about harassing behavior from you?

5        A.    No.  It -- it was exonerated.  So...

6        Q.    The next one over to the right, the date of

7   the occurrence is 12/24/92.  "Allegation: Fail to

8   respond."  Do you remember anything about this?

9        A.    That was back up to the one with me and Joe

10  Friday.  You have an exhibit, what, 47 -- 46, 47?

11  No, that was my evaluation.  45 --

12       Q.    It's the same --

13       A.    -- 46.

14       Q.    It's the same incident that you didn't --

15       A.    Yeah.

16       Q.    -- respond to the correct address?

17       A.    Yes, I believe so.  You got to look at the

18  dates.

19       Q.    Then the one in the lower left-hand corner,

20  the "Sleeping on Duty," 1/2/93.  Is this the one

21  we've already talked about?

22       A.    Yes.

23       Q.    And then the final one, lower right-hand

24  corner, allegation is "Improper conduct," January

25  30th, 1993.  Do you remember anything about this?

1      A.     Yeah.  I -- I remember that one

2  specifically, because it was the first one I ever

3  received.  And it was a joke.  But -- so...

4      Q.     **What was the allegation?**

5      A.     A young lady, ended up being 20 years old,

6  had a child.  But she looked 16 and was barely able

7  to see over the steering wheel, had a baby in the

8  backseat, not in a child seat.  And I stopped her

9  because of that, and plus, her age.  And I wrote her

10  a ticket for the child seat.  She was babysitting the

11  kid.

12             And because she looked like she was

13  16, was the second thing that -- and she ended up

14  being 20.

15             And I told John Ennis about it when he

16  called me in there.  I said, "Well, I stopped her for

17  two reasons.  That being, the child, and her looking

18  like she was underage, as far as not being able to

19  drive.  Because she was barely able to see over the

20  steering wheel."  That's why I remember that one,

21  specifically.

22      Q.     **And what was the -- the complaint?  What**

23  **was the alleged infraction?**

24      A.     She said the only reason why I stopped her

25  is because she's a pretty white girl.  So -- and that

```
 1   was that.
 2        Q.    Was there any investigation other than just
 3   talking with you about it, that you recall?
 4        A.    That's the only thing you could do.  He
 5   asked me about it and I told him.  And he said,
 6   "Okay.  Well, that figures."
 7        Q.    So when there's a complaint like this that
 8   your superior comes and talks to you, how are you
 9   notified that it's resolved?
10        A.    Well, as far as this right here, I didn't
11   know of this, as far as it -- written up like this, I
12   mean, as far as any resolution would've been in,
13   like, here, Exhibit 45, 46, or whatever it is.
14        Q.    But so, for instance, this improper conduct
15   allegation from 1993, how were you informed that the
16   disposition would be officer exonerated?
17        A.    Well, John Ennis, he was a lieutenant at
18   the time, he conducted his investigation by
19   interviewing me and asking me what it was about it.
20   And he didn't come right out and tell me, "You're
21   exonerated."  He said he just -- he figured as much.
22   And that was that.
23        Q.    And did he tell you what else he was going
24   to do in terms of investigating the complaint?
25        A.    No.
```

```
 1        Q.     Did he ask whether there were any other
 2    people who had made similar complaints?
 3        A.     Did I ask him?
 4        Q.     Did he --
 5        A.     No.
 6        Q.     -- ask you?
 7        A.     Did he ask me if I...
 8        Q.     Did he ask you whether there had ever been
 9    similar complaints, like the one this woman was
10    making against you?
11        A.     No.
12        Q.     To your knowledge, did he go talk to other
13    officers to see whether they had heard any complaints
14    about you?
15        A.     No.
16        Q.     So as far as you know, all he did to
17    investigate this was talk to you?
18        A.     Yes.
19        Q.     If you still have in front of you what we
20    marked as Exhibit 33, it's a copy of your
21    interrogatory responses.
22        A.     Yes.
23        Q.     Do you have them in front of you?
24        A.     Okay.
25        Q.     Now, we talked about these earlier.  You
```

1   said you talked with your attorney about it.  At some

2   point, did you receive a verification form that you

3   signed to verify that these answers were true?

4       A.    A verification form?

5       Q.    Yes.

6       A.    I don't know what you're talking about.

7       Q.    Did --

8       A.    As far as that -- I believe I -- I believe

9   I signed something from my attorney, though.

10      Q.    But do you remember, after answering

11  questions for your attorney, receiving a verification

12  form that you signed?  And that verification form

13  means that you are affirming these answers and

14  verifying them to be true.

15            Do you remember doing that, when it

16  comes to your responses, for these interrogatories?

17      A.    I can't recall.

18      Q.    Okay.  If you turn to the answer to

19  question 1.  And then turn the page.  This is a

20  question about your interactions with Charlene

21  Johnson, which we've already talked about.

22            Your answer goes over onto the second

23  page, and the last line says (as read): "Shrock then

24            verbally informed Best of Charlene's

25            statement a few days later."

```
 1                    Now, earlier you testified that you
 2   went twice to see Detective Best.  And the first time
 3   you showed up, he wasn't there; is that right?
 4        A.    Mm-hm.  Yes.
 5        Q.    Did you leave a note for him?
 6        A.    I can't recall.
 7        Q.    Was there a secretary or an admin person
 8   with whom you could leave a note, if you went to go
 9   see the detectives?
10        A.    There was during the day, 8:00 to 5:00.
11        Q.    Do you recall when you went there the first
12   time, whether it was during that 8:00 to 5:00 period
13   of time?
14        A.    No, I can't recall.
15        Q.    If you had information to deliver to a
16   detective, would it be your practice to leave them a
17   note if you didn't find them there?
18        A.    Well, I'd put something in their box.
19        Q.    So they knew you were looking for them?
20        A.    Yeah.
21        Q.    And if you flip a few pages to question 11.
22   Question 11 asks (as read): "Describe in detail the
23             policies of the GPD in 1994 and 1995 with
24             regard to notetaking and the documentation
25             of investigations."
```

```
 1                    And your answer is (as read): "Shrock
 2    -- Shrock asserts that the relevant
 3    policies of the GPD speak for themselves
 4    and are the best evidence of their
 5    contents."
 6                    We spoke earlier about a policies and
 7    procedure manual.  Were there any unwritten policies
 8    and procedures at the GPD?
 9        A.    Were there any unwritten?
10        Q.    (Nodded.)
11        A.    If they're written, I don't remember.
12        Q.    I'm sorry?
13        A.    If they're -- if there are, I don't
14    remember them.
15        Q.    And then if you turn the page -- it's
16    almost the last page.  It's question 14.
17                    And it asks (as read): "Identify each
18    instance in which you were arrested or
19    charged with a crime.  And for such
20    instance, identify the date, the county in
21    which it occurred, and the disposition."
22                    And your response was (as read):
23    "Shrock has been arrested for driving under
24    the influence multiple times since leaving
25    the GPD, and was arrested for assault on a
```

```
 1   female.  For details regarding these

 2   arrests, please see GPD number 21 through

 3   27 produced in Defendants Rule 26

 4   disclosures."

 5               Did I read that correctly?

 6   A.    Yes.

 7   Q.    Okay.  I'm going to mark as an exhibit that

 8   section from the GPD, number 21 through 27.  And it's

 9   Exhibit 52.

10               MS. MARTINEAU:  And what number is

11   that?

12               MR. ELLIS:  52.

13               MS. PFEIFFER:  And it's Exhibit 52.

14               MS. MARTINEAU:  Okay.

15               (WHEREUPON, EXHIBIT NUMBER 52

16               WAS MARKED FOR IDENTIFICATION.)

17   Q.    (By Ms. Pfeiffer)  Now, Exhibit 52, just to

18   orient you, at the bottom right-hand corner is where

19   the numbers are.  GPD 0021.  And they run 0021 to

20   0027, okay?

21               So these are the pages that you

22   referred us to in your interrogatory in response to

23   our question to identify each instance in which you

24   were arrested or charged with a crime.  See that?

25   A.    Yeah.
```

```
 1        Q.     Okay.  Now, this record only shows six

 2   convictions, right?  It shows your first conviction

 3   as a DWI Level 2 in 2009.

 4                    If you go to GPD 0026, it has the

 5   offense, DWI Level 2.  Offense date, 2/8/2009.  Do

 6   you see that?  Second to the last page.  Okay.  You

 7   see that there?

 8        A.     Mm-hm.

 9        Q.     Okay.  So on this document, that shows your

10   first conviction as a DWI Level 2 from February 8th,

11   2009.  And then it shows your most recent conviction

12   as a DWI Level 1 in 2012.

13                    MS. MARTINEAU:  What page is that?

14                    MS. PFEIFFER:  Hang on.  I'm flipping

15   to that right now.  That is on GPD 0023.

16        Q.     (By Ms. Pfeiffer)  All right.  And if you

17   go up from the bottom, you'll see here, DWI Level 1,

18   and the offense date is 7/2/2012.

19                    You see that?

20        A.     Is it 7/2/2012?

21        Q.     Mm-hm.  Right.  So -- so this record shows

22   a DWI Level 2 in '09, and a DWI Level 1 in 2012.

23                    But you've been convicted of more

24   crimes than the six convictions on this record,

25   right?
```

J.A. 1211

```
 1        A.    I don't know.
 2        Q.    Well, you've had convictions before 2009,
 3   correctly -- correct?
 4        A.     I -- I would've guessed everything would
 5   be in here.
 6        Q.    But you've had convictions before 2009,
 7   correct?
 8        A.    I don't know.
 9        Q.    You've had convictions after 2012, correct?
10        A.    I don't know.
11        Q.    I'm sorry?  What was your answer?
12        A.    I don't know.
13        Q.    Okay.
14        A.    I mean, as far as me pulling up my own
15   criminal history, I -- I haven't never done so.
16        Q.    Okay.
17        A.    As far as remembering dates or whatever,
18   you'll have to tell me --
19        Q.    Have you lived --
20        A.    -- what you found.
21        Q.    Have you lived in any other state besides
22   North Carolina?
23        A.    No.
24        Q.    I'm going to pass you what I've marked as
25   Exhibit 53.
```

```
 1                    (WHEREUPON, EXHIBIT NUMBER 53

 2               WAS MARKED FOR IDENTIFICATION.)

 3          Q.    (By Ms. Pfeiffer)  Exhibit 53 -- Exhibit 53

 4     is a record of your early traffic history.  See that?

 5          A.    Mm-hm.

 6          Q.    Violating traffic -- traffic laws is a

 7     crime, right?

 8          A.    Okay.

 9          Q.    Well, you're a police officer.  It's a

10     crime, correct?

11          A.    Yeah.

12          Q.    I'm sorry?

13          A.    Yes.

14          Q.    When did you first get your driver's

15     license?

16          A.    I'm trying to do the math in my head, what

17     year it was.  '87?  No.  '86.

18          Q.    And do you know how old you were when you

19     got your license?

20          A.    16.

21          Q.    And if you were born in '69, then you'd be

22     16 in '85?

23          A.    Okay.  I was just trying to think back when

24     I was in high school.

25          Q.    Well, if you take a look at the record
```

Jeffery D. Shrock on 05/09/2023                    Page 239

```
 1   here, and you go down -- and I know it's a little bit

 2   hard to read.

 3                 But the first speeding ticket you'll

 4   see here is October 4th, 1985, failure to reduce

 5   speed.

 6                 Do you see that?

 7       A.    Okay.

 8       Q.    Do you see that?

 9       A.    I think I do.

10       Q.    Do you remember getting your first traffic

11   ticket?

12       A.    Yes, I do.

13       Q.    What do you remember about that?

14       A.    It was an accident.

15       Q.    Tell me about the accident.

16       A.    I was leaving the high school football

17   game, going to go to Tarboro.

18       Q.    And what happened?

19       A.    I had an accident.

20       Q.    What kind of accident?

21       A.    I ended up rear-ending another vehicle.

22       Q.    Had you been drinking at the time?

23       A.    No.

24       Q.    I'm sorry?

25       A.    No.
```

Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 240 of 357

J.A. 1214

```
 1         Q.      Okay.  Other than being cited for failure
 2    to reduce speed, was there any other consequence?
 3         A.      No, not that I remember.
 4         Q.      If you go up two lines, your next speeding
 5    ticket is October 6th, 1986?
 6         A.      Okay.
 7         Q.      Going over 70 in a 55.  Do you remember
 8    anything about that second ticket?
 9         A.      I can't remember.
10         Q.      If you go up another line -- two.  The next
11    traffic ticket is exceeding safe speed on February
12    25th, 1987.  You see that?
13         A.      Yeah.
14         Q.      Do you remember anything about that traffic
15    ticket?
16         A.      No.
17         Q.      You go up another line, this is another
18    speeding, 70 in a 45 on December 1st, 1987.  Do you
19    see that?
20         A.      Yes.
21         Q.      Do you remember anything about that?
22         A.      No.
23         Q.      Do you remember the outcome from any of
24    these tickets to date?
25         A.      No.
```

J.A. 1215

```
 1        Q.      Do you remember you being warned that you

 2   might lose your license if you got another speeding

 3   ticket?

 4        A.      Back then, I don't recall.

 5        Q.      If you go up to the next line, another

 6   speeding ticket, 70 in a 55, on January 24th, 1988.

 7   Do you remember anything about that speeding ticket?

 8        A.      No.

 9        Q.      Go up another line.  And, suspended,

10   February 12th, 1988, until March 13th, '88,  Two

11   moving violations in 12 months.

12                 This was being convicted in the

13   District Court of Raleigh on February 12th, 1988.

14                 Do you remember your license being

15   suspended in 1988?

16        A.      No.

17        Q.      Do you remember any other consequence,

18   other than your license being suspended?

19        A.      No.

20        Q.      Did you have to pay a fine?

21        A.      I don't remember.

22        Q.      Do you remember being threatened with jail

23   time at all?

24        A.      No.

25        Q.      Then if you go up to the next line,
```

J.A. 1216

```
 1   exceeding safe speed on February 9th, 1988.  This is

 2   just before your license is suspended.

 3               Do you remember that speeding incident

 4   right before your license was suspended?

 5       A.    No, I don't.

 6       Q.    If you go up another two lines, it looks

 7   like your license was reinstated on March 18th, 1988.

 8   Do you see that there?

 9       A.    Mm-hm.

10       Q.    And then on September 15th, 1989, you get

11   another ticket for exceeding safe speed.  Do you see

12   that?

13       A.    Yes.

14       Q.    Do you recall anything about that speeding

15   ticket, the first one you got after your license was

16   renewed?

17       A.    No.

18       Q.    When you applied to the Greenville Police

19   Department in 1990, did you disclose all of these

20   speeding tickets?

21       A.    I'm sure I did.

22       Q.    Do you remember whether there was any

23   conversation about the number of speeding tickets

24   that you had?

25       A.    Not that I'm aware of.
```

```
 1        Q.      Was it a problem?

 2        A.      Not that I remember, no.

 3        Q.      Do you recall whether it was a problem for

 4   those who were looking at your application, that you

 5   had this many speeding tickets?

 6        A.      I do not know.

 7        Q.      What, if anything, do you recall about any

 8   interactions with police officers on any of these

 9   occasions?

10        A.      What do I remember?

11        Q.      (Nodded.)

12        A.      Couldn't tell you.  I don't -- I can't

13   remember.

14        Q.      Did you receive any speeding tickets while

15   you were a police officer?

16        A.      Not that I can recall.

17        Q.      I want to go back to Exhibit 52, which you

18   have in front of you.  These were the records that

19   you directed us to.  And if we flip back to the DWI

20   Level 2, it says this was out of Edgecombe County.

21   Was that where you were living at the time?

22        A.      What?

23        Q.      So the page is split, so on GPD 0026,

24   that's where you see the DWI Level 2 and the offense

25   date of 2/8/2009?
```

```
 1       A.      Mm-hm.

 2       Q.      Okay.  Then you need to go forward one

 3  page.

 4       A.      Mm-hm.

 5       Q.      And that's when we see the details, the

 6  conviction date.  Do you see where I am?

 7       A.      Mm-hm.

 8       Q.      And it says, "County of conviction,

 9  Edgecombe"?

10       A.      Mm-hm.

11       Q.      Were you living in Edgecombe County at the

12  time?

13       A.      Make sure I'm looking at the right thing.

14       Q.      It says, "County of conviction, Edgecombe."

15  My question is just whether in 2009 you were living

16  in Edgecombe County.

17               MS. MARTINEAU:  She's just asking if

18  you remember.

19       A.      I -- I don't remember.

20       Q.      When you were convicted of this in 2010,

21  was the DWI sentencing structure explained to you?

22  Grossly aggravating factors, aggravating factors,

23  mitigating factors?  Do you remember that?

24       A.      As far as it being explained to me?

25       Q.      Mm-hm.
```

```
 1        A.      No.

 2        Q.      Did you understand that in order to be

 3   charged with a DWI Level 2, to be sentenced at that

 4   level, that there had to be a grossly aggravating

 5   factor?  Did you understand that?

 6        A.      Yes.

 7        Q.      Do you recall what the grossly aggravating

 8   factor was for this DWI Level 2?

 9        A.      No.  I -- I don't remember.

10        Q.      I'm handing you what I marked as Exhibit

11   54.

12                (WHEREUPON, EXHIBIT NUMBER 54

13                WAS MARKED FOR IDENTIFICATION.)

14        Q.      (By Ms. Pfeiffer)  Exhibit 54 is a

15   comprehensive report of your criminal history.  And

16   if you turn to page 11 on this report.  Are you

17   there?

18        A.      Page 11?

19        Q.      Page 11.

20        A.      Mm-hm.

21        Q.      And if you look down at the bottom, there

22   are three charges, all on the same offense date of

23   10/20/2008, and this is in Pitt County.  And this is

24   a hit-and-run, with a failure to stop for property

25   damage; a reckless driving to endanger; and then a
```

```
 1   DWI Level 5.

 2              You see that?

 3       A.    Mm-hm.

 4       Q.    So this was your first DWI, correct?

 5       A.    Mm-hm.

 6       Q.    And Level 5 is the lowest level you could

 7   be sentenced at for a DWI.  Do you remember that?

 8       A.    As far as the levels, I -- if you say so.

 9       Q.    Do you remember learning that at that level

10   there were mitigating factors that outweighed

11   aggravating factors?  Does that sound familiar to

12   you?

13       A.    Yes.

14       Q.    What do you remember about your first DUI

15   in 2008?

16       A.    That somehow or another I ended up in my

17   truck a few miles from my house, I run off the road,

18   and took out the -- run over a fence, and then ended

19   up stuck in a ditch.  And all I had on was my pants.

20       Q.    How did you get out of the ditch?

21       A.    I didn't.

22       Q.    How were you found?

23       A.    I was laying in the front seat of my

24   truck --

25       Q.    Did police --
```

```
 1       A.      -- where I had --

 2       Q.      -- respond?

 3       A.      Yeah.  Yeah.

 4       Q.      And what happened when police responded?

 5       A.      I was arrested.

 6       Q.      And how long were you in jail?

 7       A.      I can't remember.

 8       Q.      The property damage that you were charged

 9  with, is that the fence that you ran into?

10       A.      Mm-hm.

11       Q.      Did you have to make any restitution to the

12  property owner?

13       A.      I didn't out of pocket.

14       Q.      I'm sorry?

15       A.      I didn't out of pocket, because my

16  insurance covered it.

17       Q.      And do you remember that your insurance did

18  have to pay the property owner?

19       A.      Did --

20       Q.      Do you remember that your insurance did

21  have to pay the property owner --

22       A.      I'm sure they --

23       Q.      -- or are you speculating that --

24       A.      I'm sure they --

25       Q.      -- that's what they did?
```

```
1        A.      -- did.   I'm speculating that.

2                    (Reporter clarification.)

3                MS. MARTINEAU:  Let her finish.

4                THE WITNESS:  I'm sorry.

5                MS. MARTINEAU:  And don't guess.  Just

6    answer if you know.

7        Q.      (By Ms. Pfeiffer)  I'm not sure what the

8    end of my question was, but what I wanted --

9                MS. MARTINEAU:  Damage.

10       Q.      (By Ms. Pfeiffer)  -- to know is whether

11   you know that insurance covered it, or -- or, like,

12   was that actually a part of the judgment?

13       A.      No judgment, that I was aware of.

14       Q.      Okay.  Was anyone in the car with you?

15       A.      No.

16       Q.      Do you remember what your blood alcohol

17   level was found to be?

18       A.      No.

19       Q.      When the police showed up, were you

20   unconscious?

21       A.      I can't remember.

22       Q.      Do you remember if you had to blow into an

23   Alco-Sensor?

24       A.      No, I don't remember.

25       Q.      Did they take you to the hospital?
```

```
 1        A.      No.

 2        Q.      Going back to the 2009 DUI that is

 3    reflected on the documents that you referred us to

 4    here, this document doesn't have the same level of

 5    detail as your full report.  This document just

 6    reflects the DUI itself.

 7        A.      Mm-hm.

 8        Q.      But you were also charged with reckless

 9    driving, and driving with a license revoked in 2009.

10    Do you remember that?

11        A.      No.

12        Q.      Do you remember the circumstances of this

13    DUI in 2009?

14        A.      No.

15        Q.      Do you remember being arrested?

16        A.      No.

17        Q.      Do you remember whether you blew into an

18    Alco-Sensor?

19        A.      No, I don't remember.

20        Q.      Do you remember being pulled over for the

21    2009 DUI?

22        A.      No.

23        Q.      On the report that you directed us to, it

24    shows your conviction for assault on a female, and

25    that was in Northampton?
```

```
 1         A.      Mm-hm.

 2         Q.      Tell me about that charge.

 3         A.      My ex-wife head-butted me, bit me in the

 4    shoulder, and I pushed her off of me.  I called the

 5    sheriff's department, and I got arrested.

 6         Q.      And after you got arrested, did they take

 7    you down to the jail?

 8         A.      Yeah.

 9         Q.      How long were you in jail?

10         A.      48.  DUI is 48 hours.

11         Q.      And did your wife have injuries, also?

12         A.      I don't know.  I never seen her -- saw her

13    again after that.

14         Q.      Well, you were there when this happened,

15    right?

16         A.      Yeah.

17         Q.      And after she head-butted you --

18         A.      I pushed her down -- off of me and got away

19    from her.

20         Q.      And did she have injuries from falling when

21    you pushed her?

22         A.      That, I -- I don't know, because -- there

23    must not have been, because, I mean, she ended up

24    going to court, and there wasn't anything said about

25    it, other than me -- I just went ahead and pled
```

**J.A. 1225**

```
 1   guilty to the charge.
 2        Q.    Well, you were convicted on April 12th,
 3   2011, right?
 4        A.    Yeah, if that's when you said it was.
 5        Q.    So when you say there was nothing to it,
 6   what do you mean?
 7               MS. MARTINEAU:  Object to the form of
 8   that question.
 9               You can answer.
10        A.    Well, when I pushed her off of me, it
11   wasn't like I hit her with a baseball bat or anything
12   else like that.
13        Q.    And so did you feel it was okay to push
14   her, as long as you weren't hitting her with a
15   baseball bat?
16        A.    I was defending myself.
17               MS. MARTINEAU:  Objection;
18   argumentative.
19               You can answer.
20        Q.    (By Ms. Pfeiffer)  I'm sorry?  What was
21   your answer?
22        A.    I was defending myself.
23        Q.    But you were convicted of this on April
24   12th, 2011, right?
25        A.    Mm-hm.
```

```
 1        Q.      And your wife wasn't charged with assault,

 2   was she?

 3        A.      No.

 4        Q.      On April 15th, 2011, you were charged with

 5   DWI, again, in Edgecombe.  And this was a DWI Level

 6   2.  Now, that's on GPD 0024.  Do you see that there

 7   right in the middle?

 8        A.      Mm-hm.

 9        Q.      DWI Level 2?

10        A.      Mm-hm.

11        Q.      This is also in Edgecombe County.  What do

12   you remember about your third DWI?

13        A.      Ended up -- it was -- I believe it was when

14   I was involved in the accident.

15        Q.      Tell me about the accident.

16        A.      I ran off the road, is the best I can tell

17   you.  I was impaired at the time.

18        Q.      And did you run into another car?

19        A.      No.

20        Q.      Did you run into property?

21        A.      A ditch.

22        Q.      Was anybody in the car with you?

23        A.      No.

24        Q.      And were you arrested?

25        A.      Yes.
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                              Page 253

```
1       Q.      And what did you blow?

2       A.      I don't recall.

3       Q.      Were you taken to the hospital?

4       A.      No.

5       Q.      How long did you spend in jail after you

6    were arrested for this?

7       A.      I don't remember.

8       Q.      On this same page just below that DWI,

9    there's a resisting an officer conviction that's

10   11/23/2011.  Do you see that?

11      A.      Mm-hm.

12      Q.      Tell me about that.

13      A.      The best I can remember, I was -- at the

14   time, I was with my brother-in-law.  We had been

15   drinking.  And I left his house and was walking down

16   the dirt road.  And the deputies had wanted me to

17   stop.  They were wanting me to walk back to them, and

18   I didn't.  And I kept walking down the road, and they

19   come down there and we tousled.  They grabbed hold to

20   me, we fell off in the ditch and wrestled around a

21   little bit.

22      Q.      When you say "we tousled," what does that

23   mean?

24      A.      We wrestled.  I mean, there weren't any

25   fists thrown or anything like that.  That's what the
```

```
 1   charge is.  I resisted arrest, evade and obstruct.
 2        Q.     Let me ask you a few questions about that.
 3   So you said you and your brother were drinking?
 4        A.     Mm-hm.  My brother-in-law.
 5        Q.     Brother-in-law?
 6        A.     Mm-hm.
 7        Q.     You were drinking?
 8        A.     Mm-hm.
 9        Q.     And at some point, police officers
10   approached you?
11        A.     One of the neighbors called because he had
12   the radio up too loud.  And I had left prior to them
13   getting there.  They rode past me, got to his house,
14   which was probably -- I was maybe a thousand yards
15   away from them, and they were hollering down the road
16   at me, telling me -- asking me to come back.  And I
17   just kept walking.
18               And they come down there, grabbed hold
19   to me to get me to stop, and I didn't.  And that's
20   where it was at.  Resisting an officer.
21        Q.     So as you were walking down the road, you
22   heard the police officers calling for you to stop?
23               MR. ELLIS:  Objection.
24        A.     No.
25        Q.     Okay.  Explain to me.  I'm not following
```

```
 1    your story.  So you and your --
 2         A.     They rode past me going to his house.
 3         Q.     Who rode past you?
 4         A.     The deputy.
 5         Q.     Going to whose house?
 6         A.     My step -- my brother-in-law's house.
 7         Q.     Okay.  And what were you doing when they
 8    rode past you?
 9         A.     Walking down the road.
10         Q.     Okay.
11         A.     The neighbor had supposedly called because
12    he had his stereo playing too loud.  And they ended
13    up with supposedly hollering at me, getting me --
14    wanting me to come back to the house.  And I didn't.
15    They rode down there, grabbed hold to me, wanted me
16    to get back up to the house.  And I resisted.
17         Q.     The neighbors yelled at you to come back?
18         A.     The deputy.
19         Q.     This is what I'm not following.  Can you --
20    when you -- tell me what happened.  I need to know
21    who did what and when.
22                MS. MARTINEAU:  Okay.
23         Q.     (By Ms. Pfeiffer)  You're walking on the
24    street, the neighbors are yelling about loud music?
25         A.     The neighbors called the deputies about my
```

J.A. 1230

```
 1   brother-in-law's music being too loud.

 2         Q.      Yes.

 3         A.      But I had left the house prior to them

 4   getting there.

 5         Q.      Yes.

 6         A.      They -- it was a dirt road.  I'm walking

 7   down the dirt road.  They ride past me.

 8         Q.      "They" is the police?

 9         A.      Yes, the deputy.

10                MR. ELLIS:  Object to form.

11                MS. MARTINEAU:  Same objection.

12         A.      They get up there to his house, and

13   supposedly he's turned the music down at that point.

14   But they're wanting me to come back up there.

15                I didn't hear them hollering at me.

16   They rode -- rode back there and stopped beside me,

17   and I kept walking down the road.  They get out and

18   put their hands on me.  And that's where the

19   resisting arrest, or resisting an officer --

20         Q.      So --

21         A.      -- come from.

22         Q.      -- when they got out of the car and came up

23   to you, why did you not submit to the officers?

24         A.      I don't know.  At the time, I'd been

25   drinking.  I didn't think I was doing anything wrong
```

```
 1   walking down the road.

 2        Q.      And after they put hands on you, when you

 3   say you tousled, exactly what happened?

 4        A.      They grabbed hold to me and wrestled me to

 5   the ground into a ditch.

 6        Q.      And did you fight back?

 7        A.      No.

 8        Q.      And were you charged with anything other

 9   than resisting --

10        A.      No.

11        Q.      -- an officer?

12        A.      No.

13        Q.      Back on the report that you provided to us,

14   on July 2nd, 2012, you get a DWI Level 1.  This is

15   GPD 0023.

16                MS. MARTINEAU:  Do you need to take a

17   break?

18                THE WITNESS:  Yes, please.  Can we

19   stop for a minute?

20        Q.      (By Ms. Pfeiffer)  Why don't we just get

21   through this question about this one, and then we'll

22   pause.

23        A.      Okay.

24        Q.      This conviction is July 2nd, 2012, for DWI

25   Level 1.  Do you see where I am on GPD 0023?
```

1                    MS. MARTINEAU:  I'll turn the page for

2    you (indicating).

3         A.    Okay.

4         Q.    **Now, Level 1 is the highest sentencing**

5    **level for a DWI.  Do you recall that?**

6         A.    Northampton County.  I believe so.

7         Q.    **What do you recall about the grossly**

8    **aggravating factors that led to you being a Level 1**

9    **for this conviction?**

10        A.    I believe it was the priors.

11        Q.    **How much were you drinking at this time?**

12        A.    I don't know.

13        Q.    **Were you drinking every day?**

14        A.    No.

15        Q.    **When did you first start drinking?  What**

16   **year?**

17        A.    When I started drinking more than I really

18   ever did was 2015, I think.

19        Q.    **Did something prompt that?**

20        A.    I really feel like it was more of failed

21   relationships and my physical ailments.

22        Q.    **Are you an alcoholic?**

23        A.    No.

24        Q.    **Are you in recovery?**

25        A.    No.

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                              Page 259

```
 1      Q.    Do you still drink now?

 2      A.    No.

 3      Q.    When did you stop drinking?

 4      A.    I haven't drank anything in over a year.

 5      Q.    When was the last time you drank?

 6      A.    It's been over a year.

 7      Q.    Do you remember the last time?

 8      A.    It was almost two years.  But the last time

 9   was New Year's, two years ago, of '20 -- it was

10   2020 --

11      Q.    Did you drink --

12      A.    -- '21.

13      Q.    -- while you were a police officer at

14   Greenville Police Department?

15      A.    I didn't drink anything for eight years

16   when I was with the Greenville Police Department.

17      Q.    Okay.

18            MS. PFEIFFER:  All right.  Now is a

19   good time for a break.

20            THE WITNESS:  Mm-hm.

21            MS. PFEIFFER:  Ten minutes?

22            THE WITNESS:  Okay.

23            THE VIDEOGRAPHER:  Off record at 5:26

24   p.m.

25            (WHEREUPON, A SHORT BREAK WAS TAKEN.)
```

```
 1                    THE VIDEOGRAPHER:  On record at 5:39

 2    p.m.

 3         Q.    (By Ms. Pfeiffer)  Mr. Shrock, I'm going to

 4    ask you to take a look at Exhibit 52, which is the

 5    condensed summary of convictions.  And if you flip to

 6    the second page, 0022, up at the top, there's a

 7    description of your incarceration status.  This is

 8    when you were serving time back in 2014.

 9                    And the left-hand column has a number

10    of lines.  It says "Primary crime," "Special

11    characteristics."  Do you see where I am?

12         A.    Mm-hm.

13         Q.    And this notes your admission date of

14    7/10/2013.  Do you see that?

15         A.    Mm-hm.

16                    MS. MARTINEAU:  Is that yes, sir?

17                    THE WITNESS:  Yes.

18         A.    Yes.

19         Q.    Now, do you recall when you were admitted

20    July 10th, 2013?

21         A.    No.

22         Q.    Do you recall what you were being admitted

23    for?

24         A.    No.

25         Q.    Okay.  Just below "Custody Classification,"
```

```
 1    it says "Number of infractions, six."

 2                    What do you remember about the

 3    infractions you had during your period of

 4    incarceration?

 5        A.    If it was anything, it had to do with

 6    smoking.

 7        Q.    Do you remember what the infractions were

 8    for, specifically?

 9        A.    It would be smoking.

10        Q.    All six of them?

11        A.    Yeah.

12        Q.    And how did you get caught smoking?

13        A.    The only way I can describe it is smoking.

14        Q.    Where did you get cigarettes?

15        A.    In prison.

16        Q.    From who?

17        A.    Different individuals.

18        Q.    Individuals in uniform, or other inmates?

19        A.    No.  Other inmates.

20        Q.    And you knew you weren't allowed to have

21    cigarettes in prison, right?

22        A.    Mm-hm.  That's right.

23        Q.    Any reason why you went ahead and smoked

24    cigarettes in prison anyway?

25        A.    Because I wanted to smoke.
```

1      Q.      So you knew that it was an infraction to

2    smoke, for one, correct?

3      A.      Yeah, if you got caught.  Yes.

4      Q.      And you knew it would also be an infraction

5    to be getting contraband into the prison, right?

6      A.      No, because I -- I wasn't getting it in.

7      Q.      But you were taking it from someone who did

8    smuggle it in, right?

9      A.      Yes.

10     Q.      Cigarettes are contraband, correct?

11     A.      Yes.

12     Q.      If you go back to Exhibit 53, the

13   confidential report.  Is that the comprehensive

14   report?  The comprehensive report, I think it's 53.

15   No.  54.  Exhibit 54.

16            If you turn to the last page on this

17   report, 32 -- it says at the bottom, page 32 of 152

18   -- are you there?

19     A.      Mm-hm.

20     Q.      And it says "Judgments (2 found)."  The

21   first one is a civil judgment.  The plaintiff is

22   Trust Atlantic Bank.  It says the total judgment is

23   $25,000 -- sorry -- $25,170.

24            What is this a judgment for?

25     A.      For two construction loans.  That was the

```
 1   balance remaining from the sale of two -- two houses.

 2        Q.    And did you default on that loan?

 3        A.    Yes.

 4        Q.    Have you paid any of this judgment back?

 5        A.    No.

 6        Q.    The next civil judgment has the plaintiff

 7   as John Van Coutren.  Who is John Van Coutren?

 8        A.    I don't know him.

 9        Q.    The total judgment here is $16,000.  Do you

10   know what that judgment is for?

11        A.    It's for a lease on a building, commercial

12   building.

13        Q.    Tell me more about that.

14        A.    I had opened a -- or funded a sports bar in

15   Greenville, and it fell through.  And that was the

16   balance on the lease agreement.

17        Q.    And so is John Van Coutren the owner of the

18   property?

19        A.    I -- I guess so.  I dealt with John Day.

20        Q.    And was there a lawsuit related to this?

21        A.    No.

22        Q.    Was there any lawsuit related to the

23   default on the construction loans?

24        A.    No.

25        Q.    If you can go back to the first page, and I
```

J.A. 1238

```
 1    just want to flip through this report with you.  If

 2    you go to what's labeled as page 4 of the report, but

 3    is actually the third page in the packet.  Just at

 4    the bottom, it says page 4 of 152.

 5         A.     Mm-hm.  Okay.

 6         Q.     And if you go down to the lower third, on

 7    September 11th, 1992, in Craven, North Carolina, you

 8    were charged with hunting with a primitive weapon

 9    without having a primitive weapon license.

10                Tell me about that conviction.

11         A.     That -- I didn't receive a citation.  The

12    fellow that was with me, he didn't have a permit to

13    hunt on Weyerhaeuser land.  I was a member of a

14    hunting club there.  There wasn't -- I didn't receive

15    a citation.

16         Q.     Well, you were charged with this, right?

17         A.     No.

18                MS. MARTINEAU:  Objection to the form

19    of the question.

20                You can answer.

21         Q.     (By Ms. Pfeiffer)  If you look over on the

22    right-hand --

23         A.     I see what you're pointing out.  But, I

24    swear I didn't receive a citation for it.  Another

25    gentleman did.
```

```
 1        Q.    If you look over in the right-hand box, do
 2   you recall pleading guilty to this on November 10th,
 3   1992?
 4              MS. MARTINEAU:  She's asking you about
 5   this (indicating), if you remember that, if you know
 6   about that.
 7        Q.    (By Ms. Pfeiffer)  Lower right-hand corner
 8   says, offense date 9/11/1992.  Disposition date
 9   11/10/1992.  Do you remember pleading guilty to that?
10        A.    No.  I -- I don't remember it.  I believe
11   that was the time -- like I said, another fellow was
12   hunting with me.  He received a citation.  I didn't.
13        Q.    But you are Jeffery Dwayne Shrock, right?
14        A.    That's correct.
15        Q.    And your address was 75 Lancaster Drive,
16   Greenville, North Carolina 27834, correct?
17        A.    Yes.
18        Q.    And if you turn the page, on August 11th,
19   2004 -- I'm in the upper third now.  There's a
20   conviction for speeding and a failure to comply with
21   license restrictions in Craven County on 8/11/2004.
22   You see that?
23        A.    Yeah.
24        Q.    What do you remember about that speeding
25   citation?
```

1        A.      I don't.  I don't remember anything about

2    it.

3        Q.      Okay.  And then you can turn the page.

4    We've already talked about this reckless driving and

5    your DWI.

6                But if you can turn to the next page,

7    page 6 of 152, and then all the way down at the

8    bottom, there is a DWLR.  That's driving with license

9    revoked, on March 17th, 2010.  You see that?

10       A.      Mm-hm.

11       Q.      Do you remember driving with a revoked

12   license and being charged with that in March of 2010?

13       A.      In Gaston, I don't -- I don't recall.

14       Q.      Once you lost your license because of the

15   DUIs, did you continue to drive on a revoked license?

16       A.      It's evident.

17       Q.      Why?

18       A.      Well, you don't have to have a license to

19   drive.  You only have to have a license when you're

20   stopped.

21       Q.      Why is that?

22       A.      Because it's the state law.

23       Q.      So is it your view that it's okay to drive

24   with a revoked license unless you get stopped?

25       A.      I lived alone and did what I had to.

```
 1        Q.     Did you think that the laws didn't apply to

 2   you?

 3        A.     No.

 4               MS. MARTINEAU:  Objection;

 5   argumentative.

 6               You can answer.

 7        A.     No.  I knew they did apply to me.  That's

 8   why I went to prison.

 9        Q.     Did you just hope that you wouldn't get

10   caught driving on a revoked license?

11        A.     No.  It was inevitable.  And, certainly, I

12   haven't driven in eight years.

13        Q.     If you turn the page to page 7 of 152.  In

14   the top box, which is the box in white, from Halifax

15   on December 2nd, 2010.  This is a domestic violence

16   protective order violation charge.

17               What do you remember about this

18   charge?

19        A.     It had to do with my ex-wife, but I can't

20   remember the circumstances around it.

21        Q.     Did she take out --

22        A.     It was -- it was dismissed.  She had the

23   DVPO dropped.  So...

24        Q.     Did she take out a DVPO?

25        A.     Yes.
```

```
 1      Q.     What did she take that out for?

 2      A.     I can't remember.

 3      Q.     But this was before the assault on a female

 4   in 2011?

 5      A.     Yes, it was.

 6      Q.     Was there another assault that you didn't

 7   report?

 8      A.     Oh, no.

 9      Q.     If you go down towards the grayed-out box

10   now, July 22nd, 2007.  This is in Northampton.  And

11   you were charged with allowing a registered -- not

12   having -- well, I'm not sure what that is.  Do you

13   know what "Allow registered plate not display is"?

14   Do you remember what you were charged for there?

15      A.     No, I don't.

16      Q.     Do you remember what the improper equipment

17   was?

18      A.     I do not.

19      Q.     Do you have any idea how you got pulled

20   over for this?  Because it doesn't have a speeding or

21   a seat belt -- it doesn't look like it's obvious why

22   you'd be pulled over.  Do you remember anything about

23   that?

24      A.     No.

25      Q.     Okay.  Turn the page, page 8 of 152.
```

```
1    Pretty much right in the middle, November 26th, 2010.

2    This is out of Northampton.  You were charged with

3    assault by pointing a gun.  Tell me about that.

4         A.    That's new to me.  I don't have no idea

5    about that.

6         Q.    Do you remember who you --

7         A.    No.

8         Q.    Do you remember who you pointed the gun at?

9         A.    No.  No.

10        Q.    All right.  If you turn the page now, page

11   9 of 152, it says March 2nd, 2011, Northampton.  This

12   is another DV protective order violation.

13              Did your wife take out a second DVPO?

14        A.    Not that I was aware of.

15        Q.    After the assault on a female charge in

16   February of 2011, did you and your wife get back

17   together?

18        A.    No.

19        Q.    After that charge, did you go see her at

20   all?  Did you ever visit with her?

21        A.    I -- I can't remember.

22        Q.    And so you don't have any recollection of

23   why she or someone would've taken out a DVPO in March

24   of 2011?

25        A.    I have no idea.  I mean, 2011, that's 11
```

```
 1   years ago.
 2        Q.    And then if we go down to the bottom,
 3   there's another Pitt County on February 22nd, 2002.
 4   Exceeding safe speed, another traffic violation.  Do
 5   you remember this speeding ticket in 2002?
 6        A.    No.
 7        Q.    Okay.  Turn the page, page 10.  And on
 8   April 27th, 2006, in Pitt County, you were charged
 9   with driving with license revoked again, and improper
10   muffler.
11              When you were charged with this DWRL,
12   were you aware you were driving on a revoked license?
13        A.    2006.  I can't remember.
14        Q.    If you go to the next page, page 11 of 152,
15   up at the top, November 2nd, 2006, in Pitt County,
16   "Shine/sweep light for deer with firearm."
17              Now, tell me about that conviction.
18        A.    I was -- I had left my mother's house in
19   Edgecombe County, was going to Greenville on NC 222,
20   running 55 miles an hour, and shined a flashlight in
21   -- in the field.
22        Q.    Why did you do that?
23        A.    Just did.
24        Q.    Were you drinking at the time?
25        A.    No.
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                    Page 271

```
 1        Q.      What was the --
 2        A.      It was, like, I mean, 5:30, 6:00 in the
 3   morning.  I was just trying to get to work.
 4        Q.      Why were you shining a flashlight in a
 5   field?
 6        A.      See if I saw any eyes.
 7        Q.      What kind of eyes?
 8        A.      Deer.
 9        Q.      So were you hunting on your way to work?
10        A.      No.
11        Q.      This is just out of interest?
12        A.      Yeah.
13        Q.      Okay.  If you go to page 12, and go down to
14   the lower third, on August 25th, 2008, in Pitt
15   County, there's two charges there.
16                One is as a permittee, fail to
17   superintend in person.
18                The other is transfer from one
19   container to another, a mix.
20                Tell me about those two charges.
21        A.      Like I was telling you, that judgment for
22   the 16,000 on the leased property.
23        Q.      I'm sorry.  Say it again?
24        A.      I said, the previous judgment for 16,000 on
25   the leased property, it was where I had obtained a
```

```
 1   liquor license for that business.  And I wasn't

 2   there, an employee turned around and did this, and it

 3   cost me a liquor license.

 4        Q.    So do you --

 5              MS. MARTINEAU:  "Cost me" -- can you

 6   speak up a little bit for the court reporter?

 7              THE WITNESS:  I'm sorry.

 8        Q.    (By Ms. Pfeiffer)  Do you know what

 9   occurred that cost you the liquor license?  Like, was

10   there a specific event that led to these charges?

11        A.    I have no idea.

12        Q.    Was there a raid, or something where police

13   showed up and there was underage drinking?

14              MS. MARTINEAU:  Objection; lack of

15   foundation.

16        A.    An inspection --

17              MS. MARTINEAU:  You can answer.

18        A.    -- I guess, of sorts.

19        Q.    Okay.  If you turn to the next page, page

20   13.  May 8th, 2009, in Pitt County, you were

21   convicted of breaking or entering.

22              Tell me about that conviction.

23        A.    I don't remember.

24        Q.    You need to speak up.

25        A.    I don't remember.
```

```
 1        Q.     If you scroll down on that page.  February
 2   26, 2009, there's two charges in Pitt County, as a
 3   keeper of a house wherein alcoholic beverages are
 4   served, and as a permittee, knowing allow --
 5   knowingly allow the violation.
 6                What are those charges about?
 7        A.     I have no idea.
 8        Q.     Do you recall --
 9        A.     I don't even know what they are.  I...
10        Q.     Do you recall whether there was another
11   inspection or anything at that bar property?
12        A.     No.
13                MS. MARTINEAU:  What did you say?
14                THE WITNESS:  No.
15                MS. MARTINEAU:  Okay.
16        A.     I have no idea what that is.
17        Q.     And then turn the page, page 14.  August
18   11th, 2010, here you get a citation for failure to
19   wear a seat belt, and no operator's license.  Do you
20   remember that?
21        A.     No.
22                MS. MARTINEAU:  Did you say
23   conviction?
24                MS. PFEIFFER:  Yes.  Conviction for
25   failure to wear a seat belt.
```

```
 1                    MS. MARTINEAU:  Well, it says
 2   dismissal for no operator's license.  I'm sorry.
 3                    MS. PFEIFFER:  Yeah, yeah.  But that
 4   -- I'm just talking about that conviction.
 5                    MS. MARTINEAU:  Okay.
 6       Q.    (By Ms. Pfeiffer)  Okay.  If you go ahead
 7   and flip to page 25, and in the grayed-out box there,
 8   on March 29th, 2015, in Nash County, you were charged
 9   with habitual impaired driving.
10       A.    Mm-hm.
11       Q.    You remember that incident?
12       A.    Yes.
13       Q.    And tell me about that impaired driving.
14   What happened on March 29th, 2015?
15       A.    I was stopped and arrested and charged.
16       Q.    Was there any accident involved?
17       A.    No.
18       Q.    Do you know why you were pulled over?
19       A.    No.
20                    MS. MARTINEAU:  Can you speak up, Mr.
21   Shrock, because the court --
22                    THE WITNESS:  I'm sorry.
23                    MS. MARTINEAU:  -- reporter is having
24   a hard time hearing you.
25       A.    No, I don't know.
```

J.A. 1249

```
 1         Q.     Do you remember doing any field sobriety

 2   tests?

 3         A.     No.

 4         Q.     Do you remember blowing into an Alco-

 5   Sensor?

 6         A.     No.

 7         Q.     The conviction date is 12/6/2016.  What was

 8   the punishment?

 9         A.     I was in prison.

10         Q.     And was that for a second period of time?

11         A.     Yes.

12         Q.     And how long were you in prison that time?

13         A.     13 months.

14         Q.     Did you receive any infractions that time?

15         A.     I don't know.

16         Q.     You don't remember, or you don't know?

17         A.     I don't remember.

18         Q.     Mr. Schrock, do you think someone with a

19   criminal history like this ought to be in law

20   enforcement?

21                MS. MARTINEAU:  Objection.

22                You can answer.

23         A.     I used to be.

24         Q.     But do you think someone with a criminal

25   history like this ought to be in law enforcement?
```

```
 1                    MS. MARTINEAU:  Same objection.

 2                    You can answer.

 3        A.     I should hope no one is.

 4                    MS. PFEIFFER:  I don't have any other

 5   questions for you today, Mr. Shrock.  Thank you for

 6   your time.

 7                    Mr. Ellis may and your attorney may.

 8   CROSS-EXAMINATION BY MR. ELLIS:

 9        Q.     Yeah.  Mr. Schrock, I may just have a

10   couple questions for you.

11                    When you advised Detective Best about

12   the existence of Charlene Johnson and what she had

13   relayed to you, did he ask you to make any notes of

14   your conversation with her?

15        A.     No.

16        Q.     And I think you've testified earlier that

17   when you came to be aware of Ms. Johnson's reporting

18   being an eyewitness to Mr. Sharpe murdering Mr.

19   Radcliffe --

20                    MS. PFEIFFER:  Objection.

21        Q.     (By Mr. Ellis)  -- that you advised

22   Detective Best of that, correct?

23        A.     Yes.

24        Q.     How did you know to advise Detective Best

25   about Ms. Johnson's statement?
```

1      A.     The night of the incident when the major

2  crimes unit was dispatched, I was told then that

3  Ricky Best was the lead detective.

4      Q.     Do you recall who told you that?

5      A.     I can't recall.

6      Q.     Did you ever have any communication with

7  Carolyn Melvin about the substance of what Charlene

8  Johnson had told you?

9      A.     I can't recall.

10     Q.     Did Forrest, who served as a confidential

11 informant for you, did he ever provide you any

12 information about anything to do with the homicide of

13 George Radcliffe?

14     A.     No.

15     Q.     Now, I think --

16            MR. ELLIS:  That's all the questions I

17 have.  Thank you, sir.

18 CROSS-EXAMINATION BY MS. MARTINEAU:

19     Q.     Mr. Shrock, I have some follow-up questions

20 for you.

21            You've been out of law enforcement for

22 some time?

23     A.     Yes, a number of years.

24     Q.     Okay.  And in terms of what Detective Best

25 or Detective Melvin did with the information you

```
 1    provided, are you aware of what they did?

 2        A.      No.

 3        Q.      You aware of what reports they wrote?

 4        A.      No.

 5        Q.      Or interviews they conducted?

 6        A.      No.

 7        Q.      Do you know what leads they followed up

 8    with?

 9        A.      No.

10        Q.      And when you looked at everything, have you

11    seen anything to make you believe that you testified

12    at the criminal trial of Mr. Sharpe?

13        A.      Yes.

14        Q.      Okay.  We saw the 2007 MAR, correct?

15        A.      Yes.

16             MS. PFEIFFER:  Objection.

17        Q.      (By Ms. Martineau)  How about the -- how

18    about the actual trial?  Have you seen anything from

19    the trial?

20        A.      No, not the actual trial.

21        Q.      Okay.  And you don't know what information

22    or reports you had in front of you at the time you

23    testified at the 2007 MAR, correct?

24             MS. PFEIFFER:  Objection.

25        A.      Correct.
```

1    Q.    And you did your best to recall and testify

2  as to what you remembered at that time, correct?

3    A.    Yes.

4    Q.    Okay.  Have you ever seen or been provided

5  with the audio recording that the Duke folks -- you

6  believe the Duke folks took of you when they came to

7  see you when you were incarcerated?

8    A.    No.

9    Q.    And you did review an affidavit prepared by

10 someone associated with Duke in preparation for your

11 deposition today, correct?

12   A.    Yes.

13   Q.    Okay.  And was the information contained in

14 that affidavit accurate?

15          MS. PFEIFFER:  Objection.

16   A.    I don't know.

17          MS. MARTINEAU:  All right, sir.  Thank

18 you.  Those are the questions I have for you.  Okay.

19          MS. PFEIFFER:  Nothing else.

20          MS. MARTINEAU:  Very good.  Thank you.

21          THE VIDEOGRAPHER:  This concludes

22 today's deposition.  The time is 6:04 p.m.  We are

23 now off the record.

24          THE COURT REPORTER:  Ms. Pfeiffer,

25 would you like to order this transcript?

```
 1                    MS. PFEIFFER:  We have a standing

 2     order with you.  Whatever our standing order is.

 3                    THE COURT REPORTER:  Ms. Martineau,

 4     would you like a copy?

 5                    MS. MARTINEAU:  Yes.  Etran and

 6     exhibits, please.

 7                    THE COURT REPORTER:  Mr. Ellis, would

 8     you like a copy?

 9                    MR. ELLIS:  Etran with exhibits,

10     please.

11            (WHEREUPON, THE VIDEOTAPED VIDEOCONFERENCE

12              DEPOSITION WAS CONCLUDED AT 6:04 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                          **Page 281**

```
 1                        ERRATA SHEET

 2   Case name:          Sharpe vs Best, et al.

 3

 4   Civil No.:          4:21-CV-000185-BO

 5

 6   Deponent:           Jeffery Shrock

 7

 8   Date:               May 9, 2023

 9

10   PAGE    LINE     READS               SHOULD READ

11     /       /                            /

12     /       /                            /

13     /       /                            /

14     /       /                            /

15     /       /                            /

16     /       /                            /

17     /       /                            /

18     /       /                            /

19     /       /                            /

20     /       /                            /

21     /       /                            /

22     /       /                            /

23     /       /                            /

24     /       /                            /

25     /       /                            /
```

**J.A. 1256**

```
 1    I, Jeffery Shrock, do hereby state

 2    under oath that I have read the above and

 3    foregoing deposition in its entirety and

 4    that the same is a full, true and correct

 5    transcript of my testimony.

 6

 7    Signature is subject to corrections on

 8    attached errata sheet, if any.

 9

10    Jeffery Shrock

11

12    State of

13

14    County of

15

16    Sworn to and subscribed before me this

17        day of                , 2023.

18

19    Notary Public

20

21    My commission expires:

22

23

24

25
```

J.A. 1257

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                          Page 283

```
 1   NORTH CAROLINA

 2   VANCE COUNTY

 3              C E R T I F I C A T E

 4   I, Marta J. Charles, Court Reporter and Notary

 5   Public, the officer before whom the foregoing

 6   proceeding was conducted, do hereby certify that the

 7   witness whose testimony appears in the foregoing

 8   proceeding was duly sworn by me; that the testimony

 9   of said witness was taken by me to the best of my

10   ability and thereafter transcribed under my

11   supervision; and that the foregoing pages, inclusive,

12   constitute a true and accurate transcription of the

13   testimony of the witness.

14   I do further certify that I am neither counsel

15   for, related to, nor employed by any of the parties

16   to this action in which this proceeding was

17   conducted, and further, that I am not a relative or

18   employee of any attorney or counsel employed by the

19   parties thereof, nor financially or otherwise

20   interested in the outcome of the action.

21   This the 19th day of May, 2023.

22   _____

23                    Marta J. Charles

24                    Court Reporter and Notary Public

25                    #201026500057
```

J.A. 1258

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023                Index: $16,000..106

---

**Exhibits**

ShrockJ 33
  4:14
  21:21,23
  22:13
  231:20

ShrockJ 34
  4:17
  27:22,23
  41:14,18

ShrockJ 35
  4:19 38:25
  39:3,7
  41:22

ShrockJ 36
  4:21
  40:17,20,
  23 41:16,
  17,25

ShrockJ 37
  4:23
  45:12,14,
  24

ShrockJ 38
  4:24
  93:23,24

ShrockJ 39
  5:5 105:21

ShrockJ 40
  5:7
  153:22,23

ShrockJ 41
  5:9 156:18
  157:12

ShrockJ 42
  5:11
  163:21,22,
  24

ShrockJ 43
  5:12
  165:4,5,8

ShrockJ 44
  5:14
  171:25
  172:1,3

ShrockJ 45
  5:15
  212:1,3
  230:13

ShrockJ 46
  5:17
  213:17,19

ShrockJ 47
  5:19
  216:10,14

ShrockJ 48
  5:21
  217:14,16

ShrockJ 49
  5:23
  219:17,20

ShrockJ 50
  6:5
  220:18,20,
  22 222:25

ShrockJ 51
  6:7
  222:11,12
  227:20

ShrockJ 52
  6:8 235:9,
  13,15,17
  243:17
  260:4

ShrockJ 53
  6:9 237:25
  238:1,3
  262:12

ShrockJ 54
  6:10
  245:10,11,
  12,14
  262:15

---

**$**

$16,000
  263:9

$25,000
  262:23

$25,170
  262:23

---

**(**

(jersey)'s
  224:17

---

**-**

-117080
  164:5

---

**0**

0021   235:19

0022   260:6

0023   236:15
  257:15,25

0024   252:6

0026   236:4
  243:23

0027   235:20

09   236:22

---

**1**

1   134:12
  179:8
  180:23
  192:11,14,
  17 206:22
  232:19
  236:12,17,
  22 257:14,
  25 258:4,8

1/2/93
  228:20

10   96:2
  132:6
  147:21
  152:19
  202:14
  221:24,25
  270:7

10/20/2008
  245:23

105   109:17,
  18 114:19

106   115:6
  116:10

---

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                    Index: 107..1991

117:15
126:7,8

107   126:8
127:17
130:10

108   139:25
149:8
152:17,19

109   113:2,8

10:27   8:14

10th   165:15
166:7,16
212:7
216:16
224:22
227:21
260:20
265:2

11   26:1,6,
8,9 132:21
184:2
206:13
233:21,22
245:16,18,
19 269:25
270:14

11/10/1992
265:9

11/23/2011
253:10

110   141:2

111   184:2

112   184:2

113   147:20

115   134:7,
11

11:00   75:13

11:34   68:13

11th   264:7
265:18
273:18

12   110:6
214:8
215:25
216:1
224:2
241:11
271:13

12-hour
59:6,8
75:10,18,
25 214:6
215:7,9

12/24/92
228:7

12/6/2016
275:7

12:47   68:15

12th   220:25
241:10,13
251:2,24

13   116:11
272:20
275:13

13-   154:13

13th   223:14

241:10

14   234:16
273:17

14-year-old
162:15

14-year-old's
162:15

14th   95:24
115:7
217:18

15   25:4
35:13 55:4
140:1
141:2

152   262:17
264:4
266:7
267:13
268:25
269:11
270:14

159   184:17
217:23
219:8

15th   221:3
242:10
252:4

16   13:18
25:8 31:8
35:13
117:15
140:4
172:10
229:6,13
238:20,22

16,000
271:22,24

168   189:7

169   189:8

17   13:18
110:7

17th   154:7
266:9

18th   165:15
166:7,15
216:18
242:7

19   52:5

1985   239:4

1986   240:5

1987
240:12,18

1988   241:6,
10,13,15
242:1,7

1989   242:10

1990   28:7,
20,23
29:16
37:23
39:22
40:1,11
41:20
42:23
227:4,16
242:19

1990s   52:5

1991   39:9

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023          Index: 1992..2014

40:4 41:22
42:1

**1992** 212:13
227:22,23
264:7
265:3

**1993** 94:3,
19 212:8
216:16,19
223:14
228:25
230:15

**1994** 53:20,
23 54:11,
16 56:10,
18 57:1
59:1 60:2,
10 65:7
69:3,12
70:22
75:24
80:13 91:8
97:7,17
101:8,13
105:10
109:8
110:16,21
112:19,22
113:17
123:23
154:7
157:1
164:1,4
165:15,16,
23 166:7,
16,18
193:4

233:23

**1995** 97:18
100:22
101:9,14,
17 104:3,
8,10
110:13,22
112:21
217:18
219:22
233:23

**1996** 220:25
221:3
223:2

**1997** 103:6,
11,17,20
104:15
105:3,25
106:14
108:20
109:3,15
133:11,20,
22 134:5
140:16
141:23
143:10,14,
17 153:16
165:19
166:10
172:23
173:7
174:21
175:5,20
180:3,7
205:1
206:11

**1:52** 123:16

**1st** 42:1
240:18

---

**2**

---

**2** 127:17
178:19
190:11
213:25
236:3,5,
10,22
243:20,24
245:3,8
252:6,9
262:20

**2-** 191:23

**2/17/94**
154:7

**2/18/94**
165:11
166:3

**2/24/93**
94:12

**2/8/2009**
236:5
243:25

**20** 114:21
117:15
119:24
177:5
179:12,24
229:5,14
259:9

**2002** 270:3,

5

**2004** 265:19

**2006** 270:8,
13,15

**2007** 268:10
278:14,23

**2008** 246:15
271:14

**2009** 236:3,
11 237:2,6
244:15
249:2,9,
13,21
272:20
273:2

**2010** 244:20
266:9,12
267:15
269:1
273:18

**2011** 251:3,
24 252:4
268:4
269:11,16,
24,25

**2012**
236:12,22
237:9
257:14,24

**2013** 260:20

**2014** 166:20
169:24
171:17
172:5,24

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023                    Index: 2015..44

173:7
174:21
175:20
176:1
260:8
**2015** 258:18
274:8,14
**2020** 259:10
**2023** 8:13
**21** 235:2,8
259:12
**222** 270:19
**2245**
212:14,19
**22nd** 268:10
270:3
**23** 119:25
**23rd** 39:9
41:22
94:19
157:1
**24** 126:8
212:12
**24th** 241:6
**25** 274:7
**2577** 212:17
**25th** 240:12
271:14
**26** 221:20
235:3
273:2
**262** 190:9,

12
**26th** 269:1
**27** 29:24
235:3,8
**278** 191:23
**27834** 265:16
**27th** 270:8
**28** 29:25
**28th** 219:22
**29th** 274:8,
14
**2:00** 75:13
**2:07** 123:19
**2:52** 161:12
**2nd** 257:14,
24 267:15
269:11
270:15

3
**3** 25:5
113:22
127:17
165:22
166:10,17
180:14
184:1
**3/10/94**
165:11
166:5
**3/13/97**
46:11

**3/15/96**
222:19
**30** 88:15,21
114:11
210:19
**300** 92:2
**300-and-some-odd** 92:3
**301** 213:24
**301.11.A.11**
212:22
**307** 195:22
**30th** 28:20
41:19
228:25
**31** 177:1,2
**315** 197:23
**32** 262:17
**33** 21:21,23
22:13
231:20
**332** 199:25
200:7
**333** 199:24
200:7
**34** 27:22,23
41:14,18
**35** 32:2
38:25
39:3,7
41:22
**36** 40:17,

20,23
41:17,25
**37** 45:12,
14,24
177:1
**38** 93:23,24
**39** 105:20,
21
**3:13** 161:15
**3rd** 114:2
165:17

4
**4** 127:17
130:11
164:2
165:23
166:10,18
184:16
264:2,4
**40** 153:22,
23,25
154:1
**41** 156:16,
18 157:12
**415** 202:15,
16
**42** 163:21,
22,24
**429** 202:15
**43** 165:4,5,
8
**44** 171:25

www.huseby.com          Huseby Global Litigation          800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 288 of 357
**J.A. 1262**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023                    Index: 45..90s

172:1,3

**45** 212:1,3
 228:11
 230:13
 240:18

**452** 206:14

**46** 34:18
 213:16,17,
 19 228:10,
 13 230:13

**464** 206:14

**47** 216:9,
 10,14
 228:10

**472** 207:14

**48** 217:13,
 14,16
 250:10

**49** 219:16,
 17,20

**4:13** 211:20

**4:21-CV-
000185-BO**
 8:12

**4:27** 211:23

**4th** 113:22
 114:3
 165:17
 213:21
 223:2
 239:4

— 5 —

**5** 96:2
 246:1,6

**5/30/90**
 41:19

**50** 220:18,
 20,22
 222:25

**51** 222:11,
 12 227:20

**516** 224:6

**517** 224:3,9

**519** 224:3

**52** 235:9,
 12,13,15,
 17 243:17
 260:4

**53** 237:25
 238:1,3
 262:12,14

**54** 188:14
 245:11,12,
 14 262:15

**55** 240:7
 241:6
 270:20

**5:00**
 233:10,12

**5:26** 259:23

**5:30** 271:2

**5:39** 260:1

**5th** 79:8

— 6 —

**6** 113:10
 189:19
 190:4,5,14
 266:7

**60** 178:19

**63** 35:20
 36:20

**631** 164:18

**65** 38:2
 217:23
 219:8

**69** 238:21

**6:00** 271:2

**6:04** 279:22
 280:12

**6th** 240:5

— 7 —

**7** 191:17,
 18,19
 195:21
 267:13

**7/10/2013**
 260:14

**7/2/2012**
 236:18,20

**70** 240:7,18
 241:6

**75** 265:15

**7th** 164:4

— 8 —

**8** 197:23
 200:6
 215:25
 268:25

**8-hour**
 75:10,24

**8/1/91** 41:3

**8/11/2004**
 265:21

**8/22/91** 46:6

**85** 238:22

**86** 238:17

**87** 238:17

**88** 241:10

**8:00**
 233:10,12

**8th** 94:3
 236:10
 272:20

— 9 —

**9** 116:21
 132:6
 269:11

**9/11/1992**
 265:8

**90** 26:14

**90s** 53:9

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: 91..advised

91   26:14

93   213:21,
  25

94   60:4
  76:1
  133:23
  159:3

95   133:23

98   180:15

9th   8:13
  242:1

———————

A

———————

a.m.   8:14

abandoned
  37:8

ability
  12:13,21
  33:14 50:6

accelerated
  25:6

accepted
  216:21

accident
  61:22
  85:15
  112:11
  181:25
  239:14,15,
  19,20
  252:14,15
  274:16

accuracy

88:23

accurate
  46:15
  137:14
  145:12
  166:14
  169:12
  204:23
  279:14

acknowledge
  81:1

acknowledged
  95:7

acknowledgment
  95:4,8

acquired
  26:2,4
  209:8

act   126:18

acted   115:3
  116:7
  129:8
  193:19

acting
  126:12,16
  130:13
  148:4,5

action
  116:15,25
  117:1
  221:18,22

actions
  129:8

active

94:15,23
  160:4

activities
  55:8
  60:16,23
  61:5
  181:22

activity
  37:10,12
  44:14
  54:14
  60:12
  73:23

actual   62:10
  83:9,15
  85:17
  99:22
  108:5,6,13
  109:11
  126:1
  278:18,20

actuality
  148:22

add   138:20,
  22,25

added   56:3
  72:25
  138:12

addendum
  138:13,20
  149:11

addict   16:24
  17:1
  226:20,24

adding

204:19

additional
  26:3 55:7
  83:22
  191:14

address
  24:21
  137:22
  138:6
  155:4,6,8,
  12 164:21
  213:4
  228:16
  265:15

admin   233:7

administer
  56:12

admission
  165:10
  166:3
  260:13

admitted
  260:19,22

advance
  56:19
  83:25
  84:10
  167:12

advanced
  84:7

advise
  276:24

advised
  276:11,21

J.A. 1264

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023   Index: Aesthetic..appointments

Aesthetic
    212:18

affair  14:15
    193:12
    194:9

affairs
    222:17

affect  12:19
    74:3

affected
    63:2

affecting
    72:18

affidavit
    23:19
    279:9,14

affidavits
    24:11

affirming
    232:13

age  35:1,4
    117:10
    122:3
    229:9

agency  28:15
    47:7 95:6

aggravating
    244:22
    245:4,7
    246:11
    258:8

agree  165:14
    166:7
    180:1

agreed  19:7

agreement
    263:16

ahead  12:8,
    11 54:23
    67:11 68:9
    83:8
    111:25
    113:2
    166:20
    200:12
    250:25
    261:23
    274:6

ailments
    258:21

alarms  187:4

Alco-  275:4

Alco-sensor
    248:23
    249:18

alcohol
    34:13
    248:16

alcoholic
    34:19,24
    35:9
    194:24
    195:9
    258:22
    273:3

alcoholics
    195:11,14

allegation

223:2,13,
    14 227:22,
    23 228:7,
    24 229:4
    230:15

alleged
    229:23

allowed
    52:22
    186:8
    221:5
    261:20

allowing
    268:11

altered
    169:9

amitriptyline
    12:18

amount  51:16
    59:5 86:23

amounts
    92:12

Angry  141:4

annex  69:10,
    12

annual  90:17
    91:15

answering
    12:4 20:1
    57:25
    82:15
    232:10

answers
    11:17

22:15,25
    23:21,25
    161:19
    168:25
    232:3,13

anxious
    51:22

anymore
    13:25

Anything's
    140:21

appears  20:5
    47:11
    192:23

application
    26:16 28:6
    29:3,14
    36:6,14,15
    39:15,21,
    25 40:23
    41:15,19
    243:4

applied
    28:13
    35:25
    36:24 40:7
    242:18

apply  91:13
    267:1,7

applying
    28:22,25
    29:16 41:9
    42:4 218:3
    220:12

appointments

J.A. 1265

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023   Index: approached..assisting

129:16

**approached**
254:10

**April** 39:9
41:22
164:1,4
220:25
223:2
251:2,23
252:4
270:8

**area** 37:13
52:13 55:8
65:12
73:24
74:4,6
75:23
76:12,14
95:24
96:18,19
124:6
160:16
181:14,15
182:20
183:12
187:12,16

**areas** 91:3

**argue** 42:18

**argumentative**
83:7 88:6
89:5,12
100:5
111:1,20,
24 112:24
114:16
119:9

142:11
211:2
251:18
267:5

**arranged**
19:6

**arrest** 63:8
79:20
88:22
92:15,17,
21 93:3,8
109:13
223:15,22
254:1
256:19

**arrested**
44:21 65:8
76:24
79:13
100:20
234:18,23,
25 235:24
247:5
249:15
250:5,6
252:24
253:6
274:15

**arresting**
44:18
67:5,20
77:4

**arrests**
37:12
44:13,15
91:16,21

92:5,12
93:13
235:2

**arrive** 183:1

**arrived**
183:9

**arthritis**
25:5

**ascertain**
77:7

**asks** 30:1
32:2 35:20
233:22
234:17

**asleep**
213:25
214:4

**ass** 183:14
225:11

**assault**
61:23
189:17
226:14
234:25
249:24
252:1
268:3,6
269:3,15

**asserts**
234:2

**assessed**
221:25

**assessment**
221:24

**assigned**
52:11,13
58:16
71:23
72:23
73:1,15
74:1,4,6
96:17
102:18
171:13
181:14,24
183:22
208:5,7,
16,21,25
209:6,24
210:4,8
214:1

**assigning**
207:22

**assignment**
43:13
53:24
57:13
58:10,13,
15

**assignments**
52:7 54:6
55:5,12
56:12,23
57:1

**assistance**
94:18
212:21

**assisted**
94:9

**assisting**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: associate's..back

95:6

associate's
  25:22
  26:2,11

Associates
  212:19

assume
  13:10,12
  57:1

assuming
  163:7,10
  166:14

assumption
  140:4,10

Atlantic
  262:22

attached
  69:13

attempt
  115:2

attempted
  210:22

attempting
  148:5

attended
  25:22

attention
  129:3
  152:18
  174:14

attitude
  148:7
  217:2

223:7,10

Attitude/
demeanor
  223:3

attorney
  8:20,21,24
  9:2 12:7
  20:12
  22:17,21
  23:18
  101:11
  106:13,24
  107:9,24
  108:4
  110:4
  113:6
  114:20
  139:25
  166:21
  232:1,9,11
  276:7

attorneys
  19:25 97:9
  169:6
  184:20
  189:11

attribute
  93:6,11

audio   204:9
  279:5

August   42:1
  219:22
  265:18
  271:14
  273:17

Avenue
  164:19

average   69:5

aware   21:2
  58:2
  64:14,16
  71:9 79:25
  81:10
  114:7,9
  159:1
  167:13
  172:21
  209:15
  242:25
  248:13
  269:14
  270:12
  276:17
  278:1,3

away.'
  158:23

_____

        B
_____

baby   229:7

babysitting
  229:10

back   13:15
  32:17 37:9
  47:25 48:2
  51:2,3,11,
  13,22 73:2
  97:23
  101:8
  106:10
  114:19

119:5
126:6,10
130:10
138:7,10
141:17
142:23
144:4
149:8,9
152:17,21
156:5
157:2
159:3
161:18
169:4
177:6,25
179:19
184:1
188:3
196:8
200:21
214:10,14,
22 224:3
225:4,5
227:20
228:9
238:23
241:4
243:17,19
249:2
253:17
254:16
255:14,16,
17 256:14,
16 257:6,
13 260:8
262:12
263:4,25
269:16

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: background..blow

background
  25:10

backseat
  229:8

bad  91:2
  148:25

balance
  263:1,16

Bank  262:22

bar  263:14
  273:11

barely
  229:6,19

base  84:3

baseball
  251:11,15

based  19:1,2
  57:9 60:24
  148:12
  153:15
  221:2

basic  26:4
  39:16 62:8
  154:4

basically
  37:25
  48:23
  102:15
  132:17
  196:9,18
  215:25

basis  61:16
  84:9 91:7
  92:19

bat  251:11,
  15

Bates
  189:21,23,
  25

Baxter
  170:1,7
  171:17
  172:5,12,
  16,23
  176:1
  179:15
  203:17
  204:15,24
  223:25

beat  180:19
  181:18

Beatrice
  65:25 66:4

bed  216:3

beer  35:10

began  146:19
  227:4

beginning
  8:4 113:13
  206:6

behavior
  226:20,24
  227:5,10
  228:4

bein'  197:25

believable
  122:9,11,
  13,18

believed
  141:10
  207:5,12

believes
  199:21

bell  31:23

belligerent
  141:4,24

belt  268:21
  273:19,25

beverages
  34:19,24
  35:9 273:3

BF  154:14

Bible  87:21
  109:21
  133:12

big  224:23

bigger  37:2

biggest
  37:21
  77:5,7

binder  20:6,
  8,11,15
  22:7,8
  24:5

bit  10:13
  19:22 25:9
  49:23 53:5
  54:7 66:22
  87:4
  115:12
  134:21
  149:10

239:1
  250:3
  253:21
  272:6

bits  106:9

black  115:1
  154:14
  188:13
  192:4,7
  224:23

blank  38:17
  79:6

blast  120:2

bleeding
  181:1,21

BLET  25:22
  26:13
  36:11,13,
  17 80:1

blew  249:17

block  69:17
  79:8,10
  117:19
  128:1,3

blocks  37:9
  62:23
  70:2,12
  127:3
  180:17

blood  248:16

blow  32:8
  62:23
  63:5,7
  248:22

J.A. 1268

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                    Index: blowing..called

253:1

blowing
275:4

body  182:14
216:5

bogus  78:13

book  104:1

born  48:16
49:6
238:21

bother
139:3,4

bottom  46:23
155:2
156:22
235:18
236:17
245:21
262:17
264:4
266:8
270:2

box  47:8
225:7
226:6,8
227:6
233:18
265:1
267:14
268:9
274:7

Brady  38:18,
19,21

brain  33:3,8

88:2

brands  35:14

break  54:7
67:13,15
68:10,11,
14,18
123:9,12,
14,18,22
144:7
153:5,9
161:9,11,
14,18
163:17
211:15,18,
22 257:17
259:19,25

breakdown
14:16 52:6

breaking
272:21

breast  112:4

bridges
32:15

bring  60:16

broken
129:16

brother
121:19
128:18,21
132:19
254:3

brother's
121:9

brother-in-law

253:14
254:4,5

brother-in-
law's  255:6
256:1

brought
20:21
133:5
154:15
174:13
187:19

brown  17:19
19:19
69:7,9,18,
22 70:10,
16,21
72:24
102:12

Bruce  191:12

Bud  172:14

building
48:17
69:7,9,18,
22 70:1,3,
10,17,22
72:24
102:12
263:11,12

built  32:15

bunch  168:6

burnt  50:12
109:14

business
13:24 18:6
30:7 62:9

212:20

272:1

businesses
11:9 14:1
177:18

busy  78:5

_____

C

_____

c.1.  213:25

cabinet  14:2

call  54:6,
8,12
55:11,15
56:10,13,
19,21,22
57:20
61:19,20
62:16
65:10
72:9,17
84:20
115:21
124:13
128:7
159:9
161:1
164:7
171:10,19
181:16
183:4,7

called  69:7
74:17
103:14
183:24
214:19

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023       Index: calling..certificate

220:10
229:16
250:4
254:11
255:11,25

calling
33:17
178:1
254:22

calls  21:7
70:14
82:15,18
163:25
171:9,11

Candace
68:24

canvassing
182:8

capable
26:22 27:1

captain
53:14
207:16
217:25
218:10
219:4

car  61:22
70:15 75:4
96:6
113:15
114:25
115:4,13,
24 116:9
117:5
127:5,7,9,

14 139:10
141:24
143:11
144:18
148:6
151:16
154:18,22
157:6,18
161:24
162:20
165:17,23
166:17
179:9,16
182:14
183:1
248:14
252:18,22
256:22

card  222:15
227:21

cards  222:17

care  185:19

career  35:17
43:16,18,
22,24

Carol  8:7

Carolina
8:8,11
27:9 39:18
94:2
237:22
264:7
265:16

carolyn  8:9
9:5
101:20,25

102:24
192:5,6,9
193:2
194:24
195:22
196:6,13
277:7

cars  205:4,
19

Carver  115:8

case  9:19
10:5,6
18:1 21:2,
8,11,14
53:20
55:20 69:6
71:23
72:23 76:4
77:19
88:15,17
92:21
102:3,19
103:8
105:12
107:21,22
112:14
116:3
134:25
135:4,16,
19,22,23
137:9
145:9
150:11
164:8
171:13
172:25
173:6,12

178:20
196:9
197:21
198:2
199:2
207:22
208:5,7,
16,21,25
209:6,25
210:4,8

cases  79:12
120:12
194:2

cash  92:3

CAT  33:11,
12

catch  78:3

categories
90:21

caught
214:17
261:12
262:3
267:10

caused  13:20
198:1

causing
198:4

cell  188:3

central
60:16

certificate
26:5

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: certified..child

certified
  35:22
  36:7,8

CFSID  164:4

chain  126:2

chance  49:14
  117:20
  118:4

change  52:15
  57:8 59:3,
  14 188:19

changed
  59:23 75:9
  136:1

changing
  75:11

Chapter
  221:20

characteristic
s  260:11

characterizing
  84:17

charge  136:5
  226:11
  250:2
  251:1
  254:1
  267:16,18
  269:15,19

charged
  226:9
  234:19
  235:24
  245:3

247:8
249:8
252:1,4
257:8
264:8,16
266:12
268:11,14
269:2
270:8,11
274:8,15

charges
  226:16
  245:22
  271:15,20
  272:10
  273:2,6

Charlene
  95:17,20,
  22 96:5,15
  97:24
  98:10,16,
  17 99:3,9,
  14 100:8
  101:8,13,
  18,21
  102:6,22
  105:5,10
  109:12
  110:5,9
  112:20
  113:13
  114:2,21
  119:19
  123:23
  127:2,20
  128:14,22
  129:5,25

131:2,6,
12,14
132:16
133:5
136:4,21
137:21
139:7,9,12
141:22
143:11
144:15
147:18
148:12
149:17
152:23
153:16,18
154:22
155:4
156:22
159:2
161:20
164:9,14
165:10,14
166:1
178:25
179:16
184:5
201:9,18
202:4,11
203:18
205:4,18
210:25
211:7
232:20
276:12
277:7

Charlene's
  128:9
  129:10,15

130:7,11,
20 131:24
137:23
143:22
146:15
162:19
206:2
232:24

Charles  40:8
94:3 155:5

check  32:4
33:7 73:2,
5 81:19
98:21,22
160:9

checked
  34:20 47:8
  143:22

chicken
  115:15
  116:1
  157:6,18
  158:7

chief  43:2
46:23,24
47:16
53:14
94:3,4
95:7
216:15
217:17,19
219:21,24

child  18:10,
13,25
19:3,10
229:6,8,

J.A. 1271

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023       Index: childish..committed

10,17

childish
  122:17

children
  18:24
  19:16,20

choice   96:19

choose   73:18

Christine
  38:16

chronological
  126:3

chuckled
  49:23

CI   62:22
  64:15,17
  65:25
  66:2,4,7
  77:10
  86:14,15,
  17 87:11,
  15,16
  95:20
  120:23

cigarettes
  261:14,21,
  24 262:10

Cindy   38:8

circle
  161:18

circumstances
  13:19
  16:21 74:8
  122:5

162:25
210:24
249:12
267:20

CIS   63:11,
  14,22
  64:7,10,
  13,20
  65:2,4,7,
  17 66:10,
  15 68:18
  77:17
  85:20
  118:8

citation
  264:11,15,
  24 265:12,
  25 273:18

cited   240:1

citizen   95:6

citizens
  62:9

city   8:7,25
  9:2 39:8
  40:5,23
  41:10 42:5
  49:20 55:9
  80:19
  174:23,25
  175:4,9
  177:7,16,
  25 178:3,6

civil   8:12
  62:1
  262:21

263:6

claim   32:3,
  21

claimed
  182:16
  210:11

clarification
  35:3 48:1
  248:2

clarifying
  113:10

Clark   112:20
  177:23
  178:14

class   188:4
  221:19,22

classic
  226:20
  227:8,14

Classification
  260:25

clean   65:9
  182:25

cleaned
  44:24
  188:15

clear   12:25
  26:6
  138:18
  184:4,9

Clements   9:1
  106:3
  123:6,8
  153:25

climb   37:7

clock   216:6

close   27:7
  113:20
  115:5
  120:1
  187:14

closely
  66:21

closer
  133:22

clothes
  227:6

club   32:10,
  11 264:14

co-defendant
  185:10

college
  25:14,15,
  17 38:7

column   260:9

commended
  217:11

commercial
  263:11

commitment
  130:15
  147:22
  206:2

committed
  131:2,25
  146:22
  154:9

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023 Index: communicating..contained

156:3,4

communicating
58:4

communication
21:16
76:20
277:6

communications
58:5
112:14

community
25:13,15,
16,20 38:7
43:25 74:3

comp 32:21
33:22,23,
25 56:1

company 14:3

compared
49:15

comparing
150:9

compensation
32:3

complaining
223:7,10
228:4

complaint
222:15,16,
23 223:4,
18 225:16,
22 229:22
230:7,24

complaints
223:21
227:25
231:2,9,13

complete
88:23

completely
33:20
48:15
169:12

comply
265:20

comprehensive
245:15
262:13,14

concentrate
44:3 75:22

concentrated
73:24
92:10

concern
148:14

concerned
35:6 75:14
76:23 92:7
116:6
132:25
140:13
178:25
195:8

CONCLUDED
280:12

concludes
279:21

condensed
260:5

conduct
228:24
230:14

conducted
230:18
278:5

conference
212:6,10,
11,12
213:20,22,
23 214:15
220:23,24
221:1,2

confident
76:13

confidential
64:3 68:18
79:24
120:17
125:5
262:13
277:10

conflict
198:20

conflicted
152:2

conflicts
151:8

confusing
41:13

confusion
72:25

connected
132:17

connection
26:16

consequence
213:7
240:2
241:17

consistent
208:1
209:1
210:7

construction
14:3
262:25
263:23

consult
154:9

contact 15:9
72:21
97:24 98:9
168:10,12,
14 179:3
186:9
187:8,9,
12,15,16
217:25

contacted
167:4,5
172:25

contacting
112:13

contained
279:13

J.A. 1273

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023    Index: container..correct

container
  271:19

content
  22:20

contents
  234:5

contested
  18:3,7,10,
  13,16

context  10:3
  77:4

continue
  266:15

continued
  11:8
  185:20

continues
  217:2

continuously
  166:15

contraband
  262:5,10

contractor
  49:11

contractor's
  49:7,13

conversation
  21:17 48:6
  97:3
  129:1,4,25
  131:19
  132:23
  163:10
  168:3

172:4
175:16,19
178:2,12
219:1
223:25
242:23
276:14

conversations
  22:20
  220:14

convicted
  45:5
  199:13,22
  236:23
  241:12
  244:20
  251:2,23
  272:21

conviction
  103:12
  104:6
  184:24
  198:3,15
  199:14,23
  236:2,10,
  11 244:6,
  8,14
  249:24
  253:9
  257:24
  258:9
  264:10
  265:20
  270:17
  272:22
  273:23,24
  274:4

275:7

convictions
  236:2,24
  237:2,6,9
  260:5

copies  60:15
  222:16

copy  20:12
  60:22
  80:17,18
  103:9
  105:23
  108:13
  231:20
  280:4,8

copyright
  10:7,8

corner
  109:18
  113:3
  115:7,9
  155:3
  156:23
  157:1
  190:5
  200:20
  221:11
  222:19
  227:21
  228:19,24
  235:18
  265:7

corporal
  53:13 54:3
  56:14,17
  57:21,24,

25 58:11,
12 59:12,
18 127:18,
24 128:10,
22 129:24
130:8
131:1,5,
11,21
146:21

correct
  13:13
  17:23
  20:13 32:4
  41:7
  46:20,21
  56:24
  68:3,4
  94:5 98:2
  106:8
  107:17
  109:23
  112:22
  122:4
  133:17
  135:6
  142:8
  151:19
  161:25
  166:18,19
  186:24
  187:8,17
  188:12
  197:15
  228:16
  237:3,7,9
  238:10
  246:4
  262:2,10

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: correction..criminal

265:14,16
276:22
278:14,23,
25 279:2,
11

correction
94:2,16,23
127:21

correctly
30:10
39:19
94:20
113:24
115:10
179:12,13
181:3
190:25
203:15
207:19
208:2
212:24
225:13
235:5
237:3

corroborate
66:12,19,
25 67:4,
19,23
78:18
125:7
150:3,21

corroborated
78:19
150:25
151:13

corroboration

68:6 125:6

cost  272:3,
5,9

cou-  207:14

could've
26:3 56:9,
16 120:18
121:18,21,
24 185:1,
11

Counsel  8:16
54:24
125:21

count  29:20

country
31:20
32:10,11

county  15:19
17:10
24:22
27:14
154:3
156:21
165:8
166:2
234:20
243:20
244:8,11,
14,16
245:23
252:11
258:6
265:21
270:3,8,
15,19

271:15
272:20
273:2
274:8

couple  28:2
59:23
70:2,12
73:10
138:10
180:16
189:7
190:18
202:14
212:1
276:10

courses  64:2

court  8:10,
17 11:15
12:9 56:1
88:17,21
89:8,15,
22,24
94:13
106:17
122:24
175:8
177:6
204:18
241:13
250:24
272:6
274:21
279:24
280:3,7

courtroom
174:24

cousin  27:12

Coutren
263:7,17

cover  63:24

covered
247:16
248:11

crammed
224:24

crashed
183:2

Craven  264:7
265:21

crawl  37:8

credibility
86:23
149:3

credible
124:22

credits  26:3

crime  134:16
234:19
235:24
238:7,10
260:10

crimes
135:25
182:1
183:24
236:24
277:2

criminal
25:18 36:4

J.A. 1275

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: criteria..day

62:1,11,17
120:11
135:8
219:22
220:2,5,10
237:15
245:15
275:19,24
278:12

criteria
218:8

cross   134:14

cross-   89:21
90:1

cross-
examination
113:8
276:8
277:18

cross-examined
89:24

crowd
200:22,25

crying
132:19

cucumbers
31:22

current
17:16

curriculum
25:18

cussing   96:9
117:6

custody

18:14
19:5,6
221:6
260:25

cut   32:23
225:7

cutter   225:7
226:6,8
227:6

—————————
D
—————————

DA   108:8,
12,15,21

damage   62:1
245:25
247:8
248:9

damn   185:11
186:12
192:16
224:4,7,13
225:7

Dana   17:17
19:19

Dana's   17:18

danger
186:17

dark   47:11

date   8:13
28:20
41:1,3,18
43:8  46:5,
11  111:15
112:8,12

154:7
156:25
158:5
164:15
165:10,11
166:2,5
174:23
212:7,9,10
213:21
220:24
221:2
222:24
223:2,13
228:6
234:20
236:5,18
240:24
243:25
244:6
245:22
260:13
265:8
275:7

dated   39:9
41:22 42:1
94:3
216:15
219:22
222:19
227:21

dates   16:19
42:20
111:4,5
158:4
166:12,14
225:20
228:18

237:17

David   8:6
9:8  173:25

Davis   38:16
127:18,24
128:10,22
129:24
130:8,14
131:1,5,
11,21
146:21

day   53:24
55:5  56:1
57:3,9
58:12,17
60:16,24
61:5  62:4
74:24
82:14
96:17
98:1,13,16
102:5,8
111:6,7,8,
10  112:6
145:1
154:21
156:4
172:20
177:11
203:3
204:2
205:4,19,
23  214:10
224:4,7,
13,15,19
225:19
233:10

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: daycare..deposition

258:13
263:19

daycare
14:2,8,9

daylight
203:13

days  88:21
110:12
113:8
137:14
138:10
142:7
143:19,21
144:19
214:8
232:25

dead  65:19,
23  185:2

deadly
226:14

deal  12:11
63:22 64:2

dealer  67:2,
4,18,21

dealing
49:14

dealt  263:19

Dear  39:11

Deborah
130:15

December
212:12
240:18
267:15

decide  26:19
160:10
199:17

decided
126:13

deciding
61:16

decision
83:25
84:4,5,10
86:9

deer  270:16
271:8

default
263:2,23

defendant
8:10
10:15,19

Defendants
8:8,24
235:3

defending
251:16,22

defense
86:15
87:6,10,14
136:15

degenerative
25:5

degree  25:22
26:2,11
34:21
41:13
169:9

deliver
233:15

Delivered
30:21

demeanor
130:7
132:14
223:7,10

department
27:13,15
28:7,16,23
29:1 37:6
39:14
41:15
42:24
43:5,20
45:8 46:1
47:19
48:13 49:9
52:2,4
53:8 55:10
59:1,6
60:11
66:5,8
69:2,3,11,
16,24
70:8,11
79:23
80:4,9,12,
16 82:11,
21,24
83:5,13
91:8 94:2,
8,16,22,25
103:18
134:24
154:6,16

159:18,20
164:1
170:24,25
193:12,17
195:6,14
196:21
197:17
198:18,19
214:15
220:4
242:19
250:5
259:14,16

depended
52:18
61:19
62:16
63:20
66:20
72:17
91:23
107:21
125:11
171:10

depending
54:4 55:25
56:15 75:7

depends  89:7

deposit
60:22

deposition
8:4 9:21,
22 10:1,22
11:2,5
12:25 18:9
19:23,24

J.A. 1277

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023    Index: depositions..discussed

20:4,20,23
97:14
106:6,7
279:11,22
280:12

depositions
11:13
13:16 18:1

deputies
253:16
255:25

deputy   27:14
255:4,18
256:9

describe
52:1 69:1,
3 80:2
115:22
188:13
233:22
261:13

describing
141:3
158:7

description
67:25
115:16
157:23
206:9,11
260:7

detail
233:22
249:5

details   30:4
32:6 87:25

89:2,7
126:3
191:14
211:6
221:1
235:1
244:5

detained
186:4,6

detective
72:22
125:2
134:25
135:20
136:13,22
137:11,20
141:14
143:18,21
145:13
146:14,20,
25 147:7,
8,14,17
148:16
149:10,16,
23 150:13,
22 151:3,
25 152:4
170:1,7
172:5
183:22
192:4
193:8,24
194:3,6
207:2,9,21
233:2,16
276:11,22,
24 277:3,

24,25

detective's
71:17

detectives
56:7
69:10,19,
22 70:5,20
71:7,9
73:1 90:8,
12,15
120:21
121:14
122:22
124:1,9,17
233:9

determine
77:9

determined
146:7

develop
43:18

diagnosed
25:4

Dickinson
164:19

difference
26:25
93:19

differences
13:21,23

differently
89:9
117:11
158:11

direct   9:17
53:10
57:2,8
152:18

directed
77:15
130:15
243:19
249:23

directing
152:17

directly
71:15,19,
22

dirt   253:16
256:6,7

disability
25:2,3,7

discharge
165:9,11
166:1,5

discharged
30:1

Disciplinary
221:22

disclose
242:19

disclosures
235:4

discovered
144:4,23

discussed
39:12
222:21

J.A. 1278

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: discussion..dozed

discussion
  27:25
  45:13
  61:24
  136:24
  165:2

disfigurement
  34:3

dismissal
  274:2

dismissed
  267:22

dispatched
  181:13
  212:14
  277:2

display
  268:13

disposition
  230:16
  234:21
  265:8

dispute  18:7

disrespectful
  117:13

dissatisfactio
n  30:8,13

disseminated
  159:6

distant
  31:19

distributing
  44:17

distribution
  11:8 18:6

district
  8:10,11
  52:17
  88:17,20
  101:11
  106:12,24
  107:9,23
  108:2
  110:4
  113:6
  114:20
  139:25
  160:18
  214:2
  241:13

districts
  52:16
  55:12 74:2

ditch
  246:19,20
  252:21
  253:20
  257:5

ditches
  32:16

division
  8:12
  51:23,24
  53:16,17
  57:17
  59:20
  114:23
  170:17
  220:9

divisions
  56:7

divorce
  10:4,25
  11:6
  13:15,20
  15:4,13,20
  16:22
  17:10,25
  18:3,5,8

divorced
  13:17
  14:25
  16:18,23
  18:23

divorces
  17:22

DOC   94:8

doctor   156:6

doctor's
  155:18
  156:1

document
  22:6,11,12
  28:6 48:8
  164:2
  236:9
  249:4,5

documentation
  233:24

documents
  20:15,16
  24:9,13
  97:10,13,
  17 167:21,

24 168:5
  249:3

dollars   92:3

domestic
  267:15

Dondy   133:2

Dontae   8:5,
  9,20 9:19
  21:1
  100:10,17,
  20,22,25
  101:3,9,
  14,17,22
  103:7,12
  104:3,6
  109:13
  132:25
  133:2,3
  173:6,16,
  22 174:3,5
  175:10
  176:5
  196:22
  197:21
  198:22

Dontae's
  185:10

door   188:17

dope   62:23

downhill
  215:1

downtown
  75:14

dozed   214:19

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023            Index: drank..dynamics

drank  215:22
  259:4,5
draw
  111:17,19
  112:2
drawing
  38:17 79:6
drink  34:18
  259:1,11,
  15
drinking
  35:6,8
  215:18
  239:22
  253:15
  254:3,7
  256:25
  258:11,13,
  15,17
  259:3
  270:24
  272:13
drive  70:2,
  14 79:9
  177:15
  229:19
  265:15
  266:15,19,
  23
driven
  267:12
driver's
  85:16
  238:14
driveway

179:21
driving  96:2
  114:24
  127:11,12
  129:6
  161:24
  234:23
  245:25
  249:9
  266:4,8,11
  267:10
  270:9,12
  274:9,13
drop  226:7
dropped
  267:23
dropping
  128:5
drove  127:5
  147:15
drug  16:23
  17:1 43:23
  44:1,8,9,
  14 45:5
  56:8 67:2,
  4,18,20
  73:23 77:1
  93:13
  226:16,20,
  24 227:10,
  15
drugs  17:2,6
  34:13
  44:6,10,
  12,19,20,

24 73:22
  77:18
  129:11
  139:13,20
  140:3,18
  141:7,11
  142:3,15
  143:15
  145:14,20
  146:7
  205:23
  215:20
dude  206:19
due  30:6
  32:7
  216:20
duh  207:23
DUI  246:14
  249:2,6,
  13,21
  250:10
DUIS  266:15
Duke  158:4
  166:21
  167:2,6
  169:14,18,
  21 173:1,
  8,10
  175:23,24
  184:22
  185:15
  187:23
  189:12
  191:2
  279:5,6,10

duly  9:15
duties  35:24
  36:23
  221:5
duty  37:1
  95:5,9
  214:1,4
  221:19
  222:19,21,
  23 228:20
DV  269:12
DVPO
  267:23,24
  269:13,23
Dwayne  28:10
  41:7
  265:13
DWI  92:12
  236:3,5,
  10,12,17,
  22 243:19,
  24 244:21
  245:3,8
  246:1,4,7
  252:5,9,12
  253:8
  257:14,24
  258:5
  266:5
DWLR  266:8
DWRL  270:11
dynamics
  157:3,10,
  14

J.A. 1280

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023                    Index: ear..ended

**E**

**ear** 32:23
  34:3

**earlier** 73:9
  120:11
  183:15
  215:4
  231:25
  233:1
  234:6
  276:16

**early** 52:5
  53:9 55:4
  113:19,22
  114:2
  238:4

**easily**
  185:12

**Eastern** 8:11

**ECU** 55:9

**ED** 154:6,15

**Edgecombe**
  17:11
  24:23
  25:12
  27:14 38:6
  243:20
  244:9,11,
  14,16
  252:5,11
  270:19

**Education**
  36:3

**educational**
  25:10

**effect**
  109:13

**effected**
  92:1,5

**effective**
  44:13 53:3
  111:14

**efforts** 44:3
  75:22
  92:10

**elevator**
  102:16

**Elizabeth**
  8:23
  174:23,25
  175:3,9
  177:7,16,
  25 178:3,6

**Ellis** 9:4
  54:20,24
  60:18
  61:18
  67:22
  68:22 72:6
  91:9
  106:21
  107:3
  110:24
  114:15
  129:12,17
  131:3
  133:6
  154:23

158:13
  167:9
  180:9
  187:1
  193:1
  194:22,25
  195:25
  197:7
  199:6,10
  226:24
  227:12
  235:12
  254:23
  256:10
  276:7,8,21
  277:16
  280:7,9

**emailed**
  23:18

**emails** 21:10
  24:11

**emergency**
  154:6,15

**emphasized**
  47:12

**emphatically**
  47:22

**employ-**
  52:19

**employed**
  24:24
  80:19
  82:4,10
  215:13

**employee**

14:23,24
  15:5 32:8
  212:6
  213:20
  220:23
  221:12
  222:15,16
  272:2

**employees**
  14:13,15
  49:2 59:24
  228:1

**employment**
  39:13
  40:23
  41:14
  48:9,12
  81:20

**encountered**
  61:9 159:3

**encouraged**
  146:21

**end** 60:17,
  21 61:5
  74:1,2,24
  85:5
  112:3,10
  130:11
  200:7
  248:8

**endanger**
  245:25

**ended** 33:17
  59:20
  73:25

**J.A. 1281**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: enforcement..exhibit

92:1,11
96:13
98:6,20
138:9
181:24
185:1
186:12
214:17
225:4
229:5,13
239:21
246:16,18
250:23
252:13
255:12

enforcement
26:4,17
27:5,9,17,
19 39:17
43:23 44:8
48:15 67:1
227:16
275:20,25
277:21

engage
181:22

enjoyed
48:16

Ennis    207:17
229:15
230:17

enormous
92:12

entering
272:21

entire    58:14

entirety
106:11

environment
194:10

equipment
32:15
268:16

equitable
11:7 18:6

escape    221:5

Etran    280:5,
9

evade    254:1

evaluated
90:22
91:18,22
92:13,16
94:24
132:8
147:6,24

evaluation
93:16
147:15
216:17,19,
22 218:7
228:11

event    272:10

events    76:4
97:17
104:23
109:7
126:2
191:3

Everett
112:20
178:5

Everett's
178:14

everybody's
160:22

evidence
150:10,20,
21 151:1,
8,13,17,19
198:13
199:22
234:4

evident
266:16

Evidently
101:2
110:19

ex-father-in-
law    38:11,
13

ex-wife    14:4
38:15
250:3
267:19

exact    31:2
52:6 97:3
185:19

exam    49:13

examination
9:17 90:2

examined
9:16 89:22

exceeding
240:11
242:1,11
270:4

excelled
91:1

exceptional
95:5

excessive
223:15,22
225:15

exchange
21:10

Excuse
168:11

exemplary
95:9

exhausted
50:11,14,
18 215:23

exhausting
215:5

exhibit
21:21,23
22:13
27:22,23
38:25
39:3,7
40:17,20,
23 41:14,
16,18,22,
25 45:12,
14,24
93:23,24
105:20,21

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: exhibits..February

153:22,23
156:16,18
157:12
163:21,22,
24 165:4,
5,8 171:25
172:1,3
212:1,3
213:16,17,
19 216:9,
10,14
217:13,14,
16 219:15,
17,20
220:17,18,
20,22
222:11,12,
25 227:20
228:10
230:13
231:20
235:7,9,
13,15,17
237:25
238:1,3
243:17
245:10,12,
14 260:4
262:12,15

**exhibits**
280:6,9

**existed**  52:4

**existence**
276:12

**existing**
69:11

**exonerated**
228:5
230:16,21

**expected**
159:18

**experience**
33:5,8
76:14
83:20,24
116:12

**experimental**
34:22,23
35:5,7,11

**explain**
54:10,15
144:12
254:25

**explained**
244:21,24

**extent**  67:24
192:22

**extra**  64:2

**extremely**
50:7
137:12
185:8
188:20

**eye**  160:19

**eyes**  225:12
226:5
271:6,7

**eyewitness**
141:16
147:10

182:17
210:12
276:18

_____
**F**
_____

**face**  152:13

**faces**  65:20
195:17

**fact**  14:20
33:23
88:10,17
120:22
133:17
156:4
179:6,25
184:18
197:25

**factor**
245:5,8

**factors**
244:22,23
246:10,11
258:8

**fail**  228:7
271:16

**failed**
258:20

**failure**
239:4
240:1
245:24
265:20
273:18,25

**fair**  13:13

29:4 68:6
84:18,19
87:8 105:9
110:22
115:16
133:22
134:1
145:12,18
147:5
148:11
206:10
216:5

**falling**
213:25
250:20

**familiar**
22:12
76:11,16
81:21
84:25
100:14,17
155:11
164:21,25
246:11

**family**  27:4
31:18

**farm**  31:14

**farmhand**
31:24

**father**  38:14

**February**
94:18
113:16
154:7
157:1
165:15

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: federal..flip

166:6,15
216:18
236:10
240:11
241:10,13
242:1
269:16
270:3
273:1

**federal**
10:5,6

**feel** 13:6
22:10
33:14
49:24
51:2,11
76:13
251:13
258:20

**feeling**
123:7

**fell** 19:9
32:18
214:3
253:20
263:15

**fellow** 32:17
223:21
227:25
264:12
265:11

**fellows**
184:22

**felony**
106:19,20

226:13

**felt** 26:22
105:11
116:14,23
117:9,13
190:22
199:3

**female** 61:23
115:1
154:14
235:1
249:24
268:3
269:15

**fence** 180:25
181:19
246:18
247:9

**field** 31:21
36:4
84:12,14,
23,25
85:3,6,21
86:13
87:17
99:4,10,
15,23
100:1
111:4
112:6,19
121:1
270:21
271:5
275:1

**fieldnotes**
60:15

**fields**
31:11,13,
16 35:21
36:21

**fight**
199:13,23
257:6

**figure** 53:23
124:10,21
159:21
198:7

**figured**
230:21

**figures**
230:6

**file**
222:15,17

**filed** 32:2
33:22
158:21

**files** 168:6

**fill** 22:15
47:5

**final** 46:11
228:23

**find** 56:22
63:7 66:24
71:6 87:11
96:14
144:7
160:25
161:2,4
163:9
185:9

214:13
218:19
233:17

**finding** 67:4

**Findings**
154:12

**fine** 161:10
177:4
241:20

**finish** 12:2
25:21
125:3
143:3,7
209:18,20
248:3

**finished**
46:19

**finishing**
26:1

**firearm**
270:16

**fists** 253:25

**flag** 151:9
152:3

**flashlight**
270:20
271:4

**Fleming**
95:25
114:25
115:7
156:13

**flip** 29:16,
22,23

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023        Index: flipping..friends

164:1
233:21
243:19
260:5
264:1
274:7

flipping
112:3
115:6
236:14

floor  70:4,
7,19
102:1,12

floors  70:16

Fo-uh  192:18

focus  53:19

focused
129:3

folders  55:6

folks  128:1
182:4
193:14
200:1,9,15
279:5,6

follow
149:9,24
207:5
210:20
218:10

follow-up
120:3,5
164:8
169:18
176:5

220:14
277:19

food  227:6

foot  75:16

football
239:16

for-  207:19

force  48:20
56:8
223:15,22
225:16

Fordum
192:19,20
193:11

form  23:10,
22 40:12
50:15
51:6,17
53:25
54:21
55:22
57:4,14
58:19
61:10
62:5,13
64:22 67:6
71:11,24
72:15
77:11,23
79:15
86:19
88:12
92:23
95:1,12
97:19

99:17
100:4
103:2
104:11
105:13
122:6
124:19
125:8
131:16
132:2
133:6
137:4,15
139:14
145:15
146:3
151:20
152:5
158:1
162:7
167:9
178:7
186:1
193:25
194:12
201:14
205:6
232:2,4,12
251:7
256:10
264:18

formulate
194:1

Forrest
65:24
78:2,15
79:12,14
277:10

Forrest's
78:23

forward
244:2

found  75:21
121:4,12
124:3
141:18
167:14
182:14
185:13
227:7
237:20
246:22
248:17
262:20

foundation
130:4
195:1
199:7
226:22
272:15

frame  113:7,
10 173:14
174:17

free  13:6
22:10

frequently
59:3 70:21
75:6 85:14

fresh  109:14

Friday
212:13,16
228:10

friends

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023         Index: front..GPD

65:10
73:21

front   20:11
22:11 24:9
28:9 32:19
48:8 90:3
96:7 103:9
110:20
113:14
115:4,13,
24 116:4
126:6
136:15
144:17
148:6
154:17,22
165:17,23
166:17
168:4
179:9,16
205:4,19
223:25
231:19,23
243:18
246:23
278:22

full   86:11
249:5

funded
263:14

furthest
105:8

fussing
128:18,20

future   86:7

**G**

G-W-Y-N-N-E
16:14

gain   92:22

gained   76:14

game   154:17
239:17

Gary   38:17,
19,21

gas   177:11,
19

Gaston
266:13

gathered
150:11

gave   20:12
53:24
66:13
67:2,17,24
78:7 79:12
86:14
87:16 97:9
119:2
125:12
127:15
137:23
138:2,12
141:5
149:17,20
161:19
192:2
206:11
207:4

general
148:7
186:23
188:9,12,
25

generally
194:10

gentleman
264:25

genuine
148:22

George
100:23
110:5
161:21
181:6
277:13

gesture
115:23

get along
13:25

girl   229:25

gist   35:15

give   30:4
32:6 45:22
54:6
66:11,17
72:19
74:24
76:24
77:22
91:24
135:1
136:6
137:19

146:17
168:24
171:18
210:23
224:8

giving   81:17
179:23

glass   168:13
187:6
188:17

Global   8:15

goal   43:24
44:20
49:10

goals   43:16,
18,22

goin'   178:23
225:4

good   9:18
54:25 78:8
91:2 95:8,
10 123:6
148:24
174:25
211:18
217:1
259:19
279:20

goodness
225:9

gotta   11:20

GPD   63:25
64:9 69:23
159:18

194:11
197:11
209:5,12,
23 210:2,
7,20
215:15
226:19
227:4
233:23
234:3,8,25
235:2,8,19
236:4,15
243:23
252:6
257:15,25

**grabbed**
225:10
253:19
254:18
255:15
257:4

**grades**
224:24

**graduated**
39:16

**grain**  121:11
123:25

**grapevine**
203:8
204:14

**graveyard**
181:20

**grayed-out**
268:9
274:7

**great**  49:14
76:20

**Greenville**
8:8,25 9:3
28:7,15,
22,25 29:5
39:8,14,22
40:24
41:11,15
42:5,23
43:5,10,
15,19
45:1,8,25
49:16
52:2,14,21
53:8 59:1
66:5 69:1
73:24
74:5,6
75:23
76:12,22
79:3,11,22
80:2,3,9,
12 81:18
82:20,24
83:5 91:8
94:24
96:18,19
100:15,18
103:18
154:16
155:9
159:7
160:21
163:25
164:23
169:25
177:16

212:15,18
220:4
221:20
224:15
225:20
242:18
259:14,16
263:15
265:16
270:19

**Groccia**
170:1,9,11
171:4,17
172:4,13,
23 176:1
179:15
203:17
204:15,25

**groggy**  12:20

**grossly**
244:22
245:4,7
258:7

**ground**  11:12
257:5

**group**  95:25
96:4,22
98:3,14
99:2,8

**guardian**
126:20

**guess**  24:13
27:12
42:18
76:22
86:22

102:21
103:19
105:7,16
122:16,17
158:15,16
168:17,18,
20 197:2
204:11
222:24
248:5
263:19
272:18

**guessed**
237:4

**guidelines**
81:9,11,14

**guilt**  199:4

**guilty**  251:1
265:2,9

**gun**  120:2
225:12
226:3,7
269:3,8

**guy**  65:22
188:13
192:4,7

**guys**  209:16

**Gwynne**  16:12
18:5,19
38:15,16

---
**H**
---

**habitual**
274:9

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: had've..Hey

had've
  218:23

Halifax
  267:14

hall   102:11

hallway
  175:15
  188:16
  225:5

hand   40:18
  45:16
  87:21
  93:22
  163:20
  220:17
  226:6

handed   22:13
  24:2 41:25
  55:6 57:1
  73:6 154:2
  212:5

handing
  56:23
  219:15
  245:10

handle   51:5
  54:5 64:7
  198:15

hands   48:17
  256:18
  257:2

handwriting
  157:15

Hang   28:2

236:14

hangin'
  200:19

hanging
  66:16
  201:6

happen   13:9
  50:13
  120:1

happened
  32:14
  33:1,16
  97:17
  147:3
  149:1
  180:17
  182:25
  183:14
  207:24
  214:23
  226:2,5
  239:18
  247:4
  250:14
  255:20
  257:3
  274:14

happenin'
  196:4

happenings
  55:4

happy   153:9

harassing
  228:4

harassment

227:22,23
  228:1

hard   51:4
  216:4
  239:2
  274:24

harder   78:3

Harrell   38:8

hauled
  183:14

head   32:7,
  8,13,18
  87:19
  203:6
  204:13
  226:7
  238:16

head-butted
  250:3,17

head-on
  116:2

headache
  178:23

headquarters
  69:23

heads-up
  171:18

headshake
  11:18

health
  129:16,20

hear   12:13
  131:21

183:3
  218:21
  256:15

heard   21:4
  100:12
  115:14
  121:6
  124:5
  126:5
  127:11
  128:1
  174:18
  182:5
  195:3
  203:8
  204:14
  206:18
  231:13
  254:22

hearing
  34:4,6,9
  103:7,8,11
  104:5,16
  131:23
  172:23
  274:24

held   29:15

hell   219:9

helping
  72:18,25

helps   88:19

Hey   65:14
  66:11,17
  160:8
  174:25

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: hierarchy..house

hierarchy
  53:13,18
  57:19
  59:12,13

high  25:11,
  14 238:24
  239:16

highest
  258:4

Hindsight
  148:19

Hinman  40:9
  43:2 46:23
  47:16 94:4
  216:15
  217:17

Hinman's
  46:24

hired  40:8,
  10,11
  42:23
  43:4,9,17
  81:18
  170:22

history
  29:18,24
  157:3,4,
  10,14,16
  237:15
  238:4
  245:15
  275:19,25

hit  251:11

hit-and-run
  245:24

hitting
  251:14

Hm-mm
  176:15,18
  215:21
  219:11
  222:5,10
  223:8

hobbies
  35:23

hodgepodge
  54:13

hold  111:22
  253:19
  254:18
  255:15
  257:4

holes  198:14

Holiday
  91:25
  92:17 93:8

hollering
  96:9
  254:15
  255:13
  256:15

home  50:19
  98:6 99:9
  121:8
  126:14
  127:4
  132:12
  143:12
  144:18
  148:1

152:21,23

Homemade
  35:13

homicide
  147:7
  148:21
  149:24
  277:12

honest
  168:25
  169:16

honestly
  97:22
  114:10
  125:16
  150:17
  174:15

hope  267:9
  276:3

hospital
  48:14,18,
  22 49:1,3,
  10,15 55:9
  99:14,21
  132:7,9,
  11,22
  133:4,7
  141:18
  143:2
  144:19,22
  145:1,3
  146:22
  147:6,15,
  23 152:24
  153:16,17
  154:4

156:21
  164:16
  165:8
  166:6
  202:19,22
  203:19
  248:25
  253:3

hospitalized
  165:15
  166:15

hour  96:2
  270:20

hours  26:1,
  7,8,9
  214:9
  224:20
  250:10

house  79:7
  98:21
  126:10
  127:1,19
  128:2,17
  133:9
  161:25
  162:20
  164:18
  172:24
  203:4
  204:2
  246:17
  253:15
  254:13
  255:2,5,6,
  14,16
  256:3,12
  270:18

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023    Index: Houseplants..include

273:3

**Houseplants**
10:10,12

**houses**  37:8
48:17
182:5
263:1

**hunt**  72:23
264:13

**hunting**
36:24,25
37:3,16,
20,23
264:8,14
265:12
271:9

**hurt**  118:5

**Huseby**  8:15

—————
**I**
—————

**i.e.**  212:14

**idea**  47:14
91:10
111:15
145:13
167:15
197:1
199:9
202:3
213:3
218:7
223:11
268:19
269:4,25
272:11

273:7,16

**IDENTIFICATION**
21:24
27:24 39:4
40:21
45:15
93:25
105:22
153:24
156:19
163:23
165:6
172:2
212:4
213:18
216:11
217:15
219:18
220:21
222:13
235:16
238:2
245:13

**identified**
59:11
167:1

**identify**
234:17,20
235:23

**identity**
87:11

**ignition**
151:18

**II**  221:19,
22

**impact**
12:13,21
17:4 34:4,
6 50:5
193:19
194:10

**impacted**
33:14

**impaired**
252:17
274:9,13

**importance**
86:23
87:20

**important**
67:19 68:7
74:18
78:10 89:1
108:11,15
120:25
122:19,21
135:7
137:10,12
146:17,24
147:7
148:16,18
149:2
162:14
211:10

**importantly**
11:14

**impossible**
166:8,16

**impression**
117:17

141:5

**improper**
228:24
230:14
268:16
270:9

**improve**  91:5

**in-service**
63:24 80:8

**incarcerated**
167:1,7
279:7

**incarceration**
260:7
261:4

**incident**
14:22
61:8,9,15,
17 62:10
92:8 94:12
134:23
135:4
157:24
158:6,9
182:1
216:24
221:17
222:7
228:14
242:3
274:11
277:1

**incidents**
61:7 92:11

**include**

**J.A. 1290**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023    Index: income..intelligence

150:2

income  19:2

increase
    217:5

indicating
    258:2
    265:5

indication
    112:5

individual
    44:21
    47:7,9

individuals
    44:5 52:25
    261:17,18

inevitable
    267:11

influence
    234:24

infor-
    159:24

inform
    217:22
    220:1

informant
    68:20,24
    120:18
    277:11

informants
    64:3 67:17
    68:19
    79:24
    125:5

information
40:25 41:6
66:12,13,
18,19
67:18,20
68:2,3
71:6 77:7,
22 78:7,8,
12,13,22
79:13
85:16,17,
24 86:13,
16,22
87:7,15,18
88:19
102:22,25
105:11
111:7
112:10,16
118:13
119:3
120:20,25
121:8,9,
10,18,21,
24 122:2
125:11,12,
25 126:1
127:15
130:19
134:21
135:1,15,
20 136:4,
6,20
137:2,19,
21 138:4,
12,21,23
139:17
141:16

146:6,18,
24 148:24,
25 149:2,
17,20,25
150:25
151:12
154:4
159:6,8,
12,14,25
160:13,17,
23 161:21
162:3
192:2
197:4
198:23
209:7
210:11,23
211:10
233:15
277:12,25
278:21
279:13

informed
    230:15
    232:24

infraction
    229:23
    262:1,4

infractions
    261:1,3,7
    275:14

initial
    72:1,2
    73:6
    98:10,11
    105:10
    196:10,18

197:4
198:6,11

initially
    72:3

injuries
    250:11,20

injury  32:7,
    13 33:3,8

inmates
    261:18,19

Inn  91:25
    92:18 93:8

inquiring
    219:12

inside  37:8
    198:12

inspection
    272:16
    273:11

instance
    23:3 86:25
    118:8
    151:15
    230:14
    234:18,20
    235:23

instructs
    12:7

insurance
    247:16,17,
    20 248:11

intelligence
    219:23
    220:2,5,10

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023          Index: interact..involve

interact
  90:15
  193:8

interacted
  98:3 127:2
  141:11

interacting
  90:7,11

interaction
  62:18
  65:11
  69:21
  76:18 77:8
  88:18,23
  96:16
  98:10,11,
  17,25
  99:2,7,13
  100:9
  102:9
  105:10
  109:12
  119:5
  121:25
  139:7
  142:7
  144:15
  146:19
  147:4
  149:1,16
  153:15
  166:8
  171:10
  193:22
  211:7
  225:25

interactions
  62:8
  63:14,15
  64:7 85:11
  101:8,13,
  18,21
  123:23
  148:12
  171:4
  232:20
  243:8

interest
  73:22
  220:3
  271:11

interesting
  121:5,12
  124:3

internal
  222:17

interpersonal
  31:3

interrogatorie
s  23:25
  232:16

interrogatory
  22:4,16
  23:4,17
  231:21
  235:22

interrupt
  189:9

interview
  172:20
  176:9

186:24
191:9

interviewed
  169:25
  198:13,24

interviewing
  81:15
  184:25
  230:19

interviews
  191:10
  278:5

intoxicated
  157:7,18

introduce
  8:16

investigate
  160:15
  231:17

investigated
  152:10

investigating
  135:23
  136:13
  148:21
  184:23
  230:24

investigation
  58:15 68:5
  71:4,20
  72:5,9,14,
  18 73:2,5
  87:8
  101:24
  103:15

108:14
109:11
112:12
120:23
135:8,16
138:13,20,
23 141:15
149:24
176:20,23
181:25
196:10,19,
20,24
197:5
198:7,11,
14,17
230:2,18

investigations
  71:9,18
  85:15
  108:6
  135:11
  136:18
  233:25

investigator
  102:3,18
  196:14

investigators
  69:20

invoke  94:15

involuntarily
  154:9
  156:3,4

involuntary
  206:2

involve
  99:22

**J.A. 1292**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: involved..juvenile

involved
  21:1 27:18
  44:7,13
  71:5,15,
  17,19,20,
  22 77:1,17
  135:10
  136:13,17
  174:2
  176:23
  196:8
  252:14
  274:16

involvement
  65:1 135:2
  136:11

involves
  83:1 86:14

involving
  103:12

irreconcilable
  13:21,22

issued
  80:17,18

issues  18:7,
  10,13,16
  44:2

—————————

          J

—————————

J.D.  94:18
  216:16,19
  223:16

J.H.  38:4,5

Jackie

38:10,14

jail  226:10
  241:22
  247:6
  250:7,9
  253:5

January
  212:7
  213:21,25
  228:24
  241:6

Jeff  172:11

Jeffery  8:5,
  6 9:14
  28:10 41:7
  212:7
  213:20
  220:23
  265:13

Jitt  38:3

job  29:5,14
  31:7,24
  37:4
  48:18,19,
  22 50:6,14
  54:10
  95:8,10
  149:21,22
  159:21,23
  188:4
  207:8,9
  211:8
  226:19
  227:4

jobs  29:15

31:9

Jocys  83:12

Joe  62:23
  63:5,7
  228:9

john  207:17
  229:15
  230:17
  263:7,17,
  19

Johnson
  68:24
  95:18,23
  98:16
  101:13,22
  105:10
  110:9
  113:13
  123:23
  155:3
  156:22
  159:2
  161:20
  164:10,14
  165:10
  166:2
  232:21
  276:12
  277:8

Johnson's
  105:5
  276:17,25

joined
  43:10,15

joint  19:7

joke  229:3

judge  12:9
  94:14
  149:3

judgment
  248:12,13
  262:21,22,
  24 263:4,
  6,9,10
  271:21,24

Judgments
  262:20

July  172:5,
  24 173:7
  257:14,24
  260:20
  268:10

jump  96:7
  115:3
  116:3
  148:6

jumped
  144:17
  179:8,16
  225:11
  226:3

jumping
  115:13

jumps  65:18

June  217:18

justice
  25:18 36:4

juvenile
  120:18,24

J.A. 1293

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                Index: K-A-T-H-E-R-I-N-E..lawsuit

## K

K-A-T-H-E-R-I-N-E  16:3

Karsten
   94:12

Katherine
   16:1,2,17
   17:25
   19:16

keeper  273:3

keeping
   64:10,12
   79:23

Keith  156:6

keyholder
   212:19

keys
   151:16,17

kid  229:11

kid's  98:15

kids  18:19,
   21 19:5
   95:25
   96:4,7,22
   98:4,15
   99:3,8
   122:15
   129:9
   201:6

Kimble  39:7,
   11 40:5

kind  17:2,8

21:16
35:10
44:15 62:3
64:15,17,
19 71:6
79:10,20
80:8 83:13
91:19
108:7
118:7
141:13
148:15
162:5
163:1,15
169:9
182:10
186:17
193:23
206:17
239:20
271:7

kinda  225:1

King  79:9

kitchen
   79:11
   132:18

knew  53:1,2
   54:16
   58:23
   64:18,25
   66:22,23,
   25 119:20,
   22 120:8,
   24 134:17,
   24 135:7,
   23 143:25
   144:1

168:2
171:16
184:6
193:7
198:12
209:9
233:19
261:20
262:1,4
267:7

knife  226:7

knocked
   33:17

knowing  35:6
   198:23
   273:4

knowingly
   273:5

knowledge
   76:15
   110:2
   133:18
   231:12

Koonce  38:3,
   4,5

## L

labeled
   212:6
   264:2

labor  70:2
   72:25

lack  130:4
   199:7

226:21
272:14

lacked  26:1,
   8

lady  229:5

laid  181:21

Lancaster
   265:15

land  264:13

larceny
   226:12,13

large  69:2,4

late  113:20

laughing
   96:8

law  19:1
   26:4,16
   27:4,8,17,
   18 37:3
   39:17
   48:15
   66:25
   92:11
   266:22
   275:19,25
   277:21

lawnmower
   179:20

laws  76:19
   238:6
   267:1

lawsuit
   263:20,22

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: lawyer..license

| | | | |
|---|---|---|---|
| lawyer 20:19 | 140:19 | leaving | 15 |
| 21:8,11 | 142:10 | 25:25 48:9 | legit 207:1 |
| 23:8,12 | 147:11 | 49:5,9 | |
| 86:15 | 149:5 | 124:1 | length 46:14 |
| 87:10,14 | 150:4,15 | 132:12 | letter 39:1, |
| lawyers | 187:24 | 196:21 | 2,7,9 40:5 |
| 21:14,17 | 204:4 | 234:24 | 41:21 42:2 |
| 87:6 167:6 | 205:7 | 239:16 | 94:1,7 |
| 169:14,19 | leads 278:7 | led 14:16 | 95:7,15 |
| 173:1,8,10 | learn 77:3 | 68:1 77:21 | 216:14 |
| 175:23,24 | 98:15 | 92:21 | 217:16 |
| 185:15 | 129:10,15 | 109:13 | 219:14,20 |
| 187:23 | 130:19 | 258:8 | level 25:5 |
| 189:12 | 159:13 | 272:10 | 236:3,5, |
| 191:3 | 196:13,16 | ledger 64:17 | 10,12,17, |
| lay 11:11 | learned | left 45:25 | 22 243:20, |
| 214:15 | 79:14 | 48:13 59:5 | 24 245:3, |
| layin' 181:1 | 103:10 | 143:1 | 4,8 246:1, |
| laying | 137:2 | 144:21,22 | 6,9 248:17 |
| 246:23 | 197:3,12, | 145:1,3 | 249:4 |
| layout | 13 | 149:13 | 252:5,9 |
| 128:17 | learning | 164:3 | 257:14,25 |
| lead 102:3, | 246:9 | 175:1 | 258:4,5,8 |
| 18 118:25 | lease | 188:2 | levels 246:8 |
| 119:3,17 | 263:11,16 | 196:2,7 | Lewis 8:21 |
| 132:24 | leased | 253:15 | 39:1 |
| 149:23,24 | 271:22,25 | 254:12 | 45:18,21 |
| 194:3 | leave 48:3 | 256:3 | Library |
| 277:3 | 124:9 | 270:18 | 115:8 |
| leading | 136:1 | left-hand | license |
| 89:4,12 | 175:1 | 221:11 | 49:8,11 |
| 107:13,19 | 177:17 | 222:18 | 238:15,19 |
| 117:22 | 233:5,8,16 | 227:21 | 241:2,14, |
| 120:15 | leaves | 228:19 | 18 242:2, |
| 139:21 | 198:19 | 260:9 | 4,7,15 |
| | | Legal 157:4, | 249:9 |

www.huseby.com    Huseby Global Litigation    800-333-2082
Case 4:21-cv-00185-BO  Document 196-4  Filed 09/12/24  Page 321 of 357
J.A. 1295

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023            Index: licensed..lower

264:9
265:21
266:8,12,
14,15,18,
19,24
267:10
270:9,12
272:1,3,9
273:19
274:2
licensed
    35:22
lie  216:13
lieutenant
    53:13 54:4
    56:15,17
    57:22,23,
    24 59:12,
    19 192:7
    193:11
    207:15,18
    216:15
    230:17
life
    130:12,20
light  270:16
limit  135:2
    136:10
limited
    75:15
    76:23
lines  47:11
    71:5 110:6
    119:24
    127:17

132:6
164:3
177:1,20
184:2
189:7
191:23
199:24
224:5
240:4
242:6
260:10
liquor  35:10
    272:1,3,9
Lisa  15:6,
11
list  35:20
    36:20
listed  36:24
    38:2
listened
    163:8
Litigation
    8:15
live  24:19,
22
lived  65:13
    76:17 79:2
    96:24
    116:22
    118:15
    156:8
    237:19,21
    266:25
lives  117:18
    160:9

living  124:6
    128:12
    132:18
    243:21
    244:11,15
Llewellyn
    94:14
loan  263:2
loans  262:25
    263:23
located
    69:15
    164:10
location
    52:23
    188:24
locked
    184:19
log  163:24
long  32:25
    33:19,25
    34:8 45:7
    67:10
    102:8
    110:11
    133:4
    137:2
    186:15
    204:18
    247:6
    250:9
    251:14
    253:5
    275:12
longer

103:17
153:7
longest
    193:12
looked  22:8
    24:8 63:6
    106:9
    158:10
    199:2
    229:6,12
    278:10
lookout
    160:1
lose  241:2
loss  34:3
lost  200:5
    266:14
lot  49:18
    50:3 52:24
    75:17 92:5
    93:3 115:8
    119:18
    121:15
    133:22
    179:23
    180:25
    219:9
loud  254:12
    255:12,24
    256:1
low  218:20,
23
lower  155:3
    156:23,25

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023          Index: lowest..marked

221:11
228:19,23
264:6
265:7
271:14

lowest  246:6

LUNCH  68:14

lunged  96:6
117:5
141:24
143:11

lunging
115:23
139:9

Luther  79:9

---

M

m-  224:16

Maccripine
32:10,11

made  12:6
26:24
27:16 36:6
52:7 71:8
79:20 81:3
83:25 86:3
91:16
93:4,13,18
115:23
118:12
127:10
132:25
185:12
225:23
226:7

231:2

magistrate's
221:7

maid  91:25

main  36:15
49:5

major  27:13
53:14
135:25
182:1
183:24
277:1

make  11:16
12:10 20:7
26:25
37:12
50:10
60:15 63:8
79:14
87:6,11
99:10,15,
21,24
100:2
131:1
155:23
199:1
216:24
244:13
247:11
276:13
278:11

makes  116:1

making  29:2
44:13
86:16
92:11

120:19
127:12
231:10

mama  98:7,
21 126:15
128:16
129:3
130:22
131:20

mama's  121:9
137:21

man  119:23

manager  39:8
40:5 225:1

manner
216:23
217:3

manual
80:11,15,
18,21
81:1,3,6,
8,18,22,25
82:3,7,19
83:2,16
234:7

manufacturing
44:16

MAR  103:7
172:22
278:14,23

March  94:3
110:12
113:8,15,
20,22
114:2

159:3
165:15,16,
22 166:7,
10,16,17
221:3
241:10
242:7
266:9,12
269:11,23
274:8,14

Maria  83:12
225:3

Marie  224:16

marijuana
92:1,3

mark  21:21
27:21
38:24
40:16
45:11
105:19
153:21
156:15
165:3
212:1
213:15
216:8
235:7

marked  21:24
22:13
27:24
39:4,6
40:21
45:15
93:22,25
105:22

**J.A. 1297**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023    Index: marking..Martineau

116:8
153:24
156:19
163:20,23
165:6
171:24
172:2
212:4
213:18
216:11
217:15
219:18
220:21
222:11,13
231:20
235:16
237:24
238:2
245:10,13

marking
45:17
marriage
14:10,17
16:20
marriages
17:23
married
15:11,13,
16,17
Marshawna
68:21
Martin  79:8
Martineau
8:23
11:20,22
22:3,9

23:9 24:17
28:3 29:19
37:17 39:5
40:12,19
42:7,9,11,
13 47:2,4
50:15
51:6,17
53:25
54:18,21
55:22
57:4,14
58:19
60:19
61:1,10
62:5,13
64:22
67:6,11
68:10
71:11,24
72:15
77:11,23
79:15 83:6
86:19
88:5,12
89:4,11,18
92:23
95:1,12
97:19
99:17
100:4
103:2
104:11
105:13
107:4,11,
18 108:17,
23 109:9
110:17,23

111:1,18,
20,22
112:23
114:14,16
115:17
117:22
118:9
119:7,9
120:15
123:1,7,
12,15
124:18
125:8,13,
20 129:13,
18 130:2,4
131:16
132:2
133:14
134:9
137:4,15
139:14,21
140:7,19
142:10
143:3,7
144:8
145:15
146:1,3
147:11
149:5
150:4,15
151:5,10,
20 152:5,
14 153:2
154:24
158:1,14,
16 162:7,
21 163:3
168:18

178:7,16
180:10
186:1,25
187:2,24
188:5
189:3,20,
23 190:2,6
192:21
194:12
195:1,15
197:8
199:5,7,
15,19
200:4,12
201:14,19
204:4
205:6
206:4
207:10
208:9,13,
18,23
209:2,16,
20 211:1,
13,19
219:19
220:19
224:8
226:21
227:11,13,
17 235:10,
14 236:13
244:17
248:3,5,9
251:7,17
255:22
256:11
257:16
258:1

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                  Index: match..mine

260:16
264:18
265:4
267:4
272:5,14,
17 273:13,
15,22
274:1,5,
20,23
275:21
276:1
277:18
278:17
279:17,20
280:3,5

match   151:18

math   238:16

matter   8:5
83:19
215:16

mattered
176:7

Mcnamara
113:9
134:14

MD   156:6

means   46:18
232:13

meant   124:10
196:23

measure
94:23

media   8:4

medical

105:5
143:22
145:8,11,
25 146:5
154:3
158:3
163:19
185:12

medication
12:12,17
17:9 141:7

meet   82:17
86:22
104:16
106:24,25
109:5
172:17

meeting
166:21
167:19
169:19
178:1,5
222:3,8

Melvin   8:7,9
9:5 101:20
102:24
136:2
192:5,6,9
193:3
194:24
195:22
196:13
277:7,25

member
264:13

memorable

218:19

Memorial
154:3
156:21
165:8
166:2

memories
88:18
169:9

memory   82:9
85:5 88:2,
3 109:14
128:3
133:25
138:7,14
153:17
174:17
179:22
191:3,6

mental   50:9
129:16,20

mentally
27:2 50:14
147:6

mentioned
10:25
21:18 53:5
54:8 73:10
97:9
121:15

Mercer   66:2,
7 68:20

mere   184:18

merit   217:4

mess   196:7

met   62:22
95:22 99:3
100:8
102:6
108:21
166:22,24
172:12,16
187:23
210:25

middle   46:4
79:9
124:13
153:10
158:20
188:10
252:7
269:1

midway
221:12

might've
55:8,16
155:17,25
160:18

miles   96:2
246:17
270:20

mind   13:6
48:14
65:18
105:8
124:15

mine   38:6
181:14
190:4

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: minute..motion

minute
  183:5,6
  257:19

minutes  55:4
  161:11
  177:3
  211:18
  259:21

misconduct
  30:3

misread
  140:25

misrepresentin
g  169:3

missing
  158:22
  159:1,5,9,
  19,23
  160:5
  163:18
  164:9,14

mistake
  110:15

mistaken
  10:5 198:2

mistakenly
  212:16

mitigating
  244:23
  246:10

mix  271:19

Mm-hm  11:19
  13:2,11
  14:11

27:10
31:10
32:5,12
43:3,7
46:7 47:1
49:21
62:21 69:8
73:11 76:2
84:21 87:3
106:3
107:14
109:19
120:7
122:1
127:23
137:24
143:9
149:12
154:20
155:7
165:21,25
166:19
167:6
169:15
182:9
187:21
191:25
193:18
195:12
196:25
203:10,11
207:7
215:24
226:4,6
233:4
236:8,21
238:5
242:9

244:1,4,7,
  10,25
245:20
246:3,5
247:10
249:7
250:1
251:25
252:8,10
253:11
254:4,6,8
259:20
260:12,15
261:22
262:19
264:5
266:10
274:10

mom  99:9,15
  126:22
  130:23
  131:11,24,
  25 146:21
  162:2,6,
  15,19
  163:2,9,15

mom's  138:2
  161:25

moment  12:10
  218:19

Monday  58:9,
  10

monetary
  92:22

money  64:19,
  21 197:2

monitor  8:14

month  33:2,
  20,21
  70:25
  88:17
  113:23

months  34:11
  42:2 46:15
  241:11
  275:13

Montoyae
  8:5,8

morning  9:18
  20:12
  24:3,6,8
  50:20
  271:3

Morris  38:10

mother
  121:22
  126:11
  127:21,22
  128:9
  129:4,10,
  15,22
  140:12
  146:15
  147:22
  157:7,19
  206:2

mother's
  270:18

motherfucking
  184:20

motion  86:16

J.A. 1300

87:14
103:6
104:4,15

motions
87:7,10

motivator
49:5

mouth  193:14

Move  199:10

moved  69:11

moving  59:24
166:20
241:11

muffler
270:10

multiple
11:9
234:24

murder  21:1,
2 100:23
110:5,8
113:16,21
117:19
120:9,22
132:24
135:4,10,
16 137:9
141:15
147:10
148:23
150:1
161:22
162:3,16
181:6
201:11

210:12

murdering
276:18

music  255:24
256:1,13

mutual  30:7,
13 73:22

———————

N

named  68:19
213:20

names  65:16,
21 195:18

narrative
164:8

Nash  274:8

nature
214:24

NC  270:19

necessarily
85:12

needed  56:1
60:14
61:17
78:17 86:6
91:4
116:16,24
117:1
138:15
148:19
209:23

neglect
221:19

222:19,21,
23

negligent
221:4

neighbor
255:11

neighborhood
118:16
182:11

neighbors
254:11
255:17,24,
25

Neurontin
12:18

Neuse
187:10,15
188:8,12
189:1

Nichols
218:1,11
219:4

Nick  9:4

night  50:20
52:18,20
55:18 76:8
135:24
136:1
179:4,5
180:16
181:15,23
182:17
183:12,16,
19 201:10
202:19,25

203:2
216:1
277:1

nights  214:7

nod  11:18

Nodded
210:14
234:10
243:11

nonchalantly
96:1

nonetheless
185:21

normal
137:7,8
216:5

North  8:8,11
27:9 39:18
94:2
237:22
264:7
265:16

Northampton
249:25
258:6
268:10
269:2,11

note  86:17
88:1 112:6
233:5,8,17

note-  84:12

note-taking
81:9

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: notebook..objection

notebook
  24:14
  64:15
  85:6,21
  86:10,13
  87:17,23
  98:6 99:4,
  10,16
  111:4,9
  112:4,19
  113:1
  121:1
noted  91:4
notes  60:23
  84:23
  85:1,3,5
  88:10 90:3
  99:4,10,
  15,21,23
  100:1
  104:23
  107:15,23
  108:2,5
  109:8,11
  110:20
  111:12
  118:21
  120:12
  125:23
  127:12
  168:15
  206:17
  260:13
  276:13
notetaking
  233:24

nothin'
  177:10,11
notice  29:14
  115:5
noticed  23:2
notified
  159:9
  230:9
November
  223:14
  265:2
  269:1
  270:15
number  8:4,
  12 21:23
  27:6,23
  29:15,24,
  25 32:2
  35:20 37:5
  38:1 39:3
  40:20 44:1
  45:14
  53:11
  56:2,3,8
  60:2 87:1
  90:20
  93:24
  105:21
  112:15
  116:21
  153:23
  156:18
  163:22
  164:9,18
  165:5
  172:1

183:13
189:21,23
195:19
212:3,22
213:5,17,
24 216:10
217:14
219:17
220:20
222:12
235:2,8,
10,15
238:1
242:23
245:12
260:9
261:1
277:23
number's
  109:18
numbers
  29:17
  235:19
numerous
  93:13

─────────

O

─────────

oath  46:5
  143:14
object  23:9
  54:18
  192:22
  251:7
  256:10
objection

37:17
40:12
50:15
51:6,17
53:25
54:20,25
55:22
57:4,14
58:19
60:18
61:1,10,18
62:5,13
64:22
67:6,22
68:22
71:11,24
72:6,15
77:11,23
79:15 83:6
86:19
88:5,12
89:4,11,18
91:9 92:23
95:1,12
97:19
99:17
100:4
103:2
104:11
105:13
106:21
107:3,4,
11,18
108:17,23
109:9
110:17,23,
24 111:18,
24 112:23

www.huseby.com            Husey Global Litigation            800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 328 of 357
J.A. 1302

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: objections..officer

114:14,15
115:17
117:22
118:9
120:15
123:1
124:18
125:8,14,
20 129:12,
13,17,18
130:2
131:3,16
132:2
133:6,14
137:4,15
139:14,21
140:7,19
142:10
145:15
146:1
147:11
149:5
150:4,15
151:5,10,
20 152:5,
14 154:23,
24 158:1,
13,14
162:7,21
163:3
167:9
178:7,16
180:9,10
186:1,25
187:1,2,24
188:5
189:3
193:1

194:12,22,
25 195:1,
15,25
197:7,8
199:5,6,
15,19
201:14,19
204:4
205:6
206:4
207:10
208:9,13,
18,23
209:2
211:1,13
226:21
227:11,12,
17 251:17
254:23
256:11
264:18
267:4
272:14
275:21
276:1,20
278:16,24
279:15

objections
12:6

objectively
93:18

Objectives
35:17

objects   23:4

observation
37:4,19

observe
37:10

observed
44:9 115:1

obstruct
254:1

obtain
148:23

obtained
147:22
271:25

obtaining
49:7

obvious
268:21

occasion
75:5 110:8
114:23
134:16

occasions
243:9

occur   15:4

occurred
35:13
110:8
135:24
141:20
160:14
182:4
234:21
272:9

occurrence
213:1
223:1,14

228:7

occurring
55:8

October
239:4
240:5

odor   92:1

offense   45:5
221:23
236:5,18
243:24
245:22
265:8

offered
182:6

offhand
149:18

office   9:7,8
30:6,13,
17,21 31:7
46:5
138:8,11
178:15
186:13,20
187:19,22
188:2,8,
11,15,16,
24,25
189:15
214:22
221:7

officer
20:25
26:17
28:13

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**

29:11
36:7,9,16,
18 37:1,4
39:16,23
40:2 41:10
42:4
43:11,12
44:11 45:3
46:9,18,
19,20
48:24
49:17
53:23
54:17
58:16
63:12 64:4
70:22
71:8,16
72:3 73:3,
6 80:3
82:16
83:1,5,10,
21,23
84:1,10
87:2,20
94:17
96:10
103:22
106:17
116:14,23
117:12
124:11
136:17
160:7
170:18
186:14
193:3
194:10

212:13,16
213:24
216:16,19,
21,25
217:1
221:3
224:18
230:16
238:9
243:15
253:9
254:20
256:19
257:11
259:13

officer's
159:22

Officer/
employee
223:16

officers
53:8 55:14
56:3,7,8,
12 64:10
82:6 90:7,
11,18
94:24
135:14
159:17
160:23
169:25
170:4
183:18
223:9,21
231:13
243:8
254:9,22

256:23

oftentimes
87:6

on-the-job
84:20,22

ongoing
57:13
58:14,15
72:5

onlookers
182:24

open   226:8

opened
263:14

operator's
273:19
274:2

opinion
193:23

opportunity
23:24
48:10,12
76:25
97:12
172:6

opposed   29:5

order   21:18
36:17
126:3
245:2
267:16
269:12
279:25
280:2

ordered
19:15

organize
53:7

orient
235:18

original
191:7,8
204:17

outcome
240:23

outlaw   38:13

outweighed
246:10

overdoses
44:2

overdosing
44:6

overhear
128:25

overlapping
75:19

oversee
53:15

overwhelming
51:15

overworked
49:25

owner   30:9,
23 31:1,4
247:12,18,
21 263:17

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023          Index: owners..patrol

| | | | |
|---|---|---|---|
| owners   62:9 | pain   12:17 | part   37:21 | 157:4,8, |
| oxycodone | 17:9 | 45:4 47:6 | 16,20 |
| 12:17 | pair   75:20 | 49:19 | 158:22 |
| | paired   75:17 | 92:18 | Patient/family |
| ——— P ——— | pants   224:25 | 117:16 | 157:3,10, |
| P-I-E-C-E | 246:19 | 133:8 | 14 |
| 16:5 | paper   26:2 | 248:12 | patrol |
| P-I-E-R-C-E | 85:4 87:23 | participation | 43:12,14 |
| 16:9 | 206:20 | 217:20 | 46:8,18,19 |
| P.A.   212:15 | papers | parts   89:1 | 48:23 |
| P.I.   196:3 | 130:16 | pass   22:1 | 49:17 |
| p.m.   68:16 | 147:22 | 71:6 | 51:23,24 |
| 123:17,20 | 188:18 | 120:20 | 52:3,7,9, |
| 161:13,16 | paperwork | 121:13 | 10 53:8, |
| 211:21,24 | 168:6 | 122:21 | 15,22 |
| 259:24 | paragraph | 237:24 | 55:14 |
| 260:2 | 39:10 | passed   72:12 | 56:5,11 |
| 279:22 | 94:11 | 83:22 | 57:17 |
| 280:12 | 158:20 | 88:21 | 58:16 |
| packet   264:3 | 221:18 | 102:22 | 63:12 64:4 |
| pad   85:4 | 224:6 | 103:1 | 70:13,22 |
| pages   29:23 | paraphernalia | 159:8,25 | 71:8,16 |
| 34:12,15 | 226:17 | 160:13 | 72:3 73:2, |
| 35:17 | parens   196:7 | 206:25 | 6,10 75:4, |
| 113:3 | 207:17 | 209:9 | 9 83:5 |
| 202:14 | 224:16,17 | passing | 84:1 87:1 |
| 222:16 | 225:3 | 72:10 | 90:7,11,18 |
| 233:21 | parentheses | 102:1,13 | 95:24 96:6 |
| 235:21 | 192:22 | 105:11 | 106:16 |
| paid   49:4 | parents | past   172:9 | 113:14 |
| 177:10,14, | 126:20 | 254:13 | 114:23,24, |
| 19,22 | parking | 255:2,3,8 | 25 115:4, |
| 263:4 | 115:8 | 256:7 | 13,24 |
| | | patient | 116:8 |
| | | 153:11 | 124:11 |
| | | 154:9 | 135:14 |
| | | | 136:17 |

**J.A. 1305**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: Patrolling..Pfeiffer

159:17,22
160:7,23
170:17,18,
20 171:5
193:3
194:6
214:1
223:9

Patrolling
49:1

pause 257:22

pay 19:3,12
49:3 64:20
65:2
241:20
247:18,21

payments
19:10

PCP 227:7

PD 154:16
159:7

people 26:23
38:3 44:1,
9 51:23
52:19
55:21
76:16,19,
24 77:3,
10,16,21
78:12
94:22 96:3
118:17,22
183:13
187:13
193:16,19

194:19
195:13,19
231:2

peppers
31:23

perception
176:10

performance
35:24
36:22
37:1,3
90:17 91:3
95:4 221:4

performed
95:9

period 82:8,
13 197:17
215:10,21
233:12
261:3
275:10

permission
176:16

permit
264:12

permittee
271:16
273:4

persistent
207:25
208:22
210:4

person 23:3
56:23 57:2

59:13
66:23
78:1,21
88:24
92:13
147:9
160:9,25
161:2
164:9
233:7
271:17

person's
45:4
158:22
159:2,5,
19,23
160:5,8
163:18
164:14

personal
40:24 41:6

persons
159:10

pertained
20:24 71:3

pertaining
11:9 24:12
149:25

pertinent
63:18,19
163:9

Peter 9:1
22:17,21

Pfeiffer
8:19 9:6,

12,17,19
11:24
21:25
22:1,4,10
24:19
27:21
28:1,4,5
29:21
38:24
39:2,6
40:16,22
42:16
45:11,16,
19,23,24
47:5 55:2
67:14
68:9,11,17
94:1
105:19,23
106:1,4
117:23
119:12
123:11,13,
21 133:16
134:11,13
136:25
140:9,10
142:13
143:5,8
144:11
151:7
153:4,8,
14,21
154:1,2
156:15,20
161:10,17
163:24
165:3,7

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023              Index: Phil..point

172:3
189:22,25
190:3,7,8
192:25
193:2
194:23
196:1
200:6
208:15
209:18,22
211:17,25
212:5
213:15,19
216:8
217:13,16
219:20
220:22
222:14
227:1,3
235:13,17
236:14,16
238:3
245:14
248:7,10
251:20
255:23
257:20
259:18,21
260:3
264:21
265:7
272:8
273:24
274:3,6
276:4,20
278:16,24
279:15,19,
24 280:1

Phil  214:24

Phillip  8:21
  45:17

phone  9:7
  21:7
  171:19

phonetic
  68:21

photographic
  88:3

phrase  148:2

physical
  150:10,20,
  25 151:7,
  13,17,19
  258:21

physically
  27:3

physician
  155:16

PI  196:7,22
  197:14,25
  198:7,19

pick  128:2
  139:24

picked  31:22
  156:8,10
  157:5,16

picture
  65:20

piece  68:2,
  3,4 87:23

pieces

106:10

Pierce  16:1,
  4,7,17
  18:1 19:16

Piggly
  224:21,22

pinned  32:18

pissed
  179:21
  184:18
  185:8,18
  188:20

Pitt  15:21,
  22 154:3
  156:21
  158:3
  165:8
  166:2
  245:23
  270:3,8,15
  271:14
  272:20
  273:2

place  32:18
  37:11
  60:17,22
  117:20
  224:25

plain  215:23

plaintiff
  8:6,9,20,
  22 9:9
  10:14,16
  262:21
  263:6

Plastic
  212:15,18

plate  268:13

playing
  115:15
  154:17
  157:5,17
  158:7
  255:12

pleading
  265:2,9

pled  250:25

plucking
  29:8

pocket  112:4
  247:13,15

point  12:24
  15:3 30:22
  35:12 48:7
  55:3,11
  76:10
  96:16
  102:21
  130:21
  136:3
  143:23
  145:24
  152:21
  176:11
  225:10
  226:13,18
  227:7
  232:2
  254:9
  256:13

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023    Index: pointed..precautions

pointed
  11:15
  269:8

pointing
  264:23
  269:3

points
  213:10
  217:24
  221:24
  222:1

police  20:25
  27:13
  28:7,13,
  16,23
  29:1,11
  36:7,8,15,
  18 37:1,4,
  6 39:14,
  15,23 40:2
  41:10,15
  42:4,24
  43:5,11,19
  44:11
  45:3,8,25
  48:20 52:2
  53:8 54:17
  59:1 66:5,
  8 69:1,11,
  16 70:8,10
  79:23
  80:3,9,12
  82:11,21,
  24 83:5
  89:10,17
  91:8 94:24
  96:10

103:18,22
116:14,23
117:12
127:6
134:23
154:17,22
157:5,6,
17,18
163:25
169:25
186:14
197:17
198:18
212:21
216:24
217:17,21
219:21
220:4
221:20
238:9
242:18
243:8,15
246:25
247:4
248:19
254:9,22
256:8
259:13,14,
16 272:12

policies
  81:21
  210:21
  233:23
  234:3,6,7

policing
  37:15

policy  79:22

80:11
81:17
82:6,18
83:1,16
135:14,17,
18 136:16
209:4,11,
13,22
210:2,6,
10,13,16,
25 211:5,9
212:22
213:24
216:20
217:7
221:21

pop  160:20

popped  203:6
  204:13

population
  186:23
  188:9,12,
  25

porch  65:13
  66:16

position
  28:12 30:2
  35:24
  36:23
  39:15,23
  40:2 43:9
  46:8 83:21
  84:7
  116:14,23
  134:23
  170:13

219:23
220:2,6

Position/rank
  46:17

possession
  44:16,19

possibility
  39:13
  140:5

possibly
  121:5,13
  140:8,11,
  18 141:6
  142:2,4,6
  148:17
  150:17
  152:8

pot  64:19,
  21

potatoes
  31:23

potential
  141:16

potentially
  147:9

pounds  92:2

practice
  119:2,16
  120:5
  137:1
  210:2
  233:16

precautions
  186:22

J.A. 1308

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: precise..protocol

187:4

precise
163:13

prep   108:8

preparation
19:23
279:10

prepare
19:24
20:3,17
21:8,11,
14,19
104:17,20
105:2
107:1,5

prepared
19:25
23:12
49:13
169:6
279:9

prepping
107:23

prescribed
17:9

presented
20:6 101:5
169:5

presenting
41:16
141:15

pretty   199:2
229:25
269:1

previous
20:25
57:22,25
77:16
116:20
157:24
217:8
271:24

previously
75:8 105:7
126:19
166:9
172:17
214:11

Primary
260:10

primitive
264:8,9

printed   20:5

prior   34:25
35:4 55:5
141:20
144:22
254:12
256:3

priors
258:10

prison   95:11
167:11
185:11
186:7
226:10
261:15,21,
24 262:5
267:8

275:9,12

prisoner
221:6

private
196:14

probation
94:8,14

problem
243:1,3

problems
14:9,12
31:3 44:1,
9 47:16,18
198:1,5,9

procedure
80:11
81:17
82:6,19
83:1,16
159:11
234:7

procedures
81:21
221:21
234:8

proceeded
135:1

process
217:21
219:25

processed
217:5

produced
235:3

profession
26:20

professional
216:22
217:3

programs
44:25

promotion
91:11,13
220:12

promotions
91:7

prompt   71:2
258:19

prompted
118:3

properties
49:1

property
62:1
245:24
247:8,12,
18,21
252:20
263:18
271:22,25
273:11

protected
188:11

protective
267:16
269:12

protocol
64:9,12

www.huseby.com        Huseby Global Litigation        800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 335 of 357
J.A. 1309

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023       Index: provide..questioned

161:5

provide   65:4
  211:6
  277:11

provided
  22:25 24:1
  257:13
  278:1
  279:4

providing
  49:2

psych   154:5

pull  200:24
  201:23

pulled  115:8
  249:20
  268:19,22
  274:18

pulling
  202:4,5,12
  237:14

punishment
  275:8

purchase
  35:4

purposely
  169:3

purposes
  53:19

pursue
  149:24

push   251:13

pushed

250:4,18,
  21 251:10

pushing
  188:18

put  37:22
  61:17
  62:4,18
  85:20
  87:20
  111:4,9
  122:6
  186:18
  197:5
  206:19
  225:12
  226:3,7
  233:18
  256:18
  257:2

putting
  32:17

———————

Q

qualify
  83:23

question
  12:3,5,8
  13:10
  23:7,10
  29:25 32:2
  34:18
  40:13 42:3
  46:22 47:6
  50:16
  51:7,18
  54:1,22

55:23
57:5,15
58:6,20,23
61:11
62:6,14
64:23
67:7,12,15
71:12
77:12,15,
  24 84:16
86:12,20
88:13
92:24
95:2,13
97:20
99:18
103:3
104:12
105:14
110:7,11,
  13 112:18
113:11,19
119:6,13,
  15 124:19
125:3,9
131:13,17
132:3
134:13,15
137:5,16
139:15
140:2,6,12
142:13
145:16
146:4
147:25
148:8
151:21
152:6,20

161:20
162:8
163:12,13,
  14 166:6
167:10
172:11
177:9
178:8
179:3,7,8
180:21
184:2
186:2
188:23
189:8
190:20
192:5,8,
  11,14,19
194:13
201:15
202:16,17,
  21,24
203:10
205:7,17
206:22,24
209:10,19
211:4
227:2
232:19,20
233:21,22
234:16
235:23
244:15
248:8
251:8
257:21
264:19

questioned
  181:12

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023 Index: Questioner..reappointment

214:24

**Questioner**
180:23

**questions**
9:20 11:11
20:1
22:18,23
23:17
106:12
107:7
108:4
110:3
120:3,6,8
139:6
140:1
153:10
168:23
185:21,25
206:7
212:1
232:11
254:2
276:5,10
277:16,19
279:18

**quick** 123:8,
12

**quickly**
137:2,11

**quiet** 75:21

**quit** 196:3

**quote** 119:21
126:1
157:6,17
158:21

**R**

**r-c-e** 16:10

**radar** 104:10

**Radcliffe**
100:23
102:19
110:5
161:22
181:6
201:11
276:19
277:13

**radio** 58:4
183:23
254:12

**raid** 272:12

**raise** 92:7,
19 93:6,19

**Raleigh**
241:13

**ran** 154:22
158:23
165:17,23
247:9
252:16

**Randall** 94:7

**Randy** 217:25
218:10,16

**reach** 101:12

**reached** 29:4

**reactions**
148:7

**read** 23:19
30:1,5,10
32:8 35:20
36:21
39:11,19
80:20
81:1,5,6
82:3
94:11,20
106:10
110:7
113:11,24
114:22
115:10,14
116:13,17
117:16
119:25
126:9
127:18
130:11,17
132:7,21
140:2
141:3
147:22
154:13
157:3,11,
13 158:20
164:11
172:11
177:4
178:21
179:13
180:15
181:3
184:2,17
189:9
190:16,25
192:3

196:1
197:24
199:25
200:8,13,
18 202:15,
17 203:15
205:12,15
206:14
207:14
208:2
212:12,24
213:24
216:18
217:8,19
219:24
221:3
224:13
225:13
232:23
233:22
234:1,17,
22 235:5
239:2

**reading**
169:4
179:19
191:15

**reads** 159:15
213:23
216:18
221:3

**ready** 51:3,
12 185:22

**reapplying**
40:4

**reappointment**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**

Jeffery D. Shrock on 05/09/2023    Index: rear-ending..record

47:8

**rear-ending**
239:21

**reason**  47:21
48:9 154:8
212:11
213:23
216:13
221:1
229:24
261:23

**reasons**  56:2
229:17

**rebukin'**
196:9

**rebuking**
196:18,23
197:4

**recall**  15:2
23:5
30:12,16,
25 31:2,3,
6 33:13
34:10
36:13
38:18,21
39:21,25
40:1,3
41:9 42:6,
25 43:8
48:6 60:5,
14 64:1
65:20,21
66:3 67:1
68:23,25
70:4,8

76:3,9
81:7,13
84:8,11
89:20
90:5,24,25
91:3,18
92:17
97:16 98:9
100:23
101:7,10
104:2
106:15,22
120:4
128:13
133:1
135:13
139:11
145:23
147:16,19
156:3
164:13
166:20
170:1
175:11
219:10
220:11,14
221:8
222:20
223:6,9
225:18,22
226:2
227:25
228:3
230:3
232:17
233:6,11,
14 241:4
242:14

243:3,7,16
245:7
253:2
258:5,7
260:19,22
265:2
266:13
273:8,10
277:4,5,9
279:1

**recalls**  23:6

**receive**
33:23,25
84:22
91:11
92:19
213:10
232:2
243:14
264:11,14,
24 275:14

**received**
24:5 83:21
125:5
136:3
210:11
229:3
265:12

**receiving**
136:20
232:11

**recent**
118:19
236:11

**recently**
15:18

17:12
157:4,16
185:10

**reckless**
245:25
249:8
266:4

**recognize**
28:5
155:8,13,
19 160:8
226:19
227:4,7,14

**recognized**
182:20

**recollection**
40:11
42:22
86:7,18
88:11 90:4
104:24
107:16
153:1
269:22

**recommend**
217:4

**Recommendation
s**  154:13

**record**  11:16
27:25
45:13
61:8,24
62:12,24
64:20
68:12,15
122:20

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023          Index: recorded..remain

123:16,19
136:24
154:3,5,21
157:24
158:3,10
161:12,15
165:2,9
176:17
202:10
211:20,23
236:1,21,
24 238:4,
25 259:23
260:1
279:23

**recorded**
61:7 168:1
169:7,12
191:11
203:22

**recorder**
168:1

**recording**
168:2,24
176:12,14
204:10
279:5

**records**
60:12
72:21
105:6
115:15
143:22
145:8,11,
25 146:5
163:19
243:18

**recover**
33:19 34:8

**recovery**
258:24

**red** 151:9
152:3

**reduce** 239:4
240:2

**Reed**
192:11,15

**refer** 84:14
97:17

**reference**
69:12
132:25

**referenced**
20:8 93:15
163:19

**references**
38:2 69:6

**referred**
235:22
249:3

**referring**
24:4 36:4
166:25
175:3
177:14
193:9
201:1
220:7

**refers**
221:19

**reflected**
249:3

**reflects**
249:6

**refresh** 85:5
86:6,17
88:11 90:4
104:24
107:16

**refreshed**
51:3,12,20

**regard**
233:24

**registered**
35:22
268:11,13

**regret**
217:21
219:25

**reinstated**
242:7

**reinvestigate**
199:3

**rejected**
39:22 40:2

**rejection**
220:15

**relate** 10:9
37:15

**related**
217:9
263:20,22

**relates**

14:10
18:10,13
20:23 44:8
69:15
72:13
135:15
154:21
173:12
182:13

**relationship**
17:4 30:8,
14

**relationships**
258:21

**relatives**
27:6,8
31:19,20

**relayed**
276:13

**released**
132:8
143:24
146:9,12

**relevant**
234:2

**reliable**
77:21
78:22

**relief** 103:7
104:4,16

**rely** 134:4
147:8

**remain**
215:10

**J.A. 1313**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023    Index: remaining..remember

**remaining**
  263:1

**remarried**
  15:23
  17:14

**remember**
  10:21
  11:12
  15:8,24
  16:19 20:7
  28:8,22,25
  29:2
  30:15,17,
  22 31:5
  40:4,6,15
  42:3,11,
  16,17 52:6
  65:19
  70:6,19
  76:7
  78:19,23,
  24,25
  79:1,2
  81:16 82:1
  87:25
  88:22 91:6
  95:16
  96:12,20
  97:3,6,8,
  22 98:8,
  20,24
  99:1,20
  100:21
  101:5,15,
  19,25
  102:4,10,
  23 103:5,

10,13,14,
16 104:7,
21,25
106:11,18
109:1,7,20
113:19
114:10,12
119:22
122:25
126:25
127:25
128:8,11,
16,17,19
129:7,14,
19,21
130:3,6,9,
25 131:4,
19,23
132:5,10,
12,14,15,
20 133:7,
10 135:12,
18 136:23
137:18
139:8,17
142:22
145:7,19
146:13,23
149:14,15
152:25
156:5,8
159:4
162:4,23
163:6
166:23
167:3,16,
18,19,22,
23,25

168:7,8,21
171:15,16,
21,23
172:18,19
174:6,10,
15,16
176:10,18,
21,25
177:24
178:1,5,
10,14,18
179:11,19
180:15
182:21,22,
23 183:11,
18,20,23,
25 185:7,
18 191:16
194:4
195:17
196:15
197:10,20,
22 199:25
200:8
201:21
202:17
203:13,21
204:16
206:15
207:19
213:1,6,14
214:3,5
217:12
218:2,9,
17,24
219:2,6,13
220:12
221:16,17,

25 222:2,
3,7,8
223:4,17,
20 226:15
227:22
228:8,25
229:1,20
232:10,15
234:11,14
239:10,13
240:3,7,9,
14,21,23
241:1,7,
14,17,21,
22 242:3,
22 243:2,
10,13
244:18,19,
23 245:9
246:7,9,14
247:7,17,
20 248:16,
21,22,24
249:10,12,
15,17,19,
20 252:12
253:7,13
259:7
261:2,7
265:5,9,
10,24
266:1,11
267:17,20
268:2,14,
16,22
269:6,8,21
270:5,13
272:23,25

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023   Index: remembered..responding

273:20
274:11
275:1,4,
16,17

remembered
43:1
110:21
190:23
218:12,15
221:10
279:2

remembering
40:7 41:12
191:13
237:17

remove 44:12

removing
44:10

renewed
242:16

reorganization
59:24

rephrase
84:16
227:1

report 45:24
46:1 47:6
57:12
58:17
61:15,17,
21,22,23
62:4,19,25
71:3,20
72:10,12,
20 73:7

74:11,25
79:14,20,
21 81:11
85:18
89:10,17
90:21
99:22,24
100:2
111:15
112:11,13,
15,17
136:21
159:5,23
160:5
164:14
181:9
182:2
212:6,10
213:20
220:23,24
245:15,16
249:5,23
257:13
262:13,14,
17 264:1,2
268:7

reported
159:15

reporter
8:17 11:15
35:3 48:1
248:2
272:6
274:23
279:24
280:3,7

reporting

276:17

reports
60:15,23
61:6 79:23
104:23
158:21,22
159:2,19
163:18
278:3,22

represent
9:4,19

representing
9:9

reprimand
221:23
222:22

request
154:6

requested
30:2 94:13

required
61:15,22,
23 80:25
81:5

rescue 33:17

residents
76:20

resign 30:2

resignation
48:5

resigned
30:6 48:19

resisted

254:1
255:16

resisting
253:9
254:20
256:19
257:9

resolution
230:12

resolved
230:9

respect
117:11
126:19

respond
12:11 13:1
78:2
131:25
159:18,22,
23 160:11
171:8
181:5
228:8,16
247:2

responded
72:3 91:24
171:11
212:17
247:4

responder
72:2,11

responding
13:5 72:9,
20 73:3
135:25

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: response..Ron

147:21
164:13
177:2

response
23:5 30:5
32:20 72:1
161:19
192:1
234:22
235:22

responses
22:5 23:2,
8,16
231:21
232:16

responsibiliti
es 90:6,10

responsibility
72:4,8
74:21
75:13,19

restitution
247:11

restrictions
265:21

result 61:20
63:2,4
94:11
213:7

resulted
63:9

results
217:25
218:11

retain 88:19

retired 25:1

revamping
75:9

reveal 87:15
145:11

review
23:13,24
91:16
97:12
146:2
172:6,8
217:20,24
219:25
279:9

reviewed
20:16
106:4

reviewing
98:5

reviews
90:17,20
91:4,15

revoke 94:14

revoked
249:9
266:9,11,
15,24
267:10
270:9,12

revolved
13:24 18:9
61:25

Ricky 8:6

101:16
109:2
135:25
136:5
138:8
139:18
141:21
142:8
144:19,23
145:4
174:20,24
175:13
178:4
197:18
207:4
209:8
210:24
211:6,11
277:3

ride 256:7

riding
183:12

right-hand
41:1
109:18
155:3
156:23
157:1
190:5
228:23
235:18
264:22
265:1,7

rightly
174:6

road

212:14,17
246:17
252:16
253:16,18
254:15,21
255:9
256:6,7,17
257:1

robby 37:6
66:21
73:10,12,
13,15
75:3,17,20
180:18,19,
21 181:11,
12,17,24

Robby's
181:14

Robinson
94:13
95:11

rode 254:13
255:2,3,8,
15 256:16

role 103:15

roll 54:5,
8,12
55:11,14
56:10,12,
19,21,22
57:20
159:9
161:1

rolled 215:1

Ron 39:7

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: room..sentence

40:5

room  92:2
128:12
129:2
131:5
132:17,18
188:14

rotation
59:6,8
216:2

rotations
59:4

rounded
115:9

routine
95:24
114:24

Rudolf  9:8,
10,13
173:15,18,
24,25
174:6

rule  86:4
136:16
235:3

rules  11:12

ruling  12:10

run  235:19
246:17,18
252:18,20

running
116:2
132:19
154:17

166:17
193:14
205:4,19
270:20

---

S

safe  240:11
242:1,11
270:4

sale  263:1

salt  121:11
123:25

sat  97:13

Sawyer
216:15

scan  33:11,
12

scared
188:21

scenario
58:7

scene  71:21
134:17
181:5,12,
23 182:14,
19 183:10,
19,21

schedule
59:7

school
25:11,13,
14 39:17
130:12,24
238:24

239:16

schoolteachers
38:9

Schrock
94:18
275:18
276:9

scope  136:12

scopes  37:9

score  217:23

scored
218:20,22
219:8

screwin'
192:10

scroll  32:1
273:1

search  63:8
92:2 94:9

searching
182:10

seat  229:8,
10 246:23
268:21
273:19,25

seconds
181:18

secretary
233:7

secretary's
188:16

section
60:11

157:13
205:11,13,
18,21,22,
25 235:8

secure
212:20

security
49:2

seeking
26:20
148:23

seldom
70:23,24

selected
217:22
220:1

self-employed
177:17

self-reported
217:10

sellers  77:6

sellin'
200:21

selling
44:16
62:23

sending  40:5
94:22

sense  122:17
199:1

Sensor  275:5

sentence
45:4

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023    Index: sentenced..shoplifter

94:15,23

sentenced
  245:3
  246:7

sentences
  116:20

sentencing
  244:21
  258:4

separate
  76:8 82:16

separation
  15:3 45:25
  46:2,11

September
  242:10
  264:7

sequence
  204:19

sergeant
  53:13
  54:3,4,11
  56:15,17
  57:21
  59:12,19
  72:22
  127:19
  159:12,14
  170:1,9,11
  172:4,13
  214:25
  217:21
  218:3,8
  219:7

series

153:10

serve  217:2

served  59:5
  273:4
  277:10

serves  82:9
  128:3
  138:14
  179:22

service  30:4
  46:14
  62:16
  70:14 72:9
  82:15,18
  124:14
  128:7
  163:25
  183:7

serving
  260:8

session
  108:8

set  23:25
  48:14

severity
  134:22
  135:3

shared
  161:21
  209:7

Sharpe  8:6,
  9,20 9:19
  100:10,17,
  20,22

101:1,3,
  14,17,22
  103:7,12
  109:13
  133:3
  172:25
  173:6,12,
  16,22
  174:3
  176:5
  196:22
  197:6,21
  276:18
  278:12

Sharpe's
  104:3,6

sheriff's
  27:14
  55:10
  250:5

shift  55:5,
  13 56:4
  57:19,22,
  25 58:9,
  22,25
  59:3,14,20
  60:6,17,21
  61:5,9
  66:21
  73:14
  74:14
  75:1,7,12,
  24,25
  84:2,3,6
  85:8 160:4
  161:2
  215:7

216:1
  224:21

shift's
  75:13

shifted
  60:6,7

shifts  52:25
  57:18
  75:10,18,
  19 76:9
  159:25
  214:6
  215:9

shiftwork
  50:21

Shine/sweep
  270:16

shined
  270:20

shining
  271:4

shit  177:8
  189:10
  203:7
  206:21
  224:15,19,
  24

Shoot
  226:12,14

shooting
  179:11,17

shop  14:2

shoplifter
  224:21

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023       Index: short..someone's

| | | | |
|---|---|---|---|
| short 26:9 | shows 151:17 | 96:1 164:3 | skip 113:2 |
| 123:18 | 236:1,2,9, | sign 80:25 | slap 189:10 |
| 161:14 | 11,21 | 81:5 | sleep 50:19 |
| 211:22 | 249:24 | signature | sleeping |
| 259:25 | Shrock 8:5, | 46:24,25 | 216:2 |
| shorthanded | 7,24 9:2, | 221:13,15 | 217:9 |
| 82:12 | 14,18 | signed | 228:20 |
| shot 119:23 | 16:15 | 157:8,19 | sleepy 12:20 |
| 181:1 | 23:3,6 | 232:3,9,12 | 214:13,14 |
| shoulder | 28:10 41:7 | similar | slept 188:14 |
| 250:4 | 68:17 | 213:4 | slowed 115:6 |
| show 45:12 | 113:12 | 231:2,9 | smack 188:10 |
| 55:3 | 123:21 | sir 47:2 | small 69:2,5 |
| 126:19 | 161:17 | 110:14 | smelled |
| 160:20 | 211:25 | 112:21 | 91:25 |
| 165:4 | 212:7,13, | 113:18 | smoke 261:25 |
| 171:24 | 16 213:21, | 134:20 | 262:2 |
| 173:20 | 24 216:21 | 152:22 | smoked |
| 174:2,18 | 217:1 | 190:10 | 261:23 |
| 200:4 | 220:24 | 260:16 | smoking |
| showed 33:12 | 221:3 | 277:17 | 261:6,9, |
| 57:20 | 223:16 | 279:17 | 12,13 |
| 144:9 | 232:23 | sit 37:9 | smuggle |
| 167:17,23 | 234:1,2,23 | sittin' | 262:8 |
| 172:24 | 260:3 | 181:1 | snapshot |
| 173:7 | 265:13 | sitting | 132:16 |
| 176:1 | 274:21 | 65:13 | sobriety |
| 213:3 | 276:5 | 67:10 | 275:1 |
| 233:3 | 277:19 | 106:5 | sold 78:3 |
| 248:19 | Shrock's | 214:18 | someone's |
| 272:13 | 216:17,19 | situation | 150:21 |
| showing | sic 8:7 | 91:23 92:4 | |
| 168:7 | 13:1 | skills 35:21 | |
| 176:11 | sic] 212:23 | 36:21 | |
| 184:25 | Sick 56:2 | | |
| | side 86:16 | | |

www.huseby.com       Husseby Global Litigation       800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 345 of 357
J.A. 1319

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: somethin'..starting

| | | | |
|---|---|---|---|
| **somethin'** | **speaking** | **speeding** | **squad** 33:18 |
| 196:4 | 127:20 | 239:3 | 58:22 |
| | | 240:4,18 | 59:10,16, |
| **son** 27:14 | **special** | 241:2,6,7 | 18,22 |
| 48:16 49:6 | 35:20 | 242:3,14, | 60:12,24 |
| 179:21 | 36:21 55:8 | 20,23 | |
| | 69:19 | 243:5,14 | **squads** 60:10 |
| **Sonya** 8:19 | 260:10 | 265:20,24 | 75:11 |
| 9:18 | | 268:20 | |
| | **specific** | 270:5 | **stamp** 155:24 |
| **sooner** | 43:13 | | **stand** 104:8 |
| 189:18 | 58:6,7 | **spell** 16:2, | 110:1 |
| | 77:20 | 4,13 | |
| **sort** 54:13 | 81:24 | | **standing** |
| 58:15 | 84:22 | **spend** 253:5 | 128:12,16 |
| 84:19 | 90:6,10 | **spent** 136:14 | 280:1,2 |
| 115:14 | 126:1 | | |
| 120:21 | 182:13 | **split** 226:8 | **Stantonburg** |
| 124:1,9,16 | 220:9 | 243:23 | 212:14,17, |
| 213:7 | 272:10 | | 20 |
| 221:11 | | **spoke** 19:25 | |
| | **specifically** | 22:20 | **start** 13:7 |
| **sorting** | 83:4 | 101:25 | 48:17 |
| 124:25 | 102:11 | 113:12 | 113:9 |
| 125:4 | 119:19 | 126:11 | 160:4 |
| | 137:20 | 127:20 | 206:6 |
| **sorts** 272:18 | 209:6 | 146:14 | 258:15 |
| **sound** 116:1 | 229:2,21 | 165:16 | |
| 246:11 | 261:8 | 174:24 | **started** |
| | | 234:6 | 46:18 |
| **Sounded** | **speculate** | | 96:7,9,11, |
| 47:24 | 47:15 | **spoken** 173:5 | 21 97:1 |
| | 125:16 | 192:23 | 122:16 |
| **sounds** 54:13 | | | 170:24,25 |
| **soup** 79:10 | **speculating** | **sports** | 182:4 |
| | 247:23 | 263:14 | 189:8 |
| **Southwest** | 248:1 | | 215:9 |
| 25:12 | | **spot** 37:9 | 226:19 |
| | **speed** 239:5 | **spousal** | 258:17 |
| **speak** 20:19 | 240:2,11 | 18:16 | |
| 83:14 87:4 | 242:1,11 | 19:12 | **starting** |
| 234:3 | 270:4 | | 116:20 |
| 272:6,24 | | | |
| 274:20 | | | |

**J.A. 1320**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023        Index: starts..subpoenaed

126:8
130:10
199:24

starts   200:7

state   19:1
49:8
157:7,19
237:21
266:22

stated   75:8
118:14
138:6
144:3

statement
126:4
127:10
150:3,6,
10,22
151:8,18
152:2,3,12
232:25
276:25

States   8:10

statistics
91:18

status   260:7

stay   133:4

stayed   52:21
185:24
216:20
217:7

staying
117:15
216:21

steaks
224:24

steering
229:7,20

step   255:6

Stephenson
94:7

stepping
113:14

stereo
255:12

stick   53:2

sticks   40:8

Stokes   65:25
66:4

stolen
159:16
160:2

Stone   155:4

stop   13:7
37:20
65:14
102:11
225:2
245:24
253:17
254:19,22
257:19
259:3

stopped
96:11
98:12
102:14
189:16

203:3,14
204:2
229:8,16,
24 256:16
266:20,24
274:15

stopping
96:13
98:20

store   225:5

store-bought
35:14

story   255:1

straight
32:23
57:12 70:9

straightened
122:16

street   29:8
37:7,10
44:10,12,
20 68:21
78:25
79:7,8
82:15
96:1,3,4
114:25
117:18
155:21
156:8,12
182:3
224:22
255:24

streets
49:16

160:22
182:25
183:13

stress   50:10

stressful
50:7

stretch
88:16

strike
199:10

strong   92:1

structure
52:1 53:4
244:21

stuck   92:6
246:19

student
166:21

study   25:16

stuffing
227:5

subject
52:15
212:10
216:16
219:22

submit
256:23

submitted
48:4

subpoenaed
175:8
177:6,15

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: subpoenas..talk

| | | | |
|---|---|---|---|
| subpoenas | 57:2,8,23 | 256:13 | 214:15 |
| 55:7 | 58:11,18 | | |
| | 59:9,21 | Surgery | tail  200:7 |
| substance | 84:2,3,6 | 212:15,18 | takeover |
| 277:7 | 214:23 | surprise | 30:7 |
| substantial | 217:4 | 128:6 | takin' |
| 119:1 | supervisors | surprised | 202:21 |
| Substantially | 53:2,11 | 128:4 | taking |
| 76:13 | 57:19 | surrounding | 12:12,16 |
| suggested | 58:5,23 | 211:7 | 30:23 |
| 131:24 | 60:8 64:6 | suspended | 40:22 |
| suggestion | 92:6 | 241:9,15, | 54:12 |
| 131:2 | 214:12 | 18 242:2,4 | 71:20 |
| suing  10:17, | 228:3 | Suzette  9:7 | 84:13 85:5 |
| 20 | supplies | swear  8:17 | 96:2 98:6 |
| summary | 30:21 | 88:9 | 99:20 |
| 165:9 | supply  30:6, | 109:20 | 118:4 |
| 166:1 | 13,18 31:7 | 133:11 | 130:15 |
| 260:5 | support | 264:24 | 132:10 |
| superintend | 18:11,17, | switched | 186:12 |
| 271:17 | 25 19:3, | 59:25 60:2 | 188:23 |
| superior | 10,12 | 214:5,11 | 262:7 |
| 57:9 | 199:23 | switching | talk  12:2 |
| 74:11,13 | 220:3 | 215:24 | 20:22 25:9 |
| 94:13 | supposed | swore  40:9 | 64:6 66:23 |
| 106:17 | 53:24 | 109:21 | 82:7,17 |
| 230:8 | 54:17 | sworn  9:15 | 101:12,16, |
| superiors | 57:12 | 43:1 87:20 | 21 102:25 |
| 81:19 82:2 | 60:22 61:4 | system | 103:15 |
| 95:9 223:6 | 82:2 | 145:21 | 104:5,19 |
| supervising | 135:17 | 146:8 | 108:21 |
| 176:19 | 136:14 | | 109:2 |
| supervisor | 161:6 | | 111:23 |
| 53:5,7,10 | 224:18 | T | 116:24 |
| 56:20 | supposedly | | 117:8 |
| | 255:11,13 | table  168:4 | 127:9 |
| | | | 169:21 |

www.huseby.com       Huseby Global Litigation       800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 348 of 357
J.A. 1322

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023                Index: talked..testified

173:11
174:20
175:22
176:3
177:3
182:16
197:11,18
203:18
218:16
231:12,17

**talked**
54:11,12
112:19
114:2
125:6
142:8
144:19
145:4,13
153:15
164:15
173:9
175:22
176:4
190:16,19
191:2
193:16
194:19
195:5,7
197:16
202:11
205:5,19,
24 207:3
208:4
214:6,11
218:24
228:21
231:25
232:1,21

266:4

**talkin'**
202:25

**talking** 20:9
35:9 58:4
68:18
70:20 73:9
76:21
82:20
85:19
96:12,13,
21 97:2
98:6,21
101:7
116:21
117:3
118:8
122:16
123:22
124:13
126:14
128:1,9,
13,23
131:11
132:22
138:19
141:21
144:23
150:19
158:6
161:20
163:18
168:16
169:13
173:17,24
175:4,7
176:7

177:13
179:24
184:8,21
188:18
189:12
193:10,14
195:22
201:5,10,
24 203:5
204:12
206:1
209:16
215:4
230:3
232:6
274:4

**talks** 221:18
230:8

**tape** 134:17
167:25

**Tarboro**
27:13
239:17

**task** 56:7,8

**tasks** 62:3

**taught**
117:10

**teacher** 38:6

**television**
174:8,18

**telling**
55:18 95:8
114:5
129:22
141:21

163:8
254:16
271:21

**tells** 134:3

**Ten** 161:11
211:18
259:21

**Ten-minute**
123:13

**tend** 120:12

**term** 84:25

**terms** 18:24
52:2 91:21
230:24
277:24

**test** 11:23,
24 83:22
217:25
218:2,11
219:7

**testi-** 163:7

**testified**
9:16 87:1
103:8
104:4,15
106:13,17
108:9,20
109:3,25
114:1
115:12
120:11
126:9
133:11,20
137:13
140:16

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
Jeffery D. Shrock on 05/09/2023            Index: testifies..time

141:8,23
142:3,23
143:10,14,
17 161:23
165:22
166:9
172:22
173:6
175:5
180:3,13
204:25
206:16
233:1
276:16
278:11,23

**testifies**
89:9,16

**testify**
88:16
100:25
105:3
106:20,23
108:16
131:10
134:4
279:1

**testifying**
12:9 86:8
88:9
108:14
109:21
116:11
122:24

**testimony**
21:19
24:12
88:20,25

93:5 97:25
104:17,20
105:24
106:5
107:2,6
108:22
125:21
131:6,8
133:16
134:5
144:4,25
145:3
153:16
165:20
169:7

**tests**  275:2

**text**  21:13

**theirself**
65:9

**thin**  199:3

**thing**  23:20
36:20
37:25 40:8
48:23
72:13 77:5
92:15
102:4
105:8
118:7
126:24
128:11
129:7
132:15
141:13
148:15
162:5

163:1,15
173:15,17
184:3,8
216:12
225:6
229:13
230:4
244:13

**things**  13:9
35:8 37:2,
14,15
72:12
82:18
92:13
108:7
119:16,18
120:12
121:15
123:24
126:5
169:8
190:18

**thinking**
36:14
37:24
204:20

**thought**
41:14
117:7
122:8
139:12
142:2,14
143:11,15
144:3
174:4
179:23
199:2

219:8

**thoughts**
199:11

**thousand**
254:14

**threatened**
241:22

**throat**
225:11

**throw**  107:6
151:16

**thrown**  83:14
253:25

**ticket**
229:10
239:3,11
240:5,8,
11,15
241:3,6,7
242:11,15
270:5

**tickets**
240:24
242:20,23
243:5,14

**till**  15:4

**time**  8:14
10:23
15:23 17:6
19:9 21:4
35:12
36:6,11
37:21 41:9
42:4 43:19

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**Jeffery D. Shrock on 05/09/2023**          Index: timeline..told

| | | | |
|---|---|---|---|
| 45:1,22 | 23 175:4, | 265:11 | **tiring** 50:9 |
| 49:12 | 7,17,20 | 270:24 | |
| 50:3,22,25 | 176:11 | 274:24 | **tobacco** |
| 51:10,11 | 177:11 | 275:10,12, | 31:11,23 |
| 55:3,16 | 178:3 | 14 276:6 | |
| 56:1 59:5 | 179:22 | 277:22 | **today** 9:20 |
| 75:21 | 183:7 | 278:22 | 12:9,12 |
| 82:8,12,13 | 185:8 | 279:2,22 | 19:23,24 |
| 83:19 | 186:9 | | 20:17,20 |
| 88:21,22 | 187:10 | **timeline** | 21:19 34:6 |
| 94:4 95:22 | 188:20 | 143:8 | 65:15 76:7 |
| 96:6,17 | 191:4,5,13 | 144:14 | 97:10,14 |
| 97:23 99:3 | 193:12 | | 106:5 |
| 100:8 | 194:5 | **times** 9:25 | 109:23,25 |
| 104:2,3 | 207:18 | 10:4 37:5 | 133:23 |
| 106:16 | 209:23 | 50:22 | 172:6 |
| 112:12 | 211:18 | 52:24 | 276:5 |
| 113:7,10, | 214:20,21 | 59:23 | 279:11 |
| 12 115:2,4 | 215:10,21 | 60:1,3 | |
| 123:8 | 216:3,4 | 73:10 | **today's** 8:13 |
| 124:12 | 217:5 | 75:17 | 279:22 |
| 130:21 | 222:22 | 78:17 87:1 | |
| 133:23 | 224:19 | 89:8,15 | **told** 60:14 |
| 134:10 | 225:10 | 119:18 | 62:22 |
| 135:11 | 226:13,18 | 148:6 | 78:18,21 |
| 136:3,14 | 227:3,8,16 | 160:7 | 80:20 84:9 |
| 138:9 | 230:18 | 234:24 | 85:25 |
| 139:18 | 233:2,12, | | 102:14 |
| 142:14 | 13 239:22 | **tip** 67:2 | 114:6 |
| 143:23 | 241:23 | 86:15 | 123:24 |
| 144:21 | 243:21 | 124:25 | 126:25 |
| 145:24 | 244:12 | 125:4,7 | 130:23 |
| 160:12 | 252:17 | 137:9 | 135:25 |
| 161:11 | 253:14 | | 136:21 |
| 164:13 | 256:24 | **tipster** | 138:22 |
| 172:22,23 | 258:11 | 85:20 | 139:18 |
| 173:6,7,14 | 259:5,7,8, | | 143:18,21 |
| 174:7,17, | 19 260:8 | **tipsters** | 145:20,22 |
| | | 64:3 | 149:10 |
| | | | 156:10 |
| | | **Tired** 50:18 | 162:2,19 |

**J.A. 1325**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023                    Index: top..trial

163:8
175:1
177:19
179:15
184:5
190:22
191:12
201:13
202:18
203:2,3,
17,19,21
204:2,3,
10,15,24
206:23
214:23
215:1
216:12
217:10
229:15
230:5
277:2,4,8

top  28:12
29:24
32:23
34:13,16
35:17
40:24 41:1
46:1
134:8,12
154:4
156:2,20
157:2,10
165:10
197:24
212:9
260:6
267:14
270:15

total  46:14
262:22
263:9

tousled
253:19,22
257:3

town  75:22
182:20

track  64:10,
12

tractor
32:19

trade  25:13
77:1

traffic
92:11
183:23
238:4,6
239:10
240:11,14
270:4

train  83:18

trained
63:22,23
83:18

training
26:4 35:21
36:21
39:17
63:25
80:2,8
81:24
82:5,12,
16,24,25
83:4,9,10,

15,17,21,
22,23
84:1,10,
12,14,18,
20,23
90:14
224:18
227:15

tran-  118:14

transcribed
203:23
204:9

transcript
101:2
103:9
105:24
118:15
126:6
130:21
139:24
140:23
141:1,17,
19 142:22,
23 143:25
144:1,7,12
145:19
147:20
152:18
165:20
166:11
169:4,12
172:4
176:4
179:20
184:1
191:7,9,
10,15

192:24
202:7
203:20
204:1,17,
22 205:9,
14 206:7
223:24
279:25

transcripts
20:5 169:6

transfer
271:18

transport
126:9
185:13

transported
126:10

transpose
85:17

transposed
112:17

trash  86:11

treating
155:16

treatment
44:25

trees  37:7

trial  21:1
86:8,14
88:22
100:25
101:3,4,9,
14,17,22,
24 104:3,8

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: truck..updates

106:20,23,
25 278:12,
18,19,20

truck 180:24
181:2,18,
20 200:24
201:23
202:5,12
246:17,24

true 23:22
42:19
78:22
232:3,14

trust 77:10
262:22

truth 87:21
88:9,10
110:1
114:5
133:12,17,
19 134:4

turn 34:12,
14 35:16
46:22 61:6
62:25
78:4,5,8
88:16
109:17
118:20
126:12
134:7
141:2
160:18
178:19
184:16
189:19

191:17
197:23
202:14
206:13
224:2
232:18,19
234:15
245:16
258:1
262:16
265:18
266:3,6
267:13
268:25
269:10
270:7
272:19
273:17

turned 23:14
78:13 90:1
115:7
198:11,12
206:22
256:13
272:2

turning
198:7

TV 173:16,
18 174:13

type 61:20
141:6
164:7

typically
107:6

——————————
U
——————————

Uh-huh
140:14

Uh-uh 203:1

unclear 13:6
55:20
202:1

unconscious
248:20

underage
229:18
272:13

underlined
47:22

underneath
47:11

understaffed
50:3,5

understand
12:14
33:15 35:8
53:4 93:5
97:24
131:6
144:12
184:7
198:16
245:2,5

understanding
18:24
54:25 72:4
149:19
176:6,8

184:9
209:4,11,
23 210:6

understood
13:10 82:3
136:4

unfortunate
216:23

Unfounded
223:11

uniform
226:8
261:18

Unintelligible
172:15

unit 52:3,8
73:10
154:5
277:2

United 8:10

units 52:2,3
69:20,22

unjust
223:15,21

Unlike 12:8

unsatisfactory
30:3

unusual 35:9

unwritten
234:7,9

updates
81:3,6

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023          Index: upper..watermelons

upper   109:18
  113:3
  222:18
  227:20
  265:19
upset   184:23
  185:3
  188:21
user   78:15
  227:10
users   77:6

        V

Van   263:7,
  17
vehicle
  116:4
  239:21
vehicles
  75:15,16
  76:9  82:17
  159:16
  160:2
verbal   11:17
  74:25
verbally
  232:24
verge   50:11
verification
  232:2,4,
  11,12
verify   207:8
  232:3

verifying
  232:14
verse   8:6,9
vest   225:9
VIDEOCONFERENC
E   280:11
view   145:24
  266:23
viewed   145:8
violated
  213:24
violating
  76:19
  238:6
violation
  10:7,8
  212:22
  221:20
  267:16
  269:12
  270:4
  273:5
violations
  216:20
  217:6
  241:11
violence
  267:15
violent
  49:15
visit
  168:10,12
  186:9,19
  187:5,12

269:20
visited
  171:17
visitors
  49:2
visits
  187:8,9
voice   11:16
volume   49:18
  51:4
voluntarily
  157:7,19

        W

wait   12:4
  137:3
  191:23
waiting
  116:2
wake   216:3
walk   70:10
  83:3
  159:11
  186:8
  253:17
walked   54:16
walking
  95:25
  160:22
  253:15,18
  254:17,21
  255:9,23
  256:6,17

257:1
wanted   44:3
  47:25
  48:17
  102:24
  119:20
  121:12
  126:15
  248:8
  253:16
  255:15
  261:25
wantin'
  184:4,9
wanting
  253:17
  255:14
  256:14
warden's
  186:13,19
  187:19,22
  188:2,8,
  11,15,24
  189:15
warned   241:1
warrants
  55:7
washed   32:16
watched
  115:9
watching
  78:6
watermelons
  31:22

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
Jeffery D. Shrock on 05/09/2023        Index: weapon..working

weapon
  226:14
  264:8,9
wear
  273:19,25
Webb's  30:6,
  12,17 31:4
week  52:18
  58:14
  172:9
West  52:21
  73:24 74:5
  75:23
  76:11,22
  79:2,11
  96:18
  100:15,18
  160:21
Weyerhaeuser
  264:13
whatnot
  126:12
wheel  229:7,
  20
white  119:23
  229:25
  267:14
wide  226:8
wife  15:25
  16:11
  20:21,22
  21:18
  173:10,11
  250:11

252:1
269:13,16
wife's  17:16
Wiggly
  224:22
Wilbur  66:2,
  7 68:20
Williams
  37:6 73:13
  180:21
Williamston
  36:16,18
  69:4 82:10
  224:14
Willie
  127:18,24
  130:14
  132:16
  133:9
willingly
  127:6
Willy  192:8
Wilson
  25:15,16,
  19,22,24
  26:7 39:17
wine  35:10
wines  35:13,
  14
wins  87:14
witness's
  152:3
witnessed

162:16
witnesses'
  85:16
wolves  83:14
woman  224:23
  226:2
  227:5
  231:9
Woolsey  9:7
word  32:9
  87:24
words  149:2
  185:19
  186:22
  204:24
work  27:16
  29:17,24
  30:20
  31:21
  32:25
  33:21 34:2
  35:21
  36:21
  37:7,12
  42:23 45:7
  47:25
  48:2,13
  49:12,18,
  19 51:4,
  16,22
  52:11,20,
  23 53:22
  54:16
  55:4,13
  56:18,25

57:20
58:25
73:15,18
75:20 82:5
83:13
171:14
194:2,5
196:21
198:20
207:21
214:8
216:4
271:3,9
worked  30:23
  52:25
  54:10,15
  66:21
  69:23
  73:13
  75:3,7,12
  92:10
  170:12,13
  171:5,8
  188:15
  210:20
  214:7
  224:4,13
workers'
  32:3,21
  33:22,23,
  25
workin'
  172:13
  224:13
working
  30:8,12,
  14,17

www.huseby.com            Huseby Global Litigation            800-333-2082
Case 4:21-cv-00185-BO   Document 196-4   Filed 09/12/24   Page 355 of 357
J.A. 1329

31:10,13,
16 37:5
43:25
48:16
49:7,10
50:4 52:19
54:5 56:4,
9 57:21
58:3 65:12
71:10
73:22
75:22,24
76:14
112:15
138:9
179:20
193:3
194:10
196:22
197:5
198:22
215:7
224:4,7
225:19

**workplace**
31:1

**worried**
147:18
148:8,13

**worrying**
205:23

**worth** 148:25

**would've**
47:24 52:9
56:3
112:20,21

120:7
125:11
147:3
148:17
207:24
208:8,16,
22 209:1
218:12,15,
22 219:8
221:9
230:12
237:4
269:23

**wrapped**
180:25
181:19

**wrestled**
253:20,24
257:4

**write** 23:7,8
39:10
41:21
62:24
63:15
86:1,2,3,
9,24
111:14
119:4,16,
18 120:25
121:7,8
125:18
167:12

**writes** 94:8
219:24

**writing**
61:21

81:12
85:16
90:22
111:7,12
112:11,16
168:21

**written**
29:22
86:12
87:17,23
88:24
121:16,18,
21,24
122:2,6
221:23
230:11
234:11

**wrong** 90:2
256:25

**wrongful**
184:24

**wrongfully**
199:13,22

**wrote** 32:7
34:22
37:23 39:7
95:7 181:8
229:9
278:3

_____

Y

**y'all** 20:2

**ya** 202:24

**yards** 254:14

**year** 15:2
36:13
88:18
92:8,19
93:4,6,14,
16 169:24
224:14
238:17
258:16
259:4,6

**Year's** 259:9

**year-old**
154:14

**years** 13:18
14:20,21
15:4 25:4,
8,19 45:9
46:15
53:12
83:20
88:15
94:15
114:11
177:5
179:12,25
210:19
215:22
229:5
259:8,9,15
267:12
270:1
277:23

**yelled**
255:17

**yelling**
255:24

```
young    115:1
   229:5

younguns
   200:23,25

Youtube
   173:16
```

_____

**Z**

_____

```
Zoom    9:6,11
```

# APPENDIX E

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      EASTERN DIVISION
                 Civil No.:  4:21-CV-000185-BO
 3

 4   MONTOYAE DONTAE SHARPE,              :
                    Plaintiff            :
 5                                       :
      v.                                 :
 6                                       :
     DAVID RICKY BEST, JEFFREY D. SHROCK,   :
 7    CAROLYN MELVIN and the CITY OF      :
     GREENVILLE, NORTH CAROLINA,          :
 8                   Defendants       :
                                       :
 9   _____:
                                       :
10   MONTOYAE DONTAE SHARPE,              :
                    Plaintiff            :
11                                       :
      v.                                 :
12                                       :
     CAROLYN MELVIN,                    :
13                   Defendant      :
                                       :
14   _____:

15

16        Deposition of DAVID RICKY BEST, taken pursuant to notice,

17    before Cherryl J. Maddox, a Notary Public, at the Greenville

18    City Hall, 200 West 5th Street, Greenville, North

19    Carolina, on April 28, 2023, at 9:39 a.m.

20

21              Reported by:  Cherryl J. Maddox

22

23

24

25
```

```
 1   APPEARANCES:

 2    Ms. Sonya Pfeiffer and Mr. Phillip Lewis, Rudolf Widenhouse
      225 East Worthington Avenue, Charlotte, North Carolina
 3    Counsel for Plaintiff;

 4    Mr. David S. Rudolf, Rudolf Widenhouse
      225 East Worthington Avenue, Charlotte, North Carolina
 5    Counsel for Plaintiff
      Appeared virtually;
 6
      Ms. Elizabeth A. Martineau and Mr. Peter Clements
 7    Martineau King, PLLC
      8701 Red Oak Boulevard, Charlotte, North Carolina 28217
 8    Counsel for Defendant David Ricky Best;

 9    Mr. J. Nicholas Ellis and Ms. Sydney C. Plummer
      Poyner Spruill, LLP
10    1151 Falls Road, Rocky Mount, North Carolina  27894
      Counsel for Defendant Carolyn Melvin;
11
      Mr. Donald K. Phillips, Assistant City Attorney
12    City Attorney's Office
      P.O. Box 7207, Greenville, North Carolina  27835
13    Counsel for the City of Greenville, North Carolina;

14    Mr. Matt Walters, Videographer.

15

16

17

18

19

20

21

22

23

24

25
```

J.A. 1334

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                Page 3

```
 1              I N D E X

 2              DIRECT   CROSS    REDIRECT

 3   David Ricky Best      5     262, 298   303

 4   _____

 5              E X H I B I T S

 6                              PAGE

 7   Exhibit 1 (document)            66

 8   Exhibit 2 (document)            73

 9   Exhibit 3 (document)            96

10   Exhibit 4 (document)            99

11   Exhibit 5 (document)           132

12   Exhibit 6 (document)           137

13   Exhibit 7 (trial testimony)    154

14   Exhibit 8 (autopsy report)     158

15   Exhibit 9 (document)           166

16   Exhibit 10 (document)          171

17   Exhibit 11 (document)          172

18   Exhibit 12 (document)          175

19   Exhibit 13 (polygraph report)  196

20   Exhibit 14 (indictment)        200

21   Exhibit 15 (document)          202

22   Exhibit 16 (document)          203

23   Exhibit 17 (document)          209

24   Exhibit 18 (document)          219

25   Exhibit 19 (document)          226
```

J.A. 1335

| 1 | | PAGE |
|---|---|---|
| 2 | Exhibit 20 (document) | 233 |
| 3 | Exhibit 21 (document) | 240 |
| 4 | Exhibit 22 (document) | 244 |
| 5 | Exhibit 23 (document) | 253 |
| 6 | Exhibit 24 (document) | 254 |
| 7 | Exhibit 25 (document) | 263 |
| 8 | Exhibit 26 (document) | 265 |
| 9 | Exhibit 27 (document) | 266 |
| 10 | Exhibit 28 (document) | 267 |
| 11 | Exhibit 29 (document) | 283 |
| 12 | Exhibit 30 (document) | 290 |
| 13 | Exhibit 31 (document) | 290 |
| 14 | Exhibit 32 (document) | 297 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 5

 1   April 28, 2023

 2              THE VIDEOGRAPHER:  We are now on record.

 3   Today's date is April 28, 2023, and the time is

 4   9:39 a.m.  This is the video deposition in the

 5   matter of Montoyae Dontae Sharpe v. David Ricky

 6   Best, et al, heard in the United States District

 7   Court for the Eastern District of North Carolina,

 8   Eastern Division.  Case number 4:21-CV-000185-BO.

 9   Our deponent today is Ricky Best.

10              Will counsel please introduce

11   themselves.

12              MS. PFEIFFER:  Sonya Pfeiffer on behalf

13   of Dontae Sharpe.

14              MR. LEWIS:  Phillip Lewis on behalf of

15   Dontae Sharpe.

16              MS. MARTINEAU:  Elizabeth Martineau on

17   behalf of Mr. Best, Mr. Shrock, City of

18   Greenville.

19              MR. CLEMENTS:  Peter Clements of Mr.

20   Best, Mr. Shrock, City of Greenville.

21              MR. ELLIS:  Nick Ellis on behalf of

22   Carolyn Melvin.

23              MS. PLUMMER:  Sydney Plummer on behalf

24   of Carolyn Melvin.

25              MS. PFEIFFER:  And on Zoom is David

```
 1          Rudolf, also represents Dontae Sharpe, plaintiff.

 2                THE VIDEOGRAPHER:  Thank you.  Will our

 3    court reporter now swear in our witness.

 4                MS. PFEIFFER:  And Madam Court Reporter,

 5    just so we have it on the record, as well, we have

 6    the Assistant Attorney here for Greenville here,

 7    as well.

 8                MR. PHILLIPS:  Thank you.

 9                   DAVID RICKY BEST, a defendant,

10       being called for examination by the Plaintiff,

11       first being duly sworn, testified as follows:

12    DIRECT EXAMINATION

13  BY MS. PFEIFFER:

14       Q      Good morning, sir.

15       A      Good morning.

16       Q      How are you?

17       A      Fine, thanks.

18       Q      My name is Sonya Pfeiffer, I represent

19  Mr. Sharpe.

20       A      Okay.

21       Q      I just want to start with a few depo

22  rules and how things will go this morning.  Have you ever

23  had your deposition taken before?

24       A      No.

25       Q      I know you have testified in court
```

1    before, but I'm just going to run through some basics for

2    you so we are on the same page.

3            A        Okay.

4            Q        Your attorney is here right next to you.

5    One big difference from testifying in court, is if I ask you

6    questions and she objects, you answer.  So, in court,

7    sometimes you wait for a judge to rule.  Here you go ahead

8    and answer and we take care of that later.

9                As a starting point, is there anything, any

10   medications you are taking or anything going on with you

11   that would make it difficult for you to understand my

12   question?

13           A        No, but I will put you on notice that I

14   take medicine for my kidneys, and so I will be taking a

15   break quite often.  Other than that, I'm great.

16           Q        Okay, and that has no impact on your

17   ability to testify?

18           A        Absolutely not.

19           Q        I'm going to try my best to make my

20   questions clear.  If they are not clear, please feel free to

21   ask me to repeat it or to rephrase it.  If you don't, I will

22   assume that you heard and understood what I have asked you.

23           A        Okay.

24           Q        Okay.  I'm going to do my best to not

25   speak over you and ask that you do the same, that you let me

1  finish my question before you begin your answer, and I will

2  do my best to do the same thing.

3          A        Okay.

4          Q        And if we get to a point where you are

5  feeling like you need a break, you are in charge, you can

6  ask for a break, I just ask you to either finish the

7  question that we are in the middle of, or if I have one or

8  two questions that are related to that, we go ahead and

9  finish that and I will respect your need to take a break

10  when necessary, okay?

11          A        Okay.

12          Q        I think I have covered it, but if we go

13  along and there is something unclear to you just let me

14  know.

15          A        Thank you.

16          Q        What did you do to prepare for your

17  deposition today?

18          A        I read my notes from back then.  My

19  court testimony.  I tried to regenerate my brain, but it's

20  been a long time ago.  So, I kind of stick to what I said

21  these days is, you know, what I remember.

22          Q        And you are patting on a notebook in

23  front of you, what do you have in that notebook?

24          A        A copy of the incident report,

25  interview, final appear, and affidavit, testimony from MAR

1   hearing in 1997, testimony from a 1995 trial, my training

2   materials, and handwritten notes from Dontae Sharpe

3   interview, and the handwritten statement from Charlene

4   Johnson.

5          Q       And is everything that is contained in

6   this black notebook in front of you that you just listed for

7   me, is this everything that you looked at to prepare

8   yourself for the deposition today?

9          A       Yes.

10         Q       Other than your attorney, did you speak

11  with anyone about your deposition today?

12         A       No.

13         Q       Other than your attorneys, have you

14  spoken with anyone about this case since the complaint has

15  been filed?

16         A       No.

17         Q       You mentioned that you reviewed your

18  notes?

19         A       I will stop you.  I have a PBA attorney.

20  And, but no, other than her knowing that I have.

21                 MS. MARTINEAU:  You don't have to tell

22         her.

23         Q       You don't have to tell me the contents.

24  You spoke to your PBA attorney.

25         A       Yes.

```
 1        Q        That's fine.

 2        A        Okay.

 3        Q        You mentioned that you reviewed notes

 4   when you said notes from back then, are those notes included

 5   in this binder that we have today?

 6        A        That is this note, yes.

 7        Q        So there is no other notes that you have

 8   from back --

 9              MS. MARTINEAU:  Let her finish asking

10        the question.

11        A        I apologize.

12        Q        There is a good way to start that.  It's

13   difficult for both of us.  When you said court testimony,

14   the court testimony you reviewed was only your court

15   testimony?

16        A        Yes.  Pretty much, yes.

17        Q        Did you review the testimony of any

18   other witnesses from any other court proceeding in order to

19   prepare for today?

20        A        I'm not sure.  I read some things, but I

21   can't remember if it's my testimony that was -- it's my

22   testimony.

23        Q        When you said you tried to regenerate

24   your brain?

25        A        Yes.
```

J.A. 1342

1        Q        Was there anything that you read during

2    your preparation for today, that you hadn't previously

3    thought of or read or recorded in some way?

4                      MS. MARTINEAU:  Objection to the form of

5               that question.  You can answer.

6        A        No.

7        Q        I would like to talk a little bit about

8    your law enforcement background.  And first of all, why you

9    chose to go into law enforcement.

10       A        My brother was a law enforcement

11   officer.  So, I started wanting to be in law enforcement.

12       Q        I don't understand what you mean.

13       A        My brother was a police officer and he

14   served as chief in several small towns.  I went and rode

15   with him on many occasions and saw the operations of being a

16   police officer, and it intrigued me and I wanted to help

17   people and that's the field that I chose.

18       Q        Was this an older brother?

19       A        Yes.

20       Q        Where were you raised?

21       A        In Wilson County.

22       Q        Where was your first law enforcement

23   job?

24       A        Bailey, North Carolina.

25       Q        What did you do in Bailey?

1        A        I was a patrol officer.

2        Q        From Bailey, did you go to the GPD?

3        A        I did.

4        Q        And why did you make that change?

5        A        Personal reasons.

6        Q        What was your first role at GPD?

7        A        I was patrol officer.

8        Q        Do you recall what year it was that you

9    first started there?

10       A        1975.

11       Q        And talk to me about your roles within

12   the GPD.  You started as a patrol officer and how did you

13   advance?

14       A        I served as a patrol officer for 10 or

15   12 years and was appointed in the detective position.

16       Q        Directly from patrol?

17       A        Yes.  And then I was promoted to

18   corporal, and I stayed in the unit for 20 years.

19       Q        As a corporal?

20       A        Uh-huh.

21       Q        Were there any types of cases that you

22   specialized in?

23       A        You mean once I was promoted to

24   detective?

25       Q        Yes, once you were promoted to

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.

David Ricky Best on 04/28/2023                                    Page 13

1    detective.

2          A        When I was promoted to detective, I was

3    assigned Residential Burglary for about, seemed like maybe

4    three years.  And then the Major Crime position became

5    opened and they promoted me to the Major Crimes Unit.  And

6    that's where I was until retirement.

7          Q        And when you say Major Crime Unit, what

8    does that encompass?

9          A        Murder, rape, robbery, any kind of

10   serious felony.

11         Q        And within Major Crime, did you have a

12   particular specialty?

13         A        No.  We got it all.

14         Q        And I believe that was 1975 when you

15   first went to GPD?

16         A        It was.

17         Q        And you left Bailey, what were the

18   personal reasons for leaving Bailey?

19         A        Money.  Better chance for advancement,

20   those kind of things.

21         Q        Was there anything within the department

22   that related to that personal decision other than money?

23         A        With Greenville?

24         Q        With Bailey.

25         A        Oh, no, no.  Just a small town.

```
 1        Q        And what was the pay difference between
 2   Bailey and GPD?
 3        A        That's been a long time ago.  So, it was
 4   a lot, like I say.
 5        Q        At the GPD, once you were a detective,
 6   were there performance reviews that were conducted?
 7        A        Every year.
 8        Q        And can you describe that review
 9   process?
10        A        It was done by the sergeant.  The
11   criteria, I don't remember all of them, but there was a lot
12   of them, and he would give you a score as to whether you had
13   some proficiencies or where you needed improvement, but
14   every year.
15        Q        Were you an active part of that process
16   or, so when I say describe the process, did you sit down in
17   advance of that evaluation, or did you come in for your
18   evaluation and there it was and you went through it?
19        A        No, he filled it out, called you in,
20   went over it with you, told you why he answered the
21   questions the way he did, and you went from there.  That
22   determined whether or not you were given a raise.
23        Q        And were there any specific performance
24   areas reviewed that you recall?
25        A        I don't remember them all.  There was a
```

1    lot.

2        Q        Any areas that you particularly excelled

3    in that you remember?

4        A        I can tell you that in 20 years, I never

5    received a bad one.

6        Q        But any specific areas you remember --

7                 MS. MARTINEAU:  Let her finish.

8        Q        You remember your supervisor saying

9    Detective Best does X, Y, or Z very well?

10       A        No.

11       Q        What about any areas where you were

12   noted to need improvement, anything you recall?

13       A        No.

14       Q        Any deficiencies you remember noted in

15   your evaluation?

16       A        No.

17       Q        I would like to talk a little bit about

18   how the Investigative Unit was set up.  You mentioned when

19   you moved to Major Crimes, there were three categories of

20   crimes that you focused on.  How was the structure of the

21   Investigative Division arranged at GPD in the 90's?

22       A        There was a Major Crimes Unit, one

23   person.  That was me.  There was a Rape Investigations Unit.

24   That was Janice Harris.  And then there was General

25   Investigation Unit.  That involved breaking and enterings,

1   forgeries, those kinds of crimes. And then we had Family

2   Services.

3       Q      Now, you mentioned rape as separate from

4   Major Crimes, so was, and I thought you previously testified

5   that Major Crimes was homicide, rape and burglary?

6       A      It was.

7       Q      And so, was rape a separate section of

8   Major Crimes?

9       A      Janice did all the rapes, I did all the

10   murders.

11       Q      Okay. Both within Major Crimes?

12       A      Within Major Crimes.

13       Q      And then who handled the robberies?

14       A      All of us.

15       Q      Okay. You mentioned Janice Harris and

16   you, what about sort of supervisory? Who was above the

17   Investigative Unit supervising you directly?

18       A      I don't remember exactly who was there

19   at certain times. I can tell you that we had three or four

20   sergeants, not at the same time. I mean like, proceed one

21   another. One of them would get promoted or something. We

22   had three or four of them. And at one time, we had a

23   lieutenant, but that wasn't always the case, but we had a

24   captain that was always there.

25       Q      When you said there is a sergeant, was

1   there one sergeant who would oversee?

2          A      Yes, one sergeant.

3          Q      And then during the course of your time

4   in that unit, that person changed?

5          A      Several times.

6          Q      And then you also recalled that at times

7   there was a lieutenant over the sergeant?

8          A      The lieutenant's position was taken away

9   at some point in time in there, but I can't tell you when.

10         Q      And then the captain?

11         A      Captain.

12         Q      And would the captain report directly to

13  the Police Chief?

14         A      Yes.  Or the major.

15         Q      And what role, if any, did the sergeant

16  have in the operation of Major Crimes?

17         A      He was in charge.

18         Q      And would he look at your reports?

19         A      Yes.

20         Q      And would he assist actively in

21  investigations?

22         A      I don't remember any, that any of them

23  got involved in any way.

24         Q      When you said any of them got involved,

25  you are talking about the tasks taken in an investigation,

1   it was not involvement by your supervisor?

2          A          Right.  None of them that I know of went

3   out and did any kind of footwork to help your case or

4   advance your case.

5          Q          Do you recall them reviewing your work?

6          A          Yes.  But some things changed in the

7   90's.

8          Q          What changed in the 90's?

9          A          In 1995, the Greenville Police

10  Department was accredited, which changed the whole scheme of

11  things.

12         Q          In what way?

13         A          Before, you kept your information in a

14  file to yourself.  You carried it all.  Because of

15  accreditation, that requires you to be more open, I guess is

16  the word, where they put filing cabinets out in the area of

17  the Brown Building, actually 95, we moved to the new Police

18  Department.  They put filing cabinets out there, and each

19  detective had their own file.  And so, when you would do a

20  followup or something, you would take a copy of it and place

21  it in that file so that whomever needed to check it, could

22  check it without contacting you.

23         Q          So, it was a system to create a copy of

24  what was happening in ongoing investigations?

25         A          You could say it that way.  But

1  accreditation has certain guidelines, and that was one of

2  them.

3         Q       Would you, how would you describe the

4  guidelines?

5         A       Well, it went from no deadline for

6  followup to a 10 day deadline for a followup.  That's the

7  best I can explain.

8         Q       When you say followup, what do you mean?

9         A       Anything that you did in that case that

10  needed to be on paper, you would type it up and put a copy

11  of it in that file.

12         Q       And was the accreditation process

13  focused heavily on documentation?

14                MS. MARTINEAU:  Objection to the form of

15          the question.  You can answer.

16         A       I wouldn't say that, no.

17         Q       How would you describe the focus of the

18  accreditation standard versus what was happening previously

19  in your unit?

20         A       I'd say conformity is a word.  A pattern

21  of, a process to where instead of you doing your following

22  and putting it in your case file, you would put a copy of it

23  in the file so they wouldn't have to contact you and ask you

24  for an update.

25         Q       That way, if someone had a question

1  about what was going on in the case, they could go to the

2  central filing cabinet, open it up, pull out the file, and

3  look and see what was going on?

4          A       That's correct.

5          Q       And if they wanted to suggest a task to

6  you, they could look in the file, think, oh, maybe I should

7  tell Detective Best to do this, and they could come to you

8  without first asking you to review your personal file?

9              MS. MARTINEAU:  Objection to the form of

10             the question.  You can answer.

11         A       The only person that was allowed to go

12  in these files was your sergeant and above.  They are the

13  ones that, he's the one or she's the one that kept up with

14  whether or not, because I said after the accreditation

15  process, there was a deadline on followup, which is 10 days.

16  And so, they were the ones who would check it to make sure

17  that you are up to date.

18         Q       And so did that change the process for

19  you as a detective?  Was there, for instance, more

20  engagement by the supervisor?

21         A       Absolutely.

22         Q       And describe for me the difference.

23         A       We were a very old fashioned kind of

24  process to where you were assigned the case, you go and

25  investigate the case, and you come back and you type up the

1   case.  So, you did it all.  And so, if you had 10 cases, you

2   know, it was difficult to maintain all 10 of those cases and

3   keep all that stuff in the file.  So, it really caused some

4   issues.  But you know, we got around to it.  We did it.

5            Q        Did you feel like it got better once the

6   accreditation processes were in place?

7                     MS. MARTINEAU:  Objection to the form of

8            the question.  You can answer it.

9            A        I wouldn't say, on my part of it, no,

10  because it caused a whole lot more work and you really had

11  to stay on your toes to stay up.  Especially when you had so

12  many cases.

13           Q        And what did that mean to stay on your

14  toes?

15           A        Incumbent upon that detective to make

16  sure that his reports are in that file every 10 days.  So,

17  and that's just added another task to, you know, your job to

18  fill out that paperwork and get it in that file, in addition

19  to going out and investigating those cases.

20           Q        Previously how often would you update

21  your file?

22           A        When you had time.

23           Q        How often would that be?

24           A        Whenever you got time.

25           Q        Did you often get time?

1        A        Yes, and we were very, very busy,

2    because there was a large case load.

3        Q        I want to go back to the structure we

4    were talking about before we diverted to talk about the

5    accreditation process in 1995.  So, you had said that the

6    supervisor was the person above your cases, and then we had

7    the lieutenant, the captain and the chief.  At any point in

8    time did the lieutenant, captain, or the Chief of Police

9    look over the work that was done by those in the

10   Investigative Unit?

11       A        I can't answer that question.  I mean, I

12   don't know what they did.

13       Q        Do you recall a time when someone other

14   than the sergeant may have talked with you about an

15   investigation you were working on?

16       A        The captain always wanted to be apprized

17   of what was going on.  Sometimes the sergeant, and like I

18   said, the lieutenant was a short-lived situation.  So, the

19   sergeant and the captain may come and ask you questions, but

20   they, that didn't happen a lot.

21       Q        How much interaction did you have with

22   the supervisor, the sergeant?

23       A        He is your supervisor.  I mean he is the

24   one that determines what cases you are assigned, and how

25   many you are assigned.  So, that's pretty much it.

```
 1        Q        And how would the sergeant check on your

 2   cases, your progress, that type of thing.

 3        A        If he didn't have a report to read,

 4   sometimes he would call you in and ask you what the update

 5   is on a certain case, but, as I said, there was a lot of

 6   cases.

 7        Q        Was there ever a time when a second

 8   investigator would be assigned to a case in Major Crimes?

 9        A        As times change, so did the

10   Investigative Unit.  I was assigned Major Crimes, homicide

11   cases, in 1990, and I was it.  And there was so many murders

12   occurring, I pleaded with supervision to assign more

13   detectives.  And in my recollection, it's been a long time

14   ago, and I could be wrong on the date, but I remember 1993,

15   I believe, was when so many cases come in that I appealed to

16   supervision, please add some more people to the unit, and

17   they added two more.

18        Q        And who were those two people?

19        A        Detective Melvin and Detective Novell.

20        Q        And once you had this unit of now four

21   people --

22        A        Three people.

23        Q        Three.  You, Melvin, Novell and at some

24   point did Harris leave?

25        A        No, she really didn't do a lot.  I mean,
```

1  if I was not available, or anybody wasn't available, she

2  would take the murder case, but she really wasn't there for

3  the murder cases.  She did mainly the rape cases.

4          Q        All right, so let me make sure I

5  understand what you are saying.  When you asked for more

6  people, you were specifically asking for people in homicide.

7          A        Those years are the years that they

8  increased.  All the others increased, too, I'm sure, but

9  those were the ones that we needed the help with the most.

10         Q        How were cases assigned once you had

11  that three person Major Crimes Unit?

12         A        A rotation basis.  Detective A gets the

13  first case, Detective B gets the second case, Detective C

14  gets the third case.

15         Q        And who made that decision?  Was it

16  understood or --

17         A        That was pretty much the practice.  I

18  mean, that was understood.

19         Q        Did the sergeant put that practice in

20  place?

21         A        I don't know who put that practice in

22  place.

23         Q        At that time, when you have three

24  investigators, were there times when a second investigator

25  would be assigned to a case to assist?

```
1        A        Always.

2        Q        And how would the secondary investigator

3   be assigned, how was that determined?

4        A        You have a lead detective, and you had a

5   General Investigation detective.  And they worked on the

6   same rotation as we did.  I can't remember how many General

7   Investigation detectives we had then, but it was a rotation

8   basis just like the Major Crimes.

9        Q        So, it was the three of you and then

10  another unit from whom you could pull a second detective and

11  that would be the General Investigative detective?

12       A        That's correct.

13       Q        And I'm sorry, who made that decision to

14  bring, like who would choose the General Investigative

15  detective?

16       A        I don't know.  My recollection is, it's

17  rotation.  But that's the best I can remember.

18       Q        So, it's not like you could request

19  someone?

20       A        I don't know.  I never did.

21       Q        Do you recall what Melvin was doing

22  before she was assigned to homicide around 93?

23       A        She was a patrol officer.

24       Q        Was there ever a time when there were

25  two people from Major Crimes on a case, not a General
```

1  Investigative detective, but two of you from Major Crimes?

2         A       I can't remember.

3         Q       Is the General Investigative detective

4  always assigned at the same time as the lead detective?

5         A       My recollection, this has been a long

6  time, my recollection is, the General Investigations

7  detective got called out at the same time the Major Crimes

8  detective did.

9         Q       And when you say called out, are you

10  speaking about to the crime scene?

11         A       Uh-huh.

12                 MS. MARTINEAU:  Is that a yes?

13         A       I'm sorry, yes.

14         Q       I actually didn't give you that rule.

15  It should be yes or no.

16         A       I apologize.

17         Q       That's okay.  Can you define the role

18  for me, the role of the lead investigator first?

19         A       I think the best way I can describe it

20  would be just like in your law office, you have a person who

21  is in charge of your law office that probably assigns the

22  cases that come in, and keeps up with the cases that comes

23  in.  That's pretty much the role of a lead detective.  They

24  assign the case, they keep up with the case, they assign

25  tasks in the case.  They are like the sergeant of the unit.

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    Page 27

1    I mean, they, they are in charge.

2          Q        And then what about the General

3    Investigative detective, what is that person's role?

4          A        Whatever the lead detective wants them

5    to do.  I mean, sit in on interviews, go do something.

6    Whatever the lead detective pretty much tells them to do.

7          Q        Could that secondary detective have

8    autonomy to make decisions?

9          A        I don't know.

10         Q        Did you ever serve in a secondary role?

11         A        Yes.

12         Q        And when you served in that role, would

13   you, at times, make autonomous decisions?

14         A        No.  In fact, I was the secondary

15   detective in the case at hand.

16         Q        Okay.  But going back generally to this

17   setup, when you said that the lead detective assigns the

18   tasks, I think I heard you say they might ask the secondary

19   investigator to sit in on an interview.  Whose

20   responsibility would the interview be?  Would that be a lead

21   detective responsibility?

22         A        Is your question who does that person

23   want to be in the interview?  Is that what you are saying?

24         Q        Let me rephrase it.  That was a jumbled

25   question.  I heard you say that a lead investigator might

**J.A. 1359**

1   ask the secondary investigator to sit in on an interview.

2   My question is, is the lead investigator, the person who is

3   in charge for interviews in the context of an investigation?

4              MS. MARTINEAU:  Object to the form of

5         the question.  You may answer it.

6         A      Yes.

7         Q      What would happen in a case where a

8   secondary investigator was assigned later, days after the

9   lead?  How would that person be expected to get up to speed?

10        A      I don't know how all the rest of them

11  did it.  I know how I would have done it.  You call the

12  second person in, present them with the evidence that you

13  have so far, starting with the very initial investigation,

14  and go from there.

15        Q      If you were the lead investigator, how

16  would you start your case from square one in the Homicide

17  Division?

18        A      They call you to the scene, you start

19  from the scene and work from there.

20        Q      And what do you do at the scene?

21        A      See the evidence that is there.

22  Interview witnesses that are there, talk to the patrol

23  officer that is assigned.  Those kinds of things.

24        Q      Why is going to the crime scene

25  important?

1      A       So you know where you are going.  In

2   other words, it gives you some kind of, you can form some

3   kind of game plan as to what needs to be done and how it

4   needs to be done.

5      Q       What do you mean by that?

6      A       Every detective does their

7   investigations in their own way.  So, I'm telling you the

8   way that I would have done an investigation.  I can't answer

9   for any of the rest of them.  So, you go through the crime

10   scene, you assess the scene and you go from there.

11      Q       What if you can't get to the crime

12   scene, what would you do?

13              MS. MARTINEAU:  Objection to the form of

14          the question.  You can answer.

15      A       I don't understand what you mean by

16   that.

17      Q       If you are unable to get to the crime

18   scene for some reason, whether it's by the time you are

19   assigned the case, it no longer is a crime scene, that type

20   of thing, what would you do?  If you were assigned later and

21   you couldn't get there, would there be a way for you to

22   assess the crime scene since that's an important task?

23              MS. MARTINEAU:  Same objection.

24      A       You would have, as a lead or as an

25   assisting?

1        Q        As a lead.

2        A        I don't know how to answer that question

3    because I have never had that situation.

4        Q        Would you look at crime scene photos?

5        A        Absolutely.

6        Q        Why would that be important?

7        A        It is important to see where you are

8    going.  If you didn't have an idea what the crime scene had,

9    then you have got to have some idea where you are going to

10    go.

11        Q        Are there any drawbacks between the

12    situation where you can actually go to the crime scene

13    versus a situation where you only have the crime scene

14    photos?  Do you feel like there is some disadvantage to

15    that?

16            MS. MARTINEAU:  Objection to the form of

17            the question.  You can answer.

18        A        Absolutely.

19        Q        What are those drawbacks?

20        A        If you don't get to see the crime scene

21    as it exists, then you can look at a photo, but you may miss

22    something in the photo.  So, yeah, I think it's important

23    for you to go to the crime scene.

24        Q        You mentioned witness interviews, why

25    are those important?

1              MS. MARTINEAU:  Objection to the form of

2         the question.  You can answer it.

3         A       That leads you where you want to go.  I

4    mean, that's the first form of that investigation, is

5    witness interviews.

6         Q       Would it be important to you, as a lead

7    investigator, to try to find the person or people who were

8    last in contact with the victim?

9         A       Anything that is relevant to the case is

10   important.  And that's what you try to find, something that

11   is relevant to your case and follow those facts from there.

12        Q       Would you consider the last person or

13   people to be with a victim relevant?

14             MS. MARTINEAU:  Objection to the form of

15        the question.  You can answer.

16        A       Absolutely.

17        Q       Why would that be relevant?

18        A       Investigations are just like a road map,

19   and you are riding that road map yourself.  And so, yes,

20   anything that you can find in that investigation, is

21   important.

22        Q       How about evidence collection?  And

23   let's take a shooting case.  What kind of evidence would you

24   be looking for at a crime scene in a shooting case?

25        A       I'm not a crime scene tech, but

J.A. 1363

1  everything at the crime scene that can help your case is

2  important.

3          Q        In a shooting, are there specific things

4  you would expect to find?

5          A        You would hope to find shell casings,

6  but if they used a revolver, there wouldn't be any.

7  Anything at the crime scene that, you know, parts of

8  clothing, or any of those kind of things.

9          Q        Why would a shell casing be important?

10         A        That way you can identify the caliber of

11 gun or compare the shell casings to whatever bullet you can

12 get from the person.

13         Q        And what about clothing?  You mentioned

14 pieces of clothing, why would that be important?

15         A        Anything you can get DNA from.

16         Q        And if you did collect something that

17 you thought you could get DNA from, what would you do with

18 it?

19         A        You would try to get a search warrant to

20 get DNA from your suspect and compare it to any DNA on the

21 clothing.

22         Q        So, what would you do with that clothing

23 to determine whether there was DNA on it?

24         A        I wouldn't do anything with it.  It's

25 collected by the crime scene tech, it's packaged and

1  prepared, and taken to the Police Department, put in

2  evidence.  And then at some later date, if you find a

3  suspect, you get a search warrant to get his DNA, and then

4  you compare anything that you found on the clothing to your

5  suspect.

6          Q       So again, if you are the lead detective,

7  and you have recovered clothing, your tech has, and put it

8  away in evidence collection, what would you do with that?

9  Nothing, until you have obtained DNA?  Did I understand your

10  question correctly?

11                 MS. MARTINEAU:  Objection to the form of

12          the question.  You can answerer.

13          A       I wouldn't do anything with it.  That's

14  why you have the crime scene tech.  I'm sure they would go

15  over it to see if there was any stains, hairs, fibers, or

16  whatever they might could collect.  I wouldn't do any of

17  that.  It's the crime scene tech's job.

18          Q       As a lead detective, if a crime scene

19  tech were to find something, a stain, blood, on the

20  clothing, what would you do as the lead detective then?

21          A       Back to what I said at the previous

22  question, you would try to get a search warrant for your

23  suspect, if you had one, and compare it to that person.

24          Q       Would you try to get the substance

25  tested if it was on the jacket and see if it matched the

1    victim?

2              MS. MARTINEAU:  Objection to the form of

3         the question.  You can answer.

4         A       Absolutely.

5         Q       And if it didn't match the victim, would

6    that be meaningful information to you as a lead detective?

7         A       Anything found at a crime scene is

8    important, especially blood or stain, as you said.

9         Q       Why especially blood or stain?

10        A       Back then, we didn't have the

11   capabilities of DNA and those kinds of things that we do

12   now.  So, now, I have been out of police work for 30 years

13   almost.  We didn't have those capabilities back then.  It

14   was in the early stages, and, you know, it took forever to

15   try to get something tested and stuff.  Back then, it wasn't

16   like it is now.

17        Q       And because it took long to get testing

18   done, sometimes would you not do testing?

19        A       Oh, absolutely.  Always.

20        Q       Always you would do testing?

21        A       Oh, yes.

22        Q       Any reason you wouldn't do testing?

23        A       I don't know of any.

24        Q       If you were the lead and you had a

25   secondary investigator assigned to you, what would you do as

J.A. 1366

1  a lead detective directing that person in a homicide case?

2           MS. MARTINEAU:  Objection to the form of

3        the question.  You can answer.

4        A        As I said earlier in my statement, a

5  lead detective is the sergeant of the case.  He determines

6  what move, or that person determines what move is next.  So,

7  they make assignments of trying to locate maybe a witness,

8  or any of that.

9        Q        How would you expect your secondary

10  investigator to get up to speed on a case?

11        A        Are they there with me when the crime

12  happened?

13        Q        Let me clarify.  Let's say that we are

14  assigned later, how would you expect them to get up to

15  speed?

16        A        We always sit down and compare notes, so

17  to speak.  You would tell the person what you had found

18  prior to, show them crime scene photos, witness statements,

19  those kinds of things.

20        Q        Would you expect them to take any

21  initiative on their own?

22        A        The secondary?

23        Q        Yes.

24        A        If the lead gave them an assignment, but

25  secondaries don't usually go out and take it upon themselves

```
 1   to work the cases without, you know, telling the lead what's

 2   going on.

 3           Q        So, anything that the secondary would

 4   do, should be telling you, as the lead detective, what they

 5   are doing?

 6           A        Absolutely.

 7           Q        Why?

 8           A        Back to the old road map.  How are you

 9   going to go anywhere or do anything if you don't have a road

10   map?  If they tell you what they are doing and such, then

11   you know where you are.

12           Q        What would you expect your secondary

13   investigator to provide you if he or she had done something

14   in the case?  Would you expect a report, or what would be

15   your expectation of that secondary?

16                    MS. MARTINEAU:  Objection to the form of

17           the question.  You can answer.

18           A        Either that or sit down and tell me what

19   they have done.

20           Q        And what would you do with that

21   information?

22           A        Depending on what the information was.

23           Q        Why does it depend on what the

24   information is?

25           A        Because, just the information doesn't do
```

1  you any good, unless there is something to go with it.

2       Q      What do you mean by that?

3       A      If a secondary would come to you and

4  say, I think we need to go interview witness A.  If they

5  don't have anything, any knowledge of why we should, you

6  would talk about it and if you decided it's important, then

7  you both would go interview witness A.

8       Q      What if your secondary decided to

9  interview witness A and came to you and said, hey, I

10  interviewed witness A, what would you expect from that

11  circumstance?

12             MS. MARTINEAU:  Object to the form of

13        the question.   You can answer.

14       A      I would expect them to tell me they did

15  that and what information they may have gained from it.

16       Q      Would you ask them to look at their

17  notes from that interview?

18       A      I would not.

19       Q      Why not?

20       A      It's just not what you do.  You are a

21  grown-up.  You have been doing the job for a while.  Asking

22  to look at their information in their notes is not what you

23  do.

24       Q      Would you write a report on that

25  interaction as a lead detective?

1        A        I don't understand your question.

2        Q        If I understand your answer, it was that

3    you wouldn't ask your assisting detective to look at notes

4    from an interview because that person is a grown person.

5    But if that assistant told you they did an interview, would

6    you then create a report about what your assistant did?

7        A        Depends on what it was.

8        Q        Explain.

9        A        It's a hypothetical and I can't give you

10   an answer to a hypothetical.  So, if it's facts, it's facts.

11   But that's the best way I can answer it.

12       Q        So, does that mean sometimes if your

13   assistant would come to you without facts, they would be

14   telling you something that wasn't true?

15               MS. MARTINEAU:  Objection to the form of

16               the question.  Argumentative.  You can answer.

17       A        No, but if it didn't advance you in one

18   way or the other against or for your case, then I don't see

19   the relevance of getting upset about it.

20       Q        How about if it did advance your case?

21       A        If it didn't.

22       Q        If it did.  If it did advance your case,

23   what would you expect then?

24               MS. MARTINEAU:  In terms of what?

25       Q        What would you expect from your

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    Page 39

1   assistant detective if he or she was providing you

2   information about an interview that advanced your case, what

3   would you expect from the assistant?

4        A       A reason why they did the interview by

5   themselves.  And if it was relevant information, I would

6   expect a report.

7        Q       And would you also print a report as the

8   lead investigator?

9        A       That's not how we did it.

10       Q       How would you do it?

11       A       I would take that person's report and

12  include it in my file that I gave to the DA.

13       Q       And why would that be important?

14               MR. ELLIS:  Objection.

15       A       Your question before that was my answer.

16  It's just, if they gave me a report on their interview, I

17  would include it in the file that I gave to the DA.

18       Q       And why would it be important to put

19  that report in the file that goes to the DA?

20               MR. ELLIS:  Objection.

21       Q       You can answer.

22       A       If they generated a report, of course

23  you would put it in the file.

24       Q       And why is putting it in the file

25  important?

**J.A. 1371**

```
 1                  MR. ELLIS:  Objection.

 2        Q      You can answer.

 3        A      It's relevant.

 4        Q      And why is relevant information in a

 5   file important?

 6                  MS. MARTINEAU:  Objection to the form of

 7             the question.  You can answer.

 8        A      In a 96 hour report, is what we did.

 9   That's the report you turn into the DA's office.  You fill

10   out the 96 hour report, and include everything in that 96

11   hour report attached to it.  Like, a copy of the initial

12   report, and all of your report that you had to go on with

13   the case.

14        Q      And why does the DA get that file?

15   What's the purpose of that file and giving it to the DA?

16        A      I guess that's what they use to

17   prosecute the cast with.

18        Q      Well, you sat down with DA's to prepare

19   cases, right?

20                  MS. MARTINEAU:  Objection,

21             argumentative.  You can answer.

22        A      To prepare cases, I don't understand.

23        Q      When you are the lead detective in a

24   homicide case and you are in charge of the file, you give

25   that file to the district attorney, correct?
```

```
 1       A       Correct.

 2       Q       And when the district attorney is

 3  preparing for trial in that case, you meet with the district

 4  attorney, right?

 5       A       Correct.

 6       Q       Because the district attorney might have

 7  questions.

 8               MS. MARTINEAU:  Objection to the form of

 9           the question.  You can answer.

10       A       Correct.

11       Q       And as the lead detective, there might

12  be things you need to clarify for the DA?

13       A       Possibly.

14       Q       You need to make sure that the district

15  attorney understands the file that you have created in a

16  homicide case, correct?

17               MS. MARTINEAU:  Objection to the form of

18           the question.  You can answer.

19       A       Yes.

20       Q       And it's important that that information

21  be accurate, right?

22               MS. MARTINEAU:  Objection, leading.  You

23           can answer.

24       A       I would never put anything in a report

25  that was not accurate.  I mean, that's just, that's not what
```

1   you do.  You put in your report facts and facts that are

2   relevant to the case.  And so I don't understand what you

3   mean by that question.

4          Q        Well, if there is something that you

5   haven't put in the file, like, for instance, you mentioned

6   if you got this report from your assistant who interviewed

7   someone without you present, you would put that in the file,

8   because that advanced the case, right?

9                 MS. MARTINEAU:  Objection to the form of

10              the question.  Leading.  You can answer.

11         A        I'm not following you, I'm sorry.

12         Q        You indicated that you would put a

13  report from your assistant into your case file, if it

14  advanced your case, right?

15                MS. MARTINEAU:  Objection to the form of

16              the question.  Leading.  You can answer.

17         A        Regardless of whether it would advance

18  your case or not, you put it in the file.

19         Q        So, you should put everything in the

20  file related to your case?

21                MS. MARTINEAU:  Objection to the form of

22              the question.  You can answer.

23         A        Your question was if my assistant or

24  whatever you want to call them, gave me a followup, would I

25  put it in the file and present it to you?  The answer is

J.A. 1374

1   absolutely.

2          Q      And that's because everything you

3   generate in the case should go in that file.

4          A      Yes.

5          Q      Your file should be as complete as

6   possible?

7          A      Yes.

8          Q      You are familiar with the term field

9   notes?

10         A      Yes.

11         Q      What are field notes?

12         A      Notes that you take in the field.

13         Q      What is the purpose of field notes?

14         A      So that tomorrow, or two months from

15  now, you can look back over your notes and get familiar with

16  what you had from back then.

17         Q      Are they used to then generate a report

18  later?

19         A      Not always.

20         Q      Why not always?

21         A      Because they may not be relevant.

22         Q      What were you trained about putting into

23  your field notes?  Do you remember the five W's and the H?

24         A      Ma'am, that has been so long ago that I,

25  I'm sorry.

```
 1        Q        Do you recall that from BLC?

 2        A        I do not.

 3        Q        What were you told to put in your field

 4   notes?

 5        A        Anything that the person said, is all I

 6   can say.

 7        Q        Would you agree that when you show up at

 8   a crime scene, it is important to record who was there?

 9                 MS. MARTINEAU:  Objection to the form of

10             the question.  You can answer.

11        A        Absolutely.

12        Q        Who you talked to?

13                 MS. MARTINEAU:  Same objection.

14        A        Absolutely.

15        Q        What you see yourself?

16                 MS. MARTINEAU:  Same objection.  You can

17             answer.

18        A        Yes.

19        Q        How the scene looks?

20                 MS. MARTINEAU:  Same objection.  You can

21             answer.

22        A        Well, how the scene looks would fall

23   back on your crime scene tech.  But mentally you record that

24   in your mind, but not always on paper.

25        Q        Would you take field notes if you
```

1  noticed something unusual at a crime scene?

2        A        Probably.

3        Q        Would you take field notes if someone

4  spoke to you at a crime scene?

5                    MS. MARTINEAU:  Objection to the form of

6              the question.  You can answer.

7        A        I don't know what you mean by spoke to

8  me.  Hey, Detective Best, how are you?  Or is it something

9  else?

10                   MS. MARTINEAU:  She is not here to

11             answer your question.

12       A        I'm sorry.

13       Q        If anyone spoke to you, would you write

14  their name down?

15                   MS. MARTINEAU:  Objection to the form of

16             the question.  You can answer.

17       A        No.

18       Q        Why not?

19       A        There is too much going on, you can't

20  record everything.  That's when you fall back on crime scene

21  techs and if you have a secondary, you know, maybe they did

22  that.

23       Q        Would you, as the lead detective, expect

24  your secondary to try to make notes about every person that

25  was at a crime scene?

J.A. 1377

```
 1                    MS. MARTINEAU:  Objection to the form of

 2            the question.  You can answer.

 3       A        Probably.

 4       Q        And why would that be?

 5       A        That's what they are for.  I mean, they

 6  are backups.

 7       Q        Why is it important to have the names of

 8  everyone who is at a crime scene, if possible?

 9                    MR. ELLIS:  Objection.

10                    MS. MARTINEAU:  Same objection.

11       A        The case is important and everything

12  that you can acquire from that gives you part of this

13  roadmap that I told you about.  So, yes, if you have names

14  of people at the crime scene, they are certainly important

15  to be able to go and interview again, maybe not at the crime

16  scene, because maybe too much was going on, but in the

17  future maybe.

18                    MR. ELLIS:  Counsel, can we have an

19            agreement that an objection by any of the

20            defendants is an objection by all?

21                    MS. MARTINEAU:  That's fine with me.

22       Q        Is field note taking covered in your

23  regular evaluations at GPD?

24       A        Ma'am, I don't remember all the things

25  that's in the evaluation.
```

J.A. 1378

1        Q        Do you remember any kind of routine

2    training at GPD about note taking at the crime scene?

3        A        Not that I remember.

4        Q        I have done a number of these cases and

5    one of the things that I recognize in police departments in

6    their evaluations is that often detectives are routinely

7    evaluated on the quality of their reports.  Did the GPD

8    evaluate on that?

9                 MS. MARTINEAU:  Objection to the form of

10               the question.  You can answer.

11       A        I don't remember that.

12       Q        In writing your reports when you were a

13   lead detective, what was important to you about that report,

14   what were you trying to achieve with that report?

15       A        That you include everything that was

16   garnered from that investigation.

17       Q        Why is documenting that in a written

18   report important?

19                MS. MARTINEAU:  Objection to the form of

20               the question.  You can answer.

21       A        That's what the DA uses to prosecute the

22   case.

23       Q        What information should be in that

24   written report then?

25       A        I can't give you every detail about

 1   what's in there, but your initial investigation, all your

 2   interviews, a copy of the arrest report, maybe, a copy of

 3   the crime scene tech's information.  That's just a few.

 4        Q       And you would agree it's important that

 5   that be accurate?

 6        A       Absolutely.

 7        Q       Would the supervisor review the reports

 8   before they went to the DA?

 9             MS. MARTINEAU:  Objection asked and

10             answered.  You can answer.

11        A       I don't think so.

12        Q       Another thing I have often seen in

13   detective evaluations, is evaluation on interviewing skills,

14   did the GPD evaluate on that?

15             MS. MARTINEAU:  Objection to the form of

16             the question.  You can answer.

17        A       I don't remember what was on the sheet

18   of what they used to evaluate, I'm sorry.

19        Q       Would you agree that an important, would

20   you agree that for a detective, it is important to have the

21   ability to interview witnesses?

22        A       I think it is very important.

23        Q       Would you agree it is important to be an

24   effective interviewer with witnesses?

25        A       Important, yes.

```
 1       Q       Would you agree that it is important for
 2   a detective to be an effective interviewer with suspects?
 3       A       Yes.
 4       Q       Why is it important to be an effective
 5   interviewer with witnesses?
 6       A       With witnesses?  You try to find out
 7   from the witnesses all their information that they can
 8   provide for you.  So, in order to get all that information,
 9   you need to be able to ask the right questions, or be a good
10   listener.  And so, it is important to be able to do that.
11       Q       And what about with suspects, why is it
12   important to be an important interviewer with suspects?
13       A       You want to know what the suspect will
14   tell you about their role in the crime, and whoever else
15   could possibly be involved.
16       Q       Are there different interview
17   techniques, depending on the person you are interviewing,
18   for instance, child, versus adult?
19       A       I don't know of any.
20       Q       Were there any different techniques that
21   you used when interviewing a child versus an adult?
22       A       I don't think so.
23       Q       What about any different techniques
24   between a witness and a suspect, any different interviewing
25   techniques?
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                   Page 50

| | | |
|---|---|---|
| 1 | A | Am I answering for myself? |
| 2 | Q | Yes. |
| 3 | A | No. |
| 4 | Q | Generally speaking, were you trained |

5  that there were differences between suspects and witnesses?

| | | |
|---|---|---|
| 6 | A | Ask that question again. |
| 7 | Q | You answered specifically for yourself |

8  that you didn't have a difference between how you

9  interviewed suspects or how you interviewed witnesses.  I'm

10  wondering whether there was some training that you received

11  or some general guidance about treating them differently,

12  suspects and witnesses?

| | | |
|---|---|---|
| 13 | A | No. |
| 14 | Q | What about someone with psychiatric |

15  problems versus someone who doesn't have psychiatric

16  problems, would there be a difference in your interviewing

17  techniques in that circumstance?

18          MR. ELLIS:  Objection.

19          MS. MARTINEAU:  Same objection.

| | | |
|---|---|---|
| 20 | A | No, because I don't think the |

21  interviewer or the detective would know that person's

22  disabilities.  Would have anything to tell them about their

23  disabilities, so, no, I think you would do the same thing.

| | | |
|---|---|---|
| 24 | Q | What about a circumstance where you did |

25  know the person had some psychiatric issues, would there be

**J.A. 1382**

1   a different interview technique then?

2          A       I don't think so.

3          Q       Did you receive any specific training at

4   the GPD regarding how to interview?

5          A       I attended several classes, not at the

6   Greenville PD, but at other places on interview

7   interrogation.

8          Q       What do you recall about those classes?

9          A       That everybody has their own form of

10   interview interrogation.

11          Q       Did you develop your own form or

12   technique?

13          A       I think all interviewers did.

14          Q       How would you describe your technique in

15   taking an interview?

16          A       I'm a good listener.  I don't get mad, I

17   don't get upset.  So, I'm a good listener.

18          Q       And what about interacting with the

19   witness or the suspect, what technique would you use or

20   describe, how would you describe your form?

21                 MS. MARTINEAU:  Object to the form of

22          the question.  You can answer.

23          A       If you make them mad in the very

24   beginning, most times you get nothing.  So, if you listen

25   and let them tell their story, then you can go from there.

1        Q        Were there any requirements at the GPD

2   that interviews be documented in some way?

3                      MR. ELLIS:  Objection.  Is there a

4             particular period of time you are talking about?

5                      MS. PFEIFFER:  Sure, in the 90's.

6                      MR. ELLIS:  More specific.

7                      MS. PFEIFFER:  In 1994.

8                      MR. ELLIS:  Thank you.

9        A        Not that I know of.

10       Q        Was it your practice to document

11  interviews?

12       A        Most times.

13       Q        And how would you document them?

14       A        It depends on where you are when you are

15  getting that information.  I mean are you talking about

16  bringing somebody to the police station for interview?

17       Q        Sure, let's answer that.

18                      MS. MARTINEAU:  She is not here to

19            answer your question.

20       A        Ask me that question again.

21       Q        Sure.  We will take that question.  If

22  someone was coming to the office, to the Brown Building at

23  that time for an interview, what would your practice be in

24  terms of documenting that?

25                      MS. MARTINEAU:  Objection to the form of

1          the question.  You can answer.

2          A        First of all, I would find someone to

3    sit in with me, and then I would sit down and listen to

4    them, to their statement, and then I would go back and if

5    there was anything relevant to the case, I would take notes.

6          Q        Why would you have someone with you?

7          A        In my years of detective work, I believe

8    that having two persons available in an interview is very

9    important.  So that, if you have a lead detective, your

10   secondary could pick up on anything that the lead detective

11   missed.  And so, that's why I felt very comfortable of

12   having two people interview.

13         Q        And how would you start off the

14   discussion with the witness?  You said I would bring them in

15   and talk to them a little bit.  What would that part of the

16   interview be like?

17              MS. MARTINEAU:  Objection to the form of

18              the question.  You can answer.

19         A        I'm a listener.  Tell me your story.

20   You sit down and you listen and you find out if there is

21   anything that they have to say that's relevant, and then you

22   go from there.

23         Q        And if it is relevant, then you would

24   write that down in a report?

25         A        Absolutely.

1        Q        Would you do anything else as it relates

2   to that person?  Would you ask them to write a report, would

3   you ask them to write a statement?

4        A        As a witness?  No.

5        Q        Why not?

6        A        That's never been my practice.  I always

7   ask the suspects to write one.  And occasionally, I would

8   get a witness to write a statement.  But that wasn't my

9   practice, as far as every witness would write their

10   statement out, no.

11        Q        When you would write your report after

12   that, if the witness gave relevant information, how would

13   you indicate what the witness' words were?

14        A        Hopefully I had taken some notes.  I

15   would refer to my notes.  That's the only thing I can say.

16        Q        Well, fair to say the notes would be

17   important because that could refresh your memory when you

18   went to write your report?

19             MS. MARTINEAU:  Objection to the form of

20             the question.  You can answer.

21        A        Yes.

22        Q        And in your notes, you would you do

23   anything to indicate what was a direct quote from the person

24   who you were interviewing?

25        A        I don't think so.

```
 1        Q        You wouldn't use quotation marks?

 2        A        Possibly.

 3        Q        How would you later know what was a

 4   person's direct quotes versus your summary of what they said

 5   if you didn't always use something like quotation marks?

 6        A        Hopefully you would indicate that in

 7   your notes.

 8        Q        And if you hadn't indicated that in your

 9   notes?

10        A        You would write what's in your notes.

11        Q        So fair to say, notes are important to

12   have a good written interview afterwards that's accurate,

13   right?

14        A        Yes.

15                 MS. MARTINEAU:  Objection to the form of

16        the question.

17        Q        Did you do anything different in your

18   report writing when you interviewed a witness versus a

19   suspect?

20        A        Ask the question again.

21        Q        In the reports that you would complete

22   after an interview, would there be anything different about

23   that report if the interviewee had been a witness versus a

24   suspect?

25        A        No.  If you -- no.
```

```
 1        Q        So, your practice would be the same, to

 2   take notes during the conversation, and then write a report?

 3                 MS. MARTINEAU:  Objection to the form of

 4        the question.  You can answer.

 5        A        Yes.

 6        Q        And in writing that report, would you

 7   agree that it's important to accurately summarize what the

 8   witnesses told you when it is still fresh in your mind?

 9        A        Yes.

10        Q        Why?

11        A        Well, it depends on a lot of things.

12   When I said, yes, are you talking about doing the report

13   from the notes that I, that I wrote down or from memory?

14        Q        Well, if you haven't taken notes during

15   the interview, would it be fair to say you want to do your

16   report as close in time to that interview since you don't

17   have notes to rely upon?

18                 MS. MARTINEAU:  Objection to the form of

19        the question.  You may answer.

20        A        Yes.

21        Q        Even if you did have notes, would it be

22   fair to say it would be better to do your written report

23   close in time, again because it's fresh in your mind?

24                 MS. MARTINEAU:  Same objection.

25        A        Yes.
```

1       Q        No, you had said that on occasion you

2    would have a witness write down their statement.  What would

3    determine that, why would you do that occasionally?  What

4    would be the circumstances under which you would do that?

5       A        After this question I would like to take

6    a break.

7       Q        No problem.

8       A        If it was a witness that had direct

9    knowledge of a crime, I, of a suspect, then, yes, I think

10    that is important for them to write their statement out, in

11    their words.

12       Q        And equally important for you to take

13    notes and write a report, right?

14                MR. ELLIS:  Objection.

15                MS. MARTINEAU:  Same objection.

16       A       Yes.

17       Q        Fair to say problems could be created

18    when things aren't documented?

19                MS. MARTINEAU:  Objection to the form of

20                the question.  You can answer.

21       A       I presume.

22       Q        All right.  Short break?

23       A        Please.

24                THE VIDEOGRAPHER:  Going off the record.

25                The time is 10:46 a.m.

www.huseby.com          Huseby Global Litigation          800-333-2082
Case 4:21-cv-00185-BO   Document 196-5   Filed 09/12/24   Page 58 of 409
J.A. 1389

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 58

```
 1                   NOTE:  At this time a short

 2        recess was taken.  After which time, all parties

 3        present as before, the matter continues as

 4        follows:

 5                   THE VIDEOGRAPHER:  Going back on the

 6        record, the time is 10:59 a.m.

 7    BY MS. PFEIFFER:

 8        Q       All right, Mr. Best, I would like to

 9    talk with you about developing suspects.  How would you, as

10     a detective, go about developing, or identifying potential

11     suspects in a homicide investigation you were conducting?

12        A       It depends.

13        Q       On what?

14        A       On the circumstances of the case.

15        Q       What are some of the factors that might

16     lead to a person becoming a suspect?

17        A       Yet again, it depends.

18        Q       What about proximity to the crime scene?

19        A       It depends on the case, I mean.

20        Q       But it would be fair to say that, if

21     possible, that someone who was close to the crime scene

22     might be a suspect?

23        A       Yet again, it depends.

24        Q       Would contact with the victim be

25     something that might lead a person to be considered a
```

**J.A. 1390**

```
 1   suspect?

 2        A      It depends.

 3        Q      On what?

 4        A      On the case.

 5        Q      We talked earlier about identifying

 6   witnesses at a crime scene, remember?

 7        A      Right.

 8        Q      And one of the things that we had talked

 9   about was people being in contact with the victim, right?

10        A      Yes.

11        Q      And those were important people to

12   identify, correct?

13        A      Yes.

14        Q      They could be witnesses?

15        A      Depends.

16        Q      Well, sometimes witnesses can turn into

17   suspects?

18        A      It depends.

19        Q      Sure, but sometimes witnesses can turn

20   into suspects, correct?

21        A      It depends on the case, yes.

22        Q      And sometimes having proximity to a

23   crime scene, could turn a witness into a suspect, correct?

24               MS. MARTINEAU:  Objection, leading.  You

25        can answer.
```

**J.A. 1391**

1        A        It depends.

2        Q        It depends also means it's possible,

3   correct?

4        A        Yes, it depends.  I mean, every case is

5   different, so, the best thing that I can answer that with is

6   it depends.

7        Q        In a shooting case, someone who is in

8   close proximity to the victim, would that person be a

9   witness?

10               MR. ELLIS:  Objection.

11       A        It depends.

12       Q        On what?

13       A        On the case.

14       Q        In a shooting case?

15       A        Every case is different, so, I can't do

16  hypotheticals, I can only say it depends on the case.

17       Q        All right, I will give you a

18  hypothetical that's a little more clear.  In a shooting case

19  where someone arrives on the scene, and they have recently

20  been in contact with the victim, would you consider that

21  person a witness, somebody you would like to talk to?

22       A        Depends on a lot of things.

23       Q        Such as?

24       A        Maybe.  But it depends.

25       Q        On what?

```
 1      A        When did the person talk to them?

 2      Q        Two hours before, let's say that's what

 3  they told you.

 4      A        It depends.

 5      Q        If that person then had an article of

 6  clothing around the area where the person had been shot,

 7  would that be of interest to you?

 8               MS. MARTINEAU:  Objection to the form of

 9      the question.

10      A        It all depends.

11      Q        On what?

12      A        It just depends on the circumstances.

13      Q        What circumstances?

14      A        It's hard to give you a definite answer

15  other than it depends on the case.  That's the best I can

16  answer it.

17      Q        In a case where a person approaches you

18  at the crime scene, and they have told you that they were

19  with the victim, and that they have an article of clothing

20  there at the crime scene with the victim, would that person

21  be at least a witness to you?

22      A        Yes.

23      Q        Might that person turn into a suspect?

24      A        It depends.

25      Q        On what?
```

1        A        I mean all kinds of circumstances could

2    have happened, but it all depends on that person's actions

3    or whatever that person may have done.  It just depends.

4        Q        What if that person told you they

5    intended to rob the victim, would that be an important fact

6    to you?

7                MR. ELLIS:  Objection.

8        A        Every case is different, and all I can

9    say is it depends.

10        Q        I'm giving you a specific scenario and I

11    will repeat it in case you are losing track of the facts.

12    In a shooting case, if you were the lead detective and the

13    person comes up to you at the crime scene and says I was

14    with the victim two hours ago, and that person has an

15    article clothing in the car, and that person told you they

16    intended to rob the victim, would that person possibly turn

17    into a suspect not just a witness?

18                MR. ELLIS:  Objection.

19                MS. MARTINEAU:  Same objection.  You can

20        answer.

21        A        It depends.

22        Q        On what?

23        A        On the case.  I mean, every case is

24    different, so, my best answer is, it depends.

25        Q        Would you agree that eliminating a

1   person as a suspect can be as important as identifying a

2   potential suspect?

3           A       Yes.

4           Q       On what basis would you eliminate a

5   suspect?

6           A       It depends.  Every case is different.

7           Q       All right.

8                   MS. PFEIFFER:  I'm going to ask that we

9           take a short break and go off the record.

10                  THE VIDEOGRAPHER:  Going off the record.

11          The time is 11:06 a.m.

12                          NOTE:  At this time a short

13          recess was taken.  After which time, all parties

14          present as before, the matter continues as

15          follows:

16                  THE VIDEOGRAPHER:  Going back on the

17          record.  The time is 11:15 a.m.

18   BY MS. PFEIFFER:

19          Q       Mr. Best, before we started back the

20   last time, we had taken a short break, correct?

21          A       Yes.

22          Q       And I asked you questions for a little

23   more than an hour before that break, yes.

24          A       Yes.

25          Q       And you answered all of those questions

1   for me, you remember doing that?

2        A      Yes.

3        Q      And I think only one time you said it

4   depends, do you remember that?

5               MS. MARTINEAU:  Objection to the form of

6        the question.

7        A      I do not.

8        Q      After we took a break, we came back and

9   you said it depends to, I think, about 17 of my questions.

10  I don't want to know who, but has anyone told you to respond

11  to my questions by saying it depends?

12              MS. MARTINEAU:  Objection to the form of

13       the question.  You can answer.

14       A      No.

15       Q      Why are you responding to my questions

16  that way now after a 10 minute break?

17       A      After giving it some thought, I probably

18  was not answering them correctly, because I maybe, may have

19  been assuming your question and that's not the way I should

20  do it.  So, if I don't know exactly how to answer your

21  question, you will probably get a depends.

22       Q      Did you meet with your attorney during

23  that break?

24       A      I met with both of my attorneys during

25  that break.

1       Q       And I don't want a content of your

2   conversations, but how long did you meet with them?

3       A       You saw the break, so I don't know how

4   long we were on break, but yeah, I was with them.

5       Q       And it was after that break that you

6   came back and answered my questions by saying it depends,

7   correct?

8                   MS. MARTINEAU:  Inaccurate, and I object

9           to the form of that question.  You can answer.

10      A       No.  Actually it depends on your notes.

11  I know that I said it depends a couple times before that.

12      Q       Right.  You said it depends to every

13  single one of my questions when we came back after the

14  break, and I want to know why?

15                  MS. MARTINEAU:  Objection asked and

16          answered.  You can answer.

17      A       That was my answer.  I can't do

18  hypotheticals.  And what you are asking me is hypothetical,

19  and I am not going to sit here, I'm a Christian man and I am

20  going to sit here and tell the truth, so I'm not going to

21  lie or answer things in a way that I don't feel good about.

22      Q       And what does being a Christian man have

23  to do with telling the truth?

24      A       Because that's what you rose your hand

25  for in the beginning, I didn't have a Bible, in most courts

1    they have Bibles, that's why you lay your left hand and

2    raise your right because you are supposed to sit there and

3    tell the truth and that's what I want to do today.

4         Q        And you would agree that in any criminal

5    case, it's important to tell the truth, right?

6         A        Beginning to end.

7         Q        Regardless of whether you put your hand

8    on a Bible?

9         A        Beginning to end.

10        Q        I'm going to give you what I'm going to

11   mark as Exhibit One.

12                      NOTE:  The above referred to

13            document is now being marked and filed as

14            Exhibit 1.

15        Q        Exhibit 1 is a handwritten report by

16   Officer Jones, and it is from February 11, 1994.  You

17   recognize this as an incident report that was filled out

18   when you were at the Greenville Police Department, correct?

19                 MS. MARTINEAU:  Objection, leading.  You

20            can answer.

21        A        I recognize the report.  Are you

22   indicating, well I can't ask you a question, but yes, I

23   recognize the report.

24        Q        And I want you to turn to page three of

25   this report, and down at the bottom, the very last

 1   paragraph, I'm going to read what that says and you let me

 2   know if I got it right, okay.  Wilbur Mercer, AKA Marshanna,

 3   approached responding officer at the scene and asked if he

 4   could look inside the truck in reference to a green Army

 5   jacket.  Responding officer and Marshanna, that's in quotes,

 6   then made contact with Reid and Melvin.  Marshanna, that's

 7   in quotes, stated that the jacket should have the name Noble

 8   on it, and that the jacket, I'm turning the page now,

 9   belonged to him.  Marshanna, in quotes, in parens.

10   Marshanna, quote, are you reading along with me to make sure

11   I'm getting it right?  Stated that he had been with the

12   victim approximately two hours earlier in an attempt to help

13   the victim locate some powder cocaine.  Marshanna, in

14   quotes, advised that he had dealt with the subject on one or

15   two prior occasions.  Marshanna, in quotes, stated that the

16   victim dropped him off at the intersection of 6th and

17   Hudson, so Marshanna, in quotes, could speak to someone

18   about the cocaine.  Marshanna, in quotes, advised that a

19   marked patrol car passed through the area causing the victim

20   to leave.  Marshanna advised that he yelled for the guy to

21   stop, because his coat was still in the vehicle, but the

22   victim turned left, north, in quotes, onto Forbes Street and

23   Marshanna didn't see him again.  Did I read that correctly?

24          A      Yes.

25          Q      Would Marshanna be someone you would

**J.A. 1399**

1  want to talk to in this case?

2          A       Yes.

3          Q       Would Marshanna be the kind of witness

4  that might turn into a suspect based on what you have just

5  read in this responding officer's report?

6          A       It depends.  And I know you said don't

7  use that word but it depends on Marshanna's participation in

8  the whole situation other than one little tippet here, or

9  whatever you want to call it, so, it depends.

10         Q       You said he would be somebody you would

11  want to talk to as a witness, why?

12         A       You can read it here.  He apparently was

13  with the victim earlier.

14         Q       And why is that important?

15         A       It depends on what he tells you as to

16  how much faith that you put in his story.

17         Q       Anything else in here that is of

18  interest in terms of him being a witness?

19         A       He said his coat was in the car, or

20  truck.

21         Q       Why is that of interest?

22         A       It depends on how long he was with him,

23  where he went after, and how long he was with him before

24  this incident took place.

25         Q       So, as the lead investigator, if you

J.A. 1400

1  received this responding officer's report, what would you do

2  next as it relates to Marshanna?

3          A        I can't answer that question, because I

4  wasn't confronted with this situation.  It was someone else,

5  another detective, so, what I would do, I don't know.

6          Q        Well, this was the responding officer,

7  right?

8          A        It was.

9          Q        And it's important for the responding

10  officer to put as many details as possible into this

11  incident report, correct?

12                  MS. MARTINEAU:  Objection to the form of

13          the question, leading.  You can answer.

14          A        You would hope.

15          Q        Because this kind of report is going to

16  go to a detective like you, correct?

17                  MS. MARTINEAU:  The same objection,

18          leading.  You can answer.

19          A        Correct.

20          Q        And you need to rely on this report to

21  do your investigation, right?

22                  MS. MARTINEAU:  Same objection.  You can

23          answer.

24          A        It is part of that road map.

25          Q        You are going to look at the names in

1  this report, right?

2              MS. MARTINEAU:  Same objection.  You can

3        answer.

4        A        As part of that road map.

5        Q        Is that a yes?

6        A        My answer is part of that road map that

7  you are getting to take it through the investigation.

8        Q        So part of your road map is identifying

9  the names that are in the incident report by the responding

10  officer, correct?

11             MS. MARTINEAU:  Same objection.  You can

12        answer.

13        A        I will go with that.

14        Q        I'm sorry.

15        A        I will go along with that.

16        Q        Is that a yes?

17        A        Yes.

18        Q        Sir, you are a detective in the Homicide

19  Unit, is that what you would do when you got an incident

20  report, you would look at the names in the incident report?

21        A        Generally.  Generally, that's what you

22  would do.

23        Q        And would you follow up on some of the

24  names in the incident report?

25        A        Probably.

J.A. 1402

1        Q        In this case, when you got assigned

2    later, did you go back and look at the incident report?

3        A        I wasn't the lead detective, I didn't

4    make that decision.

5        Q        I understand.  Listen to my question.

6    When you later got assigned to this case, did you look at

7    the incident report to get yourself up to speed?

8        A        Yes, I read the report, yes.

9        Q        And did it stand out to you what

10   Marshanna said as important?

11       A        Possibly, yes.

12       Q        Well, did it or not?  You were the

13   assistant investigator on this, did it stand out to you as

14   important?

15                MS. MARTINEAU:  Objection,

16                argumentative.  You can answer.

17       A        I wasn't the one he told that to.  I

18   wasn't the initial detective.  Later on, I was informed as

19   to what actions were taken with Marshanna, so that's my

20   answer.

21       Q        And when you followed up and you learned

22   about it, did that strike you as important information in

23   this case?

24       A        All of it was important, yes.

25       Q        What do you mean all of it was

J.A. 1403

```
 1   important?

 2        A       The whole, entire report.

 3        Q       The entire incident report?

 4        A       Yes.

 5        Q       Because that's the first report on the

 6   scene, right?

 7                MS. MARTINEAU:  Objection, leading.  You

 8        can answer.

 9        A       Yes.

10        Q       I'm going to mark Exhibit Two.

11                NOTE:  The above referred to

12        document is now being marked and filed as

13        Exhibit 2.

14        Q       I have just handed you what I have

15   marked as Exhibit 2, and what this is, is Carolyn Melvin's

16   followup report with Wilbur Mercer, parens Marshanna, and

17   the date of that report is 2-14-94.  Do you see that in

18   front of you where the date is?

19                MS. MARTINEAU:  Can I ask a question, is

20        this the complete report?

21                MS. PFEIFFER:  Well, I believe it is.

22        It's what we received in Discovery.

23                MS. MARTINEAU:  Okay.

24        A       Your question again, I apologize?

25        Q       Sorry.  You see the date in the middle,
```

```
 1   2-14-94?

 2        A        Yes.

 3        Q        And above that Carolyn Melvin?

 4        A        Yes.

 5        Q        And you are familiar with what this

 6   paper looks like.  As a detective, you have seen these

 7   before, correct?

 8                 MS. MARTINEAU:  Objection, leading.  You

 9   can answer.

10        A        Seen them, didn't use them.

11        Q        You didn't use the supplement report?

12        A        Not this kind, no.

13        Q        Did you do supplement reports?

14        A        Oh, yeah.

15        Q        What's different about this one than the

16   ones that you used?

17        A        I made my own.

18        Q        How did do you that?

19        A        Sit down and you type up an interview,

20   and it didn't have all of this on it.  It's included in it,

21   but it doesn't have all of this.  But yes, I recognize the

22   form.

23        Q        What would you do with the report after

24   you typed one up?

25        A        It's part of the one, part of the case
```

1    that you give to the DA.

2         Q      When you came on the case days later, do

3    you recall reviewing this report by Ms. Melvin?

4         A      I do not.

5         Q      I'm going to ask you to flip to the

6    second page.  And in the middle of the second page,

7    Ms. Melvin writes some more detail about Marshanna's

8    interaction with the victim.  Do you see the quotes where it

9    says, you got it, in quotes?  See where I am in the middle

10   of the page?

11        A      Yes.

12        Q      And I am just going to read this and let

13   me know if I get it right.  Marshanna stated at that time,

14   the victim asked, you got it.  Marshanna stated that he

15   said, no, I got to get it for you.  Marshanna stated that

16   the victim asked, quote, will I be able to taste it before I

17   get it?  Marshanna stated that he said yes.  Marshanna

18   stated to responding officer that his only plan was to take

19   him for his money.  Do you see that?

20        A      I do.

21        Q      And then if you turn the page.  It says

22   53 at the bottom.  And in the middle of the page, seven

23   lines down, the end of a sentence that says the truck, do

24   you see where I am?

25              MS. MARTINEAU:  I don't.

J.A. 1406

| | | |
|---|---|---|
| 1 | Q | Seven lines down? |
| 2 | A | Okay, yeah, I see it. |
| 3 | Q | It says the truck? |
| 4 | A | Uh-huh. |
| 5 | Q | And right after that, it says, Marshanna |

6 stated that they drove around and he told the victim to park

7 near an oil rig on West 6th Street.  Marshanna stated that

8 he told the victim that these people normally don't send the

9 drugs out without money.  Marshanna stated that he told the

10 victim to let him go check.  Marshanna stated that the

11 victim stated quote, do me right, I will look out for you.

12 Did I read that correctly?

| | | |
|---|---|---|
| 13 | A | Yes. |
| 14 | Q | And then he continues, Marshanna got out |

15 of the truck and walked down Hudson Street.

| | | |
|---|---|---|
| 16 | A | Wait, wait, wait. |
| 17 | Q | Are you with me? |
| 18 | A | No. |
| 19 | | MS. MARTINEAU:  You said he continues. |
| 20 | Q | I'm sorry. |
| 21 | A | Okay, I got you. |
| 22 | Q | Marshanna got out of the truck and |

23 walked down Hudson Street.  Marshanna stated that he stopped

24 by Shaggy Dog's mother's house, in quotes, Willie Armwood.

25 Marshanna stated that he told Shaggy Dog about the victim

1   and that he had planned to take his money.  Marshanna stated

2   that he walked back to the truck and told the victim that

3   they have the cocaine, but that they won't send drugs

4   without the money.

5            Next page, Marshanna stated that he told the

6   victim that, quote, I know you don't know me, and I don't

7   blame you for not trusting me.  Marshanna stated that the

8   victim wanted him to leave some type of identification or

9   something of value.  Did I read that correctly?

10        A       Yes.

11        Q       In this specific situation, where

12   Marshanna has now admitted to Carolyn Melvin that what he

13   wanted to do was rob this guy, take his money --

14              MR. ELLIS:  Objection.

15        Q       Is that the kind of person who you would

16   want to interview further?

17              MS. MARTINEAU:  Same objection.  You can

18        answer.

19        Q       Coming on as a detective later?

20        A       That would be up to the lead detective,

21   not me.

22        Q       Okay.  Would this information make

23   someone like Wilbur Mercer, Marshanna, a suspect in your

24   mind?

25        A       Generally, yes.

 1        Q        It is fair to say that in the drug

 2   business, guns are common, right?

 3                      MS. MARTINEAU:  Objection, leading.  You

 4        can answer.

 5        A        It depends.  I mean every case is

 6   different.

 7        Q        But generally speaking, when you are

 8   dealing with drug cases as a detective, as a patrol officer,

 9   often times drugs are involved, right?

10                      MS. MARTINEAU:  Objection, leading.  You

11        can answer.

12        Q        I'm sorry, guns are involved, right?

13        A        I don't work drug cases.

14        Q        Have you worked homicides where drugs

15   are involved before?

16        A        Absolutely.

17        Q        How frequently are guns involved in

18   those cases?

19                      MS. MARTINEAU:  In a homicide case?

20        Objection.

21        Q        In drug related homicide cases?

22        A        It depends.  I mean, they are all

23   different.

24        Q        On that responding officer's report, the

25   date is February 11, 1994.  That is the date of the murder

1   in this case, right?

2         A       Yes.

3         Q       You were assigned on February 15, that

4   was four days later, right?

5               MS. MARTINEAU:  Objection, leading.  You

6         can answer.

7         A       If that is what the report says.

8         Q       Why were you assigned to this case four

9   days after the murder?

10        A       I asked that same question.  In fact,

11  when I got called to the captain's office, Captain Hardy,

12  and he told me that I was going to be assigned this case, I

13  declined.  I already got a case, I already got a murder case

14  and some robberies.  And he took me to the chief's office

15  and the chief looked me in the face and says, you work this

16  case or you go home.  I had children at home, so I decided

17  to work this case.  That's how I got this case.

18        Q       Why did you not want to work the case?

19        A       My plate was full.  I had a murder case,

20  I had robbery cases.  I mean, I was, I did more than I could

21  do.

22        Q       Do you know why it was four days after

23  the murder?

24        A       That I got assigned?

25        Q       That anyone got assigned.  Why was it

1    four days later, do you know?

2                    MS. MARTINEAU:  Objection to the form of

3            the question.  You can answer.

4            A        I don't know the circumstances, so I

5    will leave it at that.

6            Q        Do you know why you, in particular, were

7    assigned?

8            A        No, I don't.

9            Q        Was there any personal reason, other

10   than just having work, that you didn't want to do the case?

11           A        As my previous statement, my plate was

12   full.

13           Q        Who specifically made the assignment?

14           A        As I testified to in my previous

15   statement, Captain Hardy is the one who called me in, and

16   the Chief of Police said that I would do it or else, and so

17   I guess you could say the Chief of Police did.

18           Q        What was your role supposed to be?

19           A        Assist Detective Melvin.

20           Q        Do roles ever change during the course

21   of an investigation?

22           A        All that depends.  I mean, every case is

23   different.

24           Q        In this case, Dontae was arrested

25   shortly after your and Carolyn Melvin's interview with

1   Charlene Johnson, did you make that decision or did Carolyn

2   Melvin make that decision?

3        A       A lead detective is assigned to the

4   case.  The lead detective is the one who secures the

5   warrant.  So, she secured the warrant.

6        Q       And this is not a hypothetical, this is

7   this case.  She may have secured the warrant, but was that

8   her decision to secure the warrant or was that your decision

9   to secure the warrant?

10                MR. ELLIS:  Objection.

11       A       I don't know how to answer that.  I

12  don't know who convinced her to go get the warrant.  Maybe

13  when all the evidence was there, and she saw it, maybe that

14  was the time.  But I'm not sure.

15       Q       So it was her decision to arrest Dontae

16  Sharpe?

17                MR. ELLIS:  Objection.

18       A       It's been a long time ago and I can't

19  tell you all the actions that were taken prior to her going

20  to get the warrant, but she's the one who secured the

21  warrant.

22       Q       When you were talking about the captain

23  and the chief about not wanting to take this case, did you

24  articulate to them that you had too much on your plate

25  already, that you had too many cases, is that what you told

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**         **Page 81**

1  them?

2      A     Exactly.

3      Q     Do you recall what they said?

4      A     Our chief at the time, was Chief

5  Heinman, and Chief Heinman told me I would work the case or

6  I would go home, so that wasn't very much of a decision.

7      Q     Did he say anything about the amount of

8  work that you had already?

9      A     I don't guess he cared.  He told me I

10  was going to work the case and I said, yes, sir, I will.

11      Q     And was that your impression, that he

12  didn't care?

13            MS. MARTINEAU:  Objection to the form of

14      the question.  You can answer.

15      A     It didn't matter to him that my plate

16  was full.  He told me I would work the case and so I did.

17      Q     So when you were put on this case on

18  February 15, what were your first steps?

19      A     It's been a long time ago, but the best

20  of my recollection is we sat down at a table and she gave me

21  everything that she had, as far as what she had done, and

22  Detective Reid had done and all the others had done.  That

23  is my recollection.  Now, it's been a long time.  I could be

24  incorrect, but that's my recollection.

25      Q     Did you go to the crime scene?

```
 1        A       You mean four days later?

 2        Q       Yes.

 3        A       Oh, absolutely.

 4        Q       What did you do when you got to the

 5   crime scene?

 6        A       Detective Melvin pointed out where the

 7   truck was and it was easy to see because there were tire

 8   impressions in the dirt.  She told me all about what she had

 9   done, and Detective Reid had done.  Apprized with me where

10    she was on the case.

11        Q       Did you canvas the neighborhood?

12        A       At a later date.

13        Q       Do you recall how much later?

14        A       No, several days.

15        Q       Did you do that with Melvin?

16        A       Absolutely.

17        Q       Whose decision was that?

18        A       The lead detective.

19        Q       Did you review crime scene reports?

20        A       Whatever she had is what I reviewed.

21        Q       Do you remember looking at any

22   photographs?

23        A       I don't know exactly what I looked at,

24    but I did see some crime scene photos.  Whether it was then

25    or later, I can't answer that.
```

1          Q          Now, we looked at one of Carolyn

2     Melvin's reports from February 14, that's the Wilbur Mercer

3     one, the day before you came onto the case.

4          A          Okay.

5          Q          Do you remember reviewing the report

6     that Carolyn Melvin had from interviews before you came onto

7     the case?

8                     MS. MARTINEAU:  Objection to the form of

9               that question.

10         A          I don't.

11         Q          Do you recall learning about Wilbur

12     Mercer when you first sat down with Carolyn Melvin?

13         A          I read the initial report, and I

14     believe, I believe she told me about interviewing Wilbur

15     Mercer, but at this point, I'm not sure.  It's been a while.

16         Q          Previously you said that he would be

17     considered a suspect to you.  What was suspicious about

18     Wilbur Mercer, in your mind?

19                     MS. MARTINEAU:  Objection to the form of

20               the question.  You can answer.

21         A          It depends on what you are asking.

22         Q          I'm asking you about this specific

23     example, the facts of which we have been through, and you

24     can refresh your recollection with the documents in front of

25     you.

```
 1      A        He was in the truck, the man got killed.

 2   So, probably you want to interview him.

 3      Q        And his jacket was in the truck.

 4      A        And his jacket was in the truck, or he

 5   alleged.

 6      Q        And there was blood on the jacket?

 7      A        I didn't know anything about that.

 8      Q        It was in the report, wasn't it?

 9               MS. MARTINEAU:  Okay.  You are talking

10          over each other.  You are not letting him finish

11          his answer.  Let her ask the question, then you

12          answer.

13      A        Okay, sorry.

14      Q        His jacket was in the car?

15      A        So the report says.

16      Q        And there was blood on the jacket?

17      A        I don't know about that.

18      Q        If it was in the report, that would be

19   important to you?

20      A        If it's in the report, that's the

21   report.

22      Q        And did you compare Carolyn Melvin's

23   handwritten report on February 14, with the initial scene

24   report from February 11?

25      A        It's been so long ago, I don't know what
```

1  I, how to answer that question.

2        Q      Did you notice any differences between

3  those reports?

4              MS. MARTINEAU:  Objection to the form of

5              the question.  You can answer.

6        A      Detective Melvin is a very good

7  investigator, so, I don't know what her practices were in

8  doing interviews or writing interviews, but she did her job.

9        Q      Would it be suspicious to you if there

10  were differences between the initial report and what Mercer

11  said then, and the report with Melvin and what Mercer said

12  to Melvin?

13        A      Not really.

14        Q      Why not?

15        A      As humans, we all have ways of doing

16  things and ways of saying things, and maybe her way maybe

17  differed.  So, every, generally, every report from a

18  detective is different.

19        Q      I'm talking about the content of the

20  report.  If what Wilbur Mercer said on February 11, to the

21  responding officer, was different from what Wilbur Mercer

22  said to can Carolyn Melvin on the 14th, the content of what

23  he said --

24        A      I can't speak to that.

25        Q      Would that be suspicious to you?

```
 1                    MS. MARTINEAU:  Objection, asked and
 2          answered.  You can answer.
 3          A        I can't speak to that.  I can't speak to
 4   that.
 5          Q        Why not?
 6          A        Because I explained that question
 7   before.  When we all have our own ways of writing, talking,
 8   interviewing, maybe that's just a different form of what was
 9   in the other report, but it's been, you know, I didn't write
10   the reports, and so I don't know.
11          Q        Well, one thing an investigator can do
12   when they are writing reports, is put direct quotes in
13   quotes, right?
14                    MS. MARTINEAU:  Objection, leading.  You
15          can answer.
16          A        Generally, yes.
17          Q        And you are actually trained to do that
18   so you know it's what the person actually said, as opposed
19   to your summation of what they said, right?
20                    MS. MARTINEAU:  Objection, leading.  You
21          can answer.
22          A        It depends on the situation.  I mean, it
23   all depends on, it depends on the situation.
24          Q        All right.  Take a look at exhibit 1,
25   please.
```

J.A. 1418

```
 1         A       Okay.

 2         Q       All right, I'm on the second page.

 3   Nope, it's the third page, at the bottom.   And it says,

 4   Wilbur Mercer, AKA Marshanna, approached responding officer

 5   at the scene, and asked if he could look inside the truck in

 6   reference to a green Army jacket.  Responding officer and

 7   Marshanna then made contact with Reid and Melvin.  Marshanna

 8   stated that the jacket would have the name Nobles on it and

 9   that the jacket belonged to him, Marshanna, right?

10         A       That's what it says, yes.

11         Q       That's not in quotes, is it?

12         A       Yeah, it is.  Marshanna's name is in

13    quotes.

14         Q       Not his name, I'm talking about the

15    content of what the officer wrote down.  The sentences I

16    just read to you are not in quotes, right?

17               MS. MARTINEAU:  Objection, leading.  You

18         can answer.

19         A       No.

20         Q       Now, I want you to pick up Exhibit 2 and

21    then turn to the second page.  And the part I read is right

22    in the middle.  Marshanna stated at that time the victim

23    asked, "you quote it," do you see that?

24         A       I do.

25         Q       So, when you are putting a direct quote
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    Page 88

```
1   from somebody into a report, the proper way to caption that

2   is with quotation marks, right?

3                    MS. MARTINEAU:  I'm going to object to

4            your representation.  Misrepresenting the facts of

5            the report, but you can answer.

6        A       I don't know how to answer that, other

7   than Detective Melvin does hers this way.  I don't know if

8   that's the proper way, but that's what she did.

9        Q       If something is in quotes, you know it

10  is a direct quote from the person who said it, correct?

11                   MR. ELLIS:  Objection.

12       A       If I didn't write the report, I can't

13  testify that that is a direct quote, so, no, I don't know

14  that.

15       Q       Let's move on.  Did you review the

16  interview of Martha Ann Stewart?

17       A       I did not.

18       Q       Why not?

19                   MS. MARTINEAU:  Do you mean in

20           preparation for his deposition?

21       Q       Sorry, I'm talking about when you were

22  first on the case.  Back to being assigned the case.

23       A       I never saw Ms. Stewart, went looking

24  for her, but I never saw Ms. Stewart.  I don't know, because

25  it's been so long ago, whether I saw Martha Stewart's
```

**J.A. 1420**

1    statement, if there is one, but I don't know.

2         Q        Why did you go looking for her?

3         A        We went, knocked on doors all up and

4    down 6th Street and the area around the murder scene to try

5    to find, you know, witnesses.  And so, that's the only way

6    that I remember, that's the first time I remember a Martha

7    Stewart's name coming up.

8         Q        And you are talking about the canvas

9    now, right?

10        A        Yes.

11        Q        Did you take notes of everyone you spoke

12   to during that canvas?

13        A        I don't know.

14        Q        Would it be your practice to record

15   their names?

16        A        It depends.

17        Q        Would it be helpful to investigators who

18   come after you, or anyone reviewing the file coming after

19   you, to have notes of who you spoke to?

20        A        I was with Detective Melvin, and so, I

21   don't know whether she took notes or not.

22        Q        If she was taking notes, would that mean

23   you didn't have to take notes?

24        A        Probably.

25        Q        Is that the way you generally operated?

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 90

1       A       It depends.

2       Q       On what?

3       A       On the circumstances.

4       Q       When working with Carolyn Melvin, is

5    that your general practice, she took notes and you didn't?

6       A       No, it depends on the circumstances.

7       Q       I'm talking about circumstances in this

8    case.

9               MS. MARTINEAU:  Objection.  Please

10              answer.  Is that a question, I'm sorry?

11      Q       It's the same question.  Whether in this

12   case, that was your practice with Carolyn Melvin, she took

13   notes so you didn't have to?

14              MS. MARTINEAU:  Objection to the form of

15              the question.  You can answer.

16      A       Depends on the witness or depends on

17   what the circumstances were.

18      Q       Did you review the report of Alonzo

19   Vines?

20              MS. MARTINEAU:  Again in preparation for

21              the deposition, or ever?

22      Q       My cases are when you first came onto

23   the case in 1994, do you recall, did you review the

24   interview with Alonzo Vines?

25      A       I don't remember that name.

Case 4:21-cv-00185-BO    Document 196-5   Filed 09/12/24   Page 91 of 409

J.A. 1422

1        Q        Did you talk with Trisha Clarise

2    Radcliffe?

3        A        The wife of the victim?  I talked to her

4    a couple times.  I think they might have both times been on

5    the phone, but I can't remember.  But I did talk to her a

6    couple times, yes.

7        Q        And did you make reports about those

8    conversations?

9        A        I don't remember.

10       Q        If you had, would they be in your file?

11       A        Should be.  Well, it should be in

12   Detective Melvin's file to turn in, if I did.  I would have

13   turned a copy over to her, so at this time, I don't know if

14   I did or not.

15       Q        Do you recall testifying at the trial in

16   1995 and being asked about what notes and reports you had in

17   this case?

18       A        If I can refer to my testimony.

19       Q        Sure.

20       A        You said 95?

21       Q        Uh-huh.

22       A        I don't see anything yet about notes.

23   Can you get me a better location?

24       Q        I could, and you know what, I'm actually

25   going to come back to that so we don't waste our time on it.

J.A. 1423

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                              Page 92

1   So I will find it for you and we will come back to that.

2              But in testifying, you were asked about your

3   records and all you had were two records.  You would have

4   testified accurately about what you had, correct?

5         A       If it's in here, that's the truth, and

6   that's what I remember at the time.

7         Q       In other words, any of your testimony,

8   whether it was in 95 or 97, or any future time, would be

9   accurate because you were telling the truth?

10              MS. MARTINEAU:  Objection.

11        A       Absolutely.

12        Q       Did you make any suggestion about

13  reinterviewing anyone in 1994?

14        A       I don't remember.

15        Q       As the secondary investigator, would

16  that be something you would do if you felt like it was

17  important to the investigation?

18        A       Possibly.

19        Q       In this particular investigation, what

20  decision making responsibility did you have?

21        A       None.  As I explained, she is like a

22  sergeant, or the lead detective is like a sergeant.  They

23  tell, they dictate the case, they tell everybody what to do.

24        Q       How would you describe your relationship

25  with Carolyn Melvin in 1994?

J.A. 1424

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Page 93

1       A       Good.

2       Q       How frequently did you work together?

3       A       I remember one other murder case that I

4    worked with her, but other than that, I can't remember any

5    other cases that we worked together.

6       Q       And what was good about your

7    relationship with her?

8               MS. MARTINEAU:  At that time?

9       Q       At that time.

10      A       I felt that she was a very capable

11   investigator.  She listened to me, I listened to her.  I

12   mean, we did okay.

13      Q       Were you aware that she was an

14   alcoholic?

15              MR. ELLIS:  Objection.

16              MS. MARTINEAU:  What timeframe?

17      Q       All of these questions are around 1994,

18   were you aware that she was an alcoholic?

19              MR. ELLIS:  Objection.

20      A       I was not.

21      Q       And you described her as being a, I

22   think you said, a competent detective, is that how you would

23   describe her?

24      A       I used the word good, and I will stick

25   with that.  She is a good investigator.

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 94

1        Q        What made her a good investigator?

2        A        Her technique, her, just the way she did

3   the cases.

4        Q        What do you recall about Carolyn Melvin

5   having an affair with another officer around this time, 94,

6   95?

7                 MR. ELLIS:  Objection.

8                 MS. MARTINEAU:  Objection.  You can

9        answer.  Lack of foundation.

10       A        It is a lot of rumors flying.  I never

11  seen her do any of that stuff.  So, I can't sit here and

12  tell you she did or didn't.

13       Q        Did those rumors have any impact on her

14  and how she handled her job?

15                MR. ELLIS:  Objection.

16       A        Not during this investigation, that I

17  knew of.  It may later on, but not during this

18  investigation.

19       Q        Did that affair have any impact on her

20  working relationship with other people in the department?

21                MR. ELLIS:  Objection.

22       A        Not that I know of.

23       Q        Were you aware that there was an

24  internal investigation into that affair?

25                MR. ELLIS:  Objection.

```
 1                  MS. MARTINEAU:  In that 1994 timeframe?

 2        Q         In 1994.

 3        A         See, no, I don't remember 1994.  I was

 4  thinking 1995.  But, no.

 5        Q         Let me correct, it may be 95, but were

 6  you aware that there was an internal investigation?

 7                  MR. ELLIS:  Objection.

 8                  MS. MARTINEAU:  Same objection.

 9        A         I didn't see it but I heard it.  But no,

10  I didn't see it.

11        Q         When you say it, you didn't see the

12  internal investigation, or you didn't see the affair?

13        A         I didn't see either.

14        Q         So you were not aware that an internal

15  investigation took place at some point in time?

16        A         I was told but I didn't see it.  The

17  rumors were flying.

18        Q         Were you ever interviewed as part of an

19  internal investigation relating to Melvin having an affair?

20                  MR. ELLIS:  Objection.

21        A         No.

22        Q         In November of 1994, she filed an

23  internal affairs complaint about an incident where she had

24  walked in on an interview with you, do you remember that

25  complaint?
```

J.A. 1427

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 96**

1          A          Not exactly.

2          Q          I'm going to mark and show you what I'm

3    going to mark as Exhibit 3.

4                      MS. MARTINEAU:  This is dated

5    September 20, 1995.  You said November, 1994.

6                          NOTE:  The above referred to

7          document is now being marked and filed as

8          Exhibit 3.

9                      MS. PFEIFFER:  I'm moving on.

10         Q          What I handed you marked as Exhibit 3,

11   is a note that you wrote in 1995 to Sergeant Corbitt, do you

12   see up at the top?

13         A          I do.

14         Q          And it says reference concern over

15   co-worker?

16         A          Yes.

17         Q          And in this complaint, you reference,

18   since October of 1994, my workplace has been a living hell,

19   and this has been caused by one employee, which is Detective

20   Corporal CJ Melvin.  Do you see that there?

21         A          I do.

22         Q          She has filed two complaints on me and

23   both have been unfounded.  One was improper conduct during

24   an interview of a witness, suspect; the other was for sexual

25   harassment.  Do you see that?

**J.A. 1428**

1        A       I do.

2        Q       What do you remember about the complaint

3    about improper conduct during an interview of a witness or a

4    suspect?

5        A       It's been a long time.  And I don't even

6    remember filling out this report.  I don't remember typing

7    this report.

8        Q       Well, up at the top, you see that

9    handwriting, 9-23-95?

10       A       I do.

11       Q       And I think it says, let's meet with

12   Corporal Best on this?

13       A       Yes.

14       Q       Do you remember having a meeting about

15   this with your supervisors?

16       A       I don't.

17       Q       The second complaint, she references one

18   for sexual harassment, what do you remember about that

19   complaint?

20       A       The only one that I remember, if this is

21   it, was from an interview where we were interviewing

22   witnesses in a murder case, if this is what this is.  I'm

23   not sure.  That one person was talking, she asked the

24   question, and the first one was talking and I said, wait,

25   let's go back and do it like Thursday instead of Saturday.

```
 1   That's the only thing I remember.  And I don't know if this

 2   is what it's about or not.  I'm reading on from what you

 3   said here, something about a car or something.  Okay,

 4   something about being in the car with her.  I just don't

 5   remember this.  I know there was some issues at times, but I

 6   don't remember filling this out.

 7        Q       Well you referenced since October, 1994,

 8   when you described your workplace as a living hell?

 9        A       Okay.

10        Q       And what you wrote is this has been

11   caused by one employee, which is Detective Corporal CJ

12   Melvin?

13        A       Okay.

14        Q       Why did you write that?

15        A       I don't know that I did, because I don't

16   remember it.  I know that at one time, Detective Melvin had

17   some ways about herself that I didn't agree with, and she

18   was difficult at times.

19        Q       What were the ways about her that you

20   didn't agree with?

21        A       Well, if you read on down in the

22   complaint here, if this is the one I filled out, she would

23   grab her crotch and say, suck my dick.  Those things were

24   not appropriate in the workplace.  And I remember her saying

25   that one time, or several.  But that's the only thing that I
```

1  can see on here that I remember.  Detective Melvin was a

2  good detective, Detective Melvin's dad was a friend.

3  Detective Melvin's dad worked with my wife.  And my wife was

4  pregnant at the time, and her dad would go out and get my

5  wife's car when it was raining and bring it up to the door.

6  So, as far as any issues with Detective Melvin, yeah, I

7  don't know what this thing says, but yeah, there was some

8  issues.  But some that apparently were worked out, because

9  this was September of 95, and she left in November of 95, my

10  recollection is.

11        Q       You said she could be difficult, what do

12  you mean she could be difficult?

13        A       Just like anybody else.  We all had our

14  ways of doing things, and, you know, if you didn't quite do

15  it the way that she thought it was supposed to be done, she

16  would have a problem with it.  But, you know, I was the same

17  way.  Maybe I didn't express it all the time, but she

18  wouldn't have any problem expressing it.  But she was a good

19  detective.

20        Q       I'm going to mark and show you Exhibit

21  4.

22                NOTE:  The above referred to

23        document is now being marked and filed as

24        Exhibit 4.

25        Q       This is a letter from the Chief of

1    Police, Chief Hinman, to Detective Melvin.  And in this

2    letter, he is advising Ms. Melvin that the complaint that

3    she had been sexually harassed by Captain Hardy, Sergeant

4    Conner, and Detective Best, that's you, that all

5    interviewing of appropriate department members had been

6    done, and that the allegations had been ruled unfounded.

7    And you see there at the bottom you were copied on this?

8            A        I do.

9            Q        Detective David Best.  Do you remember

10   getting this?

11           A        I don't remember getting that.

12           Q        Do you remember being interviewed about

13   allegations of sexual harassment?

14           A        I do.

15           Q        What do you remember about that?

16           A        I remember being interviewed.  And I

17   don't know what point in time, but she filed a lawsuit for

18   just that, sexual harassment, but I don't remember when it

19   was, or what, but I know that these allegations were made

20   and later on she actually filed a lawsuit with the same

21   allegations.

22           Q        And was that lawsuit and those

23   allegations what you were referring to when you called your

24   workplace a living hell because of Carolyn Melvin?

25           A        I don't remember writing this.  It has

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 101

1   my name on it and I signed it, DRB, and that's the way I

2   would have done it.  But I don't remember writing it.

3          Q       You said you do remember her filing suit

4   against you, that was in 1996?

5          A       Okay.

6          Q       That was an EEOC suit.

7          A       Right.

8          Q       Do you remember reading the suit that

9   she filed, the complaint that she filed?

10         A       I do not.  I don't think we were given a

11  copy.  We may have been, but I don't think we were given a

12  copy of the lawsuit.  I know the attorneys that were

13  representing the city had a copy, but I don't remember

14  getting a copy.

15         Q       Do you remember being interviewed as it

16  relates to that lawsuit?

17         A       By the attorneys.

18         Q       Uh-huh.

19         A       Uh-huh.

20                 MS. MARTINEAU:  Well, hold on a second,

21         you are not asking him about conversations he had

22         with his attorney.

23         Q       I'm not asking about conversations that

24  you had with your attorneys.  What do you remember about

25  those interviews in terms of your involvement with Carolyn

```
 1   Melvin?

 2              MS. MARTINEAU:  You are not asking him

 3        about what he said to those attorneys?

 4              MS. PFEIFFER:  I'm not asking what he

 5        said.

 6              MS. MARTINEAU:  So, to me that question

 7        --

 8              MS. PFEIFFER:  Let me rephrase.

 9              MS. MARTINEAU:  Yeah, thank you.

10        Q       What do you recall about the allegations

11   she was making against you in that complaint?

12        A       They were false.

13        Q       What were they?

14        A       That I put my hand up during an

15   investigation too close to her face, and that's the only one

16   that I know about.  But there was others in there, I don't

17   know.  And that happened.  I mean, plain and simple, I admit

18   it.  We were doing an interview.  She was sitting further

19   than this attorney here, and she asked a question to the

20   person sitting in the same chair as you, about what happened

21   on Sunday, on Saturday.  And so, it was more important that

22   we get to what happened on Thursday, because that's the

23   night that the murder was planned.  And I said, hold on,

24   Carolyn, let's find out what happened on Saturday and then

25   we can go to, on Thursday, then we will go to Saturday.  And
```

1   that was my part of the sexual harassment.  That's the only

2   thing that I remember seeing.  If there was more, then I

3   don't know because I don't have a copy of it and I don't

4   remember reading it.

5          Q       Were there any other allegations?

6          A       I don't know.

7          Q       Against you?

8          A       I don't know.  I don't remember reading

9   it.

10         Q       How did the filing of that complaint

11  impact your working relationship with others at the GPD?

12         A       I guess, I mean all I can say is I had a

13  good working relationship with them all.  I don't remember

14  anyone having any problems, even with Carolyn.  We still

15  went on those same investigations and, you know, we still

16  had our job, and whatever problems they had, they left it at

17  the door.  So we did our job.

18         Q       So, in October of 1994, when you

19  referenced her making your life a living hell, were you

20  still working with her at that time?

21         A       Absolutely.

22         Q       Was there ever a time when your

23  supervisors tried to create some distance between you?

24         A       Not that I remember.  You know, if a

25  case came in and they needed help with it, they would get

1  whoever was available.  And so, like I said, I don't

2  remember what date the murder case took place, but I was

3  assigned to work with her and had children at home to feed,

4  so that's what I did.

5          Q       Did you ever ask to not work with her?

6          A       No.  Well I mean, the first day, I asked

7  not to take the case, but it wasn't, I didn't ask not to

8  work with her.

9          Q       I want to talk to you a little bit about

10  any policies and procedures that existed at the GPD in 1994.

11  Do you recall if there were policies and procedures by which

12  you had to abide?

13          A       I know there was a book.  I can't tell

14  you what was in the book.

15          Q       Where was the book?

16          A       I guess with the supervisor.

17                  MS. MARTINEAU:  Don't guess.  If you

18          know, you can answer.

19          A       I guess with the supervisor.  I never

20  saw it.  If you got written up, you would have to get

21  written up by a supervisor, and I guess that supervisor

22  would have the book that told the policies and stuff.  I

23  never saw it, but I guess it was with the supervisors.

24          Q       How do you know there was a book if you

25  never saw it?

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                              Page 105

1        A        How else are they going to write you up

2    from a policy if they don't have a copy of the policy?  I

3    never saw one on the sergeant's desk or anything, but there

4    certainly was one because people got written up from it.

5        Q        Were you ever written up?

6        A        Not that I remember.

7        Q        Was there ever a time that you were told

8    you could refer to the Policies and Procedures Manual?

9                MS. MARTINEAU:  Objection to the form of

10              that question, you can answer.

11       A        I explained earlier, I don't know about

12   that book.  I don't know where it was kept or what was in

13   it.  But I know if you violate the policy, you got written

14   up.

15       Q        But you didn't know what the policy was?

16       A        I didn't read the book.  There may have

17   been one that they give out to the employees.  I don't

18   remember seeing one on any other employee's desk, but there

19   was a book, yes.

20       Q        Was there a requirement for patrol

21   officers and investigators and detectives be familiar with

22   the book?

23       A        This is 1994.  I can't answer that

24   question, because in 1994, I was a detective, and I don't

25   know what they were training their new guys coming in.

www.huseby.com            Huseby Global Litigation            800-333-2082
Case 4:21-cv-00185-BO    Document 196-5    Filed 09/12/24    Page 106 of 409
J.A. 1437

1  Maybe they gave them a copy of it, but I don't know.  I

2  can't answer that question.

3         Q        Were you ever given a copy of that

4  Policy and Procedures?

5         A        I never had a copy.  I apologize for

6  speaking over.  I never had a copy of that.

7         Q        Do you recall any specific policies and

8  procedures that weren't written down in a book at the GPD in

9  1994?

10        A        I can't remember when that --

11        Q        Was there a requirement that

12 investigators document in some way that they understand

13 policies and procedures within the GPD in 1994?

14        A        I can't answer that because I don't

15 remember anything like that.

16        Q        When you were conducting investigations

17 in the 1990's, did you have informants?

18        A        As in paid informants or informants?

19        Q        Confidential informants.

20        A        Yeah, I had a few, yeah.

21        Q        How would you define informant?

22        A        Someone that they gave you information

23 that turned out to be reliable.

24        Q        How would you differentiate an informant

25 from a tipster for the force?

1       A       I think they are all the same.

2       Q       Was there any policy within the GPD to

3    maintain some sort of confidential informant log or book

4    that identified confidential informants that were used by

5    the GPD?

6       A       I don't remember what month we got

7    accredited, but after accreditation came in, yes, there was.

8    Prior to that, no.

9       Q       Prior to that, how did you keep track of

10   your informants?

11      A       I didn't have that many, but when I

12   would see them on the street, I would talk to them or, you

13   know, yell at them, or whatever.  I mean, I didn't have a

14   book, I didn't have a list, and there wasn't that many, so

15   when I saw them, I acknowledged them.

16      Q       Did you receive any kind of training on

17   developing and using informants?

18      A       During my 30 years, maybe, but to tell

19   you specifically, I can't.

20      Q       And I recall earlier you had mentioned

21   you did take classes on interrogation.  Do you remember

22   where you took those classes?

23      A       I don't.  There was a couple of them,

24   but no, I don't.  In the initial, when I went to school in

25   1973, I believe it was, they had a block on that.  But other

1    than that, I can't remember exactly where or when.

2         Q       Back to your use of informants, how

3    would you obtain information from the informants?  You said

4    you would see them on the street.  Explain to me how you

5    would obtain information from them.

6                   MS. MARTINEAU:  Object to the form of

7              the question.  You may answer.

8         A       There were different ways.  You would

9    see them on the street, I mean, wherever.  It wasn't like a

10   tipster line or anything like that.  They didn't have

11   anything like that exist.  But you see someone that you

12   knew, if they had information, they would give it to you.

13        Q       How would you go about determining

14   whether that information was reliable?

15                  MS. MARTINEAU:  Objection to the form.

16             You can answer.

17        A       You follow that lead.  I mean, you get

18   their information and see if it was true or false.

19        Q       How important is it to determine whether

20   it's true or false?

21        A       It's very important.

22        Q       Why?

23        A       Because you don't want to be running

24   around getting false information from someone.  So, you, you

25   know, you want it to be the truth and, you know, to develop

1    a suspect, you don't want to make any errors or cause

2    anymore issues.

3           Q        And would it be more to make notes or

4    some records of what you were learning from your informants?

5           A        Possibly.

6           Q        If you didn't have notes, how would you

7    later be able to refresh your recollection of what they told

8    you?

9           A        I don't know.

10          Q        It would be hard to, wouldn't it?

11          A        It depends on the circumstances.

12          Q        Would there be a circumstance where you

13   personally could remember everything that somebody told you

14   months later if you didn't have a note?

15                   MS. MARTINEAU:  Objection to the form.

16          You can answer.

17          A        Possibly.

18          Q        Would informants sometimes have a motive

19   to lie to you as a detective?

20          A        I can't answer that.

21          Q        Have you ever had a circumstance where

22   you found out that an informant didn't tell you the truth?

23          A        No.

24          Q        And if I heard you right, you in your

25   mind, in 1994, did not see or, in your mind, you didn't have

1    a difference between confidential informant, or a source, or

2    a tipster?

3                    MS. MARTINEAU:  Objection to the form of

4            the question.  You may answer.

5            A        I don't know the difference, what you

6    are asking.  I mean, a tipster and an informant is, to me in

7    my mind, is the same thing.

8            Q        So, in your mind it would be no

9    different if there was someone who you relied upon over the

10   course of time and had been able to verify their information

11   over the course of time, as opposed to somebody who just

12   happened to give you information one time?

13           A        It's hard to answer that question.  I

14   don't know.

15           Q        Who were your informants in 1994?

16           A        I can't remember back in 1994.

17           Q        How many informants did you have back in

18   1994?

19           A        I can't answer that either, because I

20   don't know.

21           Q        Could you describe your knowledge of

22   people on the street in Greenville in 1994?

23           A        I don't know what you are asking.  I'm

24   sorry.

25           Q        Well, if you had informants, some of

1   these people were people that you knew on the street, right?

2        A      Usually didn't find them on the front

3   step of the church.

4        Q      And how did you get to know people on

5   the street who could maybe later become informants or people

6   you just were aware of who they were.

7               MS. MARTINEAU:  Objection to the form of

8        the question.  You may answer.

9        A      They may have been a victim in the past,

10  they may have given you some information in the past that

11  proved to be reliable.  All different kinds of ways.

12       Q      The people who provide you information,

13  how do you develop those relationships?  I mean, is it a

14  neighborhood cop kind of thing, where you go out and they

15  see you and you get to know them?  How do you develop your

16  knowledge in those relationships?

17       A      Yet again, it depends.  Every situation

18  is different.

19       Q      In 1994, by that point in time, how long

20  had you been on murder cases?

21       A      I was assigned murder cases on January

22  the 1st, 1990.

23       Q      And did you have a specific area that

24  you focused on, or was it the whole of Greenville?

25       A      Whole Greenville.

```
 1        Q        Were you able to develop some knowledge

 2   about different areas of the city?

 3                 MS. MARTINEAU:  1994?

 4        Q        In 1994.

 5        A        I don't know what you are asking.  Do

 6   you mean like one place is a drug area, or something?

 7        Q        Exactly.  For instance, sometimes police

 8   officers say this is known to be a high crime area, or this

 9   place is particularly, a lot of prostitution happens in that

10   area.  Were you able to develop that kind of knowledge about

11   various areas in Greenville?

12        A        I'm sure probably, yes.

13        Q        When you developed your informants, were

14   they in various areas around the city?

15        A        My list weren't very long, but most of

16   them were in the drug areas.

17        Q        When you said your list wasn't very

18   long, over the course of your career, how many informants do

19   you think you developed?

20        A        I have no idea.

21        Q        Do you know the names of anyone that you

22   used as informants?

23        A        They were informants, I will not reveal

24   their names today.

25        Q        Do you know their names?
```

1        A       Some of them.

2        Q       Would you be able to list them today?

3        A       No.

4        Q       Is that because you don't remember them?

5        A       I don't.

6        Q       How would you use the knowledge that you

7    developed about different areas in your role as a detective?

8                MS. MARTINEAU:  Objection to the form of

9        the question.  You may answer.

10       A       I don't understand your question.

11       Q       Would it be meaningful to you if a crime

12   occurred in a location that you knew to be one where there

13   was a lot of drug activity?

14       A       Whether it happened in front of the

15   police station or a drug area, it was all a case, and so you

16   work them the same way.

17       Q       What did you know about Dontae Sharpe in

18   1994, before his arrest?

19       A       We had heard, or I had heard that the

20   area around 6th Street and 14th Street, was the Sharpe

21   family area for dealing drugs.  I never had any contact with

22   any of the Sharpes prior to this case.  I knew there was

23   like three brothers or something, but other than that,

24   that's about all I knew.

25       Q       Where did you get that information from?

```
 1        A        It's on the street.

 2        Q        From who?

 3        A        On the street.

 4        Q        Would this be an instance where you just

 5   kind of had relationships with people and that was the talk

 6   on the street and you knew that about that area?

 7                 MS. MARTINEAU:  Objection to the form of

 8        that question.  Hearsay.

 9        A        I guess.

10        Q        Well, what do you mean by on the street?

11   How would you have gotten that information?

12        A        On the streets in that area.

13        Q        From people?

14        A        From people.

15        Q        People who were your informants?

16        A        No.  From people.

17        Q        Like whom?

18        A        I can't call names.  I don't even

19   remember names.

20        Q        People who lived in the area?

21        A        Or walked the streets, or stood on the

22   corners, those kind of things.

23        Q        And what did they say to you to give you

24   this information?

25        A        An area around 6th and Shepherd was the
```

**J.A. 1446**

1   Sharpe's area.  That's what was said.

2        Q      And was this just volunteered to you, or

3   was in response to questions you would ask people?

4               MS. MARTINEAU:  Objection to the form of

5          the question.  You can answer.

6        A      That was just the public knowledge.

7        Q      How was the public knowledge shared with

8   you, is what I'm trying to understand.  You were often in

9   uniform, right?

10       A      No.

11       Q      People knew you were an investigator?

12       A      Yes.

13       Q      And so did they just come up and offer

14  you this information?

15       A      When they stopped on a street corner and

16  carry on a conversation with someone, and they would tell

17  you, like, you know, this is the Sharpe's corner, and, you

18  know, that kind of information.

19       Q      And did you do anything to investigate

20  that?

21       A      I wasn't a drug officer.

22       Q      So to you it was just information?

23       A      Just information.

24       Q      In this case, the George Radcliffe case,

25  there was a delay in processing the victim's truck and

1   Carolyn Wilson actually wrote up about Mendenhall about

2   that, do you remember that?

3           A        I do not.

4           Q        Is processing a truck in a crime scene

5   as early as possible important?

6           A        Yes.

7           Q        Why?

8           A        They may get some evidence from it.

9           Q        In this case, what kind of evidence

10   might you want to get from that truck?

11          A        All kinds, whatever is there.  Whatever

12   is there.

13          Q        You would look for bloodstain?

14          A        Possibly.

15          Q        In this case?

16          A        Possibly fingerprints.  Possibly any of

17   that.  But I don't know what was done in the processing of

18   that truck.

19          Q        When you came on later, did you review

20   what the evidence tech had gathered and labeled in the case?

21          A        I'm sure I did.  At some time.

22          Q        And you mentioned fingerprints, those

23   were processed from the truck, do you recall that?

24                   MS. MARTINEAU:  Objection to the form of

25                   the question.

J.A. 1448

1        A       I can't remember that.

2        Q       Do you recall that there were no prints

3   found that matched Dontae Sharpe?

4        A       I honestly don't remember.

5        Q       I want to talk with you about Charlene

6   Johnson, what did you know about her before your interview

7   with her on April 7, 1994?

8        A       Nothing.

9        Q       Were you familiar with her from the

10  street?

11       A       No, ma'am.

12       Q       Did you have any knowledge of her

13  family?

14       A       No, ma'am.

15       Q       Why did you seek her out on April 7,

16  1994?

17               MS. MARTINEAU:  Objection to the form of

18          the question.  You can answer.

19       A       We were at the Brown Building, and when

20  I say we, me and Detective Melvin and others, when I saw

21  Officer Shrock come in the building and go to Captain

22  Hardy's office.  And this is my memory 30 years later.  So,

23  I remember Captain Hardy came to the door, his door, because

24  we had a bay, we didn't have offices.  And said, you need to

25  talk to him.  So, me and Detective Melvin went into an

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                  Page 118

1    interview room, and talked to Officer Shrock.

2          Q        And what did he tell you?

3          A        This is 30 years later, and I don't have

4    a copy of what he said, but what I remember is what I

5    testified to in the book.  So, I mean, I guess I could look

6    at that and tell you what was in here.  But vaguely I

7    remember him telling me that he had a contact with a female,

8    young female and that she had told him that she knew who had

9    killed the white man, and told him it was Dontae Sharpe, and

10   that he had carried her to the hospital at the request of

11   her mother.  That she was acting a little strange, and that

12   he left her there.  That's what I remember.

13         Q        And did you take notes about that

14   conversation?

15         A        No.

16         Q        Why not?

17         A        I didn't know what he was going to say,

18   so I mean, I didn't know.

19         Q        Did you go back after the conversation

20   with him and write it down in your field notebook?

21         A        I did not.

22         Q        Why not?

23         A        I did not.

24         Q        Why not?

25         A        I don't know.  I have no idea.

```
1      Q        He gave you important information about

2   an ongoing homicide, correct?

3      A        He did.

4      Q        Wouldn't that be the kind of thing that

5   should go in your file?

6      A        Detective Melvin should, yes, she is the

7   lead.

8      Q        When you received that information from

9   Shrock, did you immediately go out to find Charlene Johnson?

10     A        I don't remember how long it was after

11  we got the information that we went to look for Charlene,

12  but when we went looking, my recollection is that we

13  couldn't find her.

14     Q        I want to ask you about Candice Johnson.

15  When you went looking for Charlene on April 7, 1994?

16     A        Yes.

17     Q        Do you recall first talking to Candice

18  Johnson?

19     A        I do.

20     Q        What do you recall about that?

21     A        I had dealt with Candice Johnson in

22  another case and she was very nice and provided quite a lot

23  of information, and in a case I was working.  So, I went to

24  Candice's house, thinking that that's the person that I was

25  to interview, and she told me she had no idea what I was
```

```
 1  talking about.

 2        Q       What other case had you worked on with

 3  Candice Johnson?

 4        A       A shooting at the Coca Cola Bottling

 5  Company.

 6        Q       And what information did she share with

 7  you about that shooting?

 8        A       She told me her boyfriend did it.

 9        Q       And when was that shooting?

10        A       I have no idea.

11        Q       How close in time to April 7, 1994, if

12  you remember?

13        A       Two to three months.

14        Q       Did you know anything else about Candice

15  Johnson before April 7, 1994?

16        A       No.

17        Q       Did you have any other interactions with

18  her?

19        A       No.

20        Q       How did she come to your attention in

21  the Coca Cola shooting case?

22        A       The best of my memory, I actually went

23  to her house, to the best of my memory, interviewing her and

24  her boyfriend, I can't remember his name, about his

25  involvement in the shooting.  And I don't remember how she
```

J.A. 1452

1   did, whether it was there or later, but she gave me some

2   information that her boyfriend was the one involved in the

3   shooting, and we started investigating him and found out

4   that he was.

5          Q       So, when you went to go see her, it was

6   by mistake?

7          A       It was.

8          Q       Because Charlene Johnson sounded like

9   Candice Johnson?

10         A       That's correct.

11         Q       After you spoke with Candice Johnson,

12  was it that same day that you then found Charlene Johnson?

13         A       I don't know.  Whatever this report says

14  when, is when it was.

15         Q       Did you ever obtain copies of Charlene's

16  medical records?

17         A       That would have not been my

18  responsibility.  No.

19         Q       Whose responsibility would that have

20  been?

21         A       The District Attorney's office.

22         Q       Did you suggest to the District Attorney

23  that they do that?

24         A       No, I didn't know we needed it.

25         Q       You said that Shrock had told you that

1   he brought Charlene Johnson to the hospital at her mother's

2   request, correct?

3          A       He did, yes.

4          Q       And that's because she was acting crazy,

5   right.

6                  MR. ELLIS:  Objection.

7          A       I didn't say crazy, she was acting

8   different.

9          Q       She was acting different.  But you knew

10   it was a mental hospital that he took her, correct?

11                 MR. ELLIS:  Objection.

12         A       It was not.

13         Q       Knowing that he had taken her to a

14   hospital because she was acting different, would that be the

15   kind of information you would want to follow up on as an

16   investigator?

17         A       No, because it was the emergency room.

18   We all go to the emergency room, so, I thought she would be

19   treated and released.

20         Q       So you didn't think it was important to

21   follow up on that?

22         A       No.

23         Q       You didn't think it was important to

24   find out whether there might have been something going on

25   that would impact her ability to do an interview with you?

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 123

1        A        No.

2        Q        You didn't think it was important to see

3   if going to the hospital would impact her ability to recall

4   information?

5        A        No.

6        Q        When you went out looking for Charlene,

7   was that in a patrol car, unmarked car, on foot?  Do you

8   remember how you went out looking for her?

9        A        It was an unmarked car.

10       Q        And who did you speak to first when you

11   got to Charlene's house?

12       A        I can refer to my report and tell you.

13       Q        Sure.

14       A        Okay, I found it.

15       Q        Okay, and when you arrived, who did you

16   first speak with?

17       A        It says that I'm not sure if it was her

18   mother or not.

19       Q        But someone other than Charlene answered

20   the door?

21       A        That is correct.

22       Q        And do you have any memory of

23   conversations with her?

24                MS. MARTINEAU:  With Charlene or this

25       other person?

1        Q        With this other person.

2        A        It says here that she says that Charlene

3    wasn't staying there anymore.

4        Q        And then were you able to locate

5    Charlene?

6        A        The lady at that address gave us an

7    address to check, and we did, and she was there.

8        Q        And I am going to ask you questions not

9    relevant to your testimony, so you don't have to read all

10    that right now.

11              When Officer Shrock brought her to you, I

12    have just been reminded of your exact words, what you had

13    said is he told you she was acting a little strange.

14        A        If it says strange in the report, that's

15    what I said.

16              MR. ELLIS:  Objection.

17        Q        No, I'm saying that was your testimony.

18        A        Okay.

19        Q        Today.  What do you recall about how she

20    was acting when he said a little strange, how was that?

21              MS. MARTINEAU:  Objection to the form of

22              that question.  You can answer.

23        A        I think she sat, jumped up and sat on

24    his car or something.  That was the strange part.

25        Q        Did that strike you as strange?

1       A       Well, not really, but, you know, kids

2   will be kids.  Not really.

3       Q       You knew she was a kid?

4       A       I mean, I knew he told us that she was

5   young.

6       Q       When you went to pick her up, you said

7   you were in an unmarked car?

8       A       Yes.

9       Q       Were you in uniform?

10      A       No.

11      Q       And did you identify yourself as a

12  police officer when you showed up at her house?

13      A       I didn't go to the door, Detective

14  Melvin did.  And she knocked on the door, she carried on a

15  conversation with a female, and a few minutes, she came back

16  out and both of them got in the car.  And when they got in

17  the car, Detective Melvin and Charlene went to the Brown

18  Building, where we went to the interview room.  We sat down

19  and we explained to her that Officer Shrock had come forward

20  and he said that she had talked to him and made some

21  references that she had seen what had taken place.  And he

22  mentioned a name, and we wanted to know if it was true.  And

23  she said she had truly been a witness to the incident.  And

24  what did she tell you?  She had been, what else did she tell

25  you?  She said that she was leaving her house and walking to

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                              Page 126

1   the store.  When she got to the corner of 6th and 14th

2   Street, she saw a commotion and heard a commotion that

3   involved Dontae Sharpe and a white male.  They were arguing

4   over the price of drugs.  She referenced that something

5   about $18.  She said, and he said that's not enough, or

6   something to that effect.  And that they got into an

7   argument.  The white male said, fuck you, and that's when

8   Dontae pushed him and shot him.

9          Q       And right now you are reading from your

10  transcript, just for the purposes of the court reporter?

11         A       That is correct.

12         Q       And are you reading from your trial

13  testimony?

14         A       I don't know what this is.  What is this

15  I'm reading from?

16         Q       I think it might be the 1997 MAR, but

17  I'm not sure.

18         A       It's in Section 4.  So, this is my MAR

19  testimony, 1997.

20         Q       And now you can flip back a page, if you

21  want to refresh your recollection, but you mentioned there

22  that you brought her to the Brown Building and you talked to

23  her?

24         A       Yes.

25         Q       What did you talk with Charlene about at

1   the Brown Building?

2        A        The information that Officer Shrock had

3   told us.

4        Q        What did you say to her before she

5   started talking?

6        A        I don't remember.  It's been all these

7   years and I don't remember.

8        Q        And you don't have any notes of that

9   conversation?

10       A        I do not.

11       Q        If you had notes, that would help you

12  remember what she said, right?

13       A        Probably.

14       Q        And there is also not a report of that

15  conversation, is there?

16                MR. ELLIS:  Objection.

17       A        I don't know.

18       Q        You didn't write a report of that

19  conversation?

20       A        It wasn't up to me, it was Detective

21  Melvin's case.

22       Q        And you recall when you picked up

23  Charlene, she was crying?

24                MR. ELLIS:  Objection.

25                MS. MARTINEAU:  Objection to the form of

1          the question.  You can answer.

2          A       I read the reports.  It says she was, I

3   don't remember.

4          Q       The report also says she was emotional.

5          A       Okay.

6          Q       Do you remember that?

7          A       I don't, but if it says that, that's

8   what it says.

9          Q       Did you ask her how old she was at the

10   time of the interview?

11          A       I don't know.  I'm pretty sure we did,

12   but I don't know.

13          Q       And when you told her that Shrock had

14   given you information about a conversation with her, did you

15   tell her what that information was?

16          A       No.  I don't remember saying anything

17   other than Officer Shrock had told us that she had seen what

18   had taken place and we would like to hear it in her own

19   words.  That's what I remember, but it could be different.

20          Q       Are you done?

21          A       Yeah, I'm done.

22          Q       Did you tell Charlene's mother that you

23   were taking her to the Brown Building for an interview?

24          A       We asked her.

25          Q       And what did she say?

```
 1        A        Go ahead.

 2        Q        And do you have notes reflecting that

 3   conversation?

 4        A        No, but I remember it.

 5        Q        How do you remember it?

 6        A        We went to the house and the lady came

 7   to the door and said she was her mother, and she told us

 8   where she was.  And we told her we wanted to talk to her and

 9   she said fine.

10        Q        So you do remember talking to her mom

11   when you showed up at the house?

12        A        If that's the lady.  I'm pretty sure

13   that was her mom, yes.

14        Q        Did you ask her mother if she wanted to

15   come with her to the interview?

16        A        I'm pretty sure we did, but I can't say

17   that.

18        Q        Would that be a normal practice?

19        A        It would.

20        Q        Would it be typical for a parent to want

21   to come with their child to a police office for an

22   interview?

23                 MR. ELLIS:  Objection.

24        A        It depends.

25        Q        Before the April 7, 1994 interview with
```

1   Charlene, was there any evidence linking Dontae to the

2   murder of George Radcliffe in 1994?

3          A       I don't remember.  I don't remember the

4   totality of the evidence, so, my answer is going to be I

5   don't remember.

6          Q       When you went out to find Charlene, was

7   Dontae now a suspect in your mind?

8          A       I can't say that because I can't

9   remember when the first time we found out that Dontae was

10  involved.  So I can't say that because I can't remember when

11  he became a suspect.

12         Q       Well, my question to you before was,

13  whether you had any evidence linking him to the crime before

14  talking with Charlene?

15         A       I don't know.

16         Q       If you did not have anything linking him

17  to the crime, would he now be a suspect based on what Shrock

18  had told you, in your mind?

19                 MS. MARTINEAU:  Objection to the form.

20         You can answer.

21         A       Not from what Shrock told us, but what

22  Charlene told us, yes.

23         Q       So, once she shared that information

24  with you, was Dontae now a suspect in your mind?

25         A       Yes.

1         Q        What was Charlene's demeanor when she

2    arrived at the Brown Building?

3         A        It's in my notes, and I think that the

4    --

5         Q        Just to clarify, these are not your

6    notes you are looking at, you are looking at the MAR

7    transcript, just for the record.

8         A        Okay.  Well, anyway, in my transcript, I

9    said that she had been crying or was crying, or something to

10   that effect.  But she wasn't crying the whole time.  She

11   wasn't emotional the whole time, she was okay.

12        Q        In your interview with Charlene, what

13   approach or technique did you use for this interview?

14        A        I don't know what approach you would

15   call it.  We, myself and Detective Melvin took her in an

16   interview room, we sat down with her, we told her that

17   Officer Shrock had indicated she had some information and we

18   would like to hear it.  That was it.

19        Q        On page 138 of that testimony.  Do you

20   have numbers on there?

21        A        This in here?

22        Q        Uh-huh.  This is your MAR testimony from

23   1997.  And I am going to go ahead and mark this as an

24   exhibit since you are looking at it, and I am going to ask

25   you questions about it.  That will be Exhibit 5.

```
 1                     NOTE:  The above referred to

 2            document is now being marked and filed as

 3            Exhibit 5.

 4            Q      I believe you are on the right page

 5   there.  Page 138 in your binder.  And you are answering a

 6   question at the top, and what you testified here is, "I am

 7   assisting detective, and the lead detective always takes

 8   control of the interview.  I recall there was, after she

 9   brought up Dontae, and she told what she had seen, we asked

10   her how she knew him and so on and so forth.  Yes, sir."  Do

11   you see that?

12            A      I do.

13            Q      What did she say about how she knew

14   Dontae?

15            A      I don't recall.  I don't recall.

16            Q      Who told Charlene to write down her

17   statement?

18            A      I don't know if it was me or Detective

19   Melvin, or both of us, but we asked her to put it in

20   writing.  She agreed.  Detective Melvin and myself were both

21   leaving the room for different, we had to talk to Captain

22   Hardy about an issue, so she would leave and come back and I

23   would go out and come back.  But she had written it, written

24   the first part of her statement down when I came back and

25   Detective Melvin and I both were there, and we realized when
```

1  we read the statement, that she hadn't told, hadn't written

2  all the information that she had told us.  And so I asked

3  her, or she asked her, I can't remember which one, did you

4  leave something out?  And she said yes.  And so she put the

5  rest of it in the statement and signed it again.

6          Q        On page 137 of this same Exhibit Number

7  5, in the middle of the page you give a response describing

8  how you do interviews.  You say when we do interviews, we

9  sit down and we orally do the interview.  Talk about the

10  situation with the witness or suspect, whatever we are

11  talking to them about.

12         A        Okay.

13         Q        When we finish, we ask them to reduce

14  their oral statement to a written statement.  In this

15  circumstance with Charlene, at the beginning of the

16  interview, what did she say to you?

17         A        About what had happened?

18         Q        About what she saw.

19         A        I can't tell you specifically what it

20  all was, but what she put on paper is what I remember.

21         Q        And because you don't have any notes or

22  a report, you have nothing else to look at to help you

23  remember what she said, right?

24         A        That is correct.

25         Q        You would agree she is an important

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                          Page 134

1   witness in this case?

2        A        Absolutely.  All witnesses are

3   important.

4        Q        Well, she was the first person to give

5   you Dontae Sharpe's name, right?

6              MR. ELLIS:  Objection.

7        A      I don't know that.

8        Q        She was the first person to give you the

9   name of the shooter, right?

10              MR. ELLIS:  Objection.

11       A      I don't know that.

12       Q        You hadn't seen anything in the file

13  before this, had you?

14       A        I can't remember when Dontae Sharpe

15  became a suspect.  It's been so long ago and I haven't read

16  anything to tell me.  At this point in time, Dontae Sharpe

17  is a suspect.  I don't know.  I can't answer that.

18       Q        Again, if we had a written report, we

19  would know when Dontae's name first surfaced as a suspect,

20  right?

21              MS. MARTINEAU:  Objection to the form of

22              the question.  You can answer.

23       A        Possibly.

24       Q        Can we agree that the circumstances of

25  Charlene's interview were important to document?

J.A. 1466

```
 1        A       We did in her statement.

 2        Q       The notes of your interactions with her

 3   beforehand, can we agree it would be important to document

 4   what happened in that interview room before she was given

 5   pencil and paper?

 6               MS. MARTINEAU:  Objection to the form.

 7        You can answer.

 8        A       We did, she wrote it on paper.

 9        Q       I'm talking about the interactions that

10   you and Melvin had with Charlene Johnson before she was

11   given paper and pencil, can we agree that it would be

12   important to document that?

13               MR. ELLIS:  Objection.

14               MS. MARTINEAU:  Objection, you can

15        answer.

16        A       I repeat what I said earlier, she put it

17   on paper.

18               MS. MARTINEAU:  But her question is do

19        you agree, yes or no, or you don't know.

20        A       Do I agree that it would be important?

21        Q       Yes.

22        A       It depends.

23        Q       In this situation, this is your first

24   alleged eye witness in a murder case, it is two months after

25   the murder, no one has been charged.  For the first time,
```

1  you have someone coming in saying that they witnessed the

2  shooting.  In that circumstance, would it be important to

3  create a report about your interactions with that person so

4  that document exists in the investigative file going

5  forward?

6                    MS. MARTINEAU:  Objection.  You can

7          answer.

8          A        Possibly, but I don't know that one

9  doesn't exist.  I have never seen the entire file that was

10  given to the DA's office, so I don't know that one does not

11  exist.

12         Q        Did you write one?

13         A        I wasn't the lead detective.

14         Q        Did you write one?

15         A        I did not.

16         Q        Were you told to write one?

17         A        No.

18                    MS. PFEIFFER:  I think now is probably a

19         good time to take a break.

20                    MS. MARTINEAU:  That's fine.

21                    MR. ELLIS:  Thank you so much.

22                    THE VIDEOGRAPHER:  Going off the record.

23         The time is 12:49 p.m.

24                    NOTE:  At this time a recess

25         was taken.  After which time, all parties present

1          as before, the matter continues as follows:

2                    THE VIDEOGRAPHER:  We are back on the

3          record, the time is 2:03 p.m.

4     BY MS. PFEIFFER:

5          Q        We are back on the record after a break.

6     I'm going to start with an exhibit.  And we are marking it

7     as Exhibit 6.

8                    NOTE:  The above referred to

9          document is now being marked and filed as

10         Exhibit 6.

11         Q        Before we left, we were talking about

12    your interview with Charlene Johnson, and I have now handed

13    you a copy of what's been identified in trial and MAR

14    testimony going forward as a statement that Charlene Johnson

15    wrote on April 7, 1994.  You have seen that before, right?

16         A        I have.

17         Q        Now, when you are interviewing a

18    witness, do you give them words to say?

19         A        No, I don't.

20         Q        Do you suggest anything to them about

21    how or what they should put in their statement?

22         A        No, I don't.

23         Q        I noticed on Charlene's statement, she

24    uses the expression, white male.  I think she does that

25    three times.  Were those her exact words?

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 138

```
 1        A       If they are written in this statement,

 2   that is her exact words, and if you remember, she told

 3   Shrock that she saw a white man get killed.  So that was the

 4   first time the white male came up.

 5        Q       But did she use the words white male

 6   when she was talking to you and Detective Melvin, were those

 7   her specific words?

 8        A       It's been 30 years, but if it's in this

 9   statement here, I'm pretty confident she said white male.

10        Q       Now, when you get a statement like this,

11   one of the ways that you can determine if that statement is

12   accurate is to investigate the details of the statement,

13   fair?

14             MS. MARTINEAU:  Objection to the form of

15             the question.  You can answer.

16        A       Possibly, yes.

17        Q       Well, it would be fair to say that as an

18   investigator you look at details that are in the statement

19   and you compare them to the physical evidence in the case,

20   right?

21             MS. MARTINEAU:  Objection, leading.  You

22             can answer.

23        A       Possibly, yes.

24        Q       Well, if the details in the statement

25   don't match the physical evidence, that would be a red flag
```

**J.A. 1470**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 139

1    as an investigator, right?

2                    MR. ELLIS:  Objection.

3                    MS. MARTINEAU:  Objection, leading.  You

4        can answer.

5        A       Possibly, yes.

6        Q       When would it not be a red flag if

7    something in a statement did not match the physical

8    evidence?

9        A       If you remember when I told you in the

10   beginning, you sit down with the witness, you listen to

11   them, they tell the story, then you ask them to condense it

12   in writing.  That's the way that this was.  So, I mean,

13   there wasn't anything different in what she put on this

14   paper than what she told me.  So, there was not any

15   inconsistency that I found.

16       Q       Let me repeat my question.  Maybe you

17   misunderstood.  When would there be a time that something in

18   a witness' statement is inconsistent with physical evidence

19   in a case and it's not a red flag to you?

20       A       Yet again, it depends on the case.

21   Because not all of them are the same.

22       Q       Well, physical evidence is physical

23   evidence, right?

24       A       If you call it that, yes.

25       Q       If you were investigating a shooting

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    Page 140

```
 1   case, and you interviewed a witness, and the witness said to

 2   you, yes, I saw that person get stabbed by Joe Smith and I

 3   know Joe Smith killed that person because Joe Smith had the

 4   knife, but you knew a gun was used.  That would be

 5   inconsistent with the physical evidence, right?

 6               MS. MARTINEAU:  Objection, leading.  You

 7        may answer.

 8        A       Possibly, yes.

 9        Q       How would that be consistent?  If

10   someone died of a gunshot wound, no evidence a knife is used

11   at all, and you have an eye witness and the eye witness

12   tells you that she saw the perpetrator kill this person with

13   a knife.  Wouldn't that statement be inconsistent with the

14   physical evidence?

15        A       Possibly, yes.

16        Q       How is it not?

17        A       If she identifies a person -- I don't

18   know, I don't know how to answer that.

19        Q       Because if someone tells you that a

20   victim was killed with a knife but you, as an investigator

21   know they were shot to death, you probably wouldn't rely on

22   that person's testimony that they saw someone kill the

23   victim with a knife, right?

24        A       But they are witnesses, and it depends

25   on how many you have.
```

**J.A. 1472**

```
 1        Q         I'm talking about this specific witness

 2   in this circumstance, if that's what you heard, you wouldn't

 3   put that person into your investigative file as a credible

 4   witness, would you?

 5        A         I would listen to all of the witnesses

 6   and then I would determine then because it depends.

 7        Q         Would you put that report in your

 8   investigative file if it was entirely inconsistent with

 9   evidence?

10        A         I think that's probably discoverable, so

11   I think so, yes.

12        Q         So it would be important to put anything

13   in there because that would be important to a defense

14   attorney, right?

15        A         I think so.

16        Q         And that's what you would do?

17        A         I think so.

18        Q         You think so or you know so?  Was that

19   your practice?

20        A         I never had that situation, but I think

21   that would probably be what you would do.

22        Q         Well in a situation you have had, I'm

23   sure you have had interviews with witnesses where you didn't

24   think what they had to say was important.  Was it your

25   practice, none the less, to put it into your investigative
```

J.A. 1473

1  file because you knew that a defense lawyer was going to

2  look at that file and look for things that were exculpatory

3  or inconsistent?

4              MS. MARTINEAU:  Objection to the form of

5        the question.  You can answer.

6        A      I never had that situation.  So, I don't

7  know what I would do.

8        Q      You knew it was important to put

9  everything in the file is the point?

10       A      In this case, it wasn't up to me to do

11  that, but in most cases, you put in there what you have,

12  yes.

13       Q      Because if there is something in that

14  file that is inconsistent with, say, another witness

15  statement, that's something that a criminal defense attorney

16  would want to know, right?

17             MS. MARTINEAU:  Objection, leading.  You

18       can answer.

19       A      Yet again, it depends on the case, and I

20  would put a copy of it in the case file, yes.

21       Q      You are trained on exculpatory evidence,

22  aren't you?

23       A      I don't understand that word.

24       Q      You are trained to put everything into a

25  file because you know that when a person goes to trial, they

J.A. 1474

1  have a constitutional right to evidence that might impeach a

2  witness.  You are aware of that, correct?

3              MS. MARTINEAU:  Objection, leading.  You

4       may answer.

5       A       Yes, but I don't know all those rules,

6  so, I depend on the DA's office to guide me on them.

7       Q       But you know that rule?

8       A       As I said, I was a police officer 30

9  years ago, and the rules were a little different back then.

10  So, you know, I would certainly put in there what I thought

11  was the evidence.

12       Q       In your 30 years of being a police

13  officer, was there a time where it was okay for you to not

14  put something in the file if it didn't comport with what

15  your theory of the case was?

16       A       I never had that kind of situation.

17       Q       Everything you have always gathered in a

18  case, fit with your theory of the case?

19       A       I never had that kind of situation, that

20  I can remember.

21       Q       No, I'm asking you.

22       A       I'm telling you.

23       Q       In your investigation, did you ever have

24  a circumstance where you got some evidence and it didn't fit

25  with what you believe happened in the case?

J.A. 1475

1      A      As I said, it's 30 years ago, but

2  nothing comes to mind.

3      Q      I want to go back to this statement.

4  The first paragraph of the statement, you had been to the

5  crime scene by this time, right, you had canvased?

6      A      Uh-huh, yes, I had.

7      Q      And you saw where the truck came to

8  rest.  You saw the tread marks in the grass at the corner of

9  6th and Shepherd?

10     A      I did, yes, correct.  In the dirt.

11     Q      And you had read the initial report from

12 the responding officer, right?

13     A      Yes.

14     Q      Now, this first paragraph is

15 inconsistent with where the truck was found, right?  What

16 Charlene says is that he shot the white man, and that's it,

17 like just, it appears that it was outside of the truck, but

18 there is few details to even know where the shooting

19 occurred, right?

20            MS. MARTINEAU:  Objection to the form of

21            the question, leading.  You can answer.

22     A      I don't see anything in there about the

23 truck.

24     Q      There is no details about that?

25     A      I don't see anything, no.

J.A. 1476

1        Q        So, in the second paragraph that

2   according to the time stamp marks here was just made four

3   minutes later, now Charlene says, Dontae moved the truck and

4   ran it into the, I'm not sure what that word is, and Mark

5   and Dontae picked the white male up and put him in the

6   truck, and Dontae threw the keys and the gun somewhere, and

7   Mark, I'm not sure of that word, split up and meet each

8   other and got into a red Escort.  Right?

9                THE COURT:  Objection to the form of the

10               question.  I think you forgot some words in there.

11       Q        Can you read the word above, there are

12   some words above up and put him in the truck.  I think it

13   says picked him up from where he was shot, put him in the

14   truck, do you see that?

15       A        I do.

16       Q        So, in this statement, she's now placed

17   the truck somewhere else, right?

18               MS. MARTINEAU:  Objection, leading.  You

19               can answer.

20       A        I don't see where she put the truck

21   anywhere.  She just says the truck.

22       Q        Well, if in the first paragraph she

23   doesn't even mention where the truck is, right?

24       A        Does not.

25       Q        Not a lot of detail.  And then in the

1   second paragraph she said that Dontae and Mark put the

2   person in the truck, right?

3          A       That's what it says here.

4          Q       And by giving you that information, did

5   that fit more with what the physical evidence was at the

6   scene?

7          A       I don't know how to answer that

8   question.  I didn't see the actual crime scene, so, I saw a

9   picture, but I didn't see the actual crime scene.

10         Q       Well, you went to the crime scene?

11         A       Afterwards, yes.

12         Q       And you saw the tread marks?

13         A       I saw the tire marks in the dirt, yes.

14         Q       And that's where the truck was to have,

15   alleged to have stopped, right?

16         A       Alleged.

17         Q       And that matched the crime seen photos

18   that you saw of the truck in the lawn at the corner of

19   Shepherd and 6th, right?

20                 MS. MARTINEAU:  Objection, leading.

21         A       It did.

22         Q       So the second paragraph describes the

23   truck.  It describes the truck moving, right?

24                 MS. MARTINEAU:  Same objection.  You can

25         answer.

J.A. 1478

1        A       It doesn't say from where to where or

2   from when, or any of that.  So, it just says put him in the

3   truck and threw the keys.  So, it doesn't say where the

4   truck was parked.

5        Q       There is not a lot of details in there,

6   is there?

7        A       No.

8        Q       So there is not a lot of details you

9   could follow up on, right?

10               MS. MARTINEAU:  Objection, leading.  You

11          can answer.

12          A       This is her statement, you know.  It is

13   what it is.

14          Q       Did you suggest to her to write

15   something about the truck because you didn't have that

16   detail?

17          A       As I explained earlier in my testimony,

18   we carried her to the Brown Building, Melvin and I.  We went

19   in the room, we sat there both and listened to her story.

20   And then I or Detective Melvin, I don't know which, asked

21   her to condense it to writing.  And so she started writing a

22   statement.  In the meantime, Detective Melvin and myself,

23   one would go to Captain Hardy's office and come and then I

24   would go and come back because we needed to apprize Captain

25   Hardy of some stuff going on.  And so I don't know, it's

1   been 30 years and this is just -- well, I don't want to go

2   there.  I know she wrote the first part and then when we

3   came back and read it, we realized that she didn't put down

4   what she had told us verbally.  So, we said, you know,

5   didn't you leave something out?  And she says yes, and

6   that's when she wrote the second part.

7           Q       And when you said did you leave

8   something out, did you give her anymore information about

9   what she needed to put there?

10          A       I did not give her any information.

11          Q       Did Melvin give her any information?

12          A       She did not either.

13          Q       So, we talked about there not being many

14   details in here.  This doesn't say what time of day she

15   witnessed this, does it?

16          A       I don't see any, no.

17          Q       She doesn't say anything about her

18   specific location, does she?

19                  MS. MARTINEAU:  Objection to the form of

20                  the question.  Mischaracterizes it, but you can

21                  answer.

22          A       Not that I see.

23          Q       She says, I was walking down 14th.  She

24   doesn't give a cross street, does she?

25          A       No.

1        Q        She doesn't say anything about her

2    ability to witness this, in other words, whether it was

3    rainy or cloudy or dark, right?

4                    MS. MARTINEAU:  Objection, leading.  You

5        can answer.

6        A        I don't see anywhere.

7        Q        She doesn't describe what anyone was

8    wearing, does she?

9                    MS. MARTINEAU:  Same objection.  You can

10        answer.

11        A        I don't see any of that, no.

12        Q        She doesn't describe the direction that

13    the truck was in before it was moved, does she?

14                    MS. MARTINEAU:  Objection.  You can

15        answer.

16        A        I don't see that, no.

17        Q        It also doesn't say how the truck was

18    moved, right?

19                    MS. MARTINEAU:  Same objection.  You can

20        answer.

21        A        No.

22        Q        It doesn't say anything about whether

23    the white male was moving when they put him in the truck,

24    does it?

25                    MS. MARTINEAU:  Same objection.  You can

```
 1        answer.

 2        A      No.

 3        Q      So, it doesn't give you much information

 4   about what occurred, does it?

 5               MS. MARTINEAU:  Objection, leading.  You

 6        can answer.

 7        A      This is her statement.  We accepted that

 8   because that's what she told us.  That's it.  That's what,

 9   it is what it is.  And that's what we got.

10        Q      This is someone who you had no

11   experience with before, right?

12        A      Never experienced before.

13        Q      You didn't know whether she was credible

14   or not?

15        A      Not a bit, no.

16        Q      She was 14 years old, right?  She was a

17   kid.

18        A      She was.

19        Q      You didn't know whether she used drugs?

20        A      I didn't ask her.

21        Q      You didn't know whether she was a drug

22   addict?

23        A      Didn't ask her.

24        Q      And yet you accepted her statement

25   because that's what she told you, why?
```

1         A        Because she appeared to be credible.

2   She appeared to be coherent, she appeared to be honest, and

3   that was her statement.

4         Q        And what did you do to verify the

5   accuracy of her statement?

6         A        I didn't do anything that I remember.

7   It is her statement.

8         Q        As an investigator, is it adequate to

9   just take a statement at face value and not investigate it

10  for its accuracy?

11        A        At this time, 30 years later, I don't

12  know what we did as a result of this statement, but

13  Detective Melvin might can tell you, but I can't tell you.

14        Q        One of the things Charlene put in this

15  statement is that Dontae threw the keys and the gun

16  somewhere, right?

17        A        That's what it says.

18        Q        And again, when you are verifying the

19  accuracy of the statement, one thing you can do is look at

20  the statement and look at the physical evidence, right?

21                 MS. MARTINEAU:  Objection, leading.  You

22            can answer.

23        A        Yes.

24        Q        In this case, the keys were in the

25  ignition of the car.  Was it a red flag to you that she said

1   the keys were thrown?

2         A       I never picked up on that.  Maybe

3   Detective Melvin did when she said he threw the keys, you

4   know.  Maybe he threw the keys, but if they are in the

5   truck, does it say that somewhere?  Does it say that

6   somewhere, the keys were in it?

7         Q       It's in the responding officer's report

8   which you reviewed, correct?

9         A       Okay.

10        Q       So, was that a red flag?

11        A       Not necessarily.

12        Q       Did you go back and compare her

13  statement to the initial report?

14        A       30 years later, I don't remember.  I

15  don't remember.

16        Q       She also said that the gun was thrown

17  somewhere, right?

18        A       That's what she says.

19        Q       This was April 7, 2 months after the

20  murder, right?

21        A       That's what it says.

22        Q       No gun had been found, right?

23                MS. MARTINEAU:  Objection, leading.  You

24        can answer.

25        A       Not that I know of.

J.A. 1484

```
1       Q       A murder weapon was never recovered, was

2   it?

3                   MS. MARTINEAU:  Same objection.  You can

4       answer.

5       A       Not that I know of.

6       Q       Was that a red flag that she says the

7   gun was thrown somewhere and no gun was ever recovered?

8       A       Not at all.

9       Q       Why not?

10      A       You throw a gun on the side of town

11  where this is, it won't last long.  So, no, it didn't throw

12  a red flag.

13      Q       Crime scene techs were on the scene that

14  very night, weren't they?

15      A       I don't know.  I didn't respond.

16      Q       Hours after Charlene gave you this

17  statement, Dontae was arrested.  Who made that decision?

18      A       The lead detective.

19      Q       On what basis was this enough to arrest

20  Dontae?

21      A       You would have to ask her that.

22      Q       Did you believe this was enough to

23  arrest Dontae?

24                  MS. MARTINEAU:  Objection to the form of

25      the question.  You can answer.
```

J.A. 1485

1       A        I don't know.  It's something you need

2   to ask Detective Melvin.  I didn't put my name on the

3   warrant.

4       Q        You testified at the trial in this case,

5   you recall that in 1995?

6       A        I did.

7       Q        Did you sit through the trial testimony

8   of Charlene Johnson?

9       A        I don't know.

10      Q        I'm going to mark as our next exhibit

11   the trial testimony of Charlene Johnson, and your attorney

12   has it on her computer there.  We have given it to counsel

13   and that's going to be --

14              MR. LEWIS:  Exhibit 7.

15                   NOTE:  The above referred to

16              trial testimony is now being marked and filed as

17              Exhibit 7.

18              MS. PFEIFFER:  And Elizabeth, I'm going

19              to direct you to page 56.  The Bates is -- it's 56

20              on the trial page up in the right-hand corner.

21   I'm on the trial transcript 56 --

22              MR. ELLIS:  Cross examination by Mr.

23              Stokes, I believe.

24              MS. PFEIFFER:  Yes.  Have you got that?

25              MS. MARTINEAU:  Yes.

```
1        Q        Okay.  And I am going to go to line 14,

2    are you with me?

3        A        Uh-huh.

4        Q        And this is a question.  Mr. Ellis has

5    pointed out, this is cross examination of Charlene Johnson,

6    and her attorney, Mr. Stokes, says, you are guessing, okay.

7    Then, thank you for being honest with me.  And you say that

8    this man pushed the white man.  Answer, witness nodding

9    head.  Question, did he push him straight on in the shoulder

10   or how?  Answer, he pushed him like straight on.  Question,

11   like straight on in his chest?  Answer, yeah.  Question,

12   were they facing each other when they were talking?  Answer,

13   he was like right here, and right here, and Mark was right

14   there.  Question, so, they were face-to-face with one

15   another?

16            MS. MARTINEAU:  To one another.

17        Q        To one another?  Answer, witness nodding

18   head.  Question, one wasn't sideways to the other?  Answer,

19   witness shaking head.  Question, were they face-to-face when

20   Dontae shot him?  Answer, witness nodding head.  Question,

21   they were?  Answer, witness nodding head.  Question, are you

22   sure about that?  Answer, witness nodding head.  Question,

23   ma'am, I can't, you need -- answer, yes.  Question, no doubt

24   in your mind those two people were standing face-to-face

25   when Dontae pulled the trigger?  Answer, no.  Did I read
```

1    that correctly?

2          A       That's what is on here.

3          Q       I'm done with it now.  You can put that

4    away.  Is it your practice as a lead detective to attend the

5    autopsy in a murder case?

6          A       Not always.  Sometimes you have

7    something else to do, someone else may represent you.

8          Q       But there is someone from the homicide

9    team at the autopsy?

10         A       Most times.

11         Q       If you didn't attend the autopsy, would

12   you later review the autopsy?

13                 MS. MARTINEAU:  Objection to the form.

14         You can answer.

15         A       I don't remember.

16         Q       Is there any reason why you wouldn't

17   look at the autopsy?

18         A       It depends, I mean.  I didn't have any

19   reason to read it, or look at it.  Back then it was taking

20   forever and a day to get them.  I don't remember if I read

21   it or not.

22         Q       Even if it took a long time to get an

23   autopsy, wouldn't that be important to you as an

24   investigator to take a look at the autopsy and see if it was

25   consistent with other evidence you had gathered in the case?

J.A. 1488

1       A       I don't know that Detective Melvin

2   didn't.

3       Q       I'm asking about you, your practice?

4       A       As I said, I don't know that Detective

5   Melvin didn't look at it.

6       Q       Did you look at the autopsy in this

7   case?

8       A       I did not, that I remember.  It's been

9   30 years, I don't remember.

10      Q       Do you recall whether Melvin talked with

11   you about the autopsy at all?

12      A       I don't remember.

13      Q       Do you believe that looking at the

14   autopsy is an important investigative task in a homicide

15   case?

16      A       It depends on the situation.

17      Q       In this case, would it be important to

18   look at the autopsy in this case from 1994?

19      A       Yeah, again, it depends on the

20   situation.

21      Q       Well, in this situation, where you have

22   this statement from Charlene, would it be important for you,

23   as an investigator, to look at the autopsy?

24      A       As the lead detective, maybe, but not

25   especially me.

1        Q        Why, why not?

2        A        Yet again, it depends on the situation.

3        Q        I'm going to mark and show the autopsy

4    in this case.

5        A        Okay.

6        Q        As Exhibit 8.

7                 MR. ELLIS:  And is Exhibit 7 just page

8        56?

9                 MS. PFEIFFER:  I think I read two pages.

10                 MS. MARTINEAU:  She read two pages.

11                 MS. PFEIFFER:  Let's mark the whole

12        thing because I'm sure we will use it later.  All

13        of Charlene's testimony from 95 will be Exhibit 7.

14                 MR. ELLIS:  Got it, thank you.

15                     NOTE:  The above referred to

16        autopsy report is now being marked and filed as

17        Exhibit 8.

18        Q        I have just handed you what I have

19    marked Exhibit 8.  Now that you look at that, do you have

20    any memory of whether this is something you saw in 1994

21    during the investigation of the Radcliffe shooting?

22        A        I do not, I don't remember.

23        Q        I'm going to ask you to flip to, on the

24    bottom right-hand corner you will see numbers, the one that

25    says 005356, it's a drawing of the body.  Do you see where I

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 159**

1    am?

2          A        Uh-huh.

3          Q        You have looked at autopsy reports in

4    the past, right?

5          A        I have.

6          Q        And you are able to look at the autopsy

7    report and not come to the same conclusion as somebody with

8    like a medical examiner, but you understand the language of

9    an autopsy report, right?

10                  MS. MARTINEAU:  Are you asking him now

11         or then?

12                  MS. PFEIFFER:  Then.

13                  MS. MARTINEAU:  So, objection, leading.

14         You can answer.

15         A        Pretty much.

16         Q        But this is a familiar, looking at this

17   picture, this is something you have seen before in an

18   autopsy report, right?

19                  MS. MARTINEAU:  Same objection.  You can

20         answer.

21         A        I'm sure.

22         Q        And something that the medical examiner

23   does is make notes on this to indicate either wounds or

24   abrasions or things that might be related to the homicide?

25         A        I guess.

1      Q       Well, in a shooting case, one of the

2    things you are trying to determine is how was this person

3    shot, right?

4      A       Or where.

5      Q       Or where.  And why is that important?

6      A       It just is.

7      Q       Why?

8      A       I don't have an answer for you other

9    than to say it just is.

10     Q       Flip two more pages, to 5358, and here

11   is a side view of the body, right?

12     A       Okay.

13     Q       And on the left hand side, it shows

14   re-entry, do you see that there?

15     A       Uh-huh.

16     Q       And then over on the right it says exit,

17   right?

18     A       Uh-huh.

19     Q       And you recall that the autopsy in this

20   case showed that there was one bullet, correct?

21             MS. MARTINEAU:  Objection to the form of

22             the question.  You can answer.

23     A       That's all I can see.

24     Q       And that it went in through the left,

25   through the left arm, through the chest, and then exited out

1  the right arm, correct?

2        A       That's what appears, yes.

3               MR. ELLIS:  Objection.

4        Q       We can agree, that if somebody was shot

5  face-to-face, this is not what the autopsy report would look

6  like, correct?

7               MS. MARTINEAU:  Objection, leading.  You

8        can answer.

9        A       I don't know.  He was pushed, which

10 could easily turn him to the side, so that wouldn't be a big

11 issue for me.

12       Q       We just reviewed Charlene's testimony at

13 trial, right?

14       A       I heard that.

15              MS. MARTINEAU:  Objection.

16       Q       And you would agree that what Charlene

17 testified to is inconsistent with what the autopsy shows,

18 right?

19              MR. ELLIS:  Objection.

20              MS. MARTINEAU:  Same objection to the

21       form of that question.

22       A       Possibly.

23       Q       How is it not inconsistent?

24       A       She said he was pushed.

25       Q       Would you like to refer back to her

1    testimony where she said she had no doubt that he was shot

2    face-to-face?

3           A       I don't.

4           Q       If what she testified to is what's on

5    that transcript that we just read together --

6                   MS. MARTINEAU:  Well, I'm going to

7             object.  We only read a portion of the transcript

8             to be fair.

9                   MS. PFEIFFER:  And you are welcome to

10            redirect.

11          Q       If that's what she testified to, that he

12   was shot face-to-face, can we agree that that testimony is

13   inconsistent with the autopsy report?

14                  MR. ELLIS:  Objection.

15                  MS. MARTINEAU:  Object to the form of

16            the question.  You can answer.

17          A       I can't agree to that.

18          Q       Why?

19          A       I told you she said he was pushed.

20          Q       I'm talking about her testimony about

21   how he was shot.

22          A       And I'm talking about what I read, she

23   said he was pushed.

24          Q       I'm going to repeat to you what was said

25   here, okay.  Question, were they face-to-face when Dontae

1   shot him?  Witness nodding head.  They were.  Witness

2   nodding head.  Question, are you sure about that?  Witness

3   nodding head.  Ma'am, I can't, you need -- answer, yes.  No

4   doubt in your mind those two people were standing

5   face-to-face when Dontae pulled the trigger?  Is that

6   testimony consistent with this autopsy?

7          A       As I said earlier, possibly because she

8   says that he pushed him.  I don't know once he pushed him,

9   when he shot.  So, all I can answer is what she said that he

10   pushed him.

11         Q       So, her testimony that they were

12   standing face-to-face when Dontae pulled the trigger, in

13   your mind, as a homicide detective, could be consistent with

14   an autopsy that shows a bullet going through the left arm,

15   through the chest, and exiting out the right arm, is that

16   your testimony?

17                MS. MARTINEAU:  Objection,

18                argumentative.  You can answer.

19         A       That doesn't cause me a problem.

20         Q       Did you check the autopsy before Dontae

21   was arrested?

22         A       As I explained a few minutes ago, I

23   don't remember ever seeing the autopsy report.  I could

24   have.  30 years later, I don't remember seeing it.

25         Q       Do you think it would have been a good

1  investigative task to check the autopsy before arresting

2  Dontae after this statement?

3          A        I didn't issue the warrant and I didn't

4  arrest him.  But I don't know if we even had the autopsy

5  report by then.

6          Q        Do you think it would have been

7  important to try to verify the accuracy of some of the

8  details in that statement before arresting him?

9          A        Possibly.

10         Q        Any reason why it wouldn't be?

11         A        As I said, possibly.

12         Q        Why?

13         A        I don't have another answer other than

14  possibly.

15         Q        Who decided that you would be the person

16  to testify to the grand jury and not Melvin?

17         A        That would have been Clark Everett.

18         Q        Made the decision to have you testify?

19         A        Yes.

20         Q        Any idea why Melvin didn't testify?

21         A        Yes.

22         Q        Why?

23         A        She was having some issues with

24  administration at the time, and she was not appearing at

25  work on occasion because of that situation.  So, the way he

**J.A. 1496**

1   explained it to me was, he needed somebody he could count on

2   so he wanted me to testify.

3          Q        What were the problems she was having?

4          A        I don't know what the administration and

5   her had going on, but I'm telling you there were issues

6   going on between her and the administration.

7          Q        And what about the trial testimony, why

8   did you testify and not Melvin?

9          A        That question is a question for Clark

10   Everett.

11         Q        Did he talk to you about that at all?

12         A        No.

13         Q        Did you ever ask him why he wasn't

14   calling Melvin?

15         A        No.

16                  MR. ELLIS:  Objection.

17         Q        During the early 90's, and through the

18   mid 90's, fair to say is there was a dramatic increase in

19   the crime rate and homicide, in particular?

20                  MS. MARTINEAU:  Objection to the form of

21         the question.

22         A        In Greenville?

23         Q        Uh-huh.

24         A        Oh, absolutely.

25         Q        And I think you testified earlier that

1   your plate was full around that time in 1994, is that right?

2          A      Yes.

3          Q      And this increase in homicide, that put

4   pressure on your department, didn't it?

5                 MS. MARTINEAU:  Objection, leading.  You

6          can answer.

7          A      I wouldn't say that, because every case

8   is worked to its entirety.  And you don't rush because you

9   have got more cases.  So, you have got to work each one

10   individually until it's over, and so I wouldn't say that,

11   no.

12          Q      Was there pressure to solve crimes by

13   the media?

14          A      I don't know how to answer that.  I

15   don't know.  There was never any pressure put on me.

16          Q      I'm going to mark our next Exhibit 9.

17   And by the way, what did Clark Everett mean when he said he

18   needed someone that he could count on when he told you he

19   needed you to give the grand jury testimony?

20          A      That's a question you need to ask Clark.

21                 NOTE:  The above referred to

22          document is now being marked and filed as

23          Exhibit 9.

24          Q      All right, take a look at Exhibit Number

25   9, this is an addendum to one of your Performance Appraisal

1   Reports, and this is from August 12, 1992.  And I am going

2   to direct you to the second paragraph, and it begins, this

3   agency has experienced a dramatic increase in violent crime

4   in the past year, especially homicide.  The Investigations

5   Division has been severely pressed via public pressure to

6   solve these crimes.  Did I read that right?

7           A        That's what it says.

8           Q        The Investigation Division was your

9   division, right?

10          A        Yes.

11          Q        And then the crimes have occurred at the

12  time when the department is initiating problem orienting

13  policing as a method to become involved with the community

14  it serves.  Did I read that right?

15          A        That's what it says.

16          Q        Did that relate to the way you developed

17  informants or relationships with people in Greenville, the

18  community, sorry, the problem oriented policing?

19          A        This is the first time I have heard that

20  statement.

21          Q        The next line says, each homicide

22  generated media coverage on a daily basis, and the

23  investigations of these crimes, at times, were hampered by

24  the media and public involvement.  Did I read that right?

25          A        That is correct.

| | | |
|---|---|---|
| 1 | Q | So, fair to say that with this increase |

1      Q      So, fair to say that with this increase

2   in crime, there was pressure on your department to solve the

3   crime?

4                  MS. MARTINEAU:  Objection, asked and

5              answered.  You can answer.

6      A      Possibly.

7      Q      The Police Chief was concerned about

8   this, right?

9                  MS. MARTINEAU:  Objection, leading.  You

10             can answer.

11     A      I don't know.

12     Q      The Police Chief didn't express any

13   concern about the rise in crime rates and the media

14   pressure?

15     A      I never talked to him about that, no.  I

16   don't know who the chief was in 1992.

17     Q      This increase in crime wasn't limited to

18   1992, was it?

19                 MS. MARTINEAU:  Objection, leading.  You

20             can answer.

21     A      It went up a little at times.

22     Q      Well, this case that we are talking

23   about today, the Dontae Sharpe matter, the murder of George

24   Radcliffe occurred in 1994, right?

25     A      Yes.

**J.A. 1500**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                         Page 169

```
1       Q        And you have already testified about how

2  many cases you had to work in 1994, right?

3       A        Yes.

4       Q        There hadn't been a slow down in any

5  homicide between 92 and 94, had there been?

6       A        Probably not.

7                MR. ELLIS:  Objection.

8       Q        As a matter of fact, they continued

9  beyond 94, didn't they?

10               MS. MARTINEAU:  Objection,

11               argumentative.  You can answer.

12      A        Possibly.

13      Q        One of the things that was important in

14  your department was to clear cases, is that clear?

15               MS. MARTINEAU:  Objection, leading.

16      A        Investigate is a better word.

17      Q        Let's talk about clearing cases.  What

18  does clearing cases mean to you?  What does that term mean

19  when a case is cleared?

20      A        Once all the work has been done and a

21  final outcome has come and the case has been cleared.

22      Q        There are statistics that are kept in

23  the department about those clearance rates, right?

24               MS. MARTINEAU:  Objection, leading.  You

25               can answer.
```

**J.A. 1501**

1        A        I don't know.

2        Q        Well, if you look at the third paragraph

3    here, right from where we were.  During the above cited time

4    period, Detective Best and other major crimes personnel

5    performed admirably.  The current success rate for homicide

6    is 100 percent, and Detective Best has contributed greatly

7    to this success.  Did I read that right?

8        A        Correct.

9        Q        And the success rate, the 100 percent,

10   that's the clearance rate, right?

11              MS. MARTINEAU:  Objection.  Leading.

12       A        Come again.

13       Q        The current success rate for homicide is

14   100 percent, all right.  What the sergeant is talking about

15   is a hundred percent clearance rate, right?

16              MS. MARTINEAU:  Objection, leading.  You

17         can answer.

18       A        I don't know what he was referring to,

19   but it appears as that, yes.

20       Q        What else would a success be?

21       A        I can't speak for Sergeant Conner, but

22   that's what it appears.

23       Q        I'm going to mark our next Exhibit 10.

24              NOTE:  The above referred to

25         document is now being marked and filed as

1          Exhibit 10.

2          Q       What I have just handed you as Exhibit

3    10, this is another addendum to your annual Performance

4    Evaluation, and it says from August 27, 1993.  This is a

5    letter you wrote to your superiors after not getting the

6    raise that you felt like you deserved.  And you were

7    persuading them to try to give you that raise, and you have

8    listed out here points you wanted to make so that they would

9    consider that in reassessing whether you would get a raise.

10   And point one --

11              MS. MARTINEAU:  Hold on a minute.  I

12          want to object, move to strike the testimony of

13          counsel.  Go ahead.

14          Q       And point one reads, I have tried to be

15   a team player and to assist the unit in keeping our homicide

16   clearance rate at 100 percent.  Did I read that right?

17          A       Yes.

18          Q       It would be fair to say that a clearance

19   rate was an important factor in your evaluation, right?

20              MS. MARTINEAU:  Objection, leading.  You

21          can answer.

22          A       Yet again, I don't know what the

23   sergeants go with, but that's what it says.

24          Q       Well, that was the first thing you

25   pointed out to the sergeant, right?

```
1        A       Yes.

2        Q       Because you thought that was an

3   important thing to note, right?

4                MS. MARTINEAU:  Objection, leading.  You

5        can answer.

6        A       It's a long time ago, but I presume.

7        Q       I'm going to jump ahead in time to

8   Exhibit 11.  I'm going to hand you what I'm marking as

9   Exhibit 11.

10                NOTE:  The above referred to

11        document is now being marked and filed as

12        Exhibit 11.

13        Q       Exhibit 11 is an annual review of

14  employees, it's your review, and this is from 2003.  And it

15  asks for your feedback here.  And the first question is what

16  was your initial career goal?  And you put to become major

17  crimes sergeant.  The next question is --

18                MS. MARTINEAU:  Can I ask you --

19        A       I was looking at something different.

20                MS. MARTINEAU:  Okay?

21        A       It's the back page.

22                MS. MARTINEAU:  Okay.

23        Q       Sorry, second page.  Second page of the

24  exhibit.

25        A       Okay.
```

**J.A. 1504**

1    Q        Are you with me now?

2    A        I am.

3             MS. MARTINEAU:  Will you start again?

4    Q        Yes.  On the second page, this is your

5    feedback.  What was your initial career goal?  To become

6    major crime sergeant.  The next question, to what degree

7    have you reached that goal?  Not very well.  And then we

8    skip down to the bottom, the last question is, is there

9    anything you would like to accomplish in your present

10   position that you have not accomplished?  And again, this is

11   2003.  And your response is 100 percent clearance rate.  So,

12   would it be fair to say that the clearance rate is something

13   that is important to the department?

14   A        Possibly, yes.

15   Q        It was certainly important to you,

16   right?

17   A        Yes.

18   Q        Why was it so important to you?

19   A        You want to see your work come to

20   fruition, so, you know, you have a goal to go forward and I

21   guess that was my goal at the time.

22   Q        And a clearance rate suggests that

23   crimes have been solved, right?

24             MS. MARTINEAU:  Objection, leading.  You

25   can answer.

J.A. 1505

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 174

```
 1      Q       Someone has been arrested for something,
 2  right?
 3              MS. MARTINEAU:  Objection, leading.  You
 4      can answer.
 5      A       Clearance is not really you are arrested
 6  but the case has been cleared.
 7      Q       Well, once the case is cleared, do you
 8  continue to investigate it?
 9      A       No.
10      Q       And if you are not investigating the
11  case, certainly from the public and media's perception, that
12  case has been resolved, right?
13              MS. MARTINEAU:  Objection, leading.  You
14      can answer.
15      A       That's what clearance means, yes.
16      Q       And if there is pressure on the
17  department, it's certainly a good thing to show the media
18  and the public, we are clearing cases, right?
19              MS. MARTINEAU:  Objection, leading.  You
20      can answer.
21      A       That all depends on you.  I never felt
22  that pressure, so.
23      Q       Did you ever draft press releases when
24  you were in homicide?
25      A       I did not.
```

J.A. 1506

1      Q      Did you ever talk to the press?

2      A      Occasionally, when I was told to.

3      Q      Who would tell you to talk to the press?

4      A      Supervision.

5      Q      I'm going to mark, this is Exhibit 12,

6      and hand you this press release.

7                   NOTE:  The above referred to

8              document is now being marked and filed as

9              Exhibit 12.

10     Q      This press release, the date and time is

11     down at the bottom.  You see it says 4-7-94, 17:15 hours.

12     That's 5:15.  Do you see that?

13     A      I do.

14     Q      And this is an update in the murder case

15     of George Edward Radcliffe.  Do you see that at the top?

16     A      Yes.

17     Q      And the synopsis says since this

18     investigation began, investigators have conducted many

19     interviews and have talked to many residents of the area

20     where this incident occurred.  This investigation has led to

21     the arrest of Sharpe and Joiner for the murder of George

22     Edward Radcliffe.  Did I read that correctly?

23     A      Yes.

24     Q      And then at the bottom it says,

25     investigating officers, Detective Best, DR Best and CJ

1  Melvin, right?

2        A      Yes.

3        Q      Officer preparing release, DR Best and

4  William Harris, correct?

5        A      That's what it says.

6        Q      And then the notification shows the TV

7  stations and also the local paper, WNCT, WITN, WCTI, and

8  Daily Reflector.  Do you see that there?

9        A      I do.

10        Q      And there is checks next to each of

11  those.

12        A      Okay.

13        Q      Those checks indicate that this press

14  release went to those news agencies, right?

15        A      I don't know because I didn't prepare

16  this report.

17        Q      Why is your name on it?

18        A      William Harris was the Public

19  Information Officer for the Police Department.  You know, he

20  may have typed that in there.  I didn't help, I didn't

21  assist in this investigation, this report being prepared.

22        Q      Where would he have gotten this

23  information for the report?

24        A      I don't know.  Maybe me, or maybe

25  Melvin.

```
 1        Q        And you see the date and time of the

 2   release is 5:15 on the 7th?

 3        A        I do.

 4        Q        And Charlene was interviewed at 1:30

 5   that day, right?

 6        A        I don't know what the date was, but I

 7   can look and see.

 8                 MS. MARTINEAU:  Where would he see that?

 9                 MR. LEWIS:  Exhibit 6.

10        A        Yes.  Same date.

11        Q        And just hours later?

12        A        About four hours later.

13        Q        And the many interviews and the many

14   residents, what information did they provide to you that

15   either corroborated or bolstered Charlene's statement?

16        A        Ask that question again.

17        Q        Sure.  In the press release it says

18   investigators have conducted many interviews and have talked

19   to many residents of the area where this incident occurred.

20   My question is, of those interviews and discussions with

21   other residents, which of those corroborated or bolstered

22   what Charlene Johnson told you?

23        A        I don't know how to answer that.  I

24   don't have a clue.

25        Q        Did any of them corroborate or bolster
```

1  what she said?

2      A      I don't remember, and I don't, I didn't

3  see Detective Melvin's final report, so I don't know, other

4  than Charlene, if we had any additional information.

5      Q      Dontae is arrested within five hours of

6  Charlene's statement, did you receive any corroborating

7  statements between the time she was interviewed and the time

8  Dontae was arrested?

9      A      Yet again, it's been 30 years and I

10  don't remember.

11      Q      After you interviewed Charlene on

12  August 7, 1994, where did you and Melvin go?

13      A      I have no idea.

14      Q      Who brought Charlene back home after the

15  interview with you and Melvin?

16          MR. ELLIS:  Objection.

17      A      I really don't remember.

18      Q      Do you know how she was brought home?

19      A      I really don't remember.

20      Q      What would be your practice after

21  interviewing a 14 year old who couldn't drive, and wasn't

22  with her parent, what would be your practice in how to get

23  that child back home?

24      A      If you are talking about her, I would

25  say we probably carried her home ourselves, because we

1  picked her up ourselves.  But to tell you how that happened

2  or whether or not that happened, I can't.

3          Q          Would you take her back, your practice

4  now, would you take her back in a marked car or unmarked

5  car?

6          A          We brought her in an unmarked car, we

7  probably carried her back in an unmarked car.

8          Q          Did you pick her up in a marked car when

9  you picked her up for the interview?

10          A          I said unmarked car.

11          Q          Unmarked car.  How did you later learn

12  about Sissy Page and Candice Johnson and Lisa Evans and

13  Tommy Freedman showing up to Charlene's house after she met

14  with Melvin, how did you find out about that?

15                      MS. MARTINEAU:  Objection.

16          A          In the wee hours of the morning, after

17  Dontae's arrest, I received a phone call at home from

18  Detective Elks, to tell me that she had been assigned a case

19  involving Charlene, where she had been assaulted badly at

20  her home after she got back home, and that she was at the

21  hospital and that she was with her.  And she thought I

22  should come out and be with her.

23          Q          You said Detective Elks, is that Connie

24  Elks?

25          A          Yes.

**J.A. 1511**

1        Q        And why did she call you?

2        A        You will have to ask Connie that, I'm

3    not sure.

4        Q        Was she aware that you had talked with

5    Charlene earlier in the day?

6        A        You will have to ask her that, I don't

7    know.

8        Q        You said it was the wee hours of the

9    morning, around what time did you get that call?

10       A        I don't remember exactly, it was like

11   four, five or six in the morning.

12       Q        And did you take notes of this

13   conversation with Detective Elks?

14       A        No, I did not.

15       Q        Did you write anything down about the

16   conversation?

17       A        No, I did not.

18       Q        Did you think that it was important that

19   someone who you had just interviewed hours before was now

20   with another detective?

21       A        I did not.

22       Q        You didn't think that was important?

23       A        I didn't think it was important to write

24   it down.

25       Q        Why not?

**J.A. 1512**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 181

```
 1       A      What would I write down?

 2       Q      You are the detective.

 3       A      I didn't see anything to write down.

 4       Q      What did you do after your conversation

 5  with Detective Elks?

 6       A      30 years later, the best of my memory is

 7  that I showered, got dressed, and drove to the hospital.

 8       Q      And what did you do when you got to the

 9  hospital?

10       A      I don't know.  I'm sure I talked to

11  Detective Elks, and I don't even know if I talked to

12  Charlene.  But I went to the hospital.

13       Q      Did Detective Elks ask for your

14  assistance in her investigation?

15       A      With the assault?

16       Q      Uh-huh.

17       A      No.

18       Q      How, if at all, did you assist her in

19  that investigation?

20       A      30 years later, my recollection is, I

21  think I sat in on an interview with either one or two of the

22  females, but I don't remember.

23       Q      And why would you have been sitting in

24  on these interviews?

25       A      Detective Elks asked me.
```

**J.A. 1513**

```
 1        Q       Why do you think she asked you?
 2                MS. MARTINEAU:  Objection.  You can
 3      answer.
 4        A       That would be answered by Detective
 5   Elks.
 6        Q       Did you take any notes during these
 7   interviews?
 8        A       Not that I remember.
 9        Q       Did you ask any questions during these
10   interviews?
11        A       Not that I remember.
12        Q       Did you have any conversation at all
13   with the girls who were involved in this?
14        A       As I said, I don't remember.
15        Q       Did you think it would be important to
16   document this for your investigation in the Sharpe matter,
17   given the fact that Charlene had just met with you and
18   Detective Melvin and told you what she did?
19        A       I don't remember if I took any notes.
20        Q       My question is whether you think it
21   would have been important to take notes and include them in
22   the investigative file related to Dontae Sharpe since you
23   had just spoken to Charlene earlier in the day?
24        A       It depends.  My memory 30 years later, I
25   don't remember anything coming up about the murder case.
```

```
 1        Q        Did you recognize Candice Johnson as a

 2   person you had talked to earlier in the day when you sat in

 3   on the interview with her?

 4        A        I sat in on Candice's interview?  I

 5   don't know.  I don't remember that.

 6        Q        Okay.  At any point in time, did you say

 7   to Candice or any of the girls involved in the assault, that

 8   you could assist them in any way?

 9        A        Assist the girls?

10        Q        Uh-huh.

11        A        No, ma'am.

12        Q        Did you suggest that you could help them

13   in any way with the charges that they were facing?

14        A        That would not have been my call.  This

15   was Detective, Corporal Elks' case, and that wouldn't have

16   even been nothing that I would have even thought about.

17        Q        After those interviews, did you play any

18   other role in the investigation that Detective Elks was

19   leading?

20        A        Not that I remember.

21        Q        Did you have any interactions with

22   Detective Elks relating to Charlene and her testimony in the

23   Dontae Sharpe case?

24        A        Not that I remember.

25        Q        Did Detective Elks assist you in any way
```

**J.A. 1515**

 1   in the Sharpe case?

 2        A       Not that I remember.

 3        Q       Do you remember taking Charlene to

 4   Wilmington after this?

 5        A       I do.

 6        Q       What do you remember about that?

 7        A       She was having some fears of staying

 8   here.  Detective Elks contacted Social Services, and the

 9   Social Services suggested that she go somewhere else.  And I

10   think all the possibilities that they came up with was not

11   agreeable with her and I think, I don't know how it came

12   about, but some home in Wilmington agreed to accept her.

13        Q       And why were you chosen as the person to

14   transport her to Wilmington?

15        A       I don't know.  Supervision did that, I

16   don't know.

17        Q       Did you talk with her on the way?

18        A       Her and her mother and the Social

19   Service Worker.  I'm sure we did.

20        Q       Were you all in the car together?

21        A       Oh, absolutely.

22        Q       And did you take notes about anything

23   you discussed in the car?

24        A       No, ma'am.

25        Q       Did you write a report about that?

```
 1        A        No.

 2        Q        At this point, she was the primary

 3   witness in the Dontae Sharpe case, correct?

 4                 MS. MARTINEAU:  Objection, leading.  You

 5        can answer.

 6        A        She was one of.

 7        Q        At this point, who was the other witness

 8   on April 7, 1994?

 9        A        I'm not sure.  I'm not sure, because I

10   don't know.

11        Q        Do you think it would be important to

12   document your interactions with the prosecuting witness

13   during the course of a homicide investigation?

14        A        Possibly.

15        Q        When would it ever not be?

16        A        My answer is possibly.

17        Q        When would it ever not be?

18        A        I don't --

19                 MS. MARTINEAU:  I object that you are

20        talking over each other.  Objection,

21        argumentative.  You can answer.

22        Q        When would it ever not be appropriate to

23   document interactions with a prosecuting witness in a

24   homicide investigation?

25        A        That is not the way it worked.
```

J.A. 1517

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                   **Page 186**

1        Q        Explain.

2        A        That's not the way I did my

3    investigations.

4        Q        Why not?

5        A        I'm going to leave that there.  That's

6    not the way I did my business.

7        Q        Why didn't you document interactions

8    with prosecuting witnesses in your investigations?

9        A        I'm not going to argue anymore.  That's

10   just my answer.

11       Q        This is not an argument, this is a

12   deposition, and I ask you questions and you respond to the

13   question.

14       A        My answer is I don't know.

15       Q        Where were you when Charlene came back

16   from Wilmington?

17       A        I don't know.

18       Q        I want to focus on the timeframe now

19   between Charlene's statement on April 7, 1994, and the

20   trial, okay, that time period?

21               MS. MARTINEAU:  Can you say when the

22           trial was.

23       Q        In 1995, in July of 1995.  During that

24   timeframe, how many interactions did you have with Charlene?

25       A        I have no idea.

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.

**David Ricky Best on 04/28/2023**                                    **Page 187**

| | | |
|---|---|---|
| 1 | Q | More than a handful? |
| 2 | A | Probably a handful. |
| 3 | Q | And did you document any of those? |
| 4 | A | There was nothing to document. |
| 5 | Q | Did you speak with her when you met with |
| 6 | her? | |
| 7 | A | I'm sure I did. |
| 8 | Q | Why would you not document your |
| 9 | conversations? | |
| 10 | A | There was nothing we talked about was |
| 11 | about this case, so, I mean, what would you document? | |
| 12 | | MS. MARTINEAU:  Don't be argumentative. |
| 13 | A | I'm saying, I don't mean to be, but, the |
| 14 | only thing I wrote down was I saw Charlene today at the | |
| 15 | Brown Building.  That's not the way that we did it.  I mean, | |
| 16 | that's just not, that's not the way we did it. | |
| 17 | Q | Do you think it's important for an |
| 18 | investigator to keep track of the amount of contact that | |
| 19 | they have had with the prosecuting witness in a homicide | |
| 20 | case? | |
| 21 | A | Depends. |
| 22 | Q | On what? |
| 23 | A | On what that interaction is. |
| 24 | Q | How many times would you say Charlene |
| 25 | came to the Police Department during that timeframe? | |

```
 1        A        I can't answer that because I wasn't

 2   always there.  When I wasn't there, she talked to Detective

 3   Melvin.  She talked to Connie Elks, she talked to Captain

 4   Hardy.  And I don't know who else, but, you know, when she

 5   would come and want to talk, she talked to those.

 6        Q        And what did she talk to those people

 7   about?

 8        A        I don't know.

 9        Q        You don't have notes of that either, do

10   you?

11        A        I wasn't present.

12        Q        Did any of them provide you notes after

13   talking with her?

14        A        I don't know.

15        Q        Do you think it would be important for

16   you to know who she had contact with at the department?

17        A        I'm not the lead detective.

18        Q        If she had given any of them an

19   inconsistent statement, wouldn't that be important for you

20   to know if it didn't match what she told you on April 7?

21        A        Possibly.

22        Q        But without any notes or reports, you

23   wouldn't have any way of checking that, would you?

24                 MS. MARTINEAU:  Objection.  You can

25            answer.
```

1       A       Possibly.

2       Q       How many times was Charlene provided

3    with snacks or foods or meals when she came to the GPD?

4       A       I don't know how many times.  It would

5    be, I don't know how many times.  But if she come there,

6    just like in police movies you see on TV, the first thing

7    the detective does is walk in with a bag of chips and a

8    drink before interviews.  That's what it was.  It was just,

9    it wasn't giving her anything, it was just, you know,

10    showing your gratitude.

11       Q       Gratitude for what?

12       A       For her being present.  For her coming.

13       Q       And was she interviewed every time she

14    came?

15       A       I didn't interview her anymore.

16       Q       Did anyone interview her anymore?

17       A       I wasn't present for any of that.

18       Q       And did anyone keep track of what was

19    given to her in terms of food when she came to the Police

20    Department?

21       A       No.

22       Q       What about other gifts that she was

23    given, what other gifts did Charlene receive from you or the

24    GPD during that timeframe?

25       A       Connie Elks, she was in charge of Family

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 190**

1   Services, and about two or three years prior to this, she

2   started this Family Services Christmas.  And so she would

3   have a little gathering and invite all the victims in her

4   cases, and so, she put it together.  She would send out the

5   invitations or call or whatever they did, and she would have

6   a little Christmas gathering, and she included Charlene and

7   her brother.  And I don't recall all that was given, but it

8   seems like there was a stereo and maybe a book bag or, it

9   wasn't much.  But that's what the Family Services gave her

10  for Christmas, her and him.

11         Q        Other than the Family Services gifts,

12  was there anything else given to Charlene at any other time

13  during that time period?

14         A        Not by me.

15         Q        Anyone else?

16         A        And not by anyone that I know.

17         Q        Was there any note or record made of

18  Charlene receiving gifts from Family Services?

19         A        I can't answer that question because

20  Connie Elks was in charge of all that.  So it was no note by

21  me.

22         Q        Were you aware at the time that she was

23  receiving those gifts from Family Services?

24         A        I was aware that she had a party, and

25  that, or gathering, or whatever you want to call it, and

**J.A. 1522**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                  Page 191

```
1   that she was going to get some gifts.  I didn't know what

2   those gifts were, but I know that everybody that came, not

3   just Charlene and her brother, but the other people that

4   came, also received similar gifts.

5          Q        But you didn't make any note or report

6   about that?

7          A        No.

8          Q        And there is also no notes or reports

9   about any food that she received when she stopped by the

10  station?

11         A        No.

12         Q        Do you think that it's important to

13  document what a prosecuting witness receives of any value --

14         A        No.

15         Q        Let me finish my question.  Do you think

16  it's important to document what any prosecuting witness

17  receives from a police agency regardless of whether it's

18  food or whether it's gifts, to document that so that is in

19  the file, do you think that's more --

20         A        No.

21         Q        Why not?

22         A        Everything that she received was less

23  than $25, and, like I said, you know, what she got from us,

24  was maybe a bag of chips and a soda.  And other than that,

25  what Connie put together, I don't know what the gifts were
```

**J.A. 1523**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                          Page 192

1    or where they came from, but all the other witnesses got

2    similar gifts, so it was Christmas and she was showing her

3    gratitude, I guess.

4           Q       What other witnesses got gifts?

5           A       I don't know.  There were two or three

6    families that was there also.

7           Q       Maybe you misspoke, but you said other

8    witnesses got gifts.

9           A       I misspoke.  I don't know what they

10   were, because Family Services was a pretty secret unit, so I

11   don't know what happened to them or what kind of victims or

12   what they were, but I know there was two or three other

13   families there besides Charlene.

14          Q       In your cases, did other witnesses

15   receive food on a regular basis?

16          A       No.

17          Q       Did other witnesses in your cases

18   receive gifts?

19          A       No.

20          Q       Did you make any note or report about

21   lobbying for her to get Crime Stoppers?

22          A       About what now, lobbying for her?

23          Q       Lobbying for her to get Crime Stoppers

24   money in this case?

25          A       My recollection is it was in the report,

**J.A. 1524**

1    but I wasn't sure.  But I believe it was in some report that

2    she received that money, but I'm not sure.  Maybe it's in

3    the trial transcript.  I have seen it before in some of

4    these documents, but no, I haven't.

5          Q      It's in the trial transcript.

6          A      Okay.

7          Q      But I haven't seen it in a report.

8          A      Okay.

9          Q      Is that something you remember

10   documenting?

11         A      No.  Because that, Crime Stoppers is a

12   secret kind of situation where you are not supposed to know

13   the people's names, and none of that is ever published.

14         Q      Don't you think that would be important

15   to include in the investigative file?

16         A      I don't.

17         Q      How frequently did your witnesses

18   receive Crime Stoppers money?

19         A      I don't remember any other one, other

20   than Charlene, receiving anything, because as I said, it was

21   a secret unit and I don't know who called into Crime

22   Stoppers and you are assigned a number, so I don't know how

23   to answer that question.

24         Q      When we were talking about documenting,

25   you said that's not the way we did it, when you said we, who

1  were you referring to as we?

2          MS. MARTINEAU:  Objection to the form of

3      the question.  You can answer.

4      A      Let me rephrase it and say I.

5      Q      Do you know how much time Charlene spent

6  at the District Attorney's office between the time of her

7  statement in April of 1994, and the time of the trial in

8  July of 1995?

9      A      I have no idea.

10      Q      Are you aware that she would hang out

11  there?

12      A      I know she became friends with, I

13  believe it was Penny Warren, or one of the people up there,

14  but I'm not sure.  But I know she would go by and say hi.

15      Q      Who is Penny Warren?

16      A      At the time she was the Victim Witness

17  Coordinator, I believe her title was, or something.

18      Q      When you were conducting an

19  investigation, did you ever use polygraph?

20      A      Occasionally.

21      Q      What is occasionally to you?

22      A      I don't know how to answer, I can't give

23  you a number.

24      Q      Well, how frequently?  Was it a common

25  thing in your investigation?

**J.A. 1526**

```
 1       A       Not really.

 2       Q       What would prompt you to do a polygraph

 3   in a case?

 4       A       Well, if the person was a suspect, that

 5   would be the reason that you would do it.  If a person was a

 6   witness, you would want to verify what they had told you was

 7   true.  So, it depends on whether they were a suspect or a

 8   witness.

 9       Q       And when would you want to polygraph a

10   witness?

11       A       When?

12       Q       What would make you want to polygraph a

13   witness, what circumstances?

14       A       If you wanted to verify what they told

15   you was true.

16       Q       And what about a suspect?

17       A       I guess the answer would be the same.

18       Q       Are you familiar with the standard

19   procedures for a polygraph?

20       A       No.

21       Q       Have you attended a polygraph?

22       A       Yes.

23       Q       And have you interacted with a polygraph

24   examiner?

25       A       Yes.
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                  Page 196

1      Q      And so, in Greenville, was there a

2    polygraph office?

3      A      Yes.

4      Q      Where was that?

5      A      On Charles Boulevard, at the SBI office.

6      Q      Were the polygraphs done by the SBI at

7    this time in 1994?

8      A      I believe so.

9      Q      I'm going to mark our next exhibit.

10                     NOTE:  The above referred to

11             polygraph report is now being marked and filed as

12             Exhibit 13.

13     Q      And when you have done polygraphs, you

14    have looked at the polygraph reports, correct?

15                     MS. MARTINEAU:  Objection to the form of

16             the question, leading.   You can answer.

17     A      Are you referring to what they fill out?

18     Q      When you get a polygraph report back as

19    a detective, you get that polygraph report and you have

20    reviewed that report before?

21     A      No, ma'am, I don't get the polygraph

22    report.

23     Q      How do you usually learn the results of

24    the polygraph?

25     A      From the DA's office.

1      Q        So, when you take someone for a

2   polygraph, you don't get the information from the polygraph

3   examiner?

4      A        Depends on circumstances.  Sometimes

5   they will tell you if they passed it or failed.  As far as a

6   number.  You never got a polygraph report like I see in

7   front of me now.  Never got something like this.  My

8   understanding was that their policy was to send it to the

9   DA's office.

10      Q        In this case, and you are looking at

11   Exhibit 13 is Charlene's polygraph report?

12      A       Uh-huh.

13      Q        Have you seen this before?

14      A       I have not.

15      Q        When you took her for her polygraph,

16   what do you recall about that examination?

17      A        I don't recall.  I read the report, says

18   that me and Melvin took her.  Went by her mom's house, got

19   her to sign the consent form, and then we took her to the

20   SBI.  After that, I don't know.

21      Q        Did you take notes about her going to

22   take a polygraph?

23              MS. MARTINEAU:  Objection to the form of

24              the question.  You can answer.

25      A       No.

```
 1        Q       I'm sorry?

 2        A       No.

 3        Q       Did you write a report about taking her

 4   for a polygraph?

 5        A       No.

 6        Q       When was the first time you saw this

 7   polygraph report?

 8                MS. MARTINEAU:  Objection, he said he

 9        didn't see it.

10        A       This one here?

11        Q       Uh-huh.

12        A       About two minutes ago, two seconds ago.

13        Q       That's what I was asking.  When did you

14   first learn the results of Charlene's polygraph?

15        A       About a year ago.

16        Q       And how did you learn the results?

17        A       I don't remember, somebody said that she

18   had passed it.  That's all that I remember.

19        Q       Who were you talking with about the case

20   that referred to the polygraph?

21        A       I don't know.  I don't have a clue.  I

22   just, I knew that she had taken one because we carried her,

23   but as far as the results, no one ever gave me these

24   results.

25        Q       Do you think the fact that you took her
```

1   to a polygraph would be the kind of thing that you should

2   include in the investigative file?

3          A       Possibly.

4          Q       When you say possibly, help me

5   understand why you wouldn't include information about taking

6   your primary prosecuting witness for a polygraph report, why

7   it isn't absolutely that you would put that in a report?  I

8   really want to understand that.

9          A       I don't know that there wasn't one.

10  Detective Melvin was the lead detective.  I don't know if

11  she typed up a report saying she took a polygraph.  She may

12  have even found the results, but I never saw the final

13  report when it left the Police Department going to the DA's

14  office and no time at the DA's office did I see it.  So I

15  don't know that it wasn't one done but it wasn't one done by

16  me.

17         Q       Do you see the date on this polygraph

18  report of when it was done?

19         A       It says April 19, 94.

20         Q       So, I just want to go through the

21  timeline of this investigation in brief.  February 11, 1994,

22  is when George Radcliffe is murdered, right?

23         A       Yes.

24         Q       April 7, 1994, is when you interview 14

25  year old Charlene Johnson, right?

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 200**

1        A        Right.

2        Q        Hours after that interview, on April 7,

3    1994, Dontae Sharpe is arrested, correct?

4        A        Correct.

5        Q        He was then indicted on April 18, 1994,

6    do you remember that?

7        A        I don't.

8        Q        Do you have a copy of the indictment?

9                 NOTE:  The above referred to

10            indictment is now being marked and filed as

11            Exhibit 14.

12       Q        I just handed you a copy of Dontae

13    Sharpe's indictment.  Do you see the date on there,

14    April 18, 1994?

15       A        I do.

16       Q        This polygraph is on April 19, 1994, the

17    day after his indictment.  Why did you take Charlene to be

18    polygraphed after he was indicted?

19       A        I don't know how to answer that.  I

20    don't know.

21       Q        Did the DA's office ask you to do that?

22       A        I don't know.

23       Q        If she hadn't passed, was the indictment

24    going to be dismissed?

25       A        I don't know.

1      Q      If it was inconclusive, was the

2  indictment going to be dismissed?

3      A      I don't know who suggested it.  I know I

4  scheduled it, but I don't know who suggested it.

5      Q      So, as of the date that Dontae was

6  arrested, and as of the date that Dontae was indicted, there

7  was no physical evidence tying him to the murder.

8  Fingerprints didn't match him, no murder weapon was found,

9  Charlene's account of what occurred was inconsistent with

10  the autopsy.  Then she is polygraphed.  At that point, we

11  are now close to May, right?

12            MS. MARTINEAU:  Objection to the form of

13            that question.  Move to strike the testimony.  You

14            can answer.

15      A      I don't understand what your question

16  was.  What do you mean we are close to May?

17      Q      So April 19, right -- what probable

18  cause did you have at that point in time to arrest Dontae

19  Sharpe on April 19, 1994?

20      A      April the 19th?  I presented to the

21  grand jury the evidence that we possessed and they saw fit

22  to issue an indictment.

23      Q      I'm going to hand you what has been

24  marked as Exhibit 15.

25                  NOTE:  The above referred to

```
 1          document is now being marked and filed as

 2     Exhibit 15.

 3          Q        This is a supplementary investigative

 4     report and down at the bottom where you can write

 5     information, you see it says case status closed, cleared by

 6     arrest, right?

 7          A        Yes.

 8          Q        And then down in the lower left hand

 9     corner it says the date, 5-4-94, right?

10          A        Correct.

11          Q        Had you ever talked to Beatrice Stokes

12     by the time this report was written?

13          A        I don't know what date I talked to

14     Beatrice Stokes.

15          Q        Did you know Beatrice Stokes before May

16     of 1994?

17          A        Yes.

18          Q        How did you know her?

19          A        I investigated a case out of the trailer

20     park early on, when I became a detective, and a man had been

21     stabbed in the leg, and she was very nice and gave me

22     information as to who had done it.

23          Q        Was there another time you interacted

24     with her in terms of an investigation?

25          A        Not that I can remember.  I would see
```

J.A. 1534

1   her periodically on the street, I would speak to her, but

2   another case, I don't remember.

3         Q        And this case you reference where

4   somebody was stabbed, is that the first time that you met

5   her?

6         A        Yes.

7         Q        And how was it that she came to your

8   attention?

9         A        My recollection is that she was at the

10  crime scene.  But that's been 30 years ago, too.

11        Q        I'm going to mark our next Exhibit 16.

12                        NOTE:  The above referred to

13              document is now being marked and filed as

14              Exhibit 16.

15        Q        I have handed you an incident report,

16  and this is from August 22, 1993.  And on the front page,

17  you will see Beatrice Stokes is the victim.  Do you see

18  that?

19        A        I do.

20        Q        And it says that the MO, victim was

21  pulled into the room and sexually assaulted.  Do you

22  remember working on this case?

23        A        I do not.

24        Q        If you turn to, at the bottom, you will

25  see a little number, GPD00.  If you turn to GPD-0013 --

```
 1        A        Uh-huh.

 2        Q        And this is the supplemental report?

 3        A        Correct.

 4        Q        And then you flip to the second page,

 5   and your name is there at the bottom, Detective DR Best, and

 6   your signature.  Do you see that?

 7        A        I do.

 8        Q        Was this a report that you wrote?

 9        A        It appears to be mine, yes.

10        Q        You don't have a recollection of writing

11   this report?

12        A        I don't.

13        Q        Do you have any memory of whether this

14   case where she was a victim, was before or after the time

15   that you met her when she was at the crime scene and there

16   was a stabbing?

17        A        Seemed like to me the stabbing was like

18   in like 90 or something, right after I became a detective.

19   It could have been even back when I was a patrol officer,

20   because I mean, I don't remember.  But it was at the trailer

21   park across the river and that was the circumstances.  But

22   this was 93, so, it was several years after that.

23        Q        What did you know about Beatrice Stokes?

24                 MS. MARTINEAU:  What timeframe?

25        Q        Around this same timeframe, in May of
```

1   1994, what did you know about Beatrice Stokes?

2          A          Beatrice had a substance abuse problem.

3   And you see her and she was straight as an arrow, and then

4   two weeks later, you would see her and she was off the

5   wagon.  Very nice, very friendly lady.  But that's about all

6   I knew about her.

7          Q          You knew she smoked crack?

8          A          I knew she was a substance abuser.  I

9   don't know what kind of stuff she did, but I knew she was a

10   substance abuser.

11          Q          How did you know that?

12          A          Well, it was very obvious to see her at

13   times and you know that she was out there.  So, one would

14   assume that that's what was her problem.  I didn't ever see

15   her do drugs, but you could tell that she had some problems.

16          Q          How could you tell?

17          A          By her appearance, and just, I mean, she

18   talked to you, the eyes and the demeanor and stuff.

19          Q          And when you say the eyes and the

20   demeanor, what are you referring to?

21          A          Well you know her eyes would be

22   bloodshot or wide open, and then you could tell she wasn't

23   quite herself.

24          Q          Was she someone you considered an

25   informant?

```
 1      A       Not really.  She had given me

 2  information in the past that proved to be reliable and that

 3  is the definition of an informant.  But I didn't go seek her

 4  out all the time, or those kind of things, to get

 5  information.

 6      Q       What information had she given you in

 7  the past that turned out to be reliable?

 8      A       The person at the trailer park who did

 9  the stabbing.

10      Q       Anything else?

11      A       That's all I can remember.

12      Q       Do you believe there were other times

13  that you just don't remember?

14      A       Possibly.

15      Q       Was the case involving the knife, was

16  that also a drug case?

17      A       I don't think so.

18      Q       When Beatrice reached out to you in May

19  of 1994, regarding the Dontae Sharpe case --

20      A       Yes.

21      Q       How did she do that, describe the

22  circumstances for me.

23      A       I was in the area up where the crime

24  occurred, the murder occurred.  And I don't know exact, what

25  location I was, but I was in the area, and I saw her.  And
```

1   she walked up to the car and she was very afraid, very

2   scared.  And she says, I have some information for you, but

3   I'm not talking here, can I get in the car?  And she got in

4   the car.  I pulled a couple streets over to a place called

5   Quadrangle.  And she told me the information that she would

6   testify to in court.  And she jumped out of the car.  She

7   told me, you better not write nothing down or I'm getting

8   out.  And so I didn't write nothing down, I didn't move, I

9   just sat there in the front seat of the police car and she

10   was in the back, and she told me what she told me and she

11   got out and left.

12          Q       What did she tell you?

13          A       Whatever she testified to.

14          Q       Do you remember what that was?

15          A       I don't.

16          Q       And you took no notes?

17          A       I left the Quadrangle and I drove

18   straight to the DA's office and told the DA's office what

19   she had told me, and unfortunately, I never made a report.

20          Q       Why did you go to the DA's office?

21          A       Because I thought Clark needed to know

22   that.

23          Q       Had the DA expressed to you concerns

24   about the case?

25          A       No.

**J.A. 1539**

```
 1        Q        Had Dontae already been arrested by this

 2   point in time?

 3        A        I think so.  And then I left the DA's

 4   office and went straight to Detective Melvin's office and

 5   told her what had happened.

 6        Q        Did she tell you to write a report about

 7   it?

 8        A        No.

 9        Q        Did you choose to write a report about

10   it?

11        A        No.

12        Q        Didn't you think it would be important

13   to write a report about information you just received from

14   someone that related to the murder for which you only had

15   one witness?

16        A        Possibly.  But I didn't, so.

17        Q        Why not?

18        A        I can't answer that question.

19        Q        You knew Beatrice Stokes had a criminal

20   record, right?

21        A        I do.

22        Q        And at the time that you spoke to her in

23   May, you said she was on the street.  When she talked to

24   you, she wasn't in jail at the time?

25        A        No.
```

J.A. 1540

```
1      Q      Did you ever help her get out of jail
2  for any of her charges?
3      A      No.
4      Q      I'm handing you what I have marked as
5  Exhibit 17.
6                     NOTE:  The above referred to
7             document is now being marked and filed as
8             Exhibit 17.
9      Q      And these are a few of Beatrice Stokes'
10 charges.  And if you look up on the first page, the offense
11 date is May 2, 1994, do you see that?
12     A      Okay.
13     Q      And then if you scroll further down
14 under where it says District Court offense information, the
15 charge was disorderly conduct, do you see that?
16     A      Yes.
17     Q      And then go ahead and flip two pages.
18 Next the offense date is also May 2, 1994.  And then if you
19 go down, you see that here the charge is possession of drug
20 paraphernalia?
21     A      Okay.
22     Q      And then turn two more pages and again
23 another charge on May 2, 1994.  And scroll down, and it's
24 fictitious information to officer.  Do you see that?
25     A      I do.
```

```
1        Q        And this is May 2, 1994.  And you had

2   testified that you spoke with Beatrice sometime in mid May.

3   Were you aware that she had these charges pending when you

4   spoke with her?

5        A        I was not.

6        Q        And you see on all of these when it has

7   the same offense date, it usually means it's the same

8   incident, you have been charged together for those.  These

9   cases were all resolved on July 26, 1994, if you go back to

10   the section that says District Court Office.  Underneath

11   each one you will see the plea and then disposed on

12   7-26-1994, do you see that?

13             MS. MARTINEAU:  Do you want him to look

14        at every single page?

15        Q        If you want to assure yourself?

16             MS. MARTINEAU:  Objection to the form of

17        the question.  Objection to testimony of counsel.

18        A        I see that 1994.

19        Q        Do you know how those charges were

20   resolved?

21        A        I have no idea.

22        Q        When you spoke with Beatrice in May of

23   1994, did you ask her why she waited from February to May to

24   tell you what she told you?

25        A        It's been a long time, but I don't
```

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 211

1    remember that, no.

2          Q        Would that be important information to

3    you?

4          A        Possibly, but she was giving the

5    information, so, I didn't, I didn't question her.

6          Q        Why not?

7          A        She was giving the information.

8          Q        You knew she was a substance abuser?

9                   MS. MARTINEAU:  Objection, asked and

10               answered.

11         A        I did.

12         Q        You knew she had a criminal record?

13         A        I did.

14         Q        Did you think it was important to verify

15   what she told you?

16         A        Ma'am, I don't know of ever getting a

17   witness off the front row of a Baptist Church.  So, you

18   know, these witnesses may have records, but it doesn't make

19   them a bad person or a liar or any of those things.  So, she

20   was willing to give the information, I was willing to

21   listen.

22         Q        Well, even a witness from the Baptist

23   Church, you want to corroborate their statement, don't you?

24                  MS. MARTINEAU:  Objection, leading

25               argumentative.  You can answer.

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 212**

```
 1        A        Possibly.

 2        Q        When would you ever not want to

 3   corroborate a statement?

 4        A        I can't answer that, because all these

 5   cases are different.

 6        Q        When you are out patrolling,

 7   investigating, you have your field notebook with you?

 8        A        No.  I didn't use field notebooks, I

 9   used these things, whatever they are called.

10        Q        A legal pad?

11        A        Okay.

12        Q        Did you always have a legal pad with

13   you?

14        A        I had it inside of a folder, a leather

15   folder, yes.

16        Q        So you had something that you could

17   write notes on when you were out patrolling and

18   investigating?

19        A        Probably.

20        Q        Well, wouldn't it be important to write

21   important things down as soon as they are learned by you?

22                 MS. MARTINEAU:  Objection.  Asked and

23                 answered.  You can answer.

24        A        Possibly.

25        Q        Well, there is a reason that officers
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                   **Page 213**

 1   are trained as soon as they go to BLET, that you always

 2   carry a field notebook or something that you can write in

 3   immediately, right?  Is there a reason for that?

 4          A      I never was given that information in my

 5   BLET class.

 6          Q      You weren't?

 7          A      Not in 1973, no.

 8          Q      You didn't have information about field

 9   notes in 1973?

10          A      I don't know about that.

11          Q      You weren't told to document in 1973?

12          A      In fact, we didn't even have field

13   notepads when I came to work in the police department.

14          Q      At the Greenville Police Department, you

15   didn't have field notebooks?

16          A      I never got one.

17          Q      So, if the BLET was teaching that, that

18   is not something that the Greenville Police Department

19   followed?

20                 MS. MARTINEAU:  Objection,

21          argumentative.  You can answer.

22          A      I can't answer that question.  I'm just

23   saying I didn't use a field, whatever you said that was.

24          Q      A field notebook?

25          A      Yeah, I never used that.

**J.A. 1545**

```
 1        Q        After Beatrice left your car, there was

 2   no reason why you couldn't take notes about what she told

 3   you, was there?

 4        A        She told me not to, and that she was

 5   scared, you know.  She wanted to get out of there.  So I

 6   left there and went straight to Clark's house.  I didn't

 7   take time to do nothing else.

 8        Q        But nothing is stopping you from writing

 9   down notes?

10                 MS. MARTINEAU:  Objection,

11                 argumentative.  Asked and answered.  You can

12                 answer.

13        A        Nothing is stopping me.

14        Q        At this point, you didn't have another

15   witness that corroborated what Charlene Johnson had said

16   though, right?

17                 MS. MARTINEAU:  Objection, leading.  You

18                 can answer.

19        A        I can't answer that question.  I didn't

20   see the report before Detective Melvin turned it in.

21        Q        When you don't document a statement,

22   there is no way for you to know to what extent, if any, that

23   person's trial testimony is different than the statement

24   they gave you, is that fair?

25                 MS. MARTINEAU:  Objection.  You can
```

**J.A. 1546**

```
 1        answer.

 2        A       Ask that again.

 3        Q       If you don't document the conversation

 4   you have with someone, let's take this scenario, you have no

 5   notes from talking to Beatrice Stokes, right?

 6        A       Right.

 7        Q       You have no written report from talking

 8   to Beatrice Stokes, correct?

 9        A       Correct.

10        Q       Melvin has no notes about your

11   conversation with Beatrice Stokes, right?

12        A       Correct.

13        Q       At trial, and Beatrice Stokes now

14   testified, there is no way you or anyone knows whether her

15   testimony conflicts in any way with what she said to you in

16   May of 1994, isn't that true?

17                MS. MARTINEAU:  Objection, leading.  You

18        can answer.

19        A       No.

20        Q       I mean, you can't even tell us what date

21   she spoke to you in May of 1994, right?

22        A       Correct.

23                MS. PFEIFFER:  Why don't we take a short

24        break.

25                THE VIDEOGRAPHER:  Going off the record.
```

```
 1          The time is 3:42 p.m.

 2                     NOTE:  At this time a short

 3     recess was taken.  After which time, all parties

 4     present as before, the matter continues as

 5     follows:

 6                THE VIDEOGRAPHER:  Going back on the

 7     record.  The time is 3:58 p.m.

 8     Q        I would like to talk to you about

 9  another potential suspect in this case.  In 1994, do you

10  recall were there other suspects?

11          A        The only one that I can remember early

12  on, I think, was Marshanna.  And other than that, not that I

13  remember.

14          Q        And when you say Marshanna, we are

15  talking about Wilbur Mercer?

16          A        That's him.

17          Q        And he is the same one who came there

18  the night of the crime scene asking for his jacket, which

19  was in the car, right?

20          A        Yes.

21          Q        And the jacket had blood on it?

22                MS. MARTINEAU:  Objection to the

23     question.

24          A        I can't answer that.  I don't think I

25  have seen it.
```

J.A. 1548

```
 1        Q       Why was Mercer a suspect?

 2        A       In the report he had a coat in the

 3  vehicle and that would put him pretty much on the suspect

 4  list automatically.

 5        Q       And how was he ruled out as a suspect?

 6        A       I don't remember exactly, other than I

 7  think there were like two interviews.  I didn't participate

 8  in those, that I remember.  So, that's all I can say is, I

 9  think they interviewed him a couple of times and they

10   decided he wasn't it.

11        Q       Did you play any role in ruling him out

12   as a suspect?

13        A       I did not.

14        Q       Do you think it would be important to

15   rule him out as a suspect?

16        A       Carolyn Melvin was the lead detective

17  and so I'm sure that we talked about it.  What we talked

18  about, I don't know, because it's been 30 years, but I mean,

19  he was not a suspect.

20        Q       But given the fact that he was with the

21  victim hours before the murder, his clothing was in the car,

22  he showed up to the crime scene, and he said he planned to

23  take money from the guy.  Wouldn't it be important to rule

24  him out as a suspect?

25        A       As far as I know, they did.  Or we did.
```

1        Q        And on what basis?

2        A        I can't answer that question.

3        Q        What about Damien Smith, was Damien

4    Smith a suspect?

5        A        I guess I could answer that by saying

6    no, and explaining.  No, Damien Smith committed suicide a

7    few days after, and I responded and Melvin responded.

8    Melvin got the case, and he shot himself in the head with a

9    .25 caliber gun that I found in the garbage can out back.

10   So, the murder weapon, my understanding, was a .45 and he

11   had a .25, so, nothing about Damien Smith that I can

12   remember led him to be a suspect.

13       Q        Well, Tracy Highsmith testified that he

14   claimed to have shot George Radcliffe, right?

15                MS. MARTINEAU:  Objection to leading.

16       You can answer.

17       A        I can read her testimony.  I don't

18   remember that, no.

19       Q        Was Damien Smith a drug dealer in

20   Greenville?

21       A        I never had any dealings with him, so I

22   can't answer that question.

23       Q        Did you know who he was before the call

24   to the shooting?  Let me clarify.  Did you know who he was

25   before you were called to the home where he was found shot,

1   where Damien Smith was found shot?

2        A        I don't think so.  I remember sitting

3   here that I believe that he had been named as a suspect in

4   shooting Damien Smith in the buttocks, but that's just what

5   I remember.

6        Q        So, Damien Smith was never considered a

7   suspect?

8                 MS. MARTINEAU:  Objection.  You can

9        answer.

10       A        Not to my knowledge.

11       Q        I'm handing you what I have marked as

12   Exhibit 18.

13                NOTE:  The above referred to

14        document is now being marked and filed as

15        Exhibit 18.

16       Q        And these are your responses to our

17   first set of interrogatories.  Do you remember receiving

18   these?

19       A        I presume.  I, to be honest with you,

20   no, I don't remember receiving these, but I know there has

21   been paperwork in the past and this may be part of it.

22       Q        Do you recall providing answers to the

23   questions that we asked you?

24       A        I remember talking to my attorneys.

25   This may be part of that, yes.

```
 1        Q        Do you remember reading through this

 2  document?  You can feel free to flip through where we asked

 3  questions and you provided answers.

 4        A        I guess my answer is yes.

 5        Q        So, these are your answers?

 6        A        Yes.

 7        Q        I would like you to turn to question

 8  number six, which is describe in detail all investigative

 9  actions you took regarding the murder of George Radcliffe

10  between February 11, 1994, and July 27, 1995.  Do you see

11  where I am?

12        A        I do.

13        Q        And if you flip to the next page, that

14  is your response and there are some bullet points there.

15        A        Okay.

16        Q        Which of these actions, the bullet point

17  actions, were taken between February 11, 1994, the date of

18  the murder, and April 7, 1994, the date that Dontae was

19  arrested?

20        A        I have no idea.

21        Q        Do you have any notes reflecting any of

22  these investigative steps that you took?

23        A        I have none.

24        Q        Do you have any reports documenting any

25  of these investigative steps that you took?
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                   **Page 221**

1          A       I have none.

2          Q       Why did you not make any notes or

3    reports about any of these investigative steps?

4          A       The Candice Johnson one, as I put in my

5    report, or maybe it was court testimony, that I went to her

6    house by mistake, which would have been on the same day as

7    Charlene's testimony, Charlene's statements, and I think

8    that was April the 7th.

9          Q       My question is not about what you

10   testified to, my question is why you did not make any notes

11   or create any written reports about any of the investigative

12   tasks that are listed here in response to question number

13   six?

14         A       I don't know.

15         Q       In 1994, did you have any process to

16   evaluate inconsistencies in the various pieces of evidence

17   that were gathered in the case?

18         A       Ask that question again.

19         Q       In 1994, did you have any process to

20   evaluate inconsistencies in various pieces of evidence in a

21   case?

22         A       It's about 30 years, but I don't

23   remember one, no.

24         Q       What role did your supervisor, your

25   sergeant play in overseeing your investigation in this case,

**J.A. 1553**

1   in the Dontae Sharpe case?

2        A       Yet again, the sergeant usually confers

3   with the lead detective.  I was not the lead detective.  So

4   I don't know what, and I don't know what sergeant we had at

5   the time, so, I can't answer that question.

6        Q       Did you ever meet with the sergeant

7   about your work in this case?

8        A       Not that I remember.

9        Q       Did the sergeant ever review your work

10   in this case?

11        A       Not that I remember.

12        Q       How would new information be evaluated,

13   if it conflicted with other information or other evidence in

14   the case?

15        A       I guess you would say it depends on what

16   the information was.

17        Q       Well, for instance, in this case, if you

18   got the autopsy late, because you said they were coming back

19   late?

20        A       They were.

21        Q       How would that autopsy be evaluated in

22   light of the other evidence you gathered in the case, what

23   would you do?

24        A       First of all, the autopsy wouldn't have

25   come to me, and it wouldn't have gone to Detective Melvin.

1    That's not the way they did it back then.  They sent the

2    case to the DA's office and you got your information from

3    the DA's office.  That's my recollection.  I don't ever

4    remember getting the autopsy report.

5            Q        It's important for a detective in a

6    homicide case to see an autopsy report, isn't it?

7                    MS. MARTINEAU:  Objection, argumentative

8            and leading.  You may answer.

9            A        Possibly yes.

10           Q        When would it not be important?

11           A        I guess if there is no questions to be

12   asked, or anything that need to be explained, but I don't

13   ever remember, in my many years, of getting an autopsy

14   report and presenting that to the other officer, or other

15   detectives in the case.  I don't remember that.

16           Q        You don't remember ever looking at an

17   autopsy in a homicide case and comparing it to the other

18   evidence that you have gathered in that case?

19                   MS. MARTINEAU:  Objection, that's not

20           what he said.  You may answer.

21           A        I didn't say that and my story is that I

22   don't ever remember having a copy of an autopsy report to

23   compare to anything, unless I went to the DA's office and

24   got a copy of it.  I mean, that's not the way it worked, not

25   back then.  I don't know how it works now, but back then

J.A. 1555

1   that's not the way it worked.

2        Q        So, what did you have that corroborated

3   Charlene's statements?

4        A        Her statement.

5        Q        Yeah.

6        A        Her statement.  That's what we had to

7   corroborate it.  And the polygraph test that I thought she

8   passed.

9        Q        What made you think she passed the

10  polygraph?

11       A        Somebody told me that.  I cannot tell

12  you who it was, but somebody told me that.

13       Q        And when did they tell you that?

14       A        Some time in the investigation.  And I

15  can't say when.

16       Q        I thought earlier you testified that

17  someone told you that a year ago?

18       A        A year ago, is when I found out that

19  there was a copy of the report available.  But someone, when

20  asked about the polygraph, someone told me that she passed.

21  I didn't realize it was a copy anywhere.  Because copies

22  were sent from the SBI office to the DA's office.

23       Q        Wouldn't that be important information

24  to document in your investigative file if someone told you

25  she passed her polygraph test?

J.A. 1556

1        A        I think I was long gone before that

2   information came about.

3        Q        What do you mean you were long gone?

4        A        I think I was retired by then.

5        Q        By the time you, someone told you she

6   had passed her polygraph, you were retired?

7        A        And I may have misspoke when I said

8   that.  I don't know when I found out.  I will answer it that

9   way, because I really do not know.

10       Q        But in any event, you don't think it was

11   during the investigation?

12                MS. MARTINEAU:  Objection.

13       A        Honestly, I can answer it by saying I

14   really don't know.

15       Q        If it was during the investigation, that

16   would be important to document for this very reason,

17   wouldn't it?

18       A        Yet again, the SBI office sends them to

19   the DA's office and they are the ones who find out whether

20   they passed or failed.

21       Q        I'm talking about your testimony that

22   somebody told you she passed?

23       A        Somebody did, yes.

24       Q        And somebody told you that during the

25   investigation, that would be something important to

1    document, right?

2              MS. MARTINEAU:  Objection, asked and

3         answered.  You can answer.

4         A       Possibly, yes.

5         Q       Can you give me any circumstance where

6    it would not be important to document that someone told you

7    your main prosecuting witness had passed a polygraph test?

8         A       I can't.

9         Q       I'm handing you what we have marked as

10   Exhibit 19.

11              NOTE:  The above referred to

12        document is now being marked and filed as

13        Exhibit 19.

14        Q       Exhibit 21, are notes taken during the

15   interview?

16        A       Is it 21 or 19?

17        Q       Oh, I'm sorry, 19.  Exhibit 19 are notes

18   taken from the interview with Dontae Sharpe.  You are

19   familiar with these, right?

20        A       I am.

21        Q       These are your notes, correct?

22        A       They are.

23        Q       Why did you write down notes in this

24   interview?

25        A       I can't answer that question, other than

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 227

1  this was an arrest interview and what usually transpires in

2  an arrest interview, is that the lead detective is the one

3  who does the note taking, and what transpires so you can put

4  it in the form of a case file.  When I found out these

5  existed, I can't remember, I believe I was in court.  I

6  don't know exactly, but I believe I was in court when I was

7  informed that there was not an interview written up on the

8  Dontae Sharpe arrest.  And at the time, I had a case file on

9  this case, and so, I looked in it, and I found my notes from

10  the Dontae Sharpe interview.  And they are just rough notes,

11  and the best I remember, these were entered into evidence at

12  the time of trial about Dontae's interview.

13        Q       Why did you write notes down in Dontae's

14  interview, and not Charlene's, what was different?

15        A       Every case is different.  Every

16  interview is different.  And I don't know how to answer your

17  question.  So, we had been told by Officer Shrock what she

18  said.  She came in and was interviewed, she said that, she

19  put it on paper.  I was good with that.

20        Q       I'm trying to understand why on the very

21  same day that you interviewed Charlene, just hours later,

22  this interview is at 4:25 p.m. on April 7, 1994, right?

23        A       It is.

24        Q       So your notes at the top there indicate

25  the day that you were doing the interview, is that right?

**J.A. 1559**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 228**

```
 1       A      Yes.

 2       Q      And the time.

 3       A      Yes.

 4       Q      Okay.  And you had finished with

 5   Charlene about three hours earlier?

 6       A      Okay.

 7       Q      Is that right?

 8       A      Okay.

 9       Q      You did not take notes during the

10   interview with Charlene?

11       A      I did not.  I don't know if Detective

12   Melvin did or not.

13       Q      You did take notes during the interview

14   with Dontae?

15       A      I did.

16       Q      Why was this interview different?

17              MS. MARTINEAU:  Objection.  Asked and

18       answered.  You can answer.

19       A      I can't answer that other than saying

20   this was a man that had been arrested for murder, and I was

21   the second chair, and you know, I took notes.

22       Q      So you knew you were going to arrest him

23   for murder before this?

24       A      No.  I said he had been arrested for

25   murder.  I was in the interview, and so I took notes.
```

**J.A. 1560**

1      Q      So, you arrested Dontae before you

2   interviewed him?

3      A      I sat in on the interview with Dontae

4   after he had been arrested.  I don't know what time he got

5   arrested.  This says 4:25.  I can't answer what time he was

6   arrested.  Maybe I did the time wrong, I don't know.  But

7   this is the notes from the interview of Dontae Sharpe after

8   he was arrested.

9      Q      And this was hours after talking to

10   Charlene?

11            MS. MARTINEAU:  Objection, asked and

12         answered.

13      A      It was.

14      Q      So, what I'm trying to get clear on, is

15   Dontae was interviewed after being arrested, and the only

16   thing you had tying him to the case at that point in time

17   was the statement from Charlene Johnson, correct?

18            MS. MARTINEAU:  Objection to the form of

19         the question.  You can answer.

20      A      I can't answer that.

21      Q      Why not?

22      A      Detective Melvin was the lead detective.

23   I don't know what she had.  I don't know what she had.  I

24   mean, I didn't see her file when she sent it to the DA's

25   office.  I don't know what she had.

```
 1        Q        Were you aware of anything, other than
 2   the statement by Charlene that tied Dontae to this?
 3        A        I was not, no.
 4        Q        When, you interviewed him three hours
 5   after talking to Charlene?
 6        A        Okay.
 7        Q        Your notes reflect that he gave you his
 8   whereabouts at various times, right?  We have five o'clock
 9   here, me and Carlston Robinson, then we have eight o'clock.
10   What you are writing down is where he said he was at various
11   points in time, correct?
12        A        Right.
13        Q        And he gave you a number of alibi
14   witnesses in here, right?
15                 MS. MARTINEAU:  Objection, leading.  You
16        can answer.
17        A        Carlston Robinson was one of them.
18        Q        Uh-huh.  Well Carlston Robinson was the
19   first one.  Did you go interview Carlston Robinson?
20        A        I didn't.  But I think Detective Melvin
21   did.
22        Q        Did she write notes about that?
23        A        I don't know.
24        Q        Do you know whether Carlston Robinson
25   provided an alibi?
```

J.A. 1562

1      A      I don't know.

2      Q      He also mentions Kissey Page in here?

3      A      Yes.

4      Q      Did you interview Kissey Page about the

5  alibi?

6      A      No.

7      Q      Why not?

8      A      I don't know.  I don't know if Detective

9  Melvin did or not, or whether or not Corporal Elks did or

10  not.  I mean, did that come up during her interview with

11  Kissey.

12      Q      Did you ever see a report of someone

13  talking to Kissey Page about Dontae Sharpe's alibi?

14      A      I did not.

15      Q      He also gave you the name Patricia Hicks

16  as an alibi, did you interview Patricia Hicks?

17              MS. MARTINEAU:  Objection to the form of

18          the question.  You can answer.

19      A      I did not.

20      Q      Why not?

21      A      I don't know that Detective Melvin

22  didn't.

23      Q      Did you interview --

24      A      I did not.

25      Q      Why not?

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 232**

1              MS. MARTINEAU:  Objection, asked and

2         answered.  You can answer.

3         A       I was not the lead detective.

4         Q       He also gave the name Patricia Ann Ward.

5    Did you interview Patricia Ann Ward?

6         A     I did not.

7         Q       Now, I notice on the second page at the

8    end of your note, there is not a signature by Dontae, but

9    Charlene does have a signature on hers.  Why did you not

10    have him sign his statement?

11         A       This is not notes.  It's not a

12    statement.  This is my notes from his statement.

13         Q       Did he write anything down?

14         A       Not that I remember.

15         Q       Why did you not ask him to write

16    something down the way you asked Charlene?

17         A       I wasn't the lead detective and I can't

18    answer that question.

19         Q       Dontae also wanted you to talk to Alrico

20    Carmon, do you remember that?

21              MS. MARTINEAU:  Objection to the form of

22         the question.  You can answer.

23         A       I did not.

24              MS. MARTINEAU:  Do you remember that?

25         A       I don't even remember that name.

**J.A. 1564**

1        Q        I'm handing you what we are going to

2    mark as Exhibit 20.

3                         NOTE:  The above referred to

4            document is now being marked and filed as

5            Exhibit 20.

6                 MS. PFEIFFER:  And I am going to have to

7            give you guys a Bates number.  Elizabeth, you can,

8            we can send it on later.  It's Pitt County 8954.

9            And we are marking it as Exhibit 20.

10                MR. ELLIS:  What is it?

11   BY MS. PFEIFFER:

12       Q        What this is, is a letter from Clark

13   Everett to you.  Your attorney has your copy there.

14                MS. MARTINEAU:  Do you want to see it,

15           Nick?

16                MR. ELLIS:  If you will just kind of

17           give me the date on it, if you don't mind.

18                MS. MARTINEAU:  July 26, 1994.  Looks

19           like a letter from Clark Everett, Detective Ricky

20           Best.  Take a look at it.

21                MR. ELLIS:  All right.

22       Q        Do you remember receiving this letter

23   from Clark Everett?

24       A        I do not.

25       Q        Any idea why it is addressed just to you

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 234**

1    and not Carolyn Melvin?

2          A        I can't answer that question.

3          Q        Do you remember Clark Everett asking you

4    to make arrangements for Dontae Sharpe and Alrico Carmon to

5    take a lie detector test?

6          A        I do not.

7          Q        If Clark Everett asked you to do that,

8    would that be something you would do?

9          A        If he asked me.

10          Q        And the reason why you wouldn't have

11   given Alrico Carmon a lie detector test if Clark Everett

12   asked you to do so?

13          A        I would be happy to.  As far as I know,

14   I haven't seen this report, and I know I didn't schedule any

15   polygraphs for Dontae Sharpe or Alrico Carmon.

16          Q        Do you recall that in 1997, Mr. Sharpe

17   filed a motion for appropriate relief?  Do you recall that?

18          A        Yes.

19          Q        And there was a hearing on that MAR, do

20   you remember?

21          A        Yes.

22          Q        How did you learn about the MAR being

23   filed?

24          A        Honestly, I don't know.  I don't

25   remember.  I don't know if Clark called me or how it was, I

**J.A. 1566**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                              Page 235

1   don't know.

2        Q       You had worked with Clark Everett

3   before?

4        A       My whole career.

5        Q       A number of homicide cases?

6        A       My whole career.

7        Q       We can agree that -- if you could listen

8   to my questions instead of reading the transcript.

9        A       No problem with that.

10               MS. MARTINEAU:  That's okay.  Just want

11           to make sure you understand.

12       A       Yes.  I'm so tired now I can only think

13   of one thing at a time.

14               MS. MARTINEAU:  If you need to take a

15           break, let me know, but I want you to pay

16           attention.

17       Q       You worked with Clark frequently?

18       A       Yes.

19       Q       We can agree he is a thorough district

20   Attorney.

21       A       Yes.

22       Q       And one of the things he would do is

23   meet with you, as we discussed before, before a case?

24               MS. MARTINEAU:  Objection to the form of

25           the question.  You can answer.

```
 1        Q        Yes.  And before this, a meeting before

 2  a case was the, the purpose was to make sure he knew what

 3  the evidence was, right?

 4                 MS. MARTINEAU:  Objection.  Leading.

 5        You can answer.

 6        A        I presume that's the reason.

 7        Q        He wouldn't put a witness up on the

 8  stand if he didn't know what they were going to say, right?

 9                 MS. MARTINEAU:  Objection.  You can

10        answer.

11        A        Probably not.

12        Q        And that's why prep is important?

13        A        Yes.

14        Q        Before the MAR, in 1997, did you meet

15  with Clark Everett?

16        A        I honestly don't know.

17        Q        Would that be the practice if there was

18  going to be a hearing?  Would Clark normally meet with you

19  to talk with you about your testimony?

20        A        I honestly don't know.

21        Q        Can you ever recall a time when you

22  worked with Clark Everett and you testified for him in a

23  hearing, that he didn't meet with you in advance to make

24  sure he knew what you were going to testify to and you were

25  aware of what he wanted to know from you?
```

**J.A. 1568**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 237**

```
 1        A       We talked a lot, but I mean, I'm sure he
 2   told me where and when.  But the other part, I don't know
 3   the answer to.
 4        Q       But I'm asking about the practice, if
 5   you ever had an experience where working with Clark and he
 6   was going to call you as a witness to testify, under oath,
 7   in court, can you ever think of a time that he wouldn't have
 8   met with you first?
 9              MS. MARTINEAU:  Objection, asked --
10        Q       To be clear about what your testimony
11   was going to be?
12              MS. MARTINEAU:  Objection, asked and
13              answered.  You can answer.
14        A       I don't know.
15        Q       It was a normal practice?
16        A       Yes.
17        Q       Would you take notes during any of your
18   meetings with the DA before testifying?
19        A       No.
20        Q       Do you recall if, before the MAR, you
21   met with Jeffrey Shrock?
22        A       No.
23        Q       Do you recall a time before the 1997
24   MAR, that you and Shrock met together with anyone to discuss
25   the MAR?
```

**J.A. 1569**

1        A        No.

2        Q        Were you present during the 1997 MAR

3   hearing, aside from your testimony?

4        A        I don't remember.  One was held at the

5   jail, and one was held at the courthouse.  So, after I

6   testified, I wouldn't have hung around.

7        Q        At some point around 2000, Carolyn

8   Melvin began working with the Sharpe family, do you remember

9   that?

10       A        I don't know when it was.  I know after

11  she left the department in 95, some time down the road, she

12  became a PI, and I was told that she was working the Sharpe

13  case again, but I don't know what year that was.

14       Q        Do you remember how you found out that

15  she was working on the Sharpe case again as a PI?

16       A        I don't know.

17       Q        Was it something that was being talked

18  about in the department?

19       A        No.  I honestly don't remember.

20       Q        Do you know if anybody else at the GPD

21  was aware that she was working as a PI for the Sharpe

22  family?

23       A        I don't.

24       Q        Did you have any thoughts on why she was

25  doing that?

**J.A. 1570**

```
 1                    MS. MARTINEAU:  Objection, irrelevant.

 2          You can answer.  Lack of foundation.

 3          A        I did not.

 4          Q        Down the course of Melvin's work with

 5   the Sharpe family, she started to investigate, and one of

 6   the people she spoke with was Beatrice Stokes, do you recall

 7   that Melvin later spoke to Beatrice Stokes about her

 8   testimony in 1995?

 9          A        I was told.  I don't know who told me

10   but I was told.

11          Q        Were you aware that Beatrice Stokes

12   recanted her testimony from 1995 when she spoke to Carolyn

13   Melvin?

14                    MR. ELLIS:  Objection.

15                    MS. MARTINEAU:  Objection.  Answer if

16          you know.

17          A        I was told.

18          Q        Who told you?

19          A        I don't remember.

20          Q        Do you remember seeing the recantation?

21          A        No, I never saw it.

22          Q        Do you recall that Beatrice Stokes told

23   Carolyn Melvin that you provided her with information to

24   testify to in 1994?

25                    MS. MARTINEAU:  Objection.  You can
```

1     answer.

2     A       I don't know that.  I never seen that.

3     Q       You don't recall that?

4     A       I never seen that.

5             MS. PFEIFFER:  Let's go ahead and take a

6     break.

7             THE VIDEOGRAPHER:  Going off the record.

8     The time is 4:31 p.m.

9                   NOTE:  At this time a short

10    recess was taken.  After which time, all parties

11    present as before, the matter continues as

12    follows:

13            THE VIDEOGRAPHER:  Going back on the

14    record.  The time is 4:41 p.m.

15    Q       Mr. Best, I have just handed you what I

16    have marked as Exhibit 21.

17                  NOTE:  The above referred to

18    document is now being marked and filed as

19    Exhibit 21.

20    Q       And there are two letters attached to

21    this exhibit.  The first one on the top is dated May 23,

22    2000.  And this is a letter from the Interim Chief of Police

23    at the City of Greenville to Clark Everett at the District

24    Attorney's office.  And the letter reads, "Dear Clark, as

25    you are aware, Ms. Sarah Sutton and Private Detective

```
 1   Carolyn Melvin have recently made accusations that Detective

 2   Ricky Best, 'Paid, threatened, or otherwise pressured' two

 3   state's witnesses in the Montoyae Dontae Sharpe murder

 4   prosecution."  Do you see that?

 5        A       I do.

 6        Q       Were you aware of these accusations?

 7        A       I was not.

 8        Q       Have you ever been made aware of these

 9   accusations?

10        A       Not that I'm aware of.

11        Q       Did Clark Everett ever come and speak

12   with you about these allegations?

13        A       I don't remember that, no.

14        Q       Did Clark Everett ever come to you and

15   say Beatrice Stokes recanted what she testified to at trial?

16        A       I learned the information, but I don't

17   know who I learned it from.

18        Q       When did you learn the information?

19        A       I don't know.  I don't remember.  But I

20   do remember that coming forth, but I don't remember who or

21   when.

22        Q       Did anyone from the DA's office come to

23   talk with you about these accusations and whether they were

24   true?

25        A       Not that I remember, but I'm not saying
```

1    no.

2          Q      Did any investigator from any agency

3    come and talk with you about whether these investigations

4    were true?

5          A      All I can say is I don't remember

6    anyone, no.

7          Q      If you turn the page, the second letter

8    is from June 2, 2000, and this is a letter from the State

9    Bureau of Investigations, the SBI.  And if you turn to the

10   back page, you will see that Clark Everett was cc'd on this

11   letter.  And what this letter says is it's in response to

12   the letter that Simonowich wrote.  And it says, "In

13   conversation with District Attorney Clark Everett, he

14   indicated he was not going to make a request for a SBI

15   investigation into this matter."  Do you recall any

16   conversations with Clark Everett about whether or not he was

17   considering an SBI investigation about accusations that you

18   had paid, threatened, or otherwise pressured Beatrice

19   Stokes?

20         A      This is the first time I have seen this

21   letter.

22         Q      Did Clark Everett talk with you at all

23   about a potential SBI investigation into those accusations?

24         A      Not to my memory, no.

25         Q      Less than a year after this, the SBI

1   initiated an investigation into Carolyn Melvin, do you

2   recall that investigation?

3                      MS. MARTINEAU:  Objection to the form of

4           the question.  You can answer.

5           A       I had no knowledge.

6           Q       Were you aware that there were

7   allegations that she had approached witnesses who had

8   testified in 1994, and offered them money to recant or alter

9   their original testimony?

10                     MS. MARTINEAU:  Objection.  You can

11          answer.

12          A       Heard that, but don't know who I heard

13   it from.

14          Q       When did you hear it?

15          A       I don't know when I heard it, but I

16   heard that.

17          Q       Do you know Special Agent Bazemore with

18   the SBI?

19          A       I do.

20          Q       How do you know him?

21          A       I mean, I know he works there, or he did

22   work there.

23          Q       Do you have a relationship with him?

24          A       No.

25          Q       Did you at any time have a relationship

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 244**

```
 1   with him?

 2         A       No.

 3         Q       Did you ever have his personal phone

 4   number?

 5         A       No.

 6         Q       Was he someone you worked with on cases?

 7         A       He worked out of the Greenville office

 8   and I had to go out there on occasion.

 9         Q       I'm going to hand you what I have marked

10   as Exhibit 22.

11                        NOTE:  The above referred to

12                 document is now being marked and filed as

13                 Exhibit 22.

14         Q       This is a multi-page document.  You will

15   see at the top it says Duke Number 1 of 9, and I will

16   represent to you what this is, is the SBI's investigation

17   into Carolyn Melvin.  And if you open up the first page, and

18   then look to the bottom, and it says KL Bazemore as the

19   agent.  Date initiated, 2-26-2001, do you see that?

20         A       I do.

21         Q       If you turn to the next page, it has SBI

22   case number and then it says request from Attorney Diane

23   Reaves.  Do you know who Diane Reaves is?

24         A       I do not.

25         Q       If you turn to the next page, 2538, it
```

1   describes how this request got started, a telephone request

2   from North Carolina Assistant Attorney General Barry McNeal.

3                MS. MARTINEAU:  What page are you on?  I

4         have lost you.

5                MS. PFEIFFER:  I'm sorry.  2538 is the

6         Bates at the time.  Duke Number 4 of 9.

7                MS. MARTINEAU:  Okay, I have got you.

8         Q        Do you see where I am there?

9         A        I do.

10        Q        The third paragraph down says what the

11   specific request was.  The request was to contact Beatrice

12   Stokes and determine if Stokes had indeed been contacted by

13   Melvin.  If Stokes chose to cooperate, SA Bazemore was to

14   further the investigation.  Did SA Bazemore ever contact you

15   about Beatrice Stokes?

16        A        No.

17        Q        If you turn to page 2539, it says Duke

18   Number 5 of 9 at the top.  Third paragraph down, beginning

19   in February, 2001, SA Bazemore began attempting to locate

20   Stokes.  Due to Stokes' homeless status, she was not located

21   until on or about February 26, 2001.  Stokes was in the Pitt

22   County Detention Facility, charged with a violation of a

23   domestic order.

24                And then skip down to the next paragraph.  SA

25   Bazemore contacted Beatrice Stokes and spoke with her in an

1    interview room at the Pitt County Jail.  Stokes stated she

2    had in fact been contacted by Carolyn Melvin on no less than

3    four occasions, when she was offered a payment of a thousand

4    dollars to alter her testimony against Dontae Sharpe.  She

5    was told by Melvin the thousand dollar payment was being

6    offered through Sharpe's mother.  Do you see that?

7           A       I do.

8           Q       Did you ever become aware of Beatrice

9    Stokes having this conversation with SA Bazemore?

10          A       No.

11          Q       If you turn to the next page, first

12   paragraph says, "At the conclusion of the contact with

13   Stokes, SA Bazemore asked if Stokes would be willing to

14   cooperate with law enforcement by recording conversations

15   between herself and Melvin.  Stokes agreed to and was

16   provided with several telephone numbers through which she

17   could contact SA Bazemore."  Do you see that?

18          A       I do.

19          Q       And the next paragraph reads, "SA

20   Bazemore has had contact with the Pitt County District

21   Attorney who suggested any efforts to have Stokes' bond

22   reduced to a point where she could get out of jail should be

23   handled through her court appointed attorney.  Subsequently,

24   SA Bazemore contacted Peter Jacovis and efforts were

25   initiated to obtain Stokes' release from jail.  Eventually

1   Stokes bond was reduced and on Friday March 2, 2001, Stokes

2   was released."  Do you see that?

3          A       I do.

4          Q       Did Beatrice Stokes call you after she

5   was released from jail?

6          A       No.

7          Q       The next paragraph reads, "On Tuesday,

8   March 6, of 2001, at 8:05, Stokes called the Greenville SBI

9   office.  SA Bazemore was not in the office and Stokes told

10   the secretarial staff that she would return a call promptly

11   at 10:30 a.m."  Did I read that right?

12          A       Uh-huh.

13          Q       At 9:45 a.m. SA Bazemore received a call

14   from Greenville Police Department, Detective Ricky Best.  Do

15   you recall calling SA Bazemore?

16          A       I do not.

17          Q       In this conversation with SA Bazemore,

18   he says that you told him Stokes wanted to know why Best,

19   "Had put the SBI on her?"  She also made the statement she

20   would cooperate with the one who, "Got to her with the most

21   money."  Do you see that?

22          A       I don't see that.  Where are we at?

23          Q       That paragraph that starts at 9:45 a.m.

24          A       I saw that.

25          Q       Best stated he had just been phoned by

1    Beatrice Stokes, are you with me?

2            A        I found it.  Yeah, okay.

3            Q        Best said it was apparent Stokes was

4    intoxicated during the conversation.  Stokes wanted to know

5    why Best, quote, had put the SBI on her.  Do you see that?

6            A        I do.

7            Q        Do you remember that conversation with

8    Beatrice Stokes?

9            A        I do not.

10           Q        She also made the statement that she

11   would cooperate with the one who got to her with the most

12   money.  Do you see that?

13           A        I do.

14           Q        Now, this is what you are telling SA

15   Bazemore in this phone call, right?

16           A        I don't remember the phone call, so I

17   can't say that that's what I was telling him.  But it's here

18   in writing, so I don't know.

19           Q        SA Bazemore is a SBI agent in the

20   Greenville office, correct?

21           A        He is.

22           Q        Do you have any reason to believe that

23   he wouldn't accurately report a conversation that he had

24   with you on the phone?

25           A        I don't have any reason to doubt that.

```
 1        Q        You also told Bazemore in this call that

 2   Best said numerous people could be heard near the phone from

 3   which Stokes was calling, do you see that?

 4        A        I do.

 5        Q        Do you remember telling Bazemore that?

 6        A        I don't.

 7        Q        He said she was making no effort to

 8   conceal her nature of the call, mentioning Detective Best,

 9   Carolyn Melvin and the SBI investigation, and several times

10   throughout the conversation.  Do you see that?

11        A        I do.

12        Q        Best was concerned and was confident

13   that anyone present inside the room from which Stokes was

14   calling, was now aware of the investigation surrounding

15   Carolyn Melvin.  Do you see that?

16        A        I do.

17        Q        Do you remember telling Agent Bazemore

18   that?

19        A        I don't.

20        Q        Do you remember telling Agent Bazemore

21   anything about Beatrice Stokes?

22        A        I don't remember this whole ordeal.  I

23   don't remember that.

24        Q        You go down to the next paragraph at

25   10:15, Best phoned SA Bazemore a second time.  Best said
```

1    Stokes had again phoned, and was waiting at 805 Martin

2    Luther King Boulevard for SA Bazemore.  SA Bazemore and KT

3    Moser then left immediately and arrived at 805 Martin Luther

4    King Boulevard within 15 minutes.  Is 805 Martin Luther King

5    Boulevard a house address in Greenville?

6            A        I'm not sure.

7            Q        Do you recall telling Bazemore that

8    Beatrice called you again?

9            A        I don't remember the whole thing here.

10           Q        Do you remember having any conversation

11   with Beatrice Stokes about her talking to the SBI?

12           A        I do not.

13           Q        Any conversations with Beatrice Stokes

14   about accusations that you had paid, threatened her in 1994?

15           A        I do not.

16           Q        Did you at some point become aware that

17   Agent Bazemore determined that Beatrice Stokes was not

18   reliable?

19           A        I don't know anything about this here.

20           Q        Can you dispute anything that is in

21   Bazemore's report?

22                    MS. MARTINEAU:  Objection to the form of

23           the question.  You can answer.

24           A        I cannot because I don't remember any of

25   this.

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 251

```
 1        Q        You have no reason to believe that Agent

 2   Bazemore wouldn't have accurately reported what happened

 3   during the investigation?

 4        A        I have no reason to believe that.

 5        Q        Fair to say, you as an investigator,

 6   certainly wouldn't believe someone who says they would

 7   cooperate with the one who got her the most money, is that

 8   fair?

 9                 MS. MARTINEAU:  Objection.  You can

10            answer.

11        A        Ask me the question again.

12        Q        As an investigator, you certainly

13   wouldn't believe a person who had said they would cooperate

14   with the one who got to her with the most money?

15        A        Probably not.

16        Q        In 2000, Dontae filed another motion for

17   appropriate relief.  Do you recall that?

18        A        I don't.

19        Q        This involved testimony from someone

20   named Dearl Powell.  Do you remember Dearl Powell?

21        A        I do remember Dearl Powell in that, if

22   this is the time, we were summoned to Federal Court in

23   Elizabeth City.  Is that where you are talking about?

24        Q        Yes.

25        A        I do remember that.
```

```
 1        Q       Do you remember meeting with anybody
 2   about that MAR?
 3        A       No.
 4        Q       Do you remember talking to anyone from
 5   the Attorney General's Office about that MAR?
 6        A       No.
 7        Q       Do you remember speaking with Clark
 8   Everett about that 2000 MAR?
 9        A       Clark and I were there at the same time.
10   I don't remember if we went together, or whether we were
11   just there at the same time.  But I remember seeing Clark
12   there, but that's about all I remember.
13        Q       In 2014, the GPD initiated a
14   reinvestigation into the Sharpe case.  Were you aware that
15   the GPD undertook a reinvestigation of that case?
16        A       I was not.
17        Q       Did anyone talk to you about that
18   investigation in 2014?
19        A       They did not.
20        Q       Did you have any role in that 2014
21   reinvestigation?
22        A       I didn't know it was happening, so I
23   didn't have any role.
24        Q       Were you aware of anyone who was spoken
25   to in 2014 about the Sharpe case?
```

1        A        I was not.

2        Q        I'm handing you what I marked as Exhibit

3    23, and this is a property report from the Greenville Police

4    Department.  Do you see that up at the top?

5        A        Yes, ma'am.

6                 NOTE:  The above referred to

7                 document is now being marked and filed as

8                 Exhibit 23.

9        Q        This is the Radcliffe case, and if you

10   look in the center at the description of access to the file,

11   you will see at the bottom, your signature, date property

12   released.  Says Best, 11-24-04.  Why did you access the

13   evidence in the Dontae Sharpe case on November 24, 2004?

14       A        I know that I transported evidence from

15   the Sharpe case and several other cases to the SBI office.

16   I don't know if it was 11-24-04.  Not 04, it should be 94,

17   shouldn't it?

18       Q        No, that's 04.

19       A        No, I was retired in 04.

20       Q        Do you think that's just a misprint?

21       A        It could be 94, but it wasn't in 04.  I

22   retired from the Police Department in October of 2003.

23       Q        And after you retired, did you go back

24   to the Police Department at all?

25       A        I did not.

```
 1        Q        Did you ever access anything on any

 2   files after you retired?

 3        A        Oh, no.

 4        Q        I'm handing you what I have marked as

 5   Exhibit 24, two pages.  These two pages are copies of

 6   Internal Affairs complaints that were in your personnel

 7   file.

 8        A        Okay.

 9                      NOTE:  The above referred to

10            document is now being marked and filed as

11            Exhibit 24.

12        Q        And each page has four different

13   instances on the page.  Each of them says purged.  Do you

14   know where the underlying documents are for each of these

15   complaints?

16        A        I have no idea.

17        Q        On the first page, the allegation is

18   unjust arrest, harassment, disposition not sustained.  This

19   was on December 11, 1992.  What do you remember about that

20   complaint?

21        A        Nothing.

22        Q        Do you remember anyone sitting down and

23   talking with you about the complaint?

24        A        I do not.

25        Q        Were you interviewed about the
```

1   complaint?

2          A        I don't have a clue, don't remember.

3          Q        The next one to the right is from

4   June 3, 1993, and the allegation is unlawful arrest and

5   harassment.  Do you see that?

6          A        I do.

7          Q        Disposition unfounded.  Were you

8   interviewed about this allegation and complaint?

9          A        I don't have a clue.

10         Q        Do you recall being interviewed about

11  this complaint?

12         A        I do not.

13         Q        The bottom one on the left is from

14  February 16, 1995, allegation, sexual harassment,

15  disposition is unfounded.  Do you remember what this

16  complaint was about?

17         A        Unless this was the one where Melvin

18  filed, no, I don't.

19         Q        Do you remember being interviewed or

20  talked to about this complaint?

21         A        I don't know about this one.  About the

22  Melvin one, yes, but I don't know what the 95 here is.

23         Q        The next one is August 11, 1995.  The

24  allegations is gambling.  What do you remember about this

25  allegation?

J.A. 1587

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                              **Page 256**

1      A       Well, I think the date of occurrence was

2   in, if you will look, 7-20-95, not at the bottom.  But the

3   gambling situation was filed by Detective Melvin.  She had

4   alleged that we were going to, me and others were going to

5   Virginia and buying lottery tickets.

6      Q       And were you interviewed about that?

7      A       I remember something about that, yes.

8      Q       What do you remember about it?

9      A       I think I was interviewed and asked

10  about it and I told them, yeah, I went to Virginia and

11  bought lottery tickets.  As far as I know, it wasn't against

12  the law.

13     Q       Was there any policies that you were

14  shown?

15     A       No.  I didn't commit any crime or any

16  violations.

17     Q       Do you recall why she made that

18  allegation then if it wasn't a violation of policy?

19     A       I don't.

20     Q       Did you speak with her about why she did

21  that?

22     A       I did not.

23     Q       If you turn the page, top left corner,

24  there is an allegation of neglect of duty.  Date occurrence,

25  April, 1995.  Do you remember this allegation?

1        A       I do not.

2        Q       The next one to the right of that

3   allegation, improper conduct.  The date is 6-4-96, do you

4   remember that?

5        A       I do not.

6        Q       Do you have any idea what the improper

7   conduct was?

8        A       I do not.

9        Q       Lower left hand corner, this is June 13,

10  2000, another allegation, improper conduct, do you know what

11  this allegation was about?

12       A       Not a clue.

13       Q       Do you remember being interviewed or

14  talked to about this?

15       A       I do not.

16       Q       The one to the right is September, April

17  25, 2003, inappropriate conduct.  Do you recall what this

18  allegation was about?

19       A       No, I don't.

20       Q       When a complaint was made against an

21  officer, what was the procedure for handling that complaint?

22       A       It varied as far as what the complaint

23  was and whether it was handled by the supervisor or whether

24  it was handled by Internal Affairs.  And I didn't make that

25  decision.  I guess Captain Hardy maybe did, but I don't know

J.A. 1589

1  who made the decision.  But some of them were handled by the

2  sergeant.  Some of them were handled by Internal Affairs.

3        Q       Do you recall being interviewed about

4  any of these other than the sexual harassment that you think

5  may have been Melvin?

6                MS. MARTINEAU:  And the gambling?

7        A       And the gambling.  Those two were the

8  ones, if the sex arrest was the one that Melvin filed, I

9  remember that.  And if the gambling one is the one that

10  Melvin filed, I remember that.  But other than that, I don't

11  remember none of the others.

12        Q       Did you ever have any conversations with

13  Carolyn Melvin about why she brought complaints against you?

14        A       I did not, no.

15        Q       You still have Exhibit 18 in front of

16  you there.  These are your Responses to our Interrogatories,

17  and we had asked you 23 questions, and in 20 of them, you

18  included a response that says, further, best asserts that

19  plaintiff murdered George Radcliffe.  You believe that

20  Dontae Sharpe killed George Radcliffe?

21        A       As of today?

22        Q       Uh-huh.

23        A       Absolutely.

24        Q       And as you sit here today, you have no

25  desire to apologize to Dontae Sharpe for what you and

1   Carolyn Melvin did and didn't do in his case in 1994, do

2   you?

3               MS. MARTINEAU:  Objection to the form of

4         that question.

5               MR. ELLIS:  Objection.

6               MS. MARTINEAU:  You can answer.

7         A       I never heard of anyone apologizing for

8   doing their job.

9         Q       My question was whether you have any

10   desire to apologize to Dontae Sharpe?

11              MS. MARTINEAU:  Same objection.  You can

12        answer.

13        A       I don't know of anyone that apologizes

14   for doing their job.

15        Q       And in this case, do you believe you did

16   your job?

17        A       I did what was asked of me, yes.

18        Q       26 years after being convicted, Dontae

19   Sharpe received a pardon of innocence.

20        A       Yes, he did.

21        Q       And as you sit here today, you are

22   telling this jury that you have no regrets and no apology

23   for what you did and didn't do in 1994?

24              MS. MARTINEAU:  Same objection.  You can

25        answer.

1        A        I have no regrets, or no apology.  And

2    if I would have found one item at any time during this

3    investigation that said that he didn't do this, I would have

4    been on the front steps of the Pitt County Courthouse

5    telling everyone so that he could get out of jail.  So, no,

6    ma'am, I don't.

7        Q        That would have required an

8    investigation, though, wouldn't it?

9        A        As I said, if I had found out one piece

10   of evidence that said he didn't do it, I would have been up

11   on the courthouse because, as I told you this morning, I'm a

12   Christian man, don't want anybody going to prison that

13   hasn't committed the crime.

14       Q        So, how do you explain Charlene

15   Johnson's statements, which are entirely inconsistent with

16   the autopsy in this case.  How is that to you not a

17   suggestion that Dontae Sharpe was not the shooter?

18               MR. ELLIS:  Objection.

19               MS. MARTINEAU:  Objection to the form of

20          that question.  You can answer.

21       A        There is not any discrepancies in her

22   statement that is enough for me to change my mind that she

23   didn't see that man get shot.  What he, when he was pushed,

24   did he turn his shoulder to the left, all of those kind of

25   things are a possibility.

```
 1        Q        She testified that he was shot,

 2  face-to-face, correct?

 3        A        I saw what you showed me earlier.  I'm

 4  telling you, that it doesn't change my mind, because if the

 5  man was pushed, he may have shot when he was facing, but he

 6  fell sideways, I mean, I can't answer that question.  Other

 7  than saying that.

 8        Q        She told you he threw the keys and the

 9  keys were in the ignition, is that not an inconsistency?

10        A        She may have thought she saw keys.  And

11   the man may have thrown some keys, just maybe not the keys

12   from the ignition.

13        Q        She told you that the murder weapon was

14   thrown and no murder weapon was recovered?

15        A        In that area, that's very possible.

16        Q        And in your mind, there is no

17   inconsistencies in that statement?

18                 MS. MARTINEAU:  Objection, asked and

19                 answered.  You can answer again.

20        A        Not enough to render any kind of other

21   decision.

22        Q        But within three hours of talking to

23   her, Dontae is arrested and there is no further

24   investigation done?

25                 MS. MARTINEAU:  Objection to the form of
```

1          that question.  You can answer if you know.

2          A          The case was assigned to Detective

3    Carolyn Melvin.  She led this investigation, I followed.

4    She issued a warrant, I was okay with that.  I testified in

5    court, and not a single bit of my information was false, and

6    I didn't lie.  So, I can go home tonight and lay my head on

7    my pillow and go to sleep because I have no problems with

8    that.

9          Q          If you give me just a few minutes.

10                    MS. PFEIFFER:  Can we just take a short

11         break?

12                    THE VIDEOGRAPHER:  Going off the record.

13         The time is 5:09 p.m.

14                        NOTE:  At this time a short

15         recess was taken.  After which time, all parties

16         present as before, the matter continues as

17         follows:

18                    THE VIDEOGRAPHER:  Going back on the

19         record.  The time is 5:24 p.m.

20                    MS. PFEIFFER:  Mr. Best, I don't have

21         any further questions for you.  Thank you for your

22         time.  Mr. Ellis may.

23

24

25    CROSS EXAMINATION

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 263**

1    BY MR. ELLIS:

2        Q        Mr. Best, Nick Ellis, and I'm

3    representing Carolyn Melvin.  I want to ask you a couple of

4    questions here?

5        A        Okay.

6        Q        And I will do my best to try to get

7    documents to you.

8              All right, so, the first thing that I want to

9    show you, and we will mark this Exhibit 25.

10              MR. ELLIS:  Counsel, if I could borrow

11              your stickers.  And I forgot copies, I'm sorry.

12              NOTE:  The above referred to

13              document is now being marked and filed as

14              Exhibit 25.

15        Q        So, Detective Best, I'm going to show

16    you what's being marked as Exhibit Number 25.  Do you

17    recognize the handwriting on this document?

18        A        It appears to be Carolyn Melvin's.

19        Q        And it looks like it is a Greenville

20    Police Department Investigative Supplement concerning an

21    interview of Charlene Natasha Johnson, date April 7, 1994,

22    at 13:34 hours, and it does indicate that the investigator's

23    name is CJ Melvin, Carolyn Melvin, is that correct?

24        A        That's correct.

25        Q        Have you reviewed this document before,

1   this first page?

2         A        I have not.

3         Q        And if you will, just briefly read for

4   the record the details of the activity as noted by Detective

5   Melvin on this first page.

6         A        RO Detective DR Best interviewed Johnson

7   at the Brown Building.  Johnson will write a statement as to

8   the facts as she saw them the night of the murder.  Johnson

9   stated that she was in the area and witnessed the murder.

10   Her statement attached.

11        Q        And the second page of Exhibit 25, I

12   think we have already had you testify to, that that is the

13   handwritten statement that was written by Ms. Johnson on

14   April 7, 1994, correct?

15        A        Correct.

16        Q        Now, in that interview that day of

17   Charlene Johnson, did you tell Ms. Johnson what to write in

18   her statement?

19        A        No, I did not.

20        Q        Did Detective Melvin tell Ms. Johnson

21   what to write in her statement?

22        A        No, she did not.

23        Q        Did you show Ms. Johnson a statement

24   that you had written up and asked her to copy it?

25        A        I did not.

1      Q        Did Detective Melvin do anything like

2   that?

3      A        She did not.

4      Q        I'm going to show you what we have now

5   marked as Exhibit Number 26.

6                          NOTE:  The above referred to

7                document is now being marked and filed as

8                Exhibit 26.

9      Q        Detective, I will tell you that some of

10   the documents in here may be duplicative of exhibits that

11   have already been marked.  For example, this first page, I

12   think we have already talked about this and discussed this.

13   But this is two pages of interview notes and that is in your

14   handwriting, correct?

15      A        That is correct.

16      Q        Did you make these notes while Mr.

17   Sharpe was being interviewed?

18      A        I did.

19      Q        You testified that this was an arrest

20   interview, I believe, meaning the interview was conducted

21   after he was arrested?

22      A        That is correct.

23      Q        I want to make sure I understand the

24   chronology of events on April 7, 1994.  So, that is the day

25   that Charlene Johnson was interviewed by you and Detective

1    Melvin, correct?

2         A      It was.

3         Q      And that was, of course, the day that

4    Ms. Johnson gave a handwritten statement about her observing

5    Mr. Sharpe shooting Mr. Radcliffe, correct?

6         A      It was.

7         Q      And was that information then used to

8    obtain a warrant for Mr. Sharpe's arrest?

9         A      I don't know if there was anything else

10   that she used.  I know that was part of it.

11        Q      And so, then let me show you what is

12   marked as Exhibit 27.

13                      NOTE:  The above referred to

14               document is now being marked and filed as

15               Exhibit 27.

16        Q      I'm showing you now what has been marked

17   as Exhibit 27, Detective Bell, and I will ask you if you

18   have seen this document before?

19        A      I have.

20        Q      All right, and this is the warrant for

21   the arrest of Mr. Sharpe for the murder of George Radcliffe,

22   correct?

23        A      It is.

24        Q      There is some handwriting, such as the

25   date issued, do you know whose handwriting that is?

```
 1        A        Are you referring to the bottom

 2   right-hand corner?

 3        Q        Yes, that 4-7-94?

 4        A        That would be Magistrate Hall.  Oh, I'm

 5   sorry, Hall, H-A-L-L.

 6        Q        All right.  And the information that is

 7   typed on this warrant, such as the name, address and

 8   telephone number of the defendant, who typed in this

 9   information on this Exhibit 27?

10        A        Sir, I can't be sure.  I don't know if

11   this was a magistrate's doing or if it was Detective Melvin.

12   She typed a lot of her warrants, but whether she did it or

13   Magistrate Hall did it, I can't say.

14        Q        But would that have been the type of

15   document that some administrative assistant in the Major

16   Crimes Unit may have prepared?

17        A        No, sir.  We did it all.  If you were

18   assigned the case, you did it all.

19        Q        And in this warrant for arrest, the

20   complainant is listed as Detective Melvin, and you were

21   listed as a witness, correct?

22        A        It was.

23        Q        And the information contained in this

24   warrant is that there was probable cause to believe that

25   Dontae Sharpe had murdered George Radcliffe, correct?
```

1      A      That is correct.

2      Q      Did you appear before the magistrate

3   when the warrant was presented to him for his consideration?

4      A      My recollection is I was not present.

5      Q      In your experience, is it your

6   understanding that in order for a warrant for an arrest to

7   be issued, that the magistrate, who is a judge, a judicial

8   official, has to find that there is probable cause that the

9   crime has been committed by the individual for which the

10   warrant is sought, correct?

11      A      That is correct.

12      Q      I'm going to show you what has been

13   marked as Exhibit Number 28.

14              NOTE:  The above referred to

15          document is now being marked and filed as

16          Exhibit 28.

17      Q      This is an affidavit of Keith Hall, and

18   Mr. Hall, I believe you testified, was the magistrate who

19   found probable cause to issue the warrant for Mr. Sharpe's

20   arrest for the murder of George Radcliffe, correct?

21      A      That is correct.

22      Q      Have you seen this affidavit before?

23      A      I have not.

24      Q      Now, I want to go back to Exhibit 26.

25   The first pages of that are the handwritten notes from your

1  interview?

2        A       Yes, sir.

3        Q       So, again, I want to go back and make

4  sure I understand the process.  Ms. Johnson gives a

5  statement to you and Detective Melvin verbally, correct?

6        A       Yes.

7        Q       And then she, in her own handwriting,

8  writes down her statement about her witnessing Mr. Sharpe

9  murder Mr. Radcliffe, correct?

10       A       That is correct.

11       Q       Then as we have seen, that and other

12 information may have been presented to the magistrate, who

13 issues the warrant for the arrest, correct?

14       A       Correct.

15       Q       Were you involved in actually going and

16 effecting the arrest of Mr. Sharpe after the warrant was

17 issued?

18       A       I was not.

19       Q       Do you know who was?

20       A       And neither was Detective Melvin.  She

21 and I were at the office.  And I can't remember what they

22 were called back then, but they were the officers that did

23 the street crimes stuff, drugs and those kind of things, you

24 know.  I can't remember what they were called.  But anyway,

25 we gave the warrant to them, they went out and served the

J.A. 1601

1   warrant for us.

2       Q       They went out and served the warrant and

3   then took Mr. Sharpe in this case into custody?

4       A       They would, and brought them to the

5   Brown Building.

6       Q       And brought him to the Brown Building.

7   And that is where there was this interview then conducted

8   reflected by the notes that you took.

9       A       That is correct.

10      Q       You took the notes contemporaneous when

11   the interview was being given?

12      A       Yes, and my recollection is Detective

13   Melvin was taking notes, also.

14      Q       Did Mr. Sharpe act surprised to you when

15   he was brought in and had been arrested for this homicide?

16          MS. PFEIFFER:  Objection.

17      Q       You can answer.

18      A       My recollection is, is that he was mad.

19   I don't know that he acted surprised, but he acted mad.

20      Q       When he was interviewed, you were in the

21   room and Detective Melvin?

22      A       We were.

23      Q       Mr. Sharpe?

24      A       We were.

25      Q       Anybody else?

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 271**

1          A          No, sir.

2          Q          Mr. Sharpe was read his Miranda rights

3    prior to the interview?

4          A          He was, and signed the waiver.

5          Q          Signed a waiver and then continued to

6    have an interview with you and Detective Melvin?

7          A          That is correct.

8          Q          And I apologize, this Exhibit 26 may not

9    have documents that are in chronological order.

10         A          That's fine.

11         Q          So, we may be moving around a little

12    bit.

13         A          That's fine.

14         Q          Sorry about that.  So, if you look and

15    you will see in the lower right-hand corner pages marked

16    Sharpe OO, in this case, 3686, do you see that page?

17         A          I do.

18         Q          This handwriting is that of Detective

19    Melvin?

20         A          It is.

21         Q          The date on that investigative

22    supplement is what?

23         A          Looks like 2-14-94, but it could be,

24    2-19.  I don't know if it's 2-14 or 2-10-94.

25         Q          From what I understand your testimony

**J.A. 1603**

1  was, that the criminal trial, you were first brought in on

2  2-15-94, is that correct?

3          A        That's correct.

4          Q        So, this would be an investigative

5  supplement reflecting an interview conducted by Detective

6  Melvin of Wilbur Mercer, apparently street name of

7  Marshanna, correct?

8          A        That's correct.

9          Q        Have you reviewed this investigative

10  supplement before?

11          A        I haven't seen it.

12          Q        And during this time in early 1994, when

13  this investigation was being conducted, would or did

14  Detective Melvin maintain a file for her involvement in the

15  investigation?

16          A        She had a file folder that she

17  maintained herself, but we were not accredited then, so we

18  didn't have to keep one out in the main area of the Police

19  Department.  So, whatever she had, she had for herself.

20          Q        And that's what I wanted to get at.  As

21  far as an official file, if there is such a thing, for the

22  Greenville Police Department in February, 1994, was that

23  simply the file maintained by a detective investigating the

24  crime?

25          A        That's correct.

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 273**

 1        Q        Would the detective keep possession of

 2   that file at his or her desk?

 3        A        Yes, or carried with her when she went

 4   out of the office.

 5        Q        I think you said once there was

 6   accreditation, that is when there became an additional file

 7   that was maintained, that the investigator wrote hopefully

 8   within 10 days, take whatever documentation had been placed

 9   in the investigator's file and place it in what I'm going to

10   just call the central file, is that right?

11        A        That's right.

12        Q        But that process had not been

13   established as of February, 1994?

14        A        It was not.

15        Q        Did you ever speak with Detective Melvin

16   about the interview that she had done of Mr. Mercer on

17   February 14, of 94?

18        A        Sir, I don't know.  I know we talked

19   about interviews with Marshanna, Mr. Mercer, about her doing

20   interviews, but I don't know when that was, because my

21   understanding, the way I remember it, he was interviewed

22   more than once.

23        Q        If you will turn over a couple pages to

24   page 3690, please?

25        A        Okay.

**J.A. 1605**

```
 1        Q        This looks like it is also a Greenville

 2   Police Department investigative supplement?

 3        A        Yes, sir.

 4        Q        That is again Detective Melvin's

 5   handwriting, correct?

 6        A        It is.

 7        Q        So this would be notes that she made

 8   concerning an investigation, or an interview of Alonzo

 9   Vines, who was a witness, on or about February 16, 1994?

10        A        It was.

11        Q        That would be the date after you were

12   first asked by, was it the captain who first asked you to

13   get involved?

14        A        Yes, sir.

15        Q        Captain --

16        A        Hardy, CJ Hardy.

17        Q        Were you with Detective Melvin when the

18   interview of Mr. Vines took place?

19        A        I don't remember it.

20        Q        Now, if you will look at the next page,

21   3691, it says reviewed by, and the supervisor's signature,

22   do you recognize those initials?

23        A        Howard Connor.

24        Q        Who was Howard Connor?

25        A        He was a sergeant that was assigned to
```

**J.A. 1606**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                      **Page 275**

1  the Detective Bureau.  I think he was there three or four

2  years before he made lieutenant.

3          Q        So, in 1994, would he have been your

4  immediate supervisor?

5          A        He was.  One of them.

6          Q        One of them, all right.  Who would have

7  your other immediate supervisor been in the summer of 94?

8          A        Seemed like, I can't remember when we

9  changed, but the next one was JW Corbitt, and I can't

10  remember when he came.  But one after him would be Captain

11  Hardy, because we had a lieutenant for a little while, and

12  then we didn't.  So, we would have reported to Captain

13  Hardy.

14          Q        But in February, and this looks like it

15  was signed by Sergeant Hardy, I guess at the time, in

16  7-7-94, he would have been Detective Melvin's immediate

17  supervisor, as well?

18          A        This is Howard Connor's.

19          Q        I'm sorry, Howard Connor.

20          A        Yes, sir.

21          Q        But he would have been Detective

22  Melvin's immediate supervisor?

23          A        He was.

24          Q        Now, if you will turn to the next page,

25  3694, there was also another person arrested along with Mr.

**J.A. 1607**

1    Sharpe, correct?

2          A        There was.

3          Q        Mark Joyner.

4          A        He was.

5          Q        Do you recognize on this page, it is an

6    arrest report of Mark Eldridge Joyner for murder of George

7    Radcliffe.  And then there is an arresting officer, S Brown,

8    do you know who that is?

9          A        I think it's, what's his name?  Yes, I

10   know him, but I can't think of his first name.

11         Q        And it looks like the date of the arrest

12   is 4-7-94?

13         A        Yes, sir.

14         Q        So would Officer Brown have been one of

15   the Drug Street Officers you mentioned earlier that would

16   actually go effect an arrest once a warrant had been issued?

17         A        Could have been.

18         Q        So, were you present when Mr. Joyner was

19   arrested?

20         A        I was present when he was interviewed.

21   After his arrest.

22         Q        So, once he was arrested, was he then

23   brought to the Brown station?

24         A        Brown Building, yes.

25         Q        Brown Building, sorry.  Who was present

1    when Mr. Joyner was interviewed?

2         A        Myself and Detective Melvin and Joyner.

3    Except he didn't make a statement.

4         Q        He refused to speak?

5                  MS. PFEIFFER:  Objection.

6         A        He didn't make a statement.

7         Q        Was he given his Miranda rights?

8         A        Absolutely.

9         Q        But looking at page 3702, this looks

10   like it's another investigative supplement reflecting an

11   interview that Detective Melvin did of Tricia Radcliffe, who

12   is identified as the victim's wife, on February 16, of 1994.

13   Were you present when Detective Melvin interviewed Ms.

14   Radcliffe?

15        A        I was.

16        Q        Where was that interview conducted?

17        A        I think it was at the Brown Building.

18   It tells you right here.  Location of it was Brown Building.

19        Q        Anybody present in that interview other

20   than you and Detective Melvin and Ms. Radcliffe?

21        A        Not that I remember.

22        Q        And this looks like it was prepared by

23   Detective Melvin.  Did you prepare a similar investigative

24   supplement?

25        A        No, sir.  As I explained earlier, she

1    did things differently than I did.  I didn't use this

2    report.  She did, I did not.  I typed mine on another form.

3    But she did it and most of the time she did it in her

4    handwriting.  She didn't type it.

5         Q       But this investigative supplement, was

6    this an official form utilized by the Greenville Police

7    Department?

8         A       Absolutely.

9         Q       And the investigative supplement, is

10   that to supplement, as the words may suggest, an

11   investigation that is being conducted?

12        A       It is.

13        Q        If you will look over to the next page,

14   and again, it looks like it may be missing page one because

15   it says page two of three, Sharpe 3703?

16        A       Uh-huh.

17        Q       Major case notes.  What is the

18   distinction between major case notes and investigative

19   supplement?

20        A       You got interim investigations and you

21   have got major crimes.  Major case notes would be major

22   crimes case notes.

23        Q       So this is typed up.  It looks like it

24   is dated February 11, 1994, and that is the date of the

25   homicide of George Radcliffe, is that right?

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 279

1        A        Yes, it is.

2        Q        Under investigators, it looks like it's

3    Melvin slash Reid, who is Reid.

4        A        Willie Reid, he was a general

5    investigations detective, and that's the way we were doing

6    it back then.  We would have a major crime detective and a

7    general investigation detective.

8        Q        So Detective Reid would have been part

9    of the Major Crimes Unit?

10       A        No.

11       Q        No?

12       A        Detective Reid was a forgery

13   investigator in the General Investigations Unit.

14       Q        So, General Investigations was not part

15   of Major Crimes?

16       A        They were in the same building, but it's

17   not part of it.  It's a different situation.

18       Q        I got you, thank you, sir.  And turning

19   over to page, Sharpe 3705, there is a supplementary

20   investigation.  And I think this may have already been

21   discussed.  Is that handwriting Carolyn Melvin's

22   handwriting?

23       A        It appears to be, yes, sir.

24       Q        And this is dated, I think, 5-4-94, that

25   is indicating that the case has been closed or cleared,

J.A. 1611

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    Page 280

1   correct?

2          A       Yes.

3          Q       Turning to page 3711, please.  And this

4   is a page marked request for examination of physical

5   evidence.  Do you see that?

6          A       Yes, sir.

7          Q       Requesting officer Detective, is that

8   you, DR Best?

9          A       Yes, sir.

10         Q        Is that your handwriting?

11         A       It is.

12         Q       Tell me just what you were doing as part

13  of conducting your investigation into the homicide of

14  Mr. Radcliffe as reflected on this document?

15         A       Whomever was going to the lab next,

16  would always gather the evidence to be delivered to the lab

17  because it's all the way in Raleigh at the SBI office.  And

18  what they would do is they would get the evidence that

19  needed to go, fill out this request for examination form,

20  and then carry it to Raleigh themselves.  Even though they

21  may not have been the investigating officer, they were

22  responsible for carrying the evidence.  Because we usually

23  only make one trip every two weeks or so.

24         Q       So the Greenville Police Department did

25  not have its own lab, that lab work would have been done by

**J.A. 1612**

1   the State Bureau of Investigations?

2          A       That is correct.

3          Q       There has been some discussion about

4   Crime Stoppers.

5          A       Yes, sir.

6          Q       Crime Stoppers is not run or managed by

7   the Greenville Police Department?

8          A       It has its own board.  It is ran from

9   the Police Department at the time, it's with the Sheriff's

10  now.  But back then it was the Police Department, and it's

11  ran, the service is paid for by the Police Department but it

12  actually is governed by the Board of Directors of Crime

13  Stoppers.

14         Q       And this case, was Charlene Johnson, did

15  she receive an award of monetary compensation from Crime

16  Stoppers?

17         A       She did.

18         Q       And did you make the decision that Crime

19  Stoppers pay her that money?

20         A       No, but I appealed through the Crime

21  Stopper person, explained the circumstances and situation,

22  and asked him if he could help her through Crime Stoppers,

23  you know, I would appreciate it.  And he awarded her, or the

24  board awarded her some money, and I don't know how she got

25  it, as far as whether it was a secret situation where they

1    give you a code number and you go to a certain bank in town

2    and you are given the check, you sign it with a number and

3    they cash it.  And I had nothing to do with any of that.

4    But I'm pretty sure she received the $500.

5           Q       But it was not your unilateral decision

6    that she receive the money?

7           A       It was not.

8           Q       And it was not Detective Melvin's

9    decision that she receive the money?

10          A       It was not.

11          Q       Turn to page Sharpe 5028, if you will.

12   Again this is a Greenville Police Department investigative

13   supplement.  Do you see that, 5028?

14          A       Not yet.  I do.

15          Q       And is that again in Detective Melvin's

16   handwriting?

17          A       It is.

18          Q       So this would reflect an interview

19   conducted by Detective Melvin, it looks like on February 14,

20   1994, is that right?

21          A       And Detective Reid.

22          Q       And Detective Reid.

23          A       Yes, sir.

24          Q       And this was an interview of Martha Ann

25   Stewart?

```
 1      A      That's correct.

 2      Q      The day before you got involved, so I'm

 3  assuming you were not present?

 4      A      I was not.

 5      Q      Did you, after you did get involved,

 6  have any communication with Ms. Stewart?

 7      A      Couldn't find her.

 8      Q      I'm going to show you what is going to

 9  be marked as Exhibit 29, Detective.

10                    NOTE:  The above referred to

11             document is now being marked and filed as

12             Exhibit 29.

13      Q      And this first page of Exhibit 29 is a

14  warrant for arrest of Mark Joyner.  It has got a file number

15  94 CR 7659, do you see that?

16      A      I do.

17      Q      This, do you understand this to be the

18  warrant for Mr. Joyner's arrest for the murder of George

19  Radcliffe?

20      A      It appears so, yes, sir.

21      Q      On this first page, it is listed as a

22  complaint, Detective CJ Melvin and you as a witness,

23  correct?

24      A      That's correct.

25      Q      Did you have any discussion with
```

1   whomever prepared this warrant as far as the typed

2   information that should go on it?

3          A       Not to my recollection.

4          Q       Now, if you will turn over towards the

5   last couple of pages, you will see a transcript of plea.

6   Let me know when you get there.

7          A       Okay.

8          Q       And in your experience is a transcript

9   of plea a document that is entered as part of the judicial

10   system where an individual pleads guilty to a crime?

11          A       That's correct.

12          Q       And this one, it is the State of North

13   Carolina versus Mark Eldridge Joyner, correct?

14          A       Correct.

15          Q       And if you will look over to the next

16   page, in the middle, you see where it says a date, 1-10-96?

17          A       Yes, sir.

18          Q       So that would be about five, six months

19   give or take, after Mr. Sharpe had been unanimously

20   convicted by a 12 person jury in Pitt County, correct?

21          A       That is correct.

22          Q       And he was convicted of the murder of

23   George Radcliffe, right?

24          A       He was.

25          Q       Now, under the date of 1-10-96, is that

1   the signature of Mark Joyner?

2          A       It appears so.

3          Q       And to the left of that, it actually

4   says it was sworn and subscribed before, it looks like a

5   Deputy Clerk of Superior Court, correct?

6          A       She is.  Her last name is Foell,

7   F-O-E-L-L.

8          Q       I want you to turn back to the prior

9   page on this transcript of plea.  Have you been in court

10  where individuals have gone through the process of

11  presenting a transcript, where criminal defendants have

12  presented a guilty plea to a court and the court has gone

13  through and asked questions about what they were pleading

14  guilty to?

15         A       Yes, sir.

16         Q       So, on this transcript of plea that

17  Mr. Joyner has signed under oath, number five, it asks, have

18  the charges been explained to him by his lawyer, and does he

19  understand the nature of the charges, and does he understand

20  every element of each charge, and what was his response?

21         A       Yes.

22         Q       Number six, he was asked, have you and

23  your attorney discussed the possible defenses, if any, to

24  the charges, and are you satisfied with your lawyer's legal

25  services, and what did Mr. Joyner say?

J.A. 1617

1        A        Yes, and yes.

2        Q        Number seven, he was asked do you

3    understand that you have the right to plead not guilty and

4    be tried by a jury.  What did Mr. Joyner say?

5        A        Yes.

6        Q        And 7-B, he was asked did he understand

7    that at such trial, he would have the right to confront and

8    cross examine witnesses against you?

9        A        Yes.

10       Q        And so, by January 10, of 1996, Charlene

11   Johnson had already testified in the criminal case against

12   Mr. Sharpe, correct?

13       A        Yes, sir.

14       Q        Were you in court for the entire trial?

15       A        I don't think so.

16       Q        Were you in court when Ms. Johnson

17   testified?

18       A        I think so.

19       Q        She testified in line with the statement

20   that she had written in her own hand on April 7, 1994,

21   correct?

22       A        That's correct.

23       Q        And Beatrice Stokes also testified in

24   the criminal trial against Dontae Sharpe, correct?

25       A        She did.

```
 1        Q        And she testified that she witnessed Mr.

 2   Sharpe shoot and kill Mr. Radcliffe, correct?

 3        A        She did.

 4        Q        Do you have any reason to believe that

 5   Mark Joyner was not aware that Ms. Johnson and Ms. Stokes

 6   had testified that Dontae Sharpe had shot and killed George

 7   Radcliffe at his criminal charge?

 8                 MS. PFEIFFER:  Objection.

 9        A        No, sir.

10        Q        And if those witnesses were not telling

11   the truth, and they both implicated Mr. Joyner, Mr. Joyner

12   said that he understood by pleading guilty he was waving the

13   right to cross examine those witnesses, correct?

14                 MS. PFEIFFER:  Objection.

15        A        Yes.

16        Q        Now number 10, the court asked

17   Mr. Joyner whether or not he was pleading to this criminal

18   charge, and how did he plead to the criminal charge against

19   him of accessory after the fact to murder and also

20   possessing stolen goods?

21        A        Guilty.

22        Q        And he stated to the court that he

23   understood that he was pleading guilty and he understood

24   that those charges to which he was pleading guilty carried

25   total punishments that are listed below, correct?
```

```
 1        A        Correct.

 2        Q        And the accessory after the fact to

 3   murder, was that the murder by Dontae Sharpe of George

 4   Radcliffe?

 5        A        It appears as so.  It was reduced.

 6        Q        And turn the page on number 11.  Did

 7   Mr. Joyner state under oath to the judge that he was

 8   personally pleading guilty?

 9        A        Yes.

10        Q        Now, if you will turn to the following

11   page where it says information, do you see that?

12        A        Yes, sir.

13        Q        And the file number there is 94 CRS

14   7659, correct?

15        A        Correct.

16        Q        And on the first page on the warrant for

17   the arrest of Mr. Joyner, that is the same court file

18   number, 94 CR 7659, correct?

19        A        Correct.

20        Q        And do you see on that page a box for

21   signature of prosecutor?

22        A        Yes, sir.

23        Q        Do you recognize whose signature that

24   is?

25        A        Looks like Clark Everett.
```

```
 1        Q        And so I'm going to read what is in the
 2   section above that has been signed by Mr. Everett, and tell
 3   me if I read anything wrong.  It says, "I the undersigned
 4   prosecutor, upon information and belief, allege that on or
 5   about the date of the offense shown, and in the county
 6   indicated above, the defendant named above unlawfully,
 7   willfully and feloniously did," and can you read that after
 8   that?
 9        A        Looks like murder in that the defendant,
10   and I can't, knowing that Dontae Sharpe had committed the
11   felony of murder against George Radcliffe, did aide Dontae
12   Sharpe in escaping detention and apprehension by helping
13   Dontae Sharpe push the victim's car into a vacant lot after
14   the murder.
15        Q        And at the beginning that he had been
16   charged as an accessory after the fact to the felony of that
17   murder, correct?
18        A        Correct.
19        Q        And the murder was the murder of George
20   Radcliffe committed by Dontae Sharpe?
21        A        Correct.
22        Q        And the accessory after the fact, that
23   was the crime that Mr. Joyner pled guilty to, correct?
24        A        That is correct.
25        Q        Mr. Best, I'm going to show you what is
```

J.A. 1621

```
 1   marked as Exhibit 30.

 2                      NOTE:  The above referred to

 3           document is now being marked and filed as

 4           Exhibit 30.

 5       Q       I'm going to represent to you that this

 6   is a portion of the criminal trial transcript of Dontae

 7   Sharpe's criminal trial where he was unanimously found

 8   guilty by a jury of 12 in Pitt County of, for the murder of

 9   George Radcliffe.  And this begins on the upper right-hand

10   corner.  You see page 274?

11       A       Yes, sir.

12       Q       Were you in the Pitt County courtroom

13   when Detective Melvin testified?

14       A       I think so.

15       Q       I will show you what we will mark as

16   Exhibit 31.

17                      NOTE:  The above referred to

18           document is now being marked and filed as

19           Exhibit 31.

20       Q       And when you were in court and Detective

21   Melvin testified, she was cross examined by Mr. Sharpe's

22   defense lawyer, correct?

23       A       Cherry.

24       Q       And when you testified, were you cross

25   examined by Mr. Stokes?
```

J.A. 1622

1      A      Yes.  Cherry Stokes.

2      Q      And Cherry Stokes was the attorney

3   representing Dontae sharp?

4      A      He was.

5      Q      But this Exhibit 31 is an SBI report

6   dated March 11, 2014, do you see that?

7      A      I do.

8      Q      Have you seen this document before?

9      A      I have not.

10      Q      And this is, I will represent to you, a

11   polygraph report.  And if you will turn over to the next

12   page, Sharpe 14516, do you see that?

13      A      I do.

14      Q      All right.  So, on this first page, this

15   is in 2014, I realize that is a long time after you have

16   been retired, is that right?

17      A      Yes, sir.

18      Q      And this looks like a polygraph.  A

19   polygraph is commonly known as a lie detector?

20      A      That is correct.

21      Q      And so this polygraph that was taken, it

22   does list as an investigator on that second page of this

23   exhibit, Ricky Best.  Do you know who prepared this

24   document?

25      A      I do not.

```
1        Q        Now, if you look in about the middle of

2   that, do you see where it listed the examinee, Montoyae

3   Dontae Sharpe?

4        A        Yes, sir.

5        Q        It lists his height of six four, weight

6   220 pounds?

7        A        That's correct.

8        Q        Mr. Sharpe, fairly good sized guy?

9        A        Yes, sir.

10        Q        And back in 1995, when his criminal

11   trial took place, about the same size?

12        A        My recollection, yes, sir.

13        Q        Now, if you see at the bottom of that,

14   you see a numerical evaluation negative nine?

15        A        I do.

16        Q        Do you understand, based on your

17   experience as a long time criminal law enforcement officer

18   and homicide detective, what a numerical evaluation of

19   negative nine means?

20        A        It means he failed terribly.

21        Q        Failed terribly?

22        A        Yes.

23        Q        Meaning he was not telling the truth

24   when he was responding to questions?

25        A        Apparently.
```

**J.A. 1624**

```
1        Q        And if you look under remarks, do you

2   see that section, on this page 14516, at the very bottom?

3        A        Okay.

4        Q        Do you see that, remarks?

5        A        Yes, sir.

6        Q        And it says number five, did you shoot

7   George Radcliffe, and the answer that Mr. Sharpe gave was

8   no?

9        A        That's correct.

10       Q        And according to this polygraph report,

11  he was not being honest when he answered that way, is that

12  right?

13       A        That's correct.

14       Q        And question number seven, did you

15  participate in any way in the shooting of George Radcliffe

16  and he answered again no.  And according to the polygraph

17  report, that was a dishonest answer?

18       A        That's correct.

19       Q        He was asked, do you know in, number 10,

20  question 10 asked of him, do you know for sure who shot

21  George Radcliffe, and he answered no.  And again he was

22  found to be not telling the truth with that answer?

23       A        That's correct.

24       Q        And if you look at the very last page of

25  this exhibit, it indicates for this polygraph done on
```

1   August 29, it says 1994, do you know if there was a

2   polygraph done in 1994 of Mr. Sharpe?

3          A       I don't know.  I didn't participate in

4   in it, so I don't know.

5          Q       Regardless of when it was done, the

6   result was that deception was indicated, correct?

7          A       That's correct.

8          Q       Have you ever seen a score worse than

9   negative nine on a polygraph?

10                 MS. PFEIFFER:  Objection.

11         A       No, sir.

12         Q       So, in your experience, that's the

13  strongest indicator you have ever seen of somebody taking a

14  polygraph that they were not telling the truth?

15                 MS. PFEIFFER:  Objection.

16         A       That is correct.

17                 MR. ELLIS:  What was the exhibit number

18         of Carolyn Johnson's testimony in the criminal

19         trial?  We do not have a paper copy of that.

20                 MR. LEWIS:  I believe it was 6.

21                 MR. ELLIS:  Do we have any paper copies

22         of that?

23                 MR. LEWIS:  It is 7.

24         Q       All right, going to Exhibit 7, and I am

25  going to ask you a couple of questions.  And you said you

1  thought you were in the courtroom when Ms. Johnson

2  testified?

3         A        I think I was, yes, sir.

4                  MS. MARTINEAU:  Let me find it.

5         Q        Okay.  I'm going to ask you to go to

6  page 73.

7                  MS. MARTINEAU:  Okay, what page, please?

8                  MR. ELLIS:  73 of the actual trial

9         transcript.  I think it is, of the pdf of the

10         trial transcript.

11                 MS. MARTINEAU:  73, hold on.  Okay.

12        Q        Now, Mr. Best, you were asked questions

13  by Mr. Sharpe's counsel about the autopsy report, do you

14  remember that?

15        A        If I read it from here, I do, but no,

16  sir, not exactly.

17        Q        No, today earlier, you were asked a lot

18  of questions by Mr. Sharpe's counsel about the autopsy

19  report, correct?

20        A        Yes.

21        Q        And that the autopsy report showed that

22  the bullet in Mr. Radcliffe entered his left arm, went

23  through the left side of his torso, inside of his right arm

24  and I think it was actually lodged in his right arm, it

25  never actually exited?

J.A. 1627

1       A       That's my understanding.

2       Q       And then you were asked questions that

3   suggested well how in the world could that happen if Mr.

4   Sharpe and Mr. Radcliffe were facing each other

5   face-to-face, do you remember that?

6       A       I do.

7       Q       Now, on page 73 of the criminal trial

8   transcript, which reflects the testimony that Charlene

9   Johnson gave under oath in front of the 12 member jury in

10  Pitt County.  So, the question was on line four, this is by

11  Mr. Stokes, Mr. Sharpe's lawyer, okay?

12      A       Okay.

13      Q       So Dontae pushes him, the white man says

14  F you man, and Dontae shoots him face-to-face.  What was the

15  answer under oath that Ms. Johnson gave to the jury?

16      A       I don't know if the white man turned.

17  He probably was not straight, but turned and shot him.  I

18  don't know if it was straight up or not.

19      Q       If Mr. Radcliffe was turning, as Mr.

20  Sharpe was shooting him, in your experience, would that

21  explain why the bullet entered his side rather than his

22  front?

23      A       It would.

24      Q       Now, all of that argument about shooting

25  face-to-face, autopsy results, turning, if somebody is

1   getting ready to shoot a gun at you, all of those arguments

2   were made by Mr. Stokes to the jury at Mr. Sharpe's criminal

3   trial, correct?

4        A       He did.

5        Q       And the jury rejected those arguments,

6   didn't they?

7        A       They did.

8        Q       Now I think the last exhibit I'm going

9   to show you is Exhibit 32.

10                       NOTE:  The above referred to

11              document is now being marked and filed as

12              Exhibit 32.

13       Q       I will represented to you that this

14   Exhibit Number 32 is a polygraph report of Charlene Johnson.

15       A       That is correct.

16       Q       Do you see that?

17       A       I do.

18       Q       And had you seen this document before

19   today?

20       A       Not that I can remember.

21       Q       Now, this, is this examination, this

22   polygraph conducted of Charlene Johnson, I think you were

23   already asked about this earlier today, was done on

24   April 19, 1994, do you see that?

25       A       Yes, sir.

```
 1        Q        Do you know when the examination, that

 2   somebody, I think you said -- well, who contacted the North

 3   Carolina State Bureau of Investigation to do a polygraph of

 4   Charlene Johnson?

 5        A        I think I did.

 6        Q        Do you know when you did?

 7        A        I don't.

 8        Q        Do you have any feeling for how many

 9   days before April 19, 1994 you made contact to set it up?

10              MS. PFEIFFER:  Objection.

11        A        I don't.

12        Q        So, on this polygraph report, it looks

13   like, do you see the remarks at the bottom of this first

14   page?

15        A        I do.

16        Q        That number five, the question asked of

17   Ms. Johnson was did you see Dontae shoot that man, and her

18   answer was what?

19        A        Yes.

20        Q        Number 7, did you lie to me when you

21   said you saw Dontae shoot that man, what was her answer?

22        A        No.

23        Q        And number 10, have you told me the

24   complete truth about seeing that man get shot?  What was her

25   answer?
```

J.A. 1630

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 299

1        A        Yes.

2        Q        And her numerical chart analysis looks

3    like it is a, can't see the very far one on the left to make

4    out what that, but one is a plus one and one is a minus one,

5    do you see that?

6        A        Yes, sir, it was a plus one.

7        Q        And do you, in your experience, have a

8    feeling or an understanding as to what those numerical

9    evaluations equate to?

10       A        I think it's -- I don't.

11       Q        All right.  Is your understanding, with

12   the numbers being plus one or negative one, compared to a

13   negative nine for Mr. Sharpe, that the polygraph would

14   indicate that Ms. Johnson was being more honest about her

15   answers than Mr. Sharpe about his?

16               MS. PFEIFFER:  Objection.

17       A        From the numbers, yes, sir.

18               MR. ELLIS:  Detective Best, thank you, I

19       don't have any other questions.

20               MS. MARTINEAU:  Mr. Best, I have some

21       followup questions for you.

22   CROSS EXAMINATION

23   BY MS. MARTINEAU:

24       Q        You had, you had with you some

25   documents, correct?

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                    Page 300

1        A        Yes.

2        Q        And you brought those with you today?

3        A        Yes.

4        Q        And you provided them to all the parties

5   or the attorneys for the parties in the case?

6        A        Yes.

7        Q        And did part of those documents contain

8   information about your training during the time you were

9   employed with the Greenville Police Department.

10       A        Yes.

11       Q        And you indicated when you retired, when

12   did you retire?

13       A        On October the 1st of 2003.

14       Q        Since October 1st, 2003, have you ever

15   been employed in the capacity with a law enforcement agency

16   as a law enforcement officer?

17       A        I was employed with the United States

18   Marshal Service, but I contractural, starting February the

19   4th, of 2004.

20       Q        Until when?

21       A        I was required to leave because of

22   medical in 2015.

23       Q        Okay.  And during the time that you were

24   with the Marshals, did you participate in any murder

25   investigation?

J.A. 1632

1        A        I did not.

2        Q        And so, it's been quite a long time

3   since you were involved in, quite a long time since you were

4   involved in the investigation of Dontae Sharpe, correct?

5        A        Almost 30 years.

6        Q        And while you indicated that you were

7   familiar, in general, that at least during the time you

8   worked at Greenville Police Department, that they had a book

9   of policies and procedures, correct?

10       A        Yes.

11       Q        And while you may not have read the

12  book, you, while you may not be familiar today, but at the

13  time, you were familiar with certain policies and procedures

14  of the Greenville Police Department?

15               MS. PFEIFFER:  Objection, misstates the

16       evidence.

17       A        Correct.

18       Q        And in addition, you were asked a

19  question about exculpatory evidence, do you recall that?

20       A        I was.

21       Q        And while you said you weren't familiar

22  with that term, during the time you were an investigator,

23  was it your pattern and practice to not just turn over

24  information that was helpful to your case, but also turn

25  over information, even if it hurt your case, correct?

J.A. 1633

```
 1                    MS. PFEIFFER:  Objection.

 2          A       It was.

 3          Q       And in regards to Beatrice Stokes, did

 4   you ever tell her, or did you ever provide her with any

 5   information about the murder of Dontae Sharpe?

 6          A       No.

 7          Q       And when she got in your car that day,

 8   you indicated that she appeared, how?

 9          A       She appeared fine that day.

10          Q       Okay.  In terms of whether she was being

11   afraid at all, how did she appear?

12          A       Scared to death.

13          Q       And at the time you talked to Beatrice

14   Stokes, had Charlene Johnson been beat up by --

15          A       A whole bunch of girls.

16          Q       Okay, and were any of those girls, do

17   you know, had any connection to Dontae Sharpe?

18          A       Yes.

19          Q       Which ones?

20          A       I think all.  I think one of them was

21   his girlfriend.

22          Q       And when Beatrice Stokes told you

23   information about Dontae Sharpe, did she ask you whether or

24   not she wanted you to write anything down?

25          A       She told me not to write anything down.
```

1     Q        Did she ask you to promise not to?

2     A        Yes.

3     Q        And she said that she wasn't going to

4  write anything down herself, and for me not to write

5  anything down.  And as soon as she told me the information,

6  she was leaving.

7     Q        And what did you do after she left?

8     A        I left also.

9     Q        Where did you go?

10    A        To the DA's office.

11    Q        Did you tell the DA what Charlene told

12  you?

13    A        What Beatrice told me.

14    Q        Excuse me, what Beatrice told you?

15    A        Yes.

16    Q        And in regards to documents such as the

17  autopsy, that document went, to your understanding, to the

18  DA's office, correct?

19    A        Every time.

20    Q        And was it your understanding during

21  this time that the DA would be providing copies of the

22  police file and information to the defense attorneys of

23  individuals who are being prosecuted by the DA's office?

24           MS. PFEIFFER:  Object to the leading.

25    A        Yes.

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                          **Page 304**

1              MS. MARTINEAU:  Thank you, sir, those

2        are the questions I have.

3              MS. PFEIFFER:  I have a few followup

4        questions.

5      REDIRECT EXAMINATION

6    BY MS. PFEIFFER:

7         Q      Mr. Ellis asked you about a couple of

8    polygraph reports?

9         A      Okay.

10        Q      Are polygraphs admissible in court?

11        A      No.

12        Q      Why not?

13        A      I don't know why, they are just not.

14        Q      No one has ever explained to you why

15    they are inadmissible?

16        A      No.

17        Q      Could you pull up both of those

18    polygraphs in front of you.

19              MS. MARTINEAU:  What are the exhibits?

20        Q      One is --

21        A      31 and 32, right.

22        Q      31 is Dontae?

23        A      Uh-huh.

24        Q      And 32 is Charlene?

25        A      Charlene.

**J.A. 1636**

| | | |
|---|---|---|
| 1 | Q | Could you turn the page so that you are |
| 2 | looking at the numerical scores on both of these? | |

3                    MS. MARTINEAU:  What Bates number, like

4              this page?

5                    MS. PFEIFFER:  Yes.

6                    MS. MARTINEAU:  Okay.

7        A        Okay.

8        Q        Could you explain to me what these

9    numbers mean, what the polygraph examiner has written down

10   here when it says neumo, GSR, cardio and then total, where

11   there is a total?  Can you explain what those mean to me,

12   please?

13       A        I cannot.

14       Q        What's the basis for your opinion that

15   Charlene's polygraph shows more honesty than Dontae's

16   polygraph?

17       A        She's a plus one and he's a negative

18   nine.

19       Q        And what does that mean?

20       A        Well, the worse negative you get, the

21   worse off you are as far as being honest.

22       Q        Is that your understanding about how a

23   polygraph --

24       A        That's my understanding, yes.

25       Q        Would you let me finish my question.  Is

1    that your understanding about how a polygraph is scored?

2          A        Yes.

3          Q        And when you are looking at a polygraph,

4    is every question scored individually?

5          A        I don't know.

6          Q        Dontae was asked several questions,

7    right?

8          A        It appears he was asked three questions.

9          Q        And Mr. Ellis went through those

10   questions with you.  They are listed on the first, the

11   second page of the report in front of you, correct?

12         A        Correct.

13         Q        Which of those did he show dishonesty

14   on, when you take a look at the numbers on the other page?

15         A        I have no idea.  I have never been

16   certified in polygraph examination, and I don't know what

17   this score means.

18         Q        And so, where did you get the opinion

19   that this score is, I believe you said showed that he failed

20   terribly?

21         A        It shows on the front page, numerical

22   evaluation, minus nine.

23         Q        And what are you basing that opinion on

24   if you have never had any training in polygraph

25   interpretation?

**J.A. 1638**

1       A       My understanding is the negative, the

2   higher the number, the worse it is.

3       Q       And on which question did he show

4   deception?

5       A       I have no idea.

6       Q       And why do you have no idea?

7       A       I don't know how to score these

8   questions.

9       Q       And you also don't know how to interpret

10   them, do you?

11       A       I don't know what that question means.

12       Q       You don't know how to interpret a

13   polygraph report, do you?

14       A       You mean the numbers?

15       Q       Correct.

16       A       No, not at all.

17       Q       And you don't know how to interpret the

18   score on a polygraph, do you?

19       A       I have been told that, yes.

20       Q       You have been told what?

21       A       How to interpret the scores.

22       Q       Who?

23       A       By the SBI agent.  If it's a minus

24   score, that's bad.  If it's a plus score, that's good.

25       Q       And so let's go back to Charlene.  Her

**J.A. 1639**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                                    **Page 308**

1   score is a minus one, plus one, minus one.

2          A        Her score is a plus one.

3          Q        If you look on the calculation page, the

4   total numerical evaluation, there are three lines there, do

5   you see that?

6          A        I do, but on the front it says plus one.

7          Q        But you see this, this is the

8   calculation, correct?

9          A        I saw that, yes.

10         Q        And what does that mean to you when

11  there is a plus one and a minus one.

12         A        I don't know what that means.

13         Q        You notice on Dontae's, there is a page

14  at the back that Mr. Ellis pointed out to you and that's

15  where he showed you the minus nine, do you see that?

16         A        Okay.

17         Q        It says deception indicated?

18         A        Yes.

19         Q        Where is that page on Charlene's?

20         A        I have no idea.

21         Q        You don't see one there, do you?

22         A        No.

23         Q        Do you have any idea why not?

24         A        Maybe there wasn't any deception

25  indicated.

1      Q       You think if no deception was indicated,

2   they would just not include that page?  Does that make any

3   sense to you?

4      A       I can't answer for the SBI, but I'm

5   telling you that this page, this report has it, this one

6   does not, so I can't answer why.

7      Q       Does it make sense to you that there

8   wouldn't be a page like that on Charlene's?

9      A       Maybe they do different things, maybe

10  each investigator does his reports differently.  I don't

11  know.

12     Q       Does it make sense to you that there is

13  not a conclusion on Charlene's?

14     A       It does make sense.  Because maybe the

15  investigators don't do things the way the other one does.

16     Q       Are you aware that a polygraph evaluator

17  for the SBI has looked at Charlene's polygraph examination?

18     A       I'm not.

19     Q       Are you aware that the SBI examiner

20  concluded that it was inconclusive?

21     A       I think that's indicated here.

22     Q       How is it indicated that it is

23  inconclusive?

24     A       If you look on the front page, it says

25  opinion, I think if you look to the right of it, you have

1  got X's in the I section, which indicates to me that it's

2  inconclusive.

3          Q        So, if it's inconclusive, how is she

4  more honest than Dontae?  How do you have the opinion that

5  she is more honest than Dontae if this is an inconclusive

6  report?

7          A        I'm saying she had a plus one and he had

8  a negative nine.  I think that speaks for itself.

9          Q        How is inconclusive consistent with

10  being honest?

11                  MS. MARTINEAU:  Objection.

12                  Argumentative.  You can answer.

13          A        I have the same answer as before.  I

14  think a minus is bad and plus is good.

15          Q        I want to turn your attention now to

16  Exhibit 29.  Mr. Ellis handed you this.  It is a number of

17  papers related to Mark Joyner?

18          A        Okay.

19                  MS. MARTINEAU:  Give me a second,

20          please.  Okay.

21          Q        The first page of this exhibit is the

22  warrant for his arrest, correct?

23          A        Correct.

24          Q        And he was arrested for murder, right?

25          A        He was.

1      Q       And he was later indicted for murder,

2  correct?

3      A       I don't have his indictment, so I feel

4  comfortable that he probably was if he was in Superior

5  Court.

6      Q       Flip to page four, please, and you will

7  see indictment, murder.  One more page, I think.  They don't

8  have numbers on them.

9      A       It's on the back, sorry.

10     Q       Do you see that indictment, murder?

11     A       Yes.

12     Q       And it says Mark Eldridge Joyner,

13  correct?

14     A       Yes.

15     Q       And down in the lower left-hand corner

16  it says 4-18-94, correct?

17     A       Yes.

18     Q       And this is his indictment for murder on

19  4-18-94?

20     A       It appears so.

21     Q       Back when he was arrested, this is

22  warrant for murder, what was the probable cause that Mark

23  Joyner could be charged with murder?

24     A       Your question again.

25     Q       What was your probable cause that Mark

1    Joyner could be arrested and charged for murder based on the

2    information you had at that point in time?

3          A        First of all, I didn't present the

4    evidence to the magistrate.  And second of all, his

5    information is the same as my information was.  Sharpe and

6    him had the same accusations, that he was with Sharpe at the

7    time of the murder.

8          Q        Well, he didn't shoot the gun.

9          A        Acting in concert.

10         Q        He didn't shoot the gun.

11         A        Acting in concert.

12         Q        Charlene never said he helped him shoot

13   the gun.

14         A        He was acting in concert.

15         Q        At best, he could be charged with

16   accessory after the fact, which is what he pleaded to, isn't

17   it?

18                  MR. ELLIS:  Objection.

19                  MS. MARTINEAU:  Objection.

20                  Argumentative.  You can answer.

21         A        My recollection is that the state was

22   acting under the acted in concert statute.

23         Q        Did anything in Charlene's statement

24   suggest that Mark Joyner even touched George Radcliffe?

25         A        He was acting in concert with Dontae

1    Sharpe.

2        Q      My question to you was, is there

3    anything in Charlene's statement that suggests that Mark

4    Joyner even touched George Radcliffe?

5        A      Not that I remember.

6        Q      Is there anything in her statement that

7    suggests that he pushed George Radcliffe?

8        A      Not that I remember.

9        Q      So, how is it, in your view as a

10   detective in the Homicide Unit, who understands probable

11   cause, how could he be charged with murder based on what you

12   knew from Charlene Johnson, who is the only person who ever

13   said Mark Joyner's name, what was the probable cause?

14          MS. MARTINEAU:  Objection to the

15          question.  You can answer it.

16       A      Detective Melvin presented evidence to

17   the magistrate and the magistrate issued a warrant.  I was

18   not present at the time, so I don't know what the evidence

19   was, but the warrant was issued.

20       Q      Okay.  Dontae was tried in July of 1995,

21   right?

22       A      If you say so, I believe you.

23       Q      Well, you were there.

24       A      I was.

25       Q      You testified at the trial.

1       A       I was, but I don't know what the date

2   was.

3       Q       If you would like to take a look at your

4   trial testimony to ensure yourself it was July of 1995,

5   please take time to do that.

6       A       Okay.  Mine doesn't have a cover page,

7   so, I don't know what the date was.  I don't know.

8       Q       For the purposes of my question, assume

9   that in July of 1995, Dontae Sharpe went to trial?

10      A       Okay.

11      Q       And when you go to trial, you plead not

12  guilty, right?

13      A       You don't have to.

14      Q       When you are going to trial --

15              MS. MARTINEAU:  Objection.

16      Q       -- you plead not guilty?

17              MS. MARTINEAU:  Objection,

18  argumentative.

19      A       You don't have to.

20              MS. MARTINEAU:  Listen to her question.

21      Q       When you go to trial, you plead not

22  guilty?

23      A       Go to trial, yes, I'm sorry, yes.

24      Q       And Dontae has maintained his innocence

25  up to the day of his exoneration, correct?

J.A. 1646

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**      **Page 315**

1      A      Are you asking as far as I know.

2      Q      Yes.

3      A      As far as I know.

4      Q      So, from July of 1995, to the time he

5   was exonerated and then later received a pardon of

6   innocence, he has said, I'm innocent, correct?

7      A      As far as I know.

8      Q      On July 17, 1995, after a jury trial, he

9   was convicted, right?

10      A      I don't have a date, but if you say it

11   is the 17th, I believe you.

12      Q      He received a life sentence, correct?

13      A      I don't know what his sentence was.

14      Q      You don't recall that he received a life

15   sentence?

16      A      I don't.

17      Q      Assume for the purposes of this question

18   that he did.

19      A      Okay.

20      Q      Even after receiving a life sentence, he

21   continued to maintain his innocence, right?

22      A      I don't know that to be true, but

23   apparently.

24      Q      At this point in time, Mark Joyner was

25   still in jail, right?

```
 1        A        I don't know how to answer that.  I

 2  mean, I don't know.  I don't remember what date he pled

 3  guilty.  He pled guilty some time soon around there.

 4        Q        Mr. Ellis just walked you through this.

 5  I'm going to take a look at Exhibit 29.

 6                 MS. MARTINEAU:  Which one is Exhibit 29?

 7                 MS. PFEIFFER:  It's Mark Joyner.

 8        Q        And the date of plea, he walked you

 9  through the plea transcript.  If you look on this page with

10   the writing and signatures.

11        A        Okay.

12        Q        The date of plea is January 10, 1996,

13  right, you see that?

14        A        I do now, yes.

15        Q        That is six months after Dontae has been

16  convicted of a murder he said he didn't do and received a

17  life sentence, correct?

18        A        Apparently, yes.

19        Q        Mark Joyner was also charged with

20  murder, correct?

21                 MS. MARTINEAU:  Objection, asked and

22                 answered.  You can answer it.

23        A        He was.

24        Q        And when he took this plea, what he pled

25   to was accessory after the fact, right?
```

1       A       It appears.

2       Q       And he received a sentence of five

3   years, right?

4       A       I don't know that, I thought it said 10

5   years on here.

6       Q       If you take a look at his judgment.  Let

7   me flip the page and there is not numbers on here.

8       A       Okay, I found that.

9       Q       Second to the last page?

10      A       Uh-huh.

11      Q       Do you see that?

12      A       I do.

13      Q       Five years is what he received, right?

14      A       Okay, it appears so.

15      Q       And he was charged with the exact same

16  charge as Dontae, right?

17      A       That is correct.

18      Q       Give me just a quick minute.

19              MS. PFEIFFER:  I don't have anything

20      further.

21              THE WITNESS:  All right.

22              MR. ELLIS:  No questions.

23              MS. MARTINEAU:  No further questions.

24      Thank you.

25              -----------------------------------

1          AND FURTHER THIS DEPONENT SAITH NOT

2          THE VIDEOGRAPHER:  That ends this

3    deposition.  The time is 6:36 p.m.

4          MS. MARTINEAU:  He will read and sign.

5          THE COURT REPORTER:  Do you want this

6    transcript transcribed?

7          MS. PFEIFFER:  Yes, please.

8          THE COURT REPORTER:  Mr. Ellis, do you

9    want a copy?

10          MR. ELLIS:  Yes.

11          MS. PFEIFFER:  I think we have a

12    standing order with Huseby.

13          THE COURT REPORTER:  And you want a

14    copy?

15          MS. MARTINEAU:  I do.

16               WHEREUPON, the taking of the

17    deposition was concluded at 6:36 p.m.

18

19

20

21

22

23

24

25

J.A. 1650

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                    **Page 319**

```
 1

 2            I, DAVID RICKY BEST, have read pages 1

 3      through 318 and it is correct, to the best of my

 4      knowledge and/or exceptions are noted in my letter which

 5      is attached.

 6

 7

 8            _____

 9                  DAVID RICKY BEST

10

11      _____

12      (date signed)

13

14

15            SWORN to and subscribed before me this

16      the _____ day of _____, 2023.

17

18

19            _____

20                  Notary Public

21

22
        My Notary Identification Number: _____
23      My Commission expires: _____

24

25
```

**J.A. 1651**

1  STATE OF NORTH CAROLINA,

2      I, Cherryl J. Maddox, the officer before whom the

3  foregoing deposition was taken, do hereby certify that prior

4  to being examined the witness named in the foregoing

5  deposition was by me duly sworn to testify to the truth, the

6  whole truth, and nothing but the truth; that the said

7  deposition was taken down by me in stenotype at the time and

8  place therein named; and that this is a true, accurate and

9  correct record of the proceedings therein reported.

10      I further certify that I am not related to the witness

11  or counsel; that I have no interest in the outcome of this

12  case; and that there were 31 exhibits filed with me, which

13  are attached hereto and made a part of this record.

14      Given under my hand this 4th day of May, 2023.

15

16

17                    _____

18                         Notary Public

19

20  My Notary Identification Number:  202213700022

21  My Commission expires:  May 15, 2027

22

23

24

25

J.A. 1652

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023**                                    **Page 321**

```
1              CHANGES AND SIGNATURE

2  WITNESS NAME: David Ricky Best, 04/28/2023

3  PAGE   LINE   CHANGE        REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16    I, David Ricky Best, have read the foregoing

17 transcript and hereby affix my signature that same is

18 true and correct, except as noted above.

19

20              _____

21                    David Ricky Best

22    Sworn to and Subscribed before me

23 _____, Notary Public.

24 This_____day of _____, 20____.

25 My Commission Expires:
```

**J.A. 1653**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                     Index: $18..10

---

### Exhibits

BestR 1   3:7
  66:14,15
  86:24

BestR 2   3:8
  72:13,15
  87:20

BestR 3   3:9
  96:3,8,10

BestR 4   3:10
  99:20,21,
  24

BestR 5   3:11
  131:25
  132:3
  133:6,7

BestR 6   3:12
  137:7,10
  177:9

BestR 7   3:13
  154:14,17
  158:7,13
  294:24

BestR 8   3:14
  158:6,17,
  19

BestR 9   3:15
  166:16,23,
  24,25

BestR 10
  3:16
  170:23
  171:1,2,3

BestR 11
3:17
172:8,9,
12,13

BestR 12
3:18
175:5,9

BestR 13
3:19
196:12
197:11

BestR 14
3:20
200:11

BestR 15
3:21
201:24
202:2

BestR 16
3:22
203:11,14

BestR 17
3:23
209:5,8

BestR 18
3:24
219:12,15
258:15

BestR 19
3:25
226:10,13,
17

BestR 20   4:2
233:2,5,9

BestR 21   4:3
226:14
240:16,19

BestR 22   4:4
244:10,13

BestR 23   4:5
253:2,3,8

BestR 24   4:6
254:5,11

BestR 25   4:7
263:9,14,
16  264:11

BestR 26   4:8
265:5,8
268:24
271:8

BestR 27   4:9
266:12,15,
17  267:9

BestR 28
4:10
268:13,16

BestR 29
4:11
283:9,12,
13  310:16
316:5,6

BestR 30
4:12
290:1,4

BestR 31
4:13
290:16,19
291:5

BestR 32
4:14
297:9,12,
14

---

### $

$18   126:5

$25   191:23

$500   282:4

---

### 0

005356
  158:25

04   253:16,
  18,19,21

---

### 1

1   66:14,15
  86:24
  244:15

1-10-96
  284:16,25

10   12:14
  19:6  20:15
  21:1,2,16
  64:16
  170:23
  171:1,3
  273:8
  286:10
  287:16
  293:19,20
  298:23
  316:12

---

**J.A. 1654**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: 100..1994

317:4

**100**  170:6,
9,14
171:16
173:11

**10:15**  249:25

**10:30**  247:11

**10:46**  57:25

**10:59**  58:6

**11**  66:16
77:25
84:24
85:20
172:8,9,
12,13
199:21
220:10,17
254:19
255:23
278:24
288:6
291:6

**11-24-04**
253:12,16

**11:06**  63:11

**11:15**  63:17

**12**  12:15
167:1
175:5,9
284:20
290:8
296:9

**12:49**  136:23

**13**  196:12
197:11
257:9

**137**  133:6

**138**  131:19
132:5

**13:34**  263:22

**14**  83:2
84:23
150:16
155:1
178:21
199:24
200:11
273:17
282:19

**14516**  291:12
293:2

**14th**  85:22
113:20
126:1
148:23

**15**  78:3
81:18
201:24
202:2
250:4

**16**  203:11,
14 255:14
274:9
277:12

**17**  64:9
209:5,8
315:8

**17:15**  175:11

**17th**  315:11

**18**  200:5,14
219:12,15
258:15

**19**  199:19
200:16
201:17,19
226:10,13,
16,17
297:24
298:9

**1973**  107:25
213:7,9,11

**1975**  12:10
13:14

**1990**  23:11
111:22

**1990's**
106:17

**1992**  167:1
168:16,18
254:19

**1993**  23:14
171:4
203:16
255:4

**1994**  52:7
66:16
77:25
90:23
92:13,25
93:17
95:1,2,3,

**22**  96:5,18
98:7
103:18
104:10
105:23,24
106:9,13
109:25
110:15,16,
18,22
111:19
112:3,4
113:18
117:7,16
119:15
120:11,15
129:25
130:2
137:15
157:18
158:20
166:1
168:24
169:2
178:12
185:8
186:19
194:7
196:7
199:21,24
200:3,5,
14,16
201:19
202:16
205:1
206:19
209:11,18,
23 210:1,
9,18,23

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: 1995..2:03

215:16,21
216:9
220:10,17,
18 221:15,
19 227:22
233:18
239:24
243:8
250:14
259:1,23
263:21
264:14
265:24
272:12,22
273:13
274:9
275:3
277:12
278:24
282:20
286:20
294:1,2
297:24
298:9

**1995**  9:1
18:9 22:5
91:16 95:4
96:5,11
154:5
186:23
194:8
220:10
239:8,12
255:14,23
256:25
292:10
313:20
314:4,9

315:4,8

**1996**  101:4
286:10
316:12

**1997**  9:1
126:16,19
131:23
234:16
236:14
237:23
238:2

**19th**  201:20

**1:30**  177:4

**1st**  111:22
300:13,14

────────

**2**

────────

**2**  72:13,15
87:20
152:19
209:11,18,
23 210:1
242:8
247:1

**2-10-94**
271:24

**2-14**  271:24

**2-14-94**
72:17 73:1
271:23

**2-15-94**
272:2

**2-19**  271:24

**2-26-2001**
244:19

**20**  12:18
15:4 96:5
233:2,5,9
258:17

**2000**  238:7
240:22
242:8
251:16
252:8
257:10

**2001**
245:19,21
247:1,8

**2003**  172:14
173:11
253:22
257:17
300:13,14

**2004**  253:13
300:19

**2014**
252:13,18,
20,25
291:6,15

**2015**  300:22

**2023**  5:1,3

**21**  226:14,
16 240:16,
19

**22**  203:16
244:10,13

**220**  292:6

**23**  240:21
253:3,8
258:17

**24**  253:13
254:5,11

**25**  218:9,11
257:17
263:9,14,
16 264:11

**2538**  244:25
245:5

**2539**  245:17

**26**  210:9
233:18
245:21
259:18
265:5,8
268:24
271:8

**27**  171:4
220:10
266:12,15,
17 267:9

**274**  290:10

**28**  5:1,3
268:13,16

**29**  283:9,
12,13
294:1
310:16
316:5,6

**2:03**  137:3

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                                Index: 3..8

**3**

3   96:3,8,10
   255:4

30   34:12
   107:18
   117:22
   118:3
   138:8
   143:8,12
   144:1
   148:1
   151:11
   152:14
   157:9
   163:24
   178:9
   181:6,20
   182:24
   203:10
   217:18
   221:22
   290:1,4
   301:5

31   290:16,
   19 291:5
   304:21,22

32   297:9,
   12,14
   304:21,24

3686   271:16

3690   273:24

3691   274:21

3694   275:25

3702   277:9

3703   278:15

3705   279:19

3711   280:3

3:42   216:1

3:58   216:7

**4**

4   99:21,24
   126:18
   245:6

4-18-94
   311:16,19

4-7-94
   175:11
   267:3
   276:12

45   218:10

4:21-CV-
000185-BO
   5:8

4:25   227:22
   229:5

4:31   240:8

4:41   240:14

4th   300:19

**5**

5   131:25
   132:3
   133:7
   245:18

5-4-94   202:9
   279:24

5028
   282:11,13

53   74:22

5358   160:10

56   154:19,
   21 158:8

5:09   262:13

5:15   175:12
   177:2

5:24   262:19

**6**

6   137:7,10
   177:9
   247:8
   294:20

6-4-96   257:3

6:36   318:3,
   17

6th   67:16
   75:7 89:4
   113:20
   114:25
   126:1
   144:9
   146:19

**7**

7   117:7,15
   119:15
   120:11,15

129:25
137:15
152:19
154:14,17
158:7,13
178:12
185:8
186:19
188:20
199:24
200:2
220:18
227:22
263:21
264:14
265:24
286:20
294:23,24
298:20

7-20-95
   256:2

7-26-1994
   210:12

7-7-94
   275:16

7-B   286:6

73   295:6,8,
   11 296:7

7659   283:15
   288:14,18

7th   177:2
   221:8

**8**

8   158:6,17,

www.huseby.com          Huseby Global Litigation          800-333-2082
Case 4:21-cv-00185-BO   Document 196-5   Filed 09/12/24   Page 326 of 409
J.A. 1657

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: 805..acting

19

**805**  250:1,
3,4

**8954**  233:8

**8:05**  247:8

---

**9**

**9**  166:16,
23,25
244:15
245:6,18

**9-23-95**  97:9

**90**  204:18

**90's**  15:21
18:7,8
52:5
165:17,18

**92**  169:5

**93**  25:22
204:22

**94**  94:5
169:5,9
199:19
253:16,21
273:17
275:7
283:15
288:13,18

**95**  18:17
91:20 92:8
94:6 95:5
99:9
158:13
238:11

255:22

**96**  40:8,10

**97**  92:8

**9:39**  5:4

**9:45**
247:13,23

---

**A**

---

**a.m.**  5:4
57:25 58:6
63:11,17
247:11,13,
23

**abide**  104:12

**ability**  7:17
48:21
122:25
123:3
149:2

**abrasions**
159:24

**absolutely**
7:18 20:21
30:5,18
31:16
34:4,19
36:6 43:1
44:11,14
48:6 53:25
77:16
82:3,16
92:11
103:21
134:2

165:24
184:21
199:7
258:23
277:8
278:8

**abuse**  205:2

**abuser**
205:8,10
211:8

**accept**
184:12

**accepted**
150:7,24

**access**
253:10,12
254:1

**accessory**
287:19
288:2
289:16,22
312:16
316:25

**accomplish**
173:9

**accomplished**
173:10

**account**
201:9

**accreditation**
18:15
19:1,12,18
20:14 21:6
22:5 107:7

273:6

**accredited**
18:10
107:7
272:17

**accuracy**
151:5,10,
19 164:7

**accurate**
41:21,25
48:5 55:12
92:9
138:12

**accurately**
56:7 92:4
248:23
251:2

**accusations**
241:1,6,9,
23 242:17,
23 250:14
312:6

**achieve**
47:14

**acknowledged**
107:15

**acquire**
46:12

**act**  270:14

**acted**  270:19
312:22

**acting**
118:11
122:4,7,9,

14  124:13,
20  312:9,
11,14,22,
25

actions  62:2
71:19
80:19
220:9,16,
17

active  14:15

actively
17:20

activity
113:13
264:4

actual
146:8,9
295:8

add  23:16

added  21:17
23:17

addendum
166:25
171:3

addict
150:22

addition
21:18
301:18

additional
178:4
273:6

address
124:6,7

250:5
267:7

addressed
233:25

adequate
151:8

administration
164:24
165:4,6

administrative
267:15

admirably
170:5

admissible
304:10

admit  102:17

admitted
76:12

adult  49:18,
21

advance
12:13
14:17 18:4
38:17,20,
22 42:17
236:23

advanced
39:2 42:8,
14

advancement
13:19

advised
67:14,18,

20

advising
100:2

affair  94:5,
19,24
95:12,19

affairs
95:23
254:6
257:24
258:2

affidavit
8:25
268:17,22

afraid  207:1
302:11

agencies
176:14

agency  167:3
191:17
242:2
300:15

agent  243:17
244:19
248:19
249:17,20
250:17
251:1
307:23

agree  44:7
48:4,19,
20,23 49:1
56:7 62:25
66:4
98:17,20

133:25
134:24
135:3,11,
19,20
161:4,16
162:12,17
235:7,19

agreeable
184:11

agreed
132:20
184:12
246:15

agreement
46:19

ahead  7:7
8:8 129:1
131:23
171:13
172:7
209:17
240:5

aide  289:11

AKA  67:2
87:4

alcoholic
93:14,18

alibi
230:13,25
231:5,13,
16

allegation
254:17
255:4,8,
14,25

256:18,24,
25 257:3,
10,11,18

allegations
100:6,13,
19,21,23
102:10
103:5
241:12
243:7
255:24

allege 289:4

alleged 84:5
135:24
146:15,16
256:4

allowed
20:11

Alonzo
90:18,24
274:8

Alrico
232:19
234:4,11,
15

alter 243:8
246:4

amount 81:7
187:18

analysis
299:2

Ann 88:16
232:4,5
282:24

annual 171:3
172:13

answerer
33:12

answering
50:1 64:18
132:5

answers
219:22
220:3,5
299:15

anymore
109:2
124:3
148:8
186:9
189:15,16

apologize
10:11
26:16
72:24
106:5
258:25
259:10
271:8

apologizes
259:13

apologizing
259:7

apology
259:22
260:1

apparent
248:3

apparently
68:12 99:8
272:6
292:25
315:23
316:18

appealed
23:15
281:20

appearance
205:17

appeared
151:1,2
302:8,9

appearing
164:24

appears
144:17
161:2
170:19,22
204:9
263:18
279:23
283:20
285:2
288:5
306:8
311:20
317:1,14

appointed
12:15
246:23

Appraisal
166:25

apprehension

289:12

apprize
147:24

apprized
22:16 82:9

approach
131:13,14

approached
67:3 87:4
243:7

approaches
61:17

approximately
67:12

April 5:1,3
117:7,15
119:15
120:11,15
129:25
137:15
152:19
185:8
186:19
188:20
194:7
199:19,24
200:2,5,
14,16
201:17,19,
20 220:18
221:8
227:22
256:25
257:16
263:21

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: area..assigned

264:14
265:24
286:20
297:24
298:9

**area** 18:16
61:6 67:19
89:4
111:23
112:6,8,10
113:15,20,
21 114:6,
12,20,25
115:1
175:19
177:19
206:23,25
261:15
264:9
272:18

**areas** 14:24
15:2,6,11
112:2,11,
14,16
113:7

**argue** 186:9

**arguing**
126:3

**argument**
126:7
186:11
296:24

**argumentative**
38:16
40:21
71:16

163:18
169:11
185:21
187:12
211:25
213:21
214:11
223:7
310:12
312:20
314:18

**arguments**
297:1,5

**arm** 160:25
161:1
163:14,15
295:22,23,
24

**Armwood**
75:24

**Army** 67:4
87:6

**arranged**
15:21

**arrangements**
234:4

**arrest** 48:2
80:15
113:18
153:19,23
164:4
175:21
179:17
201:18
202:6

227:1,2,8
228:22
254:18
255:4
258:8
265:19
266:8,21
267:19
268:6,20
269:13,16
276:6,11,
16,21
283:14,18
288:17
310:22

**arrested**
79:24
153:17
163:21
174:1,5
178:5,8
200:3
201:6
208:1
220:19
228:20,24
229:1,4,5,
6,8,15
261:23
265:21
270:15
275:25
276:19,22
310:24
311:21
312:1

**arresting**

164:1,8
276:7

**arrived**
123:15
131:2
250:3

**arrives**
60:19

**arrow** 205:3

**article**
61:5,19
62:15

**articulate**
80:24

**asks** 172:15
285:17

**assault**
181:15
183:7

**assaulted**
179:19
203:21

**asserts**
258:18

**assess**
29:10,22

**assign** 23:12
26:24

**assigned**
13:3 20:24
22:24,25
23:8,10
24:10,25
25:3,22

26:4 28:8,
23 29:19,
20 34:25
35:14
71:1,6
78:3,8,12,
24,25 79:7
80:3 88:22
104:3
111:21
179:18
193:22
262:2
267:18
274:25

**assignment**
35:24
79:13

**assignments**
35:7

**assigns**
26:21
27:17

**assist** 17:20
24:25
79:19
171:15
176:21
181:18
183:8,9,25

**assistance**
181:14

**assistant**
6:6 38:5,
6,13 39:1,
3 42:6,13,

23 71:13
245:2
267:15

**assisting**
29:25 38:3
132:7

**assume** 7:22
205:14
314:8
315:17

**assuming**
64:19
283:3

**assure**
210:15

**attached**
40:11
240:20
264:10

**attempt**
67:12

**attempting**
245:19

**attend**
156:4,11

**attended**
51:5
195:21

**attention**
120:20
203:8
235:16
310:15

**attorney** 6:6

7:4 9:10,
19,24
40:25
41:2,4,6,
15 64:22
101:22
102:19
121:22
141:14
142:15
154:11
155:6
233:13
235:20
242:13
244:22
245:2
246:21,23
252:5
285:23
291:2

**Attorney's**
121:21
194:6
240:24

**attorneys**
9:13 64:24
101:12,17,
24 102:3
219:24
300:5
303:22

**August** 167:1
171:4
178:12
203:16
255:23

294:1

**automatically**
217:4

**autonomous**
27:13

**autonomy**
27:8

**autopsy**
156:5,9,
11,12,17,
23,24
157:6,11,
14,18,23
158:3,16
159:3,6,9,
18 160:19
161:5,17
162:13
163:6,14,
20,23
164:1,4
201:10
222:18,21,
24 223:4,
6,13,17,22
260:16
295:13,18,
21 296:25
303:17

**award** 281:15

**awarded**
281:23,24

**aware** 93:13,
18 94:23
95:6,14
111:6

www.huseby.com    Husebly Global Litigation    800-333-2082
Case 4:21-cv-00185-BO  Document 196-5  Filed 09/12/24  Page 331 of 409
J.A. 1662

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: back..Beatrice

143:2
180:4
190:22,24
194:10
210:3
230:1
236:25
238:21
239:11
240:25
241:6,8,10
243:6
246:8
249:14
250:16
252:14,24
287:5
309:16,19

**B**

back  8:18
  10:4,8
  20:25 22:3
  27:16
  33:21
  34:10,13,
  15 36:8
  43:15,16
  44:23
  45:20 53:4
  58:5
  63:16,19
  64:8 65:6,
  13 71:2
  76:2 88:22
  91:25 92:1
  97:25

108:2
110:16,17
118:19
125:15
126:20
132:22,23,
24 137:2,5
143:9
144:3
147:24
148:3
152:12
156:19
161:25
172:21
178:14,23
179:3,4,7,
20 186:15
196:18
204:19
207:10
210:9
216:6
218:9
222:18
223:1,25
240:13
242:10
253:23
262:18
268:24
269:3,22
279:6
281:10
285:8
292:10
307:25
308:14

311:9,21

background
  11:8

backups  46:6

bad  15:5
  211:19
  307:24
  310:14

badly  179:19

bag  189:7
  190:8
  191:24

Bailey
  11:24,25
  12:2
  13:17,18,
  24 14:2

bank  282:1

Baptist
  211:17,22

Barry  245:2

based  68:4
  130:17
  292:16
  312:1
  313:11

basics  7:1

basing
  306:23

basis  24:12
  25:8 63:4
  153:19
  167:22

192:15
218:1
305:14

Bates  154:19
  233:7
  245:6
  305:3

bay  117:24

Bazemore
  243:17
  244:18
  245:13,14,
  19,25
  246:9,13,
  17,20,24
  247:9,13,
  15,17
  248:15,19
  249:1,5,
  17,20,25
  250:2,7,17
  251:2

Bazemore's
  250:21

beat  302:14

Beatrice
  202:11,14,
  15 203:17
  204:23
  205:1,2
  206:18
  208:19
  209:9
  210:2,22
  214:1
  215:5,8,

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: began..bring

11,13
239:6,7,
11,22
241:15
242:18
245:11,15,
25 246:8
247:4
248:1,8
249:21
250:8,11,
13,17
286:23
302:3,13,
22 303:13,
14

**began** 175:18
238:8
245:19

**begin** 8:1

**beginning**
51:24
65:25
66:6,9
133:15
139:10
245:18
289:15

**begins** 167:2
290:9

**behalf** 5:12,
14,17,21,
23

**belief** 289:4

**Bell** 266:17

**belonged**
67:9 87:9

**Bible** 65:25
66:8

**Bibles** 66:1

**big** 7:5
161:10

**binder** 10:5
132:5

**bit** 11:7
15:17
53:15
104:9
150:15
262:5
271:12

**black** 9:6

**blame** 76:7

**BLC** 44:1

**BLET** 213:1,
5,17

**block** 107:25

**blood** 33:19
34:8,9
84:6,16
216:21

**bloodshot**
205:22

**bloodstain**
116:13

**board** 281:8,
12,24

**body** 158:25
160:11

**bolster**
177:25

**bolstered**
177:15,21

**bond** 246:21
247:1

**book**
104:13,14,
15,22,24
105:12,16,
19,22
106:8
107:3,14
118:5
190:8
301:8,12

**borrow**
263:10

**Bottling**
120:4

**bottom** 66:25
74:22 87:3
100:7
158:24
173:8
175:11,24
202:4
203:24
204:5
244:18
253:11
255:13
256:2

267:1
292:13
293:2
298:13

**bought**
256:11

**Boulevard**
196:5
250:2,4,5

**box** 288:20

**boyfriend**
120:8,24
121:2

**brain** 8:19
10:24

**break** 7:15
8:5,6,9
57:6,22
63:9,20,23
64:8,16,
23,25
65:3,4,5,
14 136:19
137:5
215:24
235:15
240:6
262:11

**breaking**
15:25

**briefly**
264:3

**bring** 25:14
53:14 99:5

**J.A. 1664**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023    Index: bringing..captain

bringing
  52:16

brother
  11:10,13,
  18 190:7
  191:3

brothers
  113:23

brought
  122:1
  124:11
  126:22
  132:9
  178:14,18
  179:6
  258:13
  270:4,6,15
  272:1
  276:23
  300:2

Brown  18:17
  52:22
  117:19
  125:17
  126:22
  127:1
  128:23
  131:2
  147:18
  187:15
  264:7
  270:5,6
  276:7,14,
  23,24,25
  277:17,18

building

18:17
52:22
117:19,21
125:18
126:22
127:1
128:23
131:2
147:18
187:15
264:7
270:5,6
276:24,25
277:17,18
279:16

bullet  32:11
160:20
163:14
220:14,16
295:22
296:21

bunch  302:15

Bureau  242:9
  275:1
  281:1
  298:3

burglary
  13:3 16:5

business
  77:2 186:6

busy  22:1

buttocks
  219:4

buying  256:5

— C —

cabinet  20:2

cabinets
  18:16,18

calculation
  308:3,8

caliber
  32:10
  218:9

call  23:4
  28:11,18
  42:24 68:9
  114:18
  131:15
  139:24
  179:17
  180:1,9
  183:14
  190:5,25
  218:23
  237:6
  247:4,10,
  13 248:15,
  16 249:1,8
  273:10

called  6:10
  14:19
  26:7,9
  78:11
  79:15
  100:23
  193:21
  207:4
  212:9
  218:25

234:25
247:8
250:8
269:22,24

calling
  165:14
  247:15
  249:3,14

Candice
  119:14,17,
  21 120:3,
  14 121:9,
  11 179:12
  183:1,7
  221:4

Candice's
  119:24
  183:4

canvas  82:11
  89:8,12

canvased
  144:5

capabilities
  34:11,13

capable
  93:10

capacity
  300:15

captain
  16:24
  17:10,11,
  12 22:7,8,
  16,19
  78:11
  79:15

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: captain's..case

80:22
100:3
117:21,23
132:21
147:23,24
188:3
257:25
274:12,15
275:10,12

**captain's**
78:11

**caption** 88:1

**car** 62:15
67:19
68:19
84:14
98:3,4
99:5
123:7,9
124:24
125:7,16,
17 151:25
179:4,5,6,
7,8,10,11
184:20,23
207:1,3,4,
6,9 214:1
216:19
217:21
289:13
302:7

**cardio**
305:10

**care** 7:8
81:12

**cared** 81:9

**career**
112:18
172:16
173:5
235:4,6

**Carlston**
230:9,17,
18,19,24

**Carmon**
232:20
234:4,11,
15

**Carolina** 5:7
11:24
245:2
284:13
298:3

**Carolyn**
5:22,24
72:15 73:3
76:12
79:25 80:1
83:1,6,12
84:22
85:22
90:4,12
92:25 94:4
100:24
101:25
102:24
103:14
116:1
217:16
234:1
238:7
239:12,23
241:1

243:1
244:17
246:2
249:9,15
258:13
259:1
262:3
263:3,18,
23 279:21
294:18

**carried**
18:14
118:10
125:14
147:18
178:25
179:7
198:22
273:3
287:24

**carry** 115:16
213:2
280:20

**carrying**
280:22

**case** 5:8
9:14 16:23
18:3,4
19:9,22
20:1,24,25
21:1 22:2
23:5,8
24:2,13,
14,25
25:25
26:24,25
27:15

28:7,16
29:19
31:9,11,
23,24 32:1
35:1,5,10
36:14
38:18,20,
22 39:2
40:13,24
41:3,16
42:2,8,13,
14,18,20
43:3 46:11
47:22 53:5
58:14,19
59:4,21
60:4,7,13,
14,15,16,
18 61:15,
17 62:8,
11,12,23
63:6 66:5
68:1 71:1,
6,23 73:25
74:2 77:5,
19 78:1,8,
12,13,16,
17,18,19
79:10,22,
24 80:4,7,
23 81:5,
10,16,17
82:10
83:3,7
88:22
90:8,12,23
91:17
92:23 93:3

**J.A. 1666**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                   Index: cases..charged

97:22
103:25
104:2,7
113:15,22
115:24
116:9,15,
20 119:22,
23 120:2,
21 127:21
134:1
135:24
138:19
139:19,20
140:1
142:10,19,
20 143:15,
18,25
151:24
154:4
156:5,25
157:7,15,
17,18
158:4
160:1,20
166:7
168:22
169:19,21
174:6,7,
11,12
175:14
179:18
182:25
183:15,23
184:1
185:3
187:11,20
192:24
195:3

197:10
198:19
202:5,19
203:2,3,22
204:14
206:15,16,
19 207:24
216:9
218:8
221:17,21,
25 222:1,
7,10,14,
17,22
223:2,6,
15,17,18
227:4,8,9,
15 229:16
235:23
236:2
238:13,15
244:22
252:14,15,
25 253:9,
13,15
259:1,15
260:16
262:2
267:18
270:3
271:16
278:17,18,
21,22
279:25
281:14
286:11
300:5
301:24,25

cases  12:21
21:1,2,12,
19 22:6,24
23:2,6,11,
15 24:3,10
26:22 36:1
40:19,22
47:4 77:8,
13,18,21
78:20
80:25
90:22 93:5
94:3
111:20,21
142:11
166:9
169:2,14,
17,18
174:18
190:4
192:14,17
210:9
212:5
235:5
244:6
253:15
cash  282:3
casing  32:9
casings
32:5,11
cast  40:17
categories
15:19
caused  21:3,
10  96:19
98:11

causing
67:19
cc'd  242:10
center
253:10
central  20:2
273:10
certified
306:16
chair  102:20
228:21
chance  13:19
change  12:4
20:18 23:9
79:20
260:22
261:4
changed  17:4
18:6,8,10
275:9
charge  8:5
17:17
26:21 27:1
28:3 40:24
189:25
190:20
209:15,19,
23 285:20
287:7,18
317:16
charged
135:25
210:8
245:22

**J.A. 1667**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: charges..chose

289:16
311:23
312:1,15
313:11
316:19
317:15

charges
183:13
209:2,10
210:3,19
285:18,19,
24 287:24

Charlene  9:3
80:1 117:5
119:9,11,
15 121:8,
12 122:1
123:6,19,
24 124:2,5
125:17
126:25
127:23
130:1,6,
14,22
131:12
132:16
133:15
135:10
137:12,14
144:16
145:3
151:14
153:16
154:8,11
155:5
157:22
161:16

177:4,22
178:4,11,
14 179:19
180:5
181:12
182:17,23
183:22
184:3
186:15,24
187:14,24
189:2,23
190:6,12,
18 191:3
192:13
193:20
194:5
199:25
200:17
214:15
227:21
228:5,10
229:10,17
230:2,5
232:9,16
260:14
263:21
264:17
265:25
281:14
286:10
296:8
297:14,22
298:4
302:14
303:11
304:24,25
307:25
312:12

313:12

Charlene's
121:15
123:11
128:22
131:1
134:25
137:23
158:13
161:12
177:15
178:6
179:13
186:19
197:11
198:14
201:9
221:7
224:3
227:14
305:15
308:19
309:8,13,
17 312:23
313:3

Charles
196:5

chart  299:2

check  18:21,
22 20:16
23:1 75:10
124:7
163:20
164:1
282:2

checking

188:23

checks
176:10,13

Cherry
290:23
291:1,2

chest  155:11
160:25
163:15

chief  11:14
17:13
22:7,8
78:15
79:16,17
80:23
81:4,5
99:25
100:1
168:7,12,
16 240:22

chief's
78:14

child  49:18,
21 129:21
178:23

children
78:16
104:3

chips  189:7
191:24

choose  25:14
208:9

chose  11:9,
17 245:13

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: chosen..collected

chosen
 184:13

Christian
 65:19,22
 260:12

Christmas
 190:2,6,10
 192:2

chronological
 271:9

chronology
 265:24

church  111:3
 211:17,23

circumstance
 37:11
 50:17,24
 109:12,21
 133:15
 136:2
 141:2
 143:24
 226:5

circumstances
 57:4 58:14
 61:12,13
 62:1 79:4
 90:3,6,7,
 17 109:11
 134:24
 195:13
 197:4
 204:21
 206:22
 281:21

cited  170:3

city  5:17,
 20 101:13
 112:2,14
 240:23
 251:23

CJ  96:20
 98:11
 175:25
 263:23
 274:16
 283:22

claimed
 218:14

clarify
 35:13
 41:12
 131:5
 218:24

Clarise  91:1

Clark  164:17
 165:9
 166:17,20
 207:21
 233:12,19,
 23 234:3,
 7,11,25
 235:2,17
 236:15,18,
 22 237:5
 240:23,24
 241:11,14
 242:10,13,
 16,22
 252:7,9,11
 288:25

Clark's
 214:6

class  213:5

classes
 51:5,8
 107:21,22

clear  7:20
 60:18
 169:14
 229:14
 237:10

clearance
 169:23
 170:10,15
 171:16,18
 173:11,12,
 22 174:5,
 15

cleared
 169:19,21
 174:6,7
 202:5
 279:25

clearing
 169:17,18
 174:18

Clements
 5:19

Clerk  285:5

close  56:16,
 23 58:21
 60:8
 102:15
 120:11
 201:11,16

closed  202:5
 279:25

clothing
 32:8,13,
 14,21,22
 33:4,7,20
 61:6,19
 62:15
 217:21

cloudy  149:3

clue  177:24
 198:21
 255:2,9
 257:12

co-worker
 96:15

coat  67:21
 68:19
 217:2

Coca  120:4,
 21

cocaine
 67:13,18
 76:3

code  282:1

coherent
 151:2

Cola  120:4,
 21

collect
 32:16
 33:16

collected
 32:25

J.A. 1669

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: collection..Connie

collection
  31:22 33:8

comfortable
  53:11
  311:4

commit
  256:15

committed
  218:6
  260:13
  268:9
  289:10,20

common  77:2
  194:24

commonly
  291:19

commotion
  126:2

communication
  283:6

community
  167:13,18

Company
  120:5

compare
  32:11,20
  33:4,23
  35:16
  84:22
  138:19
  152:12
  223:23

compared
  299:12

comparing
  223:17

compensation
  281:15

competent
  93:22

complainant
  267:20

complaint
  9:14
  95:23,25
  96:17
  97:2,17,19
  98:22
  100:2
  101:9
  102:11
  103:10
  254:20,23
  255:1,8,
  11,16,20
  257:20,21,
  22 283:22

complaints
  96:22
  254:6,15
  258:13

complete
  43:5 55:21
  72:20
  298:24

comport
  143:14

computer
  154:12

conceal
  249:8

concern
  96:14
  168:13

concerned
  168:7
  249:12

concerns
  207:23

concert
  312:9,11,
  14,22,25

concluded
  309:20
  318:17

conclusion
  159:7
  246:12
  309:13

condense
  139:11
  147:21

conduct
  96:23 97:3
  209:15
  257:3,7,
  10,17

conducted
  14:6
  175:18
  177:18
  265:20
  270:7
  272:5,13

277:16
  278:11
  282:19
  297:22

conducting
  58:11
  106:16
  194:18
  280:13

confers
  222:2

confident
  138:9
  249:12

confidential
  106:19
  107:3,4
  110:1

conflicted
  222:13

conflicts
  215:15

conformity
  19:20

confront
  286:7

confronted
  69:4

connection
  302:17

Conner  100:4
  170:21

Connie
  179:23

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: Connor..copy

180:2
188:3
189:25
190:20
191:25

Connor
274:23,24
275:19

Connor's
275:18

consent
197:19

consideration
268:3

considered
58:25
83:17
205:24
219:6

consistent
140:9
156:25
163:6,13
310:9

constitutional
143:1

contact
19:23 31:8
58:24 59:9
60:20 67:6
87:7
113:21
118:7
187:18
188:16

245:11,14
246:12,17,
20 298:9

contacted
184:8
245:12,25
246:2,24
298:2

contacting
18:22

contained
9:5 267:23

contemporaneou
s  270:10

content  65:1
85:19,22
87:15

contents
9:23

context  28:3

continue
174:8

continued
169:8
271:5
315:21

continues
58:3 63:14
75:14,19
137:1
216:4
240:11
262:16

contractural

300:18

contributed
170:6

control
132:8

conversation
56:2
115:16
118:14,19
125:15
127:9,15,
19 128:14
129:3
180:13,16
181:4
182:12
215:3,11
242:13
246:9
247:17
248:4,7,23
249:10
250:10

conversations
65:2 91:8
101:21,23
123:23
187:9
242:16
246:14
250:13
258:12

convicted
259:18
284:20,22
315:9

316:16

convinced
80:12

cooperate
245:13
246:14
247:20
248:11
251:7,13

Coordinator
194:17

cop  111:14

copied  100:7

copies
121:15
224:21
254:5
263:11
294:21
303:21

copy  8:24
18:20,23
19:10,22
40:11 48:2
91:13
101:11,12,
13,14
103:3
105:2
106:1,3,5,
6 118:4
137:13
142:20
200:8,12
223:22,24

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: Corbitt..county

224:19,21
233:13
264:24
294:19
318:9,14

Corbitt
96:11
275:9

corner
115:15,17
126:1
144:8
146:18
154:20
158:24
202:9
256:23
257:9
267:2
271:15
290:10
311:15

corners
114:22

corporal
12:18,19
96:20
97:12
98:11
183:15
231:9

correct  20:4
25:12
40:25
41:1,5,10,
16 59:12,

20,23 60:3
63:20 65:7
66:18
69:11,16,
19 70:10
73:7 88:10
92:4 95:5
119:2
121:10
122:2,10
123:21
126:11
133:24
143:2
144:10
152:8
160:20
161:1,6
167:25
170:8
176:4
185:3
196:14
200:3,4
202:10
204:3
215:8,9,
12,22
226:21
229:17
230:11
248:20
261:2
263:23,24
264:14,15
265:14,15,
22 266:1,
5,22

267:21,25
268:1,10,
11,20,21
269:5,9,
10,13,14
270:9
271:7
272:2,3,7,
8,25 274:5
276:1
280:1
281:2
283:1,23,
24 284:11,
13,14,20,
21 285:5
286:12,21,
22,24
287:2,13,
25 288:1,
14,15,18,
19 289:17,
18,21,23,
24 290:22
291:20
292:7
293:9,13,
18,23
294:6,7,16
295:19
297:3,15
299:25
301:4,9,
17,25
303:18
306:11,12
307:15
308:8

310:22,23
311:2,13,
16 314:25
315:6,12
316:17,20
317:17

correctly
33:10
64:18
67:23
75:12 76:9
156:1
175:22

corroborate
177:25
211:23
212:3
224:7

corroborated
177:15,21
214:15
224:2

corroborating
178:6

counsel  5:10
46:18
154:12
171:13
210:17
263:10
295:13,18

count  165:1
166:18

county  11:21
233:8

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: couple..criminal

245:22
246:1,20
260:4
284:20
289:5
290:8,12
296:10

couple  65:11
91:4,6
107:23
207:4
217:9
263:3
273:23
284:5
294:25
304:7

court  5:7
6:3,4,25
7:5,6 8:19
10:13,14,
18 126:10
145:9
207:6
209:14
210:10
221:5
227:5,6
237:7
246:23
251:22
262:5
285:5,9,12
286:14,16
287:16,22
288:17
290:20

304:10
311:5
318:5,8,13

courthouse
238:5
260:4,11

courtroom
290:12
295:1

courts  65:25

cover  314:6

coverage
167:22

covered  8:12
46:22

CR  283:15
288:18

crack  205:7

crazy  122:4,
7

create  18:23
38:6
103:23
136:3
221:11

created
41:15
57:17

credible
141:3
150:13
151:1

crime  13:4,

7,11 26:10
28:24
29:9,11,
17,19,22
30:4,8,12,
13,20,23
31:24,25
32:1,7,25
33:14,17,
18 34:7
35:11,18
44:8,23
45:1,4,20,
25 46:8,
14,15 47:2
48:3 49:14
57:9
58:18,21
59:6,23
61:18,20
62:13
81:25
82:5,19,24
112:8
113:11
116:4
130:13,17
144:5
146:8,9,
10,17
153:13
165:19
167:3
168:2,3,
13,17
173:6
192:21,23
193:11,18,

21 203:10
204:15
206:23
216:18
217:22
256:15
260:13
268:9
272:24
279:6
281:4,6,
12,15,18,
20,22
284:10
289:23

crimes  13:5
15:19,20,
22 16:1,4,
5,8,11,12
17:16
23:8,10
24:11
25:8,25
26:1,7
166:12
167:6,11,
23 170:4
172:17
173:23
267:16
269:23
278:21,22
279:9,15

criminal
66:4
142:15
208:19

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: criteria..dealt

211:12
272:1
285:11
286:11,24
287:7,17,
18 290:6,7
292:10,17
294:18
296:7
297:2

**criteria**
14:11

**cross**  148:24
154:22
155:5
262:25
286:8
287:13
290:21,24
299:22

**crotch**  98:23

**CRS**  288:13

**crying**
127:23
131:9,10

**current**
170:5,13

**custody**
270:3

---
D
---

**DA**  39:12,
17,19
40:14,15
41:12

47:21 48:8
74:1
207:23
237:18
303:11,21

**DA's**  40:9,
18 136:10
143:6
196:25
197:9
199:13,14
200:21
207:18,20
208:3
223:2,3,23
224:22
225:19
229:24
241:22
303:10,18,
23

**dad**  99:2,3,
4

**daily**  167:22
176:8

**Damien**
218:3,6,
11,19
219:1,4,6

**dark**  149:3

**date**  5:3
20:17
23:14 33:2
72:17,18,
25 77:25
82:12

104:2
175:10
177:1,6,10
199:17
200:13
201:5,6
202:9,13
209:11,18
210:7
215:20
220:17,18
233:17
244:19
253:11
256:1,24
257:3
263:21
266:25
271:21
274:11
276:11
278:24
284:16,25
289:5
314:1,7
315:10
316:2,8,12

**dated**  96:4
240:21
278:24
279:24
291:6

**David**  5:5,25
6:9 100:9

**day**  19:6
83:3 104:6
121:12

148:14
156:20
177:5
180:5
182:23
183:2
200:17
221:6
227:21,25
264:16
265:24
266:3
283:2
302:7,9
314:25

**days**  8:21
20:15
21:16 28:8
74:2 78:4,
9,22 79:1
82:1,14
218:7
273:8
298:9

**deadline**
19:5,6
20:15

**dealer**
218:19

**dealing**  77:8
113:21

**dealings**
218:21

**dealt**  67:14
119:21