**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: Dear..depends

Dear  240:24

Dearl
  251:20,21

death  140:21
  302:12

December
  254:19

deception
  294:6
  307:4
  308:17,24
  309:1

decided
  37:6,8
  78:16
  164:15
  217:10

decision
  13:22
  24:15
  25:13  71:4
  80:1,2,8,
  15  81:6
  82:17
  92:20
  153:17
  164:18
  257:25
  258:1
  261:21
  281:18
  282:5,9

decisions
  27:8,13

declined

78:13

defendant
  6:9  267:8
  289:6,9

defendants
  46:20
  285:11

defense
  141:13
  142:1,15
  290:22
  303:22

defenses
  285:23

deficiencies
  15:14

define  26:17
  106:21

definite
  61:14

definition
  206:3

degree  173:6

delay  115:25

delivered
  280:16

demeanor
  131:1
  205:18,20

department
  13:21
  18:10,18
  33:1  66:18

94:20
100:5
166:4
167:12
168:2
169:14,23
173:13
174:17
176:19
187:25
188:16
189:20
199:13
213:13,14,
18 238:11,
18 247:14
253:4,22,
24 263:20
272:19,22
274:2
278:7
280:24
281:7,9,
10,11
282:12
300:9
301:8,14

departments
  47:5

depend  36:23
  143:6

depending
  36:22
  49:17

depends  38:7
  52:14
  56:11

58:12,17,
19,23
59:2,15,
18,21
60:1,2,4,
6,11,16,
22,24
61:4,10,
12,15,24
62:2,3,9,
21,24 63:6
64:4,9,11,
21 65:6,
10,11,12
68:6,7,9,
15,22
77:5,22
79:22
83:21
86:22,23
89:16
90:1,6,16
109:11
111:17
129:24
135:22
139:20
140:24
141:6
142:19
156:18
157:16,19
158:2
174:21
182:24
187:21
195:7
197:4

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: depo..detective

222:15

depo  6:21

deponent   5:9
  318:1

deposition
  5:4 6:23
  8:17 9:8,
  11 88:20
  90:21
  186:12
  318:3,17

Deputy  285:5

describe
  14:8,16
  19:3,17
  20:22
  26:19
  51:14,20
  92:24
  93:23
  110:21
  149:7,12
  206:21
  220:8

describes
  146:22,23
  245:1

describing
  133:7

description
  253:10

deserved
  171:6

desire

258:25
259:10

desk  105:3,
  18 273:2

detail  47:25
  74:7
  145:25
  147:16
  220:8

details
  69:10
  138:12,18,
  24 144:18,
  24 147:5,8
  148:14
  164:8
  264:4

detective
  12:15,24
  13:1,2
  14:5 15:9
  18:19
  20:7,19
  21:15
  23:19
  24:12,13
  25:4,5,10,
  11,15
  26:1,3,4,
  7,8,23
  27:3,4,6,
  7,15,17,21
  29:6 33:6,
  18,20 34:6
  35:1,5
  36:4 37:25
  38:3 39:1

40:23
41:11
45:8,23
47:13
48:13,20
49:2 50:21
53:7,9,10
58:10
62:12
69:5,16
70:18
71:3,18
73:6
76:19,20
77:8 79:19
80:3,4
81:22
82:6,9,18
85:6,18
88:7 89:20
91:12
92:22
93:22
96:19
98:11,16
99:1,2,3,
6,19
100:1,4,9
105:24
109:19
113:7
117:20,25
119:6
125:13,17
127:20
131:15
132:7,18,
20,25

136:13
138:6
147:20,22
151:13
152:3
153:18
154:2
156:4
157:1,4,24
163:13
170:4,6
175:25
178:3
179:18,23
180:13,20
181:2,5,
11,13,25
182:4,18
183:15,18,
22,25
184:8
188:2,17
189:7
196:19
199:10
202:20
204:5,18
208:4
214:20
217:16
222:3,25
223:5
227:2
228:11
229:22
230:20
231:8,21
232:3,17

J.A. 1676

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: detectives..discussions

233:19
240:25
241:1
247:14
249:8
256:3
262:2
263:15
264:4,6,20
265:1,9,25
266:17
267:11,20
269:5,20
270:12,21
271:6,18
272:5,14,
23 273:1,
15 274:4,
17 275:1,
16,21
277:2,11,
13,20,23
279:5,6,7,
8,12 280:7
282:8,15,
19,21,22
283:9,22
290:13,20
292:18
299:18
313:10,16

**detectives**
23:13 25:7
47:6
105:21
223:15

**detector**

234:5,11
291:19

**detention**
245:22
289:12

**determine**
32:23 57:3
108:19
138:11
141:6
160:2
245:12

**determined**
14:22 25:3
250:17

**determines**
22:24
35:5,6

**determining**
108:13

**develop**
51:11
108:25
111:13,15
112:1,10

**developed**
112:13,19
113:7
167:16

**developing**
58:9,10
107:17

**Diane**
244:22,23

**dick** 98:23

**dictate**
92:23

**died** 140:10

**differed**
85:17

**difference**
7:5 14:1
20:22
50:8,16
110:1,5

**differences**
50:5 85:2,
10

**differentiate**
106:24

**differently**
50:11
278:1
309:10

**difficult**
7:11 10:13
21:2 98:18
99:11,12

**direct** 6:12
54:23 55:4
57:8 86:12
87:25
88:10,13
154:19
167:2

**directing**
35:1

**direction**

149:12

**directly**
12:16
16:17
17:12

**Directors**
281:12

**dirt** 82:8
144:10
146:13

**disabilities**
50:22,23

**disadvantage**
30:14

**discoverable**
141:10

**Discovery**
72:22

**discrepancies**
260:21

**discuss**
237:24

**discussed**
184:23
235:23
265:12
279:21
285:23

**discussion**
53:14
281:3
283:25

**discussions**
177:20

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: dishonest..Dontae

dishonest
  293:17

dishonesty
  306:13

dismissed
  200:24
  201:2

disorderly
  209:15

disposed
  210:11

disposition
  254:18
  255:7,15

dispute
  250:20

distance
  103:23

distinction
  278:18

district
  5:6,7
  40:25
  41:2,3,6,
  14 121:21,
  22 194:6
  209:14
  210:10
  235:19
  240:23
  242:13
  246:20

diverted
  22:4

division  5:8
  15:21
  28:17
  167:5,8,9

DNA  32:15,
  17,20,23
  33:3,9
  34:11

document
  52:10,13
  66:13
  72:12 96:7
  99:23
  106:12
  132:2
  134:25
  135:3,12
  136:4
  137:9
  166:22
  170:25
  172:11
  175:8
  182:16
  185:12,23
  186:7
  187:3,4,8,
  11 191:13,
  16,18
  202:1
  203:13
  209:7
  213:11
  214:21
  215:3
  219:14
  220:2

224:24
225:16
226:1,6,12
233:4
240:18
244:12,14
253:7
254:10
263:13,17,
25 265:7
266:14,18
267:15
268:15
280:14
283:11
284:9
290:3,18
291:8,24
297:11,18
303:17

documentation
  19:13
  273:8

documented
  52:2 57:18

documenting
  47:17
  52:24
  193:10,24
  220:24

documents
  83:24
  193:4
  254:14
  263:7
  265:10
  271:9

299:25
300:7
303:16

Dog  75:25

Dog's  75:24

dollar  246:5

dollars
  246:4

domestic
  245:23

Dontae  5:5,
  13,15 6:1
  9:2 79:24
  80:15
  113:17
  117:3
  118:9
  126:3,8
  130:1,7,9,
  24 132:9,
  14 134:5,
  14,16
  145:3,5,6
  146:1
  151:15
  153:17,20,
  23 155:20,
  25 162:25
  163:5,12,
  20 164:2
  168:23
  178:5,8
  182:22
  183:23
  185:3
  200:3,12

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: Dontae's..effecting

201:5,6,18
206:19
208:1
220:18
222:1
226:18
227:8,10
228:14
229:1,3,7,
15 230:2
231:13
232:8,19
234:4,15
241:3
246:4
251:16
253:13
258:20,25
259:10,18
260:17
261:23
267:25
286:24
287:6
288:3
289:10,11,
13,20
290:6
291:3
292:3
296:13,14
298:17,21
301:4
302:5,17,
23 304:22
306:6
310:4,5
312:25

313:20
314:9,24
316:15
317:16

**Dontae's**
134:19
179:17
227:12,13
305:15
308:13

**door** 99:5
103:17
117:23
123:20
125:13,14
129:7

**doors** 89:3

**doubt** 155:23
162:1
163:4
248:25

**draft** 174:23

**dramatic**
165:18
167:3

**drawbacks**
30:11,19

**drawing**
158:25

**DRB** 101:1

**dressed**
181:7

**drink** 189:8

**drive** 178:21

**dropped**
67:16

**drove** 75:6
181:7
207:17

**drug** 77:1,
8,13,21
112:6,16
113:13,15
115:21
150:21
206:16
209:19
218:19
276:15

**drugs** 75:9
76:3 77:9,
14 113:21
126:4
150:19
205:15
269:23

**Due** 245:20

**Duke** 244:15
245:6,17

**duly** 6:11

**duplicative**
265:10

**duty** 256:24

———————
E
———————

**earlier** 35:4
59:5 67:12

68:13
105:11
107:20
135:16
147:17
163:7
165:25
180:5
182:23
183:2
224:16
228:5
261:3
276:15
277:25
295:17
297:23

**early** 34:14
116:5
165:17
202:20
216:11
272:12

**easily**
161:10

**Eastern** 5:7,
8

**easy** 82:7

**Edward**
175:15,22

**EEOC** 101:6

**effect** 126:6
131:10
276:16

**effecting**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023    Index: effective..evaluate

269:16

**effective**
48:24
49:2,4

**effort**  249:7

**efforts**
246:21,24

**Eldridge**
276:6
284:13
311:12

**element**
285:20

**eliminate**
63:4

**eliminating**
62:25

**Elizabeth**
5:16
154:18
233:7
251:23

**Elks**
179:18,23,
24 180:13
181:5,11,
13,25
182:5
183:18,22,
25 184:8
188:3
189:25
190:20
231:9

**Elks'**  183:15

**Ellis**  5:21
39:14,20
40:1 46:9,
18 50:18
52:3,6,8
57:14
60:10
62:7,18
76:14
80:10,17
88:11
93:15,19
94:7,15,
21,25
95:7,20
122:6,11
124:16
127:16,24
129:23
134:6,10
135:13
136:21
139:2
154:22
155:4
158:7,14
161:3,19
162:14
165:16
169:7
178:16
233:10,16,
21 239:14
259:5
260:18
262:22
263:1,2,10

294:17,21
295:8
299:18
304:7
306:9
308:14
310:16
312:18
316:4
317:22
318:8,10

**emergency**
122:17,18

**emotional**
128:4
131:11

**employed**
300:9,15,
17

**employee**
96:19
98:11

**employee's**
105:18

**employees**
105:17
172:14

**encompass**
13:8

**end**  66:6,9
74:23
232:8

**ends**  318:2

**enforcement**

11:8,9,10,
11,22
246:14
292:17
300:15,16

**engagement**
20:20

**ensure**  314:4

**entered**
227:11
284:9
295:22
296:21

**enterings**
15:25

**entire**  72:2,
3 136:9
286:14

**entirety**
166:8

**equally**
57:12

**equate**  299:9

**errors**  109:1

**escaping**
289:12

**Escort**  145:8

**established**
273:13

**et al**  5:6

**evaluate**
47:8
48:14,18

221:16,20

evaluated
  47:7
  222:12,21

evaluation
  14:17,18
  15:15
  46:25
  48:13
  171:4,19
  292:14,18
  306:22
  308:4

evaluations
  46:23 47:6
  48:13
  299:9

evaluator
  309:16

Evans   179:12

event   225:10

events
  265:24

Eventually
  246:25

Everett
  164:17
  165:10
  166:17
  233:13,19,
  23 234:3,
  7,11 235:2
  236:15,22
  240:23
  241:11,14

242:10,13,
  16,22
  252:8
  288:25
  289:2

evidence
  28:12,21
  31:22,23
  33:2,8
  80:13
  116:8,9,20
  130:1,4,13
  138:19,25
  139:8,18,
  22,23
  140:5,10,
  14 141:9
  142:21
  143:1,11,
  24 146:5
  151:20
  156:25
  201:7,21
  221:16,20
  222:13,22
  223:18
  227:11
  236:3
  253:13,14
  260:10
  280:5,16,
  18,22
  301:16,19
  312:4
  313:16,18

exact   124:12
  137:25

138:2
206:24
317:15

examination
  6:10,12
  154:22
  155:5
  197:16
  262:25
  280:4,19
  297:21
  298:1
  299:22
  304:5
  306:16
  309:17

examine
  286:8
  287:13

examined
  290:21,25

examinee
  292:2

examiner
  159:8,22
  195:24
  197:3
  305:9
  309:19

excelled
  15:2

exculpatory
  142:2,21
  301:19

Excuse

303:14

exhibit
  66:11,14,
  15 72:10,
  13,15
  86:24
  87:20
  96:3,8,10
  99:20,24
  131:24,25
  132:3
  133:6
  137:6,7,10
  154:10,14,
  17 158:6,
  7,13,17,19
  166:16,23,
  24 170:23
  171:1,2
  172:8,9,
  12,13,24
  175:5,9
  177:9
  196:9,12
  197:11
  200:11
  201:24
  202:2
  203:11,14
  209:5,8
  219:12,15
  226:10,13,
  14,17
  233:2,5,9
  240:16,19,
  21 244:10,
  13 253:2,8
  254:5,11

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: exhibits..facts

258:15
263:9,14,
16 264:11
265:5,8
266:12,15,
17 267:9
268:13,16,
24 271:8
283:9,12,
13 290:1,
4,16,19
291:5,23
293:25
294:17,24
297:8,9,
12,14
310:16,21
316:5,6

exhibits
265:10
304:19

exist  108:11
136:9,11

existed
104:10
227:5

exists  30:21
136:4

exit  160:16

exited
160:25
295:25

exiting
163:15

exonerated

315:5

exoneration
314:25

expect  32:4
35:9,14,20
36:12,14
37:10,14
38:23,25
39:3,6
45:23

expectation
36:15

expected
28:9

experience
150:11
237:5
268:5
284:8
292:17
294:12
296:20
299:7

experienced
150:12
167:3

explain  19:7
38:8 108:4
186:1
260:14
296:21
305:8,11

explained
86:6 92:21
105:11

125:19
147:17
163:22
165:1
223:12
277:25
281:21
285:18
304:14

explaining
218:6

express
99:17
168:12

expressed
207:23

expressing
99:18

expression
137:24

extent
214:22

eye  135:24
140:11

eyes
205:18,19,
21

_____

F

_____

F-O-E-L-L
285:7

face  78:15
102:15
151:9

face-to-face
155:14,19,
24 161:5
162:2,12,
25 163:5,
12 261:2
296:5,14,
25

Facility
245:22

facing
155:12
183:13
261:5
296:4

fact  27:14
62:5 78:10
169:8
182:17
198:25
213:12
217:20
246:2
287:19
288:2
289:16,22
312:16
316:25

factor
171:19

factors
58:15

facts  31:11
38:10,13
42:1 62:11
83:23 88:4

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: failed..file

264:8

**failed** 197:5
225:20
292:20,21
306:19

**fair** 54:16
55:11
56:15,22
57:17
58:20 77:1
138:13,17
162:8
165:18
168:1
171:18
173:12
214:24
251:5,8

**fairly** 292:8

**faith** 68:16

**fall** 44:22
45:20

**false** 102:12
108:18,20,
24 262:5

**familiar**
43:8,15
73:5
105:21
117:9
159:16
195:18
226:19
301:7,12,
13,21

**families**
192:6,13

**family** 16:1
113:21
117:13
189:25
190:2,9,
11,18,23
192:10
238:8,22
239:5

**fashioned**
20:23

**fears** 184:7

**February**
66:16
77:25 78:3
81:18 83:2
84:23,24
85:20
199:21
210:23
220:10,17
245:19,21
255:14
272:22
273:13,17
274:9
275:14
277:12
278:24
282:19
300:18

**Federal**
251:22

**feed** 104:3

**feedback**
172:15
173:5

**feel** 7:20
21:5 30:14
65:21
220:2
311:3

**feeling** 8:5
298:8
299:8

**fell** 261:6

**feloniously**
289:7

**felony** 13:10
289:11,16

**felt** 53:11
92:16
93:10
171:6
174:21

**female**
118:7,8
125:15

**females**
181:22

**fibers** 33:15

**fictitious**
209:24

**field** 11:17
43:8,11,
12,13,23
44:3,25
45:3 46:22

118:20
212:7,8
213:2,8,
12,15,23,
24

**file** 18:14,
19,21
19:11,22,
23 20:2,6,
8 21:3,16,
18,21
39:12,17,
19,23,24
40:5,14,
15,24,25
41:15
42:5,7,13,
18,20,25
43:3,5
89:18
91:10,12
119:5
134:12
136:4,9
141:3,8
142:1,2,9,
14,20,25
143:14
182:22
191:19
193:15
199:2
224:24
227:4,8
229:24
253:10
254:7
272:14,16,

**J.A. 1683**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: filed..foods

21,23
273:2,6,9,
10 283:14
288:13,17
303:22

**filed** 9:15
66:13
72:12
95:22
96:7,22
99:23
100:17,20
101:9
132:2
137:9
154:16
158:16
166:22
170:25
172:11
175:8
196:11
200:10
202:1
203:13
209:7
219:14
226:12
233:4
234:17,23
240:18
244:12
251:16
253:7
254:10
255:18
256:3
258:8,10

263:13
265:7
266:14
268:15
283:11
290:3,18
297:11

**files** 20:12
254:2

**filing**
18:16,18
20:2 101:3
103:10

**fill** 21:18
40:9
196:17
280:19

**filled** 14:19
66:17
98:22

**filling** 97:6
98:6

**final** 8:25
169:21
178:3
199:12

**find** 31:7,
10,20
32:4,5
33:2,19
49:6 53:2,
20 89:5
92:1
102:24
111:2

119:9,13
122:24
130:6
179:14
225:19
268:8
283:7
295:4

**fine** 6:17
10:1 46:21
129:9
136:20
271:10,13
302:9

**fingerprints**
116:16,22
201:8

**finish** 8:1,
6,9 10:9
15:7 84:10
133:13
191:15
305:25

**finished**
228:4

**fit** 143:18,
24 146:5
201:21

**flag** 138:25
139:6,19
151:25
152:10
153:6,12

**flip** 74:5
126:20
158:23

160:10
204:4
209:17
220:2,13
311:6
317:7

**flying** 94:10
95:17

**focus** 19:17
186:18

**focused**
15:20
19:13
111:24

**Foell** 285:6

**folder**
212:14,15
272:16

**follow** 31:11
70:23
108:17
122:15,21
147:9

**followup**
18:20
19:6,8
20:15
42:24
72:16
299:21
304:3

**food** 189:19
191:9,18
192:15

**foods** 189:3

**J.A. 1684**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: foot..front

foot   123:7

footwork
 18:3

Forbes   67:22

force   106:25

forever
 34:14
 156:20

forgeries
 16:1

forgery
 279:12

forgot
 145:10
 263:11

form   11:4
 19:14 20:9
 21:7 28:4
 29:2,13
 30:16
 31:1,4,14
 33:11 34:2
 35:2 36:16
 37:12
 38:15 40:6
 41:8,17
 42:9,15,21
 44:9 45:5,
 15 46:1
 47:9,19
 48:15
 51:9,11,
 20,21
 52:25
 53:17

54:19
55:15
56:3,18
57:19 61:8
64:5,12
65:9 69:12
73:22 79:2
81:13
83:8,19
85:4 86:8
90:14
105:9
108:6,15
109:15
110:3
111:7
113:8
114:7
115:4
116:24
117:17
124:21
127:25
130:19
134:21
135:6
138:14
142:4
144:20
145:9
148:19
153:24
156:13
160:21
161:21
162:15
165:20
194:2

196:15
197:19,23
201:12
210:16
227:4
229:18
231:17
232:21
235:24
243:3
250:22
259:3
260:19
261:25
278:2,6
280:19

forward
125:19
136:5
137:14
173:20

found   33:4
 34:7 35:17
 109:22
 117:3
 121:3,12
 123:14
 130:9
 139:15
 144:15
 152:22
 199:12
 201:8
 218:9,25
 219:1
 224:18
 225:8

227:4,9
238:14
248:2
260:2,9
268:19
290:7
293:22
317:8

foundation
 94:9 239:2

free   7:20
 220:2

Freedman
 179:13

frequently
 77:17 93:2
 193:17
 194:24
 235:17

fresh   56:8,
 23

Friday   247:1

friend   99:2

friendly
 205:5

friends
 194:12

front   8:23
 9:6 72:18
 83:24
 111:2
 113:14
 197:7
 203:16

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: fruition..give

207:9
211:17
258:15
260:4
296:9,22
304:18
306:11,21
308:6
309:24

**fruition**
173:20

**fuck** 126:7

**full** 78:19
79:12
81:16
166:1

**future** 46:17
92:8

———————————
G
———————————

**gained** 37:15

**gambling**
255:24
256:3
258:6,7,9

**game** 29:3

**garbage**
218:9

**garnered**
47:16

**gather**
280:16

**gathered**
116:20

143:17
156:25
221:17
222:22
223:18

**gathering**
190:3,6,25

**gave** 35:24
39:12,16,
17 42:24
54:12
81:20
106:1,22
119:1
121:1
124:6
153:16
190:9
198:23
202:21
214:24
230:7,13
231:15
232:4
266:4
269:25
293:7
296:9,15

**general**
15:24
25:5,6,11,
14,25
26:3,6
27:2 50:11
90:5 245:2
279:4,7,
13,14

301:7

**General's**
252:5

**generally**
27:16 50:4
70:21
76:25 77:7
85:17
86:16
89:25

**generate**
43:3,17

**generated**
39:22
167:22

**George**
115:24
130:2
168:23
175:15,21
199:22
218:14
220:9
258:19,20
266:21
267:25
268:20
276:6
278:25
283:18
284:23
287:6
288:3
289:11,19
290:9
293:7,15,

21 312:24
313:4,7

**get all** 49:8

**gifts**
189:22,23
190:11,18,
23 191:1,
2,4,18,25
192:2,4,8,
18

**girlfriend**
302:21

**girls** 182:13
183:7,9
302:15,16

**give** 14:12
26:14 38:9
40:24
47:25
60:17
61:14
66:10 74:1
105:17
108:12
110:12
114:23
133:7
134:4,8
137:18
148:8,10,
11,24
150:3
166:19
171:7
194:22
211:20

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: giving..gun

226:5
233:7,17
262:9
282:1
284:19
310:19
317:18

giving  40:15
62:10
64:17
146:4
189:9
211:4,7

goal  172:16
173:5,7,
20,21

good  6:14,
15 10:12
37:1 49:9
51:16,17
55:12
65:21 85:6
93:1,6,24,
25 94:1
99:2,18
103:13
136:19
163:25
174:17
227:19
292:8
307:24
310:14

goods  287:20

governed
281:12

GPD  12:2,6,
12 13:15
14:2,5
15:21
46:23
47:2,7
48:14 51:4
52:1
103:11
104:10
106:8,13
107:2,5
189:3,24
238:20
252:13,15

GPD-0013
203:25

GPD00  203:25

grab  98:23

grand  164:16
166:19
201:21

grass  144:8

gratitude
189:10,11
192:3

great  7:15

greatly
170:6

green  67:4
87:6

Greenville
5:18,20
6:6 13:23

18:9 51:6
66:18
110:22
111:24,25
112:11
165:22
167:17
196:1
213:14,18
218:20
240:23
244:7
247:8,14
248:20
250:5
253:3
263:19
272:22
274:1
278:6
280:24
281:7
282:12
300:9
301:8,14

grown  38:4

grown-up
37:21

GSR  305:10

guess  18:15
40:16
79:17 81:9
103:12
104:16,17,
19,21,23
114:9
118:5

159:25
173:21
192:3
195:17
218:5
220:4
222:15
223:11
257:25
275:15

guessing
155:6

guidance
50:11

guide  143:6

guidelines
19:1,4

guilty
284:10
285:12,14
286:3
287:12,21,
23,24
288:8
289:23
290:8
314:12,16,
22 316:3

gun  32:11
140:4
145:6
151:15
152:16,22
153:7,10
218:9
297:1

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: guns..hear

312:8,10, 13

**guns** 77:2, 12,17

**gunshot**
140:10

**guy** 67:20
76:13
217:23
292:8

**guys** 105:25
233:7

————————

**H**

————————

**H-A-L-L**
267:5

**hairs** 33:15

**Hall** 267:4, 5,13
268:17,18

**hampered**
167:23

**hand** 27:15
65:24
66:1,7
102:14
160:13
172:8
175:6
201:23
202:8
244:9
257:9
286:20

**handed** 72:14
96:10
137:12
158:18
171:2
200:12
203:15
240:15
310:16

**handful**
187:1,2

**handing**
209:4
219:11
226:9
233:1
253:2
254:4

**handled**
16:13
94:14
246:23
257:23,24
258:1,2

**handling**
257:21

**handwriting**
97:9
263:17
265:14
266:24,25
269:7
271:18
274:5
278:4
279:21,22

280:10
282:16

**handwritten**
9:2,3
66:15
84:23
264:13
266:4
268:25

**hang** 194:10

**happen** 22:20
28:7 296:3

**happened**
35:12 62:2
102:17,20,
22,24
110:12
113:14
133:17
135:4
143:25
179:1,2
192:11
208:5
251:2

**happening**
18:24
19:18
252:22

**happy** 234:13

**harassed**
100:3

**harassment**
96:25
97:18

100:13,18
103:1
254:18
255:5,14
258:4

**hard** 61:14
109:10
110:13

**Hardy** 78:11
79:15
100:3
117:23
132:22
147:25
188:4
257:25
274:16
275:11,13,
15

**Hardy's**
117:22
147:23

**Harris** 15:24
16:15
23:24
176:4,18

**head** 155:9,
18,19,20,
21,22
163:1,2,3
218:8
262:6

**hear** 128:18
131:18
243:14

**J.A. 1688**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: heard..house

**heard** 5:6
  7:22
  27:18,25
  95:9
  109:24
  113:19
  126:2
  141:2
  161:14
  167:19
  243:12,15,
  16 249:2
  259:7

**hearing** 9:1
  234:19
  236:18,23
  238:3

**Hearsay**
  114:8

**heavily**
  19:13

**height** 292:5

**Heinman** 81:5

**held** 238:4,
  5

**hell** 96:18
  98:8
  100:24
  103:19

**helped**
  312:12

**helpful**
  89:17
  301:24

**helping**
  289:12

**hey** 37:9
  45:8

**Hicks**
  231:15,16

**high** 112:8

**higher** 307:2

**Highsmith**
  218:13

**Hinman** 100:1

**hold** 101:20
  102:23
  171:11
  295:11

**home** 78:16
  81:6 104:3
  178:14,18,
  23,25
  179:17,20
  184:12
  218:25
  262:6

**homeless**
  245:20

**homicide**
  16:5 23:10
  24:6 25:22
  28:16 35:1
  40:24
  41:16
  58:11
  70:18
  77:19,21

  119:2
  156:8
  157:14
  159:24
  163:13
  165:19
  166:3
  167:4,21
  169:5
  170:5,13
  171:15
  174:24
  185:13,24
  187:19
  223:6,17
  235:5
  270:15
  278:25
  280:13
  292:18
  313:10

**homicides**
  77:14

**honest** 151:2
  155:7
  219:19
  293:11
  299:14
  305:21
  310:4,5,10

**honestly**
  117:4
  225:13
  234:24
  236:16,20
  238:19

**honesty**
  305:15

**hope** 32:5
  69:14

**hospital**
  118:10
  122:1,10,
  14 123:3
  179:21
  181:7,9,12

**hour** 40:8,
  10,11
  63:23

**hours** 61:2
  62:14
  67:12
  153:16
  175:11
  177:11,12
  178:5
  179:16
  180:8,19
  200:2
  217:21
  227:21
  228:5
  229:9
  230:4
  261:22
  263:22

**house** 75:24
  119:24
  120:23
  123:11
  125:12,25
  129:6,11

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: Howard..improper

179:13
197:18
214:6
221:6
250:5

Howard
274:23,24
275:18,19

Hudson   67:17
75:15,23

humans   85:15

hundred
170:15

hung   238:6

hurt   301:25

Huseby
318:12

hypothetical
38:9,10
60:18
65:18 80:6

hypotheticals
60:16
65:18

—————

I

idea   30:8,9
112:20
118:25
119:25
120:10
164:20
178:13
186:25

194:9
210:21
220:20
233:25
254:16
257:6
306:15
307:5,6
308:20,23

identification
76:8

identified
107:4
137:13
277:12

identifies
140:17

identify
32:10
59:12
125:11

identifying
58:10 59:5
63:1 70:8

ignition
151:25
261:9,12

immediately
119:9
213:3
250:3

impact   7:16
94:13,19
103:11
122:25

123:3

impeach
143:1

implicated
287:11

important
28:25
29:22
30:6,7,22,
25 31:6,
10,21
32:2,9,14
34:8 37:6
39:13,18,
25 40:5
41:20 44:8
46:7,11,14
47:13,18
48:4,19,
20,22,23,
25 49:1,4,
10,12 53:9
54:17
55:11 56:7
57:10,12
59:11 62:5
63:1 66:5
68:14 69:9
71:10,14,
22,24 72:1
84:19
92:17
102:21
108:19,21
116:5
119:1
122:20,23

123:2
133:25
134:3,25
135:3,12,
20 136:2
141:12,13,
24 142:8
156:23
157:14,17,
22 160:5
164:7
169:13
171:19
172:3
173:13,15,
18 180:18,
22,23
182:15,21
185:11
187:17
188:15,19
191:12,16
193:14
208:12
211:2,14
212:20,21
217:14,23
223:5,10
224:23
225:16,25
226:6
236:12

impression
81:11

impressions
82:8

improper

96:23 97:3
257:3,6,10

**improvement**
14:13
15:12

**Inaccurate**
65:8

**inadmissible**
304:15

**inappropriate**
257:17

**incident**
8:24 66:17
68:24
69:11
70:9,19,
20,24
71:2,7
72:3 95:23
125:23
175:20
177:19
203:15
210:8

**include**
39:12,17
40:10
47:15
182:21
193:15
199:2,5
309:2

**included**
10:4 73:20
190:6
258:18

**inconclusive**
201:1
309:20,23
310:2,3,5,
9

**inconsistencies**  221:16,20
261:17

**inconsistency**
139:15
261:9

**inconsistent**
139:18
140:5,13
141:8
142:3,14
144:15
161:17,23
162:13
188:19
201:9
260:15

**incorrect**
81:24

**increase**
165:18
166:3
167:3
168:1,17

**increased**
24:8

**Incumbent**
21:15

**indicating**
66:22

279:25

**indicator**
294:13

**indicted**
200:5,18
201:6
311:1

**indictment**
200:8,10,
13,17,23
201:2,22
311:3,7,
10,18

**individual**
268:9
284:10

**individually**
166:10
306:4

**individuals**
285:10
303:23

**informant**
106:21,24
107:3
109:22
110:1,6
205:25
206:3

**informants**
106:17,18,
19 107:4,
10,17
108:2,3
109:4,18

110:15,17,
25 111:5
112:13,18,
22,23
114:15
167:17

**information**
18:13 34:6
36:21,22,
24,25
37:15,22
39:2,5
40:4 41:20
47:23 48:3
49:7,8
52:15
54:12
71:22
76:22
106:22
108:3,5,
12,14,18,
24 110:10,
12 111:10,
12 113:25
114:11,24
115:14,18,
22,23
119:1,8,
11,23
120:6
121:2
122:15
123:4
127:2
128:14,15
130:23
131:17

**J.A. 1691**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023     Index: informed..interview

133:2
146:4
148:8,10,
11 150:3
176:19,23
177:14
178:4
197:2
199:5
202:5,22
206:2,5,6
207:2,5
208:13
209:14,24
211:2,5,7,
20 213:4,8
222:12,13,
16 223:2
224:23
225:2
239:23
241:16,18
262:5
266:7
267:6,9,23
269:12
284:2
288:11
289:4
300:8
301:24,25
302:5,23
303:5,22
312:2,5

informed
71:18
227:7

initial
28:13
40:11 48:1
71:18
83:13
84:23
85:10
107:24
144:11
152:13
172:16
173:5

initials
274:22

initiated
243:1
244:19
246:25
252:13

initiating
167:12

initiative
35:21

innocence
259:19
314:24
315:6,21

innocent
315:6

inside 67:4
87:5
212:14
249:13
295:23

instance

20:19 42:5
49:18
112:7
114:4
222:17

instances
254:13

intended
62:5,16

interacted
195:23
202:23

interacting
51:18

interaction
22:21
37:25 74:8
187:23

interactions
120:17
135:2,9
136:3
183:21
185:12,23
186:7,24

interest
61:7
68:18,21

interim
240:22
278:20

internal
94:24
95:6,12,
14,19,23

254:6
257:24
258:2

interpret
307:9,12,
17,21

interpretation
306:25

interrogation
51:7,10
107:21

interrogatorie
s 219:17
258:16

intersection
67:16

interview
8:25 9:3
27:19,20,
23 28:1,22
37:4,7,9,
17 38:4,5
39:2,4,16
46:15
48:21
49:16
51:1,4,6,
10,15
52:16,23
53:8,12,16
55:12,22
56:15,16
73:19
76:16
79:25 84:2
88:16

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
**David Ricky Best on 04/28/2023  Index: interviewed..investigation**

90:24
95:24
96:24
97:3,21
102:18
117:6
118:1
119:25
122:25
125:18
128:10,23
129:15,22,
25 131:12,
13,16
132:8
133:9,16
134:25
135:4
137:12
178:15
179:9
181:21
183:3,4
189:15,16
199:24
200:2
226:15,18,
24 227:1,
2,7,10,12,
14,16,22,
25 228:10,
13,16,25
229:3,7
230:19
231:4,10,
16,23
232:5
246:1

263:21
264:16
265:13,20
269:1
270:7,11
271:3,6
272:5
273:16
274:8,18
277:11,16,
19 282:18,
24

**interviewed**
37:10 42:6
50:9 55:18
95:18
100:12,16
101:15
140:1
177:4
178:7,11
180:19
189:13
217:9
227:18,21
229:2,15
230:4
254:25
255:8,10,
19 256:6,9
257:13
258:3
264:6
265:17,25
270:20
273:21
276:20
277:1,13

**interviewee**
55:23

**interviewer**
48:24
49:2,5,12
50:21

**interviewers**
51:13

**interviewing**
48:13
49:17,21,
24 50:16
54:24
83:14 86:8
97:21
100:5
120:23
137:17
178:21

**interviews**
27:5 28:3
30:24 31:5
48:2 52:2,
11 83:6
85:8
101:25
133:8
141:23
175:19
177:13,18,
20 181:24
182:7,10
183:17
189:8
217:7
273:19,20

**intoxicated**
248:4

**intrigued**
11:16

**introduce**
5:10

**investigate**
20:25
115:19
138:12
151:9
169:16
174:8
239:5

**investigated**
202:19

**investigating**
21:19
121:3
139:25
174:10
175:25
212:7,18
272:23
280:21

**investigation**
15:25
17:25
22:15
25:5,7
28:3,13
29:8 31:4,
20 47:16
48:1 58:11
69:21 70:7
79:21

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: investigations..involving

92:17,19
94:16,18,
24  95:6,
12,15,19
102:15
143:23
158:21
167:8
175:18,20
176:21
181:14,19
182:16
183:18
185:13,24
194:19,25
199:21
202:24
221:25
224:14
225:11,15,
25  242:15,
17,23
243:1,2
244:16
245:14
249:9,14
251:3
252:18
260:3,8
261:24
262:3
272:13,15
274:8
278:11
279:7,20
280:13
298:3
300:25

301:4

investigations
15:23
17:21
18:24  26:6
29:7  31:18
103:15
106:16
167:4,23
186:3,8
242:3,9
278:20
279:5,13,
14  281:1

investigative
15:18,21
16:17
22:10
23:10
25:11,14
26:1,3
27:3  136:4
141:3,8,25
157:14
164:1
182:22
193:15
199:2
202:3
220:8,22,
25  221:3,
11  224:24
263:20
271:21
272:4,9
274:2
277:10,23

278:5,9,18
282:12

investigator
23:8  24:24
25:2  26:18
27:19,25
28:1,2,8,
15  31:7
34:25
35:10
36:13  39:8
68:25
71:13  85:7
86:11
92:15
93:11,25
94:1
115:11
122:16
138:18
139:1
140:20
151:8
156:24
157:23
187:18
242:2
251:5,12
273:7
279:13
291:22
301:22
309:10

investigator's
263:22
273:9

investigators

24:24
89:17
105:21
106:12
175:18
177:18
279:2
309:15

invitations
190:5

invite   190:3

involved
15:25
17:23,24
49:15
77:9,12,
15,17
121:2
126:3
130:10
167:13
182:13
183:7
251:19
269:15
274:13
283:2,5
301:3,4

involvement
18:1
101:25
120:25
167:24
272:14

involving
179:19

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023            Index: irrelevant..jury

206:15

**irrelevant**
239:1

**issue**  132:22
161:11
164:3
201:22
268:19

**issued**  262:4
266:25
268:7
269:17
276:16
313:17,19

**issues**  21:4
50:25 98:5
99:6,8
109:2
164:23
165:5
269:13

**item**  260:2

———————————

——— **J** ———

**jacket**  33:25
67:5,7,8
84:3,4,6,
14,16
87:6,8,9
216:18,21

**Jacovis**
246:24

**jail**  208:24
209:1
238:5

246:1,22,
25 247:5
260:5
315:25

**Janice**  15:24
16:9,15

**January**
111:21
286:10
316:12

**Jeffrey**
237:21

**job**  11:23
21:17
33:17
37:21 85:8
94:14
103:16,17
259:8,14,
16

**Joe**  140:2,3

**Johnson**  9:4
80:1 117:6
119:9,14,
18,21
120:3,15
121:8,9,
11,12
122:1
135:10
137:12,14
154:8,11
155:5
177:22
179:12
183:1

199:25
214:15
221:4
229:17
263:21
264:6,7,8,
13,17,20,
23 265:25
266:4
269:4
281:14
286:11,16
287:5
295:1
296:9,15
297:14,22
298:4,17
299:14
302:14
313:12

**Johnson's**
260:15
294:18

**Joiner**
175:21

**Jones**  66:16

**Joyner**
276:3,6,18
277:1,2
283:14
284:13
285:1,17,
25 286:4
287:5,11,
17 288:7,
17 289:23
310:17

311:12,23
312:1,24
313:4
315:24
316:7,19

**Joyner's**
283:18
313:13

**judge**  7:7
268:7
288:7

**judgment**
317:6

**judicial**
268:7
284:9

**July**  186:23
194:8
210:9
220:10
233:18
313:20
314:4,9
315:4,8

**jumbled**
27:24

**jump**  172:7

**jumped**
124:23
207:6

**June**  242:8
255:4
257:9

**jury**  164:16

166:19
201:21
259:22
284:20
286:4
290:8
296:9,15
297:2,5
315:8

JW   275:9

---

### K

keeping
171:15

Keith   268:17

keys   145:6
147:3
151:15,24
152:1,3,4,
6  261:8,9,
10,11

kid   125:3
150:17

kidneys   7:14

kids   125:1,
2

kill
140:12,22
287:2

killed   84:1
118:9
138:3
140:3,20
258:20

287:6

kind   8:20
13:9,20
18:3  20:23
29:2,3
31:23  32:8
47:1  68:3
69:15
73:12
76:15
107:16
111:14
112:10
114:5,22
115:18
116:9
119:4
122:15
143:16,19
192:11
193:12
199:1
205:9
206:4
233:16
260:24
261:20
269:23

kinds   16:1
28:23
34:11
35:19  62:1
111:11
116:11

King   250:2,
4

Kissey
231:2,4,
11,13

KL   244:18

knew   94:17
108:12
111:1
113:12,22,
24  114:6
115:11
118:8
122:9
125:3,4
132:10,13
140:4
142:1,8
198:22
205:6,7,8,
9  208:19
211:8,12
228:22
236:2,24
313:12

knife   140:4,
10,13,20,
23  206:15

knocked   89:3
125:14

knowing   9:20
122:13
289:10

knowledge
37:5  57:9
110:21
111:16
112:1,10

113:6
115:6,7
117:12
219:10
243:5

KT   250:2

---

### L

lab   280:15,
16,25

labeled
116:20

Lack   94:9
239:2

lady   124:6
129:6,12
205:5

language
159:8

large   22:2

late
222:18,19

law   11:8,9,
10,11,22
26:20,21
246:14
256:12
292:17
300:15,16

lawn   146:18

lawsuit
100:17,20,
22  101:12,
16

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: lawyer..left-hand

**lawyer** 142:1
  285:18
  290:22
  296:11

**lawyer's**
  285:24

**lay** 66:1
  262:6

**lead** 25:4
  26:4,18,23
  27:4,6,17,
  20,25
  28:2,9,15
  29:24 30:1
  31:6 33:6,
  18,20
  34:6,24
  35:1,5,24
  36:1,4
  37:25 39:8
  40:23
  41:11
  45:23
  47:13
  53:9,10
  58:16,25
  62:12
  68:25 71:3
  76:20
  80:3,4
  82:18
  92:22
  108:17
  119:7
  132:7
  136:13
  153:18

  156:4
  157:24
  188:17
  199:10
  217:16
  222:3
  227:2
  229:22
  232:3,17

**leading**
  41:22
  42:10,16
  59:24
  66:19
  69:13,18
  72:7 73:8
  77:3,10
  78:5
  86:14,20
  87:17
  138:21
  139:3
  140:6
  142:17
  143:3
  144:21
  145:18
  146:20
  147:10
  149:4
  150:5
  151:21
  152:23
  159:13
  161:7
  166:5
  168:9,19
  169:15,24

  170:11,16
  171:20
  172:4
  173:24
  174:3,13,
  19 183:19
  185:4
  196:16
  211:24
  214:17
  215:17
  218:15
  223:8
  230:15
  236:4
  303:24

**leads** 31:3

**learn** 179:11
  196:23
  198:14,16
  234:22
  241:18

**learned**
  71:21
  212:21
  241:16,17

**learning**
  83:11
  109:4

**leather**
  212:14

**leave** 23:24
  67:20 76:8
  79:5
  132:22
  133:4

  148:5,7
  186:5
  300:21

**leaving**
  13:18
  125:25
  132:21
  303:6

**led** 175:20
  218:12
  262:3

**left** 13:17
  66:1 67:22
  99:9
  103:16
  118:12
  137:11
  160:13,24,
  25 163:14
  199:13
  202:8
  207:11,17
  208:3
  214:1,6
  238:11
  250:3
  255:13
  256:23
  257:9
  260:24
  285:3
  295:22,23
  299:3
  303:7,8

**left-hand**
  311:15

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023

Index: leg..lot

leg  202:21

legal
   212:10,12
   285:24

letter  99:25
   100:2
   171:5
   233:12,19,
   22 240:22,
   24 242:7,
   8,11,12,21

letters
   240:20

letting
   84:10

Lewis  5:14
   154:14
   177:9
   294:20,23

liar  211:19

lie  65:21
   109:19
   234:5,11
   262:6
   291:19
   298:20

lieutenant
   16:23 17:7
   22:7,8,18
   275:2,11

lieutenant's
   17:8

life  103:19
   315:12,14,

20  316:17

light  222:22

limited
   168:17

lines  74:23
   75:1 308:4

linking
   130:1,13,
   16

Lisa  179:12

list  107:14
   112:15,17
   113:2
   217:4
   291:22

listed  9:6
   171:8
   221:12
   267:20,21
   283:21
   287:25
   292:2
   306:10

listen  51:24
   53:3,20
   71:5
   139:10
   141:5
   211:21
   235:7
   314:20

listened
   93:11
   147:19

listener
   49:10
   51:16,17
   53:19

lists  292:5

lived  114:20

living  96:18
   98:8
   100:24
   103:19

load  22:2

lobbying
   192:21,22,
   23

local  176:7

locate  35:7
   67:13
   124:4
   245:19

located
   245:20

location
   91:23
   113:12
   148:18
   206:25
   277:18

lodged
   295:24

log  107:3

long  8:20
   14:3 23:13
   26:5 34:17
   43:24

65:2,4
68:22,23
80:18
81:19,23
84:25
88:25 97:5
111:19
112:15,18
119:10
134:15
153:11
156:22
172:6
210:25
225:1,3
291:15
292:17
301:2,3

longer  29:19

looked  9:7
   78:15
   82:23 83:1
   159:3
   196:14
   227:9
   309:17

losing  62:11

lost  245:4

lot  14:4,11
   15:1 21:10
   22:20
   23:5,25
   56:11
   60:22
   94:10
   112:9

**J.A. 1698**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: lottery..MAR

113:13
119:22
145:25
147:5,8
237:1
267:12
289:13
295:17

lottery
  256:5,11

lower  202:8
  257:9
  271:15
  311:15

Luther
  250:2,3,4

_____

M
_____

mad  51:16,
  23 270:18,
  19

Madam  6:4

made  24:15
  25:13 67:6
  73:17
  79:13 87:7
  94:1
  100:19
  125:20
  145:2
  153:17
  164:18
  190:17
  207:19
  224:9

241:1,8
247:19
248:10
256:17
257:20
258:1
274:7
275:2
297:2
298:9

magistrate
  267:4,13
  268:2,7,18
  269:12
  312:4
  313:17

magistrate's
  267:11

main  226:7
  272:18

maintain
  21:2 107:3
  272:14
  315:21

maintained
  272:17,23
  273:7
  314:24

major  13:4,
  5,7,11
  15:19,22
  16:4,5,8,
  11,12
  17:14,16
  23:8,10
  24:11

25:8,25
26:1,7
170:4
172:16
173:6
267:15
278:17,18,
  21 279:6,
  9,15

make  7:11,
  19 12:4
  20:16
  21:15 24:4
  27:8,13
  35:7 41:14
  45:24
  51:23
  67:10 71:4
  76:22
  80:1,2
  91:7 92:12
  109:1,3
  159:23
  171:8
  191:5
  192:20
  195:12
  211:18
  221:2,10
  234:4
  235:11
  236:2,23
  242:14
  257:24
  265:16,23
  269:3
  277:3,6
  280:23

281:18
299:3
309:2,7,
  12,14

making  92:20
  102:11
  103:19
  249:7

male  126:3,
  7 137:24
  138:4,5,9
  145:5
  149:23

man  65:19,
  22 84:1
  118:9
  138:3
  144:16
  155:8
  202:20
  228:20
  260:12,23
  261:5,11
  296:13,14,
  16 298:17,
  21,24

managed
  281:6

Manual  105:8

map  31:18,
  19 36:8,10
  69:24
  70:4,6,8

MAR  8:25
  126:16,18
  131:6,22

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: March..Martineau

137:13
234:19,22
236:14
237:20,24,
25 238:2
252:2,5,8

**March**  247:1,
8 291:6

**mark**  66:11
72:10
96:2,3
99:20
131:23
145:4,7
146:1
154:10
155:13
158:3,11
166:16
170:23
175:5
196:9
203:11
233:2
263:9
276:3,6
283:14
284:13
285:1
287:5
290:15
310:17
311:12,22,
25 312:24
313:3,13
315:24
316:7,19

**marked**  66:13
67:19
72:12,15
96:7,10
99:23
132:2
137:9
154:16
158:16,19
166:22
170:25
172:11
175:8
179:4,8
196:11
200:10
201:24
202:1
203:13
209:4,7
219:11,14
226:9,12
233:4
240:16,18
244:9,12
253:2,7
254:4,10
263:13,16
265:5,7,11
266:12,14,
16 268:13,
15 271:15
280:4
283:9,11
290:1,3,18
297:11

**marking**
137:6

172:8
233:9

**marks**  55:1,5
88:2 144:8
145:2
146:12,13

**Marshal**
300:18

**Marshals**
300:24

**Marshanna**
67:2,5,6,
9,10,13,
15,17,18,
20,23,25
68:3 69:2
71:10,19
72:16
74:13,14,
15,17
75:5,7,9,
10,14,22,
23,25
76:1,5,7,
12,23
87:4,7,9,
22 216:12,
14 272:7
273:19

**Marshanna's**
68:7 74:7
87:12

**Martha**
88:16,25
89:6
282:24

**Martin**
250:1,3,4

**Martineau**
5:16 9:21
10:9 11:4
15:7 19:14
20:9 21:7
26:12 28:4
29:13,23
30:16
31:1,14
33:11 34:2
35:2 36:16
37:12
38:15,24
40:6,20
41:8,17,22
42:9,15,21
44:9,13,
16,20
45:5,10,15
46:1,10,21
47:9,19
48:9,15
50:19
51:21
52:18,25
53:17
54:19
55:15
56:3,18,24
57:15,19
59:24 61:8
62:19
64:5,12
65:8,15
66:19
69:12,17,

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: match..matter

| | | | |
|---|---|---|---|
| 22 70:2,11 | 135:6,14, | 179:15 | 251:9 |
| 71:15 | 18 136:6, | 182:2 | 258:6 |
| 72:7,19,23 | 20 138:14, | 185:4,19 | 259:3,6, |
| 73:8 74:25 | 21 139:3 | 186:21 | 11,24 |
| 75:19 | 140:6 | 187:12 | 260:19 |
| 76:17 | 142:4,17 | 188:24 | 261:18,25 |
| 77:3,10,19 | 143:3 | 194:2 | 295:4,7,11 |
| 78:5 79:2 | 144:20 | 196:15 | 299:20,23 |
| 81:13 | 145:18 | 197:23 | 304:1,19 |
| 83:8,19 | 146:20,24 | 198:8 | 305:3,6 |
| 84:9 85:4 | 147:10 | 201:12 | 310:11,19 |
| 86:1,14,20 | 148:19 | 204:24 | 312:19 |
| 87:17 | 149:4,9, | 210:13,16 | 313:14 |
| 88:3,19 | 14,19,25 | 211:9,24 | 314:15,17, |
| 90:9,14,20 | 150:5 | 212:22 | 20 316:6, |
| 92:10 | 151:21 | 213:20 | 21 317:23 |
| 93:8,16 | 152:23 | 214:10,17, | 318:4,15 |
| 94:8 95:1, | 153:3,24 | 25 215:17 | |
| 8 96:4 | 154:25 | 216:22 | **match** 34:5 |
| 101:20 | 155:16 | 218:15 | 138:25 |
| 102:2,6,9 | 156:13 | 219:8 | 139:7 |
| 104:17 | 158:10 | 223:7,19 | 188:20 |
| 105:9 | 159:10,13, | 225:12 | 201:8 |
| 108:6,15 | 19 160:21 | 226:2 | |
| 109:15 | 161:7,15, | 228:17 | **matched** |
| 110:3 | 20 162:6, | 229:11,18 | 33:25 |
| 111:7 | 15 163:17 | 230:15 | 117:3 |
| 112:3 | 165:20 | 231:17 | 146:17 |
| 113:8 | 166:5 | 232:1,21, | |
| 114:7 | 168:4,9,19 | 24 233:14, | **materials** |
| 115:4 | 169:10,15, | 18 235:10, | 9:2 |
| 116:24 | 24 170:11, | 14,24 | |
| 117:17 | 16 171:11, | 236:4,9 | **matter** 5:5 |
| 123:24 | 20 172:4, | 237:9,12 | 58:3 63:14 |
| 124:21 | 18,20,22 | 239:1,15, | 81:15 |
| 127:25 | 173:3,24 | 25 243:3, | 137:1 |
| 130:19 | 174:3,13, | 10 245:3,7 | 168:23 |
| 134:21 | 19 177:8 | 250:22 | 169:8 |
| | | | 182:16 |
| | | | 216:4 |
| | | | 240:11 |

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023        Index: Mcneal..Melvin's

242:15
262:16

Mcneal   245:2

meals   189:3

meaning
265:20
292:23

meaningful
34:6
113:11

means   60:2
174:15
210:7
292:19,20
306:17
307:11
308:12

meantime
147:22

media   166:13
167:22,24
168:13
174:17

media's
174:11

medical
121:16
159:8,22
300:22

medications
7:10

medicine
7:14

meet   41:3
64:22 65:2
97:11
145:7
222:6
235:23
236:14,18,
23

meeting
97:14
236:1
252:1

meetings
237:18

Melvin   5:22,
24 23:19,
23 25:21
67:6 73:3
74:3,7
76:12
79:19 80:2
82:6,15
83:6,12
85:6,11,
12,22 87:7
88:7 89:20
90:4,12
92:25 94:4
95:19
96:20
98:12,16
99:1,6
100:1,2,24
102:1
117:20,25
119:6
125:14,17

131:15
132:19,20,
25 135:10
138:6
147:18,20,
22 148:11
151:13
152:3
154:2
157:1,5,10
164:16,20
165:8,14
176:1,25
178:12,15
179:14
182:18
188:3
197:18
199:10
214:20
215:10
217:16
218:7,8
222:25
228:12
229:22
230:20
231:9,21
234:1
238:8
239:7,13,
23 241:1
243:1
244:17
245:13
246:2,5,15
249:9,15
255:17,22

256:3
258:5,8,
10,13
259:1
262:3
263:3,23
264:5,20
265:1
266:1
267:11,20
269:5,20
270:13,21
271:6,19
272:6,14
273:15
274:17
277:2,11,
13,20,23
279:3
282:19
283:22
290:13,21
313:16

Melvin's
72:15
79:25 83:2
84:22
91:12
99:2,3
127:21
178:3
208:4
239:4
263:18
274:4
275:16,22
279:21
282:8,15

**J.A. 1702**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: member..month

| | | | |
|---|---|---|---|
| member  296:9 | 231:2 | 110:7,8 | missed  53:11 |
| members | Mercer  67:2 | 130:7,18, | missing |
| 100:5 | 72:16 | 24 144:2 | 278:14 |
| memory  54:17 | 76:23 | 155:24 | misspoke |
| 56:13 | 83:2,12, | 163:4,13 | 192:7,9 |
| 117:22 | 15,18 | 233:17 | 225:7 |
| 120:22,23 | 85:10,11, | 260:22 | misstates |
| 123:22 | 20,21 87:4 | 261:4,16 | 301:15 |
| 158:20 | 216:15 | mine  204:9 | mistake |
| 181:6 | 217:1 | 278:2 | 121:6 |
| 182:24 | 272:6 | 314:6 | 221:6 |
| 204:13 | 273:16,19 | minus  299:4 | misunderstood |
| 242:24 | met  64:24 | 306:22 | 139:17 |
| Mendenhall | 179:13 | 307:23 | MO  203:20 |
| 116:1 | 182:17 | 308:1,11, | mom  129:10, |
| mental | 187:5 | 15 310:14 | 13 |
| 122:10 | 203:4 | minute  64:16 | mom's  197:18 |
| mentally | 204:15 | 171:11 | monetary |
| 44:23 | 237:8,21, | 317:18 | 281:15 |
| mention | 24 | minutes | money  13:19, |
| 145:23 | method | 125:15 | 22 74:19 |
| mentioned | 167:13 | 145:3 | 75:9 76:1, |
| 9:17 10:3 | mid  165:18 | 163:22 | 4,13 |
| 15:18 | 210:2 | 198:12 | 192:24 |
| 16:3,15 | middle  8:7 | 250:4 | 193:2,18 |
| 30:24 | 72:25 | 262:9 | 217:23 |
| 32:13 42:5 | 74:6,9,22 | Miranda | 243:8 |
| 107:20 | 87:22 | 271:2 | 247:21 |
| 116:22 | 133:7 | 277:7 | 248:12 |
| 125:22 | 284:16 | Mischaracteriz | 251:7,14 |
| 126:21 | 292:1 | es  148:20 | 281:19,24 |
| 276:15 | mind  44:24 | misprint | 282:6,9 |
| mentioning | 56:8,23 | 253:20 | month  107:6 |
| 249:8 | 76:24 | Misrepresentin | |
| mentions | 83:18 | g  88:4 | |
| | 109:25 | | |

**J.A. 1703**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023              Index: months..neumo

months    43:14
  109:14
  120:13
  135:24
  152:19
  284:18
  316:15

Montoyae    5:5
  241:3
  292:2

morning
  6:14,15,22
  179:16
  180:9,11
  260:11

Moser    250:3

mother
  118:11
  123:18
  128:22
  129:7,14
  184:18
  246:6

mother's
  75:24
  122:1

motion
  234:17
  251:16

motive
  109:18

move    35:6
  88:15
  171:12
  201:13

207:8

moved    15:19
  18:17
  145:3
  149:13,18

movies    189:6

moving    96:9
  146:23
  149:23
  271:11

multi-page
  244:14

murder    13:9
  24:2,3
  77:25
  78:9,13,
  19,23  89:4
  93:3  97:22
  102:23
  104:2
  111:20,21
  130:2
  135:24,25
  152:20
  153:1
  156:5
  168:23
  175:14,21
  182:25
  201:7,8
  206:24
  208:14
  217:21
  218:10
  220:9,18
  228:20,23,

25  241:3
  261:13,14
  264:8,9
  266:21
  268:20
  269:9
  276:6
  283:18
  284:22
  287:19
  288:3
  289:9,11,
  14,17,19
  290:8
  300:24
  302:5
  310:24
  311:1,7,
  10,18,22,
  23  312:1,7
  313:11
  316:16,20

murdered
  199:22
  258:19
  267:25

murders
  16:10
  23:11

_____

N
_____

named    219:3
  251:20
  289:6

names    46:7,
  13 69:25

70:9,20,24
  89:15
  112:21,24,
  25 114:18,
  19 193:13

Natasha
  263:21

nature    249:8
  285:19

necessarily
  152:11

needed    14:13
  18:21
  19:10 24:9
  103:25
  121:24
  147:24
  148:9
  165:1
  166:18,19
  207:21
  280:19

negative
  292:14,19
  294:9
  299:12,13
  305:17,20
  307:1
  310:8

neglect
  256:24

neighborhood
  82:11
  111:14

neumo    305:10

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023        Index: news..notification

news  176:14

nice  119:22
  202:21
  205:5

Nick  5:21
  233:15
  263:2

night  102:23
  153:14
  216:18
  264:8

Noble  67:7

Nobles  87:8

nodding
  155:8,17,
  20,21,22
  163:1,2,3

normal
  129:18
  237:15

north  5:7
  11:24
  67:22
  245:2
  284:12
  298:2

note  10:6
  46:22 47:2
  58:1 63:12
  66:12
  72:11
  96:6,11
  99:22
  109:14
  132:1

136:24
137:8
154:15
158:15
166:21
170:24
172:3,10
175:7
190:17,20
191:5
192:20
196:10
200:9
201:25
203:12
209:6
216:2
219:13
226:11
227:3
232:8
233:3
240:9,17
244:11
253:6
254:9
262:14
263:12
265:6
266:13
268:14
283:10
290:2,17
297:10

notebook
  8:22,23
  9:6 118:20
  212:7

213:2,24

notebooks
  212:8
  213:15

noted  15:12,
  14 264:4

notepads
  213:13

notes  8:18
  9:2,18
  10:3,4,7
  35:16
  37:17,22
  38:3 43:9,
  11,12,13,
  15,23
  44:4,25
  45:3,24
  53:5
  54:14,15,
  16,22
  55:7,9,10,
  11 56:2,
  13,14,17,
  21 57:13
  65:10
  89:11,19,
  21,22,23
  90:5,13
  91:16,22
  109:3,6
  118:13
  127:8,11
  129:2
  131:3,6
  133:21
  135:2

159:23
180:12
182:6,19,
21 184:22
188:9,12,
22 191:8
197:21
207:16
212:17
213:9
214:2,9
215:5,10
220:21
221:2,10
226:14,17,
21,23
227:9,10,
13,24
228:9,13,
21,25
229:7
230:7,22
232:11,12
237:17
265:13,16
268:25
270:8,10,
13 274:7
278:17,18,
21,22

notice  7:13
  85:2 232:7
  308:13

noticed  45:1
  137:23

notification
  176:6

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: Novell..objection

**Novell**
23:19,23

**November**
95:22 96:5
99:9
253:13

**number**  5:8
47:4 133:6
166:24
193:22
194:23
197:6
203:25
220:8
221:12
230:13
233:7
235:5
244:4,15,
22 245:6,
18 263:16
265:5
267:8
268:13
282:1,2
283:14
285:17,22
286:2
287:16
288:6,13,
18 293:6,
14,19
294:17
297:14
298:16,20,
23 305:3
307:2

310:16

**numbers**
131:20
158:24
246:16
299:12,17
305:9
306:14
307:14
311:8
317:7

**numerical**
292:14,18
299:2,8
305:2
306:21
308:4

**numerous**
249:2

———————
O
———————

**oath**  237:6
285:17
288:7
296:9,15

**object**  28:4
37:12
51:21 65:8
88:3 108:6
162:7,15
171:12
185:19
303:24

**objection**
11:4 19:14

20:9 21:7
29:13,23
30:16
31:1,14
33:11 34:2
35:2 36:16
38:15
39:14,20
40:1,6,20
41:8,17,22
42:9,15,21
44:9,13,
16,20
45:5,15
46:1,9,10,
19,20
47:9,19
48:9,15
50:18,19
52:3,25
53:17
54:19
55:15
56:3,18,24
57:14,15,
19 59:24
60:10 61:8
62:7,18,19
64:5,12
65:15
66:19
69:12,17,
22 70:2,11
71:15 72:7
73:8
76:14,17
77:3,10,20
78:5 79:2

80:10,17
81:13
83:8,19
85:4 86:1,
14,20
87:17
88:11
90:9,14
92:10
93:15,19
94:7,8,15,
21,25
95:7,8,20
105:9
108:15
109:15
110:3
111:7
113:8
114:7
115:4
116:24
117:17
122:6,11
124:16,21
127:16,24,
25 129:23
130:19
134:6,10,
21 135:6,
13,14
136:6
138:14,21
139:2,3
140:6
142:4,17
143:3
144:20

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                Index: objects..office

145:9,18
146:20,24
147:10
148:19
149:4,9,
14,19,25
150:5
151:21
152:23
153:3,24
156:13
159:13,19
160:21
161:3,7,
15,19,20
162:14
163:17
165:16,20
166:5
168:4,9,19
169:7,10,
15,24
170:11,16
171:20
172:4
173:24
174:3,13,
19 178:16
179:15
182:2
185:4,20
188:24
194:2
196:15
197:23
198:8
201:12
210:16,17

211:9,24
212:22
213:20
214:10,17,
25 215:17
216:22
218:15
219:8
223:7,19
225:12
226:2
228:17
229:11,18
230:15
231:17
232:1,21
235:24
236:4,9
237:9,12
239:1,14,
15,25
243:3,10
250:22
251:9
259:3,5,
11,24
260:18,19
261:18,25
270:16
277:5
287:8,14
294:10,15
298:10
299:16
301:15
302:1
310:11
312:18,19

313:14
314:15,17
316:21

objects   7:6

observing
266:4

obtain
108:3,5
121:15
246:25
266:8

obtained
33:9

obvious
205:12

occasion
57:1
164:25
244:8

occasionally
54:7 57:3
175:2
194:20,21

occasions
11:15
67:15
246:3

occurred
113:12
144:19
150:4
167:11
168:24
175:20
177:19

201:9
206:24

occurrence
256:1,24

occurring
23:12

October
96:18 98:7
103:18
253:22
300:13,14

offense
209:10,14,
18 210:7
289:5

offer   115:13

offered
243:8
246:3,6

office
26:20,21
40:9 52:22
78:11,14
117:22
121:21
129:21
136:10
143:6
147:23
194:6
196:2,5,25
197:9
199:14
200:21
207:18,20

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                    Index: officer..paid

208:4
210:10
223:2,3,23
224:22
225:18,19
229:25
240:24
241:22
244:7
247:9
248:20
252:5
253:15
269:21
273:4
280:17
303:10,18,
23

**officer**
11:11,13,
16 12:1,7,
12,14
25:23
28:23
66:16
67:3,5
69:6,10
70:10
74:18 77:8
85:21
87:4,6,15
94:5
115:21
117:21
118:1
124:11
125:12,19
127:2

128:17
131:17
143:8,13
144:12
176:3,19
204:19
209:24
223:14
227:17
257:21
276:7,14
280:7,21
292:17
300:16

**officer's**
68:5 69:1
77:24
152:7

**officers**
105:21
112:8
175:25
212:25
269:22
276:15

**offices**
117:24

**official**
268:8
272:21
278:6

**oil** 75:7

**older** 11:18

**ongoing**
18:24
119:2

**oo** 271:16

**open** 18:15
20:2
205:22
244:17

**opened** 13:5

**operated**
89:25

**operation**
17:16

**operations**
11:15

**opinion**
305:14
306:18,23
309:25
310:4

**opposed**
86:18
110:11

**oral** 133:14

**orally** 133:9

**ordeal**
249:22

**order** 10:18
49:8
245:23
268:6
271:9
318:12

**oriented**
167:18

**orienting**

167:12

**original**
243:9

**outcome**
169:21

**oversee** 17:1

**overseeing**
221:25

───────────

**P**
───────────

**p.m.** 136:23
137:3
216:1,7
227:22
240:8,14
262:13,19
318:3,17

**packaged**
32:25

**pad** 212:10,
12

**pages** 158:9,
10 160:10
209:17,22
254:5
265:13
268:25
271:15
273:23
284:5

**paid** 106:18
241:2
242:18
250:14

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: paper..people

281:11

**paper** 19:10
44:24 73:6
133:20
135:5,8,
11,17
139:14
176:7
227:19
294:19,21

**papers**
310:17

**paperwork**
21:18
219:21

**paragraph**
67:1
144:4,14
145:1,22
146:1,22
167:2
170:2
245:10,18,
24 246:12,
19 247:7,
23 249:24

**paraphernalia**
209:20

**pardon**
259:19
315:5

**parens** 67:9
72:16

**parent**
129:20

178:22

**park** 75:6
202:20
204:21
206:8

**parked** 147:4

**part** 14:15
21:9 46:12
53:15
69:24
70:4,6,8
73:25
87:21
95:18
103:1
124:24
132:24
148:2,6
219:21,25
237:2
266:10
279:8,14,
17 280:12
284:9
300:7

**participate**
217:7
293:15
294:3
300:24

**participation**
68:7

**parties** 58:2
63:13
136:25
216:3

240:10
262:15
300:4,5

**parts** 32:7

**party** 190:24

**passed** 67:19
197:5
198:18
200:23
224:8,9,
20,25
225:6,20,
22 226:7

**past** 111:9,
10 159:4
167:4
206:2,7
219:21

**Patricia**
231:15,16
232:4,5

**patrol** 12:1,
7,12,14,16
25:23
28:22
67:19 77:8
105:20
123:7
204:19

**patrolling**
212:6,17

**pattern**
19:20
301:23

**patting** 8:22

**pay** 14:1
235:15
281:19

**payment**
246:3,5

**PBA** 9:19,24

**PD** 51:6

**pdf** 295:9

**pencil**
135:5,11

**pending**
210:3

**Penny**
194:13,15

**people** 11:17
23:16,18,
21,22 24:6
25:25
31:7,13
46:14
53:12
59:9,11
75:8 94:20
105:4
110:22
111:1,4,5,
12 114:5,
13,14,15,
16,20
115:3,11
155:24
163:4
167:17
188:6
191:3

**J.A. 1709**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: people's..photographs

194:13
239:6
249:2

people's
193:13

percent
170:6,9,
14,15
171:16
173:11

perception
174:11

performance
14:6,23
166:25
171:3

performed
170:5

period  52:4
170:4
186:20
190:13

periodically
203:1

perpetrator
140:12

person  15:23
17:4 20:11
22:6 24:11
26:20
27:22
28:2,9,12
31:7,12
32:12
33:23

35:1,6,17
38:4 44:5
45:24
49:17
50:25
54:2,23
58:16,25
60:8,21
61:1,5,6,
17,20,23
62:3,4,13,
14,15,16
63:1 76:15
86:18
88:10
97:23
102:20
119:24
123:25
124:1
134:4,8
136:3
140:2,3,
12,17
141:3
142:25
146:2
160:2
164:15
183:2
184:13
195:4,5
206:8
211:19
251:13
275:25
281:21
284:20

313:12

person's
27:3 39:11
50:21 55:4
62:2
140:22
214:23

personal
12:5
13:18,22
20:8 79:9
244:3

personally
109:13
288:8

personnel
170:4
254:6

persons  53:8

persuading
171:7

Peter  5:19
246:24

Pfeiffer
5:12,25
6:4,13,18
52:5,7
58:7 63:8,
18 72:21
96:9
102:4,8
136:18
137:4
154:18,24
158:9,11

159:12
162:9
215:23
233:6,11
240:5
245:5
262:10,20
270:16
277:5
287:8,14
294:10,15
298:10
299:16
301:15
302:1
303:24
304:3,6
305:5
316:7
317:19
318:7,11

Phillip  5:14

PHILLIPS  6:8

phone  91:5
179:17
244:3
248:15,16,
24 249:2

phoned
247:25
249:25
250:1

photo  30:21,
22

photographs
82:22

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                Index: photos..police

photos  30:4,
  14 35:18
  82:24
  146:17

physical
  138:19,25
  139:7,18,
  22 140:5,
  14 146:5
  151:20
  201:7
  280:4

PI  238:12,
  15,21

pick  53:10
  87:20
  125:6
  179:8

picked
  127:22
  145:5,13
  152:2
  179:1,9

picture
  146:9
  159:17

piece  260:9

pieces  32:14
  221:16,20

pillow  262:7

Pitt  233:8
  245:21
  246:1,20
  260:4
  284:20

290:8,12
  296:10

place  18:20
  21:6
  24:20,22
  68:24
  95:15
  104:2
  112:6,9
  125:21
  128:18
  207:4
  273:9
  274:18
  292:11

places  51:6

plain  102:17

plaintiff
  6:1,10
  258:19

plan  29:3
  74:18

planned  76:1
  102:23
  217:22

plate  78:19
  79:11
  80:24
  81:15
  166:1

play  183:17
  217:11
  221:25

player
  171:15

plea  210:11
  284:5,9
  285:9,12,
  16 316:8,
  9,12,24

plead  286:3
  287:18
  314:11,16,
  21

pleaded
  23:12
  312:16

pleading
  285:13
  287:12,17,
  23,24
  288:8

pleads
  284:10

pled  289:23
  316:2,3,24

Plummer  5:23

point  7:9
  8:4 17:9
  22:7 23:24
  83:15
  95:15
  100:17
  111:19
  134:16
  142:9
  171:10,14
  183:6
  185:2,7
  201:10,18

208:2
  214:14
  220:16
  229:16
  238:7
  246:22
  250:16
  312:2
  315:24

pointed  82:6
  155:5
  171:25
  308:14

points  171:8
  220:14
  230:11

police
  11:13,16
  17:13
  18:9,17
  22:8 33:1
  34:12 47:5
  52:16
  66:18
  79:16,17
  100:1
  112:7
  113:15
  125:12
  129:21
  143:8,12
  168:7,12
  176:19
  187:25
  189:6,19
  191:17
  199:13

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: policies..pregnant

207:9
213:13,14,
18 240:22
247:14
253:3,22,
24 263:20
272:18,22
274:2
278:6
280:24
281:7,9,
10,11
282:12
300:9
301:8,14
303:22

**policies**
104:10,11,
22 105:8
106:7,13
256:13
301:9,13

**policing**
167:13,18

**policy**
105:2,13,
15 106:4
107:2
197:8
256:18

**polygraph**
194:19
195:2,9,
12,19,21,
23 196:2,
11,14,18,
19,21,24

197:2,6,
11,15,22
198:4,7,
14,20
199:1,6,
11,17
200:16
224:7,10,
20,25
225:6
226:7
291:11,18,
19,21
293:10,16,
25 294:2,
9,14
297:14,22
298:3,12
299:13
304:8
305:9,15,
16,23
306:1,3,
16,24
307:13,18
309:16,17

**polygraphed**
200:18
201:10

**polygraphs**
196:6,13
234:15
304:10,18

**portion**
162:7
290:6

**position**
12:15 13:4
17:8
173:10

**possessed**
201:21

**possessing**
287:20

**possession**
209:19
273:1

**possibilities**
184:10

**possibility**
260:25

**possibly**
41:13
49:15 55:2
62:16
71:11
92:18
109:5,17
116:14,16
134:23
136:8
138:16,23
139:5
140:8,15
161:22
163:7
164:9,11,
14 168:6
169:12
173:14
185:14,16
188:21

189:1
199:3,4
206:14
208:16
211:4
212:1,24
223:9
226:4

**potential**
58:10 63:2
216:9
242:23

**pounds**   292:6

**powder**   67:13

**Powell**
251:20,21

**practice**
24:17,19,
21 52:10,
23 54:6,9
56:1 89:14
90:5,12
129:18
141:19,25
156:4
157:3
178:20,22
179:3
236:17
237:4,15
301:23

**practices**
85:7

**pregnant**
99:4

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: prep..process

prep  236:12

preparation
  11:2 88:20
  90:20

prepare  8:16
  9:7 10:19
  40:18,22
  176:15
  277:23

prepared
  33:1
  176:21
  267:16
  277:22
  284:1
  291:23

preparing
  41:3 176:3

present
  28:12
  42:7,25
  58:3 63:14
  136:25
  173:9
  188:11
  189:12,17
  216:4
  238:2
  240:11
  249:13
  262:16
  268:4
  276:18,20,
  25 277:13,
  19 283:3
  312:3

313:18

presented
  201:20
  268:3
  269:12
  285:12
  313:16

presenting
  223:14
  285:11

press  174:23
  175:1,3,6,
  10 176:13
  177:17

pressed
  167:5

pressure
  166:4,12,
  15 167:5
  168:2,14
  174:16,22

pressured
  241:2
  242:18

presume
  57:21
  172:6
  219:19
  236:6

pretty  10:16
  22:25
  24:17
  26:23 27:6
  128:11
  129:12,16

138:9
159:15
192:10
217:3
282:4

previous
  33:21
  79:11,14

previously
  11:2 16:4
  19:18
  21:20
  83:16

price  126:4

primary
  185:2
  199:6

print  39:7

prints  117:2

prior  35:18
  67:15
  80:19
  107:8,9
  113:22
  190:1
  271:3
  285:8

prison
  260:12

Private
  240:25

probable
  201:17
  267:24

268:8,19
311:22,25
313:10,13

problem  57:7
  99:16,18
  163:19
  167:12,18
  205:2,14
  235:9

problems
  50:15,16
  57:17
  103:14,16
  165:3
  205:15
  262:7

procedure
  257:21

procedures
  104:10,11
  105:8
  106:4,8,13
  195:19
  301:9,13

proceed
  16:20

proceeding
  10:18

process
  14:9,15,16
  19:12,21
  20:15,18,
  24 22:5
  221:15,19
  269:4
  273:12

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                Index: processed..put

285:10

processed
    116:23

processes
    21:6

processing
    115:25
    116:4,17

proficiencies
    14:13

progress
    23:2

promise
    303:1

promoted
    12:17,23,
    25 13:2,5
    16:21

prompt  195:2

promptly
    247:10

proper  88:1,
    8

property
    253:3,11

prosecute
    40:17
    47:21

prosecuted
    303:23

prosecuting
    185:12,23
    186:8

187:19
191:13,16
199:6
226:7

prosecution
    241:4

prosecutor
    288:21
    289:4

prostitution
    112:9

proved
    111:11
    206:2

provide
    36:13 49:8
    111:12
    177:14
    188:12
    302:4

provided
    119:22
    189:2
    220:3
    230:25
    239:23
    246:16
    300:4

providing
    39:1
    219:22
    303:21

proximity
    58:18
    59:22 60:8

psychiatric
    50:14,15,
    25

public
    115:6,7
    167:5,24
    174:11,18
    176:18

published
    193:13

pull  20:2
    25:10
    304:17

pulled
    155:25
    163:5,12
    203:21
    207:4

punishments
    287:25

purged
    254:13

purpose
    40:15
    43:13
    236:2

purposes
    126:10
    314:8
    315:17

push  155:9
    289:13

pushed  126:8
    155:8,10

161:9,24
162:19,23
163:8,10
260:23
261:5
313:7

pushes
    296:13

put  7:13
    18:16,18
    19:10,22
    24:19,21
    33:1,7
    39:18,23
    41:24
    42:1,5,7,
    12,18,19,
    25 44:3
    66:7 68:16
    69:10
    81:17
    86:12
    102:14
    132:19
    133:4,20
    135:16
    137:21
    139:13
    141:3,7,
    12,25
    142:8,11,
    20,24
    143:10,14
    145:5,12,
    13,20
    146:1
    147:2

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                Index: putting..question

| | | | |
|---|---|---|---|
| 148:3,9 | 31:2,15 | 106:2 | 190:19 |
| 149:23 | 33:10,12, | 108:7 | 191:15 |
| 151:14 | 22 34:3 | 110:4,13 | 193:23 |
| 154:2 | 35:3 36:17 | 111:8 | 194:3 |
| 156:3 | 37:13 | 113:9,10 | 196:16 |
| 166:3,15 | 38:1,16 | 114:8 | 197:24 |
| 172:16 | 39:15 40:7 | 115:5 | 201:13,15 |
| 190:4 | 41:9,18 | 116:25 | 208:18 |
| 191:25 | 42:3,10, | 117:18 | 210:17 |
| 199:7 | 16,22,23 | 124:22 | 211:5 |
| 217:3 | 44:10 | 128:1 | 213:22 |
| 221:4 | 45:6,11,16 | 130:12 | 214:19 |
| 227:3,19 | 46:2 | 132:6 | 216:23 |
| 236:7 | 47:10,20 | 134:22 | 218:2,22 |
| 247:19 | 48:16 50:6 | 135:18 | 220:7 |
| 248:5 | 51:22 | 138:15 | 221:9,10, |
| | 52:19,20, | 139:16 | 12,18 |
| **putting** | 21 53:1,18 | 142:5 | 222:5 |
| 19:22 | 54:20 | 144:21 | 226:25 |
| 39:24 | 55:16,20 | 145:10 | 227:17 |
| 43:22 | 56:4,19 | 146:8 | 229:19 |
| 87:25 | 57:5,20 | 148:20 | 231:18 |
| | 61:9 64:6, | 153:25 | 232:18,22 |
| | 13,19,21 | 155:4,9, | 234:2 |
| **Q** | 65:9 66:22 | 10,11,14, | 235:25 |
| | 69:3,13 | 18,19,20, | 243:4 |
| **Quadrangle** | 71:5 | 21,22,23 | 250:23 |
| 207:5,17 | 72:19,24 | 160:22 | 251:11 |
| | 78:10 79:3 | 161:21 | 259:4,9 |
| **quality** 47:7 | 81:14 | 162:16,25 | 260:20 |
| **question** | 83:9,20 | 163:2 | 261:6 |
| 7:12 8:1,7 | 84:11 | 165:9,21 | 262:1 |
| 10:10 11:5 | 85:1,5 | 166:20 | 293:14,20 |
| 19:15,25 | 86:6 | 172:15,17 | 296:10 |
| 20:10 21:8 | 90:10,11, | 173:6,8 | 298:16 |
| 22:11 | 15 97:24 | 177:16,20 | 301:19 |
| 27:22,25 | 102:6,19 | 182:20 | 305:25 |
| 28:2,5 | 105:10,24 | 186:13 | 306:4 |
| 29:14 | | | |
| 30:2,17 | | | |

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                Index: questions..read

307:3,11
311:24
313:2,15
314:8,20
315:17

**questions**
7:6,20 8:8
14:21
22:19 41:7
49:9
63:22,25
64:9,11,15
65:6,13
93:17
115:3
124:8
131:25
182:9
186:12
219:23
220:3
223:11
235:8
258:17
262:21
263:4
285:13
292:24
294:25
295:12,18
296:2
299:19,21
304:2,4
306:6,8,10
307:8
317:22,23

**quick**  317:18

**quotation**
55:1,5
88:2

**quote**  54:23
67:10
74:16
75:11 76:6
87:23,25
88:10,13
248:5

**quotes**  55:4
67:5,7,9,
14,15,17,
18,22
74:8,9
75:24
86:12,13
87:11,13,
16 88:9

—————————

R

—————————

**Radcliffe**
91:2
115:24
130:2
158:21
168:24
175:15,22
199:22
218:14
220:9
253:9
258:19,20
266:5,21
267:25
268:20

269:9
276:7
277:11,14,
20 278:25
280:14
283:19
284:23
287:2,7
288:4
289:11,20
290:9
293:7,15,
21 295:22
296:4,19
312:24
313:4,7

**raining**  99:5

**rainy**  149:3

**raise**  14:22
66:2
171:6,7,9

**raised**  11:20

**Raleigh**
280:17,20

**ran**  145:4
281:8,11

**rape**  13:9
15:23
16:3,5,7
24:3

**rapes**  16:9

**rate**  165:19
170:5,9,
10,13,15
171:16,19

173:11,12,
22

**rates**  168:13
169:23

**re-entry**
160:14

**reached**
173:7
206:18

**read**  8:18
10:20
11:1,3
23:3 67:1,
23 68:5,12
71:8 74:12
75:12 76:9
83:13
87:16,21
98:21
105:16
124:9
128:2
133:1
134:15
144:11
145:11
148:3
155:25
156:19,20
158:9,10
162:5,7,22
167:6,14,
24 170:7
171:16
175:22
197:17
218:17

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: reading..recognize

247:11
264:3
271:2
289:1,3,7
295:15
301:11
318:4

reading
67:10 98:2
101:8
103:4,8
126:9,12,
15 220:1
235:8

reads 171:14
240:24
246:19
247:7

ready 297:1

realize
224:21
291:15

realized
132:25
148:3

reason 29:18
34:22 39:4
79:9
156:16,19
164:10
195:5
212:25
213:3
214:2
225:16
234:10

236:6
248:22,25
251:1,4
287:4

reasons 12:5
13:18

reassessing
171:9

Reaves
244:23

recall 12:8
14:24
15:12 18:5
22:13
25:21 44:1
51:8 74:3
81:3 82:13
83:11
90:23
91:15 94:4
102:10
104:11
106:7
107:20
116:23
117:2
119:17,20
123:3
124:19
127:22
132:8,15
154:5
157:10
160:19
190:7
197:16,17
216:10

219:22
234:16,17
236:21
237:20,23
239:6,22
240:3
242:15
243:2
247:15
250:7
251:17
255:10
256:17
257:17
258:3
301:19
315:14

recalled
17:6

recant 243:8

recantation
239:20

recanted
239:12
241:15

receive 51:3
107:16
178:6
189:23
192:15,18
193:18
281:15
282:6,9

received
15:5 50:10
69:1 72:22

119:8
179:17
191:4,9,22
193:2
208:13
247:13
259:19
282:4
315:5,12,
14 316:16
317:2,13

receives
191:13,17

receiving
190:18,23
193:20
219:17,20
233:22
315:20

recently
60:19
241:1

recess 58:2
63:13
136:24
216:3
240:10
262:15

recognize
47:5
66:17,21,
23 73:21
183:1
263:17
274:22
276:5

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023   Index: recollection..regenerate

288:23

**recollection**
23:13
25:16
26:5,6
81:20,23,
24 83:24
99:10
109:7
119:12
126:21
181:20
192:25
203:9
204:10
223:3
268:4
270:12,18
284:3
292:12
312:21

**record** 5:2
6:5 44:8,
23 45:20
57:24 58:6
63:9,10,17
89:14
131:7
136:22
137:3,5
190:17
208:20
211:12
215:25
216:7
240:7,14
262:12,19

264:4

**recorded**
11:3

**recording**
246:14

**records** 92:3
109:4
121:16
211:18

**recovered**
33:7
153:1,7
261:14

**red** 138:25
139:6,19
145:8
151:25
152:10
153:6,12

**redirect**
162:10
304:5

**reduce**
133:13

**reduced**
246:22
247:1
288:5

**refer** 54:15
91:18
105:8
123:12
161:25

**reference**

67:4 87:6
96:14,17
203:3

**referenced**
98:7
103:19
126:4

**references**
97:17
125:21

**referred**
66:12
72:11 96:6
99:22
132:1
137:8
154:15
158:15
166:21
170:24
172:10
175:7
196:10
198:20
200:9
201:25
203:12
209:6
219:13
226:11
233:3
240:17
244:11
253:6
254:9
263:12
265:6

266:13
268:14
283:10
290:2,17
297:10

**referring**
100:23
170:18
194:1
196:17
205:20
267:1

**reflect**
230:7
282:18

**reflected**
270:8
280:14

**reflecting**
129:2
220:21
272:5
277:10

**Reflector**
176:8

**reflects**
296:8

**refresh**
54:17
83:24
109:7
126:21

**refused**
277:4

**regenerate**

**J.A. 1718**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023        Index: regrets..remember

```
 8:19 10:23      183:22           206:2,7          12,15,16,
                                  250:18           18,25
regrets          relationship                      101:2,3,8,
 259:22           92:24 93:7      relied  110:9     13,15,24
 260:1            94:20                             103:2,4,8,
                  103:11,13       relief            13,24
regular           243:23,25        234:17          104:2
 46:23                             251:17          105:6,18
 192:15          relationships                     106:10,15
                  111:13,16       rely  56:17      107:6,21
Reid  67:6        114:5            69:20           108:1
 81:22 82:9       167:17           140:21          109:13
 87:7                                              110:16
 279:3,4,8,      release           remarks         113:4
 12 282:21,       175:6,10         293:1,4         114:19
 22               176:3,14         298:13          116:2
                  177:2,17                         117:1,4,23
reinterviewing    246:25          remember         118:4,7,12
 92:13                             8:21 10:21      119:10
                 released          14:11,25        120:12,24,
reinvestigatio    122:19          15:3,6,8,        25 123:8
n  252:14,        247:2,5          14 16:18        127:6,7,12
 15,21            253:12           17:22           128:3,6,
                                   23:14           16,19
rejected         releases          25:6,17        129:4,5,10
 297:5            174:23           26:2 43:23      130:3,5,9,
                                   46:24           10 133:3,
relate           relevance         47:1,3,11       20,23
 167:16           38:19            48:17 59:6      134:14
                                   64:1,4         138:2
related  8:8     relevant          82:21 83:5     139:9
 13:22            31:9,11,         89:6 90:25      143:20
 42:20            13,17 39:5       91:5,9         151:6
 77:21            40:3,4           92:6,14        152:14,15
 159:24           42:2 43:21       93:3,4         156:15,20
 182:22           53:5,21,23       95:3,24        157:8,9,12
 208:14           54:12            97:2,6,14,      158:22
 310:17           124:9            18,20          163:23,24
                                   98:1,5,6,
relates  54:1    reliable          16,24 99:1
 69:2             106:23           100:9,11,
 101:16           108:14
                  111:11
relating
 95:19
```

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: reminded..report

| | | | |
|---|---|---|---|
| 178:2,10, | 248:7,16 | **report** 8:24 | 121:13 |
| 17,19 | 249:5,17, | 17:12 23:3 | 123:12 |
| 180:10 | 20,22,23 | 36:14 | 124:14 |
| 181:22 | 250:9,10, | 37:24 38:6 | 127:14,18 |
| 182:8,11, | 24 251:20, | 39:6,7,11, | 128:4 |
| 14,19,25 | 21,25 | 16,19,22 | 133:22 |
| 183:5,20, | 252:1,4,7, | 40:8,9,10, | 134:18 |
| 24 184:2, | 10,11,12 | 11,12 | 136:3 |
| 3,6 193:9, | 254:19,22 | 41:24 | 141:7 |
| 19 198:17, | 255:2,15, | 42:1,6,13 | 144:11 |
| 18 200:6 | 19,24 | 43:17 | 152:7,13 |
| 202:25 | 256:7,8,25 | 47:13,14, | 158:16 |
| 203:2,22 | 257:4,13 | 18,24 48:2 | 159:7,9,18 |
| 204:20 | 258:9,10, | 53:24 | 161:5 |
| 206:11,13 | 11 269:21, | 54:2,11,18 | 162:13 |
| 207:14 | 24 273:21 | 55:18,23 | 163:23 |
| 211:1 | 274:19 | 56:2,6,12, | 164:5 |
| 216:11,13 | 275:8,10 | 16,22 | 176:16,21, |
| 217:6,8 | 277:21 | 57:13 | 23 178:3 |
| 218:12,18 | 295:14 | 66:15,17, | 184:25 |
| 219:2,5, | 296:5 | 21,23,25 | 191:5 |
| 17,20,24 | 297:20 | 68:5 69:1, | 192:20,25 |
| 220:1 | 313:5,8 | 11,15,20 | 193:1,7 |
| 221:23 | 316:2 | 70:1,9,20, | 196:11,18, |
| 222:8,11 | | 24 71:2,7, | 19,20,22 |
| 223:4,13, | **reminded** | 8 72:2,3, | 197:6,11, |
| 15,16,22 | 124:12 | 5,16,17,20 | 17 198:3,7 |
| 227:5,11 | **render** | 73:11,23 | 199:6,7, |
| 232:14,20, | 261:20 | 74:3 77:24 | 11,13,18 |
| 24,25 | **repeat** 7:21 | 78:7 83:5, | 202:4,12 |
| 233:22 | 62:11 | 13 84:8, | 203:15 |
| 234:3,20, | 135:16 | 15,18,20, | 204:2,8,11 |
| 25 238:4, | 139:16 | 21,23,24 | 207:19 |
| 8,14,19 | 162:24 | 85:10,11, | 208:6,9,13 |
| 239:19,20 | | 17,20 86:9 | 214:20 |
| 241:13,19, | **rephrase** | 88:1,5,12 | 215:7 |
| 20,25 | 7:21 27:24 | 90:18 | 217:2 |
| 242:5 | 102:8 | 97:6,7 | 221:5 |
| | 194:4 | | |

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023    Index: reported..retire

```
223:4,6,              159:3              260:7              144:12
14,22                 167:1              300:21             152:7
224:19                188:22                                292:24
231:12                191:8          requirement
234:14                196:14             105:20         response
248:23                220:24             106:11             115:3
250:21                221:3,11                              133:7
253:3                 304:8          requirements           173:11
276:6                 309:10             52:1               220:14
278:2                                                       221:12
291:5,11          represent          requires               242:11
293:10,17             6:18 156:7         18:15              258:18
295:13,19,            244:16                                285:20
21 297:14            290:5          Residential
298:12               291:10             13:3           responses
306:11                                                      219:16
307:13            representation     residents              258:16
309:5                88:4              175:19
310:6                                 177:14,19,       responsibility
                  represented          21                  27:20,21
reported             297:13                                 92:20
251:2                               resolved                121:18,19
275:12            representing          174:12
                     101:13            210:9,20        responsible
reporter             263:3                                  280:22
6:3,4                291:3          respect  8:9
126:10                              respond            rest  28:10
318:5,8,13        represents          64:10                29:9 133:5
                     6:1               153:15              144:8
reports                                186:12
17:18             request                             result
21:16                25:18          responded              151:12
47:7,12              118:10            218:7               294:6
48:7 55:21           122:2
73:13                242:14         responding        results
82:19 83:2           244:22            64:15              196:23
85:3                 245:1,11          67:3,5            198:14,16,
86:10,12             280:4,19          68:5 69:1,         23,24
91:7,16                                6,9 70:9           199:12
128:2            Requesting           74:18              296:25
                     280:7            77:24
                                      85:21          retire
                 required             87:4,6             300:12
```

www.huseby.com          Husey Global Litigation          800-333-2082
Case 4:21-cv-00185-BO   Document 196-5   Filed 09/12/24   Page 390 of 409
J.A. 1721

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023                Index: retired..SA

retired
  225:4,6
  253:19,22,
  23 254:2
  291:16
  300:11

retirement
  13:6

return
  247:10

reveal
  112:23

review   10:17
  14:8 20:8
  48:7 82:19
  88:15
  90:18,23
  116:19
  156:12
  172:13,14
  222:9

reviewed
  9:17 10:3,
  14 14:24
  82:20
  152:8
  161:12
  196:20
  263:25
  272:9
  274:21

reviewing
  18:5 74:3
  83:5 89:18

reviews   14:6

revolver
  32:6

Ricky   5:5,9
  6:9 233:19
  241:2
  247:14
  291:23

riding   31:19

rig   75:7

right-hand
  154:20
  158:24
  267:2
  271:15
  290:9

rights   271:2
  277:7

rise   168:13

river   204:21

RO   264:6

road   31:18,
  19 36:8,9
  69:24
  70:4,6,8
  238:11

roadmap
  46:13

rob   62:5,16
  76:13

robberies
  16:13
  78:14

robbery   13:9

78:20

Robinson
  230:9,17,
  18,19,24

rode   11:14

role   12:6
  17:15
  26:17,18,
  23 27:3,
  10,12
  49:14
  79:18
  113:7
  183:18
  217:11
  221:24
  252:20,23

roles   12:11
  79:20

room   118:1
  122:17,18
  125:18
  131:16
  132:21
  135:4
  147:19
  203:21
  246:1
  249:13
  270:21

rose   65:24

rotation
  24:12
  25:6,7,17

rough   227:10

routine   47:1

routinely
  47:6

row   211:17

Rudolf   6:1

rule   7:7
  26:14
  143:7
  217:15,23

ruled   100:6
  217:5

rules   6:22
  143:5,9

ruling
  217:11

rumors
  94:10,13
  95:17

run   7:1
  281:6

running
  108:23

rush   166:8

---

S

---

SA   245:13,
  14,19,24
  246:9,13,
  17,19,24
  247:9,13,
  15,17
  248:14,19
  249:25

**J.A. 1722**

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: SAITH..sense

250:2

**SAITH** 318:1

**Sarah** 240:25

**sat** 40:18
81:20
83:12
124:23
125:18
131:16
147:19
181:21
183:2,4
207:9
229:3

**satisfied**
285:24

**Saturday**
97:25
102:21,24,
25

**SBI** 196:5,6
197:20
224:22
225:18
242:9,14,
17,23,25
243:18
244:21
247:8,19
248:5,19
249:9
250:11
253:15
280:17
291:5
307:23

309:4,17,
19

**SBI's** 244:16

**scared** 207:2
214:5
302:12

**scenario**
62:10
215:4

**scene** 26:10
28:18,19,
20,24
29:10,12,
18,19,22
30:4,8,12,
13,20,23
31:24,25
32:1,7,25
33:14,17,
18 34:7
35:18
44:8,19,
22,23
45:1,4,20,
25 46:8,
14,16 47:2
48:3
58:18,21
59:6,23
60:19
61:18,20
62:13 67:3
72:6 81:25
82:5,19,24
84:23 87:5
89:4 116:4
144:5

146:6,8,9,
10 153:13
203:10
204:15
216:18
217:22

**schedule**
234:14

**scheduled**
201:4

**scheme** 18:10

**school**
107:24

**score** 14:12
294:8
306:17,19
307:7,18,
24 308:1,2

**scored**
306:1,4

**scores** 305:2
307:21

**scroll**
209:13,23

**search** 32:19
33:3,22

**seat** 207:9

**secondaries**
35:25

**secondary**
25:2 27:7,
10,14,18
28:1,8
34:25

35:9,22
36:3,12,15
37:3,8
45:21,24
53:10
92:15

**seconds**
198:12

**secret**
192:10
193:12,21
281:25

**secretarial**
247:10

**section** 16:7
126:18
210:10
289:2
293:2
310:1

**secure** 80:8,
9

**secured**
80:5,7,20

**secures** 80:4

**seek** 117:15
206:3

**send** 75:8
76:3 190:4
197:8
233:8

**sends** 225:18

**sense** 309:3,
7,12,14

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023    Index: sentence..Sharpe

sentence
  74:23
  315:12,13,
  15,20
  316:17
  317:2

sentences
  87:15

separate
  16:3,7

September
  96:5 99:9
  257:16

sergeant
  14:10
  16:25
  17:1,2,7,
  15 20:12
  22:14,17,
  19,22 23:1
  24:19
  26:25 35:5
  92:22
  96:11
  100:3
  170:14,21
  171:25
  172:17
  173:6
  221:25
  222:2,4,6,
  9 258:2
  274:25
  275:15

sergeant's
  105:3

sergeants
  16:20
  171:23

serve  27:10

served  11:14
  12:14
  27:12
  269:25
  270:2

serves
  167:14

service
  184:19
  281:11
  300:18

services
  16:2
  184:8,9
  190:1,2,9,
  11,18,23
  192:10
  285:25

set  15:18
  219:17
  298:9

setup  27:17

severely
  167:5

sex  258:8

sexual  96:24
  97:18
  100:13,18
  103:1
  255:14

258:4

sexually
  100:3
  203:21

Shaggy
  75:24,25

shaking
  155:19

share  120:6

shared  115:7
  130:23

sharp  291:3

Sharpe  5:5,
  13,15 6:1,
  19 9:2
  80:16
  113:17,20
  117:3
  118:9
  126:3
  134:14,16
  168:23
  175:21
  182:16,22
  183:23
  184:1
  185:3
  200:3
  201:19
  206:19
  222:1
  226:18
  227:8,10
  229:7
  234:4,15,

16 238:8,
  12,15,21
  239:5
  241:3
  246:4
  252:14,25
  253:13,15
  258:20,25
  259:10,19
  260:17
  265:17
  266:5,21
  267:25
  269:8,16
  270:3,14,
  23 271:2,
  16 276:1
  278:15
  279:19
  282:11
  284:19
  286:12,24
  287:2,6
  288:3
  289:10,12,
  13,20
  291:12
  292:3,8
  293:7
  294:2
  296:4,20
  299:13,15
  301:4
  302:5,17,
  23 312:5,6
  313:1
  314:9

J.A. 1724

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: Sharpe's..side

Sharpe's
115:1,17
134:5
200:13
231:13
246:6
266:8
268:19
290:7,21
295:13,18
296:11
297:2

Sharpes
113:22

sheet   48:17

shell   32:5,
9,11

Shepherd
114:25
144:9
146:19

Sheriff's
281:9

shoot   287:2
293:6
297:1
298:17,21
312:8,10,
12

shooter
134:9
260:17

shooting
31:23,24
32:3 60:7,

14,18
62:12
120:4,7,9,
21,25
121:3
136:2
139:25
144:18
158:21
160:1
218:24
219:4
266:5
293:15
296:20,24

shoots
296:14

short   57:22
58:1 63:9,
12,20
215:23
216:2
240:9
262:10,14

short-lived
22:18

shortly
79:25

shot   61:6
126:8
140:21
144:16
145:13
155:20
160:3
161:4

162:1,12,
21 163:1,9
218:8,14,
25 219:1
260:23
261:1,5
287:6
293:20
296:17
298:24

shoulder
155:9
260:24

show   35:18
44:7 96:2
99:20
158:3
174:17
263:9,15
264:23
265:4
266:11
268:12
283:8
289:25
290:15
297:9
306:13
307:3

showed
125:12
129:11
160:20
217:22
261:3
295:21
306:19

308:15

showered
181:7

showing
179:13
189:10
192:2
266:16

shown   256:14
289:5

shows   160:13
161:17
163:14
176:6
305:15
306:21

Shrock   5:17,
20 117:21
118:1
119:9
121:25
124:11
125:19
127:2
128:13,17
130:17,21
131:17
138:3
227:17
237:21,24

side   153:10
160:11,13
161:10
295:23
296:21

J.A. 1725

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: sideways..speak

sideways
  155:18
  261:6

sign  197:19
  232:10
  282:2
  318:4

signature
  204:6
  232:8,9
  253:11
  274:21
  285:1
  288:21,23

signatures
  316:10

signed  101:1
  133:5
  271:4,5
  275:15
  285:17
  289:2

similar
  191:4
  192:2
  277:23

Simonowich
  242:12

simple
  102:17

simply
  272:23

single  65:13
  210:14
  262:5

sir  6:14
  70:18
  81:10
  132:10
  267:10,17
  269:2
  271:1
  273:18
  274:3,14
  275:20
  276:13
  277:25
  279:18,23
  280:6,9
  281:5
  282:23
  283:20
  284:17
  285:15
  286:13
  287:9
  288:12,22
  290:11
  291:17
  292:4,9,12
  293:5
  294:11
  295:3,16
  297:25
  299:6,17
  304:1

Sissy  179:12

sit  14:16
  27:5,19
  28:1 35:16
  36:18
  53:3,20

65:19,20
  66:2 73:19
  94:11
  133:9
  139:10
  154:7
  258:24
  259:21

sitting
  102:18,20
  181:23
  219:2
  254:22

situation
  22:18
  30:3,12,13
  68:8 69:4
  76:11
  86:22,23
  111:17
  133:10
  135:23
  141:20,22
  142:6
  143:16,19
  157:16,20,
  21 158:2
  164:25
  193:12
  256:3
  279:17
  281:21,25

size  292:11

sized  292:8

skills  48:13

skip  173:8

245:24

slash  279:3

sleep  262:7

slow  169:4

small  11:14
  13:25

Smith  140:2,
  3 218:3,4,
  6,11,19
  219:1,4,6

smoked  205:7

snacks  189:3

Social
  184:8,9,18

soda  191:24

solve  166:12
  167:6
  168:2

solved
  173:23

Sonya  5:12
  6:18

sort  16:16
  107:3

sought
  268:10

sounded
  121:8

source  110:1

speak  7:25
  9:10 35:17
  67:17

**J.A. 1726**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: speaking..statement

85:24 86:3
123:10,16
170:21
187:5
203:1
241:11
256:20
273:15
277:4

speaking
26:10 50:4
77:7 106:6
252:7

speaks 310:8

Special
243:17

specialized
12:22

specialty
13:12

specific
14:23 15:6
32:3 51:3
52:6 62:10
76:11
83:22
106:7
111:23
138:7
141:1
148:18
245:11

specifically
24:6 50:7
79:13

107:19
133:19

speed 28:9
35:10,15
71:7

spent 194:5

split 145:7

spoke 9:24
45:4,7,13
89:11,19
121:11
208:22
210:2,4,22
215:21
239:6,7,12
245:25

spoken 9:14
182:23
252:24

square 28:16

stabbed
140:2
202:21
203:4

stabbing
204:16,17
206:9

staff 247:10

stages 34:14

stain 33:19
34:8,9

stains 33:15

stamp 145:2

stand 71:9,
13 236:8

standard
19:18
195:18

standing
155:24
163:4,12
318:12

start 6:21
10:12
28:16,18
53:13
137:6
173:3

started
11:11
12:9,12
63:19
121:3
127:5
147:21
190:2
239:5
245:1

starting 7:9
28:13
300:18

starts
247:23

state 242:8
281:1
284:12
288:7
298:3
312:21

state's
241:3

stated 67:7,
11,15
74:13,14,
15,17,18
75:6,7,9,
10,11,23,
25 76:1,5,
7 87:8,22
246:1
247:25
264:9
287:22

statement
9:3 35:4
53:4 54:3,
8,10 57:2,
10 79:11,
15 89:1
132:17,24
133:1,5,14
135:1
137:14,21,
23 138:1,
9,10,11,
12,18,24
139:7,18
140:13
142:15
144:3,4
145:16
147:12,22
150:7,24
151:3,5,7,
9,12,15,
19,20

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: statements..straight

152:13
153:17
157:22
164:2,8
167:20
177:15
178:6
186:19
188:19
194:7
211:23
212:3
214:21,23
224:4,6
229:17
230:2
232:10,12
247:19
248:10
260:22
261:17
264:7,10,
13,18,21,
23 266:4
269:5,8
277:3,6
286:19
312:23
313:3,6

**statements**
35:18
178:7
221:7
224:3
260:15

**States**  5:6
300:17

**station**
52:16
113:15
191:10
276:23

**stations**
176:7

**statistics**
169:22

**status**  202:5
245:20

**statute**
312:22

**stay**  21:11,
13

**stayed**  12:18

**staying**
124:3
184:7

**step**  111:3

**steps**  81:18
220:22,25
221:3
260:4

**stereo**  190:8

**Stewart**
88:16,23,
24 282:25
283:6

**Stewart's**
88:25 89:7

**stick**  8:20
93:24

**stickers**
263:11

**Stokes**
154:23
155:6
202:11,14,
15 203:17
204:23
205:1
208:19
215:5,8,
11,13
239:6,7,
11,22
241:15
242:19
245:12,13,
15,20,21,
25 246:1,
9,13,15
247:1,4,8,
9,18
248:1,3,4,
8 249:3,
13,21
250:1,11,
13,17
286:23
287:5
290:25
291:1,2
296:11
297:2
302:3,14,
22

**Stokes'**
209:9

**stolen**
287:20

**stood**  114:21

**stop**  9:19
67:21

**stopped**
75:23
115:15
146:15
191:9

**Stopper**
281:21

**Stoppers**
192:21,23
193:11,18,
22 281:4,
6,13,16,
19,22

**stopping**
214:8,13

**store**  126:1

**story**  51:25
53:19
68:16
139:11
147:19
223:21

**straight**
155:9,10,
11 205:3
207:18
208:4

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023        Index: strange..surfaced

214:6
296:17,18

strange
118:11
124:13,14,
20,24,25

street   67:22
75:7,15,23
89:4
107:12
108:4,9
110:22
111:1,5
113:20
114:1,3,6,
10  115:15
117:10
126:2
148:24
203:1
208:23
269:23
272:6
276:15

streets
114:12,21
207:4

strike   71:22
124:25
171:12
201:13

strongest
294:13

structure
15:20  22:3

stuff   21:3
34:15
94:11
104:22
147:25
205:9,18
269:23

subject
67:14

subscribed
285:4

Subsequently
246:23

substance
33:24
205:2,8,10
211:8

success
170:5,7,9,
13,20

suck   98:23

suggest   20:5
121:22
137:20
147:14
183:12
278:10
312:24

suggested
184:9
201:3,4
246:21
296:3

suggestion
92:12

260:17

suggests
173:22
313:3,7

suicide
218:6

suit   101:3,
6,8

summarize
56:7

summary   55:4

summation
86:19

summer   275:7

summoned
251:22

Sunday
102:21

Superior
285:5
311:4

superiors
171:5

supervising
16:17

supervision
23:12,16
175:4
184:15

supervisor
15:8  18:1
20:20
22:6,22,23

48:7
104:16,19,
21  221:24
257:23
275:4,7,
17,22

supervisor's
274:21

supervisors
97:15
103:23
104:23

supervisory
16:16

supplement
73:11,13
263:20
271:22
272:5,10
274:2
277:10,24
278:5,9,
10,19
282:13

supplemental
204:2

supplementary
202:3
279:19

supposed
66:2  79:18
99:15
193:12

surfaced
134:19

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: surprised..talking

surprised
  270:14,19

surrounding
  249:14

suspect
  32:20
  33:3,5,23
  49:13,24
  51:19
  55:19,24
  57:9
  58:16,22
  59:1,23
  61:23
  62:17
  63:1,2,5
  68:4 76:23
  83:17
  96:24 97:4
  109:1
  130:7,11,
  17,24
  133:10
  134:15,17,
  19 195:4,
  7,16 216:9
  217:1,3,5,
  12,15,19,
  24 218:4,
  12 219:3,7

suspects
  49:2,11,12
  50:5,9,12
  54:7 58:9,
  11 59:17,
  20 216:10

suspicious
  83:17
  85:9,25

sustained
  254:18

Sutton
  240:25

swear  6:3

sworn  6:11
  285:4

Sydney  5:23

synopsis
  175:17

system  18:23
  284:10

_____

_____

T

table  81:20

takes  132:7

taking  7:10,
  14 46:22
  47:2 51:15
  89:22
  128:23
  156:19
  184:3
  198:3
  199:5
  227:3
  270:13
  294:13
  318:16

talk  11:7
  12:11

15:17 22:4
28:22 37:6
53:15 58:9
60:21 61:1
68:1,11
91:1,5
104:9
107:12
114:5
117:5,25
126:25
129:8
132:21
133:9
165:11
169:17
175:1,3
184:17
188:5,6
216:8
232:19
236:19
241:23
242:3,22
252:17

talked  22:14
  44:12
  59:5,8
  91:3 118:1
  125:20
  126:22
  148:13
  157:10
  168:15
  175:19
  177:18
  180:4
  181:10,11

183:2
187:10
188:2,3,5
202:11,13
205:18
208:23
217:17
237:1
238:17
255:20
257:14
265:12
273:18
302:13

talking
  17:25 22:4
  52:4,15
  56:12
  80:22 84:9
  85:19 86:7
  87:14
  88:21 89:8
  90:7
  97:23,24
  119:17
  120:1
  127:5
  129:10
  130:14
  133:11
  135:9
  137:11
  138:6
  141:1
  155:12
  162:20,22
  168:22
  170:14

J.A. 1730

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: task..testimony

178:24
185:20
188:13
193:24
198:19
207:3
215:5,7
216:15
219:24
225:21
229:9
230:5
231:13
250:11
251:23
252:4
254:23
261:22

task  20:5
  21:17
  29:22
  157:14
  164:1

tasks  17:25
  26:25
  27:18
  221:12

taste  74:16

teaching
  213:17

team  156:9
  171:15

tech  31:25
  32:25
  33:7,14,19
  44:23

116:20

tech's  33:17
  48:3

technique
  51:1,12,
  14,19 94:2
  131:13

techniques
  49:17,20,
  23,25
  50:17

techs  45:21
  153:13

telephone
  245:1
  246:16
  267:8

telling  29:7
  36:1,4
  38:14
  65:23 92:9
  118:7
  143:22
  165:5
  248:14,17
  249:5,17,
  20 250:7
  259:22
  260:5
  261:4
  287:10
  292:23
  293:22
  294:14
  309:5

tells  27:6
  68:15
  140:12,19
  277:18

term  43:8
  169:18
  301:22

terms  38:24
  52:24
  68:18
  101:25
  189:19
  202:24
  302:10

terribly
  292:20,21
  306:20

test  224:7,
  25 226:7
  234:5,11

tested  33:25
  34:15

testified
  6:11,25
  16:4 79:14
  92:4 118:5
  132:6
  154:4
  161:17
  162:4,11
  165:25
  169:1
  207:13
  210:2
  215:14
  218:13

221:10
224:16
236:22
238:6
241:15
243:8
261:1
262:4
265:19
268:18
286:11,17,
19,23
287:1,6
290:13,21,
24 295:2
313:25

testify  7:17
  88:13
  164:16,18,
  20 165:2,8
  207:6
  236:24
  237:6
  239:24
  264:12

testifying
  7:5 91:15
  92:2
  237:18

testimony
  8:19,25
  9:1 10:13,
  14,15,17,
  21,22
  91:18 92:7
  124:9,17
  126:13,19

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023                    Index: testing..time

| | | | |
|---|---|---|---|
| 131:19,22 | thing 8:2 | 65:21 | thousand |
| 137:14 | 23:2 29:20 | 85:16 | 246:3,5 |
| 140:22 | 48:12 | 98:23 | |
| 147:17 | 50:23 | 99:14 | threatened |
| 154:7,11, | 54:15 60:5 | 114:22 | 241:2 |
| 16 158:13 | 86:11 | 142:2 | 242:18 |
| 161:12 | 98:1,25 | 151:14 | 250:14 |
| 162:1,12, | 99:7 103:2 | 159:24 | |
| 20 163:6, | 110:7 | 160:2 | threw 145:6 |
| 11,16 | 111:14 | 169:13 | 147:3 |
| 165:7 | 119:4 | 206:4 | 151:15 |
| 166:19 | 151:19 | 211:19 | 152:3,4 |
| 171:12 | 158:12 | 212:9,21 | 261:8 |
| 183:22 | 171:24 | 235:22 | throw |
| 201:13 | 172:3 | 260:25 | 153:10,11 |
| 210:17 | 174:17 | 269:23 | |
| 214:23 | 187:14 | 278:1 | thrown |
| 215:15 | 189:6 | 309:9,15 | 152:1,16 |
| 218:17 | 194:25 | | 153:7 |
| 221:5,7 | 199:1 | thinking | 261:11,14 |
| 225:21 | 229:16 | 95:4 | |
| 236:19 | 235:13 | 119:24 | Thursday |
| 237:10 | 250:9 | | 97:25 |
| 238:3 | 263:8 | thought 11:3 | 102:22,25 |
| 239:8,12 | 272:21 | 16:4 32:17 | |
| 243:9 | | 64:17 | tickets |
| 246:4 | things 6:22 | 99:15 | 256:5,11 |
| 251:19 | 10:20 | 122:18 | |
| 271:25 | 13:20 | 143:10 | tied 230:2 |
| 294:18 | 18:6,11 | 172:2 | |
| 296:8 | 28:23 | 179:21 | time 5:3 |
| 314:4 | 32:3,8 | 183:16 | 8:20 14:3 |
| | 34:11 | 207:21 | 16:20,22 |
| testing | 35:19 | 224:7,16 | 17:3,9 |
| 34:17,18, | 41:12 | 261:10 | 21:22,24, |
| 20,22 | 46:24 47:5 | 295:1 | 25 22:8,13 |
| | 56:11 | 317:4 | 23:7,13 |
| theory | 57:18 59:8 | | 24:23 |
| 143:15,18 | 60:22 | thoughts | 25:24 |
| | | 238:24 | 26:4,6,7 |
| | | | 29:18 |
| | | | 52:4,23 |

J.A. 1732

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: timeframe..today

| | | | |
|---|---|---|---|
| 56:16,23 | 156:22 | 237:7,23 | 199:21 |
| 57:25 | 164:24 | 238:11 | |
| 58:1,2,6 | 166:1 | 240:8,9, | **times** 16:19 |
| 63:11,12, | 167:12,19 | 10,14 | 17:5,6 |
| 13,17,20 | 170:3 | 242:20 | 23:9 24:24 |
| 64:3 74:13 | 172:6,7 | 243:25 | 27:13 |
| 80:14,18 | 173:21 | 245:6 | 51:24 |
| 81:4,19,23 | 175:10 | 249:25 | 52:12 |
| 87:22 89:6 | 177:1 | 251:22 | 65:11 77:9 |
| 91:13,25 | 178:7 | 252:9,11 | 91:4,6 |
| 92:6,8 | 180:9 | 260:2 | 98:5,18 |
| 93:8,9 | 183:6 | 262:13,14, | 137:25 |
| 94:5 95:15 | 186:20 | 15,19,22 | 156:10 |
| 97:5 | 189:13 | 272:12 | 167:23 |
| 98:16,25 | 190:12,13, | 275:15 | 168:21 |
| 99:4,17 | 22 194:5, | 278:3 | 187:24 |
| 100:17 | 6,7,16 | 281:9 | 189:2,4,5 |
| 103:20,22 | 196:7 | 291:15 | 205:13 |
| 105:7 | 198:6 | 292:17 | 206:12 |
| 110:10,11, | 199:14 | 300:8,23 | 217:9 |
| 12 111:19 | 201:18 | 301:2,3,7, | 230:8 |
| 116:21 | 202:12,23 | 13,22 | 249:9 |
| 120:11 | 203:4 | 302:13 | |
| 128:10 | 204:14 | 303:19,21 | **tippet** 68:8 |
| 130:9 | 206:4 | 312:2,7 | **tipster** |
| 131:10,11 | 208:2,22, | 313:18 | 106:25 |
| 134:16 | 24 210:25 | 314:5 | 108:10 |
| 135:25 | 214:7 | 315:4,24 | 110:2,6 |
| 136:19,23, | 216:1,2,3, | 316:3 | |
| 24,25 | 7 222:5 | 318:3 | **tire** 82:7 |
| 137:3 | 224:14 | | 146:13 |
| 138:4 | 225:5 | **timeframe** | |
| 139:17 | 227:8,12 | 93:16 95:1 | **tired** 235:12 |
| 143:13 | 228:2 | 186:18,24 | **title** 194:17 |
| 144:5 | 229:4,5,6, | 187:25 | **today** 5:9 |
| 145:2 | 16 230:11 | 189:24 | 8:17 9:8, |
| 148:14 | 235:13 | 204:24,25 | 11 10:5,19 |
| 151:11 | 236:21 | | 11:2 66:3 |
| | | **timeline** | 112:24 |
| | | | 113:2 |

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: Today's..transcript

124:19
168:23
187:14
258:21,24
259:21
295:17
297:19,23
300:2
301:12

**Today's**  5:3

**toes**  21:11,
14

**told**  14:20
38:5 44:3
46:13 56:8
61:3,18
62:4,15
64:10
71:17
75:6,8,9,
25 76:2,5
78:12
80:25
81:5,9,16
82:8 83:14
95:16
104:22
105:7
109:7,13
118:8,9
119:25
120:8
121:25
124:13
125:4
127:3
128:13,17

129:7,8
130:18,21,
22 131:16
132:9,16
133:1,2
136:16
138:2
139:9,14
148:4
150:8,25
162:19
166:18
175:2
177:22
182:18
188:20
195:6,14
207:5,7,
10,18,19
208:5
210:24
211:15
213:11
214:2,4
224:11,12,
17,20,24
225:5,22,
24 226:6
227:17
237:2
238:12
239:9,10,
17,18,22
246:5
247:9,18
249:1
256:10
260:11

261:8,13
298:23
302:22,25
303:5,11,
13,14
307:19,20

**Tommy**  179:13

**tomorrow**
43:14

**tonight**
262:6

**top**  96:12
97:8 132:6
175:15
227:24
240:21
244:15
245:18
253:4
256:23

**torso**  295:23

**total**  287:25
305:10,11
308:4

**totality**
130:4

**touched**
312:24
313:4

**town**  13:25
153:10
282:1

**towns**  11:14

**track**  62:11

107:9
187:18
189:18

**Tracy**  218:13

**trailer**
202:19
204:20
206:8

**trained**
43:22 50:4
86:17
142:21,24
213:1

**training**  9:1
47:2 50:10
51:3
105:25
107:16
300:8
306:24

**transcribed**
318:6

**transcript**
126:10
131:7,8
154:21
162:5,7
193:3,5
235:8
284:5,8
285:9,11,
16 290:6
295:9,10
296:8
316:9
318:6

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: transpires..types

transpires
227:1, 3

transport
184:14

transported
253:14

tread  144:8
146:12

treated
122:19

treating
50:11

trial  9:1
41:3 91:15
126:12
137:13
142:25
154:4, 7,
11, 16, 20,
21 161:13
165:7
186:20, 22
193:3, 5
194:7
214:23
215:13
227:12
241:15
272:1
286:7, 14,
24 290:6, 7
292:11
294:19
295:8, 10
296:7
297:3

313:25
314:4, 9,
11, 14, 21,
23 315:8

Tricia
277:11

trigger
155:25
163:5, 12

trip  280:23

Trisha  91:1

truck  67:4
68:20
74:23
75:3, 15, 22
76:2 82:7
84:1, 3, 4
87:5
115:25
116:4, 10,
18, 23
144:7, 15,
17, 23
145:3, 6,
12, 14, 17,
20, 21, 23
146:2, 14,
18, 23
147:3, 4, 15
149:13, 17,
23 152:5

true  38:14
108:18, 20
125:22
195:7, 15
215:16

241:24
242:4
315:22

trusting
76:7

truth  65:20,
23 66:3, 5
92:5, 9
108:25
109:22
287:11
292:23
293:22
294:14
298:24

Tuesday
247:7

turn  40:9
59:16, 19,
23 61:23
62:16
66:24 68:4
74:21
87:21
91:12
161:10
203:24, 25
209:22
220:7
242:7, 9
244:21, 25
245:17
246:11
256:23
260:24
273:23
275:24

282:11
284:4
285:8
288:6, 10
291:11
301:23, 24
305:1
310:15

turned  67:22
91:13
106:23
206:7
214:20
296:16, 17

turning  67:8
279:18
280:3
296:19, 25

TV  176:6
189:6

tying  201:7
229:16

type  19:10
20:25 23:2
29:19
73:19 76:8
267:14
278:4

typed  73:24
176:20
199:11
267:7, 8, 12
278:2, 23
284:1

types  12:21

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: typical..verbally

typical
    129:20

typing   97:6

_____

U

Uh-huh   12:20
    26:11  75:4
    91:21
    101:18,19
    131:22
    144:6
    155:3
    159:2
    160:15,18
    165:23
    181:16
    183:10
    197:12
    198:11
    204:1
    230:18
    247:12
    258:22
    278:16
    304:23
    317:10

unable   29:17

unanimously
    284:19
    290:7

unclear   8:13

underlying
    254:14

Underneath
    210:10

undersigned
    289:3

understand
    7:11  11:12
    24:5  29:15
    33:9  38:1,
    2  40:22
    42:2  71:5
    106:12
    113:10
    115:8
    142:23
    159:8
    199:5,8
    201:15
    227:20
    235:11
    265:23
    269:4
    271:25
    283:17
    285:19
    286:3,6
    292:16

understanding
    197:8
    218:10
    268:6
    273:21
    296:1
    299:8,11
    303:17,20
    305:22,24
    306:1
    307:1

understands
    41:15

313:10

understood
    7:22
    24:16,18
    287:12,23

undertook
    252:15

unfounded
    96:23
    100:6
    255:7,15

uniform
    115:9
    125:9

unilateral
    282:5

unit   12:18
    13:5,7
    15:18,22,
    23,25
    16:17  17:4
    19:19
    22:10
    23:10,16,
    20  24:11
    25:10
    26:25
    70:19
    171:15
    192:10
    193:21
    267:16
    279:9,13
    313:10

United   5:6
    300:17

unjust
    254:18

unlawful
    255:4

unlawfully
    289:6

unmarked
    123:7,9
    125:7
    179:4,6,7,
    10,11

unusual   45:1

update   19:24
    21:20  23:4
    175:14

upper   290:9

upset   38:19
    51:17

utilized
    278:6

_____

V

vacant
    289:13

vaguely
    118:6

varied
    257:22

vehicle
    67:21
    217:3

verbally
    148:4

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023          Index: verify..ways

269:5

**verify**
110:10
151:4
164:7
195:6,14
211:14

**verifying**
151:18

**versus** 19:18
30:13
49:18,21
50:15
55:4,18,23
284:13

**victim** 31:8,
13 34:1,5
58:24 59:9
60:8,20
61:19,20
62:5,14,16
67:12,13,
16,19,22
68:13
74:8,14,16
75:6,8,10,
11,25
76:2,6,8
87:22 91:3
111:9
140:20,23
194:16
203:17,20
204:14
217:21

**victim's**

115:25
277:12
289:13

**victims**
190:3
192:11

**video** 5:4

**view** 160:11
313:9

**Vines** 90:19,
24 274:9,
18

**violate**
105:13

**violation**
245:22
256:18

**violations**
256:16

**violent**
167:3

**Virginia**
256:5,10

**volunteered**
115:2

———————

W

———————

**W's** 43:23

**wagon** 205:5

**wait** 7:7
75:16
97:24

**waited**
210:23

**waiting**
250:1

**waiver**
271:4,5

**walk** 189:7

**walked**
75:15,23
76:2 95:24
114:21
207:1
316:4,8

**walking**
125:25
148:23

**wanted** 11:16
20:5 22:16
76:8,13
125:22
129:8,14
165:2
171:8
195:14
214:5
232:19
236:25
247:18
248:4
272:20
302:24

**wanting**
11:11
80:23

**Ward** 232:4,

5

**warrant**
32:19
33:3,22
80:5,7,8,
9,12,20,21
154:3
164:3
262:4
266:8,20
267:7,19,
24 268:3,
6,10,19
269:13,16,
25 270:1,2
276:16
283:14,18
284:1
288:16
310:22
311:22
313:17,19

**warrants**
267:12

**Warren**
194:13,15

**waste** 91:25

**waving**
287:12

**ways** 85:15,
16 86:7
98:17,19
99:14
108:8
111:11
138:11

www.huseby.com          Husuby Global Litigation          800-333-2082
Case 4:21-cv-00185-BO   Document 196-5   Filed 09/12/24   Page 406 of 409
J.A. 1737

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023    Index: WCTI..Worker

| | | | |
|---|---|---|---|
| WCTI 176:7 | Wilbur 67:2 | 56:8 59:6, | 278:10 |
| weapon 153:1 | 72:16 | 14,16,19 | work 18:5 |
| 201:8 | 76:23 | 89:5 97:22 | 21:10 22:9 |
| 218:10 | 83:2,11, | 134:2 | 28:19 |
| 261:13,14 | 14,18 | 140:24 | 34:12 36:1 |
| wearing | 85:20,21 | 141:5,23 | 53:7 77:13 |
| 149:8 | 87:4 | 186:8 | 78:15,17, |
| wee 179:16 | 216:15 | 192:1,4,8, | 18 79:10 |
| 180:8 | 272:6 | 14,17 | 81:5,8,10, |
| weeks 205:4 | willfully | 193:17 | 16 93:2 |
| 280:23 | 289:7 | 211:18 | 104:3,5,8 |
| weight 292:5 | William | 230:14 | 113:16 |
| West 75:7 | 176:4,18 | 241:3 | 164:25 |
| whereabouts | Willie 75:24 | 243:7 | 166:9 |
| 230:8 | 279:4 | 286:8 | 169:2,20 |
| white 118:9 | Wilmington | 287:10,13 | 173:19 |
| 126:3,7 | 184:4,12, | witnessing | 213:13 |
| 137:24 | 14 186:16 | 269:8 | 222:7,9 |
| 138:3,4,5, | Wilson 11:21 | WNCT 176:7 | 239:4 |
| 9 144:16 | 116:1 | wondering | 243:22 |
| 145:5 | WITN 176:7 | 50:10 | 280:25 |
| 149:23 | witness' | word 18:16 | worked 25:5 |
| 155:8 | 54:13 | 19:20 68:7 | 77:14 |
| 296:13,16 | 139:18 | 93:24 | 93:4,5 |
| whomever | witnessed | 142:23 | 99:3,8 |
| 18:21 | 136:1 | 145:4,7,11 | 120:2 |
| 280:15 | 148:15 | 169:16 | 166:8 |
| 284:1 | 264:9 | words 29:2 | 185:25 |
| wide 205:22 | 287:1 | 54:13 | 223:24 |
| wife 91:3 | witnesses | 57:11 92:7 | 224:1 |
| 99:3 | 10:18 | 124:12 | 235:2,17 |
| 277:12 | 28:22 | 128:19 | 236:22 |
| wife's 99:5 | 48:21,24 | 137:18,25 | 244:6,7 |
| | 49:5,6,7 | 138:2,5,7 | 301:8 |
| | 50:5,9,12 | 145:10,12 | Worker |
| | | 149:2 | 184:19 |

**J.A. 1738**

**MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.**
David Ricky Best on 04/28/2023          Index: working..years

**working**
  22:15 90:4
  94:20
  103:11,13,
  20 119:23
  203:22
  237:5
  238:8,12,
  15,21

**workplace**
  96:18
  98:8,24
  100:24

**works**  223:25
  243:21

**world**  296:3

**worse**  294:8
  305:20,21
  307:2

**wound**  140:10

**wounds**
  159:23

**write**  37:24
  45:13
  53:24
  54:2,3,7,
  8,9,11,18
  55:10 56:2
  57:2,10,13
  86:9 88:12
  98:14
  105:1
  118:20
  127:18
  132:16

136:12,14,
16 147:14
180:15,23
181:1,3
184:25
198:3
202:4
207:7,8
208:6,9,13
212:17,20
213:2
226:23
227:13
230:22
232:13,15
264:7,17,
21 302:24,
25 303:4

**writes**  74:7
  269:8

**writing**
  47:12
  55:18 56:6
  85:8 86:7,
  12 100:25
  101:2
  132:20
  139:12
  147:21
  204:10
  214:8
  230:10
  248:18
  316:10

**written**
  47:17,24
  55:12

56:22
104:20,21
105:4,5,13
106:8
132:23
133:1,14
134:18
138:1
202:12
215:7
221:11
227:7
264:13,24
286:20
305:9

**wrong**  23:14
  229:6
  289:3

**wrote**  56:13
  87:15
  96:11
  98:10
  116:1
  135:8
  137:15
  148:2,6
  171:5
  187:14
  204:8
  242:12
  273:7

_____

**X**
_____

**X's**  310:1

_____

**Y**
_____

**year**  12:8
  14:7,14
  167:4
  178:21
  198:15
  199:25
  224:17,18
  238:13
  242:25

**years**  12:15,
  18 13:4
  15:4 24:7
  34:12 53:7
  107:18
  117:22
  118:3
  127:7
  138:8
  143:9,12
  144:1
  148:1
  150:16
  151:11
  152:14
  157:9
  163:24
  178:9
  181:6,20
  182:24
  190:1
  203:10
  204:22
  217:18
  221:22
  223:13

MONTOYAE DONTAE SHARPE vs DAVID RICKY BEST, ET AL.
David Ricky Best on 04/28/2023

259:18
275:2
301:5
317:3,5,13

**yell**  107:13

**yelled**  67:20

**young**  118:8
125:5

───────────
**Z**
───────────

**Zoom**  5:25

# APPENDIX F

Page 1

1

IN THE UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION          No. 4:21-CV-000185-BO
3
4
Montoyae Dontae Sharpe,
5
                Plaintiff,
6
    vs.
7
"RL" Ricky Best, Jeffrey D.
8       Shrock, and the City of
Greenville, North Carolina,
9
                Defendants.
10      ------------------------------
11      Montoyae Dontae Sharpe,
12                Plaintiff,
13          vs.
14      Carolyn Melvin,
15                Defendant.
16
17
18
    VIDEOTAPED DEPOSITION OF CHARLENE JOHNSON FRAZIER
19
                (Taken by Defendants)
20
                Greenville, North Carolina
21
                Tuesday, September 12, 2023
22
23
24
    Job No. CS6093742
25      Reported by Andrea L. Kingsley, RPR

J.A. 1742

Page 2

```
 1                    A P P E A R A N C E S
 2
        ON BEHALF OF THE PLAINTIFF:
 3
                    Sonya Pfeiffer, Esquire
 4                  David S. Rudolph, Esquire (via Zoom)
                    Phillip Lewis, Esquire (Via Zoom)
 5                  RUDOLF WIDENHOUSE
                    225 E. Worthington Avenue Suite 200
 6                  Charlotte, North Carolina 28203
                    (704) 333-9945
 7                  Spfeiffer@rudolfwidenhouse.com
 8
        ON BEHALF OF DEFENDANTS BEST, SHROCK, CITY OF
 9      GREENVILLE
10                  Peter Clements, Esquire
                    MARTINEAU KING, PLLC
11                  8701 Red Oak Boulevard, Suite 100
                    Charlotte, North Carolina 28217
12                  (704) 247-8524
                    Pclements@martineauking.com
13
14      ON BEHALF OF DEFENDANT MELVIN:
15                  J. Nicholas Ellis, Esquire
                    Sydney P. Davis, Esquire
16                  POYNER SPRUILL, LLP
                    1151 Falls Road, Suite 1000
17                  Rocky Mount, North Carolina 27804
                    (252) 972-7113
18                  Splummer@poynerspruill.com
19
        ON BEHALF OF THE WITNESS:
20
                    Ernest L. Conner, Jr., Esquire
21                  321 Evans Street, Suite 200
                    Greenville, North Carolina 27858
22                  (252) 757-3535
                    Ernest@gnclawfirm.com
23
24      VIDEOGRAPHER:  Dan Omer
25
```

Veritext Legal Solutions

**J.A. 1743**

Page 3

1          VIDEOTAPED DEPOSITION OF CHARLENE

2     JOHNSON FRAZIER, a witness called on behalf of

3     the Defendants pursuant to the Federal Rules

4     of Civil Procedure, before Andrea L. Kingsley,

5     Notary Public, in and for the State of North

6     Carolina, at 321 Evans Street, Suite 200,

7     Greenville, North Carolina, on Tuesday,

8     September 12, 2023, commencing at 11:34 a.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions

Page 4

1                    INDEX OF EXAMINATIONS

2                                                      PAGE

3    Mr. Clements                              6, 119

4    Mr. Ellis                                     115

5    Ms. Pfeiffer                                  121

6

7

                     INDEX OF EXHIBITS

8

9      Exhibit 181, Sharpe 0002850 to Sharpe     55

10       0002851

11     Exhibit 182, Sharpe 004947 to Sharpe      60

12       004948

13     Exhibit 183, Affidavit of Charlene        77

14       Johnson

15     Exhibit 184, 0004145 to Sharpe 4004146    85

16     Exhibit 185, handwritten document         90

17     Exhibit 186, MAR testimony, Sharpe        91

18       005533 through Sharpe 005580

19     Exhibit 187, video                       106

20     Exhibit 188, transcript of recorded      112

21       interview, Sharpe 004014 to Sharpe

22       004054

23

24

25

Page 5

```
 1                P R O C E E D I N G S
 2               THE VIDEOGRAPHER:  Good morning.
 3      We're going on the record at 11:34 a.m. on
 4      Tuesday, September 12, 2023.
 5               This is media unit one of the video
 6      recorded deposition of Charlene Johnson taken
 7      by counsel for the defendant in the matter of
 8      Montoyae Dontae Sharpe versus RL "Ricky" Best,
 9      et al., filed in the United States District
10      Court for the Eastern District of North
11      Carolina, Eastern Division, Case Number 421 CV
12      000185 BO.
13               This deposition is being held at the
14      law office of Ernest L. Conner, Jr., located
15      at 321 Evans Street, suite 200, Greenville,
16      North Carolina.
17               My name is Dan Omer, I'm the
18      videographer; the court reporter is Andrea
19      Kingsley and we're both representing Veritext
20      Legal Solutions.
21               Counsel and will present in the room
22      and everyone attending remotely will now state
23      your appearances and affiliations for the
24      record.  If there are any objections to the
25      proceeding, please state them at the time of
```

1          your appearance and we'll begin with the

2          noticing attorney.

3                    MR. CLEMENTS:  Peter Clements

4          representing Greenville, Shrock and Best.

5                    MR. NICHOLAS:  Nick Ellis and

6          Sydney Davis, we represent Carolyn Melvin.

7                    MS. PFEIFFER:  Sonya Pfeiffer, I

8          represent Dontae Sharpe.  Along with me on

9          Zoom is my paralegal Suzette Woolsey and my

10         partners Phillip Lewis and David Rudolf.

11                   MR. CONNOR:  Ernest Conner.  I

12         represent Charlene Johnson.

13                   THE VIDEOGRAPHER:  Will the court

14         reporter please swear in the witness.

15

16    CHARLENE JOHNSON,

17         called as a witness, having been duly sworn

18          by a Notary Public, was examined and

19          testified as follows:

20    EXAMINATION BY

21    MR. CLEMENTS:

22                   THE VIDEOGRAPHER:  We may proceed.

23         Q.   Good morning, Charlene.  Peter Clements.

24    I will be asking the questions.

25                   Could you state your fill name for the

Page 7

1      record?

2                      MR. CONNOR:  They know your name

3           but you need to state it for the record.

4                      THE WITNESS:  My married, my old

5           name?

6                      MR. CONNOR:  Whatever you full

7           legal name is right now.

8           A.    Okay.  It's Charlene Johnson Frazier.

9           Q.    Have you ever gone by any other name?

10          A.    No, sir.

11          Q.    Have you ever been deposed before?

12          A.    I don't understand.

13          Q.    Have you ever been deposed before like

14      this in a civil case?

15          A.    Deposed?

16                      MR. CONNER:  That's -- you're being

17          deposed today.  That's the legal term for it.

18          So what they're doing right here is a

19          deposition.

20          A.    I've been deposed before.

21          Q.    How many times?

22          A.    I'm not for sure.

23          Q.    So I'm just going to layout the ground

24      rules generally.  Try to ask me the questions now

25      that the deposition has started.  But the court

Page 8

1    reporter here is taking everything down for the

2    record.  So try to wait until I finish my question

3    fully before you answer.  Try to answer -- instead

4    of a head shake or nod, just say yes or no.  If you

5    ever need a break let me know.

6              Does that sound good?

7         A.   Yes, sir.

8         Q.   And then is there anything today,

9    medication, any substance that would interfere with

10   your ability to understand and comprehend my

11   questions and respond truthfully and accurately?

12        A.   No, sir.

13        Q.   Did you do anything to prepare for

14   today's deposition?

15        A.   I spoke with my attorney.

16        Q.   Did you review any documents?

17        A.   No, sir.

18        Q.   What is your date of birth?

19        A.   ███████████████

20        Q.   Were you born in Greenville?

21        A.   No, sir.

22        Q.   Where were you born?

23        A.   I was born in Jamaica, Queens, New York.

24        Q.   I'm from Rhode Island so I'm a Yankee

25   fan myself.

```
                                              Page 9

 1              What age did you move down to

 2     Greenville?

 3          A.    Not for sure, sir.

 4          Q.    Were you still in grade school?

 5          A.    No, sir.

 6          Q.    You were older?

 7          A.    Younger, sir.

 8          Q.    Younger.  Okay.

 9                Where were you living in 1994?

10          A.    Can you repeat the question?

11          Q.    Sure.  What area in Greenville were you

12     living in 1994?

13          A.    I was living on Fleming Street.

14          Q.    We're here to talk about 6th and

15     Sheppard a little bit.  How far is that walking from

16     6th and Sheppard?

17          A.    I can't recall accurately.

18          Q.    Have you done that walk before?  Was it

19     walking distance?

20          A.    Yes, sir.

21          Q.    Was there a Hannah Store near -- do you

22     remember Hannah Store from 1994?

23          A.    Yes, sir.

24          Q.    Would that be -- because I'm not from

25     the area so I'm trying to get a lay of the land.
```

1          Would that be farther from your house

2     than the corner of 6th and Sheppard or closer?

3          A.    I cannot recall.

4          Q.    That's fine.  What is your mother's

5     name?

6               MR. CONNOR:  You can give him her

7          name.

8          A.    My mother's name was Deborah Bandy.

9          Q.    Has she passed?

10         A.    Yes.

11         Q.    I'm sorry to hear that.

12               Do you have any siblings?

13         A.    I do.

14         Q.    Could you tell me their names?

15         A.    One of them has already passed.

16         Q.    I'm sorry to hear that.  Was that a

17    brother or sister?

18         A.    It was a brother.

19         Q.    Could you tell me his name?

20               MR. CONNOR:  You can give him his

21         name.  Like I said, it's likely to lead to

22         admissible evidence so it's a question you can

23         answer.

24         A.    My brother's name was Anthony Parker.

25    That's the one that passed.

Page 11

1                    MR. ELLIS:  I'm sorry, ma'am, I

2        didn't hear.

3                    THE WITNESS:  Anthony Parker.

4        Q.    Any other siblings?

5        A.    Yes, sir.

6        Q.    Could you tell me their names?

7        A.    Yes, sir.  His name was Melvin Evans.

8        Q.    Is he still alive?

9        A.    Melvin Evans, yes.

10       Q.    And then did you have grandparents that

11   lived in the Greenville area?

12       A.    Are we going to the next question now?

13   Or you want me to finish --

14       Q.    Did you have more siblings?  Please,

15   thank you, can you tell me what other siblings

16   names?

17       A.    Her name is Tiffany Freeman.

18       Q.    Any others?

19       A.    No, sir.

20       Q.    Thank you.

21            Did you have grandparents that lived in

22   the Greenville area?

23       A.    My grandparents are no longer living.

24       Q.    Could you tell me their names?

25       A.    My grandmother's name was Tettie Mae

Page 12

1    Daniels.  And my grandfather's name was Clifton

2    Albert Daniels.

3         Q.    Did you ever live with them?

4         A.    I would visit frequently.

5         Q.    Where did they live in 1994?

6         A.    They lived on 4330 County Home Road in

7    Greenville, North Carolina.

8         Q.    Is that walking distance from 14th

9    Street and 6th Street or Sheppard Street?

10        A.    No, sir.

11        Q.    So then 1994.  So then tell me about the

12   area in 1994 around 6th and Sheppard Street and 14th

13   Street?

14        A.    I don't understand the question you're

15   asking.

16        Q.    Sure.  Did you spend time on 14th Street

17   and the area near 6th and Sheppard Street in 1994?

18        A.    I walked through it.

19        Q.    You wouldn't spend time there

20   particularly?

21        A.    Not particularly.

22        Q.    Was there anyone you knew who lived on

23   14th Street?

24        A.    There was lots of people I knew that

25   lived on 14th Street.

Page 13

1          Q.    I will represent to you that Wanda

2    Carmon said there was someone in particular she

3    would say you spend time on a duplex on 14th Street.

4    Do you know who she would be talking about, who

5    owned that duplex?

6                    MS. PFEIFFER:  Objection to leading

7          the witness.

8          A.    No, sir.  Not at this time.

9          Q.    So then you said you knew lots of people

10   who lived on 14th Street but you didn't hang out

11   there; do I have that right?

12         A.    I didn't say that, sir.

13         Q.    Did you hang out on 14th Street?

14         A.    I said I would visit frequently, but

15   you're asking me a question, sir.  That question

16   was did I visit someone, I said I didn't recall,

17   basically recall that.  I didn't say I did not hang

18   there, I just don't recall who it was that you're

19   implying that I hung out with.

20         Q.    I understand.  I wasn't there.  I'm just

21   trying to ask -- you don't remember who you hung out

22   with, is that what you are saying?

23         A.    Yes, sir.

24         Q.    But you would hang out there?

25         A.    At times, yes, sir.

Veritext Legal Solutions

1      Q.    About how many people would be hanging

2    out on 14th Street in that area?

3      A.    I don't recall, sir.

4      Q.    Do you remember anyone specific who

5    would hang out there?

6              MS. PFEIFFER:  Objection.  Asked

7         and answered.

8      A.    Can you repeat your question please?

9      Q.    Do you remember anyone specifically who

10   would hang out there?

11     A.    Sir, there was a lot of people that hung

12   out there.  There's no particular person that I

13   knew or didn't knew, there's a lot of people that

14   hung -- during that time that hung out there.

15     Q.    I understand.  I'm just trying to see if

16   you remember anyone so I'm going to ask a few names

17   and see if you remember them that way.

18              Did you ever see Dontae on 14th Street,

19   Dontae Sharpe?

20     A.    Yes, sir.

21     Q.    What about Aldrich Sharpe?

22     A.    I'm not sure about that name.  Maybe by

23   another name.

24     Q.    I believe he was also known as Monte.

25   What about Monte Sharpe?

Page 15

```
 1        A.    I can't recall.

 2        Q.    No problem.  What about Andre Sharpe?

 3        A.    Not that I can recall.

 4        Q.    Karsten Robinson?

 5        A.    I don't know that person by name.  By

 6   face.

 7        Q.    What about Wanda Carmon?

 8        A.    I knew Ms. Carmon.

 9        Q.    Did you know Ms. Carmon in 1994?

10        A.    Not relatively as knowing her as we were

11   friends, no.

12        Q.    How did you know her?

13        A.    Through passing names.  In the

14   circumstance maybe.  Passing.

15        Q.    Same inner circle?

16        A.    Guess you could say inner circle people

17   that I would pass by.

18              MS. PFEIFFER:  I object to the

19        characterization.  You said something the

20        witness didn't and I think you might be

21        talking about different names.

22              MR. CLEMENTS:  Sure.

23        Q.    People you would pass by, is that what

24   you meant?

25        A.    Yes.
```

Page 16

1          Q.    Do you remember anyone else who you

2     would see Wanda with?

3          A.    I can't answer that question because I

4     don't know what you're speaking of.  Female, male,

5     I don't know and -- I don't know.

6          Q.    Sure.  Did Wanda have any friends?

7          A.    I'm pretty sure she had friends.

8          Q.    Do you remember any of their names?

9          A.    No, sir.

10         Q.    What about Mark Joyner, would you ever

11    see him on 14th Street?

12         A.    I've seen Mark before.

13         Q.    On 14th Street?

14         A.    I'm not sure that was the first place I

15    saw him.

16         Q.    But did you ever see him there?

17         A.    I can't recall that question.

18         Q.    How did you know Mark?

19         A.    Through passing.

20         Q.    Did you ever spend time with Mark or

21    Dontae?

22         A.    Can you say that question in a different

23    way please?

24         Q.    Did you ever hang out with Mark?

25         A.    Particularly when are you speaking of?

Page 17

1          Q.     Did you ever spend time with Mark in any
2     way?
3          A.     That question I'm unable to answer
4     because I'm not for sure what you are speaking of.
5          Q.     Were you friends with Mark?
6          A.     No, I wasn't friends with him.
7          Q.     In what capacity would you see him?
8     Could you just describe your relationship with him
9     in 1994 and how you knew him?
10         A.     Say your question again, sir, please.
11         Q.     Can you just describe your relationship,
12    how you knew him, how you knew of him?  I wasn't
13    there so I'm asking you to tell me.
14         A.     I'm trying to fully understand your
15    question and your question is not being -- you're
16    not opening your questions very well for me to have
17    an understanding how to answer those questions so I
18    will have to say so.
19         Q.     I'm just asking you in any form just to
20    describe how you knew Mark Joyner, if you spent time
21    with him, where you spent time with him, anything.
22         A.     In 1994 I was a child so I'm -- I feel
23    like I'm not going to answer that question, sir.
24         Q.     Okay.  So you're refusing to answer?
25         A.     That question, yes.

Page 18

1          Q.    What about Dontae in 1994, did you spend
2     time with Dontae?  Were you friends with Dontae?
3     Where did you spend time with him?  How did you know
4     him?
5          A.    I was never friends with Dontae.  How I
6     knew him because he was on 14th Street, he would
7     tell me to go home.  That's how I knew Dontae.
8          Q.    Do you remember -- how many times did he
9     tell you to go home?
10          A.    My recall is one that I can remember.
11          Q.    Do you know why he told you to go home?
12          A.    I'm a kid outside that time of night.
13          Q.    Did you know a Diana Pearson?
14          A.    Not by name.  Maybe by face.
15          Q.    Was Diana Pearson a teacher of yours?
16          A.    Sir, I don't know, sir.
17          Q.    So 1994, were you in school?
18          A.    For a while.
19          Q.    When did you stop going to school?
20          A.    Not sure what date.
21          Q.    Were you in school in February of 1994?
22          A.    I'm not sure, sir.
23          Q.    Do you remember what percentage of the
24     year you were out of school in 1994?
25          A.    No, sir.

Page 19

```
 1          Q.    When you were out of school, how would
 2     you spend your time?
 3          A.    Home.  Friends.  Hanging out.
 4          Q.    When you say home, you mean Fleming
 5     Street?
 6          A.    Yes, sir.
 7          Q.    When you said friends, who would that
 8     be?
 9          A.    Not for sure of anybody I hung out with.
10          Q.    What school were you in in 1994?
11          A.    Was it CM Eppes Middle School?
12          Q.    CM --
13          A.    Eppes Middle School.
14          Q.    Just to back up for a second.  I think
15     you had a math class today, did I hear that right?
16          A.    Yes.
17          Q.    Are you in college now?
18          A.    Yes, sir.
19          Q.    Where do you go to college now?
20          A.    I go to East Carolina University.
21          Q.    Where did you graduate from high
22     school -- and did you graduate high school?
23          A.    I did not graduate high school.
24          Q.    What high school did you attend?  Did
25     you attend any high school?
```

Page 20

```
1          A.    I did not attend high school, sir.

2          Q.    Your math class at ECU, are you going to

3    be a math major?  What's your major?

4          A.    My major is family and community service

5    with a concentration in science.

6          Q.    So I'm going to ask you about February

7    11, 1994.  Do you remember where you were that day?

8          A.    No, sir.

9          Q.    Do you remember where you were that

10   night?

11         A.    No, sir.

12         Q.    When did you first hear about

13   Mr. Radcliffe's murder?

14         A.    On television and talking with Mr. Best.

15         Q.    So let me get this straight.  The first

16   time -- when was the first time you became aware of

17   Mr. Radcliffe's murder?

18         A.    Through Mr. Ricky Best and television.

19         Q.    Was it the news?  What did you see on

20   television?

21         A.    News.

22         Q.    Do you remember when that was?

23         A.    I don't recall.

24         Q.    Was it in February, was it in March, was

25   it in April?
```

Page 21

1          A.    I don't recall.

2          Q.    Did you ever see police tape up?

3          A.    I've seen a lot of police tape up.

4          Q.    Would you see police tape up in the area

5     of 14th Street and 6th and Sheppard Street?

6                    MR. CONNOR:  If you recall.

7               (Witness and counsel confer. )

8                    MR. CONNOR:  Let's take a short

9          break.  I can't hear.

10                    MR. CLEMENTS:  Let's go off the

11         record.

12                    THE VIDEOGRAPHER:  Off the record

13         at 11:59 p.m.

14              (Recess taken.)

15                    THE VIDEOGRAPHER:  We're back on

16         the record.  The time is 12:03 p.m.

17                    MR. CONNOR:  I just want to put on

18         the record the problem was she doesn't

19         understand the question.  You're asking about

20         police tape being up and dates and that's a

21         high crime area, there's a lot of police tape

22         being up, so she wanted more specificity from

23         your questions.  She wanted answer them

24         precisely and she didn't quite understand the

25         question.

```
                                            Page 22

 1              MR. CLEMENTS:  Sure.

 2     BY MR. CLEMENTS:

 3         Q.    Charlene, please feel free, if you don't

 4     understand, ask me, I will try to be more precise.

 5              It was a high crime area; correct?

 6         A.    Correct.

 7         Q.    So you would see police tape out there

 8     regularly; correct?

 9         A.    Not on a daily basis, sir.

10         Q.    How often?

11         A.    I don't know, sir.

12         Q.    How often would you hear about shootings

13     in that area?

14         A.    I can't recall, sir.

15         Q.    How often would you hear about -- was

16     there drug dealing going on in that area?

17         A.    Yes, sir.

18         Q.    Did you ever see people selling drugs in

19     that area?

20         A.    Yes, sir.

21         Q.    Did you ever see Dontae selling drugs in

22     that area?

23         A.    No, sir.

24         Q.    Did you ever see Mark Joyner selling

25     drugs in that area?
```

Page 23

1          A.    No, sir.

2          Q.    Did you ever see anyone from the Sharpe

3    family selling drugs in that area?

4          A.    No, sir.

5          Q.    Did you ever sell drugs in that area?

6          A.    No, sir.

7          Q.    Did you ever sell drugs with Dontae?

8          A.    No.

9          Q.    Did you ever sell drugs with Mark

10   Joyner?

11         A.    No, sir.

12         Q.    Did you ever Beatrice Stokes in that

13   area?

14         A.    I can't recall.

15         Q.    Do you know who Beatrice Stokes is?

16         A.    Yes, sir.

17         Q.    Have you seen Beatrice Stokes before?

18         A.    Yes.

19         Q.    Where did you see her?

20         A.    Can you ask that question so I can have

21   a clarification of what you mean about the question

22   you're asking?

23         Q.    When you say you saw Beatrice Stokes

24   where do you remember seeing her?

25         A.    Last time I saw Beatrice Stokes was at

Page 24

1     Pitt Community College, sir.

2          Q.    Did you ever see Beatrice Stokes in

3     1994?

4          A.    Not for sure, sir.

5          Q.    Did police ever -- do you remember an

6     Officer Shrock?

7          A.    By face maybe.

8          Q.    Did you interact with police officers in

9     1994?

10          A.    Say it again, sir.

11          Q.    Did you ever interact with police

12     officers in 1994?

13          A.    Yes, sir.

14          Q.    Did you ever know any police officers by

15     name prior to Mr. Ricky Best in 1994?

16          A.    Not that I can recall.

17          Q.    Did an officer ever take you home in

18     1994?

19          A.    Can you repeat that and say it in a

20     different way?

21          Q.    Sure.  Were you ever in a police car in

22     1994 before you talked to Mr. Best?

23          A.    I can't recall.

24          Q.    Did an officer ever take you to the

25     hospital in 1994?

1        A.    Yes.

2        Q.    Was that officer at your house before he

3    took you to the hospital?

4        A.    Not for sure what officer you're

5    speaking of.

6        Q.    Any officer.

7        A.    Yes, sir.

8        Q.    Was he the only officer there at your

9    house?

10       A.    I can't remember.

11       Q.    Was your mother at the house?

12       A.    Yes --

13            MS. PFEIFFER:  I object and ask for

14       a time frame here so we all know what we're

15       talking about.

16       Q.    Do you remember when this was, what date

17   this was in 1994?

18       A.    No, sir.

19       Q.    Do you remember the month it was?

20       A.    No, sir.

21       Q.    Did you see your mother talking to that

22   officer before he drove you to the hospital?

23       A.    Yes, sir.

24       Q.    Could you hear their conversation?

25       A.    I don't know how to answer that

1    question, sir.

2          Q.    Tell me what you remember about -- did

3    you hear them talking?

4          A.    Yes.

5          Q.    Could you tell me what you remember

6    about them saying?

7          A.    No, sir.

8          Q.    Did you talk to that officer before he

9    talked to your mother?

10         A.    I can't recall.

11         Q.    Was the first time you talked to that

12   officer at your mother's house or did you talk to

13   him prior to being at your mother's house?

14         A.    I can't recall, sir.

15         Q.    How did you get to the hospital after

16   that officer had a conversation with your mother?

17         A.    I answered that question already sir.

18         Q.    Could you answer again?  Sorry if I

19   didn't hear.

20         A.    They took me to the hospital.

21         Q.    Charlene, you don't have to lean forward

22   because it's on you, you can move it up if you want

23   but I think it's catching you.

24         A.    Oh, okay.

25         Q.    He'll tell you back there --

Page 27

1          A.    I think I was kind of actually having
2     fun doing it.
3          Q.    So the officer drove you did you say?
4          A.    Yes, sir.
5          Q.    Was he the only one in the car or were
6     there other officers in the car when he drove you?
7          A.    I'm not for sure, sir.
8          Q.    Was your mother in the car?
9          A.    Not for sure, sir.
10         Q.    Did you see your mother at the hospital
11    after he drove you to the hospital?
12         A.    I can't recall, sir.
13         Q.    Do you remember saying anything to the
14    officer in the car on the way to the hospital?
15         A.    I'm unsure.
16         Q.    When you were in the hospital, did you
17    talk to the officer?
18         A.    I'm not for sure what officer you're
19    talk about and I probably did.  I'm not sure.
20         Q.    So you probably talked to him.  Do you
21    remember what you said to him?
22         A.    Not for sure which officer you're
23    talking about --
24                    MS. PFEIFFER:  I'm going to object
25         to the compound question.  If you ask one

1          question at a time so she can answer.

2          Q.    Did you speak with any officer in the

3     hospital?

4          A.    Yes, sir.

5          Q.    Do you remember the name of that

6     officer?

7          A.    No, sir.

8          Q.    Do you remember if there were any other

9     officers there present for that conversation?

10         A.    Not for sure, sir.

11         Q.    What did you say to that officer?

12         A.    I'm not for sure, sir.

13         Q.    Do you remember what that officer said

14    to you?

15         A.    No, sir.

16         Q.    Can you tell me any details of that

17    conversation?

18         A.    Not for sure.

19         Q.    Do you remember how long the

20    conversation lasted?

21         A.    No, sir.

22         Q.    Was the doctor present for that

23    conversation?

24         A.    I don't know, sir.

25         Q.    By don't know, you can't remember?

Page 29

```
1          A.    No, I can't remember.

2          Q.    Do you remember where the conversation

3    took place?  Was it in a room in the hospital?  Was

4    it in the front entrance, the waiting room?

5                    MS. PFEIFFER:  Object to the

6          compound question.

7          Q.    You can still answer the question.

8    She's objecting for the record.  There's no judge

9    here --

10                   MS. PFEIFFER:  I'm also

11         objecting --

12                   MR. CONNOR:  If you understand the

13         question.  If you understand the question, you

14         can answer.  Compound means sometimes you're

15         asking two things in one question.

16         A.    I'm unsure.

17         Q.    Did that conversation take place in the

18   waiting room to the hospital?

19         A.    No, sir.

20         Q.    Did that conversation take place in a

21   hospital room?

22         A.    No, sir.

23         Q.    Do you remember any details about where

24   that conversation took place?

25         A.    In a room.
```

1          Q.    In a room.  Had you spoken with -- did

2     you speak with any doctors at the hospital?

3          A.    Not for sure, sir.

4          Q.    Did you speak with any hospital staff

5     while at the hospital?

6          A.    Not for sure, sir.

7          Q.    Do you remember what happened -- so what

8     happened after you spoke with the officer?

9          A.    You said I spoke to a officer -- that's

10    the question there I'm un -- for sure which officer

11    you're talking about and I can't give you an

12    accurate answer -- sorry for my hands -- accurate

13    answer to that question due to the fact I don't

14    know the person you're speaking of.  That doesn't

15    mean what you're asking is incorrect or is correct,

16    I can't answer that question, sir.

17         Q.    Sure.  Thank you for asking me to

18    clarify.

19               You do remember speaking with an

20    officer; right?

21         A.    Yes.

22         Q.    Do you remember speaking with more than

23    one officer or just one officer?

24         A.    I'm unsure.

25         Q.    Do you remember having multiple

Page 31

 1    conversations with officers at the hospital or just

 2    one?

 3            A.    I can't answer that question, sir.

 4            Q.    So you don't remember?

 5            A.    I do not remember.

 6            Q.    But you remember at least one

 7    conversation?

 8            A.    Yes.

 9            Q.    Do you remember what happened after that

10    conversation?

11            A.    No, sir.

12            Q.    Did you talk to anyone else that night?

13                    MS. PFEIFFER:  Objection to that

14        night.  When are we talking about?

15            Q.    Do you remember talking to anyone else

16    the night an officer brought you to the hospital?

17            A.    I don't remember, sir.

18            Q.    If you don't remember -- I'm just

19    asking.  I wasn't there.  You were there.  So I'm

20    just going to see if I can jog your memory or

21    anything like that.

22                    Did you go home that night?

23                    MS. PFEIFFER:  Objection to "that

24        night."

25            Q.    Did you go home the night the officer

Page 32

1    brought you to the hospital?

2          A.    I'm not sure.

3          Q.    Do you know why the officer brought you

4    to the hospital?

5          A.    Not particularly.

6          Q.    What do you remember generally?

7                MR. CONNOR:  What you remember.

8          Q.    Please ask me.

9          A.    I remember my mother having a

10   conversation but I don't know how it all got

11   started and how I wound up at the hospital so I'm

12   not for sure.

13         Q.    But the officer brought you to the

14   hospital pursuant to the conversation with your

15   mother?

16         A.    I think so.

17         Q.    Did you ever talk to your mother about

18   that conversation she had with the officer?

19         A.    No.

20         Q.    Did you ever talk with your mother

21   about -- did your mother want you to go to the

22   hospital?

23         A.    I don't know.

24         Q.    Did you draw any pictures at the

25   hospital?

```
 1          A.    Yes.

 2          Q.    Where did you draw those pictures?

 3          A.    In the room.

 4          Q.    Did you talk to the officer before you

 5    drew the pictures or after you drew the pictures?

 6          A.    Can you repeat your question, sir?

 7          Q.    Did you talk to the officer before you

 8    drew the pictures?

 9          A.    Can you be more clear?

10          Q.    Sure.  You said you remember at least

11    one conversation with an officer at the hospital;

12    correct?

13          A.    Yes.

14          Q.    Did that conversation take place before

15    you drew pictures or after you drew pictures?

16          A.    I'm not for sure, sir.

17          Q.    Did that officer ask you about the

18    pictures?

19          A.    I can't recall.

20          Q.    Can you tell me about the pictures that

21    you drew?

22          A.    No, sir.

23          Q.    What did you draw them with?

24          A.    I don't know, sir.

25          Q.    How long after the night the officer
```

Page 34

1      took you to the hospital did you talk to Officer

2      Best and Officer Melvin?

3              A.    I don't recall.

4              Q.    Was it the same month, week, day?

5                    MS. PFEIFFER:  Objection.  Asked

6              and answered.  She's testified she doesn't

7              remember.

8              A.    I can't recall.

9              Q.    So then where were you when you first

10     talked to Officers Best and Melvin?

11             A.    Not for sure, sir.

12             Q.    Were you at your mother's house when you

13     first talked to Officer Best or Melvin?

14                   MS. PFEIFFER:  Objection.  Asked

15             and answered.  She's testified she doesn't

16             remember.

17             A.    I don't recall, sir.

18             Q.    Did you see Officer Best or Officer

19     Melvin talk to your mother the first day you spoke

20     with Officer Best or Officer Melvin?

21             A.    No.

22             Q.    So then who did you talk to first,

23     Officer Best or Officer Melvin?

24             A.    I'm not for sure, sir.

25             Q.    Were they together the first time you

Page 35

1    talked to them?

2          A.    I can't recall.

3          Q.    Did they take you to the police station?

4          A.    I can't recall.

5          Q.    Did you ride in a police car to the

6    police station or did you meet them at the police

7    station?

8          A.    I can't recall, sir.

9          Q.    Do you remember talking to Officer Best

10   and Officer Melvin at the police station?

11         A.    Which time, sir?

12         Q.    The first time you spoke with them.  I'm

13   asking about the first time you spoke with Officer

14   Best or Officer Melvin.

15         A.    Can you repeat your question again

16   because I hear you but I'm not as clear as it

17   should be.  But go ahead.

18         Q.    Sure.  The first time you talked to

19   Officer Best or Officer Melvin, where was that?

20         A.    At the Brown Building.

21         Q.    At the Brown Building.  Do you remember

22   talking to them before you were at the Brown

23   Building?

24         A.    Not sure.

25         Q.    Do you remember what day you talked with

Page 36

```
 1    them at the Brown Building?

 2         A.    No, sir.

 3         Q.    Tell me about that conversation.  Let me

 4    be a little more specific because I think it might

 5    help.

 6              Were they together when you first talked

 7    to them?

 8         A.    Unsure.

 9         Q.    Do you remember where that conversation

10    took place within the Brown Building?

11         A.    In a room.

12              MS. PFEIFFER:  Objection to

13         characterizing the first conversation was in

14         the Brown Building.  She hasn't testified to

15         that.

16              MR. ELLIS:  I think she did I think

17         she said she was in the Brown Building when

18         they first talked.

19              MS. PFEIFFER:  Not in response to

20         the question about the first time.  Carry on.

21         Q.    Is the first time you remember talking

22    to them at the Brown Building?

23         A.    I'm unsure, sir.

24         Q.    You did eventually talk to them in the

25    Brown Building?
```

1          A.    Yes.

2          Q.    Can you remember talking to either of

3     them before that conversation?

4          A.    I want to answer these questions but

5     they're -- I can't remember -- I can't remember.

6          Q.    That's fine.  I'm just asking because I

7     wasn't there.  So I'm trying to figure it out.

8               So eventually you spoke with them in a

9     room in the Brown Building; correct?

10         A.    Yes.

11         Q.    Do you remember -- did you have a verbal

12    conversation with them?

13         A.    I'm unsure having a conversation with

14    both of them or one of them, sir.

15         Q.    Which one do you remember?

16         A.    I remember Mr. Best.

17         Q.    So you remember having a conversation

18    with Mr. Best in the Brown Building?

19         A.    Yes.

20         Q.    Do you remember Officer Melvin not being

21    there specifically or do you just not remember

22    whether she was there or not?

23               MS. PFEIFFER:  Object to the

24         compound question.

25         Q.    Do you remember Officer Melvin not being

1    there specifically?

2         A.    I don't remember her being there.  That

3    doesn't mean she wasn't there, I don't remember.

4         Q.    When you remember talking to Mr. Best,

5    did you have a verbal conversation with him?

6         A.    Yes.

7         Q.    Do you remember how long you talked to

8    him?

9         A.    No.

10        Q.    Do you remember what he asked you?

11        A.    Yes.

12        Q.    What did he ask you?

13        A.    To -- he gave me a piece of paper and

14   put me in a room.  And he told me to write down

15   what I knew and he came, checked on me and told me

16   that wasn't enough and he would talk to me about

17   stuff and I would write down more stuff.

18        Q.    When you say -- he told you to write

19   down what you know?

20        A.    Um-hmm.

21        Q.    And you wrote it down?

22        A.    Yes.

23        Q.    When you say he gave you a piece of

24   paper, was that a blank piece of paper?

25        A.    Yes.

    1        Q.    And he left the room, is that what you
    2   are saying?
    3        A.    He left but he wasn't far -- far -- he
    4   wasn't far.
    5        Q.    Did that room have windows?
    6        A.    Yes.
    7        Q.    Could you see through the windows?
    8        A.    Yes.  I think so (indicating).
    9        Q.    Was there any other officers out there?
   10        A.    Don't know.
   11        Q.    So you started writing what you knew;
   12   right?
   13        A.    Assumingly knew.
   14        Q.    At some point he came back into the
   15   room?
   16        A.    Yes.
   17        Q.    And you had already had writing on the
   18   piece of paper; correct?
   19        A.    Yes.
   20        Q.    And then he talked to you and -- you
   21   said he talked to you?
   22        A.    Yes.
   23        Q.    And what did he say?
   24        A.    Well, there wasn't enough, he said write
   25   down more.  We talked.

Page 40

1          Q.    What did you talk about?

2          A.    I can't give you the full conversation

3    because I don't recall the full conversation.

4          Q.    Was he asking you questions?

5          A.    No, he was telling me things.

6          Q.    What was he telling you?

7          A.    What to write.

8          Q.    What to write.  But you had already

9    written stuff down?

10         A.    Yes.

11         Q.    And he didn't tell you what to write

12   down there, right, because -- he didn't tell you the

13   first stuff you wrote down; correct?

14         A.    He told me just write and I wrote.  I

15   did what I was asked to do.

16         Q.    But he didn't tell you what to write?

17         A.    Not the first time.

18         Q.    But then the second time he came in and

19   he was telling you things?

20         A.    Yes.

21         Q.    Do you remember what he told you?

22         A.    I just wrote it down whatever was on

23   that piece of paper that is seen through my

24   transcripts before.

25         Q.    The one in your own handwriting?

```
 1          A.    Yes.
 2          Q.    When he came back in, was Officer Melvin
 3    in there?
 4          A.    No, sir.  I don't remember seeing her.
 5          Q.    Do you ever remember seeing Officer
 6    Melvin that day?
 7          A.    No, sir.  That doesn't mean I didn't see
 8    her but I don't remember seeing her.
 9          Q.    Do you remember seeing any other officer
10    that day?
11          A.    No, sir.  That doesn't mean nobody
12    wasn't there.
13          Q.    So then after you wrote down the --
14    after you wrote down your statement in your own
15    handwriting; right?
16          A.    Um-hmm.
17          Q.    What happened after that?
18          A.    Not for sure, sir.
19          Q.    Did someone drive you home?
20          A.    I don't know, sir.
21          Q.    How did you get to the Brown Building,
22    do you remember?
23                MS. PFEIFFER:  Objection.  Asked
24          and answered.
25          A.    You did -- I did ask and answer that
```

1    question when I said they brought me there.

2        Q.    Sorry if I don't remember, I'm just

3    trying not to --

4              And you don't remember anyone driving

5    home?

6        A.    No.

7        Q.    How far would the Brown Building have

8    been from your house on Fleming Street?

9        A.    I don't know, sir.

10       Q.    Walking distance?

11       A.    Depends who would he walking.

12       Q.    I don't know the area, I was just asking

13   you.  So then where did you go after the Brown

14   Building?

15       A.    I don't know, sir.

16       Q.    Who's Kizy Page (phonetic)?

17       A.    Dontae's ex-girlfriend.

18       Q.    Did you know her before you gave the

19   statement to Mr. Best?

20       A.    Not that I can recall.

21       Q.    What about Lisa Evans?

22       A.    I know Lisa Evans.

23       Q.    You know Lisa Evans.  Do you still know

24   Lisa Evans?

25       A.    I know all of them.

```
                                        Page 43

 1                  THE REPORTER:  Can we take a quick

 2        break.

 3                  MR. CLEMENTS:  Oh, sure.

 4                  THE VIDEOGRAPHER:  We're off the

 5        record.  The time 1:27 p.m.

 6              (Recess taken.)

 7                  THE VIDEOGRAPHER:  We're back on

 8        the record.  The time is 12:33 p.m.

 9     BY MR. CLEMENTS:

10        Q.    Had you ever been in the Brown Building

11     before that conversation with Mr. Best that you

12     remember?

13        A.    No.

14        Q.    Had you ever been in a police car before

15     that time in the Brown Building?

16        A.    Yes.

17        Q.    What was that for -- excuse me, strike

18     that.

19              Who is Lisa Evans?

20        A.    I apologize, which question would you

21     like me to answer?

22        Q.    Sure.  New question.  Who is Lisa Evans?

23        A.    A lady.

24        Q.    You said you knew her in 1994, did I

25     hear that earlier?
```

Page 44

```
 1          A.    No, I didn't know her.  You asked the
 2    question -- the question you asked was did I know
 3    Lisa Evans just like you asked me did I know Wanda,
 4    and I said yes.
 5          Q.    So tell me about how you knew Lisa
 6    Evans?
 7          A.    Through passing.
 8          Q.    Do you remember where you had passed
 9    her?
10          A.    No, sir.
11          Q.    What about Tanya Freeman?
12          A.    Not for sure exactly where I met her at.
13          Q.    She was involved in -- when you got beat
14    up; right?
15                MS. PFEIFFER:  Object to testifying
16          for the witness.
17          Q.    Was Tanya Freeman involved when you got
18    beat up?
19          A.    Yes.
20          Q.    Was Lisa Evans involved when you got
21    beat up?
22          A.    Yes.
23          Q.    Was Kizy Page involved when you got beat
24    up?
25          A.    Yes.
```

Page 45

```
 1       Q.    Who else was involved when you got beat
 2   up?
 3       A.    I'm not for sure, sir.
 4       Q.    Was Pam Langley involved when you got
 5   beat up?
 6                  MS. PFEIFFER:  Object to "when you
 7           got beat up."  We need to clarify what we're
 8           talking about.
 9       Q.    Did you get beat up after you talked to
10   Mr. Best?
11       A.    No.
12       Q.    You didn't get beat up after you talked
13   to Mr. Best?
14       A.    The question you're asking is not going
15   with what you're asking me.  You're asking me a
16   question but what you're asking is not going --
17   it's not connecting.  So you have to repeat that
18   question so it can be answered appropriately.
19       Q.    Sure, of course.  Kizy Page, Lisa Evans
20   and Tanya Freeman beat you up; correct?
21       A.    Yes.
22       Q.    When did they beat you up?
23       A.    They beat me up after the last
24   conversation Dontae Sharpe was -- excuse me --
25   Monte Sharpe -- Montoyae Sharpe, I apologize, was
```

Page 46

1    arrested.

2        Q.    So Montoyae Sharpe was arrested and then

3    those girls beat you up?

4        A.    Yes.

5        Q.    Where were you when you got beat up?

6        A.    Being dropped off by a police officer.

7        Q.    Where were you being dropped off?

8        A.    Fleming Street.

9        Q.    Was that your mother's house?

10       A.    Yes.

11       Q.    Can you tell me what happened?

12       A.    I got dropped off by a redheaded police

13   officer; not long after that I was getting beat up.

14       Q.    So I'm just going to break that down a

15   little bit.  You got dropped off.  Did he drop you

16   off in the front of your house?

17       A.    Yes, he did.

18       Q.    Did you go into the house?

19       A.    Yes, I did.

20       Q.    When did you first see the girls?

21       A.    When they came in the house.

22       Q.    Did they come in the front of the house?

23       A.    They came in both sides of the house,

24   front and side.

25       Q.    They came in the front and side of the

Page 47

1    house?

2         A.   Yes, sir.

3         Q.   Which girls came in the front of the

4    house?

5         A.   Don't know, sir.

6         Q.   Which girls came in the side of the

7    house?

8         A.   Don't know, sir.

9         Q.   Who was in the house with you?

10        A.   Just me.

11        Q.   Once they were in the house, did they

12   beat you -- did you ever -- tell me what happened

13   when you were in the house.

14        A.   I was threatened by a gun.

15        Q.   Do you remember who had the gun?

16        A.   No, sir.

17        Q.   How did that stop?  How did that

18   interaction stop?

19        A.   Say it again, sir.

20        Q.   You were threatened with a gun in the

21   house?

22        A.   Yes.

23        Q.   Did you ever get out of the house?

24        A.   Yes.

25        Q.   Can you tell me what happened outside of

Page 48

1    the house?

2         A.    I ran, I slipped, I got beat up.

3         Q.    Was it all the girls who beat you up?

4               How many girls were there?

5         A.    Not for sure, sir.

6         Q.    Which girls do you remember beating you

7    up specifically?

8         A.    Not for sure, sir.

9         Q.    How did the beating stop?

10        A.    Ms. Sarah.

11        Q.    You say Ms. Sarah, who is Ms. Sarah?

12        A.    Dontae's mother.

13        Q.    What happened?

14        A.    I guess she told them to stop.  I'm not

15   sure exactly how it happened.

16        Q.    Had you sustained any injuries?

17        A.    Yes, sir.

18        Q.    What injuries were those?

19        A.    I had knife marks in my head.  Lip

20   busted.  Not for sure what else.

21        Q.    When Ms. Sarah -- you call her

22   Ms. Sarah -- when she stopped the beating, did she

23   call the police?

24        A.    No.

25        Q.    Was anyone else with Ms. Sarah?

1        A.    Not sure.

2        Q.    What happened after Ms. Sarah stopped

3    the beating?

4        A.    I went to the hospital.

5        Q.    How did you get to the hospital?

6        A.    Ms. Sarah.

7        Q.    Did Ms. Sarah -- did you go in

8    Ms. Sarah's car?

9        A.    Not for sure.

10        Q.    Was Ms. Sarah in the car with you?

11        A.    Yes.

12        Q.    Was anyone else in the car with you?

13               MS. PFEIFFER:  Objection.

14        A.    Just answered that question.  I said I

15    wasn't sure.

16        Q.    You were unsure.  Okay.  What happened

17    in the car?  Did Ms. Sarah talk to you in the car?

18               MS. PFEIFFER:  Object to compound

19        question.

20        A.    She could have.

21        Q.    Do you remember talking to Ms. Sarah in

22    the car?

23        A.    I could have.

24        Q.    What did you all talk about?

25        A.    Not for sure, sir.

Page 50

1        Q.    What hospital did you go to?

2        A.    Not for sure, sir.

3        Q.    At the hospital, did you speak to any

4   officers at the hospital?

5        A.    Which time, sir?

6        Q.    The time after you got beat up.

7        A.    Not for sure, sir.

8        Q.    Did you ever speak with a Connie Elks?

9        A.    Not for sure, sir.

10       Q.    Do you remember ever speaking with an

11   officer in relation to that beating?

12       A.    I'm pretty sure, yes.

13       Q.    What officer -- can you tell me about

14   that officer?

15       A.    You just gave me a name so is that the

16   person you're talking about?

17       Q.    I'm asking you what you remember.

18       A.    I don't remember.

19       Q.    Did your mom come to the hospital?

20       A.    I'm unsure.

21       Q.    Do you remember how long you were at the

22   hospital?

23       A.    No, sir.

24       Q.    Did you leave that day?

25       A.    I'm not sure, sir.

Veritext Legal Solutions

Page 51

1          Q.    Were those girls arrested?

2          A.    Yes, sir.

3          Q.    After the beating, when is the next time

4     you talked to Officer Best or Officer Melvin?

5                    MR. ELLIS:  Objection to the form.

6          Q.    You can answer.

7          A.    Excuse me, I didn't -- say it again.

8          Q.    Sure.  When is the first time you

9     remember talking to Officer Melvin?

10         A.    I didn't really talk to Officer Melvin

11    like that so I don't remember the first time

12    talking to Officer Melvin.  Now I remember talking

13    to her but I don't remember the first time.  You

14    asked that question.

15         Q.    But you do remember talking to Officer

16    Melvin?

17         A.    Yes.

18         Q.    How often would you talk to Officer

19    Melvin?

20         A.    Not often at all.

21         Q.    Not often.  Do you remember where you

22    talked to Officer Melvin?

23         A.    There's two particular times I remember

24    talking with Ms. Melvin.  The first time was when

25    we were in a car going to get a polygraph test that

Page 52

```
 1    I can remember, that I -- because I said two.  The
 2    second time when she arrested me and put handcuffs
 3    on me.
 4         Q.    And you're saying you don't remember any
 5    other times talking to Officer Melvin?
 6         A.    As her being officer, no.
 7         Q.    So then after the beating when is the
 8    first time -- do you remember the first time you
 9    talked to an officer after the beating?
10         A.    No, sir.
11         Q.    Do you remember the first time you
12    talked to Officer Best after that beating?
13         A.    On my way to Wilmington with my mother.
14         Q.    Do you remember how long that was after
15    the beating?
16         A.    No, sir.
17         Q.    You said on your way.  Was it in a car?
18    Were you driving in a car?
19         A.    He was driving the car.
20         Q.    He was driving the car?
21         A.    Excuse me, Officer Best was driving the
22    car.
23         Q.    Was anyone else in the car besides
24    Officer Best and your mother?
25         A.    My mother and Officer Best.
```

Page 53

1          Q.    How far is that drive?

2          A.    How far is Wilmington from here?

3          Q.    I'm asking --

4          A.    I don't know, sir.

5          Q.    Did you all stop anywhere?

6          A.    Unsure.

7          Q.    Where did you go in Wilmington?

8          A.    To a home.

9          Q.    Was it just a house or anything specific

10    with the home?

11         A.    There was other people there.

12         Q.    Do you remember was it a group home?

13         A.    Not for sure if it was a group home or

14    home -- it could have been a home that people raise

15    kids and foster, I'm not for sure, sir.

16         Q.    Was it a battered woman shelter?

17         A.    It's not a battered woman shelter.

18    There's children there, sir, only children there.

19         Q.    Only children were there?

20         A.    Yes, sir.

21         Q.    Were there any social workers there?

22         A.    Not for sure if their titles were social

23    workers.

24         Q.    But there was people in charge there?

25         A.    Yes, sir.

Page 54

1          Q.    Did your mom stay with you at that home?

2          A.    It wasn't a battered women's shelter, it

3     was for children, sir, so no.

4          Q.    So she went back with Officer Best?

5          A.    Yes, sir.

6          Q.    How long were you at that home?

7          A.    Not for sure, sir.

8          Q.    Did you go to school when you were in

9     that home?

10          A.    Yes, I did, sir.

11          Q.    Do you remember what school that was?

12          A.    No, sir.

13          Q.    Was it a home in the school or did you

14     leave to go to school?

15          A.    I left to go to school, sir.

16          Q.    And then eventually you came back to

17     Greenville?

18          A.    Yes, sir.

19          Q.    Do you remember why you came back?

20          A.    I wanted to come back, sir.

21          Q.    Why did you want to come back?

22          A.    I'm away from my family, my mother.

23          Q.    Did your mother want you to come back?

24          A.    I can't answer that question, sir.

25          Q.    Did you talk to your mother about the

Page 55

1    beating?

2         A.    My mother knew about the beating.

3         Q.    Did you see your mother talk to any

4    officers about the beating?

5         A.    No, sir.

6              (Exhibit 181, Sharpe 0002850 to

7         Sharpe 0002851, marked for identification, as

8         of this date.)

9         Q.    I will hand you what I marked as Exhibit

10   181.  It says --

11        A.    Am I supposed to open it?

12        Q.    Just one second, I'm going to read.

13   It's Sharpe 0002850 to Sharpe 0002851.  I'm going to

14   ask you if I'm reading this correctly.

15             It says, "Exhibit 35, notes from

16   interview with Deborah Bandy."  Did I read that

17   right?

18        A.    Excuse me?

19        Q.    It says at the top, "Notes from

20   interview with Deborah Bandy"?

21        A.    Okay.

22        Q.    Deborah Bandy, that's your mother's

23   name?

24        A.    Yes, that was my mother's name.

25        Q.    If you turn to the next page, the top

1    left corner says, "Ms. Bandy," in cursive; right?

2         A.    This doesn't look like my mama's

3    handwriting.

4         Q.    I don't believe it's your mother's

5    handwriting, but it's a handwritten note.

6         A.    Yeah, but this isn't my mama's

7    handwriting at all.  Who wrote this?

8         Q.    This is an officer's notes.

9         A.    Oh, officer's notes?  Okay.

10        Q.    If you go all the way down to almost the

11   bottom, there's sort of a little paragraph.  It

12   says, "I asked Charlene what happened, did she tell

13   on those boys, she said she did because they did."

14             Did I read that -- can you read that?

15        A.    Barely, but yes.

16        Q.    Did your mother make this statement to

17   the police officers?

18        A.    Excuse me?

19        Q.    Did you hear your mother make this

20   statement to the police officers?

21        A.    I never knew my mama talked to anybody.

22        Q.    You never knew your mother talked to

23   anyone about the beating?

24        A.    No.

25        Q.    Did anyone come to your house, police

Page 57

```
 1    officers to talk about the beating?
 2         A.    No.
 3         Q.    Do you remember talking to Officer Best
 4    in the car about the beating?
 5         A.    I'm not sure how that all occurred, he
 6    talked to my mother or not, but I don't know what
 7    this is.  This is the first time I've ever seen
 8    this.
 9         Q.    Did you ever make that statement to your
10    mom?
11         A.    No, sir.
12         Q.    Did your mom ever ask you, "Did you tell
13    on those boys?"
14         A.    I don't remember, sir.
15         Q.    Did you ever say to your mom, "I did
16    because they did"?
17         A.    I just answered your question, sir, I
18    said I don't remember, sir.
19         Q.    So then I think I heard you testify
20    earlier that when you -- Officer Melvin drove you to
21    take a polygraph; did I hear that right?
22         A.    No, sir, you didn't.
23         Q.    Did Officer Melvin drive you to take a
24    polygraph?
25         A.    No, sir.
```

1          Q.    When you came back to Greenville how did
2     you come to take a polygraph?
3          A.    Sir, I answered that question.  I said
4     Ricky Best and Carolyn Melvin took me.  The first
5     time I ever saw or remember -- two times I saw
6     Ms. Caroline, that's when she took me to the
7     polygraph and she handcuffed me.
8          Q.    So the first time is Ricky Best and
9     Carolyn Melvin took you to the polygraph --
10          A.    You asked me a couple questions.  Okay.
11     You asked me three or four questions in one.  So
12     I'm going to try to answer all of them that I can
13     answer.  Okay?
14               First time you asked me when's the first
15     time I seen Ricky Best.  The second time you asked
16     me when I saw Carolyn Melvin.  The third time you
17     asked me who drove me.  The other question is when
18     was the time I saw Carolyn -- remember seeing
19     Carolyn Melvin.  I told you when she handcuffed me
20     and went to polygraph.  You didn't ask me who else
21     drove me to take a polygraph, but Ricky Best and
22     Carolyn Melvin took me to the polygraph.  When that
23     happened, I am unsure.
24          Q.    Thank you for clarifying.
25               MR. CONNOR:  Let him finish his

Page 59

```
1        questions before you say anything; okay?  I

2        want you to let him -- let the question come

3        out completely because the court reporter has

4        to take down everything and it's hard for her

5        to take down two people talking at the same

6        time.  Okay?

7                     THE WITNESS:  Okay.

8        Q.    Before anyone drove you to take the

9   polygraph, did you have a conversation about taking

10  the polygraph?

11       A.    Yes.

12       Q.    Who was that conversation with?

13       A.    Unsure.

14       Q.    Was it with Ricky Best or Carolyn

15  Melvin?

16       A.    I can't answer that question, I'm not

17  sure, sir.

18       Q.    When you were driving to take the

19  polygraph, did you drive in a police car?

20       A.    I didn't drive.

21       Q.    Who drove?

22       A.    Ricky Best.

23       Q.    Was Carolyn Melvin in the car?

24       A.    Yes.

25       Q.    Did you all talk on the drive over?
```

Page 60

1          A.    Not sure.

2          Q.    Do you remember where they picked you

3    up?

4          A.    No.

5          Q.    Do you remember where you went to

6    actually take the polygraph?

7          A.    Yes. `

8          Q.    Where was that?

9          A.    Somewhere on Arlington Boulevard.

10                     (Exhibit 182, Sharpe 004947 to

11         Sharpe 004948, marked for identification, as

12         of this date.)

13         Q.    Once you got to Arlington Boulevard, did

14    they just drop you off and you walked in a building

15    by yourself or did they come in with you?

16         A.    I'm not sure, sir.

17         Q.    Do you remember how many stories that

18    building is?

19         A.    No, sir.

20         Q.    Did you talk with anyone besides Carolyn

21    Melvin and Ricky Best when you got into the

22    building?

23              MR. ELLIS:  Objection to the form.

24         A.    I don't know, sir.

25         Q.    Did you talk to a polygraph examiner?

1      A.    Yes.

2      Q.    Do you remember the name of that

3  polygraph examiner?

4      A.    No, sir.

5      Q.    I'm going to hand you what I marked as

6  Exhibit 182.  I'm showing you what is Bates numbered

7  Sharpe 004947 to Sharpe 004948.  At the top it says

8  polygraph report, "NC State Bureau of Investigations

9  Polygraph Report."

10          Were you polygraphed?

11     A.    Yes.

12     Q.    Did they strap anything to your arm

13  before the polygraph?

14     A.    Don't remember, sir.

15     Q.    Were you and the polygraph examiner the

16  only two people in the room when you were given the

17  polygraph?

18     A.    I don't recall.

19     Q.    Do you remember how long the polygraph

20  took?

21     A.    No.

22     Q.    I'm going to ask you if you go all the

23  way down to remarks, so it says 5, 7 and 10.  I will

24  ask you about those three.  It says, "5, Did you see

25  Dante' shoot that man question answer?  YES."

1          Do you remember getting asked that

2    question and answering yes?

3          A.    No.

4          Q.    7 says, "Did you lie to me when you said

5    you saw Dante' shoot that man?"  Answer, "NO."

6          Do you remember answering "no" to that

7    question?

8          A.    No.

9          Q.    10 says, "Have you told me the complete

10   truth about seeing that man get shot?"  Answer,

11   "YES."

12         Do you remember answering yes to that

13   question?

14         A.    No.

15         Q.    What do you remember about the

16   polygraph?

17         A.    That when I got back in the car I asked

18   them, "Did I pass it?"  That's the only thing I

19   remember, they said, yes, I did a good job.

20         Q.    Did you see them talking to the

21   polygraph examiner?

22         A.    I don't know.

23         Q.    Was it both Ricky Best and Carolyn

24   Melvin together when you asked if you passed the

25   polygraph?

```
 1          A.    I asked if I passed, yes.

 2          Q.    So then do you remember Clarke Everett?

 3          A.    Yes.

 4          Q.    Do you remember the first time you

 5     talked to Clarke Everett?

 6          A.    Not the first time.

 7          Q.    When is the first time you remember

 8     meeting Clarke Everett?

 9          A.    In his office.

10          Q.    Was that before or after the beating?

11          A.    I don't know the time line, sir.

12          Q.    Was that before or after you went to

13     Wilmington?

14                MS. PFEIFFER:  Objection.  She said

15          she doesn't know the timing.

16          Q.    You can still answer.

17          A.    I don't remember the time line, sir.

18          Q.    Was anyone else present the first time

19     you talked to Clarke Everett in his office?

20          A.    His secretary I do believe.

21          Q.    Do you remember her name?

22          A.    No.

23          Q.    Anyone else besides the secretary?

24          A.    I'm not for sure, sir.

25          Q.    How often after you first talked to
```

1    Clarke Everett would go back to see Clarke Everett?

2         A.    All the time.

3         Q.    All the time?  What would you talk

4    about?

5         A.    Go to sleep, hang out there, eat.  It

6    was my little playground.

7         Q.    Was there a TV in there?

8         A.    I'm not for sure.

9         Q.    This is the DA's office.  That's

10   different than the Brown Building; right?

11        A.    Yes, sir.

12        Q.    Sorry, I'm not from Greenville so I've

13   got to -- how far is it from the Brown Building?

14        A.    It's a ways away, sir.

15        Q.    Besides Clarke, would you see anyone

16   else in the DA's office?

17        A.    His secretary, sir.

18        Q.    Do you remember a Myra Degrassi?

19        A.    No, sir.

20        Q.    Besides the secretary, would you ever

21   see anyone when you were there?

22        A.    I only recall seeing a secretary, sir.

23        Q.    Where would you sleep?

24        A.    On a bean bag.

25        Q.    What would you eat?

1      A.    Not for sure.

2      Q.    Now the first time you talked to Clarke

3   Everett, what did you talk about?  Do you remember?

4      A.    Not for sure when was the first time I

5   talked to him and not for sure what the

6   conversation we had.

7      Q.    Do you ever remember talking to Clarke

8   Everett about the beating?

9      A.    No, sir.

10      Q.    Do you remember talking to Clarke

11   Everett about the Radcliffe murder?

12      A.    Yes, sir.

13      Q.    Did you tell Clarke Everett you saw

14   Dontae shoot Mr. Radcliffe?

15      A.    I'm not sure, sir.

16      Q.    Did you tell Clarke Everett that you saw

17   Mark Joyner involved in the shooting of

18   Mr. Radcliffe?

19      A.    Not for sure, sir.

20      Q.    I just want to back up real fast.

21          Lisa Evans, would you ever see Lisa

22   Evans selling drugs?

23      A.    No, sir.

24      Q.    When you were in the DA's office all the

25   time, did Clarke ever tell you not to come?

1          A.     No.  Not that I remember.  Not -- no.

2          Q.     Would he talk to you about the cases

3     while you were there?

4          A.     No.  I was free to come and go as I

5     choose.

6          Q.     Did you ever talk to Clarke and Ricky

7     Best together?

8          A.     Not for sure, sir.

9          Q.     Did you ever talk to Clarke and Carolyn

10    Melvin together?

11         A.     Not for sure, sir.

12         Q.     Would you go -- in the DA's office would

13    you also go to the Brown Building?

14         A.     Yes.

15         Q.     How often would you go to the Brown

16    Building?

17         A.     Often.

18         Q.     Who would you talk to at the Brown

19    Building?

20         A.     Ricky.

21         Q.     What about anybody else?

22         A.     Who ever was in there I would say hello,

23    as a child, hello.

24         Q.     Did you ever talk to Carolyn Melvin when

25    you were in the Brown Building?

Page 67

```
 1          A.    I didn't talk to Ms. Melvin often.
 2          Q.    What about Connie Elks, did you talk to
 3     a female officer?
 4          A.    I talked to a lot of people.  I'm not
 5     for sure, sir.
 6          Q.    Did you talk to anyone besides Mr. Best
 7     frequently?
 8          A.    Not that I recall.
 9          Q.    Would you go to the DA's office more
10     than the Brown Building?
11          A.    Can't put a -- I can't tell you which
12     one I stayed at more.
13          Q.    Eventually you got $500 from crime
14     stoppers; is that correct?
15          A.    I assume so.
16          Q.    Do you remember getting money from
17     CrimeStoppers?
18          A.    Yes.
19          Q.    How much money did you get?
20          A.    Not for sure.
21          Q.    Did you talk to anyone from
22     CrimeStoppers?
23          A.    I'm not for sure, sir.
24          Q.    Do you remember getting the money?
25          A.    Yes.
```

1          Q.    Where did you get the money?

2          A.    When I went to Wilmington.

3          Q.    When you went to Wilmington?

4          A.    Yes.

5          Q.    When you were in the Brown Building,

6     would you ever eat like you did in the DA's office?

7          A.    No.

8          Q.    What would you eat in the Brown

9     Building?  Sorry if you answered this already.

10         A.    You just asked me that question, I said

11    no.

12         Q.    You don't remember -- excuse me, not the

13    Brown Building, what did you eat in the DA's office?

14         A.    I said I didn't know, sir.

15         Q.    Did you have free rein of the Brown

16    Building the same way you did the DA's office?

17         A.    Yes.

18              MR. CLEMENTS:  Why don't we take a

19         quick five-minute break.

20              THE VIDEOGRAPHER:  Off the record.

21         The time is 1:06 p.m.

22              (Recess taken.)

23              THE VIDEOGRAPHER:  Back on the

24         record.  The time is 1:12 p.m.

25    BY MR. CLEMENTS:

Page 69

1          Q.    So then the day before -- the day of

2     trial, is that when you first acted out?

3                     MS. PFEIFFER:  Object to that

4          question and ambiguity.  When are we talking

5          about?

6          A.    Yeah, you came out of nowhere with it.

7          Q.    Sure.  The day before trial, do you

8     remember having a conversation with Clarke Everett?

9                     MS. PFEIFFER:  Objection.  What

10         trial are we talking about?

11         Q.    The day of Dontae -- before Dontae's

12    murder trial, do you remember having a conversation

13    with Clarke Everett?

14         A.    No, sir.

15         Q.    Do you remember telling Clarke Everett

16    that you were concerned about getting beat up?

17         A.    No, sir.

18         Q.    Do you remember talking to Carolyn

19    Melvin about this?

20         A.    No, sir.

21         Q.    The day of Dontae's murder trial did you

22    show up to the courthouse?

23         A.    Eventually.

24         Q.    Did you know you were supposed to show

25    up to the courthouse?

J.A. 1810

Page 70

1          A.    Yes, sir.

2          Q.    How did you know that?

3          A.    I was told.

4          Q.    Told by who?

5          A.    Don't know, sir.

6          Q.    Did anyone eventually pick you up?

7          A.    Yes.

8          Q.    Before you said that was Carolyn Melvin;

9     correct?

10               MR. ELLIS:   Objection.

11         A.    Yes.

12               MR. CONNOR:   I will object.  She

13         didn't really say Carolyn Melvin, she said,

14         "When she arrested me, put me handcuffs."  I

15         think you're assuming a fact.

16         Q.    Did Carolyn Melvin come pick you up and

17     take you to the DA's office?

18         A.    That's not what you just asked.

19         Q.    I'm asking that question now.

20         A.    I'm confused.

21         Q.    The day of trial you didn't show up.

22         A.    I'm still confused.  You --

23         Q.    Sure.  So the day of trial you did

24     not -- you eventually got to the courthouse but you

25     did not initially go to the courthouse; correct?

Page 71

```
 1        A.    Correct.

 2        Q.    Why did you not go to the courthouse?

 3        A.    I didn't want to go.

 4        Q.    How did you eventually get to the

 5   courthouse?

 6        A.    I was picked up.

 7        Q.    Who picked you up?

 8        A.    Carolyn Melvin.

 9        Q.    Where did she pick you up?

10        A.    Piggly Wiggly I think.

11        Q.    How did she know you were at the Piggly

12   Wiggly?

13        A.    I called.

14        Q.    Who did you call?

15        A.    Not for sure.

16        Q.    What phone did you use?

17        A.    A friend's phone.

18        Q.    Would it be a cell phone or pager or

19   what kind of phone?

20        A.    Pager isn't a phone.

21        Q.    Pager --

22        A.    A pager isn't a phone.  So do it again.

23        Q.    Ma'am, what kind of phone did you use?

24        A.    I'm not for sure.

25        Q.    Did you make the call from the Piggly
```

```
 1    Wiggly?
 2         A.    I'm un for sure.
 3         Q.    When Carolyn Melvin went and picked you
 4    up at the Piggly Wiggly, did you all have a
 5    conversation?
 6         A.    Yes.
 7         Q.    What did you talk about?
 8         A.    I didn't want to be there.
 9         Q.    Did you say anything besides "I don't
10    want to be there"?
11         A.    Not that I remember.
12         Q.    Where did Carolyn Melvin take you?
13         A.    In the courthouse.
14         Q.    Did you talk to anyone at the
15    courthouse?
16         A.    On the way into the courthouse getting
17    ready to go into trial, yes.
18         Q.    Who did you talk to?
19         A.    Not for sure but I was told that I
20    had -- I had to continue on and I didn't want to be
21    there.
22         Q.    That was on the way to the courthouse?
23         A.    On the way to trial.
24         Q.    So it wasn't Ricky Best who told you
25    that?
```

```
                                           Page 73
 1               MS. PFEIFFER:  Objection.  Not what
 2        she testified to.
 3        Q.    Was it Ricky Best who told you that?
 4        A.    No.
 5        Q.    Was it Clarke Everett who told you that?
 6        A.    No.
 7        Q.    Did you eventually talk to Clarke
 8   Everett?
 9        A.    At the end.
10        Q.    The end of what?
11        A.    Talking about the trial.
12        Q.    You didn't talk to Clarke Everett until
13   the end of the trial?
14        A.    Not that day that we're speaking of.
15        Q.    Did you talk to Clarke Everett that day?
16        A.    Yes.
17        Q.    Where did you talk to Clarke Everett?
18        A.    In the courthouse.
19        Q.    Do you remember where in the courthouse?
20        A.    Upstairs in the courthouse.
21        Q.    What did you talk to Clarke Everett
22   about?
23        A.    We were done with trial.
24        Q.    The whole trial or just that day?
25        A.    That day, sir.  The trial ended that
```

Page 74

1    day, sir.

2         Q.    The trial was only one day?

3         A.    For me, sir.

4         Q.    Did you talk to Clarke Everett between

5    the time Carolyn Melvin picked you up and the time

6    you testified at trial?

7         A.    No, sir.

8         Q.    Did you talk to Ricky Best between the

9    time Carolyn Melvin picked you up and the time you

10   testified at trial?

11        A.    No, sir, that I recall.

12        Q.    And you don't remember talking to

13   anybody besides the person on the way into the door?

14        A.    That I can recall.

15        Q.    How long from the time you got to the

16   course house did you get up on the stand?

17        A.    Immediately.  I was late.

18        Q.    Do you remember how long you were on the

19   stand?

20        A.    No, sir.

21        Q.    Where did all those details come from on

22   the stand?

23        A.    They were given to me and written down.

24        Q.    There's more details on the stand than

25   in your written statement so where did those details

Page 75

1    come from?

2        A.    Those details were given to me.

3        Q.    When?

4        A.    Through conversations.

5        Q.    With?

6        A.    Ricky Best.

7        Q.    Did you have a conversation with Ricky

8    Best where he gave you details besides that initial

9    statement that you wrote down?

10       A.    We talked all the time, not sure what

11   particular day, when.

12       Q.    What would you talk about?

13       A.    Everything.

14       Q.    When you say everything, does that

15   include the beating?

16       A.    No, sir.

17       Q.    Does that include the murder?

18       A.    Yes.

19       Q.    Does that include your home life?

20       A.    Yes.

21       Q.    Does this include your relationship with

22   your family?

23       A.    Not for sure about that one.  Home life,

24   family, it could have ran together.

25       Q.    Did you ever go to a Christmas party at

1    the Brown Building?

2         A.    Not a party.  So no.

3         Q.    Did you ever go to a celebration or

4    anything at the Brown Building for Christmas?

5         A.    Yes.

6         Q.    Could you tell me about that?

7         A.    Just to pick up toys.

8         Q.    You went to the Brown Building to pick

9    up toys?

10        A.    Yes.

11        Q.    Who was at the Brown Building?

12        A.    Ricky Best and I'm not for sure who

13   else.

14        Q.    Were there other people at the Brown

15   Building?

16        A.    Yes, sir.

17        Q.    How many people?

18        A.    I'm not for sure.

19        Q.    Was anyone else with you when you went

20   to the Brown Building?

21        A.    Yes.

22        Q.    Who was with you?

23        A.    My little brother.

24        Q.    Which brother?

25        A.    My brother Melvin.

Page 77

1          Q.    Was your mother with you?

2          A.    No, sir.

3          Q.    I will show you what I will mark as

4     Exhibit 183.

5                      (Exhibit 183, Affidavit of Charlene

6          Johnson, marked for identification, as of this

7          date.)

8          Q.    This is -- do you recognize this

9     document?  What is this?

10         A.    No.

11         Q.    Did you make an affidavit after -- did

12    you ever make an affidavit related to the Dontae

13    Sharpe and George Radcliffe murder?

14         A.    I'm un for sure if I ever did this.

15         Q.    After the trial, how long before you

16    recanted your testimony to anybody?

17         A.    Not for sure how long.

18         Q.    Did you ever talk to a Kay Lambert,

19    Cherry Stokes' paralegal?

20         A.    Yes.  I think.

21         Q.    Did you talk to her at the Courtside

22    Cafe?

23         A.    Unsure.

24         Q.    Did your mother work at the Courtside

25    Cafe?

Page 78

1          A.    My mother did.

2          Q.    Did your mother work at the Courtside

3     Cafe after the trial?

4          A.    I'm not sure.

5          Q.    What about before the trial?

6          A.    Yes, sir.

7          Q.    So she worked at the Courtside Cafe

8     before the trial?

9          A.    Yes.

10          Q.    Did Kay Lambert give you any clothes?

11          A.    I don't know the person you're talking

12     about.  That doesn't mean she didn't.  Maybe if you

13     could show me a picture maybe.

14          Q.    Did Cherry Stokes' paralegal give you

15     any clothes?

16          A.    I don't know who she is.  Somebody gave

17     me clothes but I'm not sure who she is.

18          Q.    Did you eventually talk to Dontae's

19     family after the murder trial?

20          A.    When I recanted?  Yes.  If that's what

21     you're speaking of.

22          Q.    Did you recant to anyone before you

23     recanted to Dontae's family?

24          A.    Recanted to anybody -- I'm not sure,

25     sir.

1          Q.    How long after the murder trial did you

2     recant to Dontae's family?

3          A.    I was asked that question.  I'm not

4     sure, sir.

5          Q.    Which member of Dontae's family did you

6     first recant to?

7          A.    His aunt.

8          Q.    Which aunt?

9          A.    I don't know -- Sharon.

10         Q.    Is that Sharon Sharpe?

11         A.    Yes.

12         Q.    Where did that conversation take place?

13         A.    In her home.

14         Q.    In her home?

15         A.    Yes.

16         Q.    Do you know where that was?

17         A.    No.

18         Q.    Did you eventually go visit Dontae in

19    prison?

20         A.    I have.

21         Q.    Did you visit Dontae -- when did you

22    visit Dontae in prison for the first time?

23         A.    I'm not sure.

24         Q.    Was it prior to when you eventually

25    testified at a hearing related to the Dontae

1   Sharpe's murder conviction?

2         A.    Say it again, sir.

3         Q.    Did you eventually testify about your

4   recantation in court?

5         A.    Did I -- yes.

6         Q.    Did you see Dontae in prison before you

7   testified the first time in court about your

8   recantation?

9         A.    I'm not sure, sir.

10        Q.    Did you ever visit Mark Joyner in

11  prison?

12        A.    No.

13        Q.    Why not?

14        A.    I treated him as a whole.  It was a

15  whole.  They both were together.  There was no one

16  separately.  They were both -- one person to me.

17        Q.    They were both one person to you?

18        A.    Yes.

19        Q.    So if they're both one person why did

20  you only visit Dontae?

21        A.    Unsure, sir.

22        Q.    Did you ever talk to anyone from Mark

23  Joyner's family?

24        A.    No, sir.

25        Q.    Did you have a romantic relationship

**J.A. 1821**

Page 81

```
 1    with Mark Joyner?
 2         A.    Explain what you are asking, sir.
 3         Q.    Did you ever have a romantic
 4    relationship with Mark Joyner?
 5         A.    What does that mean, sir?
 6         Q.    Did you ever have sexual relations with
 7    Mark Joyner?
 8         A.    Yes, sir.
 9         Q.    Was that a romantic relationship --
10         A.    We just had sex, sir.
11         Q.    Was it more than once?
12         A.    We had sex, sir.
13         Q.    Was that before the trial, before he got
14    arrested for the trial I assume?
15         A.    Yes, sir.  Not before -- way -- yeah.
16         Q.    It was way before?
17         A.    Yeah.
18         Q.    Did you ever have sex with Dontae?
19         A.    No.
20         Q.    I wasn't there.  I'm just asking.
21               If you look at -- finally I get to it,
22    if you look at 183, do you remember going to
23    Dontae's attorney's office and making a statement?
24         A.    I did.
25         Q.    If you could turn to the second page of
```

1    that document.  Do you remember that statement being

2    recorded?

3        A.    No.

4        Q.    I'm going to ask you to go down about

5    seven lines where it says, "Question, (Tina) Okay,

6    tell me what you have in your hand.

7            "A" --

8                MR. ELLIS:  What page are you on --

9                MR. CONNOR:  It's the third page.

10       You directed her to the second page.

11       Q.    Oh, excuse me.  Can you go to the third

12   page?

13       A.    Now seven you said?

14       Q.    Yeah, go down to seven.

15       A.    Okay.

16       Q.    It says, "(Tina) Okay.  Tell me what you

17   have in your hand.

18           "A,"  answer, "(Charlene) It's a piece

19   of paper telling like what they used to do for me."

20           Who created that piece of paper?

21       A.    I don't recall the paper on which we're

22   even talking about.

23       Q.    Well, Ms. Lyda in this transcription is

24   asking about a piece of paper.  Do you remember

25   having a piece of paper in your hand when you talked

Page 83

```
 1    to Ms. Lyda in Steve Fisher's office?
 2          A.    No, sir.
 3          Q.    Did anyone come with you to Steve
 4    Fisher's office?
 5          A.    Yes.
 6          Q.    Who?
 7          A.    Ms. Sharon and I'm not for sure who
 8    else.
 9          Q.    Do you remember when this was?
10          A.    No, sir.
11          Q.    Had you talked to them about your
12    recantation before you went to Steve Fisher's
13    office?
14          A.    Sir?
15          Q.    Had you previously talked to them about
16    your recantation before you went to Steve Fisher's
17    office?
18          A.    I can't talk about something that didn't
19    happen until I went to Steve Fisher's office.
20          Q.    So you hadn't recanted until you went to
21    Steve Fisher's office?
22          A.    That was the first time.
23          Q.    That was the first time?
24          A.    Right.
25          Q.    But had you talked to Sharon Sharpe --
```

Page 84

1     who told you to go to Steve Fisher's office?

2          A.    Ms. Sharon.

3          Q.    Ms. Sharon.  Now did she tell you and

4     you went that same day?

5          A.    I went the same day.

6          Q.    Same day.  She went with you and you

7     don't remember the other lady who went?

8          A.    I don't remember -- I didn't say it was

9     a lady.

10          Q.    I'm asking if it was a lady now.

11          A.    I'm not for sure if it was a lady.

12          Q.    And you don't remember having a piece of

13     paper in your hand?

14                MS. PFEIFFER:  Asked and answered.

15          A.    No, sir.

16          Q.    Well, go back to that page 3 again, if

17     you don't mind, of 183.  It says -- go about halfway

18     down.

19                It says, "Question (Tina) Okay, tell me

20     what they used to do for you?

21                "Answer, Detective Best used to buy me

22     outfits, give me money, take me out to eat, take me

23     places and stuff like that.

24                "Question, Go ahead and tell me what

25     else he did.

Page 85

1              "A, that's it, he took me to Wilmington,

2     North Carolina."

3              Why did you bring up that he took you to

4     Wilmington, North Carolina?

5         A.   Because she asked me a question.

6         Q.   Did you think that was something he did

7     for you -- why do you think he brought you to

8     Wilmington, North Carolina?

9              MS. PFEIFFER:  Objection.  Asked

10          and answered.

11        Q.   I'm asking.

12        A.   Can you reanswer that question again.

13        Q.   Sure.  Do you know why he brought you to

14    Wilmington, North Carolina?

15        A.   Because I got beat up and he took me to

16    Wilmington.

17        Q.   I will give you, Charlene, what I will

18    mark as Exhibit 184.

19              (Exhibit 184, 0004145 to Sharpe

20          4004146, marked for identification, as of this

21          date.)

22              MR. CLEMENTS:  For the record, I

23          just gave her Sharpe 0004145 to Sharpe

24          4004146.

25        Q.   Could you go to the second page of this

1    document?  Do you see where it says, "Charlene

2    Johnson Frazier," and the signature?  Is that your

3    signature?

4         A.    Yes.

5         Q.    Do you see where it says, "18th day of

6    April 2014"?

7         A.    I do.

8         Q.    Do you remember signing this document?

9         A.    No, sir.

10        Q.    Do you remember who -- did you write

11   this document?

12        A.    Sir, no.

13        Q.    Could you go down to paragraph -- give

14   me one second -- could you go down to paragraph 7

15   please of that document.

16        A.    I don't have a 7.  I have an 8, 9 and 10

17   on the page you told me to turn to.

18        Q.    Could you turn back to the first page

19   and go to paragraph 7.  It says, "7, I got involved

20   in this case when, some time after Mr. Radcliffe's,

21   murder a police officer stopped me on the street for

22   running in front of his police car."

23              Is that true?

24        A.    Yes, I was running from a police car but

25   I don't know if this is when this happened.  If it

Page 87

1    all corresponds with each other.

2        Q.    It says, "When he was talking to me

3    about that, he asked me if I knew anything about the

4    murder."

5            Is that true?

6        A.    Not that I can recall.

7        Q.    It says, "I said yes even though it

8    wasn't true."

9            Is that true?

10       A.    I'm not sure, sir.

11       Q.    Is that not true or you just can't

12   remember?

13       A.    I can't remember.

14           MS. PFEIFFER:  Objection.  She

15       testified she doesn't even remember this

16       document.  You're asking her questions about

17       something --

18           MR. CLEMENTS:  And I'm going to ask

19       her about it.

20       A.    You asked me if I wrote it and how could

21   I write this?

22       Q.    Well, it has your signature on it;

23   correct?

24       A.    I signed it, but how can I write

25   something like this and then it become permanent

1    evidence when I'm not a lawyer?

2         Q.    So you signed this document?

3         A.    It looks like my signature.

4         Q.    You wouldn't have signed something if

5    you hadn't read it; would you?

6                   MS. PFEIFFER:  Objection.  Calls

7         for speculation.

8                   MR. CLEMENTS:  I'm asking her.

9                   MR. ELLIS:  Not really.

10        A.    There was stuff we sign and don't fully

11   read everything.  So there's a possibility I could

12   have signed this and not read it fully to its

13   entirety.  Or I probably -- doing what I'm asked to

14   do.  Who knows why I signed this piece of paper?

15        Q.    It was in 2014.

16        A.    Okay.  There's a lot of stuff that

17   happened in 2014, sir.

18        Q.    I will ask you about the document.

19   Let's go back to paragraph 7.  If you could turn to

20   the first page again.

21        A.    I didn't turn from it, it's right here.

22        Q.    Further down it says, the last sentence

23   of that page, paragraph 7 reads, "I made up what

24   might have happened and wrote it down.  None of it

25   was true."

Page 89

1              Is that correct?

2         A.    That is correct.

3         Q.    It doesn't say Ricky Best told you what

4    to write down; does it?

5         A.    It says his name up here.  But in every

6    one of my documents, Ricky Best is the head of

7    everything.  So, yes, he wrote it down, you can go

8    back and look at more evidence that says his name

9    on it.

10        Q.    I'm asking about this document.

11        A.    This document does not say so.

12        Q.    And then if you turn to the next page.

13   First sentence line reads, "I don't remember how

14   Dontae's name came up and why I put his name in the

15   statement I wrote, but I know I did not see him

16   shoot anyone."

17              Is that accurate?

18              MS. PFEIFFER:  Objection to what

19        you're asking.

20              MR. CONNOR:  Objection.  Compound.

21        There's two statements in there and I don't

22        know -- it can't be answered that way.

23              MR. CLEMENTS:  Sure.  I will ask

24        one at a time.

25        Q.    "I don't remember how Dontae's name came

Page 90

1    up."

2              Is that correct?

3         A.    That isn't correct, I do remember how

4    his name came up.

5         Q.    How did his name come up?

6         A.    Through conversations with Ricky Best.

7         Q.    But you told me earlier that Ricky Best

8    gave you a piece of paper and told you to write

9    stuff down and didn't tell you what to write down

10   and then you wrote stuff down; right?

11        A.    That's not what I said, sir.  What I

12   said, sir, I wrote down and he keep standing there

13   coming back he told me stuff and I finished the

14   rest of it.  If you look at the document which I

15   wrote, there's two parts to that document.  So one

16   part that I wrote myself and another part that why

17   it wasn't enough so I was asked to write.  So find

18   that document and look at that document, sir.

19                   MR. CLEMENTS:  I will mark this.

20                   (Exhibit 185, handwritten document,

21        marked for identification, as of this date.)

22        Q.    I will show you what I marked as Exhibit

23   185.  It is the page 20 of 185.

24                   MS. PFEIFFER:  For the record, this

25        has been previously marked in other

1          depositions.  Are we marking it now as another

2          exhibit?

3                    MR. CLEMENTS:  Yes, because I don't

4          think the back side has been marked.

5          Q.    Could you turn to page 20 of that, the

6     page with the handwriting on it?

7          A.    I mean, can I look at the whole document

8     and what you've given me.

9          Q.    Of course.  Take your time.

10         A.    Okay.

11         Q.    This is your handwritten statement;

12    right?

13         A.    I guess so.

14         Q.    There's the first part of the document

15    and second part of the document; correct?

16         A.    Yes.

17         Q.    The first part of the document, Dontae's

18    name is in the first part of that document; correct?

19         A.    Yes.

20         Q.    Thank you.  Now I will go ahead and show

21    you what I will mark as Exhibit 186.

22                    (Exhibit 186, MAR testimony, Sharpe

23         005533 through Sharpe 005580, marked for

24         identification, as of this date.)

25         A.    So we're finished with this?

Page 92

1          Q.    Yes, done with those.

2                This is, for the record, Charlene

3    Johnson's testimony from the 1997 MAR.  It has

4    previously been marked in its entirety.  I will

5    remark it as Exhibit 186.

6                Now, Charlene, do you remember

7    testifying -- do you need to take a break?

8          A.    Hmm?

9          Q.    Do you want to take a break?

10         A.    I didn't do anything.

11         Q.    You were just rubbing your head.  If you

12   ever need to take a break, just let me know.

13                   MR. CONNOR:  For the record, she's

14         been up since 4 o'clock to go to work and then

15         she went to class.  Now she's here so it's

16         getting late for her.  I just meant you may

17         see her show signs of being tired.

18         Q.    I understand.  If you ever need to take

19   a break, let me know.

20                After you talked to Steve Fisher did you

21   talk to any other of Dontae's attorneys?

22         A.    I'm not sure, sir.

23         Q.    After the trial did you ever talk to

24   Clarke Everett again?

25         A.    I don't think so.

1          Q.     Did you talk to his secretary ever?

2          A.     I don't think so.

3          Q.     Did you go to the DA's office?

4          A.     No, sir.  I don't think so.

5          Q.     Did anyone tell you not to go to the

6     DA's office?

7          A.     No.  Not that I can recall.

8          Q.     Did you go to the Brown Building?

9          A.     Yes.

10          Q.     When did you go to the Brown Building?

11          A.     I'm not for sure.

12          Q.     Would you go regularly like you would

13     before the trial?

14          A.     No.

15          Q.     Did anyone tell you not to go to the

16     Brown Building?

17          A.     I was told I couldn't go up there as

18     much.

19          Q.     Who said that?

20          A.     Ricky Best.

21          Q.     Could you turn to page 15 in the top

22     right corner, that's Sharpe 000460.  This is, for

23     the record, your testimony to Dontae's attorney

24     Mr. McNamara.

25                It says, question, "Did you ever protest

Page 94

1    to him or did you ever tell him this is not true?"

2                Answer, "No, sir."

3                Is that true?

4         A.    I don't know what you're talking about,

5    sir, and who you are talking about that I told.

6         Q.    Let's go back a couple pages then.  Did

7    you ever tell Mr. Best that this was not true?

8         A.    No.

9         Q.    You never told Best the statement that

10   you made was not true?

11        A.    No, because he knew it was not true

12   first.

13        Q.    How did he know it wasn't true?

14        A.    Because he helped me so I could write it

15   down, sir.  I told you he stood when I wrote --

16   when we just got finished looking at -- look at

17   second part where we talk about that I was in the

18   room, he was standing out there and he would come

19   and check on me and tell me things and I would

20   write the rest of the stuff down.

21        Q.    The first part says -- if you pick up

22   185 again which you were just looking at, it says,

23   "And you said he didn't help you write this part, it

24   says, 'I was walking down on my way to Lucky Spot, I

25   stopped at the stop sign and I saw Dontae and a

Page 95

1    white man and Mark Joyner.  Dontae was about to sell

2    the white male a rock and he only had $18.'"

3              And then further down it says, "The

4    white man said, 'Fuck you, man,' Dontae pushed him

5    and then he pulled out a gun and shot him."

6              You testified earlier Ricky Best didn't

7    help you write that part?

8                   MS. PFEIFFER:  Objection --

9        A.    Sir, that is not what I said.  We said

10   this twice already.  I said it wasn't enough, I

11   didn't write enough, so he gave me things and I

12   went back and to write this.  I'm not for sure what

13   you're asking or what you're saying.

14       Q.    Ma'am, you told me before the first

15   part, he didn't help you write it.

16                   MS. PFEIFFER:  Objection.  That's

17        not what she testified to.

18                   MR. ELLIS:  Yes, it is.

19                   MR. CONNOR:  Objection.  You're

20        getting close to being argumentative to her.

21                   MR. CLEMENTS:  Okay.  Feel free to

22        object.

23       Q.    Could you turn to -- we're at Exhibit

24   186, please turn to page 21.  This is 1997.  That

25   front part reads, answer, "It was a fib and that's

Page 96

```
1    all I remember."
2              Is that true?
3         A.    What?
4         Q.    It says -- you testified in 1997, "It
5    was a fib and that's all I remember."
6              Was that true in 1997?
7         A.    I'm not sure -- 2023 so how can I
8    remember 1997?
9         Q.    Was your memory better in 1997 about
10   these events than it is in 2023?
11        A.    I have some recollection of what
12   occurred.  It's not something that I keep in the
13   forefront of my mind every single day.  After
14   Mr. Sharpe returned home I no longer had -- concern
15   but not as concerned as I was for his freedom
16   because he's free now.
17             So these things that you're asking me,
18   they're already in paper.  These are things I've
19   already said and you're asking me about things that
20   are already here.  So I'm unclear really,
21   technically, the whole premise of this situation
22   when we know it had to be something going on for
23   Mr. Sharpe to be free.  That means somebody dropped
24   the ball somewhere.
25             And it's getting a little frustrating,
```

1    and I'm trying to be as cordial as I can and

2    respectful, but it's get a little frustrating

3    because I'm trying to answer these questions but

4    you keep going back to the same question over and

5    over again and I answer it.  So can we just answer

6    the question that you want me to answer and just

7    answer it in a way so I can answer that I don't

8    feel like I got to keep saying I don't know.

9         Q.    Sure.  Well, Charlene, I'm going to ask

10   you some questions about what you remember now but

11   I'm asking you now:  Was your memory better and your

12   answers more accurate when you testified in 1997?

13        A.    1997, would you have remembered

14   everything today that you did in 1997, sir?

15        Q.    What I'm asking you is was your memory

16   better about these events in 1997 than it is today?

17        A.    Yes.  Because -- it's 20 years ago.

18        Q.    That's what I'm asking.

19              Did Ricky Best ever tell you why he was

20   taking you to get a polygraph test?

21                  MS. PFEIFFER:  Objection.  Asked

22        and answered.

23        A.    It's a polygraph test.  I guess to see

24   if I was telling the truth, sir.

25        Q.    But I'm asking if he told you.

Page 98

1          A.    Told me what, sir?

2          Q.    Did you have a conversation with him

3     about why you were taking a polygraph test?

4          A.    To see if I was telling the truth, sir.

5          Q.    And you had a conversation with him

6     about that affirmatively?

7          A.    I'm not sure, sir, but I'm pretty sure

8     that's why people get polygraphs so I'm not sure.

9          Q.    Did you have a conversation with

10    Caroline Melvin about why you were taking the

11    polygraph test?

12         A.    Not sure, sir.

13         Q.    Did you have a conversation with Clarke

14    Everett about why you were taking a polygraph test?

15         A.    I am not sure, sir.

16         Q.    If Ricky Best knew it was a lie, why

17    would he take you to get a polygraph test?

18              MS. PFEIFFER:  Objection.  Calls

19         for speculation.

20         A.    Can I please answer this?  People do

21    things for reasons unknown.  Okay?  Just like you

22    do things for reasons unknown.  Okay?  I was a

23    child that could be easily manipulated to do as

24    anybody asked me to do.  Okay?  They couldn't get

25    this young man for drugs so they got him for

1    murder.  They'd been after this man for a very long

2    time and I was an easy target.  Okay?

3         Who participated more?  It tells you in

4    this statement, in every statement when I recanted

5    whose name is up more?  Ricky Best.  Carolyn

6    Melvin, you can't even see her name often in it.  I

7    had been abused by these people.  I have been a

8    victim of these people.  And they are trying to sit

9    here and justify what they did wrong and put a man

10    in prison for something he didn't do and use me to

11    do so.

12         And I live my life everyday trying to be

13    better than what I was then so I don't have to deal

14    with this anymore.  But here I sit again in front

15    of you telling you the same thing that I told many

16    others that will listen, if they would have

17    listened to me then that man that pushed me into

18    that trial, I wouldn't have been there then and I

19    wouldn't be here now and Dontae would have been

20    free.

21         Q.    Okay.

22         A.    So any other questions that you need to

23    ask me ask me so -- because you already have the

24    answers to it.  You are fighting for somebody that

25    has already done this for somebody else.

1      Q.    Did you ever tell Clarke Everett that

2    you lied?

3      A.    Sir, I answered that question before.

4      Q.    Did you ever Carolyn Melvin that you

5    lied?

6      A.    Yes.

7      Q.    Yes.  Was it before the trial?

8      A.    Sir, she picked me up, sir.  She

9    handcuffed me.  I did not want to be there.  So if

10   a person that gets -- supposed to listen to me, if

11   a person gets handcuffed and threatened to be

12   somewhere that they don't want to be, that means

13   something's wrong.  That means they don't want to

14   be there not because they're telling the truth,

15   that's because they know they're telling a lie.

16   And I acted out that way because I needed somebody

17   to help me but they were not helping me.  I had no

18   one to help me.

19      Q.    Did you say to her "I'm going to lie on

20   the stand"?

21      A.    Did I say -- did I say that?  No, sir.

22   You're telling me what I said.  I said I -- that's

23   a lie.

24      Q.    I'm asking you.

25      A.    That it is a lie.  It's been a lie.

Page 101

1          Q.    Did you tell Carolyn Melvin that?

2          A.    Sir, I just answered that same exact

3     question that you just asked me.

4          Q.    But did you use those words?

5          A.    Not the words that you just used.

6          Q.    What words did you use?

7          A.    It's a lie.  That's what I said.  It's a

8     lie.

9          Q.    Candice Johnson.

10         A.    Oh, my goodness.

11         Q.    Did you know Candice Johnson?

12                   MR. CONNOR:  Let's take a break.

13         Let her calm down for a minute.

14                   THE VIDEOGRAPHER:  Off the record.

15         The time is 1:50 p.m.

16              (Recess taken.)

17                   THE VIDEOGRAPHER:  Back on the

18         record.  The time is 2:04 p.m.

19     BY MR. CLEMENTS:

20         Q.    Charlene, I want to back up for a

21     second.  Did you know a Candice Johnson?

22         A.    Uh-uh.  Know her, no.

23         Q.    Did you know of her?

24         A.    Yes.

25         Q.    What did you know of her?

1          A.    Nothing.  I mean, I don't know how to

2     explain that.  I don't know how to answer that

3     question.

4          Q.    Would you ever see her?

5          A.    Yes.

6          Q.    Where would you see her?

7          A.    I used to go to her house sometimes.

8          Q.    Were you friends with her?

9          A.    Not really.

10         Q.    What would you do at her house?

11         A.    Just hang out.

12         Q.    Would she sell drugs?

13         A.    Not that I know of, sir.

14         Q.    Now after 1997, did you talk to any of

15    Dontae's attorneys after 1997?

16         A.    Yes.

17         Q.    Do you remember which ones?

18         A.    No.

19         Q.    Did you talk to anyone from the Duke

20    Wrongful Convictions Clinic?

21         A.    Yes, sir.

22         Q.    Do you remember their names?

23         A.    No.

24         Q.    Do you remember Caitlin Swain?

25         A.    No.

```
 1          Q.    What about Theresa Newman?

 2          A.    Yes.

 3          Q.    Where did you talk to Theresa Newman at?

 4          A.    In this office.

 5          Q.    In this office?

 6          A.    Um-hmm.

 7          Q.    Did Theresa Newman ask you to sign that

 8    affidavit -- did Theresa Newman ask you to sign

 9    anything?

10          A.    Not for sure.

11          Q.    Did Theresa Newman ask you to do

12    anything?

13          A.    Do what, sir?

14          Q.    Anything.  Did she ask you to talk to

15    anyone?  Anything?

16          A.    No.

17          Q.    Was that conversation recorded with

18    Theresa Newman?

19          A.    I'm not sure.

20          Q.    Was anyone else present for that

21    conversation?

22          A.    Yes.

23          Q.    Who?

24          A.    (Indicating).

25                THE REPORTER:  I didn't hear.
```

```
                                                    Page 104

 1                    MR. CONNER:  She pointed to me.

 2                    THE WITNESS:  Mr. Buddy.  Sorry,

 3          ma'am.

 4          Q.    What do you remember about that

 5     conversation?

 6          A.    I don't.

 7          Q.    You don't remember anything?  Did you

 8     end up talking about -- to the TV show "Final

 9     Appeal"?

10          A.    Yes.

11          Q.    How did you first hear about that TV

12     show?

13                    MR. CONNOR:  I will object to that

14          if your answer leads to anything I've said to

15          you.

16          Q.    I don't want to hear about anything you

17     talked about with your attorney, I just want to hear

18     about -- so don't tell me anything about that.

19                 How did you first come to hear about the

20     TV show?

21          A.    I can't answer that question, sir.

22          Q.    Did you talk to any producers before you

23     were actually filmed for the TV show?

24          A.    No.

25          Q.    Did you talk to Theresa Newman about the
```

Page 105

1      TV show before you were filmed for the TV show?

2                      MS. PFEIFFER:  Objection.  Assumes

3          a fact not in evidence.

4          A.    Not for sure.

5          Q.    You were eventually filmed for the TV

6      show; right?

7          A.    Yes.

8          Q.    I'm going to show you a clip from that.

9          A.    I mean, I've seen it so what's the

10     point?  I was up there.

11         Q.    I know but I'm going to ask you --

12         A.    You want to see it?

13         Q.    I'm going to play a clip for you and I'm

14     going to ask you a question about it.

15                      MR. ELLIS:  Why don't you give the

16         hour and minute it is on the clip.

17                      MR. CLEMENTS:  Can I move this box?

18                      THE VIDEOGRAPHER:  Sure.

19         Q.    Can you see it now, ma'am?

20         A.    I can see, sir.

21                      MS. PFEIFFER:  Are you going to

22         mark this as exhibit?

23                      MR. CLEMENTS:  Let's go ahead and

24         mark the "Final Appeal," the entire film as

25         Exhibit 187.

Page 106

1                    (Exhibit 187, video, marked for

2          identification, as of this date.)

3          Q.    I will show you the clip starting at --

4    it says 1 hour 14 minutes and 34 seconds.

5                         MR. CONNOR:  Can you do me a favor

6          and show it to the camera first so they can

7          see it?

8               (Videographer complying.)

9                         MR. CONNOR:  Now tell me what hour

10         that was.

11                        MR. CLEMENTS:  1 hour 14 minutes

12         and 34 seconds.

13         Q.    Can you still see?

14         A.    Yes, sir.

15                        MR. CLEMENTS:  Off the record for

16         one second.

17                        THE VIDEOGRAPHER:  Off the record.

18         The time is 2:11 p.m.

19                   (Discussion off the record.)

20                        THE VIDEOGRAPHER:  Back on the

21         record.  The time is 2:13 p.m.

22         Q.    I will play a clip from Exhibit 187.

23              (Video plays.)

24         Q.    Charlene, did you hear yourself on the

25    tape say, when you were asked, "Did you ever tell

Page 107

```
1    them 'I wasn't even there,'" say no, you didn't say
2    that?
3         A.    I heard what -- you just asked me the
4    question did I hear what I just said up there?
5    Yes.
6         Q.    Is that true?
7         A.    What's true?
8         Q.    That you never told them you weren't
9    there?
10         A.    Not until I recanted.
11         Q.    Not until you recanted.  By them you
12    even Officer Best and Officer Melvin?
13         A.    No.  I said recant.
14         Q.    Say that -- I think maybe you
15    misunderstood me.
16               You never told anyone you weren't
17    actually there until you recanted?
18         A.    Yes.  That I recall.
19         Q.    Thank you.
20               When did they talk to you?  Do you
21    remember what year they talked to you about the
22    "Final Appeal" documentary?
23         A.    No.
24         Q.    Do you remember talking to Officers Huff
25    and Baxter?
```

Page 108

```
 1          A.    No.
 2          Q.    Do you remember talking from the time
 3    you testified in 1997 until the "Final Appeal"
 4    documentary ever talking to any officers?
 5          A.    Not for sure.
 6          Q.    Did you eventually testify in 2019
 7    before Dontae got out of prison?
 8          A.    Say it again, sir.
 9          Q.    Did you eventually testify in 2019?
10          A.    Yes.
11          Q.    Did you eventually testify in a hearing
12    when Dontae -- and Dontae was eventually released
13    from prison?
14          A.    Yes.
15          Q.    Who did you talk to before you
16    testified?
17          A.    I don't recall.
18          Q.    Did you talk to Ms. Newman before you
19    testified?
20          A.    I don't recall.
21          Q.    Did you talk to Ms. Sarah Sharpe before
22    you testified?
23          A.    No.
24          Q.    Did you talk to Sharon Sharpe before you
25    testified?
```

Page 109

1          A.    Ms. Sharp is not living so no.

2          Q.    Was she deceased at the time, do you

3      know?

4          A.    Yes.

5          Q.    Did you tell anyone you didn't want to

6      testify until the day of the trial?

7          A.    Not that I can recall.

8          Q.    How frequently do you speak with

9      Ms. Sarah Staton or Sharon Blakely?

10         A.    I don't know this person you're speaking

11     of.

12         Q.    Dontae's mom, how often do you speak

13     with Dontae's mom?

14         A.    None.

15         Q.    Had you spoken with her before your 1997

16     MAR testimony?

17         A.    Not for sure.

18         Q.    Had you spoken to her after your 1997

19     MAR testimony?

20         A.    I don't recall.

21         Q.    Did you speak with any of Dontae's

22     family after the 1997 MAR testimony?

23         A.    I don't recall.

24         Q.    So you would speak to Clarke Everett all

25     the time?  You would go see him often?

Page 110

1          A.    I would go to the DA's office often.

2          Q.    Did Clarke Everett ever stress to you

3     the importance of telling the truth?

4          A.    Not that I can recall.

5          Q.    What about his secretary?

6          A.    Not that I can recall.

7          Q.    What are roots?

8          A.    I don't know of what you're speaking.

9          Q.    Did anyone put roots on you in relation

10    to this case?

11         A.    I think so.

12         Q.    Who was that?

13         A.    Not for sure, sir.

14         Q.    Was it a woman?

15         A.    I'm not for sure what you're asking.

16         Q.    What are roots?  I don't know.  What are

17    roots, your understanding of roots?

18         A.    You have a computer that may explain it

19    a little bit better.  I don't know how to explain

20    it to you for you to have an understanding so you

21    would have to look more in deep into that.

22         Q.    You said you believe someone put roots

23    on you related to this case; correct?

24         A.    Not related to the case but I think

25    somebody put roots on me, yes.

Page 111

1          Q.    Why do you think that?

2          A.    Because I kept going around in circles.

3                MS. PFEIFFER:  I will object.  The

4          record is not clear on what we're even talking

5          about here.  You're asking her about roots,

6          she's not even explained to you what they are.

7                MR. CLEMENTS:  That's why --

8          Q.    You kept going around in circles you

9    say.  What does that mean?

10         A.    I could never get out of the -- I don't

11   know how to explain it to you.

12         Q.    What does roots have to do with not

13   being able to get out of circles?

14         A.    Sir, the easiest way for me to explain

15   that to you is for you to Google like you just

16   found -- search it up and then we can all

17   understand and give everybody an understanding of

18   it.

19         Q.    Okay.  You can't tell me though?

20         A.    Because I don't know how to explain it

21   to you in terms for you to understand.  So it's

22   best for you to look at -- Google it so you have an

23   understanding of it because roots are a lot deeper

24   than just me saying something, it has different

25   meanings to different people.  So I can't give you

Page 112

1    the answer that you are wanting -- you want me to

2    give you something I can't technically give you.

3         Q.    Yeah, I just want your understanding,

4    your definition.

5         A.    I can't give you a definition because it

6    has multiple meanings, sir.

7         Q.    Have you seen Dontae since he got out of

8    prison?

9         A.    No.

10        Q.    Have you seen Candice Johnson since

11   Dontae got out of prison?

12        A.    No.

13        Q.    Give me one second.  I might be done,

14   Ms. Johnson.

15             I think we're up to 188.

16                  (Exhibit 188, transcript of

17        recorded interview, Sharpe 004014 to Sharpe

18        004054, marked for identification, as of this

19        date.)

20        Q.    For the record, I'm handing you an

21   interview, transcript of a recorded interview

22   between yourself, Detective Baxter and Detective

23   Gorocca.  It's Sharpe 004014 to Sharpe 004054.

24             Do you remember having a conversation

25   with officers on the porch of your home?

Page 113

1          A.    Yeah.  I didn't want to be bothered.

2    They came to my house unexpectedly, tried to force

3    me to have a conversation that I didn't want to

4    have but, yes, I had a conversation.

5          Q.    Were you honest in that conversation?

6          A.    I've been honest in every conversation

7    I've had since I recanted my statement, sir.

8          Q.    Could you go ahead and turn to page 18

9    of that statement.

10               MR. CONNOR:  When you say 18 you

11         mean 04 --

12               MR. CLEMENTS:  No, in the top

13         right-hand corner --

14         A.    I don't have an 18.

15         Q.    You were truthful when you talked to

16    those officers?

17         A.    Yes.

18         Q.    I want to go back, and I'm almost done,

19    ma'am.

20               When police originally took you to the

21    hospital, I just want to confirm again, do you

22    remember anything that police talked to you about at

23    the hospital?

24               MS. PFEIFFER:  Asked and answered.

25         A.    Which time at the hospital, sir?

Page 114

1          Q.    When you drew the picture.

2          A.    When I assumedly drew a picture.

3                    MS. PFEIFFER:  Objection.  She

4          testified she didn't remember that.  Asked and

5          answered.

6                    MR. CLEMENTS:  I believe she did,

7          but go ahead.

8          A.    I don't know what you are asking.

9          Q.    Do you remember drawing a picture at the

10   hospital?

11         A.    That's not what you asked me.

12         Q.    I'm asking now.  Do you remember the

13   time you went to the hospital and drew the picture?

14   So we're talking about the same thing.

15         A.    We are.  So yes.

16         Q.    You remember an officer asking you about

17   the picture you drew?

18         A.    No.

19         Q.    You don't remember an officer asking

20   about the picture you drew?

21         A.    No.

22         Q.    Do you remember an officer saying

23   anything to you?

24         A.    Not for sure, sir.

25         Q.    Do you remember specifically anything an

Page 115

1    officer said to you?

2         A.    No, sir.

3         Q.    Those are all my questions.  Thank you,

4    Charlene.

5    EXAMINATION BY

6    MR. ELLIS:

7         Q.    Ms. Johnson, my is Nick Ellis.  I

8    represent Carolyn Melvin.  That's the only person I

9    represent today.

10        A.    Yes, sir.

11        Q.    The statement, the handwritten statement

12   from you, Exhibit 185, is dated April 7, 1994.

13        A.    I'm sorry, which statement?  I had put

14   it down.

15        Q.    Sure, that's fine.  Exhibit 185.

16        A.    Which one's that one?

17        Q.    It's the handwritten statement.

18        A.    Yes, sir.  I'm there.

19        Q.    That was written in it your handwriting;

20   correct?

21        A.    I assume it is, sir, yes.

22        Q.    It's dated April 7, 1994.  The first

23   half is timed 1:30 p.m. and the next one is

24   p.m.?

25        A.    Yes, sir.

1      Q.    From what I understand -- yes, ma'am, go

2    ahead.

3      A.    The dates are different though.

4      Q.    I think they're both April 7, 1994.

5      A.    Oh, I see it now.  Yes.

6      Q.    Had you talked to Carolyn Melvin at any

7    time prior to that date?

8      A.    Prior to this date?

9      Q.    Yes, ma'am.

10     A.    No, sir.

11     Q.    When Detective Melvin and Detective best

12   were bringing you to the police station where you

13   made this statement, did Detective Melvin tell you

14   in any way about what you were to write down if you

15   were to give a statement?

16              MS. PFEIFFER:  Objection to the

17         characterization of her making that statement.

18         You can answer.

19     A.    Do you remember I said when he asked

20   that I didn't know if she brought me there?  I

21   don't know how I got there so I can't --

22     Q.    I understand.  So when you wrote the

23   statement, that was written on a piece of paper that

24   Detective Best had given you; correct?

25              MR. CLEMENTS:  Objection.

1          A.    Yes.

2          Q.    You were in one of the interview rooms

3    in the police department when you were given the

4    paper?

5               MR. CLEMENTS:   Objection.

6          A.    Yes, sir.

7          Q.    When you wrote the statement, was

8    anybody else in the room with you?

9          A.    There was nobody in the room with me.

10         Q.    Prior to writing the statement, did

11   Detective Melvin instruct you in any way what you

12   were to write down?

13         A.    I didn't see Ms. Melvin.

14         Q.    Prior to testifying at Mr. Sharpe's

15   trial in July of 1995, did Detective Melvin instruct

16   you in any way how you were to testify?

17         A.    No, sir.

18         Q.    You said Detective Melvin came out that

19   day, the day of the trial when you testified, and

20   put handcuffs on you and brought you to the

21   courthouse; correct?

22         A.    Yes, sir.

23         Q.    That was pursuant to a warrant that the

24   judge had issued?

25         A.    Yes, sir.

1      Q.    So did you understand that Detective

2    Melvin was just doing what she had been instructed

3    to do?

4                   MS. PFEIFFER:  Objection.

5      A.    I'm not for sure what she was told to

6    do.

7      Q.    During the time that she and -- was she

8    the one driving the car that brought you back to the

9    courthouse?

10      A.    Yes, sir.

11      Q.    During that transportation time from the

12    Piggly Wiggly to the courthouse, did Detective

13    Melvin tell you at all how you were to testify?

14      A.    No, sir.

15      Q.    Did she give you any papers to look at

16    to ask you to testify the same way what the papers

17    said?

18      A.    I had handcuffs on, sir.

19      Q.    Did you tell Detective Melvin as she was

20    bringing you to the courthouse the day you testified

21    that the handwritten statement you had made back in

22    April of 1994 was false?

23      A.    No.  But I told her I didn't want to be

24    there.

25      Q.    Did you tell her anything more than that

Page 119

```
 1    you didn't want to be there?
 2         A.    Not that I can recall.
 3         Q.    Thank you, ma'am.  That's all the
 4    questions I have.
 5                   MS. PFEIFFER:  Charlene, I don't
 6         have any questions for you.
 7                   MR. CLEMENTS:  I have a few more
 8         quickly.
 9    FURTHER EXAMINATION
10    BY MR. CLEMENTS:
11         Q.    Had you talked to --
12         A.    You don't have your mic on.  You need to
13    put your mic on.
14         Q.    Thank you, ma'am.
15                Prior to the day you wrote that
16    statement, had you talked to Officer Best when?
17                   MR. CONNOR:  When you say "that,"
18         clarify that.  What exhibit?  Make sure she's
19         on the same page that you're on.
20         Q.    Exhibit 185.  Prior to the day you wrote
21    that statement, had you ever talked to Detective
22    Best?
23         A.    Prior meaning before?
24         Q.    Um-hmm.
25         A.    Have I ever talked to Ricky Best?
```

**J.A. 1860**

Page 120

1          Q.    Before that.

2          A.    I don't recall, sir.

3          Q.    If Detective Melvin says she was in the

4     room when you wrote that statement, do you have any

5     reason to not believe her?

6               MS. PFEIFFER:  Objection.

7               MR. ELLIS:  Objection.

8          A.    Excuse me?

9          Q.    If Detective Melvin says she was in the

10    room when you wrote that statement, do you have any

11    reason to dispute that?

12               MR. ELLIS:  Objection.

13         A.    Yes, because she wasn't in there.

14         Q.    I believe earlier you testified prior to

15    the date you wrote your statement, Exhibit 185, you

16    had been to the Brown Building before; correct?

17         A.    No.

18         Q.    Had you ever been to the Brown Building

19    before that day you wrote the statement on Exhibit

20    185?

21         A.    No, sir.

22         Q.    Thank you, ma'am, those are all my

23    questions.

24               MS. PFEIFFER:  If we could take a

25          five-minute break just for me to review a

Page 121

1          couple things and we'll come back to make sure

2          I don't have any questions based on this.

3                    THE VIDEOGRAPHER:  We're off the

4          record.  The time is 2:34 p.m.

5               (Recess taken.)

6                    THE VIDEOGRAPHER:  We're back on

7          the record.  The time is 2:48 p.m.

8     EXAMINATION BY

9     MS. PFEIFFER:

10         Q.    Charlotte, my name is Sonya Pfeiffer.  I

11    represent Dontae Sharpe.  I appreciate your

12    patience.  I have just a couple of questions by way

13    of follow up.

14              You were asked some questions about the

15    day that Carolyn Melvin arrested you and took you to

16    the courthouse to testify.  Do you remember being

17    asked questions about that day?

18         A.    Yes, ma'am.

19         Q.    In reviewing my notes you said you

20    didn't want to go testify.  Why did you not want to

21    go testify?

22         A.    Because it was all a lie.

23         Q.    When Carolyn arrested you, did you tell

24    her that the story was a lie?

25         A.    Yes, ma'am.

Page 122

1          Q.    What did she tell you when you told her

2     the story was a lie?

3                    MR. ELLIS:  Objection.

4          A.    I'm not for sure.

5          Q.    Did she continue to take you to the

6     courthouse after you told her that the story was a

7     lie?

8          A.    Yes, ma'am.

9          Q.    Did she know that you were going to

10    testify when you got to the courthouse after you

11    told her that the story was a lie?

12                    MR. CLEMENTS:  Objection.

13                    MR. ELLIS:  Objection.

14         A.    Yes, ma'am.

15         Q.    Did she at any point take the handcuffs

16    off of you while you were in the car with her on the

17    way to the courthouse?

18         A.    No, ma'am.

19         Q.    At what point did she finally take the

20    handcuffs off of you?

21         A.    When we got out of the car --

22         Q.    After you got --

23         A.    I apologize.  I'm not for sure because

24    she put a coat over me (indicating) so I'm not for

25    sure if it's when we got in the courthouse, it

Page 123

1    wasn't that moment when we got out of the car.

2         Q.    When you say she put a coat over you,

3    you did something with your hands --

4         A.    I had handcuffs on so she put the coat

5    over me.

6         Q.    When she put the coat over you and the

7    handcuffs, why did you understand she was doing

8    that?

9              MR. ELLIS:  Objection.  Calls for

10        speculation.

11        A.    I'm not for sure.

12        Q.    Did you go into the courthouse with the

13   coat over your hands in the handcuffs?

14        A.    I can't recall.

15        Q.    After you told Carolyn Melvin that the

16   story was a lie, did you see her talk to anyone else

17   about you telling her that it was a lie?

18        A.    Not that I can recall.

19              MR. ELLIS:  Objection.

20        Q.    You also testified that you were told

21   that you had to continue on.  Do you recall whether

22   Carolyn Melvin is the person who told you that you

23   had to continue on even after you told her the story

24   was a lie?

25              MR. ELLIS:  Objection.  She

Page 124

1          testified she didn't know who these

2          individuals were.  Asked and answered.

3          A.     No, ma'am.

4          Q.     No, ma'am, you don't remember?

5          A.     There was -- I don't know if you all --

6    if it's -- I said it was a redheaded guy that told

7    me kind of like -- I think it was a police officer.

8          Q.     And you're talking about the person you

9    saw when you walked into the courthouse?

10         A.     Yes.  Like you know when you go up and

11   to the -- you're going to the stand, there's a

12   hallway into the courthouse, that was it.

13         Q.     When you're talking about the person who

14   has the red hair in the hallway on the way to the

15   courthouse, did you say anything to that person or

16   is it just you remember seeing that person?

17         A.     I remember seeing that person and I also

18   remember they were kind of nudging me telling me

19   basically I had to go along.

20         Q.     At that point in time do you recall

21   whether you still had the handcuffs on with the

22   jacket over you?

23         A.     Not that I recall.

24         Q.     I don't have any further questions for

25   you.  Thank you.

Page 125

1          A.    Yes, ma'am.

2                    MR. CLEMENTS:  No further

3     questions.

4                    MR. ELLIS:  No questions.

5                    THE VIDEOGRAPHER:  Off the record

6     at 2:52 p.m.  This conclude today's testimony

7     given by Charlotte Johnson.  Total number of

8     media units was two and will be retained by

9     Veritext Legal Solutions.

10         (Deposition concluded at 2:52 p.m.)

11               (Signature reserved)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1    STATE OF NORTH CAROLINA

2    WAKE COUNTY

3                    REPORTER'S CERTIFICATE

4                    I, Andrea L. Kingsley, a Notary Public

5    in and for the State of North Carolina, do hereby

6    certify that there came before me on Tuesday, the

7    September 12, 2023, the person hereinbefore named,

8    who was by me duly sworn to testify to the truth

9    and nothing but the truth of their knowledge

10   concerning the matters in controversy in this

11   cause; that the witness was thereupon examined

12   under oath, the examination reduced to typewriting

13   under my direction, and the deposition is a true

14   record of the testimony given by the witness.

15                    I further certify that I am neither

16   attorney or counsel for, nor related to or employed

17   by, any attorney or counsel employed by the parties

18   hereto or financially interested in the action.

19                    IN WITNESS WHEREOF, I have hereto set

     my hand this the 25th day of September, 2023.

20

21

22

23                    Andrea L. Kingsley, Notary Public

24                    Notary Public #201903800023

25

```
                                        Page 127

 1     Ernest L. Conner Esq

 2    ernest@gnclawfirm.com

 3                    September 26th 2023

 4    RE:    Sharpe, Montoyae Dontae v. R.L. "Ricky" Best, Et Al

 5          9/12/2023, Charlene Johnson (#6093742)

 6          The above-referenced transcript is available for

 7    review.

 8          Within the applicable timeframe, the witness should

 9    read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12          The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15     (erratas-cs@veritext.com)

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                      Yours,

23                  Veritext Legal Solutions

24

25
```

Veritext Legal Solutions

Page 128

1   Sharpe, Montoyae Dontae v. R.L. "Ricky" Best, Et Al

2   Charlene Johnson (#6093742)

3                E R R A T A  S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____        _____

24  Charlene Johnson                          Date

25

Page 129

1    Sharpe, Montoyae Dontae v. R.L. "Ricky" Best, Et Al

2    Charlene Johnson (#6093742)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Charlene Johnson, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11    _____    _____

12    Charlene Johnson                         Date

13    *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

**0**

**000185**  1:2
5:12
**0002850**  4:9
55:6,13
**0002851**  4:10
55:7,13
**0004145**  4:15
85:19,23
**000460**  93:22
**004014**  4:21
112:17,23
**004054**  4:22
112:18,23
**004947**  4:11
60:10 61:7
**004948**  4:12
60:11 61:7
**005533**  4:18
91:23
**005580**  4:18
91:23
**04**  113:11

**1**

**1**  106:4,11
**10**  61:23 62:9
86:16
**100**  2:11
**1000**  2:16
**106**  4:19
**11**  20:7
**112**  4:20
**115**  4:4
**1151**  2:16

**119**  4:3
**11:34**  3:8 5:3
**11:59**  21:13
**12**  1:21 3:8 5:4
126:7
**121**  4:5
**12:03**  21:16
**12:33**  43:8
**14**  106:4,11
**14th**  12:8,12,16
12:23,25 13:3
13:10,13 14:2
14:18 16:11,13
18:6 21:5
**15**  93:21
**18**  95:2 113:8
113:10,14
**181**  4:9 55:6,10
**182**  4:11 60:10
61:6
**183**  4:13 77:4,5
81:22 84:17
**184**  4:15 85:18
85:19
**185**  4:16 90:20
90:23,23 94:22
115:12,15
119:20 120:15
120:20
**186**  4:17 91:21
91:22 92:5
95:24
**187**  4:19
105:25 106:1
106:22

**188**  4:20
112:15,16
**18th**  86:5
**1980**  8:19
**1994**  9:9,12,22
12:5,11,12,17
15:9 17:9,22
18:1,17,21,24
19:10 20:7
24:3,9,12,15,18
24:22,25 25:17
43:24 115:12
115:22 116:4
118:22
**1995**  117:15
**1997**  92:3
95:24 96:4,6,8
96:9 97:12,13
97:14,16
102:14,15
108:3 109:15
109:18,22
**1:06**  68:21
**1:12**  68:24
**1:27**  43:5
**1:30**  115:23
**1:50**  101:15

**2**

**2**  8:19
**20**  90:23 91:5
97:17 129:15
**200**  2:5,21 3:6
5:15
**2014**  86:6
88:15,17

**2019**  108:6,9
**201903800023**
126:24
**2023**  1:21 3:8
5:4 96:7,10
126:7,19 127:3
**21**  95:24
**21582**  126:22
**225**  2:5
**247-8524**  2:12
**252**  2:17,22
**25th**  126:19
**26th**  127:3
**27804**  2:17
**27858**  2:21
**28203**  2:6
**28217**  2:11
**2:04**  101:18
**2:11**  106:18
**2:13**  106:21
**2:34**  121:4
**2:48**  121:7
**2:52**  125:6,10

**3**

**3**  84:16
**30**  127:17
**321**  2:21 3:6
5:15
**333-9945**  2:6
**34**  106:4,12
**35**  55:15

**4**

**4**  92:14

**J.A. 1871**

| | | | |
|---|---|---|---|
| **4004146** 4:15 85:20,24 | **9/12/2023** 127:5 | **affiliations** 5:23 | 98:20 102:2 104:14,21 |
| **421** 5:11 | **90** 4:16 | **affirmatively** 98:6 | 112:1 116:18 |
| **4330** 12:6 | **91** 4:17 | **age** 9:1 | **answered** 14:7 |
| **4:21** 1:2 | **972-7113** 2:17 | **ago** 97:17 | 26:17 34:6,15 |

**5**

| | | | |
|---|---|---|---|
| **5** 61:23,24 | **a** | **ahead** 35:17 | 41:24 45:18 |
| **500** 67:13 | **a.m.** 3:8 5:3 | 84:24 91:20 | 49:14 57:17 |
| **55** 4:9 | **ability** 8:10 | 105:23 113:8 | 58:3 68:9 |

**6**

**a**

| | | | |
|---|---|---|---|
| **6** 4:3 | **able** 111:13 | 114:7 116:2 | 84:14 85:10 |
| **60** 4:11 | **above** 127:6 | **al** 5:9 127:4 | 89:22 97:22 |
| **6093742** 127:5 | 129:7 | 128:1 129:1 | 100:3 101:2 |
| 128:2 129:2 | **abused** 99:7 | **albert** 12:2 | 113:24 114:5 |
| **6th** 9:14,16 | **accuracy** 127:9 | **aldrich** 14:21 | 124:2 |
| 10:2 12:9,12 | **accurate** 30:12 | **alive** 11:8 | **answering** 62:2 |
| 12:17 21:5 | 30:12 89:17 | **allotted** 127:20 | 62:6,12 |
| | 97:12 | **ambiguity** 69:4 | **answers** 97:12 |

**7**

| | | | |
|---|---|---|---|
| **7** 61:23 62:4 | **accurately** 8:11 | **andre** 15:2 | 99:24 |
| 86:14,16,19,19 | 9:17 | **andrea** 1:25 3:4 | **anthony** 10:24 |
| 88:19,23 | **acknowledge...** | 5:18 126:4,23 | 11:3 |
| 115:12,22 | 129:3 | **answer** 8:3,3 | **anybody** 19:9 |
| 116:4 | **acknowledg...** | 10:23 16:3 | 56:21 66:21 |
| **704** 2:6,12 | 127:12 | 17:3,17,23,24 | 74:13 77:16 |
| **757-3535** 2:22 | **acted** 69:2 | 21:23 25:25 | 78:24 98:24 |
| **77** 4:13 | 100:16 | 26:18 28:1 | 117:8 |
| | **action** 126:18 | 29:7,14 30:12 | **anymore** 99:14 |

**8**

| | | | |
|---|---|---|---|
| **8** 86:16 | **actually** 27:1 | 30:13,16 31:3 | **apologize** 43:20 |
| **85** 4:15 | 60:6 104:23 | 37:4 41:25 | 45:25 122:23 |
| **8701** 2:11 | 107:17 | 43:21 51:6 | **appeal** 104:9 |
| | **additions** 129:6 | 54:24 58:12,13 | 105:24 107:22 |

**9**

| | | | |
|---|---|---|---|
| **9** 86:16 | **admissible** 10:22 | 59:16 61:25 | 108:3 |
| | **affidavit** 4:13 | 62:5,10 63:16 | **appearance** 6:1 |
| | 77:5,11,12 | 82:18 84:21 | **appearances** 5:23 |
| | 103:8 | 94:2 95:25 | **appended** 129:7 |
| | | 97:3,5,5,6,7,7 | |

applicable
  127:8
appreciate
  121:11
appropriately
  45:18
april  20:25
  86:6 115:12,22
  116:4 118:22
area  9:11,25
  11:11,22 12:12
  12:17 14:2
  21:4,21 22:5
  22:13,16,19,22
  22:25 23:3,5
  23:13 42:12
argumentative
  95:20
arlington  60:9
  60:13
arm  61:12
arrested  46:1,2
  51:1 52:2
  70:14 81:14
  121:15,23
asked  14:6 34:5
  34:14 38:10
  40:15 41:23
  44:1,2,3 51:14
  56:12 58:10,11
  58:14,15,17
  62:1,17,24
  63:1 68:10
  70:18 79:3
  84:14 85:5,9

87:3,20 88:13
90:17 97:21
98:24 101:3
106:25 107:3
113:24 114:4
114:11 116:19
121:14,17
124:2
asking  6:24
  12:15 13:15
  17:13,19 21:19
  23:22 29:15
  30:15,17 31:19
  35:13 37:6
  40:4 42:12
  45:14,15,15,16
  50:17 53:3
  70:19 81:2,20
  82:24 84:10
  85:11 87:16
  88:8 89:10,19
  95:13 96:17,19
  97:11,15,18,25
  100:24 110:15
  111:5 114:8,12
  114:16,19
assume  67:15
  81:14 115:21
assumedly
  114:2
assumes  105:2
assuming  70:15
assumingly
  39:13

attached
  127:11
attend  19:24,25
  20:1
attending  5:22
attorney  6:2
  8:15 93:23
  104:17 126:16
  126:17 127:13
attorney's
  81:23
attorneys  92:21
  102:15
aunt  79:7,8
available  127:6
avenue  2:5
aware  20:16

**b**

back  19:14
  21:15 26:25
  39:14 41:2
  43:7 54:4,16
  54:19,20,21,23
  58:1 62:17
  64:1 65:20
  68:23 84:16
  86:18 88:19
  89:8 90:13
  91:4 94:6
  95:12 97:4
  101:17,20
  106:20 113:18
  118:8,21 121:1
  121:6

bag  64:24
ball  96:24
bandy  10:8
  55:16,20,22
  56:1
barely  56:15
based  121:2
basically  13:17
  124:19
basis  22:9
bates  61:6
battered  53:16
  53:17 54:2
baxter  107:25
  112:22
bean  64:24
beat  44:13,18
  44:21,23 45:1
  45:5,7,9,12,20
  45:22,23 46:3
  46:5,13 47:12
  48:2,3 50:6
  69:16 85:15
beating  48:6,9
  48:22 49:3
  50:11 51:3
  52:7,9,12,15
  55:1,2,4 56:23
  57:1,4 63:10
  65:8 75:15
beatrice  23:12
  23:15,17,23,25
  24:2
behalf  2:2,8,14
  2:19 3:2

**believe** 14:24 56:4 63:20 110:22 114:6 120:5,14
**best** 1:7 2:8 5:8 6:4 20:14,18 24:15,22 34:2 34:10,13,18,20 34:23 35:9,14 35:19 37:16,18 38:4 42:19 43:11 45:10,13 51:4 52:12,21 52:24,25 54:4 57:3 58:4,8,15 58:21 59:14,22 60:21 62:23 66:7 67:6 72:24 73:3 74:8 75:6,8 76:12 84:21 89:3,6 90:6,7 93:20 94:7,9 95:6 97:19 98:16 99:5 107:12 111:22 116:11,24 119:16,22,25 127:4 128:1 129:1
**better** 96:9 97:11,16 99:13 110:19
**birth** 8:18

**bit** 9:15 46:15 110:19
**blakely** 109:9
**blank** 38:24
**bo** 1:2 5:12
**born** 8:20,22 8:23
**bothered** 113:1
**bottom** 56:11
**boulevard** 2:11 60:9,13
**box** 105:17
**boys** 56:13 57:13
**break** 8:5 21:9 43:2 46:14 68:19 92:7,9 92:12,19 101:12 120:25
**bring** 85:3
**bringing** 116:12 118:20
**brother** 10:17 10:18 76:23,24 76:25
**brother's** 10:24
**brought** 31:16 32:1,3,13 42:1 85:7,13 116:20 117:20 118:8
**brown** 35:20 35:21,22 36:1 36:10,14,17,22 36:25 37:9,18 41:21 42:7,13

43:10,15 64:10 64:13 66:13,15 66:18,25 67:10 68:5,8,13,15 76:1,4,8,11,14 76:20 93:8,10 93:16 120:16 120:18
**buddy** 104:2
**building** 35:20 35:21,23 36:1 36:10,14,17,22 36:25 37:9,18 41:21 42:7,14 43:10,15 60:14 60:18,22 64:10 64:13 66:13,16 66:19,25 67:10 68:5,9,13,16 76:1,4,8,11,15 76:20 93:8,10 93:16 120:16 120:18
**bureau** 61:8
**busted** 48:20
**buy** 84:21

**c**

**c** 2:1 5:1
**cafe** 77:22,25 78:3,7
**caitlin** 102:24
**call** 48:21,23 71:14,25
**called** 3:2 6:17 71:13

**calls** 88:6 98:18 123:9
**calm** 101:13
**camera** 106:6
**candice** 101:9 101:11,21 112:10
**capacity** 17:7
**car** 24:21 27:5 27:6,8,14 35:5 43:14 49:8,10 49:12,17,17,22 51:25 52:17,18 52:19,20,22,23 57:4 59:19,23 62:17 86:22,24 118:8 122:16 122:21 123:1
**carmon** 13:2 15:7,8,9
**carolina** 1:2,8 1:20 2:6,11,17 2:21 3:6,7 5:11 5:16 12:7 19:20 85:2,4,8 85:14 126:1,5
**caroline** 58:6 98:10
**carolyn** 1:14 6:6 58:4,9,16 58:18,19,22 59:14,23 60:20 62:23 66:9,24 69:18 70:8,13 70:16 71:8

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 134 of 159

**J.A. 1874**

72:3,12 74:5,9
99:5 100:4
101:1 115:8
116:6 121:15
121:23 123:15
123:22
**carry** 36:20
**case** 5:11 7:14
86:20 110:10
110:23,24
**cases** 66:2
**catching** 26:23
**cause** 126:11
**celebration**
76:3
**cell** 71:18
**certificate**
126:3
**certify** 126:6,15
**change** 128:4,7
128:10,13,16
128:19
**changes** 127:10
129:6
**characterizati...**
15:19 116:17
**characterizing**
36:13
**charge** 53:24
**charlene** 1:18
3:1 4:13 5:6
6:12,16,23 7:8
22:3 26:21
56:12 77:5
82:18 85:17

86:1 92:2,6
97:9 101:20
106:24 115:4
119:5 127:5
128:2,24 129:2
129:4,12
**charlotte** 2:6
2:11 121:10
125:7
**check** 94:19
**checked** 38:15
**cherry** 77:19
78:14
**child** 17:22
66:23 98:23
**children** 53:18
53:18,19 54:3
**choose** 66:5
**christmas**
75:25 76:4
**circle** 15:15,16
**circles** 111:2,8
111:13
**circumstance**
15:14
**city** 1:8 2:8
**civil** 3:4 7:14
**clarification**
23:21
**clarify** 30:18
45:7 119:18
**clarifying**
58:24
**clarke** 63:2,5,8
63:19 64:1,1

64:15 65:2,7
65:10,13,16,25
66:6,9 69:8,13
69:15 73:5,7
73:12,15,17,21
74:4 92:24
98:13 100:1
109:24 110:2
**class** 19:15
20:2 92:15
**clear** 33:9
35:16 111:4
**clements** 2:10
4:3 6:3,3,21,23
15:22 21:10
22:1,2 43:3,9
68:18,25 85:22
87:18 88:8
89:23 90:19
91:3 95:21
101:19 105:17
105:23 106:11
106:15 111:7
113:12 114:6
116:25 117:5
119:7,10
122:12 125:2
**clifton** 12:1
**clinic** 102:20
**clip** 105:8,13
105:16 106:3
106:22
**close** 95:20
**closer** 10:2

**clothes** 78:10
78:15,17
**cm** 19:11,12
**coat** 122:24
123:2,4,6,13
**college** 19:17
19:19 24:1
**come** 46:22
50:19 54:20,21
54:23 56:25
58:2 59:2
60:15 65:25
66:4 70:16
74:21 75:1
83:3 90:5
94:18 104:19
121:1
**coming** 90:13
**commencing**
3:8
**community**
20:4 24:1
**complete** 62:9
129:8
**completed**
127:17
**completely**
59:3
**complying**
106:8
**compound**
27:25 29:6,14
37:24 49:18
89:20

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 135 of 159

**J.A. 1875**

comprehend
  8:10
computer
  110:18
concentration
  20:5
concern  96:14
concerned
  69:16 96:15
concerning
  126:10
conclude  125:6
concluded
  125:10
confer  21:7
confirm  113:21
confused  70:20
  70:22
connecting
  45:17
conner  2:20
  5:14 6:11 7:16
  104:1 127:1
connie  50:8
  67:2
connor  6:11 7:2
  7:6 10:6,20
  21:6,8,17
  29:12 32:7
  58:25 70:12
  82:9 89:20
  92:13 95:19
  101:12 104:13
  106:5,9 113:10
  119:17

continue  72:20
  122:5 123:21
  123:23
controversy
  126:10
conversation
  25:24 26:16
  28:9,17,20,23
  29:2,17,20,24
  31:7,10 32:10
  32:14,18 33:11
  33:14 36:3,9
  36:13 37:3,12
  37:13,17 38:5
  40:2,3 43:11
  45:24 59:9,12
  65:6 69:8,12
  72:5 75:7
  79:12 98:2,5,9
  98:13 103:17
  103:21 104:5
  112:24 113:3,4
  113:5,6
conversations
  31:1 75:4 90:6
conviction  80:1
convictions
  102:20
copies  127:14
cordial  97:1
corner  10:2
  56:1 93:22
  113:13
correct  22:5,6,8
  30:15 33:12

37:9 39:18
  40:13 45:20
  67:14 70:9,25
  71:1 87:23
  89:1,2 90:2,3
  91:15,18
  110:23 115:20
  116:24 117:21
  120:16 129:8
corrections
  129:6
correctly  55:14
corresponds
  87:1
counsel  5:7,21
  21:7 126:16,17
  127:14
county  12:6
  126:2
couple  58:10
  94:6 121:1,12
course  45:19
  74:16 91:9
court  1:1 5:10
  5:18 6:13 7:25
  59:3 80:4,7
courthouse
  69:22,25 70:24
  70:25 71:2,5
  72:13,15,16,22
  73:18,19,20
  117:21 118:9
  118:12,20
  121:16 122:6
  122:10,17,25

123:12 124:9
  124:12,15
courtside  77:21
  77:24 78:2,7
created  82:20
crime  21:21
  22:5 67:13
crimestoppers
  67:17,22
cs  127:15
cs6093742  1:24
cursive  56:1
cv  1:2 5:11

**d**

d  1:7 5:1
da's  64:9,16
  65:24 66:12
  67:9 68:6,13
  68:16 70:17
  93:3,6 110:1
daily  22:9
dan  2:24 5:17
daniels  12:1,2
dante  61:25
  62:5
date  8:18 18:20
  25:16 55:8
  60:12 77:7
  85:21 90:21
  91:24 106:2
  112:19 116:7,8
  120:15 128:24
  129:12
dated  115:12
  115:22

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 136 of 159

**dates** 21:20
116:3
**david** 2:4 6:10
**davis** 2:15 6:6
**day** 20:7 34:4
34:19 35:25
41:6,10 50:24
69:1,1,7,11,21
70:21,23 73:14
73:15,24,25
74:1,2 75:11
84:4,5,6 86:5
96:13 109:6
117:19,19
118:20 119:15
119:20 120:19
121:15,17
126:19 129:15
**days** 127:17
**deal** 99:13
**dealing** 22:16
**deborah** 10:8
55:16,20,22
**deceased** 109:2
**declare** 129:4
**deemed** 129:6
**deep** 110:21
**deeper** 111:23
**defendant** 1:15
2:14 5:7
**defendants** 1:9
1:19 2:8 3:3
**definition**
112:4,5

**degrassi** 64:18
**department**
117:3
**depends** 42:11
**deponent**
127:13 129:3
**deposed** 7:11
7:13,15,17,20
**deposing**
127:13
**deposition** 1:18
3:1 5:6,13 7:19
7:25 8:14
125:10 126:13
**depositions**
91:1
**describe** 17:8
17:11,20
**details** 28:16
29:23 74:21,24
74:25 75:2,8
**detective** 84:21
112:22,22
116:11,11,13
116:24 117:11
117:15,18
118:1,12,19
119:21 120:3,9
**diana** 18:13,15
**different** 15:21
16:22 24:20
64:10 111:24
111:25 116:3
**directed** 82:10

**direction**
126:13
**discussion**
106:19
**dispute** 120:11
**distance** 9:19
12:8 42:10
**district** 1:1,2
5:9,10
**division** 1:2
5:11
**doctor** 28:22
**doctors** 30:2
**document** 4:16
77:9 82:1 86:1
86:8,11,15
87:16 88:2,18
89:10,11 90:14
90:15,18,18,20
91:7,14,15,17
91:18
**documentary**
107:22 108:4
**documents**
8:16 89:6
**doing** 7:18 27:2
88:13 118:2
123:7
**dontae** 1:4,11
5:8 6:8 14:18
14:19 16:21
18:1,2,2,5,7
22:21 23:7
45:24 65:14
69:11 77:12

79:18,21,22,25
80:6,20 81:18
94:25 95:1,4
99:19 108:7,12
108:12 112:7
112:11 121:11
127:4 128:1
129:1
**dontae's** 42:17
48:12 69:11,21
78:18,23 79:2
79:5 81:23
89:14,25 91:17
92:21 93:23
102:15 109:12
109:13,21
**door** 74:13
**draw** 32:24
33:2,23
**drawing** 114:9
**drew** 33:5,5,8
33:15,15,21
114:1,2,13,17
114:20
**drive** 41:19
53:1 57:23
59:19,20,25
**driving** 42:4
52:18,19,20,21
59:18 118:8
**drop** 46:15
60:14
**dropped** 46:6,7
46:12,15 96:23

**drove**  25:22
  27:3,6,11
  57:20 58:17,21
  59:8,21
**drug**  22:16
**drugs**  22:18,21
  22:25 23:3,5,7
  23:9 65:22
  98:25 102:12
**due**  30:13
**duke**  102:19
**duly**  6:17 126:8
**duplex**  13:3,5

**e**

**e**  2:1,1,5 5:1,1
  128:3,3,3
**earlier**  43:25
  57:20 90:7
  95:6 120:14
**easiest**  111:14
**easily**  98:23
**east**  19:20
**eastern**  1:2,2
  5:10,11
**easy**  99:2
**eat**  64:5,25
  68:6,8,13
  84:22
**ecu**  20:2
**either**  37:2
**elks**  50:8 67:2
**ellis**  2:15 4:4
  6:5 11:1 36:16
  51:5 60:23
  70:10 82:8

88:9 95:18
  105:15 115:6,7
  120:7,12 122:3
  122:13 123:9
  123:19,25
  125:4
**employed**
  126:16,17
**ended**  73:25
**entire**  105:24
**entirety**  88:13
  92:4
**entrance**  29:4
**eppes**  19:11,13
**ernest**  2:20,22
  5:14 6:11
  127:1,2
**errata**  127:11
  127:13,17
**erratas**  127:15
**esq**  127:1
**esquire**  2:3,4,4
  2:10,15,15,20
**et**  5:9 127:4
  128:1 129:1
**evans**  2:21 3:6
  5:15 11:7,9
  42:21,22,23,24
  43:19,22 44:3
  44:6,20 45:19
  65:21,22
**events**  96:10
  97:16
**eventually**
  36:24 37:8

54:16 67:13
  69:23 70:6,24
  71:4 73:7
  78:18 79:18,24
  80:3 105:5
  108:6,9,11,12
**everett**  63:2,5,8
  63:19 64:1,1
  65:3,8,11,13,16
  69:8,13,15
  73:5,8,12,15,17
  73:21 74:4
  92:24 98:14
  100:1 109:24
  110:2
**everybody**
  111:17
**everyday**  99:12
**evidence**  10:22
  88:1 89:8
  105:3
**ex**  42:17
**exact**  101:2
**exactly**  44:12
  48:15
**examination**
  6:20 115:5
  119:9 121:8
  126:12
**examinations**
  4:1
**examined**  6:18
  126:11
**examiner**  60:25
  61:3,15 62:21

**excuse**  43:17
  45:24 51:7
  52:21 55:18
  56:18 68:12
  82:11 120:8
**exhibit**  4:9,11
  4:13,15,16,17
  4:19,20 55:6,9
  55:15 60:10
  61:6 77:4,5
  85:18,19 90:20
  90:22 91:2,21
  91:22 92:5
  95:23 105:22
  105:25 106:1
  106:22 112:16
  115:12,15
  119:18,20
  120:15,19
**exhibits**  4:7
**explain**  81:2
  102:2 110:18
  110:19 111:11
  111:14,20
**explained**
  111:6

**f**

**face**  15:6 18:14
  24:7
**fact**  30:13
  70:15 105:3
**fails**  127:19
**falls**  2:16
**false**  118:22

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 138 of 159

**J.A. 1878**

**family** 20:4
23:3 54:22
75:22,24 78:19
78:23 79:2,5
80:23 109:22
**fan** 8:25
**far** 9:15 39:3,3
39:4 42:7 53:1
53:2 64:13
**farther** 10:1
**fast** 65:20
**favor** 106:5
**february** 18:21
20:6,24
**federal** 3:3
**feel** 17:22 22:3
95:21 97:8
**female** 16:4
67:3
**fib** 95:25 96:5
**fighting** 99:24
**figure** 37:7
**filed** 5:9
**fill** 6:25
**film** 105:24
**filmed** 104:23
105:1,5
**final** 104:8
105:24 107:22
108:3
**finally** 81:21
122:19
**financially**
126:18

**find** 90:17
**fine** 10:4 37:6
115:15
**finish** 8:2 11:13
58:25
**finished** 90:13
91:25 94:16
**first** 16:14
20:12,15,16
26:11 34:9,13
34:19,22,25
35:12,13,18
36:6,13,18,20
36:21 40:13,17
46:20 51:8,11
51:13,24 52:8
52:8,11 57:7
58:4,8,14,14
63:4,6,7,18,25
65:2,4 69:2
79:6,22 80:7
83:22,23 86:18
88:20 89:13
91:14,17,18
94:12,21 95:14
104:11,19
106:6 115:22
**fisher** 92:20
**fisher's** 83:1,4
83:12,16,19,21
84:1
**five** 68:19
120:25
**fleming** 9:13
19:4 42:8 46:8

**follow** 121:13
**follows** 6:19
**force** 113:2
**forefront** 96:13
**foregoing**
129:5
**form** 17:19
51:5 60:23
**forward** 26:21
**foster** 53:15
**found** 111:16
**four** 58:11
**frame** 25:14
**frazier** 1:18 3:2
7:8 86:2
**free** 22:3 66:4
68:15 95:21
96:16,23 99:20
**freedom** 96:15
**freeman** 11:17
44:11,17 45:20
**frequently** 12:4
13:14 67:7
109:8
**friend's** 71:17
**friends** 15:11
16:6,7 17:5,6
18:2,5 19:3,7
102:8
**front** 29:4
46:16,22,24,25
47:3 86:22
95:25 99:14
**frustrating**
96:25 97:2

**fuck** 95:4
**full** 7:6 40:2,3
**fully** 8:3 17:14
88:10,12
**fun** 27:2
**further** 88:22
95:3 119:9
124:24 125:2
126:15

**g**

**g** 5:1
**generally** 7:24
32:6
**george** 77:13
**getting** 46:13
62:1 67:16,24
69:16 72:16
92:16 95:20
96:25
**girlfriend**
42:17
**girls** 46:3,20
47:3,6 48:3,4,6
51:1
**give** 10:6,20
30:11 40:2
78:10,14 84:22
85:17 86:13
105:15 111:17
111:25 112:2,2
112:5,13
116:15 118:15
**given** 61:16
74:23 75:2
91:8 116:24

117:3 125:7
126:14 129:9
**gnclawfirm.c...**
2:22 127:2
**go** 18:7,9,11
19:19,20 21:10
31:22,25 32:21
35:17 42:13
46:18 49:7
50:1 53:7 54:8
54:14,15 56:10
61:22 64:1,5
66:4,12,13,15
67:9 70:25
71:2,3 72:17
75:25 76:3
79:18 82:4,11
82:14 84:1,16
84:17,24 85:25
86:13,14,19
88:19 89:7
91:20 92:14
93:3,5,8,10,12
93:15,17 94:6
102:7 105:23
109:25 110:1
113:8,18 114:7
116:1 121:20
121:21 123:12
124:10,19
**going** 5:3 7:23
11:12 14:16
17:23 18:19
20:2,6 22:16
27:24 31:20

45:14,16 46:14
51:25 55:12,13
58:12 61:5,22
81:22 82:4
87:18 96:22
97:4,9 100:19
105:8,11,13,14
105:21 111:2,8
122:9 124:11
**good** 5:2 6:23
8:6 62:19
**goodness**
101:10
**google** 111:15
111:22
**gorocca** 112:23
**grade** 9:4
**graduate** 19:21
19:22,23
**grandfather's**
12:1
**grandmother's**
11:25
**grandparents**
11:10,21,23
**greenville** 1:8
1:20 2:9,21 3:7
5:15 6:4 8:20
9:2,11 11:11
11:22 12:7
54:17 58:1
64:12
**ground** 7:23
**group** 53:12,13

**guess** 15:16
48:14 91:13
97:23
**gun** 47:14,15
47:20 95:5
**guy** 124:6

## h

**h** 128:3
**hair** 124:14
**half** 115:23
**halfway** 84:17
**hallway** 124:12
124:14
**hand** 55:9 61:5
82:6,17,25
84:13 113:13
126:19
**handcuffed**
58:7,19 100:9
100:11
**handcuffs** 52:2
70:14 117:20
118:18 122:15
122:20 123:4,7
123:13 124:21
**handing** 112:20
**hands** 30:12
123:3,13
**handwriting**
40:25 41:15
56:3,5,7 91:6
115:19
**handwritten**
4:16 56:5
90:20 91:11

115:11,17
118:21
**hang** 13:10,13
13:17,24 14:5
14:10 16:24
64:5 102:11
**hanging** 14:1
19:3
**hannah** 9:21,22
**happen** 83:19
**happened** 30:7
30:8 31:9
41:17 46:11
47:12,25 48:13
48:15 49:2,16
56:12 58:23
86:25 88:17,24
**hard** 59:4
**he'll** 26:25
**head** 8:4 48:19
89:6 92:11
**hear** 10:11,16
11:2 19:15
20:12 21:9
22:12,15 25:24
26:3,19 35:16
43:25 56:19
57:21 103:25
104:11,16,17
104:19 106:24
107:4
**heard** 57:19
107:3
**hearing** 79:25
108:11

**held** 5:13
**hello** 66:22,23
**help** 36:5 94:23
  95:7,15 100:17
  100:18
**helped** 94:14
**helping** 100:17
**hereinbefore**
  126:7
**hereto** 126:18
  126:19 129:7
**high** 19:21,22
  19:23,24,25
  20:1 21:21
  22:5
**hmm** 38:20
  41:16 92:8
  103:6 119:24
**home** 12:6 18:7
  18:9,11 19:3,4
  24:17 31:22,25
  41:19 42:5
  53:8,10,12,13
  53:14,14 54:1
  54:6,9,13
  75:19,23 79:13
  79:14 96:14
  112:25
**honest** 113:5,6
**hospital** 24:25
  25:3,22 26:15
  26:20 27:10,11
  27:14,16 28:3
  29:3,18,21
  30:2,4,5 31:1

31:16 32:1,4
  32:11,14,22,25
  33:11 34:1
  49:4,5 50:1,3,4
  50:19,22
  113:21,23,25
  114:10,13
**hour** 105:16
  106:4,9,11
**house** 10:1 25:2
  25:9,11 26:12
  26:13 34:12
  42:8 46:9,16
  46:18,21,22,23
  47:1,4,7,9,11
  47:13,21,23
  48:1 53:9
  56:25 74:16
  102:7,10 113:2
**huff** 107:24
**hung** 13:19,21
  14:11,14,14
  19:9

**i**

**identification**
  55:7 60:11
  77:6 85:20
  90:21 91:24
  106:2 112:18
**immediately**
  74:17
**implying** 13:19
**importance**
  110:3

**include** 75:15
  75:17,19,21
**incorrect** 30:15
**index** 4:1,7
**indicating** 39:8
  103:24 122:24
**individuals**
  124:2
**initial** 75:8
**initially** 70:25
**injuries** 48:16
  48:18
**inner** 15:15,16
**instruct** 117:11
  117:15
**instructed**
  118:2
**interact** 24:8
  24:11
**interaction**
  47:18
**interested**
  126:18
**interfere** 8:9
**interview** 4:21
  55:16,20
  112:17,21,21
  117:2
**investigations**
  61:8
**involved** 44:13
  44:17,20,23
  45:1,4 65:17
  86:19

**island** 8:24
**issued** 117:24

**j**

**j** 2:15
**jacket** 124:22
**jamaica** 8:23
**jeffrey** 1:7
**job** 1:24 62:19
**jog** 31:20
**johnson** 1:18
  3:2 4:14 5:6
  6:12,16 7:8
  77:6 86:2
  101:9,11,21
  112:10,14
  115:7 125:7
  127:5 128:2,24
  129:2,4,12
**johnson's** 92:3
**joyner** 16:10
  17:20 22:24
  23:10 65:17
  80:10 81:1,4,7
  95:1
**joyner's** 80:23
**jr** 2:20 5:14
**judge** 29:8
  117:24
**july** 117:15
**justify** 99:9

**k**

**karsten** 15:4
**kay** 77:18
  78:10

**keep** 90:12 96:12 97:4,8
**kept** 111:2,8
**kid** 18:12
**kids** 53:15
**kind** 27:1 71:19 71:23 124:7,18
**king** 2:10
**kingsley** 1:25 3:4 5:19 126:4 126:23
**kizy** 42:16 44:23 45:19
**knew** 12:22,24 13:9 14:13,13 15:8 17:9,12 17:12,20 18:6 18:7 38:15 39:11,13 43:24 44:5 55:2 56:21,22 87:3 94:11 98:16
**knife** 48:19
**know** 7:2 8:5 13:4 15:5,9,12 16:4,5,5,18 18:3,11,13,16 22:11 23:15 24:14 25:14,25 28:24,25 30:14 32:3,10,23 33:24 38:19 39:10 41:20 42:9,12,15,18 42:22,23,23,25

44:1,2,3 47:5,8 53:4 57:6 60:24 62:22 63:11,15 68:14 69:24 70:2,5 71:11 78:11,16 79:9,16 85:13 86:25 89:15,22 92:12,19 94:4 94:13 96:22 97:8 100:15 101:11,21,22 101:23,25 102:1,2,13 105:11 109:3 109:10 110:8 110:16,19 111:11,20 114:8 116:20 116:21 122:9 124:1,5,10
**knowing** 15:10
**knowledge** 126:9
**known** 14:24
**knows** 88:14

## l

**l** 1:25 2:20 3:4 5:14 126:4,23 127:1
**lady** 43:23 84:7 84:9,10,11
**lambert** 77:18 78:10

**land** 9:25
**langley** 45:4
**lasted** 28:20
**late** 74:17 92:16
**law** 5:14
**lawyer** 88:1
**lay** 9:25
**layout** 7:23
**lead** 10:21
**leading** 13:6
**leads** 104:14
**lean** 26:21
**leave** 50:24 54:14
**left** 39:1,3 54:15 56:1
**legal** 5:20 7:7 7:17 125:9 127:23
**lewis** 2:4 6:10
**lie** 62:4 98:16 100:15,19,23 100:25,25 101:7,8 121:22 121:24 122:2,7 122:11 123:16 123:17,24
**lied** 100:2,5
**life** 75:19,23 99:12
**likely** 10:21
**line** 63:11,17 89:13 128:4,7 128:10,13,16

128:19
**lines** 82:5
**lip** 48:19
**lisa** 42:21,22,23 42:24 43:19,22 44:3,5,20 45:19 65:21,21
**listen** 99:16 100:10
**listened** 99:17
**little** 9:15 36:4 46:15 56:11 64:6 76:23 96:25 97:2 110:19
**live** 12:3,5 99:12
**lived** 11:11,21 12:6,22,25 13:10
**living** 9:9,12,13 11:23 109:1
**llp** 2:16
**located** 5:14
**long** 28:19 33:25 38:7 46:13 50:21 52:14 54:6 61:19 74:15,18 77:15,17 79:1 99:1
**longer** 11:23 96:14
**look** 56:2 81:21 81:22 89:8

**J.A. 1882**

90:14,18 91:7
94:16 110:21
111:22 118:15
**looking** 94:16
94:22
**looks** 88:3
**lot** 14:11,13
21:3,21 67:4
88:16 111:23
**lots** 12:24 13:9
**lucky** 94:24
**lyda** 82:23 83:1

**m**

**ma'am** 11:1
71:23 95:14
104:3 105:19
113:19 116:1,9
119:3,14
120:22 121:18
121:25 122:8
122:14,18
124:3,4 125:1
**made** 88:23
94:10 116:13
118:21 129:5
**mae** 11:25
**major** 20:3,3,4
**make** 56:16,19
57:9 71:25
77:11,12
119:18 121:1
**making** 81:23
116:17
**male** 16:4 95:2

**mama** 56:21
**mama's** 56:2,6
**man** 61:25 62:5
62:10 95:1,4,4
98:25 99:1,9
99:17
**manipulated**
98:23
**mar** 4:17 91:22
92:3 109:16,19
109:22
**march** 8:19
20:24
**mark** 16:10,12
16:18,20,24
17:1,5,20
22:24 23:9
65:17 77:3
80:10,22 81:1
81:4,7 85:18
90:19 91:21
95:1 105:22,24
**marked** 55:7,9
60:11 61:5
77:6 85:20
90:21,22,25
91:4,23 92:4
106:1 112:18
**marking** 91:1
**marks** 48:19
**married** 7:4
**martineau** 2:10
**martineaukin...**
2:12

**math** 19:15
20:2,3
**matter** 5:7
**matters** 126:10
**mcnamara**
93:24
**mean** 19:4
23:21 30:15
38:3 41:7,11
78:12 81:5
91:7 102:1
105:9 111:9
113:11
**meaning**
119:23
**meanings**
111:25 112:6
**means** 29:14
96:23 100:12
100:13
**meant** 15:24
92:16
**media** 5:5
125:8
**medication** 8:9
**meet** 35:6
**meeting** 63:8
**melvin** 1:14
2:14 6:6 11:7,9
34:2,10,13,19
34:20,23 35:10
35:14,19 37:20
37:25 41:2,6
51:4,9,10,12,16
51:19,22,24

52:5 57:20,23
58:4,9,16,19,22
59:15,23 60:21
62:24 66:10,24
67:1 69:19
70:8,13,16
71:8 72:3,12
74:5,9 76:25
98:10 99:6
100:4 101:1
107:12 115:8
116:6,11,13
117:11,13,15
117:18 118:2
118:13,19
120:3,9 121:15
123:15,22
**member** 79:5
**memory** 31:20
96:9 97:11,15
**met** 44:12
**mic** 119:12,13
**middle** 19:11
19:13
**mind** 84:17
96:13
**minute** 68:19
101:13 105:16
120:25
**minutes** 106:4
106:11
**misunderstood**
107:15
**mom** 50:19
54:1 57:10,12

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 143 of 159

[mom - objection]                                                              Page 14

57:15 109:12
109:13
**moment** 123:1
**money** 67:16
67:19,24 68:1
84:22
**monte** 14:24,25
45:25
**month** 25:19
34:4
**montoyae** 1:4
1:11 5:8 45:25
46:2 127:4
128:1 129:1
**morning** 5:2
6:23
**mother** 25:11
25:21 26:9,16
27:8,10 32:9
32:15,17,20,21
34:19 48:12
52:13,24,25
54:22,23,25
55:2,3 56:16
56:19,22 57:6
77:1,24 78:1,2
**mother's** 10:4,8
26:12,13 34:12
46:9 55:22,24
56:4
**mount** 2:17
**move** 9:1 26:22
105:17
**multiple** 30:25
112:6

**murder** 20:13
20:17 65:11
69:12,21 75:17
77:13 78:19
79:1 80:1
86:21 87:4
99:1
**myra** 64:18

### n

**n** 2:1 5:1
**name** 5:17 6:25
7:2,5,7,9 10:5,7
10:8,19,21,24
11:7,17,25
12:1 14:22,23
15:5 18:14
24:15 28:5
50:15 55:23,24
61:2 63:21
89:5,8,14,14,25
90:4,5 91:18
99:5,6 121:10
**named** 126:7
**names** 10:14
11:6,16,24
14:16 15:13,21
16:8 102:22
**nc** 61:8
**near** 9:21 12:17
**necessary**
129:6
**need** 7:3 8:5
45:7 92:7,12
92:18 99:22
119:12

**needed** 100:16
**neither** 126:15
**never** 18:5
56:21,22 94:9
107:8,16
111:10
**new** 8:23 43:22
**newman** 103:1
103:3,7,8,11,18
104:25 108:18
**news** 20:19,21
**nicholas** 2:15
6:5
**nick** 6:5 115:7
**night** 18:12
20:10 31:12,14
31:16,22,24,25
33:25
**nod** 8:4
**north** 1:2,8,20
2:6,11,17,21
3:5,7 5:10,16
12:7 85:2,4,8
85:14 126:1,5
**notary** 3:5 6:18
126:4,23,24
129:13,19
**note** 56:5
127:10
**noted** 129:7
**notes** 55:15,19
56:8,9 121:19
**noticing** 6:2
**nudging** 124:18

**number** 5:11
125:7
**numbered** 61:6

### o

**o** 5:1
**o'clock** 92:14
**oak** 2:11
**oath** 126:12
**object** 15:18
25:13 27:24
29:5 37:23
44:15 45:6
49:18 69:3
70:12 95:22
104:13 111:3
**objecting** 29:8
29:11
**objection** 13:6
14:6 31:13,23
34:5,14 36:12
41:23 49:13
51:5 60:23
63:14 69:9
70:10 73:1
85:9 87:14
88:6 89:18,20
95:8,16,19
97:21 98:18
105:2 114:3
116:16,25
117:5 118:4
120:6,7,12
122:3,12,13
123:9,19,25

**objections** 5:24
**occurred** 57:5
96:12
**office** 5:14 63:9
63:19 64:9,16
65:24 66:12
67:9 68:6,13
68:16 70:17
81:23 83:1,4
83:13,17,19,21
84:1 93:3,6
103:4,5 110:1
**officer** 24:6,17
24:24 25:2,4,6
25:8,22 26:8
26:12,16 27:3
27:14,17,18,22
28:2,6,11,13
30:8,9,10,20,23
30:23 31:16,25
32:3,13,18
33:4,7,11,17,25
34:1,2,13,18,18
34:20,20,23,23
35:9,10,13,14
35:19,19 37:20
37:25 41:2,5,9
46:6,13 50:11
50:13,14 51:4
51:4,9,10,12,15
51:18,22 52:5
52:6,9,12,21,24
52:25 54:4
57:3,20,23
67:3 86:21

107:12,12
114:16,19,22
115:1 119:16
124:7
**officer's** 56:8,9
**officers** 24:8,12
24:14 27:6
28:9 31:1
34:10 39:9
50:4 55:4
56:17,20 57:1
107:24 108:4
112:25 113:16
**oh** 26:24 43:3
56:9 82:11
101:10 116:5
**okay** 7:8 9:8
17:24 26:24
49:16 55:21
56:9 58:10,13
59:1,6,7 82:5
82:15,16 84:19
88:16 91:10
95:21 98:21,22
98:24 99:2,21
111:19
**old** 7:4
**older** 9:6
**omer** 2:24 5:17
**once** 47:11
60:13 81:11
**one's** 115:16
**ones** 102:17
**open** 55:11

**opening** 17:16
**originally**
113:20
**outfits** 84:22
**outside** 18:12
47:25
**own** 40:25
41:14
**owned** 13:5

**p**

**p** 2:1,1,15 5:1
**p.m.** 21:13,16
43:5,8 68:21
68:24 101:15
101:18 106:18
106:21 115:23
115:24 121:4,7
125:6,10
**page** 4:2 42:16
44:23 45:19
55:25 81:25
82:8,9,10,12
84:16 85:25
86:17,18 88:20
88:23 89:12
90:23 91:5,6
93:21 95:24
113:8 119:19
128:4,7,10,13
128:16,19
**pager** 71:18,20
71:21,22
**pages** 94:6
**pam** 45:4

**paper** 38:13,24
38:24 39:18
40:23 82:19,20
82:21,24,25
84:13 88:14
90:8 96:18
116:23 117:4
**papers** 118:15
118:16
**paragraph**
56:11 86:13,14
86:19 88:19,23
**paralegal** 6:9
77:19 78:14
**parker** 10:24
11:3
**part** 90:16,16
91:14,15,17,18
94:17,21,23
95:7,15,25
**participated**
99:3
**particular** 13:2
14:12 51:23
75:11
**particularly**
12:20,21 16:25
32:5
**parties** 126:17
**partners** 6:10
**parts** 90:15
**party** 75:25
76:2
**pass** 15:17,23
62:18

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 145 of 159

**passed**  10:9,15
  10:25 44:8
  62:24 63:1
**passing**  15:13
  15:14 16:19
  44:7
**patience**
  121:12
**pclements**  2:12
**pearson**  18:13
  18:15
**people**  12:24
  13:9 14:1,11
  14:13 15:16,23
  22:18 53:11,14
  53:24 59:5
  61:16 67:4
  76:14,17 98:8
  98:20 99:7,8
  111:25
**percentage**
  18:23
**permanent**
  87:25
**person**  14:12
  15:5 30:14
  50:16 74:13
  78:11 80:16,17
  80:19 100:10
  100:11 109:10
  115:8 123:22
  124:8,13,15,16
  124:17 126:7
**peter**  2:10 6:3
  6:23

**pfeiffer**  2:3 4:5
  6:7,7 13:6 14:6
  15:18 25:13
  27:24 29:5,10
  31:13,23 34:5
  34:14 36:12,19
  37:23 41:23
  44:15 45:6
  49:13,18 63:14
  69:3,9 73:1
  84:14 85:9
  87:14 88:6
  89:18 90:24
  95:8,16 97:21
  98:18 105:2,21
  111:3 113:24
  114:3 116:16
  118:4 119:5
  120:6,24 121:9
  121:10
**phillip**  2:4 6:10
**phone**  71:16,17
  71:18,19,20,22
  71:23
**phonetic**  42:16
**pick**  70:6,16
  71:9 76:7,8
  94:21
**picked**  60:2
  71:6,7 72:3
  74:5,9 100:8
**picture**  78:13
  114:1,2,9,13,17
  114:20

**pictures**  32:24
  33:2,5,5,8,15
  33:15,18,20
**piece**  38:13,23
  38:24 39:18
  40:23 82:18,20
  82:24,25 84:12
  88:14 90:8
  116:23
**piggly**  71:10,11
  71:25 72:4
  118:12
**pitt**  24:1
**place**  16:14
  29:3,17,20,24
  33:14 36:10
  79:12
**places**  84:23
**plaintiff**  1:5,12
  2:2
**play**  105:13
  106:22
**playground**
  64:6
**plays**  106:23
**please**  5:25
  6:14 11:14
  14:8 16:23
  17:10 22:3
  32:8 86:15
  95:24 98:20
**pllc**  2:10
**point**  39:14
  105:10 122:15
  122:19 124:20

**pointed**  104:1
**police**  21:2,3,4
  21:20,21 22:7
  24:5,8,11,14,21
  35:3,5,6,6,10
  43:14 46:6,12
  48:23 56:17,20
  56:25 59:19
  86:21,22,24
  113:20,22
  116:12 117:3
  124:7
**polygraph**
  51:25 57:21,24
  58:2,7,9,20,21
  58:22 59:9,10
  59:19 60:6,25
  61:3,8,9,13,15
  61:17,19 62:16
  62:21,25 97:20
  97:23 98:3,11
  98:14,17
**polygraphed**
  61:10
**polygraphs**
  98:8
**porch**  112:25
**possibility**
  88:11
**poyner**  2:16
**poynerspruill...**
  2:18
**precise**  22:4
**precisely**  21:24

**premise** 96:21
**prepare** 8:13
**present** 5:21
  28:9,22 63:18
  103:20
**pretty** 16:7
  50:12 98:7
**previously**
  83:15 90:25
  92:4
**prior** 24:15
  26:13 79:24
  116:7,8 117:10
  117:14 119:15
  119:20,23
  120:14
**prison** 79:19,22
  80:6,11 99:10
  108:7,13 112:8
  112:11
**probably** 27:19
  27:20 88:13
**problem** 15:2
  21:18
**procedure** 3:4
**proceed** 6:22
**proceeding**
  5:25
**producers**
  104:22
**protest** 93:25
**public** 3:5 6:18
  126:4,23,24
  129:19

**pulled** 95:5
**pursuant** 3:3
  32:14 117:23
**pushed** 95:4
  99:17
**put** 21:17 38:14
  52:2 67:11
  70:14 89:14
  99:9 110:9,22
  110:25 115:13
  117:20 119:13
  122:24 123:2,4
  123:6

**q**

**queens** 8:23
**question** 8:2
  9:10 10:22
  11:12 12:14
  13:15,15 14:8
  16:3,17,22
  17:3,10,15,15
  17:23,25 21:19
  21:25 23:20,21
  26:1,17 27:25
  28:1 29:6,7,13
  29:13,15 30:10
  30:13,16 31:3
  33:6 35:15
  36:20 37:24
  42:1 43:20,22
  44:2,2 45:14
  45:16,18 49:14
  49:19 51:14
  54:24 57:17
  58:3,17 59:2

59:16 61:25
62:2,7,13
68:10 69:4
70:19 79:3
82:5 84:19,24
85:5,12 93:25
97:4,6 100:3
101:3 102:3
104:21 105:14
107:4
**questions** 6:24
  7:24 8:11
  17:16,17 21:23
  37:4 40:4
  58:10,11 59:1
  87:16 97:3,10
  99:22 115:3
  119:4,6 120:23
  121:2,12,14,17
  124:24 125:3,4
**quick** 43:1
  68:19
**quickly** 119:8
**quite** 21:24

**r**

**r** 2:1 5:1 128:3
  128:3
**r.l.** 127:4 128:1
  129:1
**radcliffe** 65:11
  65:14,18 77:13
**radcliffe's**
  20:13,17 86:20
**raise** 53:14

**ran** 48:2 75:24
**read** 55:12,16
  56:14,14 88:5
  88:11,12 127:9
  129:5
**reading** 55:14
**reads** 88:23
  89:13 95:25
**ready** 72:17
**real** 65:20
**really** 51:10
  70:13 88:9
  96:20 102:9
**reanswer** 85:12
**reason** 120:5
  120:11 127:11
  128:6,9,12,15
  128:18,21
**reasons** 98:21
  98:22
**recall** 9:17 10:3
  13:16,17,18
  14:3 15:1,3
  16:17 18:10
  20:23 21:1,6
  22:14 23:14
  24:16,23 26:10
  26:14 27:12
  33:19 34:3,8
  34:17 35:2,4,8
  40:3 42:20
  61:18 64:22
  67:8 74:11,14
  82:21 87:6
  93:7 107:18

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 147 of 159

**J.A. 1887**

108:17,20
109:7,20,23
110:4,6 119:2
120:2 123:14
123:18,21
124:20,23
**recant** 78:22
79:2,6 107:13
**recantation**
80:4,8 83:12
83:16
**recanted** 77:16
78:20,23,24
83:20 99:4
107:10,11,17
113:7
**receipt** 127:18
**recess** 21:14
43:6 68:22
101:16 121:5
**recognize** 77:8
**recollection**
96:11
**record** 5:3,24
7:1,3 8:2 21:11
21:12,16,18
29:8 43:5,8
68:20,24 85:22
90:24 92:2,13
93:23 101:14
101:18 106:15
106:17,19,21
111:4 112:20
121:4,7 125:5
126:14

**recorded** 4:20
5:6 82:2
103:17 112:17
112:21
**red** 2:11 124:14
**redheaded**
46:12 124:6
**reduced** 126:12
**referenced**
127:6
**refusing** 17:24
**regularly** 22:8
93:12
**rein** 68:15
**related** 77:12
79:25 110:23
110:24 126:16
**relation** 50:11
110:9
**relations** 81:6
**relationship**
17:8,11 75:21
80:25 81:4,9
**relatively** 15:10
**released** 108:12
**remark** 92:5
**remarks** 61:23
**remember** 9:22
13:21 14:4,9
14:16,17 16:1
16:8 18:8,10
18:23 20:7,9
20:22 23:24
24:5 25:10,16
25:19 26:2,5

27:13,21 28:5
28:8,13,19,25
29:1,2,23 30:7
30:19,22,25
31:4,5,6,9,15
31:17,18 32:6
32:7,9 33:10
34:7,16 35:9
35:21,25 36:9
36:21 37:2,5,5
37:11,15,16,17
37:20,21,25
38:2,3,4,7,10
40:21 41:4,5,8
41:9,22 42:2,4
43:12 44:8
47:15 48:6
49:21 50:10,17
50:18,21 51:9
51:11,12,13,15
51:21,23 52:1
52:4,8,11,14
53:12 54:11,19
57:3,14,18
58:5,18 60:2,5
60:17 61:2,14
61:19 62:1,6
62:12,15,19
63:2,4,7,17,21
64:18 65:3,7
65:10 66:1
67:16,24 68:12
69:8,12,15,18
72:11 73:19
74:12,18 81:22

82:1,24 83:9
84:7,8,12 86:8
86:10 87:12,13
87:15 89:13,25
90:3 92:6 96:1
96:5,8 97:10
102:17,22,24
104:4,7 107:21
107:24 108:2
112:24 113:22
114:4,9,12,16
114:19,22,25
116:19 121:16
124:4,16,17,18
**remembered**
97:13
**remotely** 5:22
**repeat** 9:10
14:8 24:19
33:6 35:15
45:17
**report** 61:8,9
**reported** 1:25
**reporter** 5:18
6:14 8:1 43:1
59:3 103:25
**reporter's**
126:3
**represent** 6:6,8
6:12 13:1
115:8,9 121:11
**representing**
5:19 6:4
**required**
129:13

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 148 of 159

**J.A. 1888**

| reserved | 56:1 57:21 | **s** | 54:8,11,13,14 |
|---|---|---|---|

**reserved**
125:11
**respectful** 97:2
**respond** 8:11
**response** 36:19
**rest** 90:14
94:20
**retained** 125:8
**return** 127:13
127:17
**returned** 96:14
**review** 8:16
120:25 127:7
**reviewing**
121:19
**rhode** 8:24
**ricky** 1:7 5:8
20:18 24:15
58:4,8,15,21
59:14,22 60:21
62:23 66:6,20
72:24 73:3
74:8 75:6,7
76:12 89:3,6
90:6,7 93:20
95:6 97:19
98:16 99:5
119:25 127:4
128:1 129:1
**ride** 35:5
**right** 7:7,18
13:11 19:15
30:20 39:12
40:12 41:15
44:14 55:17

56:1 57:21
64:10 83:24
88:21 90:10
91:12 93:22
105:6 113:13
**rl** 1:7 5:8
**road** 2:16 12:6
**robinson** 15:4
**rock** 95:2
**rocky** 2:17
**romantic** 80:25
81:3,9
**room** 5:21 29:3
29:4,18,21,25
30:1 33:3
36:11 37:9
38:14 39:1,5
39:15 61:16
94:18 117:8,9
120:4,10
**rooms** 117:2
**roots** 110:7,9
110:16,17,17
110:22,25
111:5,12,23
**rpr** 1:25
**rubbing** 92:11
**rudolf** 2:5 6:10
**rudolfwidenh...**
2:7
**rudolph** 2:4
**rules** 3:3 7:24
**running** 86:22
86:24

**s**

**s** 2:1,4 5:1
128:3
**sarah** 48:10,11
48:11,21,22,25
49:2,6,7,10,17
49:21 108:21
109:9
**sarah's** 49:8
**saw** 16:15
23:23,25 58:5
58:5,16,18
62:5 65:13,16
94:25 124:9
**saying** 13:22
26:6 27:13
39:2 52:4
95:13 97:8
111:24 114:22
**says** 55:10,15
55:19 56:1,12
61:7,23,24
62:4,9 82:5,16
84:17,19 86:1
86:5,19 87:2,7
88:22 89:5,8
93:25 94:21,22
94:24 95:3
96:4 106:4
120:3,9
**school** 9:4
18:17,19,21,24
19:1,10,11,13
19:22,22,23,24
19:25 20:1

54:15
**science** 20:5
**search** 111:16
**second** 19:14
40:18 52:2
55:12 58:15
81:25 82:10
85:25 86:14
91:15 94:17
101:21 106:16
112:13
**seconds** 106:4
106:12
**secretary** 63:20
63:23 64:17,20
64:22 93:1
110:5
**see** 14:15,17,18
16:2,11,16
17:7 20:19
21:2,4 22:7,18
22:21,24 23:2
23:19 24:2
25:21 27:10
31:20 34:18
39:7 41:7
46:20 55:3
61:24 62:20
64:1,15,21
65:21 80:6
86:1,5 89:15
92:17 97:23
98:4 99:6
102:4,6 105:12

| | | | |
|---|---|---|---|
| 105:19,20 | 108:24 109:9 | **short** 21:8 | 13:25 14:3,11 |
| 106:7,13 | **sharp** 109:1 | **shot** 62:10 95:5 | 14:20 16:9 |
| 109:25 116:5 | **sharpe** 1:4,11 | **show** 69:22,24 | 17:10,23 18:16 |
| 117:13 123:16 | 4:9,9,11,11,15 | 70:21 77:3 | 18:16,22,25 |
| **seeing** 23:24 | 4:17,18,21,21 | 78:13 90:22 | 19:6,18 20:1,8 |
| 41:4,5,8,9 | 5:8 6:8 14:19 | 91:20 92:17 | 20:11 22:9,11 |
| 58:18 62:10 | 14:21,25 15:2 | 104:8,12,20,23 | 22:14,17,20,23 |
| 64:22 124:16 | 23:2 45:24,25 | 105:1,1,6,8 | 23:1,4,6,11,16 |
| 124:17 | 45:25 46:2 | 106:3,6 | 24:1,4,10,13 |
| **seen** 16:12 21:3 | 55:6,7,13,13 | **showing** 61:6 | 25:7,18,20,23 |
| 23:17 40:23 | 60:10,11 61:7 | **shrock** 1:8 2:8 | 26:1,7,14,17 |
| 57:7 58:15 | 61:7 77:13 | 6:4 24:6 | 27:4,7,9,12 |
| 105:9 112:7,10 | 79:10 83:25 | **siblings** 10:12 | 28:4,7,10,12,15 |
| **sell** 23:5,7,9 | 85:19,23,23 | 11:4,14,15 | 28:21,24 29:19 |
| 95:1 102:12 | 91:22,23 93:22 | **side** 46:24,25 | 29:22 30:3,6 |
| **selling** 22:18,21 | 96:14,23 | 47:6 91:4 | 30:16 31:3,11 |
| 22:24 23:3 | 108:21,24 | **sides** 46:23 | 31:17 33:6,16 |
| 65:22 | 112:17,17,23 | **sign** 88:10 | 33:22,24 34:11 |
| **sent** 127:14 | 112:23 121:11 | 94:25 103:7,8 | 34:17,24 35:8 |
| **sentence** 88:22 | 127:4 128:1 | 127:12 | 35:11 36:2,23 |
| 89:13 | 129:1 | **signature** 86:2 | 37:14 41:4,7 |
| **separately** | **sharpe's** 80:1 | 86:3 87:22 | 41:11,18,20 |
| 80:16 | 117:14 | 88:3 125:11 | 42:9,15 44:10 |
| **september** 1:21 | **sheet** 127:11 | 126:22 | 45:3 47:2,5,8 |
| 3:8 5:4 126:7 | **shelter** 53:16 | **signed** 87:24 | 47:16,19 48:5 |
| 126:19 127:3 | 53:17 54:2 | 88:2,4,12,14 | 48:8,17 49:25 |
| **service** 20:4 | **sheppard** 9:15 | 127:20 | 50:2,5,7,9,23 |
| **set** 126:19 | 9:16 10:2 12:9 | **signing** 86:8 | 50:25 51:2 |
| **seven** 82:5,13 | 12:12,17 21:5 | **signs** 92:17 | 52:10,16 53:4 |
| 82:14 | **shoot** 61:25 | **single** 96:13 | 53:15,18,20,25 |
| **sex** 81:10,12,18 | 62:5 65:14 | **sir** 7:10 8:7,12 | 54:3,5,7,10,12 |
| **sexual** 81:6 | 89:16 | 8:17,21 9:3,5,7 | 54:15,18,20,24 |
| **shake** 8:4 | **shooting** 65:17 | 9:20,23 11:5,7 | 55:5 57:11,14 |
| **sharon** 79:9,10 | **shootings** 22:12 | 11:19 12:10 | 57:17,18,22,25 |
| 83:7,25 84:2,3 | | 13:8,12,15,23 | 58:3 59:17 |

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 150 of 159

**J.A. 1890**

| | | | |
|---|---|---|---|
| 60:16,19,24 | 120:2,21 | **specifically** | **statement** |
| 61:4,14 63:11 | **sister** 10:17 | 14:9 37:21 | 41:14 42:19 |
| 63:17,24 64:11 | **sit** 99:8,14 | 38:1 48:7 | 56:16,20 57:9 |
| 64:14,17,19,22 | **situation** 96:21 | 114:25 | 74:25 75:9 |
| 65:9,12,15,19 | **sleep** 64:5,23 | **specificity** | 81:23 82:1 |
| 65:23 66:8,11 | **slipped** 48:2 | 21:22 | 89:15 91:11 |
| 67:5,23 68:14 | **social** 53:21,22 | **speculation** | 94:9 99:4,4 |
| 69:14,17,20 | **solutions** 5:20 | 88:7 98:19 | 113:7,9 115:11 |
| 70:1,5 73:25 | 125:9 127:23 | 123:10 | 115:11,13,17 |
| 74:1,3,7,11,20 | **somebody** | **spend** 12:16,19 | 116:13,15,17 |
| 75:16 76:16 | 78:16 96:23 | 13:3 16:20 | 116:23 117:7 |
| 77:2 78:6,25 | 99:24,25 | 17:1 18:1,3 | 117:10 118:21 |
| 79:4 80:2,9,21 | 100:16 110:25 | 19:2 | 119:16,21 |
| 80:24 81:2,5,8 | **something's** | **spent** 17:20,21 | 120:4,10,15,19 |
| 81:10,12,15 | 100:13 | **spfeiffer** 2:7 | **statements** |
| 83:2,10,14 | **sonya** 2:3 6:7 | **splummer** 2:18 | 89:21 |
| 84:15 86:9,12 | 121:10 | **spoke** 8:15 30:8 | **states** 1:1 5:9 |
| 87:10 88:17 | **sorry** 10:11,16 | 30:9 34:19 | **station** 35:3,6,7 |
| 90:11,12,18 | 11:1 26:18 | 35:12,13 37:8 | 35:10 116:12 |
| 92:22 93:4 | 30:12 42:2 | **spoken** 30:1 | **staton** 109:9 |
| 94:2,5,15 95:9 | 64:12 68:9 | 109:15,18 | **stay** 54:1 |
| 97:14,24 98:1 | 104:2 115:13 | **spot** 94:24 | **stayed** 67:12 |
| 98:4,7,12,15 | **sort** 56:11 | **spruill** 2:16 | **steve** 83:1,3,12 |
| 100:3,8,8,21 | **sound** 8:6 | **staff** 30:4 | 83:16,19,21 |
| 101:2 102:13 | **speak** 28:2 30:2 | **stand** 74:16,19 | 84:1 92:20 |
| 102:21 103:13 | 30:4 50:3,8 | 74:22,24 | **stokes** 23:12,15 |
| 104:21 105:20 | 109:8,12,21,24 | 100:20 124:11 | 23:17,23,25 |
| 106:14 108:8 | **speaking** 16:4 | **standing** 90:12 | 24:2 77:19 |
| 110:13 111:14 | 16:25 17:4 | 94:18 | 78:14 |
| 112:6 113:7,25 | 25:5 30:14,19 | **started** 7:25 | **stood** 94:15 |
| 114:24 115:2 | 30:22 50:10 | 32:11 39:11 | **stop** 18:19 |
| 115:10,18,21 | 73:14 78:21 | **starting** 106:3 | 47:17,18 48:9 |
| 115:25 116:10 | 109:10 110:8 | **state** 3:5 5:22 | 48:14 53:5 |
| 117:6,17,22,25 | **specific** 14:4 | 5:25 6:25 7:3 | 94:25 |
| 118:10,14,18 | 36:4 53:9 | 61:8 126:1,5 | |

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 151 of 159

**J.A. 1891**

stopped  48:22
  49:2 86:21
  94:25
stoppers  67:14
store  9:21,22
stories  60:17
story  121:24
  122:2,6,11
  123:16,23
straight  20:15
strap  61:12
street  2:21 3:6
  5:15 9:13 12:9
  12:9,9,12,13,16
  12:17,23,25
  13:3,10,13
  14:2,18 16:11
  16:13 18:6
  19:5 21:5,5
  42:8 46:8
  86:21
stress  110:2
strike  43:17
stuff  38:17,17
  40:9,13 84:23
  88:10,16 90:9
  90:10,13 94:20
subscribed
  129:14
substance  8:9
suite  2:5,11,16
  2:21 3:6 5:15
supposed  55:11
  69:24 100:10

sure  7:22 9:3
  9:11 12:16
  14:22 15:22
  16:6,7,14 17:4
  18:20,22 19:9
  22:1 24:4,21
  25:4 27:7,9,18
  27:19,22 28:10
  28:12,18 30:3
  30:6,10,17
  32:2,12 33:10
  33:16 34:11,24
  35:18,24 41:18
  43:3,22 44:12
  45:3,19 48:5,8
  48:15,20 49:1
  49:9,15,25
  50:2,7,9,12,25
  51:8 53:13,15
  53:22 54:7
  57:5 59:17
  60:1,16 63:24
  64:8 65:1,4,5
  65:15,19 66:8
  66:11 67:5,20
  67:23 69:7
  70:23 71:15,24
  72:2,19 75:10
  75:23 76:12,18
  77:14,17 78:4
  78:17,24 79:4
  79:23 80:9
  83:7 84:11
  85:13 87:10
  89:23 92:22

  93:11 95:12
  96:7 97:9 98:7
  98:7,8,12,15
  103:10,19
  105:4,18 108:5
  109:17 110:13
  110:15 114:24
  115:15 118:5
  119:18 121:1
  122:4,23,25
  123:11
sustained  48:16
suzette  6:9
swain  102:24
swear  6:14
sworn  6:17
  126:8 129:14
sydney  2:15 6:6

**t**

t  128:3,3
take  21:8 24:17
  24:24 29:17,20
  33:14 35:3
  43:1 57:21,23
  58:2,21 59:4,5
  59:8,18 60:6
  68:18 70:17
  72:12 79:12
  84:22,22 91:9
  92:7,9,12,18
  98:17 101:12
  120:24 122:5
  122:15,19
taken  1:19 5:6
  21:14 43:6

  68:22 101:16
  121:5
talk  9:14 26:8
  26:12 27:17,19
  31:12 32:17,20
  33:4,7 34:1,19
  34:22 36:24
  38:16 40:1
  49:17,24 51:10
  51:18 54:25
  55:3 57:1
  59:25 60:20,25
  64:3 65:3 66:2
  66:6,9,18,24
  67:1,2,6,21
  72:7,14,18
  73:7,12,15,17
  73:21 74:4,8
  75:12 77:18,21
  78:18 80:22
  83:18 92:21,23
  93:1 94:17
  102:14,19
  103:3,14
  104:22,25
  107:20 108:15
  108:18,21,24
  123:16
talked  24:22
  26:9,11 27:20
  34:10,13 35:1
  35:18,25 36:6
  36:18 38:7
  39:20,21,25
  45:9,12 51:4

USCA4 Appeal: 25-1154   Doc: 23-4   Filed: 04/14/2025   Pg: 218 of 560  Total Pages:(218 of 560)

51:22 52:9,12
56:21,22 57:6
63:5,19,25
65:2,5 67:4
75:10 82:25
83:11,15,25
92:20 104:17
107:21 113:15
113:22 116:6
119:11,16,21
119:25
**talking**  13:4
15:21 20:14
25:15,21 26:3
27:23 30:11
31:14,15 35:9
35:22 36:21
37:2 38:4 45:8
49:21 50:16
51:9,12,12,15
51:24 52:5
57:3 59:5
62:20 65:7,10
69:4,10,18
73:11 74:12
78:11 82:22
87:2 94:4,5
104:8 107:24
108:2,4 111:4
114:14 124:8
124:13
**tanya**  44:11,17
45:20
**tape**  21:2,3,4
21:20,21 22:7

106:25
**target**  99:2
**teacher**  18:15
**technically**
96:21 112:2
**television**  20:14
20:18,20
**tell**  10:14,19
11:6,15,24
12:11 17:13
18:7,9 26:2,5
26:25 28:16
33:20 36:3
40:11,12,16
44:5 46:11
47:12,25 50:13
56:12 57:12
65:13,16,25
67:11 76:6
82:6,16 84:3
84:19,24 90:9
93:5,15 94:1,7
94:19 97:19
100:1 101:1
104:18 106:9
106:25 109:5
111:19 116:13
118:13,19,25
121:23 122:1
**telling**  40:5,6
40:19 69:15
82:19 97:24
98:4 99:15
100:14,15,22
110:3 123:17

124:18
**tells**  99:3
**term**  7:17
**terms**  111:21
**test**  51:25
97:20,23 98:3
98:11,14,17
**testified**  6:19
34:6,15 36:14
73:2 74:6,10
79:25 80:7
87:15 95:6,17
96:4 97:12
108:3,16,19,22
108:25 114:4
117:19 118:20
120:14 123:20
124:1
**testify**  57:19
80:3 108:6,9
108:11 109:6
117:16 118:13
118:16 121:16
121:20,21
122:10 126:8
**testifying**  44:15
92:7 117:14
**testimony**  4:17
77:16 91:22
92:3 93:23
109:16,19,22
125:6 126:14
127:9,18 129:8
**tettie**  11:25

**thank**  11:15,20
30:17 58:24
91:20 107:19
115:3 119:3,14
120:22 124:25
**theresa**  103:1,3
103:7,8,11,18
104:25
**thing**  62:18
99:15 114:14
**things**  29:15
40:5,19 94:19
95:11 96:17,18
96:19 98:21,22
121:1
**think**  15:20
19:14 26:23
27:1 32:16
36:4,16,16
39:8 57:19
70:15 71:10
77:20 85:6,7
91:4 92:25
93:2,4 107:14
110:11,24
111:1 112:15
116:4 124:7
**third**  58:16
82:9,11
**threatened**
47:14,20
100:11
**three**  58:11
61:24

**tiffany** 11:17
**time** 5:25 12:16
12:19 13:3,8
14:14 16:20
17:1,20,21
18:2,3,12 19:2
20:16,16 21:16
23:25 25:14
26:11 28:1
34:25 35:11,12
35:13,18 36:20
36:21 40:17,18
43:5,8,15 50:5
50:6 51:3,8,11
51:13,24 52:2
52:8,8,11 57:7
58:5,8,14,15,15
58:16,18 59:6
63:4,6,7,11,17
63:18 64:2,3
65:2,4,25
68:21,24 74:5
74:5,9,9,15
75:10 79:22
80:7 83:22,23
86:20 89:24
91:9 99:2
101:15,18
106:18,21
108:2 109:2,25
113:25 114:13
116:7 118:7,11
121:4,7 124:20
127:19

**timed** 115:23
**timeframe**
127:8
**times** 7:21
13:25 18:8
51:23 52:5
58:5
**timing** 63:15
**tina** 82:5,16
84:19
**tired** 92:17
**titles** 53:22
**today** 7:17 8:8
19:15 97:14,16
115:9
**today's** 8:14
125:6
**together** 34:25
36:6 62:24
66:7,10 75:24
80:15
**told** 18:11
38:14,15,18
40:14,21 48:14
58:19 62:9
70:3,4 72:19
72:24 73:3,5
84:1 86:17
89:3 90:7,8,13
93:17 94:5,9
94:15 95:14
97:25 98:1
99:15 107:8,16
118:5,23 122:1
122:6,11

123:15,20,22
123:23 124:6
**took** 25:3 26:20
29:3,24 34:1
36:10 58:4,6,9
58:22 61:20
85:1,3,15
113:20 121:15
**top** 55:19,25
61:7 93:21
113:12
**total** 125:7
**toys** 76:7,9
**transcript** 4:20
112:16,21
127:6,20 129:5
129:8
**transcription**
82:23
**transcripts**
40:24
**transportation**
118:11
**treated** 80:14
**trial** 69:2,7,10
69:12,21 70:21
70:23 72:17,23
73:11,13,23,24
73:25 74:2,6
74:10 77:15
78:3,5,8,19
79:1 81:13,14
92:23 93:13
99:18 100:7
109:6 117:15

117:19
**tried** 113:2
**true** 86:23 87:5
87:8,9,11
88:25 94:1,3,7
94:10,11,13
96:2,6 107:6,7
126:13 129:8
**truth** 62:10
97:24 98:4
100:14 110:3
126:8,9
**truthful** 113:15
**truthfully** 8:11
**try** 7:24 8:2,3
22:4 58:12
**trying** 9:25
13:21 14:15
17:14 37:7
42:3 97:1,3
99:8,12
**tuesday** 1:21
3:7 5:4 126:6
**turn** 55:25
81:25 86:17,18
88:19,21 89:12
91:5 93:21
95:23,24 113:8
**tv** 64:7 104:8
104:11,20,23
105:1,1,5
**twice** 95:10
**two** 29:15
51:23 52:1
58:5 59:5

61:16 89:21
90:15 125:8
**typewriting**
126:12

**u**

**uh** 101:22,22
**um** 38:20 41:16
103:6 119:24
**un** 30:10 72:2
77:14
**unable** 17:3
**unclear** 96:20
**under** 126:12
126:13
**understand**
7:12 8:10
12:14 13:20
14:15 17:14
21:19,24 22:4
29:12,13 92:18
111:17,21
116:1,22 118:1
123:7
**understanding**
17:17 110:17
110:20 111:17
111:23 112:3
**unexpectedly**
113:2
**unit** 5:5
**united** 1:1 5:9
**units** 125:8
**university**
19:20

**unknown** 98:21
98:22
**unsure** 27:15
29:16 30:24
36:8,23 37:13
49:16 50:20
53:6 58:23
59:13 77:23
80:21
**upstairs** 73:20
**use** 71:16,23
99:10 101:4,6
**used** 82:19
84:20,21 101:5
102:7 127:20

**v**

**v** 127:4 128:1
129:1
**verbal** 37:11
38:5
**verify** 127:9
**veritext** 5:19
125:9 127:14
127:23
**veritext.com**
127:15
**versus** 5:8
**victim** 99:8
**video** 4:19 5:5
106:1,23
**videographer**
2:24 5:2,18
6:13,22 21:12
21:15 43:4,7
68:20,23

101:14,17
105:18 106:8
106:17,20
121:3,6 125:5
**videotaped**
1:18 3:1
**visit** 12:4 13:14
13:16 79:18,21
79:22 80:10,20
**vs** 1:6,13

**w**

**wait** 8:2
**waiting** 29:4,18
**wake** 126:2
**walk** 9:18
**walked** 12:18
60:14 124:9
**walking** 9:15
9:19 12:8
42:10,11 94:24
**wanda** 13:1
15:7 16:2,6
44:3
**want** 11:13
21:17 26:22
32:21 37:4
54:21,23 59:2
65:20 71:3
72:8,10,20
92:9 97:6
100:9,12,13
101:20 104:16
104:17 105:12
109:5 112:1,3
113:1,3,18,21

118:23 119:1
121:20,20
**wanted** 21:22
21:23 54:20
**wanting** 112:1
**warrant** 117:23
**way** 14:17
16:23 17:2
24:20 27:14
52:13,17 56:10
61:23 68:16
72:16,22,23
74:13 81:15,16
89:22 94:24
97:7 100:16
111:14 116:14
117:11,16
118:16 121:12
122:17 124:14
**ways** 64:14
**week** 34:4
**went** 49:4 54:4
58:20 60:5
63:12 68:2,3
72:3 76:8,19
83:12,16,19,20
84:4,5,6,7
92:15 95:12
114:13
**when's** 58:14
**whereof** 126:19
**white** 95:1,2,4
**widenhouse** 2:5
**wiggly** 71:10
71:12 72:1,4

Case 4:21-cv-00185-BO   Document 196-6   Filed 09/12/24   Page 155 of 159

**J.A. 1895**

118:12
**wilmington**
  52:13 53:2,7
  63:13 68:2,3
  85:1,4,8,14,16
**windows** 39:5,7
**witness** 2:19
  3:2 6:14,17 7:4
  11:3 13:7
  15:20 21:7
  44:16 59:7
  104:2 126:11
  126:14,19
  127:8,10,12,19
**woman** 53:16
  53:17 110:14
**women's** 54:2
**woolsey** 6:9
**words** 101:4,5
  101:6
**work** 77:24
  78:2 92:14
**worked** 78:7
**workers** 53:21
  53:23
**worthington**
  2:5
**wound** 32:11
**write** 38:14,17
  38:18 39:24
  40:7,8,11,14,16
  86:10 87:21,24
  89:4 90:8,9,17
  94:14,20,23
  95:7,11,12,15

116:14 117:12
**writing** 39:11
  39:17 117:10
**written** 40:9
  74:23,25
  115:19 116:23
**wrong** 99:9
  100:13
**wrongful**
  102:20
**wrote** 38:21
  40:13,14,22
  41:13,14 56:7
  75:9 87:20
  88:24 89:7,15
  90:10,12,15,16
  94:15 116:22
  117:7 119:15
  119:20 120:4
  120:10,15,19

**y**

**yankee** 8:24
**yeah** 56:6 69:6
  81:15,17 82:14
  112:3 113:1
**year** 18:24
  107:21
**years** 97:17
**york** 8:23
**young** 98:25
**younger** 9:7,8

**z**

**zoom** 2:4,4 6:9

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

**J.A. 1898**

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# APPENDIX G



On Feb. 11, 1994   I WAS WALKing down 4th ON my
WAy TOO Licky Spot, I STOp At the STOp sign.
AND I SO DON+A AND A white MAle AND MARK JOY
DON+A WAS About To sAle thAt white MAle
A Rock but he ONly had 8.00 DON+A sAid
I can't do it you have to have the money
Straight up, ANd the white MAle sAid FuckyOU MAN
DON+A push him ANd then he pulled out A gON
A shot him.
                                    Charie North Jon
                                        4 7. 94  1:30 pm

Also DON+A move the truck A RAN it iN the
.eild ANd MARK ANd DON+A pick the white MAle
up And *F.x.x WhErE hE go.5ng* put him iN the truck AVd DON+A throw
the keys ANd the gun some Anere ANd AMARKAHd cMd
Split up ANd meet each noc/ ANd got into A
Red escort

                                    ChARlEDE NoRSMAlo
                                        4-7-94  1:34 pM

20

# APPENDIX H

# STATE OF NORTH CAROLINA

**In The General Court Of Justice**
**District Court Division**

Pitt     County

| File No. | |
|---|---|
| **94CR 02660** | |

## WARRANT FOR ARREST

**Offense**   Murder

**THE STATE OF NORTH CAROLINA VS.**

**Name, Address And Telephone No. Of Defendant**

Montoyae Dontae Sharpe
1202 Farmville Blvd.,
Greenville,N.C.

| Race | Sex | Date Of Birth | Age |
|---|---|---|---|
| B | M | | 19 |

**Social Security No.**    **Driver's License No.**

**Name Of Defendant's Employer**

| Offense Code | Offense In Violation Of G.S. |
|---|---|
| | 14-17 |
| | **Date Of Offense** |
| | 02-11-94 |

**Date Of Arrest And Check Digit No. (From Fingerprint Card)**
4-7-94 M03592

**Complainant (Name, Address Or Department, Phone No.)**

Det. C. J. Melvin
Greenville Police Dept.
Greenville,N.C.

**Witnesses (Names, Addresses, Phone Numbers)**

Det. D. R. Best
Greenville Police Dept.
Greenville,N.C.

**Date Issued**   4-7-94

**Date Of Service**

AOC-CR-100
Rev. 10/91

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below:

I, the undersigned, find that there is probable cause to believe that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously did of malice aforethought kill and murder George Edward Radcliffe.

This act was in violation of the law referred to in this Warrant. This Warrant is issued upon information furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring him before a judicial official without unnecessary delay to answer the charge(s) above.

**Signature**   _K Field_

☑ Magistrate   ☐ Deputy CSC
☐ Assistant CSC   ☐ Clerk Of Superior Court

**Location Of Court**   Greenville

**Court Date**    **Court Time**   9:00   ☑AM ☐PM

Sharpe 007589

If this Warrant For Arrest is not served within one hundred and eighty (180) days, it must be returned to the Clerk of Court in the county in which it was issued with the reason for the failure of service noted thereon. The officer must state all steps taken by his department in attempting to execute the warrant and any information obtained about the whereabouts of the defendant.

**RETURN OF SERVICE**

I certify that this Warrant was received and served as follows:

| Date Received | Date Served | Date Returned |
|---|---|---|
| 4-7-84 | 4-7-84 | |

☒ By arresting the defendant and bringing him before:

Name Of Judicial Official

Jackson

☐ This Warrant WAS NOT served for the following reason:

Signature Of Officer Making Return

D. Nano

Department Or Agency Of Police

Greenville Police Dept

**RETURN FOLLOWING REDELIVERY**

I certify that this Warrant was received and served as follows:

| Date Received | Date Served | Date Returned |
|---|---|---|

☐ By arresting the defendant and bringing him before:

Name Of Judicial Official

☐ This Warrant WAS NOT served for the following reason:

Signature Of Officer Making Return

Department Or Agency Of Officer

AOC-CR-100, Side Two
Rev. 10/91

---

Name Of Attorney For Defendant At Time Of Trial Or Plea

☐ Waived Attorney

PLEA: ☐ guilty     VERDICT: ☐ guilty
    ☐ not guilty     ☐ not guilty
    ☐ no contest

☐ It is ORDERED that this case be consolidated for judgment with case number _____

JUDGMENT: The defendant appeared in open court and freely, voluntarily and understandingly entered the above plea; on the above verdict it is ORDERED that he: ☐ pay a fine of $ _____ and costs.
☐ be imprisoned for a term of _____ in the custody of the
☐ Sheriff. ☐ N. C. DOC. ☐ With defendant's consent, execution of the sentence is suspended and he is placed on unsupervised probation for _____ years, subject to the following conditions:
1. commit no criminal offense in any jurisdiction. 2. possess no firearm, explosive or other deadly weapon listed in G.S. 14-269. 3. remain gainfully and suitably employed or faithfully pursue a course of study or of vocational training that will equip him for suitable employment. 4. satisfy child support and family obligations, as required by the Court.
5. pay to the Clerk of Superior Court the costs of court and any additional sums shown below.

| Fine | Restitution* | Attorney's Fee | Community Service Fee | Other |
|---|---|---|---|---|
| $ | $ | $ | $ | |

*The name(s) and address(es) and amount(s) due the person(s) to receive this restitution are:

☐ 6. complete _____ hours of community service during the first _____ days of probation, as directed by the community service coordinator, and pay the fee prescribed by G.S. 143B-475.1(b).

☐ 7. surrender his driver's license to the Clerk of Superior Court for transmittal to the Division of Motor Vehicles and not operate a motor vehicle for a period of _____ or until relicensed by the Division, whichever is later, except as may be permitted in a limited driving privilege.

☐ 8. not be found in or on the premises of _____ located at _____

☐ 9. not assault, communicate with or be in the presence of _____

☐ 10. this sentence is to run at the expiration of the sentence in case number _____

☐ 11. Other: _____

_____ Sharpe 007588

☐ The defendant, in open court, gives notice of appeal to the Superior Court.

PROBABLE CAUSE: ☐ Probable cause is found as to all Counts except _____ and the defendant is bound over to Superior Court for action by the grand jury.
☐ No probable cause is found as to Count(s) _____ of this Warrant, and the Count(s) is dismissed.

| Date | | Signature Of District Court Judge |
|---|---|---|

WAIVER OF PROBABLE CAUSE HEARING: The undersigned defendant, with the consent of his attorney, waives his right to a probable cause hearing.

| Date Waived | Signature Of Defendant | Signature Of Attorney |
|---|---|---|

NOTE: If defendant is placed on supervised probation, judge should NOT execute judgment on this form, but on AOC-CR-302. Clerk may use this form for courtroom notes.

**J.A. 1904**

STATE OF NORTH CAROLINA

In The General Court Of Justice
District Court Division

Pitt     County

File No. **94CR 07659**

## WARRANT FOR ARREST

Offense

**Murder**

**THE STATE OF NORTH CAROLINA VS.**

Name, Address And Telephone No. Of Defendant

Mark Eldridge Joyner
1903 Norcott Cir.
Greenville, N.C.

| Race | Sex | Date Of Birth | Age |
|------|-----|---------------|-----|
| B | M | | 23 |

Social Security No.     Driver's License No.

Name Of Defendant's Employer

| Offense Code | Offense In Violation Of G.S. |
|--------------|------------------------------|
| | 14-17 |

Date Of Offense
02-11-94

Date Of Arrest And Check Digit No. (From Fingerprint Card)
4-7-94 M359300

Name, Address Of Department, Phone No.)

Det. C. J. Melvin
Greenville Police Dept.
Greenville, N.C.

(Name, Address, Phone Number)

Det. D.R. Best
Greenville Police Dept.
Greenville, N.C

Date Issued
4-7-94

Date Of Service

AOC-CR-100
Rev. 10/91

To any officer with authority and jurisdiction to execute a warrant for arrest for the offense(s) charged below:

I, the undersigned, find that there is probable cause to believe that on or about the date of offense
shown and in the county named above the defendant named above unlawfully, willfully and feloniously
did of malice aforethought kill and murder George Edward Radcliffe.

This act was in violation of the law referred to in this Warrant. This warrant is issued upon information
furnished under oath by the complainant listed. You are DIRECTED to arrest the defendant and bring
him before a judicial official without unnecessary delay to answer the charge(s) above.

Signature

☒ Magistrate    Location Of Court   Greenville
☐ Deputy CSC
☐ Assistant CSC    ☐ Clerk Of Superior Court   Court Date   9:00 ☐ AM ☐ PM

# APPENDIX I

CITY OF GREENVILLE, N.C. POLICE DEPARTMENT

**1994** EMPLOYEE SERVICE RECORD

Name: Melvin, Carolyn

Balances brought forward:
18½ Vac.
61½ Sick
11⅔ Holiday

| | | | HOURS VACATION | | | HOURS SICK LEAVE | | | HOURS HOLIDAY | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | − | + | net | − | + | net | − | + | net |
| **JANUARY** | | | | | | | | | | | |
| DAY | 17 18 24 | | | | | | | | | | |
| LEAVE | 8 8 5 | | 8 | 10 | 20½ | 5 | 5 | 64½ | 8 | 7⅓ | 16 |
| | L L V | | | | | | | | | | |
| **FEBRUARY** | | | | | | | | | | | |
| | 18 21 22 | | | | | | | | | | |
| | 8 8 8 | | − | 10 | 30½ | 24 | 8 | 48½ | − | 7⅓ | 18 |
| | S V V | | | | | | | | | | |
| **MARCH** | | | | | | | | | | | |
| | 8 10 11 14 15 16 17 18 24 31 | | | | | | | | | | |
| | S S 8 8 8 8 8 8 3 8 | | 45 | 10 | ⟨4½⟩ | 24 | 8 | 32½ | | 7⅓ | 2⅔ |
| | V V V V V V S S | | | | | | | | | | |
| **APRIL** | | | | | | | | | | | |
| | 1 13 14 15 27 | | | | | | | | | | |
| | 8 8 8 8 8 | | 24 | 10 | ⟨18½⟩ | | 5 | 40½ | 16 | 7⅓ | |
| | L V V V V | | | | | | | | | | |
| **MAY** | | | | | | | | | | | |
| | 30 | | | | | | | | | | |
| | 8 | | | 10 | ⟨8½⟩ | | 8 | 48½ | 8 | 7⅓ | 16 |
| | L | | | | | | | | | | |
| **JUNE** | | | | | | | | | | | |
| | 10 13 21 22 | | | | | | | | | | |
| | 8 8 8 8 | | 16 | 10 | ⟨14½⟩ | 16 | 8 | 40½ | | 7⅓ | |
| | V V S S | | | | | | | | | | |
| **JULY** | | | | | | | | | | | |
| | 1 14 22 | | | | | | | | | | |
| | 8 3 6 | | 14 | 10 | ⟨18½⟩ | 3 | 8 | 45½ | | 7⅓ | |
| | V S S | | | | | | | | | | |
| **AUGUST** | | | | | | | | | | | |
| | 16 17 18 19 29 | | | | | | | | | | |
| | 1½ 6 6 8 8 | | | 10 | ⟨8½⟩ | 8 | 5 | 45½ | 21½ | 7⅓ | 1⅙ |
| | L L L L S | | | | | | | | | | |
| **SEPTEMBER** | | | | | | | | | | | |
| | 5 19 20 23 | | | | | | | | | | |
| | 8 8 8 4½ | | 21½ | 10 | ⟨19⟩ | | 8 | 53½ | 8 | 7⅓ | 10 |
| | L V V V | | | | | | | | | | |
| **OCTOBER** | | | | | | | | | | | |
| | 6 10 25 27 | | | | | | | | | | |
| | 8 4 1 8 | | | 10 | ⟨9⟩ | 16 | 8 | 45½ | 5 | 7⅓ | 18.3 |
| | S L L S | | | | | | | | | | |
| **NOVEMBER** | | | | | | | | | | | |
| | 7 8 9 10 11 14 15 16 17 18 24 | | | | | | | | | | |
| | S 8 8 8 8 8 8 8 4½ 8 5½ | | 10 | 1 | 50 | 8 | 3½ | | 26 | 7⅓ | ⟨⅓⟩ |
| | S S S S V V L L L L L | | | | | | | | | | |
| **DECEMBER** | | | | | | | | | | | |
| | 26 27 | | | | | | | | | | |
| | 8 5 3½ | | 5 | 10 | 6 | 3½ | | 8 | 8 | 7⅓ | ⟨1⟩ |
| | V S | | | | | | | | | | |

Symbols: V = Vacation
S = Sick Leave
H = Holiday

GPD 0728

Name _____

Case 4:21-cv-00185-BO   Document 196-9   Filed 09/12/24   Page 2 of 2

# APPENDIX J

**STATE OF NORTH CAROLINA**
In the General Court of Justice
Superior Court Division

_____ Pitt _____ County

| File No. |
| 94 CRS 7659 |

Film No.

| Defendant | |
| **STATE VERSUS** | **INDICTMENT MURDER** |
| Mark Eldridge Joyner | |
| Date of Offense | Offense in Violation of G.S |
| 2/11/94 | 14-17 |

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder

George Edward Radcliffe

[Note. This indictment is sufficient to charge both First and Second Degree Murder. G.S. 15-144; G.S. 15-156. A prosecutor who only intends to prosecute for Second Degree Murder may want "Second Degree" typed before "Murder" in the offense block.]

Signature of Prosecutor

**WITNESSES**

| ☐ C.J. Melvin | GPD | ☐ |
| ☒ D.R. Best | GPD | ☐ |
| ☐ | | ☐ |
| ☐ | | ☐ |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing testimony, this bill was found to be:

☒ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

| Date | Signature of Grand Jury Foreman |
| 4-18-94 | |

AOC-CR-124

**J.A. 1909**

**STATE OF NORTH CAROLINA**
In the General Court of Justice
Superior Court Division

Pitt _____ County

File No.

94 CRS 7660

Film No.

STATE VERSUS

Defendant
Montoyae Dontae Sharpe

Date of Offense 2/11/94

Offense in Violation of G.S.
14-17

**INDICTMENT
MURDER**

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder

George Edward Radcliffe

[*Note: This indictment is sufficient to charge both First and Second Degree Murder. G.S. 15-144; G.S. 15-155. A prosecutor who only intends to prosecute for Second Degree Murder may want "Second Degree" typed before "Murder" in the offense block.*]

Signature of Prosecutor

**WITNESSES**

| | | | |
|---|---|---|---|
| ☐ C.J. Melvin | GPD | ☐ | |
| ☒ D.R. Best | GPD | ☐ | |
| ☐ | | ☐ | |
| ☐ | | ☐ | |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing testimony, this bill was found to be:

☒ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

Date
4-18-94

Signature of Grand Jury Foreman

Sharpe 007583

AOC-CR-124
Rev. 7/82.

# APPENDIX K



**STATE BUREAU OF INVESTIGATION**
**INVESTIGATIVE FILE DISSEMINATION REQUEST**

| | |
|---|---|
| CASE NUMBER: RPG94KM027 | DATE: March 11, 2014    ☒ RUSH |
| VICTIM OR SUSPECT: Montoya Sharpe (suspect) | |
| REQUESTING AGENT: Special Deputy AG Angel Gray | |

**Part I**

☐ Transcribe and prepare copy of SBI-11 & SBI 11-As for individual(s) listed in Part II.

☐ Prepare copy of the SBI-11As already typed and copy of subsequent SBI-11As for individual(s) listed in Part II.

☒ Prepare copy of CASE. (Include SBI-11, SBI-11As, SBI-11Bs, SBI-4s and SBI-19s).

    Also  ☒  Memorandum  ☒  Correspondence  ☒  SBI-10  ☒  SBI-69As & SBI-69Bs  ☒  SBI-102

☐ Prepare copy of the following **SPECIFIC** reports. Please check each report to be copied.

| | |
|---|---|
| ☐ SBI-4, Arrest and Physical Description | ☐ SBI-10, 10A, 10B, 10C, 10D, or 98, Case Identification |
| ☐ SBI-11, Investigative Cover Sheet | ☐ SBI-11A, Investigative Report |
| ☐ SBI-11B, Attachment Cover Sheet | ☐ SBI-19, Final Disposition |
| ☐ SBI-24, Drug Statistics Report | ☐ SBI-53, Polygraph |
| ☐ SBI-69A, Evidence Accountability | ☐ SBI-69B, Physical Evidence/Transfer Receipt or Disposition |
| ☐ SBI-102, Indices | ☐ SBI-106, Homicide Investigation Inactive Status |
| ☐ Photographic Work Order Request | ☐ Correspondence |
| ☐ Other | |

                                   List Each Report

☐ Notification to the Records Center that the previously designated individual,
is no longer participating in the investigation. His copies of the reports and all subsequent reports should be designated to:

(Name) _____    (Title) _____
(Address) _____

**Part II**

Designate Copy To: (Name, Title, and Agency)

Theresa Newman—Duke Wrongful Convictions Clinic

              ☒  Requesting Agent; or Name, Title, and Address    ☐  Same as Above, Please Provide Address

[stamp: RECEIVED MAR 11 2014 SBI RECORDS]

| | |
|---|---|
| Purpose of Request:  ☐  Law Enforcement Certification Review | ☐  Federal Forfeiture Investigation |
|                       ☐  Federal Prosecution | ☐  Joint Investigation |

Post-conviction relief—pending MAR

**AUTHORIZATIONS**

_(signature)_ Special Agent in Charge          _Erik C. Hooks_ Assistant Director

Reel 27 Loc. 31487   ✓ PLEASE MAIL TO RECORDS CENTER    Printed & delivered 3/12/14 (SS)

SBI-104 (10/95)



–53                                                                    7-86        Reel 27
                                                                                    Loc. 31487

N.C STATE BUREAU OF INVESTIGATION

POLYGRAPH REPORT

POLYGRAPH FILE # (612)RPG94KM027        EXAMINER: KELLY MOSER

SBI INVESTIGATIVE FILE # N/A

DATE OF EXAM: 08-29-94 EXAM LOCATION: PITT                GREENVILLE
                                                   (COUNTY)        (CITY)
REQUESTING AGENCY:GREENVILLE POLICE DEPT.           OCAN 94-1108

INVESTIGATORS:DET. RICKY BEST

OFFENSE: HOMICIDE                        DATE: 02-11-94

CRIME LOCATION: PITT                       GREENVILLE
                 (COUNTY)                    (CITY)
VICTIM: GEORGE EDWARD RADCLIFF

RACE: WHITE      SEX: MALE    DATE OF BIRTH:

ADDRESS: UNK.

EXAMINEE: MONTOYA DONTE SHARPE

RACE: BLACK    SEX: MALE   DOB: ███████   HEIGHT: 6'4"   WEIGHT: 220

ADDRESS: 1202 FARMVILLE ROAD, GREENVILLE, N.C.

TYPE: SUSPECT            (VICTIM, WITNESS, SUSPECT, DEFENDANT, APPLIC)

NUMBER OF TESTS: THREE

OPINION      NDI          DI    XXX       RECEIVED
                                          AUG 29 1994
             R            S           RE SBI
                                  NORTHEASTERN DISTRICT
             C            NS

NUMERICAL EVALUATION: -9

REMARKS: 5. DID YOU SHOOT GEORGE RADCLIFF?   NO    7. DID YOU
         PARTICIPATE IN ANY WAY IN THE SHOOTING OF GEORGE RADCLIFF?
         NO    10. DO YOU KNOW FOR SURE WHO SHOT GEORGE RADCLIFF?
         NO   THE EXAMINEE WAS IN CUSTODY FOR THIS CRIME AT THE TIME
         OF THIS TEST. THE ADVICEMENT OF RIGHTS WAS ADMINISTERED BY
         & IN THE PRESENCE OF HIS ATTORNEY. THE EXAMINEE DENIED ANY
         INVOLVEMENT IN THE CRIME.                 SBI POLYGRAPH SECTION

# NORTH CAROLINA STATE BUREAU OF INVESTIGATION
## NUMERICAL CHART ANALYSIS

File # 612RAG-94PKC27    Evaluator: Bridges

Examinee: M.D. Sharpe

| | C1/R1 | | C2/R2 | | C3/R3 | |
|---|---|---|---|---|---|---|
| | 4/5 | | 6/7 | | 9/10 | |
| Pneumo | | | | | | |
| G.S.R. | | | | | | |
| Cardio | | | | | | |
| Total | | | | | | |
| Grand Total | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pneumo | | | | | | |
| G.S.R. | | | | | | |
| Cardio | | | | | | |
| Total | | | | | | |
| Grand Total | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Pneumo | | | | | | |
| G.S.R. | | | | | | |
| Cardio | | | | | | |
| Total | | | | | | |
| Grand Total | | | | | | |

TOTAL NUMERICAL EVALUATION   RECEIVED   -9    -7

SBI POLYGRAPH SECTION

SBI 107

Sharpe-014517

J.A. 1914

# INVESTIGATIVE ACTIVITY

**Date:**   03/18/2014

**Case Number:**   RPG94KM0273

| Activity | Agent | Activity Date | Opinion | Description of Activity |
|---|---|---|---|---|
| **Name: Sharpe, Montoya Donte** | | | | |
| Polygraph | 612 | 08/29/1994 | 02 - Deception Indicated | -9 |

# APPENDIX L

# W. GREGORY DUKE
ATTORNEY AT LAW
BLOUNT & DUKE
119 WEST FOURTH STREET
GREENVILLE, NORTH CAROLINA 27858

TELEPHONE (252) 758-4444
FACSIMILE (252) 758-4080

<u>Via Federal Express</u>

September 16, 2004

Ms. Gaya Gunasekaran
c/o Associate Dean Theresa Newman
Duke University School of Law
Durham, NC 27708

      Re:  Montoyae Dontae Sharpe

Dear Gaya:

You will find enclosed the transcript from Mr. Sharpe's trial, the transcript from
the hearing on the first Motion for Appropriate Relief, the transcript from the
hearing on the second Motion for Appropriate Relief, and a Memorandum of Law
prepared by me (with exhibits) on behalf of Mr. Sharpe during my representation
of him.  I have also enclosed the Motion for Appropriate Relief I filed on Mr.
Sharpe's behalf.  I will supplement the above material once I have gathered the
other documents from Mr. Sharpe's prior legal counsel.

I appreciate your willingness to assist Mr. Sharpe and me.  I look forward to
meeting you.

Sincerely,

W. Gregory Duke

enclosures

Sharpe 000001

J.A. 1917

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
COUNTY OF PITT                SUPERIOR COURT DIVISION
                             FILE NO. 94-CRS-7660


STATE OF NORTH CAROLINA    )    T-R-A-N-S-C-R-I-P-T
                           )
            VS.            )          Volume I
                           )       (Pages 1-214)
MONTOYAE DANTAE SHARPE,    )

        The transcript of the jury trial proceedings
taken in the General Court of Justice, Superior Court
Division, Pitt County, North Carolina, at the July 24,
1995, Criminal Session before the Honorable J. Richard
Parker, Jr., Judge Presiding.


APPEARANCES:

Mr. Clark Everett
Assistant District Attorney
Greenville, North Carolina
On behalf of the State.

Mr. R. Cherry Stokes
Attorney at Law
Greenville, North Carolina
On behalf of the Defendant.


Tina McNair
Official Court Reporter
Judicial District 3A
Pitt County Courthouse
Greenville, North Carolina  28735

2

INDEX

VOLUME I
Voir dire of:
 Juror #2

Motions:
 Witness statements, 18;
 Witness sequestration, 19
 Photograph sequestration, 21
 Defendant's statement, 22
 Witness list, 32.

EVIDENCE FOR THE STATE:

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Charlene Johnson | 37 | 51 | 84 | 86 |
| Alonzo Vines | 88 | 97 | 99 | |
| Kenneth Denton | 100 | 106 | | |
| Kevin Jones | 108 | 114 | 124 | 128 |
| Ralph Mendenhall | 130 | 145 | 162 | 164 |
| M.G.M. Gilliland | 165 | 186 | 193 | |
| T. R. Trochum | 194 | 210 | 214 | |

VOLUME II

| Beatrice Stokes | 215 | 226 | | |
| D. R. Best | 245 | 257 | 270 | 273 |
| Carolyn Melvin | 274 | 280 | | |

State rested, 287

Motion:
 Strike testimony of Charlene Johnson, 288

EVIDENCE FOR DEFENDANT:

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Patricia Ward | 302 | 307 | | |
| Patricia Hicks | 314 | 318 | | |
| Angela Sutton | 327 | 331 | | |
| Tracy Highsmith | 334 | 358 | | |

Motion:
 Inadmissibility of statement
                 Denied, 357

Defendant rested, 376
Charge conference 377
Charge, 385

**J.A. 1919**

3

STATE'S EXHIBITS:

| Exhibit No. | Marked | Offered | Received |
|---|---|---|---|
| 1-blackboard | 45 | 45 | 45 |
| 2-photo | 32 | 136 | 136 |
| 3-photo | 32 | 136 | 136 |
| 4-photo | 32 | 136 | 136 |
| 5-photo | 32 | 136 | 136 |
| 6-photo | 32 | 136 | 136 |
| 7-photo | 32 | 136 | 136 |
| 8-gun | 141 | 143 | 143 |
| 9-casing | 141 | 143 | 143 |
| 10-casing | 141 | 113 | 143 |
| 11-bullet | 143 | 143 | 143 |
| 12-photo | 173 | 175 | 175 |
| 13-photo | 178 | 178 | 178 |
| 14-photo | 178 | 178 | 178 |

DEFENDANT'S EXHIBITS:

| Exhibit No. | Marked | Offered | Received |
|---|---|---|---|
| 1-accident report | 115 | 363 | Not admitted |
| 2 accident report | 123 | 363 | 373 |
| 3-lab report | 268 | 363 | 373. |

Voir dire Exhibits:

| | Marked | | Received |
|---|---|---|---|
| 1-report | 29 | | 374 |
| 2-report | 374 | | 374 |
| 2A-report | 374 | | 374 |

4

```
1              THE COURT:  Members of the jury, the first
2    case being called for trial this week, State of North
3    Carolina vs. Montoyae Dantae Sharpe.  Mr. Sharpe is
4    seated over here on my left, on your right side of the
5    courtroom, with his attorney Cherry Stokes.  Mr. Sharpe
6    is charged with the defense of first-degree murder.  To
7    this charge he's entered a plea of not guilty.  Under
8    the law of North Carolina Mr. Sharpe is presumed to be
9    innocent unless the State of North Carolina proves to
10   you his guilt beyond a reasonable doubt.
11              All right, Madam Clerk, if you will call 12
12   jurors.
13              At she calls your name, if you will come up
14   and have a seat in the seat as designated.
15              (Clerk complied.)
16              THE COURT:  Now, members of the jury during
17   the selection process I will ask you a number of
18   questions, followed by the attorney for the State and
19   then followed by the attorney for the defendant.  Many
20   of the questions that we're going to ask you are not
21   intended to pry into your personal affairs or to
22   embarrass you in any way.  We're merely seeking to
23   select a jury that can be fair and impartial to the
24   State of North Carolina and to the defendant
25   Mr. Sharpe.  If your answers to any of my questions are
```

Sharpe 000005

**J.A. 1921**

```
 1     "yes", just indicate it by raising your hand.

 2               (Jury Selection.)

 3               THE COURT:  Before Mr. Stokes ask you any

 4     questions, we will take a recess.  During this recess

 5     and any other recess, let me instruct you, you're not

 6     to discuss this case among yourselves.  Don't allow

 7     anyone to discuss it with you.  Don't talk to the

 8     attorneys, defendant or witnesses about anything.

 9     Don't form any kind of opinion about the case.  Those

10     of you in the box, when you come back after the recess,

11     if you would take the same seats that you presently

12     occupy.  We will be in recess for 15 minutes.

13     (Recess.)

14               THE COURT:  Members of the jury, we're going

15     to our evening recess at this time but I have some

16     instructions for you.  Again let me remind you that

17     you're not to discuss this case overnight with anyone

18     or allow anyone to discuss it with you.  Don't talk to

19     any of the witnesses, the attorneys or the defendant

20     about anything, and don't form any kind of opinion

21     about the case.

22               Anything else before we take our evening

23     recess, gentlemen?

24               THE COURT:  The jurors are excused then and

25     be back tomorrow.
```

J.A. 1922

6

```
 1   (Overnight recess.)
 2            THE COURT:  Members of the jury, the first
 3   case being called for trial this week, State of North
 4   Carolina vs. Montoyae Dantae Sharpe.  Mr. Sharpe is
 5   seated over here on my left, on your right side of the
 6   courtroom, with his attorney Cherry Stokes.  Mr. Sharpe
 7   is charged with the defense of first-degree murder.  To
 8   this charge he's entered a plea of not guilty.  Under
 9   the law of North Carolina Mr. Sharpe is presumed to be
10   innocent unless the State of North Carolina proves to
11   you his guilt beyond a reasonable doubt.
12            All right, Madam Clerk, if you will call 12
13   jurors.
14            At she calls your name, if you will come up
15   and have a seat in the seat as designated.
16            (Clerk complied.)
17            THE COURT:  Now, members of the jury during
18   the selection process I will ask you a number of
19   questions, followed by the attorney for the State and
20   then followed by the attorney for the defendant.  Many
21   of the questions that we're going to ask you are not
22   intended to pry into your personal affairs or to
23   embarrass you in any way.  We're merely seeking to
24   select a jury that can be fair and impartial to the
25   State of North Carolina and to the defendant
```

```
 7
```

1    Mr. Sharpe.  If your answers to any of my questions are

2    "yes", just indicate it by raising your hand.

3              (Jury Selection.)

4              THE COURT:  Before Mr. Stokes ask you any

5    questions, we will take a recess.  During this recess

6    and any other recess, let me instruct you, you're not

7    to discuss this case among yourselves.  Don't allow

8    anyone to discuss it with you.  Don't talk to the

9    attorneys, defendant or witnesses about anything.

10   Don't form any kind of opinion about the case.  Those

11   of you in the box, when you come back after the recess,

12   if you would take the same seats that you presently

13   occupy.  We will be in recess for 15 minutes.

14   (Recess.)

15             THE COURT:  Members of the jury, we're going

16   to our evening recess at this time but I have some

17   instructions for you.  Again let me remind you that

18   you're not to discuss this case overnight with anyone

19   or allow anyone to discuss it with you.  Don't talk to

20   any of the witnesses, the attorneys or the defendant

21   about anything, and don't form any kind of opinion

22   about the case.

23             Anything else before we take our evening

24   recess, gentlemen?

25             THE COURT:  The jurors are excused then and

8

```
 1    be back tomorrow.

 2    (Overnight recess.)

 3          THE COURT:  Mr. Cherry, I believe we're

 4    ready for you to examine these four new jurors.

 5          MR. STOKES:  Thank you, Your Honor.

 6    (Jury selection continues.)

 7          THE COURT:  Members of the jury, we're going

 8    to take a recess at this.  Remember during this recess,

 9    don't discuss this case among yourselves or allow

10    anyone to talk to you.  Don't talk to the attorneys,

11    the defendant or witnesses involved in this case.

12    Don't form any kind of opinion about this case.  I told

13    you last night if there are any news accounts about

14    this trial in the newspapers or TV or radio, you're not

15    to read or listen to any accounts of the trial in this

16    case.  When you come back after the recess, those of

17    you in the box take the same seats you presently

18    occupy.  We will be in recess for 15 minutes.

19    (Recess.)

20          To the members of the jury who have been

21    selected to sit on this case, I need to take up a

22    matter outside the presence of the jury.  With the

23    exception of Juror Number 6, Susan Cox, I'm going to

24    ask that the other jurors step into your jury room for

25    a few minutes.  While you're in there, don't discuss
```

Sharpe 000009

**J.A. 1925**

9

```
 1    the case among yourselves or form any kind of opinion
 2    about the case.  We'll send for you when we need you.
 3    (Jury out.)
 4                THE COURT:  Let the record reflect that all
 5    jurors with the exception of Juror Number 6, Susan Cox,
 6    are absent from the courtroom, and the Court is now
 7    conducting the hearing based upon the fact that I was
 8    contacted this morning prior to the resumption of this
 9    session of court by the District Attorney who advised
10    that the father of Juror Number 6, Susan Cox, had
11    contacted him and expressed reservations about his
12    daughter serving on this jury; that there was some
13    discussion last night as to whether or not she could be
14    a fair and impartial juror, between she and your
15    father.  The Court is now going to conduct a hearing to
16    determine the suitability of this juror to continue
17    serving as a juror in this case.
18    VOIR DIRE EXAMINATION BY THE COURT:
19    Q.    Ms. Cox, as I just indicated, your father has
20    contacted the District Attorney, and I also talked to
21    him this morning in which he expressed some reservations
22    about your serving on this jury.  I want to address my
23    questions to you now about how you feel about your jury
24    service in this case, as to whether or not anything has
25    changed from yesterday when you were selected to sit on
```

10

1   this case.

2   A.    Just the more I thought about it, I really feel

3   uncomfortable about deciding this case.

4   Q.    All right.  You indicated yesterday that you had

5   gone to school with the defendant Mr. Sharpe?

6   A.    Right.

7   Q.    And you told me yesterday you do not think that

8   that would affect your decision to be fair and impartial

9   in this case.  Do you feel like -- has something changed

10  from what you told me yesterday that you now feel like

11  that it would be difficult for you to be fair and

12  impartial because of your knowledge of the defendant?

13  A.    Yes.

14  Q.    And how old are you, Ms. Cox?

15  A.    Twenty.

16  Q.    You're twenty now?

17  A.    (Juror nodding head.)

18  Q.    Was Mr. Sharpe in your class as a senior in high

19  school or in your grade?

20  A.    I don't remember him our senior year but before

21  that.

22  Q.    What years are you talking about?

23  A.    Junior high and high school.

24  Q.    Junior high and high school?

25  A.    (Juror nodding head.)

11

```
1   Q.   Was he in your same grade?

2   A.   Yes.

3   Q.   You and he are approximately the same age?

4   A.   Yes.

5   Q.   So you have known him for how many years, would

6   you say?

7   A.   I guess like five or six.

8   Q.   Five or six years.  Is there any other thing that

9   you can think of that would cause you some problems in

10  sitting on this case?

11  A.   Other than emotions, no.

12  Q.   Other than what?

13  A.   Emotions.

14  Q.   Emotions?

15  A.   (Juror nodding head.)

16  Q.   Emotions about what, about what in particular?

17  A.   Just -- I don't know.  I'm real uncomfortable that

18  I know who he is and that I've never done anything like

19  this before.

20           THE COURT:  Has either the State or the

21  defendant any questions of this juror?

22           MR. EVERETT:  One moment, Judge.

23  VOIR DIRE EXAMINATION BY MR. EVERETT:

24  Q.   Ma'am, do you feel like that -- I know you don't

25  want to be here and most people rather be somewhere else
```

**J.A. 1928**

12

1   than jury service, but do you feel like you have some --

2   this case would be some special inconvenience or special

3   problem to you that an ordinary juror doesn't have

4   because you know the defendant?

5   A.   (Juror nodding head.)

6          THE COURT:  Would you answer out loud please

7    for the transcriber.

8   A.   Yes.

9   BY MR. EVERETT:

10  Q.   Do you feel like that you would not be able to

11  render a verdict based on the evidence?

12  A.   Yes.

13  Q.   Do you understand that you're going to have to put

14  your hand on the Bible and tell the Court that you'll

15  render a verdict that's the truth?  Do you feel like you

16  could do that?  And that's what the Judge is going to

17  tell you.  You feel like you could listen to the

18  evidence and render a verdict based on the evidence?

19  A.   Um, 1 mean, I can't -- I wouldn't know, you know,

20  until the end.

21  Q.   Would you be able to sit on some other jury, some

22  other case?

23  A.   Yes.

24  Q.   This is a case that -- the specific case rather

25  than just the jury duty in particular?

Sharpe 000013

J.A. 1929

13

```
 1   A.      Right.

 2   Q.      And the reason is you know the defendant?

 3   A.      Right.

 4   Q.      And you have some reservations about deciding the

 5   case that the defendant is someone that you know?

 6   A.      Right.

 7   Q.      That's the bottom line?

 8   A.      (Juror nodding head.)

 9   Q.      Yesterday you told us that wasn't a problem.  Is

10   it something that came about overnight thinking about

11   it?

12   A.      Yes.

13   Q.      And you feel like there is a substantial

14   likelihood that you would not be able to base your

15   verdict on the evidence?

16   A.      Yes.

17   Q.      Is that because of --

18               MR. EVERETT:  No further questions, Judge.

19               THE COURT:  Mr. Stokes, you have any

20   questions of this juror?

21               MR. STOKES:  Yes, sir.

22   VOIR DIRE EXAMINATION BY MR. STOKES:

23   Q.      Ms. Cox, at the present time, since you've had a

24   chance to think about it overnight, are you trying to

25   tell us that you do not feel like you could be fair to
```

14

```
 1   one side or the other?  It doesn't matter which side.

 2   Do you feel like that you just could not be fair in this

 3   case?

 4   A.    It's the fact -- I don't know.  I really am

 5   uncomfortable.

 6   Q.    Do you feel like that your thoughts overnight,

 7   your discussions with your father have put you in a

 8   position where there is a strong likelihood that you

 9   could not give this man a fair trial but could give

10   other people a fair trial?

11   A.    Wait.  I didn't understand you.

12   Q.    Okay.  You thought about this particular case?

13   A.    Right.

14   Q.    And this particular man?

15   A.    (Juror nodding head.)

16   Q.    And you answered the District Attorney a while ago

17   that you felt like in another case where you didn't know

18   the defendant that you could -- that you would have no

19   problem being fair?

20   A.    Right.

21   Q.  - But do you feel like now that because of your

22   thoughts, because of reexamining your knowledge that you

23   can no longer be fair in this case?

24   A.    Yeah.

25   Q.    In this particular case?
```

15

```
 1   A.    Yes.

 2   Q.    And I'm not asking you for which way.

 3   A.    Right.

 4   Q.    Okay.  But you just couldn't be fair to one side.

 5   Is that what you're saying?

 6   A.    Yes.

 7            MR. STOKES:  Judge, may we approach the

 8   bench?

 9            THE COURT:  Yes, sir.

10   (Side-bar Conference.)

11            MR. STOKES:  Your Honor, at this time the

12   defendant would challenge Ms. Cox for cause, if Your

13   Honor would allow it, and replace Ms. Cox with Juror

14   Number 13, the first alternate.

15            THE COURT:  All right.  Upon this hearing

16   conducted outside the presence of the other jurors, the

17   Court is of the opinion that the defendant's motion for

18   cause should be allowed and Juror Number 6, Susan Cox,

19   is excused from this jury, and she is to be replaced by

20   Alternate Juror Number 13, James Jackson.

21            Ms. Cox, if you'll have a seat out in the

22   courtroom then; we may need you over in Farmville as

23   well.

24            All right.  We've got some motions that we

25   need to hear.  Do we want to go ahead -- is this a good
```

Sharpe 000016

**J.A. 1932**

1    time to go ahead and hear those motions before we bring

2    the jury back?

3              MR. HAIGWOOD:  Judge, we got a matter we

4    need to discuss with you also, if we could at the

5    bench.

6              THE COURT:  All right.

7    (Side-bar conference.)

8              THE COURT:  This matter coming on to be

9    heard before the undersigned Judge -- this will be in

10   the matter of Charlene Johnson -- it appears to the

11   Court from talking with the Assistant District Attorney

12   Clark Everett that an essential witness for the State

13   in the prosecution of this first-degree murder case is

14   one Charlene Johnson who resides at 826 Fleming Street

15   in Greenville, North Carolina.

16             Mr. Clark (sic) has advised the Court that

17   this particular witness was contacted by telephone this

18   morning and that she advised that she was not going to

19   appear pursuant to a subpoena to testify in this case;

20   that officers from the Greenville Police Department

21   have gone to the witness' residence and have determined

22   that the doors are locked and that no one would come to

23   the door upon their knocking upon same.

24             The Court upon the assertion of the

25   Assistant District Attorney finds this witness to be

```
 1    essential to the prosecution of this particular case

 2    and hereby orders the Greenville Police Department to

 3    go to the residence of 826 Fleming Street and take the

 4    witness Charlene Johnson into immediate custody and

 5    bring her to the courtroom for her testimony in this

 6    particular trial.  This order to be executed

 7    immediately.

 8            All right.  I understand, Mr. Stokes, you

 9    have some motions upon which you care to be heard?

10            MR. STOKES:  Judge, I don't know whether

11    Your Honor has copies of them or not.

12            THE COURT:  I have copies -- I got copies of

13    some.  I see some other judge has ruled on a few of

14    these motions, Judge Everett.

15            MR. STOKES:  There may be three that are in

16    the file and one that I filed this morning that may not

17    be in the file that I have a copy of.  I've served the

18    District Attorney.  I have a copy of that motion, if I

19    might approach the bench with a copy, because I don't

20    know if you got these.

21            THE COURT:  Yes, sir.

22            (Documents handed to the Court.)

23            MR. STOKES:  May I proceed, Your Honor?

24            THE COURT:  Let me read this motion first.

25            MR. STOKES:  Okay.
```

18

```
 1              THE COURT:  All right.  I'll be glad to hear
 2      from you, Mr. Stokes.
 3              MR. STOKES:  Your Honor, as I believe there
 4      may be four motions that are still left to be heard,
 5      and if I might just sort of run through them so that
 6      Mr. Everett and Your Honor will understand which way
 7      I'm going.
 8              I got one that's a motion for copies of
 9      witnesses' statements.  I got one that deals with a
10      motion to sequester.  That was dealing with
11      sequestering witnesses.  And I have a second motion for
12      sequestering, for lack of a better word, some of the
13      photographs in the case.  And I have the one just
14      entitled "Motion," which I handed Your Honor a copy of
15      just a few minutes ago.
16              Judge, if I might, I will take them in any
17      order Your Honor wishes.
18              THE COURT:  Any way you prefer will be fine.
19              MR. STOKES:  The first one I have in front
20      of me is a motion for copies of the witness' statement
21      pursuant to North Carolina General Statute 15A-903(t).
22      And I would hope that Your Honor would allow me to have
23      copies of any statements made to anyone connected with
24      the prosecution in this case after these witnesses have
25      testified in this matter pursuant to Chapter 15A.
```

19

```
 1          THE COURT:  The State want to be heard on
 2   that motion?
 3          MR. EVERETT:  Judge, as long as it's
 4   pursuant to the statute -- that's the law.  But it's
 5   got -- I think the statute requires it to be statements
 6   adopted by the witness.  And Your Honor is familiar
 7   with that I'm sure.  As long as it is pursuant to the
 8   law, I have no objection.
 9          THE COURT:  All right.  I'll allow that
10   motion then.
11          MR. STOKES:  Okay.  The second one, Your
12   Honor, is a motion to sequester the witnesses.  Now, it
13   is my understanding that the State has two witnesses of
14   whom I don't know the identification of and didn't know
15   one of them up to this point.  Now, I know one of them.
16   And what I'm asking in this motion, and hoping Your
17   Honor will do, is sequester at least those two
18   witnesses separate and apart from the courtroom and
19   separate and apart from each other so that their
20   testimony will come out into court, and again for lack
21   of a better word, uneducated by the testimony of other
22   witnesses or exhibits and testimony relating to those
23   exhibits that the State plans to offer.
24          I believe that for the defendant to get a
25   fair trial, the two -- and as I understand it, two
```

Sharpe 000020

**J.A. 1936**

20

```
 1    eyewitnesses because -- I'll still not sure -- but I
 2    believe the State has two eyewitnesses that they plan
 3    to offer.  And I'm hoping that Your Honor would
 4    sequester at least those two witnesses.  They are
 5    really the two I'm asking to be sequestered away from
 6    each other, also as well as outside the courtroom so
 7    that their testimony would not even have the appearance
 8    of being tainted by other testimony or other exhibits
 9    which have been introduced prior to their testimony in
10    this trial.  And that would be my argument about that,
11    Your Honor.
12            THE COURT:  Mr. Everett, you want to be
13    heard on that motion?
14            MR. EVERETT:  We object, Your Honor.  We
15    feel like that it's not necessary and certainly we
16    should be able to talk to our witnesses together or
17    apart or wherever they might be.
18            THE COURT:  Well, I will allow the motion
19    insofar as, if there are two eyewitnesses, that one can
20    not be in the courtroom while the other is testifying.
21    But if the State wants to talk to their witnesses --
22            MR. STOKES:  Oh, yes, sir.  I didn't mean
23    for it to be like that.
24            THE COURT:  I will exclude one from the
25    courtroom while the other is testifying.
```

21

```
 1              MR. STOKES:  Thank you, Your Honor.

 2              THE COURT:  To that extent I will allow the

 3    motion.

 4              MR. STOKES:  Now, the next motion I have,

 5    Your Honor, is a motion to sequester photographs.

 6              Judge, I think it's pretty clear that

 7    Mr. Radcliffe was shot and murdered out on the street

 8    by someone.  I believe that, as in any other case of

 9    this nature, that a lot of the photographs from the

10    autopsy are photographs of the deceased.  Well, they --

11    it's not an issue as to whether or not this man was

12    shot and killed that night.  And I believe that

13    photographs of the deceased do nothing in almost any

14    murder case other than -- and I don't want to use the

15    word "inflame" because I'm not so sure that's the

16    correct word.  But I feel like that photos of a

17    deceased have a tendency to elicit sympathy from the

18    jury and it may cause a juror to feel or think

19    otherwise because of all the photographs.  And I don't

20    know how many they have.  They may not have but one or

21    two.  I've seen a couple of them.  And I'm hoping that

22    Your Honor would just -- if Your Honor allows the State

23    to introduce any photographs of the deceased, that they

24    be of such a nature that they would be least

25    prejudicial and inflammatory as possible.  I understand
```

Sharpe 000022

J.A. 1938

22

```
 1    that the State would have the right to put on some of

 2    these photographs, and I'm hoping that Your Honor --

 3    because I plan to object as the photograph comes in.

 4          THE COURT:  I don't think I can rule on that

 5    motion until I see the photographs.

 6          MR. STOKES:  Yes, sir.  And I'm just hoping

 7    that Your Honor will reserve ruling on this motion

 8    until the photographs are introduced and rule on them

 9    at that time.

10          THE COURT:  I'll be glad to.

11          MR. STOKES:  Now, Judge, I have one final

12    motion that I filed this morning.  And yesterday during

13    the picking of the jury or some time yesterday during

14    this case, Mr. Everett gave to me an interview.  It is

15    labeled "interview of the defendant."  An interview

16    taken from the defendant at 4:25 p.m., according to the

17    writing on the statement.  I was furnished on April 7

18    of 1994.

19          Now, Judge, about a month ago I saw the main

20    investigating officer, Ms. Melvin, over in district

21    court.  She was there on another unrelated matter and

22    obviously this case came up.  And she said, "Well, you

23    knew that your client made a statement to us when he

24    was arrested, didn't you?"  I said, "No.  It's not been

25    furnished to me."  Because in the discovery that I was
```

23

```
 1   furnished, the only statement that was furnished to me
 2   was a statement that says plural, "defendants'
 3   statements."  Quote, "I can't do it.  You have to have
 4   the money straight up."  It doesn't say who said it,
 5   whether it was my client or co-defendant.  That's all I
 6   was furnished.  That one sheet.  And so after
 7   Ms. Melvin told me that -- and I want Mr. Everett to
 8   correct me if I got my sequence wrong because I can't
 9   remember everything exactly.  And I went to Mr. Everett
10   and said, "I believe that there is a statement that the
11   Greenville police have of my client.  And if there is
12   would you check on it."
13           THE COURT:  This is about a month ago, you
14   think?
15           MR. STOKES:  About a month ago.  Roughly a
16   month ago.  Three or four weeks ago.  And I asked
17   Mr. Everett to check on it.  He came back to me at some
18   time later, and, Judge, I don't remember when, but he
19   said I checked and I didn't find one.  And Mr. Everett
20   telling me this morning that yesterday was the first
21   time he had heard of this statement, I believe him
22   without any doubt in my mind.  1 believe that yesterday
23   was the first time that Mr. Everett found out about the
24   statement.  But as I recall it, and I may be wrong, I
25   recall Mr. Everett -- it may have been yesterday that
```

J.A. 1940

24

1    he said it -- that he had talked with either Mr. Best,

2    one of the detectives, or Ms. Melvin, one of the two,

3    and that they said they didn't know of a statement.

4    And then he found out that the one he didn't talk to

5    was the one in possession of the statement.  And he

6    can correct me on that because my mind is a little

7    vague as to exactly what he told me, because I was

8    overwhelmed by the statement at that moment.

9           Judge, I got two reasons for making this

10   motion.  First, I would like -- obviously I would like

11   to suppress in their case in chief, and I would like to

12   suppress for two reasons:  One, they knew about it.

13   They've known about it since April 7, '94, and they

14   didn't furnish it to me.  I have yet had the

15   opportunity to speak with my client about the

16   statement.  I gave him a copy of it this morning.  I

17   was working with my witnesses at 5:00 yesterday until

18   approximately 9:15 last night, and I was tired.  I

19   didn't have the strength to go over to the detention

20   center at 9:30 last night and sit down with my client

21   and talk with him.  This morning is the first time

22   we've even had any conversation.  And all it was, was I

23   gave him a copy of the statement.  It's laying in front

24   of him.  I told him I would talk with him just as soon

25   as I could possibly talk with him, for him to read the

Sharpe 000025

**J.A. 1941**

25

1   statement.

2           So my first objection to the statement

3   coming in, either in their case in chief or by

4   cross-examining the defendant about it, if he chooses

5   to take the stand, is that even though Mr. Everett may

6   not have known about it, it was furnished to me when

7   picking the jury. And I understand that officers don't

8   give the District Attorney everything that they should,

9   like they should. I also understand these two officers

10  have been officers a long time. I also understand it

11  seems like every case I've had up here that I've picked

12  the jury lately, which is one other case, that Friday

13  before we started picking the jury, here comes some

14  more statements that the defendant's made. Even in

15  that case, I don't think Mr. Everett or Mr. Haigwood's

16  office was aware of it. Judge, that's one thing. And

17  1 realize that there is a remedy for that, which is to

18  grant me a long enough recess to prepare for it.

19          Secondly, Your Honor, I object to the

20  statement coming in on the grounds that under the

21  discovery that I was furnished, including this

22  statement now, because I would consider this to be

23  discovery, I assume it is, that the statement, the

24  interview was done at 4:25 p.m. The Miranda Warning

25  signed by my client was signed at 4:37 p.m.

Sharpe 000026

**J.A. 1942**

26

1        And, Judge, if I might make one other

2    observation about this Miranda warning.  No matter

3    which officer the District Attorney talked to and

4    didn't talk to the other one who had the statement,

5    both officers were present during the interview with my

6    client because both officers signed as witnesses on the

7    Miranda Warning.  So, I don't see how an officer who

8    was present at that interview on April 7 could have in

9    good faith told the District Attorney that they didn't

10   know about any statements of my client because they

11   were sitting in the room when it was done.

12        I would argue that the interview was done

13   according to their own writing at 4:25 p.m.  And after

14   the interview, he was advised of his rights 10 or 12

15   minutes later.  And I believe because of those two

16   reasons that this statement should be suppressed in

17   their case in chief and that they should not be allowed

18   to cross-examine the defendant with reference to any

19   particular statement contained within there should he

20   take the stand.  And I believe that the way the

21   statement is written up that Your Honor should order

22   that they not cross-examine him as it relates to any

23   particular thing that he told him; that they could

24   separate that out.  I believe the statement is in such

25   a form -- and that would be my duel argument dealing

Sharpe 000027

J.A. 1943

27

1    with this particular statement that I was furnished

2    yesterday.

3                THE COURT:  Does the State care to respond?

4                MR. EVERETT:  Yes, Your Honor.  First of

5    all, Judge, as far as the -- and I'm going backwards

6    first.  As far as the time on the Miranda sheet and

7    date and time when the statement commenced, that would

8    be something I would -- if necessary, I would certainly

9    want to offer evidence in.  As far as the timeliness of

10   the statements, Your Honor, just to clarify it,

11   Mr. Stokes -- first, this statement is not one where

12   the defendant admits the guilt in any fashion.  It's

13   not an inculpatory (sic) statement as far as the

14   defendant admitting anything about the death of George

15   Radcliffe.  Second --

16               THE COURT:  You're saying it's exculpatory?

17               MR. EVERETT:  Right.  We have an obligation,

18   as Your Honor knows, to produce any statements made by

19   the defendant whether we intend to offer them or not,

20   whenever we receive them, and I try to do that.

21               In Mr. Stokes's discovery there is one other

22   statement that I have that basically says that the

23   defendant denied any knowledge of the murder.  That's

24   what I'm showing along with the statements that were

25   made at the time of the murder.

Sharpe 000028

J.A. 1944

28

1          Mr. Stokes contacted me back, in the form of

2     a motion, I guess, in a motions hearing back in May and

3     brought to the Court's attention that he believed that

4     Ms. Melvin had statements.  And Ms. Melvin had told him

5     that she had a statement, and he brought that to my

6     attention that she had a statement.

7          THE COURT:  That was when?

8          MR. EVERETT:  That was in May, I believe.

9     That week they had the motions.

10         MR. STOKES:  That was approximately a month

11    ago, I believe.

12         MR. EVERETT:  And I went to Ms. Melvin and

13    talked with her.  She told me that the defendant had

14    denied any knowledge of the murder and that she had no

15    written statements.  So I went and I talked to

16    Mr. Stokes, then I talked to Ms. Melvin and she said

17    that she had no statements made by the defendant other

18    than denying any part in the murder.  I did not speak

19    to Mr. Best at that time.  And I spoke with him

20    yesterday.  He at the time did not recall a statement.

21    He went back into his notes, looked into his notes, and

22    then he realized that he had taken notes of a brief

23    interview that he had with the defendant the night he

24    was arrested.  And that's what this statement is.  It's

25    an interview of what the defendant told him he was

29

```
 1   doing the night of the alleged murder.  And I gave it
 2   to Mr. Stokes within 15 minutes of hearing it from
 3   Mr. Best.  In fact, we had to have Mr. Best transcribe
 4   it so it could be read from his notes, his shorthand
 5   notes, and given to him.  And I have it, Your Honor.  I
 6   offer it into evidence for this hearing at this point
 7   for Your Honor to look at as what we gave Mr. Stokes.
 8               THE COURT:  Mark it voir dire exhibit.
 9               (Voir dire Exhibit 1 marked for
10   identification.)
11               MR. EVERETT:  Judge, may I just continue.
12   At this point we would certainly not be offering that
13   in any way in our case in chief.  However, I would
14   argue that we should be allowed to cross-examine the
15   defendant if he takes the stand and says something that
16   is contradictory.  I mean, discovery is one thing, but
17   to shield someone from perjury or creating a story to
18   fit the case is something else.  And I would argue to
19   Your Honor that the purpose of discovery is not to --
20   it's not so much to play games; but rather, it's to
21   insure that the defendant knows what's facing him.  And
22   we try to do that.
23               And we certainly ask that if Your Honor
24   feels like that there are remedies, that you would use
25   the less severe remedy as far as suppressing, but
```

**J.A. 1946**

30

1    rather give the defendant a chance to look into this

2    further.  Obviously, we're not going to put that on in

3    our case anyway.  We're not going to have it to contend

4    with until he chooses to put on evidence.

5              THE COURT:  You care to respond?

6              MR. STOKES:  I can't say that the bottom

7    three lines on the front page of this statement are

8    exculpatory.  That's three that jumped out at me and

9    just floored me.

10             THE COURT:  Which three are you talking

11   about?

12             MR. STOKES:  "Saw truck with white male

13   inside.  Truck turned onto 6th Street."  I wouldn't say

14   that those words would be too exculpatory when the

15   murder occurred in the truck on 6th Street.  Right down

16   at the bottom of the page.

17             THE COURT:  Yes, sir.

18             MR. STOKES:  Plus, Judge, the way Mr. Best

19   -- I assume Mr. Best did the statement.  He segmented

20   the times at five, eight; then he jumps all the way to

21   eleven, between eight and eleven.  It's my

22   understanding that this homicide occurred approximately

23   9:15.  And I'm not sure, and haven't had an opportunity

24   to talk with him as to the sequence of events in this

25   statement as they go with the sequence of events in

Sharpe 000031

J.A. 1947

31

1     chronological order, that he's told me of before his

2     witnesses had talked to me about it. I'm not sure and

3     I haven't had the opportunity to go over it. And this

4     is a fragmented statement. A line here, a line here, a

5     line here. And it's not in story form. And I'm not

6     sure what occurred first or what occurred second,

7     whether everything occurred at 8:00 that he puts here.

8     And it jumps to eleven where some of it occurred at

9     10:00. The only remedy that I would ask for would be

10    time enough to speak with my client about the statement

11    and my witnesses about it to see if all of it fits

12    together, because I just have not had that opportunity

13    with my client since I've been furnished this statement

14    yesterday.

15          THE COURT: How much time do you feel like

16    you need?

17          MR. STOKES: Judge, I got a witness coming

18    in at lunch -- two witnesses coming in at lunch that

19    I'm already scheduled to talk to. At the most an hour

20    other than the lunch break. At the absolute most an

21    hour. I believe I can sit down with my client and

22    witnesses after I talk with him. I don't think it will

23    take any more than an hour, Judge, quite frankly.

24    That's all I would ask for.

25          THE COURT: It's 12:30 now. You tell me

32

1    when you think you can be ready?

2         MR. STOKES:  3:00.

3         THE COURT:  All right.  With regard to the

4    defendant's motion relating to the statement provided

5    to the defendant on the 24th day of July 1995, which

6    was allegedly made by the defendant on the 7th day of

7    April, 1994, the Court, upon hearing the argument, has

8    determined from the assertions of the defendant's

9    attorney that he needs additional time in order to

10   discuss this statement with his client and with other

11   witnesses involved in the defendant's case and that in

12   the event he was given until 3 p.m. today he would be

13   prepared to proceed with the trial of this case, the

14   Court hereby orders that this trial be postponed until

15   3 p.m. this afternoon, at which time we will empanel

16   the jury and begin hearing opening statements.

17        MR. STOKES:  May I put one other thing on

18   the record, Your Honor?

19        THE COURT:  All right.

20        MR. STOKES:  Yesterday prior to picking the

21   jury, as I recall it, Your Honor requested both the

22   State and defendant to provide a witness list so that

23   both sides could ask the jury -- Your Honor could ask

24   the jury if they knew any of the witnesses to determine

25   their fairness and that the defendant was willing to

33

1    provide a list of his witnesses or prospective

2    witnesses that he intended to call.  And I would ask

3    that the record reflect that the State was unwilling to

4    do that.  1 understand their position about security of

5    the witnesses as being their reason, but I would like

6    it on the record that Your Honor requested it and that

7    they were unwilling to do it.  Not that they absolutely

8    refused to do it under any circumstances but were

9    unwilling to do it.  I believe that's the way

10   Mr. Everett put it because of security of their

11   witnesses.  And I would ask Mr. Everett if he would add

12   anything to that.  I would just like to make that part

13   of the record if I might.

14          THE COURT:  Mr. Everett, you care to respond

15   to that?

16          MR. EVERETT:  Judge, just for the record I

17   would like to put on the record that I think the reason

18   I gave Your Honor was that one of the witnesses was

19   drugged from her house last year after this happened,

20   after she cooperated, and was beaten by five

21   individuals.  And certainly we have our -- we do our

22   best to try to look after these people, Judge.  And

23   certainly I didn't want their names broadcasted all

24   over the courthouse, and it would be downtown very

25   shortly after the names were broadcasted.  I think that

Sharpe 000034

J.A. 1950

34

1    we have an obligation to protect these people, Judge.

2                    THE COURT:  Let the record reflect that

3    during the jury selection process the Court inquired of

4    the State as to a list of its potential witnesses for

5    this particular case, and the Court also inquired of

6    the defendant a list of its potential witnesses; that

7    the Court conducted a conference at the bench, at which

8    time the Assistant District Attorney, Mr. Everett,

9    advised the Court that one of his witnesses who had

10   cooperated in the past had been assaulted by five

11   individuals and; therefore, he was reluctant to provide

12   the names of the other witnesses for security purposes.

13   The Court advised the Assistant District Attorney and

14   the defense attorney that in its opinion there was a

15   possibility of creating a mistrial for failure to

16   provide witnesses for the jurors to determine whether

17   or not they had knowledge of those witnesses and the

18   Court's still of the opinion the potential for a

19   mistrial exists.  And for the record, the defendant

20   offered to send one of his associates -- the

21   defendant's attorney offered to send one of his

22   associates to his office to provide a list of the

23   defendant's witnesses but that was never done.  And so,

24   therefore, the jury has not heard from either the State

25   or the defendant as to the potential witnesses involved

Lines 13 -

Sharpe 000035

J.A. 1951

35

1    in the trial of this case and the Court finds this for

2    purposes of the record for whatever good it may do --

3              MR. STOKES:  Judge, one last thing.

4              THE COURT:  -- whatever it's worth.

5              MR. STOKES:  I don't know the procedure of

6    the Sheriff's Department about whether they will keep

7    this man over here or take him back to the detention

8    center at lunch.  Do y'all keep him here?  That's fine,

9    Your Honor.  They tell me they're going to keep him

10   here, and I can see him downstairs.  Thank you very

11   much, Your Honor.

12             THE COURT:  All right.  Let's bring the jury

13   back in, Mr. Sheriff.

14   (Jury in.)

15             THE COURT:  All right.  Mr. Jackson, I'm

16   going to ask that you have a seat in number 6, sir.

17   You're going to be a juror in this case, as I have

18   excused Ms. Cox.  And Mr. Koonce, if you'll have a seat

19   in number 13 where Mr. Jackson was.  You'll be an

20   alternate.

21             Now, members of the jury, something has come

22   up.  It's going to require this trial to be delayed for

23   a few hours.  So I'm going to let you go ahead and take

24   your lunch at this time.  You will not need to return

25   to the courtroom until 3 p.m. this day.  During this

Sharpe 000036

J.A. 1952

36

1    recess remember again not to discuss this case among

2    yourselves or allow anyone to discuss it with you.

3    Don't talk to any of -- the defendant, the attorneys or

4    the witnesses about anything.  Don't form any kind of

5    opinion about the case.  Don't read or listen to any

6    accounts of this trial, should it be broadcasted or

7    published in the newspaper.  When you come back after

8    your lunch recess, when you come back at 3 p.m., take

9    the same seats that you presently occupy.  At this time

10   I'll let you go and ask that everyone else remain

11   seated.

12   (Lunch recess.)

13        THE COURT:  For the benefit of the other

14   jurors, Juror Number 7, Ms. Harrington, has been at the

15   emergency room at the hospital.  I understand an injury

16   received by a family member.  That's why she's late.

17   But we waited for you, Ms. Harrington.  So, now,

18   hopefully, we can begin this trial.

19        Madam Clerk, let's empanel the jury.

20        (Whereupon twelve jurors were duly

21   empaneled.)

22        THE COURT:  Members of the jury, the next

23   stage of the proceedings is what is referred to as

24   opening statements of counsel.  During the opening

25   statements the attorneys more or less give you a

J.A. 1953

37

```
1    forecast of what they predict their evidence will show.

2    The opening statements are not evidence, however, and

3    are not to be considered by you as evidence.

4              Mr. Everett, does the State care to make an

5    opening statement?

6              MR. EVERETT:  Yes, Your Honor, briefly.

7              (An openings statement by Mr. Everett.)

8              THE COURT:  Mr. Stokes, does the defendant

9    care to making an opening statement?

10             MR. STOKES:  Not at this time, Your Honor.

11             THE COURT:  The State may call its first

12   witness.

13                      ********

14   CHARLENE JOHNSON, being first duly sworn, was examined

15   and testified as follows during DIRECT EXAMINATION by

16   MR. EVERETT:

17   Q.    State your name for the Court?

18   A.    Charlene Johnson.

19   Q.    Pull that mike up to you, Charlene.

20             THE COURT:  Charlene Johnson?

21             THE WITNESS:  Yes, sir.

22   BY MR. EVERETT:

23   Q.    How old are you, Charlene?

24   A.    15.

25   Q.    And where do you live?
```

38

1   A.    826 Fleming Street.

2   Q.    Now --

3                 THE COURT:  If any of you jurors cannot hear

4       this witness, just raise your hand.  Make sure you

5       speak up good and loud.

6   BY MR. EVERETT:

7   Q.    How long have you lived there, Charlene?

8   A.    Probably a year and a half.

9   Q.    Okay.  Do you know the defendant Dantae Sharpe?.

10  A.    Yes, I do.

11  Q.    How long have you known him?

12  A.    I don't know.

13  Q.    When did you meet him?

14  A.    Um, I think it was one day everybody was like

15      hanging out in the streets, I met him.

16  Q.    Okay.  And are you in school now?

17  A.    No, I'm not.

18  Q.    When did you leave school?

19  A.    Two years ago.

20  Q.    Now, going back to the winter of 1994, did you

21      know the defendant at that time?

22  A.    Yes, I did.

23  Q.    Where did you normally see him?

24  A.    On the corner of 14th Street.

25  Q.    And what was he normally doing?

Sharpe 000039

**J.A. 1955**

39

| | | |
|---|---|---|
| 1 | A. | Selling drugs. |
| 2 | Q. | Did you ever sell drugs with him? |
| 3 | A. | A couple of times. |
| 4 | Q. | What kind of drugs did y'all sell? |
| 5 | A. | Crack, rocks. |
| 6 | Q. | Crack.  Is that cocaine? |
| 7 | A. | Yes. |
| 8 | Q. | Did you use crack cocaine? |
| 9 | A. | No, I didn't. |
| 10 | Q. | And how old were you at that time? |
| 11 | A. | 14. |
| 12 | Q. | Did you go to school then? |
| 13 | A. | No, I didn't. |
| 14 | Q. | How often did you sell crack cocaine or how often |
| 15 | | were you with the defendant when he sold crack cocaine? |
| 16 | A. | Well, I didn't sell crack cocaine for just a |
| 17 | | little while, and I saw the defendant a couple of times. |
| 18 | Q. | And did other people sell crack cocaine in that |
| 19 | | area? |
| 20 | A. | Yes, they did. |
| 21 | Q. | Was there a particular area that the defendant |
| 22 | | sold crack cocaine that was his area? |
| 23 | A. | 14th Street. |
| 24 | Q. | Was that his area? |
| 25 | A. | Yes. |

Sharpe 000040

**J.A. 1956**

40

```
 1   Q.    Are there territories where people sell drugs,
 2   different blocks belong to different people and so
 3   forth?
 4   A.    I guess so.
 5   Q.    Now, on February 11, 1994, did it come a time that
 6   you left home that night after 9:00?
 7   A.    Yes, I did.
 8   Q.    Where were you going?
 9   A.    To the store.
10   Q.    What store was that?
11   A.    Now, it's Greenfield Mart.  It was Hannah's.
12   Q.    Hannah's.
13   A.    Uh-huh.
14   Q.    Is that a convenient store?
15   A.    Yes.
16   Q.    And what -- you Live on Fleming Street?
17   A.    Yes.
18   Q.    Tell us how you were going to Hannah's.
19   A.    Okay.  There's like two sections of Fleming
20   Street.  I was going this way (indicating), and there's
21   like a turning section, and I was going like down, turn
22   right here (indicating) and go on.
23   Q.    What street were you on?
24   A.    14th.
25   Q.    14th.  That runs into 5th?
```

J.A. 1957

41

1   A.     Yes.

2   Q.     And you passed by Douglas Street; is that right?

3   A.     Uh-huh.

4   Q.     And 6th Street?

5   A.     Uh-huh.

6   Q.     When you got to 6th Street, could you tell us what

7   happened?

8   A.     Well, I was like going down 14th Street.  I was

9   like -- looked both ways to see if any cars was coming

10  before I crossed the street, and I seen Dantae and Mark

11  and a white man talking.

12  Q.     Did you know Dantae when you saw him?

13  A.     Uh-huh.

14  Q.     How did you recognize him?

15  A.     It's just the way he wear his clothes and stuff.

16  Q.     Did you hear him talking?

17  A.     Yeah.

18  Q.     Who was he talking to?

19  A.     A white man.

20  Q.     And did you recognize his voice?

21  A.     - Yes.

22  Q.     Did you recognize -- was Mark Joyner saying

23  anything?

24  A.     Not too much.

25  Q.     Well, what did you hear going on?

**J.A. 1958**

42

```
 1   A.   The white man was trying to buy something.

 2   Q.   What did you hear?

 3   A.   I heard him say -- Dantae asked him what did he

 4   want.  And he said a twenty.  And he didn't have all his

 5   money.

 6   Q.   So what happened then?

 7   A.   And he said, "You got to have the money straight

 8   up," and he didn't, so he pushed him.

 9   Q.   Who pushed who?

10   A.   Dantae pushed the white man.

11   Q.   Did the white guy say anything to --

12   A.   He said "F" you.

13   Q.   A curse word?

14   A.   Uh-huh.

15   Q.   To the defendant?

16   A.   Uh-huh.

17   Q.   And what happened then?

18   A.   And shot him.

19   Q.   Well, now, the white guys said "F" you to the

20   defendant.

21   A.   Uh-huh.

22   Q.   And is that the point where the defendant pushed

23   him?

24   A.   Uh-huh.

25   Q.   Where was this white guy at the time?
```

43

```
 1   A.   He was like on -- okay.  The street is right here.
 2   It is like right there.
 3   Q.   Was it 6th Street or 14th Street?
 4   A.   It was not 14th Street.  It was like the street
 5   right here.  This is 14th Street, and then a street
 6   right here and then right there.
 7   Q.   So we're one block down from where you were?
 8   A.   No, a half block.
 9   Q.   Half block.  This white guy, was he in a vehicle?
10   Had he been driving a vehicle?
11   A.   He was driving a vehicle.
12   Q.   What kind of vehicle was it?
13   A.   A truck.
14   Q.   Was it a big truck or little truck?
15   A.   A little truck.
16   Q.   Was it a pickup truck or panel truck?  Was the
17   back a pickup, had an open bed on the back?
18   A.   Uh-huh.
19   Q.   And you say after he cussed at the defendant, the
20   defendant pushed him.  And then what did you see him do?
21   A.   I don't know what else he said, but he said
22   something else.  I couldn't hardly hear what he said.
23   Q.   Then what did the defendant do?
24   A.   Shoot.
25   Q.   He shot him.  Did you see a gun?
```

44

1   A.   Yes.

2   Q.   Can you describe what kind of gun it was?

3   A.   No.

4   Q.   Did you see any fire come out of the gun?

5   A.   I don't know.  I mean, I was scared so, you know.

6   Q.   You heard a sound?

7   A.   Yeah.

8   Q.   What did you hear?

9   A.   Boom, boom.

10   Q.   Now, after you saw the defendant shoot this white

11   guy, what happened then?

12   A.   They, um --

13   Q.   Take your time.

14   A.   They, um --

15   Q.   "They" would be Mr. Joyner and the defendant; is

16   that right?

17   A.   Yeah.

18   Q.   What did they do?

19   A.   They drove the truck and put the man in it and

20   went in the field.

21   Q.   Into a field?

22   A.   Yeah.

23   Q.   Now, was that the truck that they found, the

24   police found in that field by Mr. Vines' house?

25   A.   Yes.

Sharpe 000045

**J.A. 1961**

45

1   Q.   And the white guy that the police found in that

2   car -- in that truck was the guy that you saw being

3   shot?

4   A.   Uh-huh.

5   Q.   After Mr. Joyner and the defendant did that, what

6   did they do then?

7   A.   I heard something like throw up in the air and

8   fall.  The next thing I saw them running, like spit up.

9   Q.   Okay.  Did you see him any more?

10  A.   Yeah.  After that had happened, I had like ran to

11  the store, and I seen them get in a red car.

12  Q.   Had you ever seen that red car before?

13  A.   I think I seen it at their house.

14  Q.   Whose house?

15  A.   Dantae's house.

16  Q.   Okay.  Now, did you -- could you show us -- if we

17  had a map, could you show us about where you were when

18  you saw this?

19  A.   Yes.

20          MR. EVERETT:  Mr. Stokes, you want to see

21   this first?

22          MR. STOKES:  Yes, please.

23          (State's Exhibit Number 1 was marked for

24   identification.)

25  BY MR. EVERETT:

Shape 000046

J.A. 1962

46

1    Q.    Charlene, this is a map of streets.  And I want

2    you to look at it just for a minute and try to place

3    yourself.  Just to help you, this is 14th Street, okay.

4    This is --

5              THE COURT:  You may want to pull it this way

6    so the jury can see it.

7    BY MR. EVERETT:

8    Q.    This would be 6th Street, okay.  This would be

9    Mr. Vines' house, Sheppard, McKinley Street, Roosevelt

10   Street; 5th Street would be down here, and Hannah's

11   would be over here.  Are you oriented now on what this

12   map purports to show?

13   A.    Uh-huh.

14   Q.    I know it's not to scale, but does it fairly and

15   accurately depict the layout of the streets as they were

16   back then when you saw this?

17   A.    Kind of.

18   Q.    Is it close enough for you to show us what you

19   saw?

20   A.    Yeah.

21   Q.  -  Okay.

22              MR. EVERETT:  Well, we offer, Your Honor, at

23   this point for the limited purpose of illustrating the

24   witness' testimony.

25              THE COURT:  All right.  Let State's Exhibit

```
 1   I be received into evidence.

 2   BY MR. EVERETT:

 3   Q.    Charlene, if you can step down and show us, the

 4   best you can, with your finger there where you were when

 5   you first noticed this noise down the street?

 6              MR. STOKES:  Your Honor, could I move back

 7   around here so I can see?

 8              THE COURT:  Certainly.  Wherever you want to

 9   as long as you don't block the jury.

10   BY MR. EVERETT:

11   Q.    Okay.  This being Hannah's down here, this being

12   14th Street going towards Hannah's, this being Fleming

13   Street at the top.  You understand the map now?  This

14   being Sheppard Street, going down Sheppard Street?

15              THE COURT:  I thought it was 6th Street.

16   BY MR. EVERETT:

17   Q.    I'm sorry.  6Th Street going towards Sheppard

18   Street.

19   A.    (Witness nodding head.)

20   Q.    And I believe you said you had come down 14th

21   Street about to where 6th Street was?

22   A.    I was right here.

23   Q.    Okay.  And what direction did you look down when

24   you heard this noise?

25   A.    Back up here.
```

Sharpe 000048

J.A. 1964

48

```
 1    Q.    Where about did you see the defendant, Mark

 2    Joyner, and this white guy talking?

 3    A.    I was like --

 4              REPORTER:  I can't hear.

 5              THE COURT:  Keep your voice up.

 6    A.    I was like in the middle of these two streets

 7    going that way and this way.

 8    BY MR. EVERETT:

 9    Q.    So it would be the intersection of Sheppard and

10    6th?

11    A.    Uh-huh.

12    Q.    And these are not long blocks, are they?

13    A.    Huh-uh.

14    Q.    I mean, like three houses maybe on some of them?

15    A.    Uh-huh.

16    Q.    Could you hear clearly what was being said?

17    A.    Yes, until the man started mumbling.

18    Q.    Okay.  And they were speaking loudly?

19    A.    Uh-huh.

20    Q.    Had you ever seen Dantae Sharpe in this area

21    before?

22    A.    Yes, I have.

23    Q.    Is this part of his area?

24    A.    14th Street and the street that turns off 14th

25    Street.
```

Sharpe 000049

J.A. 1965

49

1    Q.    Okay.  And the yard here, was that -- you know

2    what this line here is?  Was there a fence there at that

3    time?

4    A.    Yes.

5    Q.    Is this the yard that the car ended up in?

6    A.    Yeah, the truck.

7    Q.    I'm sorry, the truck.  Excuse me.  You can have a

8    seat.

9          Charlene, did there come a time that you called

10   the police and told them what you saw?

11   A.    Um, I didn't call the police.

12   Q.    Okay.  Did you contact Crime Stoppers in some way?

13   A.    No, I did not.

14   Q.    Okay.  How was it that you actually talked to

15   Mr. Best?

16   A.    Well, I was like cut up one night, and I had went

17   to hospital, Greenville hospital, and the police brought

18   me there and they started talking to me.  I drew out

19   some things, and he asked me what it was.  And at first

20   I didn't say anything.  But Ricky Best, he went to my

21   friend's house looking for me because the police, you

22   know, told him what I drew out, and I finally told him.

23   Q.    Okay.  You told Mr. Best?

24   A.    Yes.

25   Q.    And you told him what you have told us today?

50

1   A.    Yes.

2   Q.    Is there any doubt in your mind that Dantae Sharpe

3   was the one that shot this man that night?  Any doubt at

4   all?

5   A.    Excuse me?

6   Q.    Are you sure that Dantae Sharpe is the one you saw

7   shoot this man?

8   A.    Yes.

9   Q.    And you were compensated by Crime Stoppers for

10   coming forward, were you not?

11   A.    Yes.

12   Q.    And how much were you paid by Crime Stoppers?

13   A.    $500.

14   Q.    Okay.  And was that payment for you to testify or

15   was it a reward for coming forward?

16   A.    A reward for coming forward.

17   Q.    Have you been promised anything since then?

18   A.    No, I have not.

19   Q.    Where have you been living since -- well, you've

20   been living on Fleming Street since April of 1994?

21   A.    Yes.

22   Q.    And is your testimony today the same as what you

23   told Mr. Best?

24   A.    Yes, it is.

25   Q.    Was it true then?

Sharpe 000051

**J.A. 1967**

51

```
 1   A.    Yes.

 2   Q.    Is it true now?

 3   A.    Yes.

 4   Q.    You are -- are you trying to get back into school

 5   now?

 6   A.    Yes, I am.

 7   Q.    When did you leave school?

 8   A.    Two years ago.

 9   Q.    Two years ago.  Thank you, Charlene.  Answer this

10   man's questions right over here, Mr. Stokes, okay.

11              MR. STOKES:  May we approach the bench?

12              THE COURT:  Yes, sir.

13   (Side-bar conference.)

14              THE COURT:  You ready to proceed?

15              MR. STOKES:  Yes, sir.

16   CROSS-EXAMINATION BY MR. STOKES:

17   Q.    Now, Ms. Johnson, about what time of day or night

18   was this, about 9:00 at night?

19   A.    Yes.

20   Q.    A little bit after nine maybe, right around nine?

21   A.    Yes.

22   Q.    Was it dark?

23   A.    Yes.

24   Q.    Do you recall how many street lights are on those

25   corners down there in that area?
```

Sharpe 000052

J.A. 1968

52

1   A.    Well, when I was walking out there, it seemed like

2   one street light on this end and a couple on the other

3   end.

4   Q.    Do you recall what the weather was that night?

5   A.    No, I don't.

6   Q.    Remember it being cold or warm?  Do you recall

7   either way?

8   A.    Huh-uh.

9   Q.    Do you remember whether it was drizzling rain?

10  A.    It was trying to.

11  Q.    It was trying to.  Now, you did not walk on --

12        MR. STOKES:  May I approach the witness --

13  approach the exhibit?

14        THE COURT:  Yes, sir.

15  BY MR. STOKES:

16  Q.    You say that you were coming down 14th Street from

17  this way going this way.

18  A.    Uh-huh.

19  Q.    Is that right?  And that you saw the truck in the

20  intersection of Sheppard and 6th Street?

21  A.    (Witness nodding head.)

22  Q.    And you say that there's one street light on that

23  corner?

24  A.    No.  I said like on this corner.

25  Q.    Up here?

53

```
 1    A.    Yeah.

 2    Q.    Where would the next street light be, down this

 3    way?

 4    A.    Probably like half way.

 5    Q.    Down on this corner?

 6    A.    Right.

 7    Q.    So one here and one here.  So where the truck was,

 8    there was no light?

 9    A.    I can't remember if there was or not.

10    Q.    Okay.  But you say that the truck was right in

11    this intersection, right there?

12    A.    Uh-huh.

13    Q.    Okay.  The truck was stopped --

14    A.    Uh-huh.

15    Q.    -- in the middle of the intersection; is that

16    true?

17    A.    Uh-huh.

18    Q.    The white man was outside the truck --

19    A.    (Witness nodding head.)

20    Q.    -- talking, as you say, to Dantae Sharpe and Mark

21    Joyner?

22    A.    Yes.

23    Q.    They got to arguing.  And you say you saw Dantae

24    pull out a gun and shoot him?

25    A.    Yes.
```

**J.A. 1970**

54

1  Q.   Now, when you were walking along 14th Street, did

2  you just stop and watch all this going on?

3  A.   No.   I stopped and looked.   And I didn't want him

4  to see me, so there was some cars right there, and I

5  slid behind like over there in between the cars.

6  Q.   Okay.   So you slid between some cars to watch what

7  was going on because it was a drug deal?

8  A.   Right.

9  Q.   Had you ever slid between cars before and watched

10  a drug deal going down on 14th Street?

11  A.   No, I have not.

12  Q.   But you did on this occasion?

13  A.   Yes, I did.

14        MR. STOKES:   May I approach?

15        THE COURT:   Yes, sir.

16  BY MR. STOKES:

17  Q.   From where this truck was, right here, if someone

18  was walking down Sheppard Street, would they have seen

19  the same thing you did?

20  A.   Probably.

21  Q.   - Probably so.   If someone was walking this way up

22  Sheppard Street towards 5th Street, 5th Street being

23  down here --

24  A.   You're talking about going down here?

25  Q.   Yeah.   If somebody was walking this way down

55

1    Sheppard Street, would they also have seen what was

2    going on at the intersection?

3    A.    Yes.

4    Q.    Could anybody in these first couple of houses have

5    seen what was going at that intersection?

6    A.    Probably.

7    Q.    Could Mr. Vines have seen what was going on at

8    that intersection?

9    A.    Probably.

10    Q.    Isn't there a house right here on this corner too?

11    A.    Yes.

12    Q.    Could this man have seen what was going on in that

13    intersection?

14    A.    Probably.

15    Q.    But you were the only one that you knew of that

16    saw it?

17    A.    Yes.

18    Q.    Now, was the door opened or closed to the truck

19    while the man was outside and they were talking?

20    A.    It was open.

21    Q.    And you say that Dantae Sharpe shot this man while

22    they were both standing outside the truck?

23    A.    Yes.

24    Q.    Do you recall how high Dantae Sharpe had the gun

25    when you heard it go off?

Sharpe 000056

J.A. 1972

56

1   A.    You mean -- I don't know.

2   Q.    Did he have it waist high, up here or up here or

3   you don't recall?

4   A.    It was probably like that, like that right there

5   (indicating).

6   Q.    About how?

7   A.    Right here.

8   Q.    About midway on your chest?

9   A.    Uh-huh.

10  Q.    But you don't really know?

11  A.    Yeah.

12  Q.    You do know?

13  A.    I don't really know.  I'm guessing right now.

14  Q.    You're guessing.  Okay.  Thank you for being

15  honest with me.  And you say that this man pushed the

16  white man?

17  A.    (Witness nodding head.)

18  Q.    Did he push him straight on, in the shoulder or

19  how?

20  A.    He pushed him like straight on.

21  Q.    - Like straight on in his chest?

22  A.    Yeah.

23  Q.    Were they facing each other when they were

24  talking?

25  A.    He was like right here and right here, and Mark

Sharpe 000057

J.A. 1973

57

```
 1   was right there.

 2   Q.    So they were face to face to one another?

 3   A.    (Witness nodding head.)

 4   Q.    One wasn't sideways to the other?

 5   A.    (Witness shaking head.)

 6   Q.    Were they face to face when Dantae shot him?

 7   A.    (Witness nodding head.)

 8   Q.    They were?

 9   A.    (Witness nodding head.)

10   Q.    Are you sure about that?

11   A.    (Witness nodding head.)

12   Q.    Ma'am, I can't -- you need --

13   A.    Yes.

14   Q.    No doubt in your mind those two were people

15   standing face to face when Dantae pulled the trigger?

16   A.    No.

17   Q.    And was the man's back to the truck when he was

18   shot?  Which way was the man facing on that board when

19   he was shot?

20   A.    The truck was right here, and the man was right

21   there.  The truck was like pulled on the side, and they

22   were talking.  I don't know all of that.

23   Q.    Can you point it out on the board for me?  If

24   you'll step down, can you show me which way the truck

25   was facing and where the man was standing by drawing a
```

58

1    little block or something up there, please, ma'am?

2    A.    The truck was like right here.

3    Q.    Okay.

4    A.    And the man was probably standing right there.

5    Dantae was standing right there, and Mark was standing

6    like right there.

7    Q.    Okay.  So when you say that this is the truck

8    right here, which way was the front end of the truck?

9    A.    This way.

10    Q.    Going this way?

11    A.    This way.

12    Q.    So would you draw a little square where the truck

13    was in that intersection please?

14    A.    This is the truck and the back end was like this,

15    is like --

16    Q.    Going that way up Sheppard?

17    A.    Yes.

18    Q.    And the front end was headed towards 5th Street?

19    A.    Yeah.

20    Q.    All right.  Now, draw a little circle where the

21    white man was.

22    A.    Okay.

23    Q.    Draw another little circle where you say Dantae

24    was?

25    A.    (Witness complied.)

**J.A. 1975**

59

1  Q.    Draw a little circle where you say Mark Joyner

2  was?

3  A.    (Witness complied.)

4  Q.    Okay.  Would you put a little triangle, half type

5  triangle where the front end of the truck was?

6  A.    (Witness complied.)

7  Q.    Okay.  Thank you.  Take a seat back up there.

8  You're not saying that Dantae Sharpe was the only man

9  that sold drugs on 14th Street, are you?

10  A.    Uh-huh.

11  Q.    There were a whole lot of people out there,

12  probably right today, selling drugs out on 14th Street

13  in that area, aren't there?

14  A.    They are not selling on 14th Street no more.

15  Q.    In that area of Greenville?

16  A.    Yeah.  They are in that area but not on 14th

17  Street.

18  Q.    They quit selling?

19  A.    Where he was selling drugs.  Not on that

20  particular part of that street.

21  Q.    - Down there on Sheppard Street, McKinley and

22  Roosevelt, a lot of people sold drugs right in that area

23  on those two or three blocks, didn't they?

24  A.    Uh-huh.

25  Q.    How many drugs dealers you reckon would be out

60

```
 1    there on a Saturday afternoon or a Friday afternoon?
 2    A.    You're talking about now?
 3    Q.    Back then.
 4    A.    All I know that sold drugs out there was him and
 5    his friends.
 6    Q.    Him and his friend Mark?
 7    A.    Mark and all them.
 8    Q.    I didn't hear you .
 9    A.    I said Mark and all them.
10    Q.    So you're saying there are only two or three drug
11    dealers in that area of Greenville.  Is that what you're
12    trying to say?
13    A.    Was.
14    Q.    Back then?
15    A.    Uh-huh.
16    Q.    You're sure where you put Dantae that that's where
17    he was standing.  And you're sure where you put Mark
18    Joyner that that's where he was standing?
19    A.    I'm positive.
20    Q.    Okay.
21              MR. STOKES:  May I approach?
22              THE COURT:  Yes, sir.
23    BY MR. STOKES:
24    Q.    Could you step down, please, ma'am, and put a
25    little DS by Dantae Sharpe and a little MJ by Mark
```

J.A. 1977

61

```
 1   Joyner as to which ones they were please?

 2   A.    (Witness complied.)

 3   Q.    That's Dantae and that's Mark Joyner.  Okay.

 4   Thank you, ma'am.  Now, after -- how many times did they

 5   shoot?

 6   A.    I heard two.

 7   Q.    You heard two?

 8   A.    (Witness nodding head.)

 9   Q.    Now, but you say you didn't see the flash of a

10   gun?

11   A.    (Witness shacking head.)

12   Q.    But you could see a gun.  No doubt in your mind

13   from a block away it was a gun?

14   A.    (Witness nodding head.)

15   Q.    Is that right?

16   A.    Yeah.

17   Q.    After they shot this man in the middle of the

18   intersection at 9:00 at night, they picked the man -

19   did they drive the truck?  What did they do next?

20   A.    I think they drug him to the truck.

21   Q.    _ They drove the truck.

22         THE COURT:  She said "they drug" --

23   A.    Drug him to the truck.

24   Q.    Drug him to the truck.  Did they put him in the

25   truck?
```

62

1    A.    Like halfway in the truck.  His feet were hanging

2    out.

3    Q.    His feet were hanging out of the truck.  On the

4    driver's side or the passenger side?

5    A.    They put him on the driver's side.  His head was

6    like halfway in the passenger side, I guess.

7    Q.    Okay.  And then what happened?  Did they just

8    leave the truck sitting there?

9    A.    They drove it in the -- like where that man's

10   house was sitting.

11   Q.    Who drove it?

12   A.    I don't know which one drove it, but somebody

13   drove it.

14   Q.    But you were looking, you were watching, weren't

15   you?

16   A.    Yeah.

17   Q.    You could tell Dantae Sharpe from Mark Joyner,

18   couldn't you?

19   A.    Yeah.

20   Q.    But now you don't know who drove the truck; is

21   that what you're saying?

22   A.    Yeah.

23   Q.    Okay.  And describe how they drove the truck and

24   where it went?

25   A.    Well, they drove it -- they drove it in there.

63

1    Q.    And in there, you're talking about Mr. Vines'

2    yard?

3    A.    Uh huh.

4    Q.    Excuse me.

5              MR. STOKES:  May I approach the witness?

6              THE COURT:  Yes, sir.

7              MR. STOKES:  Thank you.

8    BY MR. STOKES:

9    Q.    So you're saying that they put this man in the

10   truck headed this way.  And then one of them, but you

11   don't know which one any more or you don't know which

12   one, got in the truck and headed this way?

13   A.    They didn't head that way.  They turnt and went

14   somehow in there.

15   Q.    They turned the truck and somehow the truck ended

16   up over here?

17   A.    (Witness nodding head.)

18   Q.    But you just say somehow, but you don't know how?

19   A.    Right.

20   Q.    Now, when they got the truck into Mr. Vines yard,

21   did both of them get in the truck or just one of them?

22   I mean, Dantae and Mark Joyner.  Did Mark Joyner and

23   Dantae get in the truck?

24   A.    I guess one of them.

25   Q.    Ma'am?

Sharpe 000064

**J.A. 1980**

64

```
 1   A.    I guess one of them.

 2   Q.    But you don't know which one?

 3   A.    Right.

 4   Q.    But you could see them well enough to identify

 5   them up to that point in time?

 6   A.    Right.

 7   Q.    And after whichever one of them drove the truck,

 8   drove it into Mr. Vines' yard, did they get out of the

 9   truck?

10   A.    Yeah.

11   Q.    If they put the man who got killed on the driver's

12   side, how did they get in the truck to drive it?  Did

13   you see how they did that?

14   A.    They probably sat on him.

15   Q.    They probably sat on the man to drive the truck

16   Well, you could see down in the driver's side of the

17   truck, couldn't you?  The driver's side of the truck was

18   facing you, right?

19   A.    Uh-huh.

20   Q.    That door was opened and you could see into the

21   truck well enough to say that they put the deceased in

22   the truck, right?

23   A.    Uh-huh.

24   Q.    And now you're saying you don't know how or what

25   they did to drive the truck, whether they sat on the man
```

65

1　　or pushed him over, you don't know, right?

2　　A.　　(Witness nodding head.)

3　　Q.　　What did the other one do while one of them was

4　　driving the truck making a U-turn and driving in

5　　Mr. Vines' yard?  You don't know?  Ma'am?

6　　　　　　　THE COURT:  Would you answer out loud

7　　please.

8　　A.　　No.

9　　Q.　　You don't know.  After -- did you see -- after

10　　they drove the truck in the yard, did you see them get

11　　back out of the truck?

12　　A.　　Yes.

13　　Q.　　Who got out of the truck?

14　　　　　　　MR. EVERETT:  Objection.  Asked and

15　　answered.

16　　　　　　　THE COURT:  Overruled.

17　　BY MR. STOKES:

18　　Q.　　Was it Dantae Sharpe or Mark Joyner?

19　　A.　　Didn't I say I didn't know?

20　　Q.　　I mean, when the truck ended up in Mr. Vines'

21　　yard, did you know who got out of the truck?

22　　A.　　I can't remember that.

23　　Q.　　You can't remember?

24　　A.　　Naw.

25　　Q.　　But you can remember that it was Dantae Sharpe

Sharpe 000066

**J.A. 1982**

66

1    that pulled out the gun and pulled the trigger?

2    A.    Yes.

3    Q.    Did they leave the door to the truck opened when

4    they pulled the truck in Mr. Vines' yard and got out?

5    A.    Yes.

6    Q.    They left the driver's door open?

7    A.    Yeah.

8    Q.    Did both of them leave the area at that time?

9    A.    They splitted up.

10   Q.    They spit up?

11   A.    I heard something fall.  I don't know what it was.

12   Q.    You heard something.  You heard what?  I didn't

13   understand --

14   A.    I said I heard something fall.

15   Q.    Something fall?

16   A.    Like something heavy when they splitted up.

17   Q.    And they ran?

18   A.    Yeah.

19   Q.    Now, in Mr. Vines' yard did you ever see a sign

20   put up there by Crime Stoppers after this happened, some

21   time later?

22   A.    What kind of sign.

23   Q.    Put up by Crime --

24   A.    You're talking about a yellow sign?

25   Q.    Put up by Crime Stoppers saying if you know

Sharpe 000067

**J.A. 1983**

67

```
 1   anything call this number?

 2   A.    No.

 3   Q.    Did you know that the SCLC had put up a reward for

 4   the information leading to the arrest and conviction of

 5   the man that did the shooting?

 6   A.    Excuse me?

 7   Q.    Did you know -- you know what the SCLC is?

 8   A.    No.

 9   Q.    Okay.  Southern Christian Leadership Conference.

10   Did you know that they put up a reward?

11   A.    No.

12   Q.    Did you know that Fountain Power Boats put up a

13   award?

14   A.    No.

15   Q.    And you've already received $500; is that right?

16   A.    Right.

17   Q.    And you live at 826 Fleming Street.  Do you still

18   live at the same place?

19   A.    Uh-huh.

20   Q.    Who do you live with?

21   A.    _ My mother.

22   Q.    And is anyone else living there other than you and

23   your mother?

24   A.    Yes.

25   Q.    And who is that?
```

Sharpe 000068

**J.A. 1984**

68

```
 1    A.    My little brother.

 2    Q.    Little brother.  Just the three of you.

 3    A.    (Witness nodding head).

 4    Q.    Is that right?

 5    A.    (Witness nodding head.)

 6    Q.    How old are you now?

 7    A.    15.

 8    Q.    15.  When you get 16 are you going to get you a

 9    driver's license?

10          MR. EVERETT:  Objection.

11          THE COURT:  Sustained.

12    BY MR. STOKES:

13    Q.    Do you own an automobile now?

14    A.    No.

15    Q.    After the man was shot, did you see either Dantae

16    Sharpe or Mark Joyner reach down on the street and pick

17    up anything?

18    A.    No, I did not.

19    Q.    If they had reached down and picked up a shell

20    casing, you think would you have seen that?

21    A.  - Yes.

22    Q.    And you saw nobody do anything like that, reach

23    down and pick up something off the street?

24    A.    Did I see anybody?

25    Q.    Yes, ma'am.  Did you see anybody?
```

Sharpe 000069

**J.A. 1985**

69

1   A.    No, I did not.

2   Q.    And there's absolutely no doubt in your mind that

3   when this man got shot that he and Dantae were facing

4   each other and that Dantae had just pushed him?

5   A.    No doubt in my mind.

6   Q.    Now, I believe you said earlier that you saw Mark

7   Joyner and Dantae Sharpe get in a red car?

8   A.    Yes.

9   Q.    Do you recall what kind of car it was?

10  A.    It was a small car.

11  Q.    A small car.  Do you recall writing out a

12  statement saying it was a Ford Escort in your own

13  handwriting?

14  A.    Yes.

15  Q.    Do you remember it as being a Ford Escort?

16  A.    They asked me what kind of car I thought it was.

17  So that's what I think it was.  I don't know if it was

18  that kind of car or not.

19  Q.    You think it was as small red car like a Ford,

20  something like a Ford Escort?

21  A.    Yes.

22  Q.    Where was that car parked?

23  A.    Okay.  I had --

24  Q.    Could you show us on the map by stepping down and

25  making an X just where that red car was parked?

Sharpe 000070

**J.A. 1986**

70

1    A.    Okay.  After I left from here, I went like to the

2    store?

3    Q.    Okay?

4    A.    On 5th Street, there's like some -- a church.  Not

5    a church but a funeral home place?

6    Q.    Okay.

7    A.    It was like right like on this side of the walkway

8    in front of the -- what's the name?

9    Q.    The funeral home?

10   A.    Yeah.

11   Q.    And that's where the red car was?

12   A.    Yeah.

13   Q.    The funeral home is not on that map, is it?

14   A.    No.

15   Q.    Okay.  How long after you saw them shoot, did you

16   see them get in the red car and leave?

17   A.    Like about 15, 20, 30 minutes after it happened,

18   they like jetted and ran.

19   Q.    They what?

20   A.    They ran.

21   Q.    They ran from the scene?

22   A.    Yeah.

23   Q.    They split up?

24   A.    Yeah.

25   Q.    And you're saying in 15 minutes later they are

Sharpe 000071

J.A. 1987

71

```
 1    back together on a street a block away getting in a car?

 2    A.    Okay.  They split up -- okay.  From where the

 3    truck is, you go down that street right here.  And one

 4    split up somehow and went the other way, and they found

 5    each other, and they got in a red car.

 6    Q.    And the red car was down at the funeral home on

 7    5th Street?

 8    A.    Yeah.

 9    Q.    Is that right?

10    A.    Right.

11    Q.    Who drove?

12    A.    I don't know who drove.

13    Q.    Didn't you see both of them get in the car?

14    A.    I seen them get in the car, but I don't know who

15    was driving.

16    Q.    Who got in on the driver's side?

17    A.    I think it was Mark that got on the driver's side.

18    Q.    Are you sure?

19    A.    Yeah.

20    Q.    So Mark must of drove the car, hadn't he?

21    A.    I don't think he drove the car.  I think somebody

22    else was in the car.  He must have got in on the

23    driver's side.

24    Q.    How do you know someone else was driving the car?

25    A.    Because it looked like -- how can the car be
```

Sharpe 000072

**J.A. 1988**

72

1   already started up under -- when they're running to

2   catch up with each other, how can the car be already

3   started up if won't nobody else driving?

4   Q.    So they both ran up to this car, jumped in and

5   took off?

6   A.    Yeah.

7   Q.    Were they running together?

8   A.    No.  They won't running together.  One was running

9   down the other street and one /probably/ was running down

10  the other street.

11  Q.    But 15 minutes after all this happens, you see the

12  same two men run up to a red car and jump in the red car

13  and the car takes off?

14  A.    Yeah.

15  Q.    It took you two months to talk to the police,

16  right?

17  A.    Approximately two months.

18  Q.    Now, was it Dantae Sharpe or the white man that

19  said the cuss word after Dantae pushed him?

20  A.    The white man.

21  Q.    The white man said "F" you?

22  A.    Yeah.

23  Q.    And is that the moment --

24  A.    He pushed him.

25  Q.    -- that Dantae pushed him?

73

1   A.    He said "F" you man, and he shot him.

2   Q.    Did Dantae say "F" you man or the white man say

3   that?

4   A.    I said the white man.

5   Q.    So Dantae pushes him, the white man says "F" you

6   man, and Dantae shoots him face to face?

7   A.    I don't know if the white man turnt.  He probably

8   was not straight but turned and shot him.  I don't know

9   if it was straight up or not.

10  Q.    A while ago didn't you tell me that they were face

11  to face?

12  A.    They were facing to each other, but he could have

13  been turning or slanted kind of.

14  Q.    Was he turning?

15  A.    I don't know.

16  Q.    If you could see that good to see it was Dantae,

17  that it was a white man, see it was Mark Joyner,

18  couldn't you see well enough to tell if they were face

19  to face?  Your best recollection you believe they were

20  face to face?

21  A.  .  Yes, I do.

22  Q.    Now, before you told Mr. Best what you did, had

23  you ever visited in Dantae's home before that?

24  A.    What you mean, when Dantae was in jail or

25  something?

74

1   Q.   No.   Before he was arrested?

2   A.   I've been by there, but I never had went in the

3   house.

4   Q.   And you've been off with him on the car, haven't

5   you, before he got arrested?  Have you not?

6   A.   I don't think I've been in Dantae's car.

7   Q.   Well, you saw him every day, didn't you?

8   A.   Yes.

9   Q.   You hung out, didn't you?  Are you saying you hung

10  out with this man standing right beside him every day?

11  A.   I mean, not every day.  I went by there, and I

12  stopped and I stayed a long time.  You know what I'm

13  saying?

14  Q.   Now, so could you hear the words that they were

15  saying from where you were?  Most of them any way.

16  A.   Yes, most of them.

17  Q.   And yet you didn't walk up there where they were,

18  right?

19  A.   What did you say?

20  Q.   You didn't walk up there where they were?

21  A.   _ No, I did not.

22  Q.   You didn't holler, "Hey, Dantae.  Hey Mark"?

23  A.   You're talking about when the man got shot or

24  something?

25  Q.   Yes, ma'am.

Sharpe 000075

J.A. 1991

75

1   A.   No, I did not.

2   Q.   But you knew both of them?

3   A.   Yes, I do.

4   Q.   You're saying both of them were your friends?

5   A.   They weren't friends. They were just hommies,

6   associates.

7   Q.   Associates like everybody else out on the street;

8   isn't that right?

9   A.   Yeah.

10   Q.   They were not in the group that you called your

11   friends, were they?

12   A.   I call so many people my friends, but people

13   aren't my friends so.

14   Q.   They're your associates?

15   A.   Yes.

16   Q.   He was not your friend; he was your associate?

17   A.   Right.

18   Q.   So you didn't know him as well as you know your

19   friends?

20   A.   I'm trying to tell you, I don't have friends. I

21   have people that I associate with, hang out some times

22   with. Not friends.

23   Q.   You don't have any friends?

24   A.   Except my mother. She's my friend.

25   Q.   She's your only friend?

Sharpe 000076

**J.A. 1992**

76

1   A.   Yes, she is.

2   Q.   Did you see anybody else out on the street that

3   night?

4   A.   I was between the cars.  I saw Marciana.

5   Q.   Where did you see Marciana?

6   A.   Coming down the street.

7   Q.   5th Street?

8   A.   This street.

9   Q.   14th Street?

10  A.   No.  This street.

11  Q.   Would you step up there and point to which street

12  you're talking about.

13  A.   This street.

14  Q.   6th Street?

15  A.   I guess this is 6th street over here.

16  Q.   The street the truck was on?

17  A.   Yeah, on the other side.

18  Q.   On the other side of 14th Street?

19  A.   Coming real close.

20  Q.   Coming towards you from the other way?

21  A.   . Yeah.

22  Q.   Okay.  So Marciana would have seen all of this

23  too?

24  A.   Yes.

25  Q.   Now, when you went on down 14th Street, did you go

77

```
 1   to Hannah's?

 2   A.    Yes, I did.

 3   Q.    What did you buy?

 4   A.    Some cigarettes, some chips, candy and a soda, I

 5   think.

 6   Q.    And where did you go from there?

 7   A.    Home.

 8   Q.    Did you tell anybody at Hannah's that you just saw

 9   somebody shot and killed?

10   A.    No.

11   Q.    You knew the people that worked there, didn't you?

12   A.    Yeah.

13   Q.    Known them a long time, right?

14   A.    Yeah.

15   Q.    How many people were in Hannah's that night as

16   best as you can recall?

17   A.    A couple of people?

18   Q.    Did you know everybody that was in Hannah's, as

19   best as you can recall, that night?

20   A.    Just the people that was working there at that

21   particular point in time.

22   Q.    Okay.  Did you see anybody else between the time

23   you left Hannah's and the time you got home that you

24   knew?

25   A.    Huh-uh.
```

Sharpe 000078

**J.A. 1994**

78

1    Q.    When you got home did you tell anybody else about

2    all of this, get on the phone and tell all your

3    associates what you'd seen?

4    A.    No.

5    Q.    You witnessed a murder and didn't tell anyone,

6    isn't that true, until you talked to Mr. Best?  Is that

7    true?

8    A.    Yes.

9    Q.    Mr. Best was the first one you told about it; is

10   that true?

11   A.    Yes.

12   Q.    You know a lady named JoAnne Tyson?

13   A.    I don't know.

14   Q.    You don't know whether you know that name or not?

15   A.    Huh-uh.  Probably the face but not the name.

16   Q.    You recall telling anybody that you didn't see

17   anything, that you didn't see who did it, and you didn't

18   know anything about it after Dantae was arrested?

19   A.    Did I tell anybody that I didn't see it?

20   Q.    Didn't see it, didn't know anything about it after

21   he was arrested?

22   A.    No, I did not.

23   Q.    Do you know a lady named Diana Pearson, a teacher,

24   Ms. Pearson?

25   A.    Yes.

**J.A. 1995**

79

1   Q.    Do you recall telling any of the students at

2   school that the reason you told it was for the money?

3   A.    No.  I did not tell nobody that.

4   Q.    Isn't that the reason that you came up and talked

5   with Mr. Best was because you knew you were going to get

6   some money out of it and that the truth is you didn't

7   see nothing?

8   A.    I ain't in for the money.  I'm in for somebody's

9   life that got killed, okay?

10  Q.    How many times have you talked to Mr. Best?

11  A.    A couple of times.

12  Q.    How many times have you talked with the District

13  Attorney?

14  A.    Couple of times.

15  Q.    Did anybody ever tell you not to talk with anyone

16  else about this case?

17  A.    They told me not to talk to anybody about this

18  case what?

19  Q.    Did either Mr. Best or the District Attorney tell

20  you don't talk with anybody else about what you know?

21  A.  -  Yeah, I think.

22  Q.    You think that somebody told you not to talk with

23  anybody else about it?

24  A.    (Witness nodding head.)

25  Q.    Do you recall who that person was that told you

Sharpe 000080

**J.A. 1996**

80

1    that?

2    A.    No, I don't.

3    Q.    You don't recall which one it was?

4    A.    (Witness shaking head.)

5    Q.    Did they tell you not to talk about what you saw

6    or just not to talk about anything about this case with

7    anybody else?

8    A.    Probably told me not to tell what I saw or

9    something.

10    Q.    Told you not to tell what you saw?

11    A.    (Witness nodding head.)

12    Q.    Do you recall who it was?  Which one of them told

13    you that?

14    A.    I said I don't know.

15    Q.    You recall about when somebody told you that?

16    A.    Like when I first started speaking to them.

17    Q.    When you first started talking to the officer?

18    A.    (Witness nodding head.)

19    Q.    Some time right around in then?

20    A.    (Witness nodding head.)

21    Q.    Now, when this man was shot, where did he fall?

22    A.    Like right in front of the truck.  Like the door

23    -- like where the door opens, right, like right -- his

24    face was like where the door opens --

25    Q.    Uh-huh.

81

```
 1    A.     -- and shut right there.

 2    Q.     Right there.  He fell right beside the driver's

 3    door?

 4    A.     Yeah.

 5    Q.     Which one of them picked him up and put him in the

 6    truck?

 7    A.     Both of them helped.

 8    Q.     Both of them.  Who grabbed his shoulders and who

 9    grabbed his feet?

10    A.     (No response.)

11                THE COURT:  Did you answer that?

12                THE WITNESS:  Yes, sir.

13                THE COURT:  What was your answer?

14                THE WITNESS:  Mark had the arms and Dantae

15     had the feet.

16    BY MR. STOKES:

17    Q.     Okay.  Did Mark back into the truck from the

18    driver's side carrying the man's shoulders?  How did

19    they get him in the truck?

20    A.     Well, I think Mark let -- Dantae let go after they

21    got him -- after they put his -- like, like his legs and

22    head in, he pulled him from the his arms up in the truck

23    and his legs were dangling.

24    Q.     Where was he standing when he pulled on his arms

25    to pull him in the truck?  Where was Mark standing?  Was
```

82

```
 1   he in the truck, on the back of the truck, outside on
 2   the driver's side?  Where was Mark standing when he was
 3   pulling on his head to get his feet in the truck?
 4   A.     Say that again?
 5   Q.     Where was Mark standing?  You say that they put
 6   his head and upper body in the truck and then they put
 7   his feet in the truck, and his feet were dangling out on
 8   the driver's side, where was Mark Joyner standing when
 9   he put his shoulders in the truck?
10   A.     On the other side.
11   Q.     Did he open the door?
12   A.     Yeah.
13   Q.     So they opened the passenger door now; is that
14   right?
15   A.     Right.
16   Q.     Climbs in the truck --
17   A.     He doesn't climb in the truck.  He was halfway --
18   okay, the stairwell is right here --
19   Q.     Uh-huh.
20   A.     -- and the music and stuff is right there.  And
21   probably his head was right there, and he pulled him.
22   Q.     Opened the passenger door and pulled him?
23   A.     (Witness nodding head.)
24   Q.     And did Mark shut the passenger door?
25   A.     Yes.
```

Sharpe 000083

J.A. 1999

83

```
 1   Q.    Did you see the music and stuff in the truck?

 2   A.    I'm just saying that's probably where --

 3   Q.    You didn't see it.  You think it was there.  Was

 4   the light on in the truck?

 5   A.    What you mean, inside the truck?

 6   Q.    You know, you open the door and the light comes

 7   on?

 8   A.    Yeah.

 9   Q.    Light was on in the truck.  Are you sure?

10   A.    Something was on.  I don't know if it was the

11   light or not.

12   Q.    Now, you don't know if it was the light or not.

13   You don't remember if the street light was on that

14   corner or not, right?

15   A.    (Witness shaking head.)

16   Q.    Bu you do remember where everybody was standing

17   when the gunshot was fired.  And you say that there were

18   two shots fired.  Were they real close together or real

19   far apart?  Did it go bang, bang?  Or did it go bang,

20   bang?

21   A.    It went bang, bang.

22   Q.    You're saying this man was looking at that man in

23   the face and shot him twice or shot at him twice?

24   A.    Uh-huh.

25   Q.    Looked him right in the face and shot him?
```

**J.A. 2000**

84

```
 1   A.      (Witness nodding head.)
 2             MR. STOKES:  I don't have any further
 3   questions.
 4             MR. EVERETT:  Any redirect?
 5             MR. EVERETT:  Briefly.
 6   REDIRECT EXAMINATION BY MR. EVERETT:
 7   Q.      Charlene, tell us why you didn't tell anybody any
 8   sooner?
 9   A.      I was scared.
10   Q.      Who were you scared of?
11   A.      Scared of getting beat up?
12   Q.      What happened to you?
13             MR. STOKES:  Objection.
14             THE COURT:  What was the question?
15             MR. EVERETT:  I said what happened to you?
16             THE COURT:  What are you talking about?
17             MR. EVERETT:  After you told the police what
18   happened to you?
19             MR. STOKES:  Objection.
20             THE COURT:  Sustained.
21   BY MR. EVERETT:
22   Q.      Charlene, do you recall telling anybody that you
23   hadn't seen anything?
24   A.      No.
25   Q.      And you recall anybody asking you, that is, not
```

85

```
 1    Mr. Best, but anyone else asking you if you had seen

 2    anything?

 3    A.     I can't remember.

 4    Q.     Do you recall anybody asking you, that is, anybody

 5    on the street asking you if you were talking to the

 6    police?

 7    A.     Yes.

 8    Q.     Who asked you that?

 9    A.     Candice?

10    Q.     Who is Candice?

11    A.     Her name is Candice Johnson.

12    Q.     And did you tell her?

13    A.     I told her that it was a probation officer.

14    Q.     You didn't tell her you were talking to Mr. Best,

15    did you?

16    A.     No.

17    Q.     Of course, you didn't have a probation officer at

18    that time, did you?

19    A.     No.

20    Q.     Charlene, why were you afraid?

21           -        MR. STOKES:  Objection.  Asked and answered.

22    A.     I was just afraid.

23                    THE COURT:  Overruled.

24    BY MR. EVERETT:

25    Q.     Ma'am?
```

**J.A. 2002**

86

1    A.    I was just afraid.

2              MR. STOKES:  Just one or two questions if I

3    might.

4              THE COURT:  All right.

5              MR. STOKES:  May I approach her, Your Honor?

6              THE COURT:  Yes, sir

7    RECROSS-EXAMINATION BY MR. STOKES:

8    Q.    Ms. Johnson, could you turn a little bit towards

9    me? Can you tell me how close, using me as either one

10   of the people and you as either one of the people as

11   either the white man or Dantae, how close were Dantae

12   and the white man together when the shooting occurred?

13             MR. EVERETT:  Objection.

14             THE COURT:  Sustained.  This is not a proper

15   recross.

16   BY MR. STOKES:

17   Q.    Could you estimate in feet approximately -- strike

18   that.  The District Attorney on his last question asked

19   you about talking to Mr. Best.  Mr. Best was the man

20   that you talked to and that's the man seated against the

21   wall behind Mr. Everett; he's the man you told this

22   statement to.

23   A.    Yes.

24   Q.    And in that statement that Mr. Everett referred

25   to, you talked to Mr. Best about -- did you ever tell

Sharpe 000087

**J.A. 2003**

87

```
 1    Mr. Best how far apart the white man and Dantae Sharpe
 2    were?
 3    A.    I can't remember what I wrote now.  It's been a
 4    long time.  But no, I don't think so.
 5    Q.    You don't think you told him?
 6    A.    No.
 7    Q.    How far apart were they?
 8              MR. EVERETT:  Objection.
 9              THE COURT:  Sustained.
10              MR. STOKES:  I don't have any further
11    questions of her.
12              THE COURT:  Thank you, ma'am.  You may step
13    down.
14              All right.  Members of the jury, we're going
15    to take our evening recess at this time.  During the
16    evening recess remember my prior admonitions to you.
17    Don't discuss this case among yourselves or allow
18    anyone to discuss it with you.  Don't form any kind of
19    opinion about the case.  Don't visit the scene that's
20    been testified to, that being the intersection of 6th
21    and Sheppard Street in Greenville.  Don't read, listen
22    to or watch any accounts of this trial in the newspaper
23    or on the radio or on television.  I'd ask that you be
24    back tomorrow morning in your seats at 9:30.  Y'all may
25    leave now.  I ask everyone else to remain seated while
```

1    y'all leave the courtroom.

2    (Jury out.)

3            THE COURT:  Is there anything further we

4    need to take up before we take our evening recess?

5            MR. EVERETT:  No, Your Honor.

6            THE COURT:  Sheriff, take a recess until

7    9:30.

8    (Overnight recess.)

9            THE COURT:  All right.  State can call its

10    next witness.

11            MR. STOKES:  Your Honor, may we approach the

12    bench?

13            THE COURT:  Yes.

14    (Side-bar conference.)

15                    ********

16    ALONZO VINES, being first duly sworn, was examined and

17    testified as follows during DIRECT EXAMINATION by

18    MR. EVERETT:

19    Q.    State your name for the Court, please.

20    A.    Alonzo Vines.

21    Q.    Alonzo Vines.  Mr. Vines, are you retired?

22    A.    Yes, sir.

23    Q.    Where did you work?

24    A.    I used to work for Mr. Wackenford (sic) in

25    Greensboro, Virginia.  I come home 1980, been home about

89

```
 1    15 years.
 2    Q.    All right.  Now, back in 1994, in February, where
 3    were you living?
 4    A.    I think I was living -- I used to live at 1912
 5    South Pitt, and then I left from there and come to 602-B
 6    on -- you know where 602 at.  My uncle lives on that
 7    side and I live on this side.
 8    Q.    What street was that on, Sheppard Street?
 9    A.    Uh-huh.
10    Q.    Okay.  If you don't mind, just look over here at
11    the diagram.  It may be somewhat confusing.
12    A.    Uh-huh.
13    Q.    Sheppard Street and 6th Street come together at a
14    corner, don't they?
15    A.    Sheppard Street run this way here and 6th Street
16    run that way.
17    Q.    Okay.  And 602-B Sheppard Street is sort of on a
18    corner, isn't it?
19    A.    That's right.
20    Q.    Okay.  Now, if this is 6th Street like this --
21    A.    Uh-huh.
22    Q.    -- and this is Sheppard Street --
23    A.    That's right.
24    Q.    -- you would live somewhere right around here,
25    wouldn't you?
```

90

1  A.    Yeah.  The house on the left.  This be on the

2  left.

3  Q.    All right.  And the yard in which you live -- are

4  there any other houses between the house you live in and

5  6th Street or is there a field?

6  A.    There is a field or a garden.

7  Q.    A garden?

8  A.    Uh-huh.

9  Q.    All right.  And is that where you were living back

10 in February when this happened?

11 A.    Yes, sir.  In the apartment house where my uncle

12 used to live at.  After he died, that's where I went at,

13 stayed with my first cousin.

14 Q.    Now, you remember when that guy got shot and the

15 truck was in your yard, don't you?

16 A.    Well, I tell you, I don't got no education --

17 Q.    Could you answer --

18 A.    -- and I don't remember what time it was, but I

19 was to the house.

20 Q.    You remember when it happened, don't you?  You

21 remember it?

22 A.    Yeah.

23 Q.    Was that around the 11th of February '94?

24 A.    Well, it might be, because I ain't -- I didn't

25 keep no account of it.

**J.A. 2007**

91

1   Q.    Now, the day it happened, the night it happened,

2   were you at home?

3   A.    Yeah, I was in the house.

4   Q.    Okay.  And did you hear something?

5   A.    Yeah, I heard something.

6   Q.    What did it sound like?

7   A.    It sounded like a bomb to me.  It shook the house.

8   It scared you to death.

9   Q.    A bomb?

10   A.    A shot or something.  I heard some people talking.

11   But I looked out the window, I couldn't half see because

12   the window was kind of dull, so I decided to go ahead

13   and call the law.  And that's what I did, so I could get

14   some help.

15   Q.    It was a noise, sounded like a shot?

16   A.    Yes, sir.

17   Q.    And it actually shook the house a little bit?

18   A.    Yes.  I decided to get some help.

19   Q.    Did it appear to be close by, the noise?

20   A.    Yes, sir.

21   Q.   - And when you looked out the window -- tell us how

22   you did that.

23   A.    Well, I had the telephone in my hand.  I decided

24   to make the call, 911.  My first cousin said, "Lonie,

25   look like a car or something pull up here by the

**J.A. 2008**

92

1   window." I said, "I'm going to call." That's what I

2   did. When I called somebody said, "We're going to come

3   out on this trace." That's when I hung the phone up.

4   Q.   That's what 911 told you?

5   A.   Yeah. I hung the phone back up. I ain't going to

6   tell no lie. When I hung the phone up, won't long here

7   comes the detective. Now, I told the truth, I ain't

8   going to tell no lie.

9   Q.   You hung up the phone. You knew that they could

10  find you where you were?

11  A.   Yeah. I knew where -- they could find where I

12  was. He did come there. That's when we walked out and

13  talked.

14  Q.   How long did it take for the rescue squad to get

15  there?

16  A.   I don't know, because I was inside the house.

17  Q.   Was it there pretty quick?

18  A.   Well, I'm going to tell you now, I'm inside the

19  house. I don't know what time they got there. But when

20  the detective got there, that's when I saw the rescue

21  squad thing out there.

22  Q.   So, now, when you heard this loud noise that

23  sounded like a shot and you looked out the window --

24  A.   That's right.

25  Q.   -- what did you see?

93

```
 1    A.    Look like -- see people.  Two people standing
 2    beside the truck, but I couldn't see in the face.  I
 3    could see the pants.
 4    Q.    So two or three people?
 5    A.    About two or three people standing on the side of
 6    the truck.  I didn't know -- I said to myself "I don't
 7    know what that thing is."
 8    Q.    Were those people -- was the truck in your garden
 9    then?
10    A.    Yeah.  Truck sitting in the garden with the door
11    open.
12    Q.    So the truck was in the garden?
13    A.    That's right.
14    Q.    And there were two or three people standing around
15    the truck?
16    A.    That' right.
17    Q.    And one of the doors was opened?
18    A.    That's right.  The door opened on the truck.
19    Q.    Was it the passenger side or driver's side?
20    A.    On the driver's side when we went on out of the
21    house.
22    Q.    So you went out when the detective got there and
23    the truck was still there?
24    A.    That's right.  And the man laying in the truck.
25    Q.    Were those three guys standing around?
```

Sharpe 000094

**J.A. 2010**

94

```
 1   A.     Naw, I couldn't see any face.  I don't know if
 2   it's a lady or either a man.  All I know they had pants
 3   on.  See, if the window had been clear, I could see
 4   pretty good.  But that dust, I could see the pants
 5   shaking like that (indicating.)
 6   Q.     You have dirty windows?
 7   A.     Yes, sir.
 8   Q.     Not talking about your windows, but your windows
 9   were dirty?
10   A.     Yes, sir.
11   Q.     As I understand what you're saying when you looked
12   out the window and you were calling the police at the
13   same time you saw a truck in your yard?
14   A.     That's right.
15   Q.     You saw a door open and three guys, two or three
16   guys?
17   A.     That's right.
18   Q.     Two or three people standing --
19   A.     That's right.  I couldn't see in the face,
20   couldn't tell woman or man.
21   Q.     Why didn't you go outside and see what was going
22   on?
23   A.     Naw, I can't go outside.  How am I going to go
24   outside and I had the phone in my hand trying to get
25   help, see.
```

95

```
 1   Q.    Okay.  After you put the phone down, did you go
 2   outside?
 3   A.    No.  No.  Uh-huh.
 4   Q.    Why didn't you go outside?
 5   A.    Who me?
 6   Q.    Uh-huh.
 7   A.    I was scared then.  My first cousin had taken
 8   these pills of his to keep from having a heart attack.
 9   Q.    You were scared?
10   A.    Yeah, I was scared.  But when the detective got
11   there, that's when we all went outside, yes, sir.
12   Q.    Tell me --
13   A.    I was scared, see.  If I throwed my head out, my
14   head could have got blowed off.
15   Q.    Somebody might blow your head off?
16   A.    That's right.
17   Q.    All right.  Tell me -- do you know who lived
18   across the street from you over here?
19   A.    No, I don't.
20   Q.    Okay.  Were any houses over here across 6th Street
21   from-you?
22   A.    The houses over in front of us won't nobody living
23   in that old house.
24   Q.    Nobody living in that old house?
25   A.    No.
```

Sharpe 000096

J.A. 2012

96

```
1    Q.    How about over here across on the corner of 6th

2    and Sheppard diagonally across from you?

3    A.    I don't know any of those people there.

4    Q.    Didn't know any?

5    A.    No.  Huh-uh.

6    Q.    You ever see them?

7    A.    Naw.  I just walk by.  I walk every morning, speak

8    to people, keep on getting up.

9    Q.    The houses on 6th Street on the block between

10   Sheppard and McKinley, are there houses there?  Do you

11   remember?

12   A.    I can't tell you the peoples' names.  They got a

13   brick house there on 6th Street.

14   Q.    Did you know those people?

15   A.    I don't know them good.  Mr. Spruill, you know, he

16   died.  That's where that garden lot belonged to.

17   Q.    Was Mr. Spruill alive then?

18   A.    No, he was dead.

19   Q.    Were these old people, young people or --

20   A.    That was an old man that owned that land.

21   Q.    - Okay.  Were most of these houses owned, lived in

22   by older people?

23   A.    I don't know anything about that.

24   Q.    You don't know any of these people who live in

25   these houses?
```

Sharpe 000097

**J.A. 2013**

97

1   A.   Huh-uh.  I been living in my first cousin's house,

2   her daddy.

3   Q.   Okay.  How old are you Mr. Vines.

4   A.   I'm 73.  I'll be 74 my next birthday.  I was born

5   1921, December 1.

6            MR. EVERETT:  No further questions.

7            THE COURT:  Cross-examine.

8            MR. CHERRY:  Thank you, Your Honor.

9   CROSS-EXAMINATION BY MR. STOKES:

10  Q.   Mr. Vines?

11  A.   Yes, sir.

12  Q.   Now, did you have your glasses on when you were

13  looking out your window?

14  A.   Yeah.  I had my glasses -- eyeglasses on?

15  Q.   Yeah.  That's what I'm talking about?

16  A.   Uh-huh.

17  Q.   Okay.  Now, when you heard that noise you say

18  sounded like a bomb or a shot, did it happen at the same

19  time that your house shook?

20  A.   Well, it happened so quick, it scared my first

21  cousin and scared me too.  I don't know what happened

22  right then, but I went and got that telephone.

23  Q.   Okay.  Let me ask you this way:  You remember

24  hearing the noise sounding like a bomb?

25  A.   Yeah.  It shook the house looked like to me now; I

98

1    don't know.

2    Q.    Did your house shake at the same time you heard

3    the noise?

4    A.    It happened so quick and done like that

5    (indicating).

6    Q.    It all happened at the same time?

7    A.    Yeah.  It scared my first cousin and scared me

8    too, yes, sir.

9    Q.    You say that you went and looked out your window?

10   A.    Yeah, I had the telephone now.

11   Q.    Okay.

12   A.    And try to get me some help.

13   Q.    And when you looked out your window --

14   A.    Yeah.

15   Q.    -- you say you saw two or three people just

16   standing there?

17   A.    Just standing beside the truck.  And I couldn't

18   see in their face.

19   Q.    I understand.

20   A.    And they had pants on.  I didn't know if it was a

21   woman or man.

22   Q.    Were they running?

23   A.    Naw.  Just standing beside the truck.

24   Q.    Standing beside the truck?

25   A.    Uh-huh.

99

1   Q.   How long did you stand there to the window and

2   look out there?

3   A.   I ain't stood that long because I done hung the

4   phone up.

5   Q.   Did you ever see any of those people leave from

6   around the truck?

7   A.   No.

8   Q.   They was just standing there?

9   A.   Just standing there, the only thing I know.

10   Q.   They won't moving?

11   A.   Naw. Just standing still, like I just stand right

12   straight up and down.

13   Q.   You didn't see anybody running?

14   A.   No. No, sir.

15   Q.   Thank you, Mr. Vines?

16           MR. EVERETT: Let me ask one other thing.

17   REDIRECT EXAMINATION BY MR. EVERETT:

18   Q.   Mr. Vines, did you watch them the whole time until

19   the police got there?

20   A.   No. I walked away when I hung the phone up.

21   Q.   - So you looked out the window and you saw the three

22   guys -- two or three guys?

23   A.   That's right.

24   Q.   You talked on the phone just a second or two?

25   A.   Yeah.

Sharpe 000100

**J.A. 2016**

100

```
 1    Q.    And hung the phone up and left?

 2    A.    That's right.

 3    Q.    Didn't look out any more?

 4    A.    That's right.  Right when I put the phone down

 5    here comes the detective, he knocked on the door.

 6    That's right.  I done told the truth about the whole

 7    thing.

 8              MR. EVERETT:  No further questions.

 9              THE COURT:  Thank you, sir.  You may step

10    down.

11              THE WITNESS:  Okay.

12              THE COURT:  Call your next witness.

13              MR. EVERETT:  May I release Mr. Vines, Your

14    Honor?

15              MR. STOKES:  No objection, Your Honor.

16              THE COURT:  Yes, sir.  You are released,

17    sir.

18              THE WITNESS:  Okay.

19                        ********

20    KENNETH DENTON, being first duly sworn, was examined and

21    testified as follows during DIRECT EXAMINATION by

22    MR. EVERETT:

23    Q.    State your name for the Court.

24    A.    Kenneth Denton.

25    Q.    And where are you employed?
```

101

1   A.   Greenville Fire and Rescue.

2   Q.   And were you so employed on February 11, 1994?

3   A.   Yes.

4   Q.   What is your job with Greenville Fire and Rescue?

5   A.   Firefighter/EMS.

6   Q.   And did there come a time that you received a call

7   to go to the corner of Sheppard and 6th streets in

8   Greenville?

9   A.   Yes.

10   Q.   What time did you receive that call, sir?

11   A.   2116, 1 believe is when that call came in.

12   Q.   What is that nonmilitary time?

13   A.   9:16.

14   Q.   What time did you arrive at the corner of Sheppard

15   and 6th streets?

16   A.   9:18.

17   Q.   Okay. At the time you got the call, what were you

18   going to?

19   A.   The call came in as a motor vehicle accident. So

20   we were geared up going to a car accident normally.

21   Q.   - Okay. And when you arrived at the corner of

22   Sheppard and 6th Street, would you tell us what you

23   found?

24   A.   First, we didn't find -- didn't notice the truck

25   at first. We were looking on the street for two cars

102

```
 1   involved in a car accident.  But it didn't even take
 2   very long to figure out that this truck looked out of
 3   place.  The fence was down and sign was down as well.
 4   We walked over through the little garden and that's when
 5   we found the patient.
 6   Q.    Where was this person?
 7   A.    He was -- his feet were on the --
 8   Q.    Was he in the vehicle, on the ground or what?
 9   A.    He was in the vehicle.
10   Q.    How was he in the vehicle?
11   A.    His feet were on the driver's side with his head
12   and his body, for the most part, slumped over into the
13   foot of the passenger side of the truck.
14   Q.    Describe this person.
15   A.    He was a white male.  We didn't know at the time
16   how old.  He looked like 45 or so.  Fairly large, maybe
17   200 pounds or so.  He had a beard.
18   Q.    Did you later find this man to be George
19   Radcliffe?
20   A.    Yes.
21   Q.    Did you do an external examination of
22   Mr. Radcliffe?
23   A.    Yes.  Initially, I unlocked the -- the passenger
24   side door was locked.  I unlocked that, walked around to
25   the other side.  Still at that time not knowing whether
```

**J.A. 2019**

103

1   he was just drunk or passed out or exactly what his

2   problem was, knew he wasn't responding to us.  I pulled

3   him up onto the seat and checked for a pulse, and he

4   didn't have a pulse.  From there we got our equipment

5   and started breathing for him and doing CPR.

6   Q.   Was he breathing on his own?

7   A.   No.

8   Q.   Were you ever able to establish a pulse there at

9   the scene?

10  A.   No.

11  Q.   Or any voluntary breathing?

12  A.   No.

13  Q.   Did you notice any wounds about his person?

14  A.   Yes.  We initially took his top off, cut his

15  clothes off looking for wounds.  We saw what looked like

16  a bullet wound on his left side between his armpit and

17  his left nipple.  There was one on the right side as

18  well in pretty much the same place.

19  Q.   From your experience when you arrived at the scene

20  and examined this man and attempted to treat him, was he

21  basically dead at the scene?

22           MR. STOKES:  Objection.

23           THE COURT:  Sustained.

24  BY MR. EVERETT:

25  Q.   Did he have a pulse?

Sharpe 000104

**J.A. 2020**

104

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Was he breathing on his own? |
| 3 | A. | No. |
| 4 | Q. | Was his heart beating? |
| 5 | A. | No. |
| 6 | Q. | Was he dead? |
| 7 | | MR. STOKES:  Objection. |
| 8 | | THE COURT:  Sustained. |

9  BY MR. EVERETT:

10  Q.    You seen -- strike that.  After you -- Mr.

11  Denton, what kind of training have you had, sir?

12  A.    I'm an AI with the City of Greenville.  That's

13  Advance Intermediate.  We go through a course that's

14  about a year long to get to that level.  We start IVs on

15  people.  We do BTLS, which is basic trauma life support.

16  They teach you how to take care of people that are

17  involved in trauma, such as this call.  We train on a

18  regular basis.  Usually once a month, we will go to a

19  class of some type.

20  Q.    And when you arrived at and found this vehicle,

21  were the doors opened or closed?

22  A.    They were closed.

23  Q.    Did you see anybody around when you arrived there?

24  A.    No.

25  Q.    Anywhere around?

105

1    A.    No one.

2    Q.    Anybody on the street, just sightseers or

3    anything?

4    A.    No.

5    Q.    While you were there did anyone come up?

6    A.    After we found -- after we realized what happened,

7    this man there was pretty much -- from there I was busy.

8    1 didn't have time to really notice who was around other

9    than my partners.

10   Q.    Now, did you then trans -- at some point in time

11   you called the police?

12   A.    Yes.  As soon as we realized that he had been

13   shot, we called for back up.

14   Q.    And did you take Mr. Radcliffe to the hospital

15   then?

16   A.    Yes.

17   Q.    And when you arrived at the hospital what happened

18   there?

19   A.    He was brought into the shock-trauma room which is

20   a room they have set up for critical patients.  CPR was

21   still done on him.  At that time they cracked his chest,

22   which means they cut his chest to try to squeeze his

23   heart.  It's pretty much a last snitch thing, and they

24   told us that --

25             MR. STOKES:  Objection.

106

```
 1              THE COURT:  Sustained.
 2   BY MR. EVERETT:
 3   Q.   What did you see while you were in there?
 4   A.   I really didn't see a lot of that.  It's pretty
 5   crazy in there at that time.
 6   Q.   And did there come a time that you just left?
 7   A.   Yes.
 8   Q.   And did you see the victim, Mr. Radcliffe, before
 9   you left?
10   A.   Yes.
11   Q.   Where was he when you saw him?
12   A.   He was in shock-trauma.
13   Q.   Were they still working on him?
14   A.   Yes, they were.
15   Q.   And did they stop working on him while you were
16   there?
17   A.   Yes.
18   Q.   Did you see him at that point?
19   A.   No.
20              MR. EVERETT:  No further questions.
21   CROSS-EXAMINATION BY MR. STOKES:
22   Q.   Mr. Denton, you said, as I recall in your direct
23   testimony, correct me if I'm wrong, that the fence was
24   down and the sign was down?
25   A.   Yes.
```

Sharpe 000107

**J.A. 2023**

107

1    Q.    What sign are you talking about?

2    A.    I believe it was a stop sign.

3    Q.    Using --

4              MR. STOKES:  May I approach the diagram,

5    Your Honor?

6              THE COURT:  Yes, sir.

7    BY MR. STOKES:

8    Q.    If you would, Mr. Denton, could you step down and

9    point on this diagram where the stop sign was that you

10   said was down?

11   A.    I think this was probably the stop sign here.

12   Q.    If this is the intersection, this is 6th Street

13   and this is Sheppard Street and these are the edges of

14   the blocks --

15   A.    This is the garden right here.

16   Q.    And the dotted area would be the fenced in garden

17   area.  Where would that stop sign have been?

18   A.    Somewhere in here.  I'm not really quite sure how

19   far away from the corner it was.

20   Q.    But it would have been on this corner?

21   A.    - Yes.

22   Q.    As opposed to this corner, this corner or this

23   corner?

24   A.    This corner.

25   Q.    Where did the truck end up on this diagram?  I

Sharpe 000108

108

```
 1   know it's not to scale but just approximately.

 2   A.    In the garden.  It was somewhere in here in the

 3   garden.

 4   Q.    Could you take this blue chalk please and put a

 5   little circle on there just about where you think it

 6   ended up.  I understand it's not to scale.

 7   A.    (Witness complied.)

 8   Q.    Okay.  Somewhere in there?

 9   A.    Yeah.

10   Q.    Thank you.  You say this was a large man, 200

11   pounds?

12   A.    Yes.

13   Q.    Thank you, Mr. Denton.

14         MR. STOKES:  No further questions.

15         THE COURT:  You may step down.

16         MR. EVERETT:  Kevin Jones.

17                    ********

18   KEVIN JONES, being first duly sworn, was examined and

19   testified as follows during DIRECT EXAMINATION by

20   MR. EVERETT:

21   Q.  -  State your name for the Court.

22   A.    Kevin Jones.

23   Q.    Where are you employed?

24   A.    I'm employed as a police officer with the

25   Greenville Police Department.
```

Sharpe 000109

J.A. 2025

109

1   Q.    And were you so employed and working on the 11th

2   of February 1994?

3   A.    Yes, sir.  I was a uniformed patrol officer.

4   Q.    On that night did it come a time that you were

5   sent to the intersection of Sheppard and 6th Street?

6   A.    Yes, sir, I was.

7   Q.    Do you remember what time you arrived there?

8   A.    I arrived there -- the call came in at

9   approximately 9:16 p.m.  I arrived there probably 9:19,

10  9:20 p.m.

11  Q.    What did you find when you arrived?

12  A.    I found -- observed a EMS truck, a fire truck on

13  the scene, a gray Mazda pickup in the garden area or

14  vacant lot just north of 602 Sheppard Street.

15  Q.    Okay.  Where was the vehicle setting?

16  A.    The vehicle was setting towards the rear of 602

17  Sheppard.  And as I say, closer to the intersection of

18  -- closer to 6th Street, on the 6th Street side of 602

19  Sheppard, which would be the north side.  The front of

20  the vehicle was facing towards the back of the house.

21  Q.    How far from the house was it?

22  A.    Probably 10 feet.

23  Q.    Okay.  Any indication the house had been struck?

24  A.    Not that I saw then, no, sir.

25  Q.    What damage did you observe in the area?

Sharpe 000110

**J.A. 2026**

110

1   A.    I observed the stop sign at the -- within the

2   southwest corner of 6th and Sheppard, which is right

3   there at the vacate lot, had been knocked over and was

4   leaning against a fence post.  There's a small-like wire

5   fence with some barb wire that was around that vacate

6   lot that had been knocked over, and the barb wire was

7   extending from the bottom of the truck, underneath the

8   truck back to the fence area.  Of course, the fence was

9   knocked over.

10   Q.    Okay.  Did you look at the vehicle?

11   A.    Yes, sir, I did.

12   Q.    When you arrived, the EMS was already there?

13   A.    Yes, sir.

14   Q.    Were the doors opened or closed when you arrived:

15   A.    When I arrived both doors were open.

16   Q.    They were working on him?

17   A.    Yes, sir.

18   Q.    Did you see anybody in the vehicle?

19   A.    I saw a white male later identified as George

20   Radcliffe laying across the seat.  At that point his

21   feet were up underneath the steering wheel, and he was

22   laying on his right side, so his head was in the right

23   passenger area.  EMS Specialist Denton advised me that

24   originally --

25              MR. STOKES:  Objection.

Sharpe 000111

J.A. 2027

111

```
 1              THE COURT:  Sustained.
 2     BY MR. EVERETT:
 3     Q.     You talked to Mr. Denton?
 4     A.     Yes, sir.
 5     Q.     Was the windows on the vehicle -- were they up or
 6     down?
 7     A.     The right side window was up.  The left side
 8     window -- the driver's side window was rolled down
 9     between half and three-quarters of the way down.  So ·
10     probably that much (indicating) of the window was rolled
11     up.
12     Q.     Did you accompany Mr. Denton and Mr. Radcliffe to
13     the emergency room?
14     A.     Not at that time, no, sir.
15     Q.     Did there come a time that you went to the
16     emergency room?
17     A.     Yes, sir.
18     Q.     And when was that?
19     A.     It was probably an hour and half later after the
20     detectives arrived on the scene.
21     Q.     Was Mr. Radcliffe responding at all when you
22     arrived?
23              MR. STOKES:  Objection.
24              THE COURT:  Sustained.
25     BY MR. EVERETT:
```

Sharpe 000112

**J.A. 2028**

112

```
 1   Q.   Was he talking?

 2   A.   No, sir.

 3            MR. STOKES:  Objection.

 4            THE COURT:  Overruled.

 5   BY MR. EVERETT:

 6   Q.   Was he breathing?

 7   A.   No, sir.

 8   Q.   He wasn't walking around or anything?

 9   A.   No, sir.

10   Q.   Did you go to the hospital an hour and a half

11   later?

12   A.   Yes, sir.

13   Q.   Did you see him?

14   A.   Yes, sir, I did.

15   Q.   Where was he?

16   A.   He was in a back room of the emergency department.

17   I don't recall the exact room number.

18   Q.   Was he walking around or anything like that?

19   A.   There was no one around him.

20   Q.   And where was he?

21            MR. STOKES:  Objection.  Asked and answered.

22            THE COURT:  Overruled.

23   BY MR. EVERETT:

24   Q.   Where was he?

25   A.   He was on a bed by himself.  As I said, no one was
```

113

1    around him.

2    Q.    Did you notice any wounds about him at that point?

3    A.    Yes, sir, I did.

4    Q.    What did you notice?

5    A.    I noticed a hole in his left upper arm on the

6    outside, one on the inside of the left upper arm.

7    Another hole on the left side of his chest, another hole

8    on the right side of his chest, another hole inside of

9    his right arm, and then a bruise on the outside of his

10   right arm and then the stitches across the chest area.

11   Q.    Mr. Jones, are you familiar with firearms?

12   A.    Yes, sir.

13   Q.    You've fired firearms in the past?

14   A.    Yes, sir.

15   Q.    You've had training in firearms?

16   A.    Yes, sir.

17   Q.    Are you familiar with a .45 caliber firearm?  Just

18   the size.

19   A.    Yes, sir.

20   Q.    Is that considered a small or large caliber

21   firearm?

22   A.    A large caliber firearm.

23   Q.    And are you familiar with the sound of a .45

24   caliber projectile?

25   A.    Yes, sir.

Sharpe 000114

**J.A. 2030**

-114-

```
1    Q.    All right.  Is that -- would you consider that to
2    be a very loud or not so loud type of weapon?
3    A.    Loud.
4    Q.    Very powerful weapon?
5    A.    Yes, sir.
6    Q.    All right.  Thank you, sir.
7    CROSS-EXAMINATION BY MR. STOKES:
8    Q.    Now, very powerful weapon.  Is that correct?
9    A.    Yes, sir.
10   Q.    Slugs from a .45 do what to a human body at close
11   range?
12   A.    It would tear it up pretty well.
13   Q.    Move it, wouldn't it?
14   A.    Yes, sir.
15   Q.    Feel like the impact of a cannon, wouldn't it?  Be
16   kind of hard, wouldn't it?
17   A.    It'll do some damage, yes, sir.
18   Q.    Slug would be powerful enough to knock a person
19   over, wouldn't it?
20   A.    Possibly.
21   Q.    Now, Mr. Jones, after everything was cleared up
22   and all that, did you make out an accident report
23   dealing with this incident?
24   A.    Yes, sir, I did.
25            MR. STOKES:  May I approach the witness,
```

115

1    Your Honor?

2           THE COURT:  Yes, sir.

3           (Defendant's Exhibit Number 1 marked for

4   identification.)

5   BY MR. STOKES:

6   Q.   Now, I hand you this piece of paper and ask you to

7   examine it please.  Is that a true and accurate copy of

8   the original of the accident report which you did at

9   this scene?

10   A.    Yes, sir, it is.

11   Q.   And could you tell us --

12           MR. STOKES:  May I approach the board, Your

13   Honor?

14           THE COURT:  Yes, sir.

15   BY MR. STOKES:

16   Q.   Could you step down, Mr. Jones, and using this

17   board -- did you happen to draw this?

18   A.    No, sir.

19   Q.    Do you recognize it?

20   A.    Yes, sir, I do.

21   Q.   - Could you show us on this board what your

22   investigation showed the truck had done prior to coming

23   to rest here?

24   A.    Okay.

25   Q.   Without drawing on the board, just sort of

**J.A. 2032**

116

1    pointing to start with.  Try not to erase anything.

2    A.    To the best I could determine on the accident

3    scene, it appeared the vehicle had come maybe from this

4    way.  Here's where the stop sign was knocked over, the

5    fence was here, the fence was knocked over, the vehicle

6    came to rest back here facing this way.

7    Q.    So your investigation showed that the vehicle came

8    this way into the stop sign?

9    A.    Possibly.  Yes, sir.  Apparently.

10   Q.    And did you find tire tracks on the street side of

11   the stop sign that would lead to the vehicle that went

12   over the stop sign indicating to you the vehicle had hit

13   this stop sign at this corner?

14   A.    Yes, sir, I did.

15   Q.    So your investigation showed -- now, this is going

16   which way, east or west?

17   A.    That would be going west.  North is this way.

18   Q.    Okay.  Did your investigation show that the

19   vehicle was traveling west on 6th Street, hit the stop

20   sign and ended up in this area?

21            MR. EVERETT:  Objection.

22            THE COURT:  Overruled.

23   A.    Yes, sir.

24   BY MR. STOKES:

25   Q.    Okay.  Now, Mr. Jones, were you able to speak with

117

1   anyone at the scene about what was going on?

2   A.    I spoke to one subject.

3   Q.    And what was that subject's name?

4   A.    Tony Johnson.

5   Q.    And where did Mr. Johnson say that he was

6   standing?

7          MR. EVERETT:   Objection.

8   Q.    If he was or where did he say he was during this

9   time?

10          THE COURT:   Sustained.

11  BY MR. STOKES:

12  Q.    Now, part of what your -- the route of the truck,

13  part of what you used was what Mr. Johnson told you, was

14  it not?

15  A.    That's true, yes, sir.

16  Q.    Now, did you speak with anyone named Wilbert

17  Mercer at the scene?

18  A.    Yes, sir, I did.

19  Q.    So there were two people you spoke to?

20  A.    Yes, sir.

21  Q.   . And does Wilbert Mercer have a street nickname?

22  A.    Yes, sir, he does.

23  Q.    And what is that nickname?

24  A.    Marciana.

25  Q.    Marciana?

Sharpe 000118

J.A. 2034

118

1   A.    I'm sorry.  I had forgotten about speaking to

2   Marciana.

3   Q.    So you actually spoke to two people that indicated

4   to you they knew something about the wreck itself?

5   A.    Marciana didn't know anything about the accident,

6   no, sir.

7   Q.    The other man indicated he did?

8   A.    Indicated he did, yes, sir.

9   Q.    And did you take part in looking for any evidence

10  which might have been on those streets in that area?

11  A.    Yes, sir, briefly.

12  Q.    In the ground search?

13  A.    Briefly, yes, sir.

14  Q.    Do you know whether or not anything was found in

15  that ground search of those streets?

16  A.    Any particular place or --

17          MR. STOKES:  May I approach the board, Your

18  Honor?

19          THE COURT:  Yes, sir.

20  BY MR. STOKES:

21  Q.  -  In the search from say on 6th Street --

22  A.    Yes, sir.

23  Q.    -- back this way toward McKinley and Roosevelt.

24  A.    Okay.  Yes, sir.

25  Q.    Do you know whether or not anything was found that

119

1   might have had a connection with this case at that time

2   that the police department thought might of had a

3   connection with the case?

4   A.    Yes, sir.

5   Q.    And what were those things or items or whatever?

6   A.    Found what appeared to be three spent or used .45

7   caliber shell casings.

8   Q.    Now, these were found somewhere on 6th Street,

9   were they not?

10  A.    Yes, sir.

11  Q.    And you didn't find them.  And you don't know

12  exactly where they were found, do you or did you?

13  A.    I saw them, yes, sir.

14  Q.    All right.  Could you step down from the seat up

15  there and indicate with -- well, with white chalk and a

16  little X about where you saw those cartridges on that

17  street as best you can?

18  A.    Mr. Stokes, one of them I didn't say where it was

19  found exactly.  So I'm not sure exactly.

20  Q.    Okay.  As best you can.

21  A.    But the other two, two were found back in this

22  area.

23  Q.    And where do you believe the other ones --

24  A.    The other ones were right up in this area.  I

25  think like right there.

Sharpe 000120

J.A. 2036

120

1    Q.    Okay.  Now, you can take your seat back up there.

2    Thank you.  This entire street, 6th Street that is, from

3    Roosevelt all the way down to somewhere in here, was

4    searched very carefully, was it not?

5    A.    To the best of my knowledge.  I didn't particate

6    in the actual search, no, sir.

7    Q.    But there were a lot of officers out there

8    looking?

9    A.    There were several.

10   Q.    Did you -- well, they had lights and all out

11   there, didn't they?

12   A.    Yes, sir.

13   Q.    It was night?

14   A.    Yes, sir.

15   Q.    Very dark?

16   A.    Yes, sir.

17   Q.    How many street lights do you have out there, you

18   recall.

19   A.    There are street lights out there, but they're not

20   the best lighted streets in town.

21   Q.  - And do you recall anybody finding any blood out

22   there on the street?

23   A.    No, sir.

24   Q.    If somebody found some, do you think you would

25   have heard about it?

Sharpe 000121

J.A. 2037

121

1   A.    Yes, sir.

2   Q.    Now, as a matter of fact -- do you have a copy of

3   the accident report with you?

4   A.    No, sir, I don't.

5          MR. STOKES:  May I approach the witness?

6          THE COURT:  Yes, sir.

7   BY MR. STOKES:

8   Q.    As a matter of fact, Mr. Jones, you made several

9   detailed measurements with one of those little road

10  tapes at various points tracking the movement of that

11  truck, did you not?

12  A.    Yes, sir.

13  Q.    And those measurements are indicated and outlined

14  on your accident report, are they not?

15  A.    Yes, sir.

16  Q.    May I have it back please, sir.  Was there any

17  type of clothes located in the truck that you later

18  found to be not owned by George Radcliffe?

19  A.    Yes, sir, there was.

20  Q.    And what type of clothing was that?

21  A.  -  Was a green army style camouflage jacket with the

22  name "Nobles" across it.

23  Q.    Like where they have the name tag?

24  A.    Yes, sir.

25  Q.    Did anyone claim ownership of that jacket?

122

1  A.    Yes, sir.

2  Q.    Who was that?

3  A.    Marciana.

4  Q.    Marciana?

5  A.    Yes, sir.

6  Q.    ID Officer Mendenhall responded to the scene as

7  the ID officer in charge of gathering evidence that

8  night?

9  A.    Yes, sir.  That's correct.

10  Q.    Did Marciana make a statement about Mr. Radcliffe

11  to you?

12  A.    Yes, sir.

13  Q.    As matter of fact it was, I believe, Officer

14  Jenkins that located the three spent .45 shell casings,

15  wasn't it?

16  A.    That's correct.

17  Q.    Have you got all of your notes that you made at

18  the scene or any time during this investigation with you

19  now, all your rough notes?

20  A.    Mr. Stokes, when I arrived on the scene, we

21  secured the scene, called for detective.  At that point

22  I sat and began to write my investigation while it was

23  fresh right then.

24  Q.    Do you have all of those rough drafts, the actual

25  handwriting that you made?

123

1   A.    Yes, sir. This is the actual report that was

2   turned in that was written on the scene.

3           MR. STOKES:  May I approach the witness?

4           THE COURT:  Yes, sir.

5   Q.    May I see that, sir?

6   A.    Yes, sir.

7           (Defendant's Exhibit Number 2 marked for

8   identification.)

9   BY MR. STOKES:

10  Q.    Now, Officer, I hand you back this that has now

11  been marked as Defendant's Exhibit 2, and I ask you can

12  you identify it?

13  A.    Yes, sir.

14  Q.    And what is it?

15  A.    It's a copy of the original investigation.

16  Q.    Is that a copy that you yourself made?

17  A.    Yes, sir.

18  Q.    Do you recognize that document, being several

19  pages, as being the document that you yourself prepared

20  that night at the scene while it was fresh on your mind?

21  A.  . Yes, sir.

22  Q.    Was the jacket that was found in the truck made a

23  part of the evidence in this case?

24  A.    I do not know.

25  Q.    You don't know one way or the other?

**J.A. 2040**

124

1  A.    No, sir.

2  Q.    The last time you saw it was where?

3  A.    In the truck.

4  Q.    In the truck.  Thank you, Mr. Jones.

5          MR. STOKES:  I don't have any further

6  questions, Your Honor.

7  REDIRECT EXAMINATION BY MR. EVERETT:

8  Q.    Mr. Jones, what did Marciana tell you?

9  A.    Mr. Mercer or Marciana told me that he had earlier

10 been with the victim, Mr. Radcliffe, had dealt with him

11 -- had dealt with Mr. Radcliffe in the past and was

12 trying to help him locate some powder cocaine; that

13 Marciana exited the vehicle in an attempt to locate some

14 powder cocaine and a marked patrol car drove by, and

15 Mr. Radcliffe at that time fled from the area in his

16 truck with Marciana's coat still in it and that Marciana

17 tried to stop him so he could get his jacket back.

18 Q.    This is at the time of the shooting?

19 A.    No, sir.  This was approximately two hours

20 earlier.

21 Q.    And Marciana, that's somebody you know, right?

22 A.    Oh, yes, sir.

23 Q.    I mean a -- he's from Greenville?

24 A.    Yes, sir.

25 Q.    You know him by his name Wilbert Mercer and know

125

```
 1   him by his name Marciana?
 2   A.     Yes, sir.
 3   Q.     This guy Mr. Stokes asked you about, Tony Johnson,
 4   do you know him?
 5   A.     No, sir.
 6   Q.     Have you ever been able to find him since then?
 7   A.     All he would tell me was he was from Tarboro and
 8   that his grandmother lived near K-Mart.
 9   Q.     And I don't think you or anyone else have been
10   able to locate him?
11   A.     Not to my knowledge, no.  I know I haven't.
12   Q.     Now, tell us, Mr. Jones, what physical evidence
13   that you have that you observed as far as a vehicle
14   traveling through this yard?
15   A.     I had a sign knocked down.  The stop sign is
16   leaning against the post, a fence post.  The fence
17   knocked down.  Now, the fence was knocked down this way.
18   It was laying like this.  And then some tire tracks
19   going through here, and they stopped underneath the
20   vehicle.  The barb wire leading from the knocked down
21   fence up to under the bed of the truck.
22   Q.     Did you have any skid marks on the curbing?
23   A.     Yes, sir.
24   Q.     Where were those skid marks located?
25   A.     One was located here, right before -- about the
```

**J.A. 2042**

127

```
 1   here?

 2   A.     To be honest, yes, sir, it is.

 3   Q.     In fact, isn't it true that one of these was found

 4   around the corner and one was found here?

 5   A.     It's very possible.  I remember from up here when

 6   I found out about the shell casings, I rode down and

 7   looked at it and then left.

 8   Q.     You recall that this one that was found here could

 9   have been found farther this way?

10   A.     Very possible.

11   Q.     And that this one had actually been run over?

12   A.     Yeah, that one was.  I do have that in my notes?

13   Q.     Tell me, Mr. Jones, is it rare in this area to

14   find shell casings.

15   A.     No, sir.

16   Q.     Aren't there a lot of shell casings on these

17   streets?

18   A.     Yes, sir.

19   Q.     And as I understand, you told us that the only

20   information Wilbert Mercer's gave you was concerning

21   trying to get some crack for Radcliffe -- I mean,

22   powdered cocaine for Mr. Radcliffe some time earlier?

23   A.     Yes, sir.

24   Q.     In your experience in this area, is it rare for

25   that to happen, for someone in the neighborhood to go
```

J.A. 2043

128

1  out and try to get cocaine for someone else who is not

2  familiar with the neighborhood?

3  A.    No, sir.  Not to try to get cocaine.

4  Q.    All right.  Thank you, sir.

5  RECROSS-EXAMINATION BY MR. STOKES:

6  Q.    Mr. Jones, you were not up here yesterday, were

7  you?

8  A.    No, sir.

9  Q.    Did you not hear the testimony of Charlene

10  Johnson?

11  A.    No, sir, I did not.

12        MR. STOKES:  May I approach the board, Your

13  Honor?

14        THE COURT:  Yes, sir.

15  BY MR. STOKES:

16  Q.    If Marciana -- this is 14th Street.  Is there

17  another street -- does Sheppard keep on going this way

18  up on the other side of 14th Street?

19  A.    6th Street.

20  Q.    6th Street.  Excuse me.  Does 6th Street keep on

21  going the other way?

22  A.    Yes, sir.

23  Q.    If Marciana was walking down 6th Street coming

24  towards this intersection when all this happened, he

25  sure didn't mention it to you, did he?

J.A. 2044

129

```
 1   A.    No, sir.

 2   Q.    And, now, Mr. Jones, how long have you been

 3   involved in trafficking as a Greenville police officer?

 4   A.    Eight and a half years.

 5   Q.    And investigated how many accidents in eight and a

 6   half or nine years?

 7   A.    Numerous.

 8   Q.    A lot them?

 9   A.    Yes, sir.

10   Q.    If this truck was stopped at the intersection like

11   it's drawn here with the front of the truck facing

12   toward 5th Street, what maneuvers would it have had to

13   have made to knock down this stop sign and end up here

14   if it was facing that way?

15            MR. EVERETT:  Objection.

16            THE COURT:  Sustained.

17   BY MR. STOKES:

18   Q.    Did you see any evidence which would lead you to

19   believe that just prior to the wreck that truck was

20   facing towards 5th Street on Sheppard Street?

21            MR. EVERETT:  Objection.

22            THE COURT:  Overruled.

23   A.    No, sir.

24   Q.    Thank you, Mr. Jones.

25            THE COURT:  You may step down.
```

J.A. 2045

130

1          MR. EVERETT:  Hold it.

2    RE-REDIRECT EXAMINATION BY MR. EVERETT:

3    Q.    Mr. Jones, you didn't find anything in the

4    intersection, did you?

5    A.    No, sir.

6    Q.    Thank you sir.

7          MR. STOKES:  Your Honor, his report is

8    marked as defendant's exhibit.  He's got it back.

9          THE COURT:  Just leave it with the court

10   reporter.

11         MR. STOKES:  I have no further questions.

12         THE COURT:  You may step down, sir.

13         MR. EVERETT:  I'm sorry.  What did you

14   offer?  Did you offer something?

15         MR. STOKES:  No.  I said he had the exhibit

16   still.

17         MR. EVERETT:  Oh.

18              ********

19   RALPH MENDENHALL, being first duly sworn, was examined

20   and testified as follows during DIRECT EXAMINATION by

21   MR. EVERETT:

22   Q.    State your name for the Court.

23   A.    Corporal Ralph Mendenhall.

24   Q.    Where are you employed?

25   A.    Greenville Police Department, identification

J.A. 2046

131

1   section.

2   Q.   And were you so employed and working on the 11th

3   day of February 1994?

4   A.   Yes, I was.

5   Q.   And what is your job with the Greenville Police

6   Department?

7   A.   I am what's called an identification specialist.

8   I am called out on major crimes and/or whenever needed

9   to process, collect evidence, photographs and collect

10  any fingerprints or any other evidence deemed necessary

11  found on the crime scene.

12  Q.   Now, did there come a time that you went to the

13  corner of 6th and Sheppard Street on February 11, '94?

14  A.   Yes.

15  Q.   And what did you first observe when you arrived

16  there?

17  A.   First arrived actually at the intersection of

18  Roosevelt and 6th.  It was blocked off by a patrol car.

19  They told me, I can't remember which officer it was,

20  they mentioned the crime scene.  The vehicle in question

21  was down at 6th and Sheppard.  I drove down 6th and

22  Sheppard and met with Officer Jones.  Upon --

23  Q.   Go ahead.

24  A.   -- arrival I observed a pickup truck in an open

25  field area off the road.

132

1  Q.    At that time was the deceased, Mr. Radcliffe,

2  still there?

3  A.    No.  He had been removed by EMS and taken to the

4  hospital.

5  Q.    All right.  Would you describe how the pickup

6  truck was in the field?

7  A.    The pickup truck was facing away from the road,

8  both doors were opened, headlights were on, the ignition

9  was off.  Several items were strung about the floor

10  board and on the seat.

11            MR. EVERETT:  Give me one moment, Judge.

12            (State's Exhibits Numbers 2 through 7 marked

13   for identification.)

14  BY MR. EVERETT:

15  Q.    Mr. Mendenhall, I point out to you what has

16  earlier been marked as State's Exhibit 1, the

17  chalkboard.  Did you assist in drawing that?

18  A.    Yes.

19  Q.    Is that a fair and accurate representation of the

20  block of Roosevelt through 14th Street on 6th Street as

21  they were on the 11th of February of 1994?

22  A.    Yes, it is.

23  Q.    Okay.  Could you step down to the chalkboard and

24  point out to the Court and jury where the vehicle was

25  when you first arrived?

J.A. 2048

133

1    A.    The vehicle was more or less in this area pointed

2    away from the roadway up close to the house.

3    Q.    Did you take any photographs of the vehicle as it

4    was when you first saw it?

5    A.    Yes.

6    Q.    Now, when you arrived, the doors, I assume, were

7    opened on the vehicle?

8    A.    I believe both doors were opened, yes.

9    Q.    Mr. Radcliffe was gone?

10   A.    Yes.

11   Q.    And you can have a seat.  What did you observe

12   inside of the vehicle?

13   A.    There were a lot of papers on the floor board on

14   the passenger side.  There was a camouflaged field

15   jacket.  There was blood sustains on the seat itself?

16   Q.    Okay.  The camouflaged jacket, is that -- that was

17   what Marciana tried to get back?

18   A.    I believe it was, yes.

19   Q.    Now, I hand you what's been marked for

20   identification as State's Exhibits 5, 7, 3, and 4.  Do

21   you recognize those?  First of all, they're colored

22   photographs, are they not?

23   A.    Yes, sir, they are.

24   Q.    And do you recognize those photographs?

25   A.    Yes.

J.A. 2049

134

1   Q.    What are they photographs of?

2   A.    Get them in numerical order.  State's Exhibit

3   Number 3 is a photograph showing the vehicle as I

4   approached it and first saw it with the contents on the

5   seat and blood stain on the seat and position of the

6   camouflaged jacket.

7            State's Exhibit Number 4 is the driver's

8   side of the vehicle depicting the contents of what's on

9   the seat and the blood stain on the seat, a wallet in

10  the floor board near the gas and brake pedal, a

11  checkbook off to the side where the clutch or left foot

12  would normally stay while driving.

13           State's Exhibit Number 5 is a photograph

14  showing the vehicle before I even approached it, how I

15  saw it when I first arrived.  And State's Exhibit

16  Number 7 is a photograph from a distance showing the

17  vehicle's position it was in, the curbing, and the

18  general area around that area where the truck was.

19  Q.    Now, did you notice any damage to anything either

20  in the yard or to any street signs?

21  A.  -  There was damage to a stop sign and a fence that

22  was on the corner of 6th and Sheppard.  It's located on

23  the diagram in the upper right side of that

24  intersection.

25  Q.    Okay.  And was there any other damage to any

135

1   buildings or houses or fences in the yard itself, not

2   counting the wire fence out in front?

3   A.    I didn't take notice of any other -- there was

4   some damage to the car.

5   Q.    I'll hand you what's been marked for

6   identification also as State's Exhibits 2 and 6.  Do you

7   recognize State's Exhibits 2 and 6?

8   A.    Yes, sir.

9   Q.    What is State's Exhibit Number 2?

10  A.    Number 2 is a photograph depicting the area of the

11  curbing on 6th Street.  It's showing damage to the

12  fence.  I believe it was a headlight assembly to the

13  vehicle and the vehicle in the background.

14  Q.    And what is State's Exhibit Number 6.

15  A.    Number 6 is a photograph depicting the damage to

16  the stop sign, the fence.  And it takes in the

17  headlights assembly of the truck, and a truck in the

18  back ground.

19  Q.    Now, are the items -- the photographs that you

20  just identified are they fair and accurate photographs

21  of the objects that you photographed as they were when

22  you first observed them that night?

23  A.    Yes, they are.

24  Q.    Can you use those photographs to help you

25  illustrate your testimony in this case?

136

1    A.    Yes, I can.

2              MR. EVERETT:  We offer those.  I didn't

3    write all the numbers down, but we offer those

4    photographs he just identified into evidence.

5              THE COURT:  Let State's Exhibits 2 through 7

6    be received into evidence.

7              (Whereupon State's Exhibits 2 through 7 were

8    received into evidence.)

9    BY MR. EVERETT:

10   Q.    Could you step down to the chalkboard,

11   Mr. Mendenhall, and show us where the fence was down?

12   A.    Okay.  The fence was down from about right here

13   onward.  This area here.  I'm not sure how far this

14   fence extended.  The stop sign on the corner was bent

15   over, and the sign itself was punctured by a support

16   pole coming up on the fence.

17   Q.    And what tracks did you observe in the yard?

18   A.    There were some ruts from the tires that extended

19   from this area to where the truck was parked or stopped.

20   Q.    Did you observe anything on the curbing?

21   A.    _ The headlight assembly was between the curb and

22   the fencing?

23   Q.    Any marks or skid marks on the curbing that you

24   recall?

25   A.    I don't recall any.  I didn't take note of any.

J.A. 2052

137

1   Q.    Now, did you dust for fingerprints on the vehicle?

2   A.    Not at the scene.  Not that night, no, sir.

3   Q.    Did there come a time that you did do that?

4   A.    Yes.

5   Q.    Did you locate any latent fingerprints that were

6   suitable for comparison?

7   A.    Yes.  There were two suitable comparisons that

8   were put through our composite or automatic fingerprint

9   identification system, the fingerprint data base.  No

10  suspects were developed from that.

11  Q.    Where were those latent fingerprints located?

12  A.    Let me look in my notes real quick.

13  Q.    Okay.  You can have a seat.

14  A.    The one identifiable latent print impression was

15  located on the inside driver's door window.  And the

16  other one, it was from the top rail of the pickup behind

17  the driver's door.

18  Q.    Outside in the bed?

19  A.    Out side in the bed.  Out on the top part of the

20  rail.

21  Q.    - You ran through the computer system to check

22  against anyone else who happened to have their

23  fingerprints in the same?

24  A.    Yes.

25  Q.    That would be people who have been arrested before

Sharpe 000137

J.A. 2053

138

1  basically.

2  A.    Yes.

3  Q.    Now, if you could, with permission of the Court,

4  if you could step down to the jury box.  First of all,

5  Lake State's Exhibits 7 and 5.  And with the use of

6  these two photographs, describe to the jury what you

7  found when you arrived.  Sort of hold it up so one can

8  see it or do it in groups.

9  A.    This photograph is depicting -- standing back from

10  the roadway looking toward the truck, again it shows the

11  truck, the damaged stop sign, and damaged fence.  This

12  photograph is a close up of the truck, the way I found

13  it before I even approached it the first time.

14  Q.    Now, would you take State's Exhibit 2 and 6.  I

15  believe you identified it as being taken from a corner

16  showing or it's west of the corner showing a stop sign

17  and fence.  Would you just show that to the jury and

18  point out what you observed in those photographs?

19  A.    State's Exhibit Number 6, which is a photograph

20  showing damage to the stop sign.  The black down here on

21  the bottom, between the curb and the fence, those are

22  the headlights assembly.  The truck is fairly visible

23  there in the back.

24        This is a close up showing the damage to the

25  fence, the headlight assembly to the truck in the

**J.A. 2054**

139

1    background.

2    Q.    Now, Officer Mendenhall, if you can use State's

3    Exhibits 3 and 4, I believe you described showing the

4    interior of the truck as you found it, point out the

5    items you described, sir.

6    A.    State's Exhibit Number 6 is the passenger side of

7    the vehicle showing the debris, miscellaneous papers,

8    blood stained seat and the camouflaged jacket.

9            THE COURT:    What number did you say that

10    was?

11            THE WITNESS:    Number three, sir.

12    A.    State's Exhibit Number 4 is the driver's side

13    showing the position of the field jacket, papers, blood

14    stain.    There's a checkbook here in the little corner

15    and a wallet.

16    BY MR. EVERETT:

17    Q.    You can have a seat.    Now, Officer Mendenhall, did

18    you along with other officers conduct a search up and

19    down the street for any other evidence you might find?

20    A.    Yes, we did.

21    Q.    And were there any spent shell casings found?

22    A.    During a search from the intersection of Roosevelt

23    and 6th to 6th and Sheppard, we found three shell

24    casings from a .45 automatic pistol on the corners of

25    6th and Roosevelt near the intersection of 6th and

1    McKinley.

2    Q.    These were the actual spent casings?

3    A.    Spent casings, yes.  They had been fired.

4    Q.    Did you make some measurement as to where these

5    spent casings were located?

6    A.    Yes.

7    Q.    Could you show us on State's Exhibit Number 1

8    where these casings were located?

9    A.    One of the casings was from the corner here, 28'

10   feet 8 inches up against the curb here.  The other one

11   was from the curb going in a south direction, 8 foot 8

12   inches up against the curb.  The third one was from the

13   corner of 6th and McKinley here.  It was 38 feet 11

14   inches from the curb and 7 foot 3 inches out in the

15   roadway.

16   Q.    These were .45s?

17   A.    .45 ACP, automatic Colt pistol.

18   Q.    Did you find any bullets, that is, actual fired

19   bullets in the vehicle or anywhere around the vehicle?

20   A.    No.  We could not find any projectile in the

21   vehicle.

22   Q.    Now, you have the casings here today with you,

23   sir?

24   A.    I believe.  It will take me a minute to find them.

25   Q.    If you would retrieve them, sir.

**J.A. 2056**

141

1    A.    (Witness complied.)

2    Q.    Have you found the three shell casings,

3    Mr. Mendenhall?

4    A.    Yes, sir.

5    Q.    First of all, the one that you found at 6th and

6    McKinley, if you could locate that one.  Go ahead and

7    open them up.  I would like to show Mr. Stokes anyway.

8    If you can remember which is which.

9             MR. EVERETT:  May I approach the witness,

10   Judge?

11            THE COURT:  Yeah.

12            (State's Exhibits Numbers 8, 9 and 10 marked

13   for identification.)

14   BY MR. EVERETT:

15   Q.    Officer Mendenhall, I just hand you now what has

16   been marked as State's Exhibits 8, 9 and 10 for

17   identification.  Could you tell us now -- and looking at

18   State's Exhibit Number 8, could you tell us where you

19   found that?

20   A.    State's Exhibit Number 8 is a .45 automatic Colt

21   pistol casing.  This one was recovered from 6th and

22   Roosevelt.  It was the one actually up on Roosevelt, 8

23   foot 8 inches away from 6th Street.

24   Q.    How about State's Exhibit Number -- it would be 9?

25   A.    State's Exhibit Number 9 is a .45 automatic

142

1  casing.  This one was recovered from the intersection

2  closest to 6th and McKinley, which was found out in the

3  street.

4  Q.   Was that casing -- what condition is that one in?

5  A.   It's been fired.  There is a slight dent in the

6  lip of it or the mouth.  It's scratched up.

7  Q.   Is the damage to it more than what normally

8  happens to a shell when it's fired?

9  A.   It's hard to say really.  It depends on where it

10  was shot.

11  Q.   I'm saying no more than a gun produces on --

12  A.   Oh, yes.

13  Q.   And State's Exhibit 10, where was that found?

14  A.   State's Exhibit 10 is also a .45 automatic Colt

15  pistol casing.  This is recovered on 6th Street.  This

16  was 28 foot 8 inches from Roosevelt Street on 6th by the

17  curbing.

18  Q.   This is the one back around the corner then?

19  A.   On 6th Street by the curbing.

20  Q.   Now, were you able also to retrieve from the

21  morgue a spent shell -- bullet?

22  A.   Yes.

23  Q.   What caliber was that?

24  A.   .45.

25  Q.   And was that taken from the body of George

143

1    Radcliffe?

2    A.    Yes.

3    Q.    Could you produce that, sir?

4    A.    If I could have a moment.

5    Q.    Would you open that, sir?

6    A.    (Witness complied.)

7            (State's Exhibit Number 11 marked for

8    identification.)

9    BY MR. EVERETT:

10   Q.    Officer Mendenhall, I hand you what's been marked

11   as State's Exhibit Number 11.  I believe you identified

12   that as being the .45 bullet that was retrieved from the

13   body of Mr. Radcliffe?

14   A.    Yes.

15   Q.    And are all those exhibits, 8, 9, 10 and 11, in

16   substantially the same condition as they were when you

17   first received possession of them?

18   A.    Yes.

19   Q.    Have you altered or modified them in any way?

20   A.    No.

21            MR. EVERETT:  We offer State's 8, 9, 10 and

22   11 into evidence?

23            THE COURT:  All right.  Let them be

24   received.

25            (Whereupon State's Exhibits 8, 9, 10 and 11

J.A. 2059

144

```
 1    were received into evidence.)

 2    BY MR. EVERETT:

 3    Q.    Officer Mendenhall, these blocks on 6th Street,

 4    they aren't what we normally think of as a full-size

 5    city block, are they?

 6    A.    They seem to be a little shorter than normal city

 7    blocks.

 8    Q.    And this one only has houses?

 9    A.    Yes.

10    Q.    And the houses are not far apart, are they?

11    A.    No, they're not.  Very close together.

12    Q.    Very close together.  And there's no yard?

13    A.    No.

14    Q.    And this street has only four houses and the

15    houses are fairly close together?

16    A.    That's correct.

17    Q.    Narrow houses?

18    A.    Yes.

19    Q.    And on this block, how many houses are along this

20    -- 6th Street?

21    A.    I don't recall.  I know there was one near the end

22    of the fence line, what would normally be the end of the

23    fence line in that area.  I'm not sure exactly.  There's

24    one or two there before the corner.

25    Q.    This is a fairly short block?
```

145

1    A.    That's right.

2    Q.    Room for no more than three houses on it?

3    A.    I would say no more than three.

4          MR. EVERETT:  No further questions.

5          THE COURT:  Members of jury, we're going to

6    take our morning recess at this time.  Remember during

7    this recess do not discuss this case among yourselves

8    or allow anyone to discuss it with you.  Don't form any

9    kind of opinion about the case.  Don't talk to any of

10   the attorneys, the defendant or the witnesses about

11   anything.  Court will be in recess for 15 minutes.

12   (Recess.)

13         THE COURT:  All right.  Mr. Stokes, you can

14   cross-examine this witness.

15         MR. STOKES:  Thank you, Your Honor.

16   CROSS-EXAMINATION BY MR. STOKES:

17   Q.    Mr. Mendenhall, what was the weather like that

18   night out there at the scene?

19   A.    There was a slight misty rain.

20   Q.    Drizzle?

21   A.  - More like -- yeah, just a light --

22   Q.    Fog type drizzle?

23   A.    It wasn't really one you get wet in, but you could

24   tell it was moisture falling.

25   Q.    Was it cold, warm?

J.A. 2061

146

```
1   A.     It was cold.  I believe it was somewhere in the
2   fifties.
3   Q.     Now, when you took those pictures that night, you
4   were using something like a bright stroll flash, right?
5   A.     Used a flash.
6   Q.     They will not take with the light that was
7   existing?
8   A.     No.
9   Q.     Could you describe the light that was existing out
10  there other than artificial light by automobiles or
11  police officers?  And if no police was there, what
12  lighting would have been along that 6th Street?
13  A.     There is a street light on every block, if I
14  remember correctly.
15  Q.     If you need to, step down and point them out.
16  A.     I believe there's a street light on this corner
17  here and a street light on this corner here.
18  Q.     Okay.  Now, while you're down, could you label --
19         MR. STOKES:  May I approach the board, Your
20  Honor?
21         THE COURT:  Yes, sir.
22  BY MR. STOKES:
23  Q.     Could you label the three little dots that you say
24  where you found the shell casings?  I believe it's here,
25  here and here.  Could you label those as State's Exhibit
```

147

1   Numbers -- as they were labeled on State's Exhibits

2   Numbers --

3   A.    This is number 9.

4   Q.    Okay.

5   A.    This is number 10.

6   Q.    Okay.

7   A.    This will probably be number 8?

8   Q.    Okay.  Thank you.  Have a seat back up there.

9   Now, Mr. Mendenhall, were the items marked as State's

10  Exhibits Numbers 8, 9 and 10, the three shell casings

11  sent to the SBI laboratory in Raleigh for analysis?

12  A.    I believe they were.  I did not send them.  I

13  believe Detective Best had them sent off.

14  Q.    The envelopes and packages they were in indicate

15  that they were, don't they?

16  A.    Yes, they do.

17  Q.    And also State's Exhibit Number 11, the spent

18  bullet, was it also, according to the packaging,

19  submitted to the State Bureau of Investigation

20  Laboratory in Raleigh for analysis?

21  A.    - Yes, it was.

22  Q.    And is the State's Bureau of Investigation

23  Laboratory in Raleigh the best law enforcement lab in

24  the State we have for analysis of the evidence?

25  A.    Yes, it is.

148

1   Q.   They have experts up there that can determine just

2   about everything, don't they?

3   A.   Just about, yes.

4   Q.   Now, you did not submit them and don't know what

5   the analysis was or what was tested for or anything else

6   to your own knowledge?

7   A.   No.  But I do remember turning the shell casings

8   over to Detective Best so he could send them off to the

9   SBI lab in Raleigh.

10  Q.   Did you also turn State's Exhibit Number 11, the

11  spent bullet over to Detective Best to be sent to the

12  lab in Raleigh?

13  A.   Yes, I did.

14  Q.   Now, was 6th Street searched very carefully by the

15  police that night?

16  A.   As far as my part of it, I walked from the length

17  of 6th and Roosevelt to where the truck was parked or

18  was found using a flashlight and an available light.

19  Q.   Okay.

20         MR. STOKES:  May I approach the board?

21         THE COURT:  Yes.

22         MR. STOKES:  Thank you, Your Honor.

23  BY MR. STOKES:

24  Q.   So you investigated all of 6th Street.  Is this

25  correct?  From Roosevelt at this intersection all the

J.A. 2064

149

1  way down to pass the intersection of Sheppard and 6th

2  Street?

3  A.    That's correct.

4  Q.    And you yourself walked basically every square

5  inch of 6th Street from this point on Roosevelt to where

6  the truck ended up?

7  A.    Not every square inch.  It was more of an area

8  search.  Went out in the middle of the road and looked

9  curb to curb.

10  Q.    Anywhere on 6th Street and especially in the

11  intersection of Sheppard and 6th Street, did you find

12  any blood on the street?

13  A.    I didn't notice any.  The road was wet from

14  previous rain that day and, like I said, a light misty

15  drizzle.

16  Q.    If blood had been on that street at approximately

17  9 p.m. that night, was it raining hard enough to have

18  washed it off by the time you got there?

19  A.    I would not think so, no.

20  Q.    Was it a moonlit night or was it a dark night?

21  A.    Being it was misty rain -- I don't have my notes.

22  As far as the clouds, it was a dark night.  And being it

23  was rainy, it was more likely it was cloudy.

24  Q.    Now, you say that at some time I believe you did

25  dust for latent fingerprints, the truck itself?

J.A. 2065

150

```
 1   A.    Yes, I did.

 2   Q.    Did you dust it both inside and out?

 3   A.    Yes, I did.

 4   Q.    And you found only two fingerprints that were

 5   suitable for comparison?

 6   A.    Yes.

 7   Q.    And when you say that one of them was on the

 8   inside of the driver's door window, does that mean the

 9   fingerprint was found on the window glass of the

10   driver's side or the inside of the truck?

11   A.    Yes.  If you look at the door from the inside, it

12   would be the upper corner where the frame work is coming

13   down.

14   Q.    Did you notice or could you tell which way the

15   person's hand was when that fingerprint was placed

16   there?

17   A.    I have to look at it again.

18   Q.    Yes, sir.

19   A.    I really can't tell.

20   Q.    Okay.

21   A.    It didn't indicate which way it would be, up or

22   down, on the latent print.

23   Q.    Now, you know these two prints were not

24   Mr. Radcliffe's prints, don't you?

25   A.    Correct.
```

J.A. 2066

151

1    Q.    You also know these two prints were not the

2    defendant Dantae Sharpe's prints, don't you?

3    A.    That is correct.

4    Q.    Now, the jacket that was in the truck, did you

5    have an occasion to observe that camouflaged jacket?

6    A.    Going through the truck and collecting the items,

7    I did pick it up and see if there were any items in the

8    pocket itself.

9    Q.    Excuse me.  I didn't under --

10   A.    I did notice there were some blood stains on it.

11   Q.    There were some blood stains on it.  Did you take

12   custody of that jacket?

13   A.    Best of my knowledge, no, I did not take custody

14   of it.

15   Q.    Did any Greenville police officer take custody of

16   that jacket to your knowledge?

17   A.    Not to my knowledge, no.

18   Q.    To your knowledge does anyone in the Greenville

19   Police Department know where that jacket is now?

20   A.    Not that I'm aware of, no.  I may have collected

21   it and inadvertently left it out of my notes.

22   Q.    You would have it with you in one of those boxes

23   over there, wouldn't you?

24   A.    One of those boxes.

25   Q.    Would you mind looking through the evidence that

J.A. 2067

152

1    you collected at the scene?

2    A.    If I can have a few minutes.

3    Q.    Yes, sir.  See if you happened to have that coat.

4    A.    (Witness complied.)  I do have it.

5    Q.    You do have it?

6    A.    Yes.

7    Q.    Was it ever submitted for any type of analysis?

8    A.    No.  This is the same way I packaged it when I

9    packaged all the other things.

10   Q.    Okay.  Now, when you collected the evidence like

11   the coat, the checkbook, the wallet and the things you

12   took in your possession, did you individually package

13   them?

14   A.    Yes, I did.

15   Q.    Was there any currency, any money found in the

16   wallet or in the truck itself?

17   A.    If I remember correctly, in Mr. Radcliffe's

18   wallet, which had identification, there was $53 in

19   currency.  It was counted by me and verified by Sergeant

20   Highland.

21   Q.    Okay.  There was $53?

22   A.    That's correct.

23   Q.    And that was identified as being the wallet that

24   Mr. Radcliffe had on him in that truck that night, was

25   it not?

**J.A. 2068**

153

1    A.    Yes.  It had his driver's license in that wallet.

2    Q.    So it was obvious that Mr. Radcliffe had more than

3    $18 on him, wasn't it?

4    A.    That is correct.

5    Q.    And was there anything that would indicate to you

6    that just prior to the impact that truck was headed

7    north on Sheppard Street as is drawn on that board?

8    A.    I cannot say for certain which way it was heading.

9    Q.    Did the tire tracks from the vehicle lead back to

10   the stop sign that was knocked down?

11   A.    Led back toward the curbing.  In the general area,

12   yes.

13   Q.    And was the -- did you do a lot of investigation

14   with the tire tracks and the point of impact on the curb

15   or was that done by somebody else?

16   A.    I did not do it.  I just made a mental note that

17   that's where the tire tracks were coming from, the

18   relationship to the curb to where the vehicle was.

19   That's basically from my aspects that the vehicle did

20   make that damage.

21   Q.    Now, do you have any more photographs up there?

22   A.    No.

23   Q.    Now, I show you what's been marked as State's

24   Exhibit Number 7, and you've already testified that's an

25   adequate depiction of the scene that night or part of

154

1   the scene out there that night; is that correct?

2   A.    That is correct.

3   Q.    And does State's Exhibit Number 7 -- you said that

4   was a photograph showing the scene from a distance; is

5   that correct?

6   A.    From where the truck was found, yes.

7   Q.    Do you recall whether or not that was one of the

8   photographs you exhibited to the jury?

9   A.    Yes, it is.

10  Q.    Okay.  And that shows -- that photograph was taken

11  from what position?  If you could step down, please, and

12  sort of point on that map what position, approximately,

13  that photo was taken and which way you were looking when

14  you took it.

15  A.    Roughly from about the middle of the intersection,

16  a little off the center here.  I was facing more or less

17  in that area.

18  Q.    Having that in mind, would you now step to the

19  jury box, please, sir, and exhibit that photo to the

20  jury one more time so that they can see the position

21  that it was taken from.

22  A.    (Witness complied.)

23  Q.    Mr. Mendenhall, before you sit back up there, I

24  show you State's Exhibit Number 6, and ask you is that a

25  little bit closer to the stop sign with approximately

1    the same angular view?

2    A.    Yes.

3    Q.    Would you now exhibit that photograph, showing a

4    little bit closer to the jury.

5    A.    (Witness complied.)

6    Q.    Well, I didn't mean for you to hold it closer, but

7    go ahead.

8    A.    (Witness complied.)

9    Q.    And you can see the portion of the headlights in

10   the truck from that photograph, can you not?

11   A.    That is correct.

12   Q.    And I show you now what has been marked as State's

13   Exhibit Number 2, and I ask you was there a third

14   photograph taken even closer toward the rear end of the

15   truck in a progression or series of photographs taken

16   from a distance up closer and closer?

17   A.    That is correct.

18   Q.    Would you now exhibit that photograph to the jury

19   please.

20   A.    (Witness complied.)

21   Q.    And I now show you what has been marked as State's

22   Exhibit Number 5, and I ask you is that a picture of the

23   rear end of the truck in a series of photographs in

24   which you were going closer and closer and closer from

25   the intersection of Sheppard and 6th to the rear end of

156

1    the truck?

2    A.    Yes.

3    Q.    Would you exhibit that one to the jury please?

4    A.    (Witness complied.)

5    Q.    You may have your seat back up there,

6    Mr. Mendenhall.  Were both the doors on the front opened

7    when you arrived on the scene?

8    A.    Yes, they were.

9    Q.    And in State's Exhibit --

10        MR. STOKES:  May I retrieve a picture, Your

11    Honor?

12        THE COURT:  Yes, sir.

13   BY MR. STOKES:

14   Q.    In State's Exhibit Number 4 that I hand to you,

15   which -- does that indicate the positions of the

16   checkbook and the wallet when you arrived at the scene

17   and took possession of those things?

18   A.    Yes.

19   Q.    Now, you did not speak with anybody at the scene

20   other than law enforcement officers, did you?

21   A.    That's correct.

22   Q.    So you didn't interview anybody.  That wouldn't be

23   part of your job, would it?

24   A.    No.

25   Q.    And you collected your -- how long were you at

157

```
 1    that scene, roughly?

 2    A.    I got my notes -- roughly a little over an hour.

 3    Q.    Okay.  And when you collected your evidence you

 4    left the scene?

 5    A.    That is correct.

 6    Q.    And then at some time individually bagged it up,

 7    wrote your name on it, sealed it and did the things that

 8    an ID officer does?

 9    A.    That is correct.

10    Q.    Now, was the truck towed away from the scene to

11    some area where you later saw it?

12    A.    Yes, it was.

13    Q.    And where was that carried?

14    A.    The truck was towed to -- I believe it was Leaf

15    Silver Star who actually towed it to their body shop on

16    Bismarck Street.

17    Q.    Was the truck placed in a locked in, secured area

18    at the time it was towed to wherever it was towed?

19    A.    Yes, it was.  It was locked inside the body shop.

20    Q.    Inside a building?

21    A.    Yes, it was.

22    Q.    And was that where it was kept until you came and

23    dusted that truck for fingerprints some time later?

24    A.    That is correct.

25    Q.    To the best of your knowledge, did anyone else
```

J.A. 2073

158

1   have access to that truck during the period it was

2   locked up somewhere?

3   A.   To my knowledge, no.  I know when I got there to

4   process it, they had signs on it.  "Do not touch.  Wait

5   for police to process."

6   Q.   You don't know who put those signs up there, do

7   you?

8   A.   I believe the wrecker driver did.

9   Q.   Okay.  And this wrecker driver, and these people,

10  have towed vehicles that were dusted before, have they

11  not?

12  A.   I believe so.  I can't say for certain.  He has

13  been used several times.

14  Q.   And he sort of knows the procedures that are used

15  by the Greenville Police Department in fingerprinting

16  and the people that do it that come to you and dust the

17  truck, and you ain't suppose to touch it and all that?

18  A.   He knows not to touch.  We tell him not to touch

19  it.

20  Q.   Okay.  Do you recall telling him that night?

21  A.   I was not at the scene when the vehicle was towed,

22  I had already left.  Officer Jones remained to have the

23  vehicle towed.

24  Q.   And Officer Jones knew the proper procedure to use

25  that is used by the Greenville Police Department in

159

1    securing vehicles for later fingerprint dusting?

2    A.    I believe he does, yes.

3    Q.    And to the best of your knowledge that procedure

4    was followed by Officer Jones that night?

5    A.    Yes, it was.

6    Q.    You heard that area -- did it appear that area had

7    been at some time a garden with rows in it and that the

8    fence protected the garden and that kind of thing?

9    A.    I recall that had furrows or ridges as someone

10   would plant a garden in it, yes.  I'm not sure exactly

11   if it was used for a garden or what.

12   Q.    Now, all this whole area was blocked off and taped

13   off and secured prior to your getting there, was it not?

14   A.    That is correct.

15   Q.    Now, can you step to the board and show us

16   approximately the area which had been secured by the

17   police department prior to your arrival?

18   A.    The best I can recall there was yellow crime scene

19   tape along here, going to some object to hold it and

20   then along here, between the truck and the building.

21   Q.    Okay.

22   A.    There was also -- I want to say it was somewhere

23   over here when I got there.  I'm not sure if it had been

24   there all the time or not.  Officer Jones was in this

25   general area.  He said nobody had gone up to the truck

Sharpe 000159

**J.A. 2075**

```
 1   since the EMS took Mr. Radcliffe's body away.

 2   Q.    Now, at the other end of the street -- I believe

 3   you said -- originally said you came up Roosevelt, did

 4   you?

 5   A.    Yes, I did.  I came up this way on Roosevelt.

 6   Q.    And you say there was an officer already there at

 7   that intersection?

 8   A.    Yes, sir.  There was a patrol car parked blocking

 9   the roadway here.

10   Q.    So that entire street was sealed off?

11   A.    Yes.

12   Q.    No cars going up and down the street?

13   A.    No.

14   Q.    No public allowed to wander all over the place

15   looking?

16   A.    I did not notice anybody else walking when I was

17   walking at that particular time.

18   Q.    And to your knowledge Officer Jones had not left

19   that scene since he secured it, had he?

20   A.    To the best of my knowledge, no.

21   Q.    You may take a seat back.  Thank you.

22   How long have you been an ID officer, Mr. Mendenhall?

23   A.    A little over five and a half years.

24   Q.    How many approximate hours of training have you

25   had in crime scene investigation?  Just roughly if you
```

161

1    can recall.

2    A.    Classes and schoolings, well over 150.

3    Q.    Hours?

4    A.    Hours, yes.

5    Q.    And how many hours out on the ground investigating

6    crime?

7    A.    Too many to count.

8    Q.    Thousands and thousands?

9    A.    It's hard to judge how long I've been out.

10   Q.    Everything to serious crimes to very minor crimes?

11   A.    From breaking into vehicles to homicide.

12   Q.    You collected all of the evidence that you could

13   possibly find at that scene that night, didn't you?

14   A.    That's correct.

15   Q.    Was there any evidence whatsoever that you

16   collected that would indicate that Dantae Sharpe was

17   guilty of any crime at that scene that night?

18   A.    As far as the latent fingerprints that were found

19   on the items of process that we recovered from the truck

20   itself, no fingerprints matched up with Mr. Sharpe.

21   Q.    And there was no other piece of evidence that --

22   A.    Not that I found, no.

23   Q.    Thank you very much, Mr. Mendenhall.

24            MR. STOKES:  I have no further questions,

25   Your Honor.

162

1          THE COURT:  Any redirect?

2          MR. EVERETT:  Very briefly.

3  REDIRECT EXAMINATION BY MR. EVERETT:

4  Q.   Mr. Mendenhall, did you find any blood in the

5  vehicle?

6  A.   There was some on the seat.

7  Q.   Was it pooled up or just a stain?

8  A.   Stain.

9  Q.   Was that about the same location where the coat

10  was found?

11  A.   The coat was found more in the center of the seat

12  between the gear shift and seat, like fallen.  The blood

13  was on the front corner of the driver's side -- excuse

14  me -- of the passenger's side of the seat.

15  Q.   If Mr. Radcliffe had been laying across the seat,

16  he would have been laying on top of the coat then?

17  A:   A little bit of it, yes.

18  Q.   Was there a lot of blood on the coat?

19  A.   I don't recall.  I do remember picking up and

20  seeing some blood stain on it.  I don't remember exactly

21  how much blood was on it.

22  Q.   But it was not a lot of blood in that vehicle?

23  A.   Not pooled up blood, no.

24  Q.   And you found -- you didn't find any print that

25  matched the driver of the truck, Mr. Radcliffe, did you?

163

```
 1   A.   No.

 2   Q.   In the whole vehicle?

 3   A.   Nonidentifiable that could be compared to

 4   Mr. Radcliffe.

 5   Q.   So the man who had been driving the truck for some

 6   period of time, you couldn't even find any prints of his

 7   in the car?

 8   A.   No.

 9   Q.   How long would a fingerprint last on the inside

10   glass of the vehicle?

11   A.   It depends on the weather, the atmosphere, the

12   condition of the item itself.  The glass is nonporous.

13   They do tend to stay a little bit longer than some on

14   paper.

15   Q.   So it would be some considerable period of time?

16   A.   On the average about 12 to 24 hours, a fingerprint

17   will last.  You can make comparisons or lift, I should

18   say.

19   Q.   On glass?

20   A.   On glass.

21   Q.   This would have been on the inside glass?

22   A.   Inside glass, yes, sir.

23   Q.   Do you know when -- no further questions.

24             MR. STOKES:  May I approach the board, Your

25   Honor?
```

J.A. 2079

164

1          THE COURT: Yes.

2    RECROSS-EXAMINATION BY MR. STOKES:

3    Q.    From your evidence and blood that you did find at

4    the scene, was there any indication to you that anyone

5    had been shot out in the middle of this intersection?

6    A.    In walking around I did not notice any type of

7    blood at the intersection. I said the ground was wet.

8    I didn't notice anything out of the ordinary that would

9    indicate blood.

10   Q.    But it did not rain hard enough to wash -- if

11   there had been blood out there, it did not rain hard

12   enough to wash it away?

13   A.    Not from the time I was there. I know it had

14   rained earlier that day, but I cannot remember how hard

15   it was. When I got there it was a fine, misty drizzle.

16   Q.    I don't recall you saying this and you probably

17   did, but what time did you arrive at the scene?

18   A.    I arrived at 10:05.

19   Q.    10:05 p.m.

20   A.    P.m.

21   Q.    On February --

22   A.    11, 1994.

23   Q.    Thank you very much, Mr. Mendenhall.

24          MR. STOKES: I don't have any further

25   questions.

Sharpe 000164

J.A. 2080

165

1          THE COURT:  Thank you, sir.  You may step

2     down.

3          THE COURT:  Call your next witness.

4          MR. EVERETT:  Doctor Gilliland.

5                    * * * * * * * *

6     M.G.M. GILLILAND, being first duly sworn, was examined

7     and testified as follows during DIRECT EXAMINATION by

8     MR. EVERETT:

9     Q.    State your name for the Court, please.

10    A.    M.G.M. Gilliland.  G-I-L-L-I-L-A-N-D.

11    Q.    And where are you employed, ma'am?

12    A.    At the East Carolina University School of

13    Medicine.

14    Q.    In what capacity?

15    A.    I'm an associate pathologist at the School of

16    Medicine in the Department of Pathology.

17    Q.    What does a pathologist do?

18    A.    A pathologist studies the effect of disease and

19    injury on the human body.

20    Q.    And what are your duties as pathologist at the

21    East Carolina School of Medicine?

22    A.    I'm a forensic pathologist.  We provide medical

23    examiner's services to the State of North Carolina.  We

24    also provide forensic pathology, that is to say, autopsy

25    services to the State of North Carolina.  The medical

166

1    examiner system, we provide autopsy services to Pitt

2    County Memorial Hospital with which we are closely

3    affiliated.

4    Q.    What does a forensic pathologist do?

5    A.    A forensic pathologist studies effects of disease

6    and injuries and in particular tries to determine the

7    cause and the manner of death to reconstruct how fatal

8    events occurred, to gather evidence or materials which

9    could be used as evidence in death investigation.

10   Q.    Go ahead.

11   A.    And provide testimony in court.

12   Q.    What is your training in the field of forensic

13   pathology?

14   A.    I did a year of forensic pathology fellowship at

15   the Coroner's Office in Cleveland and then a second year

16   of forensic pathology training at the Officer of the

17   Chief Medical Examiner in Richmond, Virginia, after I

18   had completed a four-year residency in pathology at the

19   Case Western Reserve University in Cleveland.

20   Q.    Before that you went to medical school and

21   received your degree in medicine and all of that stuff?

22   A.    Yes.

23   Q.    All right.  After you did your residency in

24   forensic pathology did you work in any medical examiners

25   offices?

167

1   A.   Yes.

2   Q.   I believe one was in Texas?

3   A.   Yes.  I was medical examiner at the Southwestern

4   Institute of Forensic Sciences, which is a part --

5   includes the Dallas County Medical Examiner's Office and

6   was assistant professor of pathology there.

7   Q.   Did you conduct autopsies while you were in

8   Dallas?

9   A.   Yes.

10  Q.   How many did you conduct there?

11. A.   Probably about two thousand that I did personally.

12  Q.   And when did you come to Pitt County?

13  A.   In 1989.

14  Q.   Did you come as a forensic pathologist?

15  A.   Yes.

16  Q.   And did you work as a medical examiner when you

17  came?

18  A.   Yes.

19  Q.   How many autopsies have you done in Pitt County?

20  A.   About a thousand.

21  Q.   And there are other pathologists that have worked

22  with you during this period of time?

23  A.   Yes.

24  Q.   You have records that indicate their work along

25  with your work?

168

1    A.    That's correct.

2    Q.    And do you have control of and access to those

3    records?

4    A.    Yes.

5    Q.    Now, did you do the autopsy on the deceased George

6    Radcliffe?

7    A.    No.

8    Q.    Were you familiar with that autopsy?

9    A.    I have reviewed it.

10   Q.    Who actually did the autopsy on Mr. Radcliffe?

11   A.    R. Page Hudson.

12   Q.    And is -- was Mr. Hudson a forensic pathologist?

13   A.    Yes.

14   Q.    He was at one time the State Medical Examiner?

15   A.    Yes, he was.

16   Q.    At  this time is Mr. Hudson able to testify?

17   A.    He had a stroke in the latter part of April and

18   had some surgery at that time.  His doctor has not yet

19   cleared him to testify though he is feeling very good.

20   Q.    Okay.  So when Doctor Hudson became ill you took

21   over his cases if needed for court?

22   A.    Yes.

23         MR. EVERETT:  Judge, we would at this time

24   tender Doctor Gilliland as an expert in the field of

25   forensic pathology.

169

1          THE COURT:  All right.  The Court so finds.

2   BY MR. EVERETT:

3   Q.    You have been offered and accepted as an expert in

4   the field of forensic pathology in the Superior Courts

5   of North Carolina on many occasions?

6   A.    Yes.

7   Q.    Doctor Hudson has been?

8   A.    Yes.

9          MR. EVERETT:  We also tender, Judge, Doctor

10  Hudson as an expert in the field of forensic pathology.

11         THE COURT:  Does the defendant want to be

12  heard on that?

13         MR. STOKES:  Judge, I understand Doctor

14  Hudson's problems, and I have discussed it with the

15  State.  I have no objection with Ms. Gilliland

16  testifying because of his physical condition.  I would

17  really object to him -- well, no.  I would not object

18  to Doctor Hudson being offered as an expert in the

19  field of forensic pathology.  I would even stipulate

20  that the former State Medical Examiner would probably

21  be an expert in the field of forensic pathology as well

22  as Doctor Gilliland.

23         THE COURT:  All right.  Thank you.

24  BY MR. EVERETT:

25  Q.    Doctor Gilliland, reviewing the records of the

Sharpe 000169

J.A. 2085

170

1    Pitt County Medical Examiner, have you reviewed Doctor

2    Hudson's notes as they were recorded, the autopsy that's

3    performed on George Radcliffe?

4    A.    Yes.

5    Q.    And could you tell us when that autopsy was

6    performed?

7    A.    On February 13, 1994, at 8:10 in the morning.

8    Q.    Okay.  Would you tell the Court what external

9    observations that Doctor Hudson made of the body of

10   Mr. Radcliffe?

11   A.    He observed that the man was a 33-year-old

12   individual who was 5 foot 10 and weighed 224 pounds.  He

13   appeared to be a healthy individual except for some

14   marks of injury and some marks of medical attention.

15   Q.    Okay.  The medical attention being open heart

16   message?

17   A.    Yes.

18   Q.    What marks of injury did he notice?

19   A.    He observed a perforating gunshot wound of the

20   left arm, that is to say it went through and through, in

21   and out of the left arm.  I'm gesturing towards the

22   upper part of my left arm between the elbow and the

23   shoulder.  He then observed that there was a gunshot

24   wound in the chest area that would line up with that

25   wound in -- on the arm on the left side and an

1   additional wound on the right side that is in

2   approximate line with the one in the arm on the left and

3   the left side of the chest with a little bit of bruising

4   on the right side of the chest. And then there was an

5   additional gunshot wound on the inside of right arm,

6   where I'm gesturing up high, between the elbow and the

7   armpit area. And then there was a bruise with a hard

8   bump under it on the outside of the right arm. And that

9   would be consistent with a gunshot wound with the bullet

10  traveling all the way across the arm, the chest and the

11  body and then into the arm and stopping on the right

12  side of the right arm.

13  Q.    Was the bruise with the bump in it explored

14  farther?

15  A.    Yes. But the bullet was recovered under that area

16  of bruising. And the hard thing that was felt was the

17  broke bullet.

18  Q.    What size bullet?

19  A.    It's described as a .45 caliber bullet and

20  approximate .45 caliber -- large caliber bullet.

21  Q.    All right. Did Doctor Hudson -- based on your

22  examination of his records conduct an internal

23  examination --

24  A.    Yes.

25  Q.    -- of the remains of Mr. Radcliffe?

172

```
1   A.    Yes, he did.

2   Q.    What did that examination reveal?

3   A.    That showed that the bullet did go across the left

4   arm through the chest.  And when it was in the chest it

5   damaged the heart.  It went in through the chest wall

6   into the sac around the heart, through the heart, and

7   then onto the right side of the heart.  It bruised the

8   right lung but didn't go through it and then left the

9   right side of the chest and then passed through the

10  right arm, as it appeared to have done, and then it was

11  found in the right arm up there by the bruise.

12  Q.    Did the bullet appear to travel in a level

13  projectory or was it up or down or down or up?

14  A.    It was approximately level, yes.

15  Q.    Okay.  Did it appear to travel straight through,

16  front to back, back to front?

17  A..   Approximately parallel to the body, as I'm sitting

18  here, from one side to the other and not very front to

19  back deviations.

20  Q.    The point that it entered it, the approximate

21  point where it exited on the other side of the body?

22  A.    That's correct.

23  Q.    Would it be towards the front of the body or

24  toward the back of the body or dead center?

25  A.    A little bit more toward the front of the body so
```

173

1  that -- in the armpit area.  It's closer to the front of

2  the armpit than the back of the armpit.

3  Q.    Based on your examination of the medical

4  examiner's records, did you form an opinion based on

5  your experience to a scientific certainty as to the

6  cause of death -- as to Mr. George E. Radcliffe's cause

7  of death?

8  A.    Yes.

9  Q.    And Mr. Radcliffe was the individual that was

10  found on -- in the vehicle at the intersection of 6th

11  and Sheppard Street?

12  A.    That is the medical examiner's investigation.  It

13  says that individual on whom the autopsy was performed

14  and about whom this discussion has been given was George

15  E. Radcliffe, yes.

16  Q.    Was found at that location?

17  A.    Yes.

18  Q.    And you formed an opinion?

19  A.    Yes.

20  Q.    What is your opinion?

21  A.    In my opinion George E. Radcliffe died as a result

22  of a gunshot wound of the arms and of the chest.  That's

23  one gunshot wound that damaged both his arms and his

24  chest.

25            (State's Exhibits 12 and 13 marked for

**J.A. 2089**

174

1    identification.)

2            MR. EVERETT:  Approach the bench, Judge?

3            THE COURT:  Yes, sir.

4    BY MR. EVERETT:

5    Q.    Now, Doctor Gilliland, I hand you for your

6    examination two photographs.  You have seen the

7    photographs of the deceased?

8    A.    Yes.

9    Q.    The two photographs of the deceased George

10   Radcliffe to be State's Exhibits 12 and 13, and I would

11   ask you if you could examine those two photographs?

12   A.    Yes.

13   Q.    And what are those photographs depicted in that?

14   A.    Those are photographs of the body of George

15   Radcliffe.  State's Exhibit 13 shows the left side of

16   his body and chest area, and State's Exhibit 12 shows

17   the right side of his body and chest area.

18   Q.    That was at the morgue?

19   A.    Yes.

20   Q.    Are they fair and accurate photographs as you know

21   them -- as you know it of the body of Mr. Radcliffe when

22   he was photographed in the morgue?

23   A.    Yes.

24   Q.    And can you indicate from those photographs the

25   wounds you described?

**J.A. 2090**

176

 1    line that goes across was a surgical procedure that was

 2    done to try to start his heart up again and revive him

 3    and was not successful.

 4        The gunshot wound is not obvious.  It's hard to

 5    see even looking at it at the time.  It's difficult to

 6    see in a close-up photograph.  It's in there but all

 7    that you can see is what a forensic pathologist with

 8    training and experience can see, a little part of this

 9    scrap-like thing that's found around a gunshot wound

10    which is found in part of his otherwise medical

11    attention.  And then underneath it is the track of the

12    bullet to the damage to the underlying structure.

13        You can see a little bit of the wound on the

14    other side of the right arm in State's Exhibit 13.  And

15    in State's Exhibit 12, you can see the exit wound where

16    it comes out of the chest, a little bit above the

17    nipple, with some bruising around it, and then you get

18    back into the arm.  And again the arm is up and over

19    the head so that the alignment -- it isn't lined up

20    like it was at the time of the shooting.

21            THE COURT:  Doctor, would you mind moving

22    down a little farther so that the other jurors can see

23    as well?

24  A.    I guess I'll have to start again.

25            THE COURT:  You don't have to start over.

1              THE WITNESS:  All right.

2    A.    The other hole on the left side is 13.  The

3    entrance wound is lost in the marks of medical

4    attention.  And 12, you can see where it comes out on

5    the right side and then goes back into the right arm.

6    You can't see the bruises which is on the opposite side

7    of the arm.

8              Number 12, you can see the entrance wound

9    coming in on the outside of the arm through the arm and

10   then it enters into the chest in this mark of medical

11   attention.  It comes out on the other side by the

12   armpit and reenters the arm in the upward position.  It

13   doesn't line up very well any more.  Comes in the arm,

14   reenters the chest on State's Exhibit 13 and passes

15   through and comes out, and in State's Exhibit 12

16   reenters the armpit.

17   Q.    Doctor Gilliland, does it indicate where the

18   actual projector was located?

19   A.    Yes.  Not in these photographs.  Neither 12 nor 13

20   shows that.

21   Q.    Do you have a photograph showing where it was --

22   A.    Yes.

23              MR. EVERETT:  May I approach the witness,

24   Judge?

25              THE COURT:  Yes, sir.

J.A. 2092

178

```
 1              (State's Exhibit Number 14 marked for
 2      identification.)
 3      BY MR. EVERETT:
 4      Q.    Doctor Gilliland, I now hand you what's marked for
 5      identification as State's Exhibit 14.  Do you recognize
 6      State's Exhibit 14?
 7      A.    Yes.
 8      Q.    What is State's Exhibit 14?
 9      A.    This is a close-up black and white photograph of
10      the right side of the body of George Radcliffe showing
11      the exit wound from the chest, the reentrance wound into
12      the right arm and a bruise with what I've described as a
13      bump under it on the outside of the right arm.  That was
14      where the bullet was recovered.
15              MR. EVERETT:  We offer State's Exhibit
16      Number 14 into evidence.
17              MR. STOKES:  Your Honor, I would renew my
18      objection on the same ground.
19              THE COURT:  Objection is overruled.  Let
20      State's Exhibit 14 be received.
21              (State's Exhibit Number 14 admitted into
22      evidence.)
23      BY MR. EVERETT:
24      Q.    Step down, Doctor Gilliland, and briefly show the
25      jury where the bullet was removed?
```

**J.A. 2093**

179

```
 1   A.    Removed from under this -- there are bruises out
 2   here.  You can see a little light area where the light
 3   touches it and that's what is sticking out under the
 4   skin.  The entrance wound into the arm and chest wound
 5   with some bruising around it.  The bullet wound where
 6   the bullet is under the skin here, how it got in the
 7   right arm and how it got out of the right side of the
 8   chest.  The bullet under the skin here, how it got in
 9   and how it got out of the chest.  Bruising over the
10   surface of the skin, and then the bullet is the light
11   looking area.
12   Q.    Okay.  You can return to the stand.
13   A.    (Witness complied.)
14   Q.    And from your examinations of Doctor Hudson's
15   report, did he form the same opinion --
16   A.    Yes.
17   Q.    -- that Mr. Radcliffe died of a gunshot wound to
18   the arms and chest?
19   A.    Yes.
20   Q.    Tell us, Doctor Gilliland, with that type of wound
21   -- what would be the immediate affect to the deceased.
22   How long would he have been conscious?
23   A.    He could have been conscious for as long as
24   several seconds.  Some individuals collapse pretty much
25   immediately.  It is a hole that goes diagonally through
```

180

```
 1    the heart from the tip up through a part call the septum
 2    and damage an area that is very near the part that
 3    decides whether or not the heart is going to keep
 4    beating anyway.  And you have ten seconds from when your
 5    heart stops beating or when there's nothing left to pump
 6    until you lose consciousness.  So this is a varying
 7    injury that causes a person to lose consciousness very
 8    rapidly.
 9    Q.    He would be incapacitated almost immediately?
10    A.    Yes.
11    Q.    Would you describe the amount of bleeding that
12    this wound causes?
13    A.    It would not necessarily cause a lot of external
14    bleeding, a lot of bleeding to the outside.  If he fell
15    forward so that some of the blood could trickle out by
16    gravity from the hole in the armpit area on the left or
17    on the right or these tissues -- sort of tissue or flesh
18    wounds in the arm could bleed, those could bleed to some
19    extent.  But it would depend on how much clothing he was
20    wearing in February as to how much would get out into
21    the vehicle onto other material.
22    Q.    Okay.  The heart basically is stopped when the
23    bullet hits it?
24    A.    It could.  It could be that it missed the heart so
25    that it would continue to beat very rapidly for a few
```

181

1    more beats until it had used up all of the blood by

2    putting it out into the wound, out into the chest

3    cavities so that it wasn't available to circulate to the

4    brain.  So we're talking as much as a minute if it

5    didn't stop it immediately that the heart might be

6    beating to some extent.  But in terms of circulating

7    blood, getting up to the head, being awake, no.

8    Q.    And this is the type of wound that would not spurt

9    blood though?

10   A.    No.

11   Q.    It would have to basically ooze out, like the

12   gravity?

13   A.    Yeah.  Gravity would bring most of it out.

14   Q.    Like an artery being cut or something.

15   A.    Yeah.  If one of the blood vessels is cut and is

16   exposed, then there can be a fairly impressive spurt of

17   blood that would go a distance and would be something

18   that would mark the area of the vehicle or farther but

19   not from something like this.  This would tend to bleed

20   internally.  The hole in the sac would tend to keep

21   things more or less in the heart sac and then inside in

22   the chest cavity.

23   Q.    It would ooze out of the wound through the

24   clothing and then whatever it was in contact with?

25   A.    Right.

182

```
 1   Q.    What affect would this type of wound have on a

 2   person as far as their immediate reactionary move?  I

 3   mean, I know on television you see people shot and they

 4   fall backwards and turn two our three flips.  What's the

 5   real type of affect this type of gunshot wound would

 6   have on a person?

 7   A.    The real effect is actually fairly minimal.  If

 8   some kind of a scientific study was done in which

 9   something the size of the human body was placed on a

10   perfectly frictionless surface and they were shot,

11   they'd barely move because the force is so small

12   compared to the size of the individual that's 220 pounds

13   -- 224-pound man.  It produces an awful lot of force in

14   the heart and tears that up and does terrible things to

15   the heart.  But in terms of throwing a whole man --

16   those movie things were done by having a rope tired

17   around the waist of the cowboy and two good size guys

18   would yank on him at the time of the bang and he would

19   go flying from the terrible effects of the .45 caliber

20   bullet.  But in real life it would not be that

21   impressive.

22         If the injury causes some kind of a seizure type

23   activity from lack of blood, there can be a convulsive

24   sort of a movement in the individual.  Simply having

25   these wounds they often just collapse or simply slump
```

183

1    over.  If they were starting to move as the injury was

2    occurring, there might even be some continuation of

3    that movement so that they -- there was some scene

4    investigation reported to the medical examiner that the

5    body was slumped over.  That would be -- not surprising

6    with the nature of the injury.

7    Q.    That would be just when the person could just pass

8    out or fall over?

9    A.    Right.

10   Q.    Or could fall on the ground?

11   A.    Right.

12   Q.    What conclusions can be made, if any, about the

13   path of this projector as far as the person was sitting

14   or standing, turned one way or the other?

15   A.    It's pretty left side to right side.  There's

16   little bit of downward path, but it's not a lot.  In the

17   photographs one can see that -- I've said that the

18   entrance wound is in the surgical intervention that goes

19   all the way across the chest where you can see that the

20   surgical intervention kind of goes downward a little

21   bit, but it starts near the left nipple, and then the

22   exit wound on the right side is a little bit above the

23   right nipple but that's with the arms all pulled around.

24   So it's a little hard to be real sure.  But the right

25   arm was next to the body, because you can see the

184

1   bruising of wrinkles. I'm ripping my jacket off here so

2   you can see the wrinkles better. When I got my arm at

3   my side, my shirt makes some little wrinkles under -- at

4   the armpit area. And they're wrinkle bruises on the

5   side of the body. Those are seen in State's Exhibit 12.

6   They're better seen in State's Exhibit 14. So that's

7   where that arm was. And this thing is going across the

8   body left to right maybe a little bit downward.

9   Q.    But the bruising you were talking about was on the

10  left side?

11  A.    That's correct.

12  Q.    Entrance wound?

13  A.    There's bruising on both sides.

14  Q.    So both arms would have been down?

15  A.    That is what it looks like from looking at the

16  injury on the arm. There's much less injury on the

17  chest wall on the left.

18  Q.    And as far as the direction in which the defendant

19  -- I mean the victim was facing, that depends on a lot

20  of factors, does it not?

21  A.    Where the face was facing (indicating).

22  Q.    There's no way to tell as far as where the face is

23  facing and where the body is facing?

24  A.    That's right. For instance, my body is facing the

25  injury but my face is off towards you.

J.A. 2099

185

1   Q.   And also how this person is leaning over, standing

2   up, those kinds of things make a difference?

3   A.   That's right.  That isn't something that we can

4   tell from a path that goes through the body and doesn't

5   damage anything else.

6   Q.   I mean, he could be standing, laying down on his

7   side and could be shot straight down?

8   A.   Yes.

9   Q.   Or in an angle, shot in an angle?

10  A.   That's correct.

11  Q.   You were not able to make any opinions about the

12  distance of the gun barrel to the wound, were you?

13  A.   There is no evidence of what's called close-range

14  firing.  The clothing were not received or examined by

15  Doctor Hudson.  And there's no evidence that the gun was

16  very near to the body at the time of discharge into the

17  left side of the left arm.  If it was up, very tight

18  against, then there would be some sort of powder that

19  would make its way through not very much clothing.  But

20  if it's wintertime and cool and sometimes all of the

21  residue would be in the clothing.

22  Q.   Close range being inches?

23  A.   Yes.  Up to a couple of inches.  Kind of depending

24  on the caliber of the weapon.  We use the term

25  "distance" for things beyond about 3 feet.  But with

J.A. 2100

186

1   some of the larger weapons, they will still deposit some

2   powders or residues, but those are deposited on the

3   first thing they get to.  Again if there's a lot of

4   stuff in between.

5   Q.    So distance could mean?

6   A.    Don't know.

7   Q.    Distance -- when you're talking about distance,

8   you're talking about a high-powered rifle from a mile

9   away, talking about a foot?

10  A.    Yes.

11  Q.    A distance?

12  A.    Right.

13  Q.    No conclusions can be reached?

14  A.    That's right.

15          MR. EVERETT:  No further questions.

16          THE COURT:  Cross-examination.

17          MR. STOKES:  All right, sir.

18  CROSS-EXAMINATION BY MR. STOKES:

19  Q.    Now, Doctor, is it your opinion that you didn't

20  perform this autopsy yourself, so you're reading Doctor

21  Hudson's notes?

22  A.    Right.

23  Q.    Is it fair to say that if you had performed this

24  autopsy that your notes would probably be real close to

25  what Doctor Hudson says?

Sharpe 000185

J.A. 2101

187

1   A.    Yes, they would.

2   Q.    Doctor Hudson has been a pathologist all over

3   this state for a lot of years, hasn't he?

4   A.    Yes, he has.

5   Q.    And he is a real expert, is he not?

6   A.    Yes, he is.

7   Q.    But from reading his notes and from your own

8   observation of the pictures and the things that you've

9   done to acquaint yourself with this, do you believe that

10  both arms of the deceased would have been in a normal

11  resting position down by his side when the bullet passed

12  from left to right?

13  A.    Yes, pretty much so.  The left one could have been

14  just a hair out farther, because the more extensive

15  bruising on the right and more extensive changes in the

16  way the bullet came out that suggests that the right was

17  a little tighter tucked but not -- if I lift my arm up

18  too much, then it isn't lined up with a nice level path

19  through the arm.

20  Q.    And so one way you determine the path of the

21  bullet when it passes through someone's arm into their

22  chest cavity would be to line the bullet holes up and

23  see what it looked like?

24  A.    Yeah.

25  Q.    And this one sort of looked like both arms were by

Sharpe 000186

J.A. 2102

188

1    the side?

2    A.    That's correct.

3    Q.    And the hands were nct raised above the head or

4    bringing the upper arms up?

5    A.    Right.    The upper arms weren't -- did not appear

6    to be up.    I have -- I can get my hands up by my face or

7    have them forward as if I were holding a steering wheel,

8    but I can't get them up like this because I have now

9    pulled my arm away.    When we looked at State's Exhibit

10    12 and 13 we saw what happens.    The bullet holes didn't

11    line up with the chest injuries when you take the hand

12    out or up and away like that.

13    Q.    But they did line up when the arms --

14    A.    When they're down like that (indicating), yeah.

15                MR. STOKES:    Judge, may I find one of the

16    photographs?

17                THE COURT:    Yes, sir.

18    BY MR. STOKES:

19    Q.    Doctor, I show you what has been marked as State's

20    Number 3, and ask you do you see on the seat of the

21    vehicle in the picture, the seat in the picture what

22    appears to blood?

23    A.    Yes.

24    Q.    Blood stain?

25    A.    Right.

J.A. 2103

189

1   Q.   And if any blood stain was on the seat of the

2   truck in which Mr. Radcliffe was found on the

3   passenger's side, what would that indicate to you about

4   his body as the bullet hit it?

5   A.   It would --

6   Q.   If you can.

7   A.   Okay.  What I would say is it wouldn't necessarily

8   tell you that much because the paramedics would have

9   taken the body out and that could be a blood stain that

10   has been derived after he was injured, not telling us

11   where he was at the time of injury, but instead where

12   his body had traveled on its way out of the vehicle.

13   Q.   When a .45 caliber slug hits nothing but soft

14   tissue within -- there was no evidence that this

15   particular slug hit any bones?

16   A.   No.

17   Q.   Anything like that hard, was it?

18   A.   Right.

19   Q.   The evidence tended to show, did it not, that the

20   particular shell went through only soft tissue in the

21   body?

22   A.   Yes.

23   Q.   And even though it hit soft tissue, would not the

24   body have a tendency to go in the direction of the

25   bullet as it went through even though it might not be in

J.A. 2104

190

1  a cowboy movie?

2  A.    Well, there are a couple of factors that would

3  tend to be there.  If the victim saw what was about to

4  come down, he could start to duck anyway and that would

5  tend to produce more motion than the little bullet

6  moving.

7  Q.    So that there could have been momentum on the

8  victim's part as well as some force by the bullet

9  itself?

10  A.    Right.

11  Q.    Now, do you have -- let's see now.  It's very

12  possible for Mr. Radcliffe to have been conscious for

13  several seconds after having been shot?

14  A.    Yes.

15  Q.    During that several seconds would he still have

16  had some control over his bodily functions of his moving

17  his feet or his arms?

18  A.    Yes.

19  Q.    If Mr. Radcliffe's body had laid on a street for a

20  minute or two, do you think that there might have been

21  some blood on that street?

22  A.    There could be but not necessarily.  Again because

23  of the wounds being covered over by clothes.  If he was

24  on the street for a few -- as much as a minute or so and

25  then ducked back into the vehicle, there might not be

191

1    anything.

2    Q.    If you knew that the blood was in the truck, which

3    you observed in the picture, and blood on a coat in the

4    truck was there before the EMT people removed him, would

5    you say that had the body laid on the street for a

6    minute or so there would probably have been blood on the

7    street?

8    A.    There would be some possibility.  But again by the

9    nature of the wounds, there wouldn't be much transfer

10   there.  There is very little blood for the severity of

11   the internal wounds.  There's very little blood shown in

12   State's Exhibit 3.  There's just a little smear on the

13   upper front of the seat part.  And I can't see that it's

14   present on the camouflage jacket in this photograph.

15   But camel is real hard to see things.  That's why they

16   make it that way.

17   Q.    Now, you got Doctor Hudson's report with you,

18   don't you?

19   A.    Yes.

20   Q.    Would you please turn to page 4 under his summary

21   and comment?

22   A.    Yes.

23   Q.    Would you tell us, not in the first paragraph but

24   in the second paragraph, would you tell us Doctor

25   Hudson's conclusion in the last paragraph of this

192

1   autopsy, what his opinions were?  If you would just read

2   it.

3   A.     Okay.  "The several gunshot wounds are in my

4   opinion the result of a single bullet.  I am convinced

5   at this time the bullet entered the left arm from the

6   side and then passed through the arm, then entered the

7   left chest.  The bullet went across the chest from left

8   to right perforating the heart.  It exited the chest and

9   entered the right arm.  It was from the outside of the

10  right arm that I recovered a large jacketed bullet that

11  was in good condition."

12  Q.     That's far enough.  Now, so, Doctor Hudson was of

13  the opinion that this man was shot from the left side,

14  having the bullet enter his left side and went through

15  his body and exited his right side?

16  A.     That's correct.

17  Q.     Was there any medical indication whatsoever that

18  this man was shot from the front face on face with

19  anybody else?

20  A.     The front of his chest was not the part that got

21  the injury.  Back to the, you know, where's your face?

22  (indicating).  In my face (indicating).  The microphone

23  is in my face.  Well, my shoulder is also lined up with

24  the microphone.

25  Q.     Right.  It would depend on where your body was?

193

1   A.   That's right.

2   Q.   And if his body was face to face with someone with

3   a gun, from shoulders down, face to face --

4   A.   That's correct.

5   Q.   -- it would have produced a different injury from

6   the injury left to right?

7   A.   That's correct.

8   Q.   It would have produced an injury front to back?

9   A.   That's right.

10  Q.   Is it your opinion that whoever did shoot this man

11  shot him from the deceased's left side?

12  A.   Yes.

13  Q.   Thank you very much.

14          THE COURT:  Redirect?

15          MR. EVERETT:  Just briefly.

16  REDIRECT EXAMINATION BY MR. EVERETT:

17  Q.   Doctor Gilliland, your reading that last paragraph

18  about the bullet, and then he went on to say he gave the

19  bullet to Mr. Baker at the police department?

20  A.   Yes.

21  Q.   And what did he say next?

22  A.   "It is my opinion that the wound would have very

23  rapidly incapacitated and quickly killed this man."

24          MR. EVERETT:  No further questions.

25          THE COURT:  Thank you, Doctor.  You may step

J.A. 2108

194

1    down.

2              THE WITNESS:  And be excused?

3              MR. STOKES:  Yes, sir, Judge.  I have no

4    problem with that.

5              THE COURT:  Yes, ma'am.  You may be excused.

6              Members of the jury, we're going to take our

7    lunch recess at this time.  Remember my prior

8    admonitions to you.  I'm going to let y'all go and ask

9    that everybody else remain seated and ask that you be

10   back in your seats at 1:45.  Everyone else remain

11   seated while the jury leaves.

12   (Jury out.)

13             THE COURT:  Mr. Stokes, you want to put

14   anything else in the record, your objection on the

15   basis of the photographs.  I think we've covered that.

16             MR. STOKES:  Judge, I think that we covered

17   that earlier in the motion and the motion, I think,

18   will be satisfactory.  Thank you very much.

19             THE COURT:  I just wanted to make sure.

20             All right, Sheriff, take a recess until

21   1:45.

22   (Lunch recess.)

23                    ********

24   T.R. TROCHUM, being first duly sworn, was examined and

25   testified as follows during DIRECT EXAMINATION by

195

1   MR. EVERETT:

2           THE COURT:  Mr. DA, your first question is

3   going to be his name, because I want his name.

4           MR. EVERETT:  Yes, sir.

5   Q.    State your name for the Court.

6   A.    Thomas Trochum.  That's T-R-O-C-H-U-M.

7           THE COURT:  Sir, let me ask you to explain

8   to me and these 13 people sitting out here in this 82

9   degree courtroom why you were not here at 1:45 when we

10  reconvened court today.

11          THE WITNESS:  Because, Your Honor, the

12  restaurant that I was at when I partook of lunch, the

13  woman was given a large denomination bill and she did

14  not come back with the change.  So I was a long time

15  waiting for the change from the $100 bill for lunch to

16  come back.  And that was the reason for the delay.  The

17  restaurant was very, very slow.

18          THE COURT:  Well, let me suggest that in the

19  future if you have to eat lunch over here, go across

20  the street where the rest of us eat, and you will get

21  fed over there in about 30 or 40 minutes at the most

22  and you can be on time for court.

23          THE WITNESS:  I'm very sorry about that,

24  Your Honor.  Usually this place is very fast, but I'm

25  sorry to say they were not today.

Sharpe 000194

J.A. 2110

196

```
 1                THE COURT:  All right.

 2                MR. EVERETT:  Proceed, Your Honor?

 3                THE COURT:  Yes, sir.

 4     BY MR. EVERETT:

 5     Q.    Mr. Trochum, where are you employed?

 6     A.    With the North Carolina State Bureau of

 7     Investigation.

 8     Q.    In what capacity?

 9     A.    I'm a special agent with the duties of a forensic

10     firearm and toolmarks examiner.  I'm assigned to the SBI

11     Crime Laboratory in Raleigh.

12     Q.    What is your training in the field of forensic --

13     in the field of forensic firearms examination.

14     A.    Well, there is no college curriculum specifically

15     for my discipline.  As such, my training consists of

16     that which I received during the course of my

17     employment.

18                From 1970 to 1989, I was employed as a

19     Philadelphia police officer.  I spent the last four

20     years assigned to that firearms and toolmarks section.

21     When I entered that laboratory in 1989 --'85, excuse

22     me, I underwent a two-year structured and tested

23     program which consisted of the identification of

24     firearms and the make, model and country of origin, the

25     examination of ammunition components to determine their
```

197

1    caliber or their manufacturer.  I also received

2    training in how different firearms function and

3    different manufacturing procedure that go into making

4    various firearms and different safety systems that are

5    employed.

6            I also received training in the microscopic

7    examination of ammunition components, such as a fired

8    bullet cartridge casing or shotgun shell to ascertain

9    the type of weapon that was fired by or to

10   microscopically compare them against specimens, known

11   specimens, from another firearm to see whether they

12   were fired by that firearm and that fire alone to the

13   exclusion of all others.

14        I received similar training in toolmarks

15   identification.  That is microscopically examining a

16   tool to ascertain whether it was made by that tool and

17   that tool alone to the exclusion of all others.

18        Now, my training was also supplemented by other

19   schools and seminars which I attended.  I received

20   training from the Pennsylvania, New Jersey and

21   Connecticut state police forces.  I attended schools

22   with the Ruger Firearms Company specifically for the

23   revolvers, for Glock Firearms and the Department of the

24   Army.  And in addition have seven hours with the Dupont

25   Chemical Company, Mossberg Shotgun Company, and Action

198

Arms.

I came to this State Bureau of Investigation in March of 1989, and as I have not been trained in gunshot residue testing, which is determining how far the muzzle of a gun was from an object when it was fired, I underwent a three-month structured and tested program in that area.

I attended the SBI Academy for the remainder of 1989. And starting in 1990, I started doing case work for the bureau. Since then I have received additional training with the Ruger Firearms Company. This time for their semiautomatic pistols, the Beretta Firearms Company, Smith & Wesson, Colt, six-hour H&K and Remington Firearms as well as a one week course of the National Academy, Quantico, Virginia, for advanced problems in gunshot residue testing. And prior to leaving Philadelphia I was accepted in the Association of Firearms and Toolmarks Examiners. This is an international body in which board certified firearm examiners are accepted into. And since that time I have attended four annual training seminars for new methodology and unique problems in my field as well as a one week tour of the -- at major manufactures of the New England -- in the New England area firearms to see firsthand different machine techniques and processes

Sharpe 000197

J.A. 2113

199

1    that go into making firearms.  That would be the extent

2    of my training today.

3    Q.    And as part of your job with the State Bureau of

4    Investigation you compare projectiles, fired bullets

5    with guns to determine whether or not they were fired in

6    that gun?

7    A.    As well as cartridge casings and shotgun shells.

8    Q.    And you can compare cartridge casings to the gun

9    or other cartridge casings, right?

10   A.    That's correct.  Ammunition components can be

11   compared against slug ammunition components or against

12   firearms.

13   Q.    How many comparisons have you made since you've

14   been in North Carolina?

15   A.    In North Carolina approximately five thousand.

16   Q.    Have you been admitted in the superior courts of

17   North Carolina as an expert in the field of forensic

18   firearms examination?

19   A.    In excess of one hundred times.

20   Q.    In Pitt County, how many times?

21   A.    At least four or five.

22           MR. EVERETT:  At this time we'd offer

23   Special Agent Trochum as an expert in the field of

24   forensic firearms examination.

25           THE COURT:  So find.

Sharpe 000198

**J.A. 2114**

200

BY MR. EVERETT:

1  Q.    Agent Trochum, would you tell us the difference

2  between a semiautomatic weapon pistol and a revolver?

3  A.    Well, a revolver is where the bullets are loaded

4  into a cylinder and therefore revolves.  And all the

5  cartridges, that is, once the bullet leaves the barrel,

6  that part of the ammunition component which contains the

7  powder stays inside that cylinder and you must manually

8  open it up to unload it or remove those ammunition

9  components fired cartridge casings from the weapon.  In

10 a semiautomatic pistol, as the bullet leaves the barrel

11 of the gun by its mechanical function, it removes the

12 cartridge casing from the end of the barrel and throws

13 it clear of the weapon.  And it will do this each time

14 that you pull the trigger, for as long as you have

15 ammunition in the firearm.  That's the main difference

16 between a semiautomatic and revolver.  They both do the

17 same function.  But the unloading part is done

18 automatically by the semiautomatic pistol itself as

19 opposed to what you manually you have to do with a

20 revolver.

21 Q.    Can you look at a casing, that is, the part that's

22 left after the bullet's fired, and tell whether it was

23 fired from a semiautomatic or a revolver?

24 A.    It's possible to see whether there are marks on a

J.A. 2115

201

1   cartridge casing caused by a mechanical part which

2   removes it and throws it clear of the firearm to see

3   whether it's consistent with having been fired in that

4   type of weapon, yes, sir.

5   Q.    Can you compare a fired projectile with any

6   particular cartridge to tell if that projectile was

7   fired from that cartridge or casing?

8   A.    No.  There is no scientific method for taking any

9   bullet which is that portion of an ammunition component

10  and linking it to the cartridge which it's set into.

11  And if you want to, I have an illustration to show that.

12  Q.    Can you tell if a particular bullet is fired from

13  a particular firearm?

14  A.    Yes.  Absolutely.

15  Q.    And can you tell if a particular casing was fired

16  in a particular firearm?

17  A:    Yes, we can.

18  Q.    All right.  How do you -- how can you determine

19  whether a bullet is fired from a firearm?

20  A.    Well, whenever firearms are made many of the parts

21  are machine cut.  They're very specific sizes or

22  tolerances.  When this occurs, the tools that do the

23  cutting cut the parts themselves with tiny microscopic

24  imperfection on the surface of the cut, and these are

25  called toolmarks.  Every time a tool cuts something like

202

1    the interior surface of a gun barrel or the firing pin

2    itself to make those particular sizes, these marks will

3    be left on those surfaces.  Each pass of the tool that

4    does the cutting dulls the tool slightly so that it

5    never leaves the same marks twice on the individual --

6    from barrel to barrel, firing pin to firing pin.  Thus

7    when an ammunition component is fired in a firearm, the

8    bullet traveling down the barrel of a firearm or the

9    cartridge being struck in the back by the firing pin,

10   these individual toolmarks can then be impressed onto

11   these ammunition components and that's what allows us to

12   compare them.  Microscopically, we can look at these

13   things and they will never be the same twice.  They're

14   different for each part.  And that's what allows us to

15   say that an ammunition component was fired by that

16   firearm and that firearm alone to the exclusion of all

17   others.

18   Q.    Why can't you tell whether a particular bullet

19   came from a particular casing?

20   A.    Because bullets are actually placed into the top

21   of the cartridge casing and the cartridge casing is

22   pressed tightly around it.  There are no toolmarks that

23   are then impressed on that cartridge casing.  They

24   separate.  Actually it's quite the opposite.

25         When cartridge is fired, the cartridge casing

203

1   expands away from the bullet because of the pressures

2   of burning gases of the powder chamber.  And when

3   soluble gases burn, it's expanded 360 degrees in all

4   directions which leaves the bullet loose now and the

5   gas forces it down the barrel and out.  So there are no

6   toolmarks to be gleaned from a bullet that's inside the

7   cartridge casing.

8   Q.    How can you tell if one casing was fired from the

9   same weapon as another casing?

10  A.    By these individual toolmarks which I described.

11  If they are all -- if they match from casing to casing,

12  and they're from the firing process, that would allow me

13  to make that determination.

14  Q.    But a revolver, unlike a semiautomatic, does not

15  eject the shell automatically and stays in the gun

16  basically until it's manually removed?

17  A.    That's correct.  And this extraction, pulling out

18  extraction of the projection process, pushing it free.

19  The firearm is done by the part of the named machine and

20  as such they leave their only individual marks on the

21  casings itself.  Seeing those on the cartridge casings

22  is indicative of being fired from a semiautomatic as

23  opposed to a revolver.  That does not preclude a

24  cartridge casing when firing the semiautomatic pistol or

25  work through the action of a semiautomatic pistol placed

Sharpe 000202

J.A. 2118

204

1   in a revolver and then fired from the revolver.

2   Q.    But in order for a revolver to -- for someone to

3   -- for the shell to be fired in a revolver to land

4   somewhere else it has to be manually removed?

5   A.    That's correct.

6   Q.    Now, did you receive from the Greenville Police

7   Department back in February of 1994 three shell casings

8   and a bullet?

9   A.    Yes.  They were received in the laboratory on

10  February 16, 1994.

11          MR. EVERETT:  May I approach the witness,

12  Judge?

13          THE COURT:  Yes, sir.

14  BY MR. EVERETT:

15  Q.    Mr. Trochum, I'm going to hand you what's been

16  marked earlier as State's Exhibit 8, 9 and 10, which

17  were identified as shell casings that were found on

18  Roosevelt Street -- on 6th and Roosevelt and McKinley,

19  and I'll ask you to examine those, sir?

20  A.    Yes, sir.

21  Q.    Were they the three shell casings that you

22  received on February 16, 1994?

23  A.    These are the ones that were submitted in the lab

24  at that time.  That's correct, sir.

25  Q.    Now, looking at State's Exhibit Number 9, the

205

1   shell casing, did you make any observations about that

2   shell casing?

3   A.    Yes, sir.  I made the observation that it's a

4   Remington brand caliber .45 automatic fired cartridge

5   casing.

6   Q.    Anything unusual about it other than being a fired

7   cartridge casing?

8   A.    No, sir, other than I compared it to State's

9   Exhibits 8 and 10 naturally.

10  Q.    All right.  Let's look at State's Exhibit Number

11  8.

12  A.    Yes, sir.

13  Q.    And is there anything unusual about State's

14  Exhibit Number 8?

15  A.    The only thing different from State's Exhibit

16  Number 9 is that the cartridge casing itself is not

17  round.  Some pressure has been put on it to change the

18  oval or round shape of it.  It's now more egg shaped and

19  that's not normal.

20  Q.    And how about State's Exhibit Number 10.

21  A.    State's Exhibit Number 10 like State's Exhibit

22  Number 8 and 9 is also a Remington brand caliber .45

23  automatic fired cartridge casing.  And like State's

24  Exhibit 8 it is now egg or oval shaped as opposed to

25  being round.

206

1   Q.      Did you compare those, 8, 9 and 10, to see if they

2   were fired from the same gun?

3   A.      Yes, sir, I did.

4   Q.      Do you have an opinion as to whether or not they

5   were fired from the same gun?

6   A.      And it's my conclusion, based on the microscopic

7   examination, that State's 8, 9 and 10 were fired from

8   the same firearm.

9   Q.      If you could look at State's Exhibit number 11

10  please.  I think it's up -- the bottom.

11  A.      Yes, sir.

12  Q.      What is State's Exhibit Number 11?

13  A.      State's Exhibit Number 11 is a tan envelope which

14  contains a plastic bag.  Inside that plastic bag is a

15  caliber .45 fired bullet?

16  Q.      Can you tell what brand it is?

17  A.      No.  By the configuration of this bullet, it's

18  consistent with several brands, such as Remington,

19  Winchester or Federal which are very common brands.  I

20  can tell you what it is not; it is not a CCI.

21  Q.      And can you tell from looking at that particular

22  projectile the type of gun it fired?

23  A.      There is an internal structure impressed on a

24  bullet as it travels down a barrel.  These are called

25  "lands" and "grooves."  This is a structure that travels

207

1    the entire length of the barrel and alternates around

2    inner circumference of the barrel. It's a very -- it's

3    a alternating system of high points and low points

4    called "lands" and "grooves." That structure is

5    impressed into the bullet as it travels down the barrel

6    of gun. The amount of lands and grooves will vary from

7    manufacturer to manufacturer from as few as two to as

8    many as twenty. I can measure the width of the lands

9    and grooves and look at the direction of twist whether

10   it runs from the right or left, whether the twist is

11   going to the right or going to the left. By measuring

12   that, I can then give a list of firearm manufacturers

13   that this bullet was fired by.

14   Q.    And you have that list?

15   A.    Yes, I do.

16   Q.    All right?

17   A:    And I generated this list when I made the report

18   after my microscopic examination. And I found a list of

19   six manufacturers. The first was Auto Ordinance; the

20   second one was Haskell, third was Llama, fourth was the

21   Ruger, fifth was Smith & Wesson, and the sixth was U.S.

22   Military 127-81.

23   Q.    That's a submachine gun?

24   A.    That's correct. That's the Thompson submachine

25   gun.

208

```
 1   Q.    Okay.  The Llama, is that a semiautomatic?

 2   A.    Yes, sir, it is.

 3   Q.    The Ruger?

 4   A.    That's a revolver.

 5   Q.    Smith & Wesson?

 6   A.    It's a revolver.  The Haskell would also be a

 7   semiautomatic pistol, and the Auto Ordinance would be a

 8   copy of the 127 U. S. Military.  So that would be a

 9   submachine.

10   Q.    So basically you got four pistols and two

11   submachine guns?

12   A.    Two revolvers, two semiautomatic pistols, and two

13   submachine guns.

14   Q.    Can you tell from looking at that projectile which

15   type of weapon that bullet was fired from?

16   A.    No, sir, I cannot.  Not without having the

17   particular weapon.  I can only measure the lands and

18   grooves and tell you the type of manufacturer that this

19   bullet would have been fired from.  To tell you what

20   particular weapon it was fired from, I would have to

21   have that weapon, fire test shots and microscopically

22   compare it to the individual toolmarks that would be

23   impressed by that barrel that it traveled in.

24   Q.    So that weapon could have been fired by either one

25   of those two submachine guns, one of those two revolvers
```

209

1  or one of these two semis?

2  A.    That's correct.

3  Q.    Can you compare that bullet in any way with the

4  three casings you've compared?

5  A.    I can only tell you that it's a caliber .45 and

6  that the cartridge casings are caliber .45 auto and that

7  weight, bullet of that design is most consistent with

8  caliber .45.  But there's other .45 calibers where the

9  cartridge casing is different in length, such as .45

10  Colt, .45 Auto Rem, that this bullet could be hand

11  loaded into by someone and then fired from it.

12  Q.    But as far as the shell casings themselves you

13  can't tell if that bullet was fired in any shell casings

14  that you found on the street?

15  A.    That's correct.  There's no way to compare this

16  bullet microscopically with these cartridge casings and

17  say that they were at one time joined as a single

18  cartridge.

19  Q.    All you can say is that that is a .45 caliber

20  projectile that could have been fired in any of those

21  six weapons?

22  A.    That's correct.  And the weight is consistent in

23  the caliber of the three cartridges.

24  Q.    Are there other cartridge casings, other brands

25  that are consistent also?

210

1    A.    Oh, yes.

2    Q.    So is that a pretty general or generic --

3    A.    This design is generic for caliber .45 bullets.

4    230 grams, of course.  But the configuration of the

5    bullet, the shape, the way the jacket goes around the

6    lead is very generic of several other manufacturers.  I

7    couldn't tell what brand that is exclusive of.

8    Q.    It could be Remington or anybody?

9    A.    That's correct.

10   Q.    So there is really no way that the bullet, number

11   11, that came from George Radcliffe's body can be linked

12   to any casing or firearm unless you had the firearm to

13   compare it to?

14   A.    That's correct.

15   Q.    All right.

16            MR. EVERETT:  No further questions.

17            THE COURT:  Any cross-examination?

18            MR. STOKES:  Yes, sir.  May I proceed?

19            THE COURT:  Yes, sir.

20            MR. STOKES:  Thank you.

21   CROSS-EXAMINATION BY MR. STOKES:

22   Q.    Now, Mr. Trochum, you don't know that that

23   projectile didn't come from one of those three shell

24   casings either, do you?

25   A.    That's correct, I don't.

Sharpe 000209

J.A. 2125

211

1   Q.    It could have?

2   A.    Could have.

3   Q.    And those three casings and a bullet were

4   submitted to you for microscopic analysis, were they

5   not?

6   A.    That's correct.

7   Q.    Were they the only items submitted to you for

8   microscopic analysis?

9   A.    No, sir.

10  Q.    What other items or item was submitted to you for

11  microscopic analysis?

12  A.    I also receive a caliber .45 automatic,

13  semiautomatic pistol brand Haskell.

14  Q.    And who did you receive that from?

15  A.    From the Greenville Police Department.

16  Q.    Did you receive it at the same time that you

17  received the other evidence that you examined?

18  A.    No, sir.  That came into the laboratory on -- give

19  me a second here, sir -- on 4-14.  April 14, 1994.

20  Q.    Okay.  And was it submitted to you to be examined

21  in this particular case and no other?

22  A.    It was submitted specifically for this case.

23  However, it would be now compared against all cases in

24  an open case file.

25  Q.    And is it standard procedure that when you get a

212

1    weapon in you compare it for the case that you're

2    dealing with and then you sort of look to see if that

3    weapon was used in any other crime that you had

4    previously examined and not completely sewed up all the

5    loose ends?

6    A.    Basically that would have been the case.  However,

7    now, with the inception of computerized system that

8    examines bullets and gives them a bar code, that's now

9    done automatically.

10   Q.    Did you have that system at the time you --

11   A.    No.  We would just then check it against any case

12   leads or against any open case file.

13   Q.    That a .45 might have been used?

14   A.    That's correct.

15   Q.    Now, did you compare what, I believe you labeled

16   as your item Q1, one caliber .45, a fired bullet with, I

17   believe, your item K1, one Haskell caliber .45 automatic

18   semiautomatic pistols?  Did you compare the bullet

19   itself to see if it was fired from that particular

20   weapon?

21   A.    Yes, sir, I did.

22   Q.    Was it?

23   A.    I couldn't say that it -- there's no microscopic

24   indications that it was fired from that gun.  It has the

25   same class characteristics, same lands and grooves, the

Sharpe 000211

J.A. 2127

213

1    same twists but there's no indication that it was fired

2    from that firearm?

3    Q.    Class characteristics would mean a .45 caliber

4    pistol, wouldn't it?

5    A.    No, sir.  It would mean as a .45 caliber bullet it

6    would mean that it has the same amount of lands and

7    grooves, the same width lands and grooves, and the same

8    directional twist in those lands and grooves.  And in

9    this particular case there would be six lands and

10   grooves, right-hand directional twist.

11   Q.    And yet your area of expertise is now to the point

12   where when you identify bullets as being fired from a

13   particular weapon, and you feel that you have done your

14   examination, that it's much like a fingerprint.  That if

15   you say that this bullet was fired from this gun that it

16   could be not fired from any other gun but that one?

17   A.    It's conclusive once I say it's fired from a

18   particular firearm, yes, sir.

19   Q.    And that would be the only firearm which could

20   have fired that particular bullet?

21   A.    That's correct.

22   Q.    And that was -- those comparisons were the only

23   comparisons that you have made in this case with the

24   items that you have been submitted?  You may know other

25   comparisons with any other evidence that you know about?

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
COUNTY OF PITT                SUPERIOR COURT DIVISION
                             FILE NO. 94-CRS-7660


STATE OF NORTH CAROLINA    )    T-R-A-N-S-C-R-I-P-T
                           )
            VS.            )         Volume II
                           )      (Pages 215-422)
MONTOYAE DANTAE SHARPE,     )


        The transcript of the jury trial proceedings
taken in the General Court of Justice, Superior Court
Division, Pitt County, North Carolina, at the July 24,
1995, Criminal Session before the Honorable J. Richard
Parker, Jr., Judge Presiding.


APPEARANCES:

Mr. Clark Everett
Assistant District Attorney
Greenville, North Carolina
On behalf of the State.

Mr. R. Cherry Stokes
Attorney at Law
Greenville, North Carolina
On behalf of the Defendant.



Tina McNair
Official Court Reporter
Judicial District 3A
Pitt County Courthouse
Greenville, North Carolina  28735

```
 1                            INDEX
      VOLUME I
 2    Voir dire of:
       Juror #2
 3
      Motions:
 4     Witness statements, 18;
       Witness sequestration, 19
 5     Photograph sequestration, 21
       Defendant's statement, 22
 6     Witness list, 32.

 7    EVIDENCE FOR THE STATE:
      WITNESS         DIRECT      CROSS    REDIRECT   RECROSS
 8
      Charlene Johnson  37          51        84        86
 9    Alonzo Vines      88          97        99
      Kenneth Denton   100         106
10    Kevin Jones      108         114       124       128
      Ralph Mendenhall 130         145       162       164
11    M.G.M. Gilliland 165         186       193
      T. R. Trochum    194         210       214
12
      VOLUME II
13    Beatrice Stokes  215         226
      D. R. Best       245         257       270       273
14    Carolyn Melvin   274         280

15    State rested, 287

16    Motion:
       Strike testimony of Charlene Johnson, 288
17

18    EVIDENCE FOR DEFENDANT:
      WITNESS         DIRECT      CROSS    REDIRECT   RECROSS
19
      Patricia Ward    302         307
20    Patricia Hicks   314         318
      Angela Sutton    327         331
21    Tracy Highsmith  334         358

22    Motion:
       Inadmissibility of statement
23                          Denied, 357

24    Defendant rested, 376
      Charge conference 377
25    Charge, 385
```

J.A. 2130

1

STATE'S EXHIBITS:

2

| Exhibit No. | Marked | Offered | Received |
|---|---|---|---|
| 1-blackboard | 45 | 45 | 45 |
| 2-photo | 32 | 136 | 136 |
| 3-photo | 32 | 136 | 136 |
| 4-photo | 32 | 136 | 136 |
| 5-photo | 32 | 136 | 136 |
| 6-photo | 32 | 136 | 136 |
| 7-photo | 32 | 136 | 136 |
| 8-gun | 141 | 143 | 143 |
| 9-casing | 141 | 143 | 143 |
| 10-casing | 141 | 113 | 143 |
| 11-bullet | 143 | 143 | 143 |
| 12-photo | 173 | 175 | 175 |
| 13-photo | 178 | 178 | 178 |
| 14-photo | 178 | 178 | 178 |

11

DEFENDANT'S EXHIBITS:

12

| Exhibit No. | Marked | Offered | Received |
|---|---|---|---|
| 1-accident report | 115 | 363 | Not admitted |
| 2-accident report | 123 | 363 | 373 |
| 3-lab report | 268 | 363 | 373. |

Voir dire Exhibits:

| | | |
|---|---|---|
| 1-report | 29 | 374 |
| 2-report | 374 | 374 |
| 2A-report | 374 | 374 |

16

17

18

19

20

21

22

23

24

25

215

1  possible to fire bullets from a firearm and get

2  different marks on Remington brand ammunition than from

3  Winchester brand ammunition.  You can compare the

4  Winchesters against the Winchesters, the Remingtons

5  against the Remingtons, but it's possible that you could

6  not compare those brands to each other even though I

7  would fire them from the gun.  The marks, due to the

8  pressure, would replicate differently.  Could replicate

9  differently.  That's not always the case but that does

10  happen.  And that's why my report does not conclusively

11  say that this was not fired in that Haskell firearm.

12  There's microscopic indications that it was, but I can't

13  conclusively, one hundred percent, rule it out.

14  Q.    The likelihood is it was not fired?

15  A.    That's correct.

16  Q.    Thank you, sir.

17          MR. STOKES:  No further questions.

18          THE COURT:  You may step down.

19          MR. STOKES:  Your Honor, I have no objection

20  if he is excused.

21          THE COURT:  All right.  You may be excused.

22  Call your next witness.

23                  ********

24  BEATRICE STOKES, being first duly sworn, was examined

25  and testified as follows during DIRECT EXAMINATION by

Sharpe 000216

J.A. 2132

216

```
 1    MR. EVERETT:

 2    Q.    State your name for the Court?

 3    A.    Beatrice Stokes.

 4    Q.    Pull the mike up to you, Ms. Stokes.

 5              THE COURT:   Could you repeat your name,

 6      please?

 7              THE WITNESS:   Beatrice Stokes.

 8              THE COURT:   Stokes?

 9              THE WITNESS:   Uh-huh.

10    BY MR. EVERETT:

11    Q.    Ms. Stokes, where were you living back in February

12    of 1994?

13    A.    1110 Douglas Street.

14    Q.    And Douglas Street is located where in Greenville?

15    A.    Near the library, Sheppard.

16    Q.    How is it in relation to 6th Street and West 14th?

17    A.    It's just right up the street.

18    Q.    Would it be one block over from 6th Street?  If

19    this was 6th and that was -- be one block over here?

20    A.    Yes.

21    Q.    . At that time were you working?

22    A.    No.

23    Q.    At that time did you know the defendant Dantae

24    Sharpe?

25    A.    Yes, I did.
```

J.A. 2133

217

1   Q.   And how did you know him?

2   A.   Well, at the time I was on the street, I was doing

3   drugs, I used to buy drugs from him.

4   Q.   From Mr. Sharpe?

5   A.   Yeah.

6   Q.   And where was -- and where did Mr. Sharpe sell

7   drugs?

8   A.   On 14th.

9   Q.   14th Street?

10  A.   Uh-huh.

11  Q.   Near what intersection?

12  A.   Fifth.

13  Q.   14th and 5th?

14  A.   Yeah.  Right there on the corner of 14th and 5th

15  by Hannah's store.

16  Q.   Is that where Hannah's is?

17  A.   Yeah.

18  Q.   Did you ever see him on any other blocks?

19  A.   Just mainly in the whole area.  They usually walk

20  down the street -- 6th, Sheppard.

21  Q.   Pull that mike up to you so the jury can hear you,

22  okay.  I believe you said the whole area of 6th and

23  Sheppard?

24  A.   Yes.  All those streets.  You know, everybody sold

25  drugs around there.

218

```
1    Q.    Who sold drugs with him?

2    A.    This guy named Mark.

3    Q.    Is that Mark Joyner?

4    A.    Yes.

5    Q.    Who else?

6    A.    Just be a bunch of girls.  About one or two more

7    guys, you know.

8    Q.    Members of his family?

9    A.    I don't know how they are related.

10   Q.    Did you on occasion prior to the 11th of February

11   of 1994 buy drugs from Mr. Sharpe?

12   A.    I don't remember buying drugs on that date.

13   Q.    Prior to that day.  Prior to Mr. Radcliffe being

14   killed, had you bought drugs from him?

15   A.    Oh, no.  Not that day.

16   Q.    I mean, anytime in that month?

17   A.    Yes.  Of course.  Yeah.

18   Q.    Now, on that day, that is February 11, 1994, had

19   you bought any drugs from anybody?

20   A.    I can't remember.

21   Q.    · Were you a regular drug user at that time?

22   A.    Yes.  I was on the street.

23   Q.    What kind of drugs did you use?

24   A.    Crack cocaine.

25   Q.    All right.  Now, did it come a time on that day
```

Sharpe 000219

J.A. 2135

219

```
 1   that you left your home on Douglas Street to go
 2   somewhere?
 3   A.    Yes.  That night I had left Douglas heading up
 4   towards -- well, going in the opposite direction from
 5   the church.
 6   Q.    Where were you going?
 7   A.    I was just walking.  I was out, you know.
 8   Q.    Down the street?
 9   A.    Yeah.
10   Q.    Did you walk towards 6th Street?
11   A.    Yes.  The little section of the garden, you know
12   -- I don't know the name of that street, you know.
13   Q.    Okay.  You know where Mr. Vines lived, there is a
14   garden and a little house?
15   A.    Yes.  Exactly.
16   Q.    And you walked down Sheppard Street going towards
17   that -- in that direction?
18   A.    In that direction, yeah.
19   Q.    Was it dark?
20   A.    Yes, it was.  But it was a light on the end of one
21   of the streets so you could -- at that corner --
22   Q.    Uh-huh.
23   A.    -- where Mr. Vines lives at.
24   Q.    As you were walking down Sheppard Street, tell us
25   what you saw.
```

Sharpe 000220

**J.A. 2136**

220

```
 1   A.    Well, it was a lot of people bunched up together.

 2   And Dantae them, his group, the truck --

 3   Q.    Who was in his group?

 4   A.    The man driving the truck.

 5   Q.    What people did you recognize?

 6   A.    This guy named Marciana, Mark.

 7   Q.    Mark Joyner?

 8   A.    Uh-huh.

 9   Q.    Did you hear any voices?

10   A.    Yes, I know them.  I know their voice like, you

11   know --

12   Q.    Did you recognize Dantae's voice?

13   A.    Yes.  Of course, I did.  I deal with him near

14   'bout every day buying drugs.

15   Q.    How far were you from Dantae Sharpe and Mr. Mark

16   Joyner and Marciana when you first realized who it was?

17   A.    I wasn't that far.  I mean, it was like halfway up

18   the Street, and I'm right there on that corner where Mr.

19   Vines lives at.

20   Q.    And did you see any vehicles?

21   A.    - Who?

22   Q.    Any vehicles, cars or trucks.

23   A.    Just that truck.  The truck the guy was driving.

24   Q.    Did you recognize the truck?

25   A.    Yes.  I had seen the guy several times in that
```

221

```
 1   area, and I knew he got along with Marciana.

 2   Q.    Okay.  And tell what you saw.

 3   A.    Well, it was a group bunched up and looked like it

 4   started with an argument.  I was being nosey.  I was

 5   standing, you know, far back.  I didn't want to get into

 6   it.  So it just looked like they was scuffling.  And all

 7   of a sudden, I just saw a spark - a gun go off.

 8   Q.    Who had the gun?

 9   A.    Dantae.

10   Q.    All right.  After the gun went off, what did you

11   see?

12   A.    I just, you know, look like he -- everybody just

13   scattered.  And I just hauled ass.  Excuse me, please.

14   Q.    Was it a loud gunshot?

15   A.    Yes.

16   Q.    And did you stay around and see what happened to

17   the truck?

18   A.    No, I did not.  I went and called.  And when I

19   called, I found out they had already said that somebody

20   was on the way.

21   Q.  -  You went and called the police?

22   A.    Yes.

23   Q.    The white guy in the truck, you since learned --

24   you knew who the guy was?

25   A.    I've seen him before.
```

222

```
 1    Q.    As being Mr. George Radcliffe?

 2    A.    I didn't know him by name.

 3    Q.    But you've since learned that, have you not?

 4    A.    Yes.

 5    Q.    Did you that night have a chance to go back and

 6    see where the truck was located?

 7    A.    Yes.  I went back through and the truck was just

 8    in the field.  Everybody was gone.

 9    Q.    Beside Mr. Vines' house?

10    A.    Yes.  Right there in the field.

11    Q.    Did you see how the truck got there?

12    A.    Huh-uh.  After the gun went off, I was gone.

13    Q.    Did you -- did you expect to see anyone get shot

14    that night?

15    A.    No.  But I expected it was going to be some

16    trouble.  They used to start trouble with everybody, you

17    know.  Throw beer bottles at me if I didn't want to buy

18    the drugs, you know.  Stuff like that.

19    Q.    Have you ever seen Mr. Sharpe with a weapon, the

20    defendant?

21    A.    Yes.  He usually carries a gun, you know.  I saw

22    it one time anyway.  But they always talked like they

23    were bad.  They started trouble.

24    Q.    Did the other people, other than Mr. Sharpe and

25    Mr. Joyner and their friends sell drugs in this area?
```

J.A. 2139

223

```
 1   A.    I didn't quite understand.

 2   Q.    Were there other people other than Mr. Sharpe and

 3   his friends that sold drugs in this area?

 4   A.    Yeah, but they didn't really do it out on the

 5   street.

 6   Q.    What was different about what Mr. Sharpe did from

 7   the other drug dealers?

 8   A.    They would just have it on them.  They sat out on

 9   the porch.  The rest of the people would like dish it

10   behind the house or somewhere, because, you know, they

11   pull up and check you out and stuff.

12   Q.    So some of the other guys did it in the back lot

13   off the street?

14   A.    Yeah.  Pretty much tried to be undercover.

15   Q.    Mr. Sharpe, how did he sell his drugs?

16   A.    I seen him have it on him.  Just pull it out and

17   sell it to you, you know.

18   Q.    All right.  Now, have you ever seen a red --  you

19   know where Mr. Sharpe stayed?

20   A.    Yes.

21   Q.    Where did he stay?

22   A.    On 14th.  That's why I always seen him.

23   Q.    But any other houses you know of that he stayed

24   at?

25   A.    No.
```

Sharpe 000224

**J.A. 2140**

224

```
1    Q.    You ever see any vehicles at that residence?

2    A.    It was a red car.  I think it was a white one.

3    I'm not for sure about that.  But I've seen a red one.

4    They had different cars at different times, you know.

5    Usually give a piece of crack cocaine to someone, you

6    can get their car for so many hours or something.

7    Q.    You didn't see what started this argument?

8    A.    No.

9    Q.    You didn't see what ended the argument --

10   A.    No.

11   Q.    -- except for the gunshot?

12   A.    No.

13   Q.    Did you see Mr. Radcliffe fall down?

14   A.    No.

15   Q.    Could you tell whether he was standing up or

16   sitting down or could you tell at all?

17   A.    No, not really.

18   Q.    Was his car door opened or shut, could you tell?

19   A.    The door, I think, was opened.

20   Q.    After you called the police, I believe they told

21   you that somebody had already called in?

22   A.    Yes.

23   Q.    Where did you go then?  Did you go home?

24   A.    I went down Douglas -- back down Douglas Street,

25   and I let them know that the truck was in the field,
```

J.A. 2141

225

```
 1   that it was a shooting.  And when I came back through,
 2   that's when the law and everybody were there.
 3   Q.    And did it come a time that you went and talked to
 4   Mr. Best, Ricky Best?
 5   A.    Yes.  I volunteered myself.  I talked to a police
 6   officer and he gave me the number of Mr. Best.
 7   Q.    Did you get any money?
 8   A.    No.  I have not received any money.
 9   Q.    Applied for any money?
10   A.    No.
11   Q.    You want any money?
12   A.    Everybody want money but not for this case, you
13   know.  I volunteered to come forward.
14   Q.    You admit you didn't call in as one of the secret
15   people.  You went directly --
16   A.    I went to Mr. Best.
17   Q.    You got anything -- you have any hard feelings
18   against Dantae Sharpe for any reason?
19   A.    No.  I just feel like nobody deserved to die, not
20   because of drugs anyway.  Not if that person hasn't done
21   anything to you.
22   Q.    So from where you saw it until -- you didn't see
23   the truck -- when you first saw the truck, you didn't
24   see it move again?
25   A.    No, I didn't.
```

Sharpe 000226

J.A. 2142

226

```
 1   Q.    And when you came back was when you saw it up in
 2   the field?
 3   A.    Yeah.  When I came back through, it was parked in
 4   the field.
 5   Q.    All right.  Thank you, Ms. Stokes.
 6   A.    Uh-huh.
 7              THE COURT:  Cross-examination.
 8   CROSS-EXAMINATION BY MR. STOKES:
 9   Q.    Ms. Stokes, about what time was it when you saw
10   all of this?
11   A.    I don't know.  I don't remember.
12   Q.    Could it have been as early as 8 p.m. on that
13   night?
14   A.    I don't remember.
15   Q.    Don't remember the time at all?
16   A.    No.  Like I said, I was just out that night.
17   Q.    On a cold drizzling night you were out wandering
18   around?
19   A.    It might of been cold.  Like I said, I was on
20   drugs.  Usually you don't care what kind of weather it
21   might be.
22   Q.    So you were doing drugs that night?
23   A.    I was doing drugs.
24   Q.    You were under the influence of what kind of drugs
25   that night?
```

227

```
 1   A.    I don't know at that time that I was high or not.
 2   But I was saying I usually do drugs, you know.  I
 3   usually buy drugs.  But I don't remember whether I was
 4   high or not, but I know what I saw.
 5   Q.    You could have been high as a kite out there, huh?
 6   A.    Could have been, but I know what I saw.
 7   Q.    How many people deal drugs -- were dealing drugs
 8   in that area between 6th, 14th, 5th back during that
 9   period of time all out there on the streets, you reckon?
10   How many dealers were there hanging out on those
11   streets?
12   A.    I don't know.
13   Q.    Less than five?
14   A.    I don't know.
15   Q.    Many as 40?
16   A.    I don't know.
17   Q.    But you were out there every day?
18   A.    But I don't keep a number on how many drug dealers
19   be out on the street.
20   Q.    And you can't give me an estimation?
21   A.    No, I can't.
22   Q.    Now, who do you live with on Douglas Street?
23   A.    I live with a friend of mine that I was living
24   with.
25   Q.    Do you still live on Douglas Street?
```

Sharpe 000228

J.A. 2144

228

```
 1   A.     No, I do not.

 2   Q.     Where do you live now?

 3              MR. EVERETT:  Objection.

 4              THE COURT:  Sustained.

 5   BY MR. STOKES:

 6   Q.     Who do you live with now?

 7              MR. EVERETT:  Objection.

 8              THE COURT:  Sustained.

 9   BY MR. STOKES:

10   Q.     How old are you, ma'am?

11   A.     I'm 27 years on.

12   Q.     Do you own an automobile?

13   A.     No.

14   Q.     What do you do now?

15   A.     Nothing but take care of my two kids.

16   Q.     Have you worked at a -- at regular employment

17   since February 11, 1994?

18   A.     Yeah.  If you consider being out in the tobacco

19   field, yes.

20   Q.     Only during the summer in the tobacco.  Is that

21   the only job you've had since February of '94?

22   A.     I did some private duty as far as clean-up help

23   through my sister's friends, housekeeping.

24   Q.     For some of your sister's friends?

25   A.     Through some friends of hers.
```

J.A. 2145

229

1    Q.    Okay.  Now, you knew and still know that there

2    were some rewards offered for information in this case?

3    A.    No, I did not.

4    Q.    Well, now, you walked up -- after this date, you

5    walked up and down Sheppard Street a whole bunch, didn't

6    you?

7    A.    After this date?

8    Q.    Yes, ma'am.

9    A.    I walked lot of places after that day.

10   Q.    Well, I'm asking specifically Sheppard and 6th

11   Street.  Did you walk pass that old garden after that

12   day?

13   A.    I sure did.  Still remember everything that

14   happened.

15   Q.    You didn't see that great big sign out there in

16   the garden with Crime Stoppers offering a $2500 reward?

17   A.    That's not the point of the money.

18   Q.    Did you see --

19   A.    But what somebody done; somebody got killed.

20   Q.    Did you see the sign?

21   A.    No.  I have not seen that sign, okay?

22   Q.    You think all of this is funny?

23   A.    No, I don't think it's funny.  It seems like

24   you're making a big deal out of something, asking me

25   silly questions.

Sharpe 000230

J.A. 2146

230

```
 1   Q.    My questions seem to be simple to you.

 2   A.    Yes, they do.

 3   Q.    Did Mr. Everett's questions seem to be silly to

 4   you?

 5   A.    No.  He was getting to --

 6              THE COURT:  Sustained.

 7   A.    -- the point.

 8   BY MR. STOKES:

 9   Q.    Now, you say that there was a lot of people

10   bunched up together around this truck?

11   A.    Well, on the side of it, you know.

12   Q.    On the side of it.  How many people are we talking

13   about is a lot of people?

14   A.    About five.

15   Q.    About five?

16   A.    About four.  Four or five.

17   Q.    Four or five people.  And how far were you from

18   the truck?  Can you pick out something in the courtroom

19   that you could use to tell us in distance how far you

20   were from that truck?

21   A.    About as far as the clock.  I guess just a little

22   farther.

23   Q.    The back of the courtroom or a little bit farther?

24   A.    Yes.  From where I was standing from where the

25   truck was, yes.
```

231

```
 1   Q.    Now, those blocks in that area are short blocks,

 2   aren't they?  They're not as long as a regular block,

 3   are they?

 4   A.    No, they're not.

 5   Q.    So you would have been standing just about halfway

 6   of one of these short blocks from the truck?

 7   A.    I was at that corner.

 8   Q.    Would you step down and point on the board which

 9   corner you were at?

10   A.    I was at this corner right here.  That's the

11   garden.  I was coming up this street.

12              MR. STOKES:  May I approach the board?

13              THE COURT:  Yes, sir.

14   BY MR. STOKES:

15   Q.    And do you know this street to be Sheppard Street

16   right here running into 5th Street down here?

17   A.    That's right.

18   Q.    And is this -- if this is the garden right here

19   where these little dotted lines are --

20   A.    Uh-huh.

21   Q.    -- and would you take this blue piece of chalk and

22   make a little point on the board about where you were in

23   relation to that intersection?

24   A.    I was right here in the corner.  This is the

25   church.  The church is right there.
```

232

1   Q.    Okay.

2   A.    Coming down this way, I was right here.  I stopped

3   because this is the Street where it happened.   That's

4   the garden.

5   Q.    This is 6th Street?

6   A.    Yeah.

7   Q.    Was the truck in the middle of the intersection?

8   A.    Yes.  It was in the middle of the street.   I can't

9   tell you exactly where the truck stopped unless I take

10  you to the scene of the crime.  You see what I'm saying?

11  Q.    Yes, ma'am.  You may have a seat back up there.

12  So if this is the truck here -- can you see where I'm --

13  where this rectangular area with the triangle on the end

14  of it is?  Right there?

15  A.    Uh-huh.

16  Q.    If that was the truck, you would have been

17  standing beside it where you put your mark, right?

18  A.    Yes.  If the truck was there, yes.

19  Q.    Are you saying that the truck was back this way

20  towards McKinley Avenue or this way towards 14th Street?

21  A.    It was towards 14th.

22  Q.    And which way was the front of the truck facing?

23  A.    It was facing this way.

24  Q.    Towards 14th?

25  A.    14th.

Sharpe 000233

J.A. 2149

233

```
 1    Q.    And you stopped and watched what was going on?

 2    A.    Yes, I did.

 3    Q.    And were they standing on the driver's side of the

 4    truck or the passenger's side, the group of people?

 5    A.    They wasn't all bunched up there at the door, the

 6    driver's door.  It was mainly him, Dantae.  You know,

 7    they were there at the truck, but they won't all of them

 8    bunched up like they ganging him.

 9    Q.    All right.  Where were they all standing in

10    relation to the truck?

11    A.    Just right by the truck, you know.  All I can say

12    is right there at the truck.  But I can't tell you

13    exactly where they were standing.

14    Q.    But you just happened to remember exactly where

15    Dantae was standing?

16    A.    That's right.  Any two times, you know, somebody's

17    in an argument you're not going to argue way cross town,

18    you know what I'm saying, and shoot nobody way cross

19    town.

20    Q.    Was the white man facing you or was his back to

21    you?

22    A.    I don't remember.

23    Q.    So you don't remember whether Dantae was facing

24    you or his back to you, do you?

25    A.    You asked me about the man.
```

234

```
1    Q.    I understand.  I'm asking you about Dantae now.
2    Do you remember whether he was facing you or his back
3    was to you?
4    A.    He was facing my way because I saw the spark of
5    the gun, you know.
6    Q.    But Dantae, you could see him because he was
7    facing you?
8    A.    Yes.
9    Q.    But you don't remember where the white man was
10   standing or sitting --
11   A.    I remember where the white man was standing.  But
12   you asked me which way he was standing.  I don't know
13   which way he was standing.
14   Q.    Which way was Marciana standing?
15   A.    I don't remember.
16   Q.    Okay.  Now, who else did you say was out there
17   other than Marciana and Dantae?
18   A.    Mark Joyner; this girl named Lisa, Candice or
19   Candy.  They call her something like that.
20   Q.    Do you remember which way and where Mark Joyner
21   was standing?
22   A.    No, I do not.
23   Q.    Do you remember which way Lisa was standing?
24   A.    No, I do not.
25   Q.    Do you remember which way Candice was standing?
```

235

1    A.    No.  Not which way they were standing, but they

2    were standing by the truck.

3    Q.    Were they all standing on the driver's side.

4    A.    No.  I mean, it was a lot of confusion.  I don't

5    recall.  Usually when you see two people arguing and

6    stuff, you're looking at those two people.  You're not

7    really worried unless everybody is in a fight, you know.

8    Q.    And you say that Dantae is the only one of the

9    group that you remember which way he was standing?

10   A.    When it came down to a gun being fired, yes, I do.

11   Q.    And when the gun was fired, what did this whole

12   group of people do?

13   A.    Everybody scattered, and I scattered too.

14   Q.    Did the white man scatter too?

15   A.    How could he, if I say that he shot him?

16   Q.    Did he shoot him in the chest or the back?

17   A.    I don't know.  Can't tell where a bullet go.

18   Could you?  Unless I was standing right there in front

19   of the bullet I would know, wouldn't I?

20   Q.    If you don't know where the white man was

21   standing, how can you be so sure he was shot right then?

22   A.    You could tell.  I told you he was standing right

23   there at the truck.  But I don't know which way.  You

24   asked me which way he was standing.

25   Q.    So the only thing you really remember for sure is

236

1    that the truck was out there on 6th Street and there was

2    a bunch of people around it, including Dantae and these

3    other people and a white man, that Dantae was the only

4    one you remember where he was standing and he had a gun

5    and fired it?

6    A.    Yeah, I remember it.  Yeah.  When two people are

7    arguing, yes.

8    Q.    And you don't even remember where the white man

9    fell, went or anything else?

10   A.    No.  Once I saw the flare of the gun, you know,

11   shoot, and the noise scared me, I left.  I don't know

12   which way he fell or what, you know.  I just left.

13   Q.    When did you talk to Mr. Best?

14   A.    I don't remember what day I started talking with

15   him.

16   Q.    You remember what month?

17   A.    I don't recall.  We've been keeping up with each

18   other, you know, since that has happened.

19   Q.    Well, I mean, the first time that you talked to

20   him?

21   A.    I don't remember the date.

22   Q.    Could it have been as short as a week after this

23   happened?

24   A.    No.  I'm not for sure.  I doubt it was a week.  I

25   don't remember.

Sharpe 000237

J.A. 2153

237

1   Q.   It wasn't that same night, was it?

2   A.   No.  I did not talk to Mr. Best that same night,
3   no.

4   Q.   You saw the truck later on in the garden with all
5   the police out there and everything else?

6   A.   Uh-huh.  And I did not go forth then, no.

7   Q.   And you didn't bother to tell the police that you
8   knew who did it that night; is that right?

9   A.   That's right.

10   Q.   And yet you testified you're up here as a
11   good-hearted citizen?

12   A.   I told -- I came up later on.  I was mainly
13   scared.

14   Q.   You came up later on after you found out there was
15   some money involved and you could make some money?

16   A.   No.

17   Q.   Now, you were unemployed using cocaine on a daily
18   basis; is that right?

19   A.   At that time, yes.

20   Q.   And how were you paying for your cocaine, with
21   sex?

22   A.   I don't think that's none of your business.

23   Q.   Well, I'm asking you, ma'am.

24   A.   To be honest with you, you know, it seems like
25   you're getting in my personal business, and I do not

238

1   want to answer no questions like that.

2   Q.    Did you use sex to get cocaine?

3             MR. EVERETT: Objection. Irrelevant.

4             THE COURT: Sustained.

5   BY MR. STOKES:

6   Q.    Now, did you ever personally write out a statement

7   of what happened that night in your own handwriting?

8   A.    I don't remember writing a statement. I remember

9   telling what happened over and over again.

10  Q.    But you don't ever remember sitting down and

11  taking a pen or pencil and writing it out on a piece of

12  paper?

13  A.    No, because it has been going -- this case has

14  been going on for a while. No, I don't.

15  Q.    And how many times have you talked with Mr. Best

16  about what happened?

17  A.    At least three or four times I talked with him.

18  He's been trying to get in touch with me over the phone,

19  but at different times I couldn't reach him.

20  Q.    Ms. Stokes, have you ever been convicted of a

21  crime that carries more than 60 days imprisonment in

22  your life?

23  A.    You consider disorderly conduct, paraphernalia.

24  Q.    Is that all?

25  A.    And a check, writing a check.

239

```
 1   Q.   One worthless check?

 2   A.   Yes.

 3   Q.   Is that all?

 4   A.   That's all.

 5   Q.   Okay.  And you've been out on that block selling

 6   drugs yourself, haven't you?

 7   A.   I never sold any drugs.

 8   Q.   Just used?

 9   A.   Just used them.

10   Q.   Now, did you tell Mr. Best that Marciana, Mark

11   Joyner, Lisa and Candice were also out there?

12   A.   Yes.  That's what I said.

13   Q.   The white man was outside the truck or inside the

14   truck when the gun went off?

15   A.   He was outside the truck.

16   Q.   And the last thing you remembered is everybody

17   left and he was still outside the truck?

18   A.   I don't know.  I don't know, you know, whether he

19   got in the car -- truck or not, you know.  I ran just

20   like everybody else.

21   Q.   And you don't remember -- when you first talked to

22   Mr. Best was in February or March or how long after this

23   night?

24   A.   I don't exactly remember, no.

25   Q.   Well, do you recall when you received the feeling
```

**J.A. 2156**

240

1  that you should come forward and be a good citizen and

2  report all of this?

3  A.   Excuse me?  Say that again.

4  Q.   Do you recall when you got the feeling that you

5  wanted to be a good citizen and come and report all this

6  and contact the police?

7  A.   It's been a while back since I have talked to the

8  police.

9  Q.   Do you recall when it was?

10  A.   No.  Not that exact day or night, no.

11  Q.   So when you called the police, did you give them

12  your name?

13  A.   Yes.  I talked to the police.

14  Q.   That night, to report it?

15  A.   No.  Not the night that it happened, no.

16  Q.   That's not what I'm talking about.  Did you --

17  A.   I talked to them to get some help over in that

18  area, but I didn't say my name.

19  Q.   You didn't give them your name that night but you

20  called them?

21  A.   No.  I didn't feel like it was -- I was trying to

22  be helpful.  Just call the law.

23  Q.   You say you went back through and the truck was in

24  the field and everybody was gone and nobody was around

25  it?

J.A. 2157

241

1   A.    Nobody was around it.  And that truck was not in

2   that field at that time.

3   Q.    Did you see it in the field before the police got

4   there?

5   A.    Yes.  It was in the field before they came.

6   Before I could even come back up the street, because I

7   went back on Douglas and I came back and there was the

8   police and everybody.

9   Q.    Which way did you run when you ran?

10  A.    Towards 14th Street -- 5th Street.

11  Q.    Towards 5th Street?

12  A.    Yeah, towards Hannah's store.  But I went around.

13  Because the incident happened, you know, you could have

14  took that street, you know, to get to Hannah's, but I

15  went around to get to the store.

16  Q.    Did you go to Hannah's?

17  A.    Yes.  I went to Hannah's store and used the phone.

18  Q.    You know Charlene Johnson?

19  A.    Yes, I do.

20  Q.    You see Charlene that night in Hannah's?

21  A.  -  No.  I didn't see her.

22  Q.    Was she in Hannah's that night that you saw her,

23  that you remember?

24  A.    No.  I don't remember.  I mean, I just don't.

25  Q.    Do you remember seeing her at all that night?

242

```
 1    A.    I don't remember her.  I used to see her all the

 2    time, and she used to work there a little bit.

 3    Q.    How long did you stay up at Hannah's?

 4    A.    I don't remember.

 5    Q.    Can you give me your best estimate?

 6    A.    No, I can't.  Oh, yes, I can.  I didn't stay long.

 7    Because like I said, I went back through, and I saw the

 8    truck in the field.  So I didn't stay long.

 9    Q.    Where did you call from?

10    A.    Hannah's store.

11    Q.    Did you tell the people that worked there what you

12    had seen?

13    A.    No.  I said it's some shooting, get the police

14    over here.  It was some shooting that happened.

15    Q.    So you asked them to call and get the police?

16    A.    No, I called.

17    Q.    Did you use their phone or is there a pay phone

18    there?

19    A.    It's a pay phone.

20    Q.    And you used the pay phone to call?

21    A.    ' Yes, I did.

22    Q.    Do they have their own personal phone behind the

23    counter in Hannah's that you know of?

24    A.    Yes.  They always did have one.

25    Q.    But you used the pay phone even though you walked
```

J.A. 2159

243

1    in and said there's been some shooting?

2    A.    They don't let you use the phone whether you say

3    that your own mother is sick or not.  They don't let you

4    use the phone.  They just don't.

5    Q.    You went in there and said, "Get the police.

6    There's been some shooting"?

7    A.    One time I was sick myself and didn't get no help,

8    they didn't let me use the phone.  So I knew not to do

9    that, you know.

10   Q.    Well, when you walked into Hannah's, did you know

11   the people?

12   A.    I didn't walk in Hannah's that night.  I used the

13   phone outside.

14   Q.    Didn't you just earlier just a couple of minutes

15   ago say that you went in there and said, "Get the

16   police, there's been some shooting"?

17   A.    No.  I did not say that.

18   Q.    You didn't just say that?

19   A.    No, I did not just --

20   Q.    You never went into Hannah's store at all that

21   night?

22   A.    I don't know whether I went into the store earlier

23   that night or not.

24   Q.    Could this have been as late as 11:30 or 12:00?

25   A.    I don't remember what time it was.

Sharpe 000244

**J.A. 2160**

244

```
 1   Q.    It could have been 2 a.m. in the morning as far as

 2   you know, couldn't it?

 3   A.    It could have been four or 5:00 in the morning, I

 4   don't remember.

 5   Q.    You remember whether it was in darkness or in the

 6   daylight?

 7   A.    It was in the darkness.  It wasn't broad daylight.

 8   Q.    As a matter of fact, there's a whole lot of this

 9   you don't remember, isn't it?

10   A.    It sure is.

11   Q.    Just a few things you remember; isn't that right?

12   A.    That's right.  The main things anyway.

13   Q.    And they're the things that's going to get you the

14   reward money, aren't they?

15   A.    Whatever you say.  Are you giving me any?

16              MR. STOKES:  I don't have any further

17   questions, Your Honor.

18              THE WITNESS:  Thank you.

19              MR. EVERETT:  No further questions, Your

20   Honor.

21              THE COURT:  Thank you.  You may step down.

22              Members of the jury, let's take our

23   afternoon recess at this time.  Remember my prior

24   admonitions to you.  We'll be in recess for 15 minutes.

25              THE COURT:  Detective Ricky Best.
```

Sharpe 000245

**J.A. 2161**

245

1                        ********

2    D.R. BEST, being first duly sworn, was examined and

3    testified as follows during DIRECT EXAMINATION by

4    MR. EVERETT:

5    Q.    State your name for the Court.

6    A.    D. R. Best.

7    Q.    And where are you employed?

8    A.    The Greenville Police Department.

9    Q.    And in what capacity?

10   A.    I'm a detective assigned to the major crimes unit.

11   Q.    Mr. Best, were you involved in the investigation

12   into the death of the George Radcliffe back on February

13   11, 1994?

14   A.    Yes, I was.

15   Q.    And what was your status in regard to that

16   investigation?

17   A.    I was not involved initially but several days

18   later was asked to assist Detective Melvin with the

19   investigation.

20   Q.    Now, Mr. Trochum, the forensic firearm examiner,

21   testified that you sent him a gun at some point in time?

22   A.    Yes, sir, I did.

23   Q.    Where did this gun come from?

24   A.    From the Farmville Police Department.

25   Q.    And why did you send it?

246

1    A.    Because of who it had been taken off of.

2    Q.    It was a .45 weapon?

3    A.    Yes, it was.

4    Q.    And what is your normal practice when you receive

5    a gun that is the same type as you're looking for in

6    this type of case?

7    A.    When I found out the gun was there, I wanted it to

8    be checked.  They had no problem with it being checked.

9    So I called them up and asked for permission to send it

10   to the State Bureau of Investigation lab to have it

11   compared to this case.  They agreed.

12   Q.    That gun was not taken off the defendant?

13   A.    No, it was not.

14   Q.    Or none of his family?

15   A.    No, sir.

16   Q.    And really was found to have no connection with

17   this case?

18   A.    That's correct?

19   Q.    That was the early stages of investigation.  At

20   that point you had not been -- no arrest had been made?

21   A.    An arrest had been made but the gun had not been

22   found in this case.

23   Q.    And you still haven't found the gun?

24   A.    Still have not.

25   Q.    Now, when you began your investigation into this

247

1  matter, what did you do?

2  A.    I was apprised of the investigation on February 15

3  by Detective Melvin and others.  She and I went back out

4  to the crime scene, started knocking on doors.

5  Q.    Did you knock on doors down 6th Street?

6  A.    From the dead end of 6th Street all the way down

7  to Ford Street, Sheppard Street, from 5th to Douglas,

8  same way on McKinley, same way on Roosevelt.

9  Q.    I believe you talked to Mr. Vines?

10  A.    Yes, we did.

11  Q.    Were you able to get any other cooperation from

12  any of the other people that you talked to at any of

13  these houses?

14  A.    The few people that would answer their door either

15  said, "We don't know anything, didn't see anything" or

16  "We're afraid, we're not getting involved."

17  Q.    While you were out on this day -- that was what,

18  the 15th?

19  A.    February 15.

20  Q.    Did you, in walking the street, observe shell

21  casings on the ground?

22  A.    There was a lot of shell casings near the corner

23  of Roosevelt and 6th.  There were several along 6th

24  Street all the way down to 14th Street.  The most we

25  found were .9mm casings.  I think there was one .22, but

248

```
 1   most of them were .9mm casings.

 2   Q.    Is it uncommon to find casings in this area?

 3   A.    Not at all.

 4   Q.    Of all types of weapons?

 5   A.    Of all types.

 6   Q.    Did it come a time that you spoke with Charlene

 7   Johnson?

 8   A.    Yes, there was.

 9   Q.    When did you speak with her?

10   A.    April 7, 1994.

11   Q.    And were -- how were you put in contact with

12   Ms. Johnson?

13   A.    Through a uniformed police officer.

14   Q.    Did she seek you out?

15   A.    Not necessarily myself.  The police officer knew

16   that myself and Detective Melvin were investigating, and

17   I don't know where she was at the time.  She may have

18   been out that day or something, but he contacted me, the

19   day before.  Afterward is when we got the information.

20   And Detective Melvin and myself on April 7 went looking

21   for Ms. Johnson.

22   Q.    The officer contacted you to get in touch with

23   her?

24   A.    Yes.  I thought I remembered Ms. Johnson from

25   having spoken with her on Chestnut Street.  But after we
```

Sharpe 000249

**J.A. 2165**

249

1   found Charlene Johnson, I found out that I remembered

2   Candice Johnson and not Charlene.

3   Q.   And you remember how old Charlene was at that

4   time?

5   A.   14.

6   Q.   And she was living where?

7   A.   She was living with her mother at 826 Fleming

8   Street.  However, when we got to Fleming Street she was

9   not there.  But someone in the neighborhood knew where

10  she might be, visiting a friend around the corner, a

11  couple of blocks, and we went to that house.  Detective

12  Melvin got out and knocked on the door and she was

13  there.

14  Q.   And did you talk with her?

15  A.   Yes.  As I said, when she came out the door, I

16  didn't think that was her, so I told Detective Melvin

17  that's not her.  And she said, "I'm Charlene Johnson."

18  We brought her to the police department, the Brown

19  Building, where we interviewed her.

20  Q.   When you talked with her, describe her emotional

21  state?

22  A.   She started crying once she got in the police car

23  and pretty much cried and sobbed the whole time she was

24  with us.  She was very emotionally upset.  She kept

25  telling us how afraid she was.  And she had been having

**J.A. 2166**

250

1   some problems at home not wanting to stay at home

2   because of the fact this case was bothering her, she

3   said.

4   Q.    Did she ask for any money?

5   A.    No, sir.

6   Q.    Did she inquire about the possibility of her

7   getting money?

8   A.    No, sir.

9   Q.    Now, Crime Stoppers, you don't have to come in and

10  interview, do you?

11  A.    No, sir.  Most of the time the Crime Stoppers'

12  moneys are initiated by a phone call.  On this incident

13  she never asked for any money.  I asked for money for

14  her.

15  Q.    But normally Crime Stoppers, you call in and get

16  your money and nobody never knows who you are?

17  A.    That's correct.

18  Q.    On this occasion when you first talked to her, did

19  you mention any possibility of getting any money or any

20  reward money?

21  A.    She never mentioned getting any money.  Sergeant

22  Jackson, the best of my recollection, spoke with her

23  less than a minute.  I wanted her to have some money.

24  The money wasn't paid until a lot later than the day we

25  talked to her, some one or two three weeks later.  The

Sharpe 000251

**J.A. 2167**

251

1   reason I wanted her to have that money, first of all,

2   because she talked, being afraid.  Second of all because

3   of her home life.  At the time we talked to her, her

4   lights were turned off; she had no money for school

5   clothes, no father figure in the home.

6   Q.    Did you -- the money that you got for her, did she

7   in any way initiate your getting her some money?

8   A.    I did that myself.

9   Q.    Did she in any way --

10  A.    She did not.

11  Q.    Did she speak of any reward funds she knew of from

12  SCLC or Fountain Power Boats?

13  A.    She did not.

14  Q.    And since that time has she mentioned to you

15  anything about getting money from any of these reward

16  funds?

17  A.    No.  We got her the $500 from Crime Stoppers.  As

18  far as I know -- and I'm sure SCLC has never paid any

19  money to anyone in this case.  Fountain Power Boats, I

20  don't know where the information came from, but they

21  told me they were not offering any reward money.

22  Q.    So whatever has been said in this trial is

23  absolutely not true?

24  A.    I know of no reward money offered by Fountain

25  Power Boats.

252

1   Q.   All right.  What did she tell you on --- what day

2   was it?

3   A.   April 7.

4   Q.   What did she tell you on April 7?

5   A.   Can I read her statement?

6   Q.   Yes.

7   A.   That's pretty much what she told us.  February 11,

8   1994" -- excuse me.  "I was walking down on 14th Street

9   on my way to the Lucky Spot.  I stopped at the stop sign

10  and I" -- she got "so" -- "Dantae and a white male and

11  Mark Joyner -- Dantae was about to sell that white man a

12  rock, but he only had $18.  Dantae said, 'I can't do it.

13  You have to have the money straight up.'  And the white

14  male said, 'Fuck you, man.'  Dantae pushed him, and then

15  he pulled out a gun and shot him."  And then she signed

16  her name, 4-7-94, 1:30 p.m.

17          And then she came back and wrote, "Also

18  Dantae moved the truck and ran it in the field.  And

19  Mark and Dantae picked up the white male and put, from

20  where he got shot, in the truck and Dantae throw the

21  keys and the gun somewhere.  And Mark and Dantae split

22  up and met each other and got into a red Escort."  And

23  then she signed it again and dated it four minutes

24  later.

25  Q.   Now, since she gave that statement, have you

**J.A. 2169**

253

1    talked with her on occasion?

2    A.    Yes, sir.

3    Q.    And have you tried to emphasize the importance of

4    telling the truth?

5    A.    Yes, sir.

6    Q.    And has she ever waivered from that statement?

7    A.    No, sir.

8    Q.    She ever say anything other than that's how it

9    happened?

10    A.    No, sir.

11    Q.    Did you tell her that she would have to testify?

12    A.    Yes, sir.  And she was very afraid about that.

13    Q.    When did you first talk with -- or did you in fact

14    talk with Beatrice Stokes?

15    A.    Some time in the -- around the middle of May 1994.

16    Q.    How did you know her?

17    A.    She had been a victim in one of my cases earlier

18    in the year.  I guess I got to know her pretty well.

19    And I was contacted that she had been looking for me, so

20    I started looking for her.

21    Q.    And when did you find her?

22    A.    Some time maybe a week after I got the information

23    that she was looking for me.  I was riding over on the

24    west side of town, Douglas Avenue, saw her standing at

25    a house on Douglas Avenue, and she saw me, and we pulled

J.A. 2170

254

1   around the corner.

2   Q.   Did you talk with her?

3   A.   Yes, sir.  She made me leave the area.  She was

4   scared.  She laid down in the back seat of the car.

5   She wanted to leave.

6   Q.   Where did y'all go?

7   A.   Out behind the Quadrangle, my recollection, out

8   near the hospital area.

9   Q.   And what did she tell you?

10  A.   She said her conscience had been beating her and

11  that she wanted to tell about what happened to that

12  white man that got shot at the corner of 6th and

13  Sheppard; that she knew that I was investigating it,

14  that I had been nice to her and that she wanted to get

15  it off her conscience so she could sleep.

16  Q.   And what did she tell you?

17  A.   That she was using a lot of cracks.  On this night

18  she smoked crack early in the night at a house on

19  Douglas Avenue.  Sat there for a while and didn't have

20  any more money and she decided to go home.  She left the

21  house on Douglas and walked down -- turned up Sheppard.

22  As she got just near the garden, which is across the

23  street from that garden, which is diagonally across the

24  street from where Mr. Vines lives, that she heard an

25  argument.  She looked up, she saw Dantae Sharpe, Mark

Sharpe 000255

J.A. 2171

255

1    Joyner, and a girl named Lisa, a girl named Candice and

2    Marciana. And that Dantae was arguing very loudly with

3    a white man. That it appeared to be over drugs. That

4    she saw Dantae pull a gun, fire it. She got scared and

5    ran.

6    Q.    Did she ask you for any help in getting any reward

7    money?

8    A.    She's never asked me for a penny.

9    Q.    And has she filed any claims at Crime Stoppers?

10   A.    As of this morning when I checked with Sergeant

11   Jackson, he knew of none but only one person had been

12   paid. He would not know the name, but only one person

13   had been paid by the file number in this investigation

14   and that was the $500.

15   Q.    And at any time did she ask you to help her get

16   any money for cooperation?

17   A.    No, sir. Her statement to me was the same as it

18   was today in court. Her conscience was beating her,

19   that she wanted to do what was right.

20   Q.    Why did she -- did she say why she waited so long?

21   A.    She's scared to death.

22   Q.    And since that time have you talked to her on

23   occasion?

24   A.    Occasionally I have tried to keep in contact with

25   her. It's been kind of hard because she doesn't want to

Sharpe 000256

J.A. 2172

256

 1  stay at the same place all the time.  But yes, I've made

 2  contact at least three or four times?

 3  Q.    Has she ever indicated to you that she wanted to

 4  change her story or that she wasn't telling the truth?

 5  A.    She's never waivered from the first statement.

 6  Q.    Now, are you familiar with the defendant Dantae

 7  Sharpe and where he lives?

 8  A.    Yes, I am.

 9  Q.    Are you familiar with this area around Sheppard

10  Street and 14th Street?

11  A.    Yes, sir.

12  Q.    Have you ever seen Mr. Sharpe there?

13  A.    Yes, sir.

14  Q.    Prior to this homicide?

15  A.    Many times.

16  Q.    Where have you seen him?

17  A.    The times that I've seen him was the corner of

18  Roosevelt, McKinley, between those two blocks on 6th

19  Street, standing on the corner with his two brothers and

20  his cousin and several others.

21  Q.    Have you ever seen Mark Joyner in this area?

22  A.    Yes, I have.

23  Q.    Have you ever seen Marciana in this area?

24  A.    All the time.

25  Q.    Have you tried to talk with Marciana about this

Sharpe 000257

J.A. 2173

257

1   incident?

2   A.    I tried.

3   Q.    Would he cooperate with you?

4   A.    Not at all.  All he wants is his coat.

5   Q.    And at this point, Mr. Best, just to clear it up

6   further, have you offered any reward or promise of

7   reward to anyone in this case to testify or give you

8   information?

9   A.    No, sir, I have not.

10  Q.    Thank you, sir.  Your witness.

11          MR. STOKES:  May I proceed, Your Honor?

12          THE COURT:  Yes, sir.

13  CROSS-EXAMINATION BY MR. STOKES:

14  Q.    But, now, Crime Stoppers did offer a reward, did

15  they not?

16  A.    From day one, yes, sir.

17  Q.    And they put a sign out there in that garden area

18  stating that there was a reward?

19  A.    That's correct.

20  Q.    And both of these women can file for this reward

21  if there is a conviction in this case once it's over,

22  can't they?

23  A.    That's something you might better ask Sergeant

24  Jackson.  My understanding is that the first horse at

25  the trough drinks, so to speak.  The first person that

258

1    calls in with the information gets the reward money if

2    there is reward money.  I don't know that there's going

3    to be any more.  I don't think there will be.

4    Q.    But you don't know?

5    A.    I don't know.

6    Q.    Now, you are the officer who brought Charlene

7    Johnson and Beatrice Stokes -- it was your doing that

8    got both of them up here, wasn't it?

9    A.    I don't quite understand your question.

10   Q.    But for your talking to them and helping them

11   along emotionally, or however, it was your effort --

12   don't you believe that it was -- your efforts was the

13   reason they came up here and testified?

14   A.    No.  I think it was a combination of my efforts

15   and Detective Melvin's efforts.  We both have been in

16   contact quite a lot with Charlene.  Beatrice's part, I

17   don't think Detective Melvin ever talked to her.

18   Q.    But on Charlene, it was both of you.  And

19   Beatrice, it was just you that talked with her?

20   A.    That's a fair statement.

21   Q.  .  And you believe both of those stories to be

22   credible and true, do you not?

23   A.    Yes, sir, I do.

24   Q.    And did you at some time discover that

25   Mr. Radcliffe through your investigation was down in

259

1   that area to purchase illegal drugs?

2   A.    Probably so, yes, sir.

3   Q.    That at least that was your best information you

4   could get or gather?

5   A.    Yes, sir.

6   Q.    And, Mr. Best, down in this area between Roosevelt

7   and 14th down there by Hannah's store and back up on 5th

8   back during 1994, the early part of 1994, approximately

9   how many people, male or female, would you consider to

10  be drug dealers hung out on those streets right in that

11  little area?

12  A.    I don't know of any that hung out between Sheppard

13  and Roosevelt, because of the information on the street

14  that is the Sharpe territory.  On the Sheppard Street

15  area back a block.  But from 6th and Sheppard to 6th and

16  Roosevelt, our information on the street belonged to the

17  Sharps and you didn't cross it.

18  Q.    When you say a lot of drugs dealers hung out in

19  that area, you're talking about how many, estimate?

20  A.    I don't know that I can.  I can say a lot.

21  Q.    _ Big bunch of people?

22  A.    Yes, sir.

23  Q.    Dantae Sharpe has a reputation for being a drug

24  dealer, does he not?

25  A.    Yes, sir, he does.

260

```
 1   Q.    He sells cocaine?

 2   A.    Yes, he does.

 3   Q.    And that was his reputation at the time and you

 4   knew that reputation?

 5   A.    Yes, sir.

 6   Q.    Now, did you know whether or not Mark Joyner had a

 7   reputation for selling cocaine?

 8   A.    I knew that he'd been hanging with the "Sharpe

 9   brothers" and cousins for a while.  But as far as

10   actually hearing he was a dealer, I can't say anything.

11   Q.    How about Marciana?

12   A.    Marciana mostly robs people.  He goes out, gets in

13   the car with people to buy drugs for them and he usually

14   takes their money.

15   Q.    Does he do it with a firearm when he does it

16   sometimes?

17   A.    No, sir.

18   Q.    So Marciana is a robber more than a drug dealer?

19   A.    I would call him an embezzler because he gets in

20   the car with the people who can't buy the drug

21   themselves.  And he's a booster.  I guess that's a good

22   word.  He goes out and buys the drugs for them to bring

23   back to them, and nine out of ten dimes he'll run off

24   with their money.

25   Q.    And don't show back up?
```

261

```
1    A.    That's correct.

2    Q.    Now, these two, Beatrice Stokes and Charlene

3    Johnson, would you consider them to be, quote, street

4    people?

5    A.    Charlene no.  She's had her problems.  But she is

6    14 or 15 years old.

7              MR. EVERETT:  Your Honor -- Judge, can I

8    approach the bench?

9              (Side-bar conference.)

10             THE COURT:  Now, Mr. Bailiff, I want you to

11   post one of the deputies back here behind the jury box

12   and if you hear anybody talking, snickering or

13   laughing, bring them up to me and I'll take care of it.

14             All right.  You can go ahead.

15             MR. STOKES:  Thank you, Your Honor.

16   BY MR. STOKES:

17   Q.    You had spoken about Charlene, but how about --

18   A.    Can I finish with Charlene.

19   Q.    Oh, excuse me.  Go ahead, Mr. Best.  I'm Sorry.

20   A.    Her stuff had been juvenile stuff, not wanting to

21   go to school some but not selling drugs or break-ins or

22   none of that stuff.

23   Q.    Drug use possibly?

24   A.    Possibly.  But I never knew of any.

25   Q.    Now, how about Beatrice Stokes.
```

J.A. 2178

262

1   A.    Beatrice Stokes has had her problems.  She's been

2   on the streets.  She looks better today than I've ever

3   seen her.  She says she's cleaned up her act, and I hope

4   she has.  But yeah, she's been out there.

5   Q.    In February of '94, would you have considered her

6   to be a crackhead?

7   A.    She was on the street, yes.

8   Q.    On crack a lot?

9   A.    Appeared to be, yes.

10  Q.    What are some of the affects that someone on crack

11  has?  What are the affects of crack cocaine on a

12  person's body that you've noticed out on the streets?

13  A.    If you look at her today, she's probably gained 30

14  pounds from when I saw her in '94, for weight loss.  For

15  black people, it turns them darker.  Not sleeping.

16  Those kinds of things.

17  Q.    Doesn't crack cocaine also cause memory problems?

18  A.    I'm sure it could.

19  Q.    Now, Beatrice Stokes never wrote out a statement

20  likes Charlene Johnson, did she?

21  A.    No, sir.  She didn't want to write out one because

22  she was scared.

23  Q.    Do you have your original notes with you that -- I

24  assume you made notes as she talked to you?

25  A.    I did not.  She wouldn't let me.

263

1   Q.    Did you ever reduce what she told you to written

2   form?

3   A.    Never.  I don't know that my partner did.  I did

4   not.  I couldn't tell you what the date was that I

5   talked to her.

6   Q.    That's not usual procedure, is it?

7   A.    For people who say they're not coming to court,

8   who don't want to get involved, just want to give

9   information, sometimes.

10  Q.    So if something had happened to you and Detective

11  Melvin, there would have been no way for any follow-up

12  officer to have know about Beatrice Stokes, would they?

13  A.    The District Attorney's Office knew about her.

14  Q.    Okay.  Did you supply them with a written summary

15  of what she told you?

16  A.    I did not.

17  Q.    So you have -- and bear with me please.  You've

18  never written down any time anywhere about what Beatrice

19  Stokes told you?

20  A.    That's correct.

21  Q.    Okay.

22              MR. STOKES:  May I approach the board?

23              THE COURT:  Yes.

24  BY MR. STOKES:

25  Q.    Do you recall Beatrice Stokes telling you

**J.A. 2180**

264

1    originally that the whole time that the truck was

2    located on 6th Street between the intersection of

3    Sheppard and 14th?  Down here where she made this blue

4    mark towards the center of the block?

5    A.    Yes, sir.

6    Q.    That's where she said the truck was?

7    A.    Correct.

8    Q.    And Charlene Johnson said the truck was in the

9    intersection where she herself drew it yesterday?

10    A.    That's correct.

11    Q.    And at no time did anyone ever say that the

12    deceased Radcliffe was in the truck when the shooting

13    occurred?

14    A.    One more time?

15    Q.    Did anybody ever tell you he was sitting in the

16    truck when the shooting occurred?

17    A.    No, sir.

18    Q.    Everybody always said he was standing outside the

19    truck?

20    A.    Yes, sir.

21    Q.    . The truck's setting in the middle of the street,

22    stopped?

23    A.    That's correct.

24    Q.    Did you see the police officer's accident

25    investigation report?

**J.A. 2181**

265

1   A.    I have a copy of it.  But I don't know that I've

2   ever researched it.  I know we've looked for Mr. Johnson

3   that was supposedly a witness to interview him on the

4   15th, and we can't find anyone by that name.

5   Q.    Did you go to Tarboro?

6   A.    We have looked everywhere for Mr. Johnson.  He

7   doesn't live at the address on the report.

8   Q.    Did you yourself go to Tarboro?

9   A.    On several occasions me and Robert Cherry have

10  looked for Mr. Johnson.

11  Q.    In Tarboro?

12  A.    Robert Cherry is the captain of the police

13  department in Tarboro.

14  Q.    And you can't find him?

15  A.    No, sir.

16  Q.    But, now, Robert Johnson, to the best of your

17  knowledge, doesn't know anybody involved in this case to

18  the best of your knowledge?

19  A.    Robert Johnson or Tony Johnson?

20  Q.    Tony Johnson.  Excuse me.

21  A.  -  I never got a chance to talk to him, so I don't

22  know what he knows.

23  Q.    But I understand to the best of your knowledge he

24  doesn't know anybody in this case?

25  A.    I never got a chance to talk to him.

**J.A. 2182**

268

1  Q.    And you did not go to the scene that night?

2  A.    No, sir. I didn't get involved until four days

3  later. I think it was on the 15th. I think it was on a

4  Tuesday.

5  Q.    And you went out to the scene at that time?

6  A.    Myself and Detective Melvin did a house to house

7  that day.

8  Q.    Did you also on that day look at where the truck

9  had ended up and the tire impressions that were

10 remaining, those kinds of things, yourself?

11 A.    Yes, sir.

12 Q.    You did an investigation of at least the garden

13 area and that corner?

14 A.    Yes, sir.

15 Q.    Now, you say you found a whole bunch of shell

16 casings that day. Were any of them .45 caliber?

17 A.    No, sir.

18 Q.    To the best of your knowledge the only .45 caliber

19 shell casings were found that night by the Greenville

20 Police Department?

21 A.    - Yes, sir.

22 Q.    Now, you have been to these nighttime crime scenes

23 before, I assume?

24 A.    Yes, sir.

25 Q.    Standard operating procedure is to search just as

Sharpe 000267

J.A. 2183

267

```
 1   much as you possibly can and recover everything that's

 2   possible right then in a sealed off area?

 3   A.    If you have time.

 4   Q.    Everybody, to the best your knowledge, had plenty

 5   of time that night, didn't they?

 6   A.    I can't answer that.

 7   Q.    You weren't there?

 8   A.    No, sir.

 9   Q.    Now, Detective Best, the items laying in front of

10   you on the witness stand are not the only items you

11   submitted to the SBI for testing, are they?

12   A.    No, sir.

13   Q.    You sent a series of handwipings from a gun

14   residue kit to the SBI lab too, didn't you?

15   A.    Yes, sir.

16   Q.    And what is a -- when you say handwipings dealing

17   with gun residue, what are you speaking about?

18   A.    It's called a gunshot residue kit where they take

19   cotton swabs and swab the area where a gun would have

20   been fired, right-hand, left-hand, seal it and then it's

21   checked for gunshot residue.

22   Q.    And did you take one of these kits and use it on

23   the hands of George Radcliffe?

24   A.    I did not, but it was -- ID Officer Baker did one.

25   Q.    And he turned over those handwipings to you?
```

J.A. 2184

268

1    A.    Yes, sir.

2    Q.    You're satisfied they were from the hands of

3    George Radcliffe?

4    A.    They were marked and the box was still sealed with

5    George Radcliffe as being the victim.

6    Q.    Did you ask for an analysis from the SBI lab as to

7    the possibility of whether or not George Radcliffe could

8    have fired a gun?

9    A.    Yes.  We asked for a residue, yes.

10   Q.    And did you receive a report back that did not

11   eliminate the possibility of George Radcliffe having

12   fired a gun?

13   A.    I didn't receive it.  Detective Melvin is the lead

14   detective in this case and all of those would have come

15   back to her and the DA's office, but I never got one.

16   Q.    Do have a copy of that lab report in front of you?

17   A.    I do not.

18        MR. STOKES:  May I approach the witness,

19   Your Honor?

20        THE COURT:  Yes, sir.

21        (Defendant's Exhibit Number 3 marked for

22   identification.)

23   BY MR. STOKES:

24   Q.    Mr. Best, let me hand you this laboratory report,

25   and you -- or this piece of paper, and ask you can you

Sharpe-000269

J.A. 2185

269

```
 1   identify it?

 2

 3              THE COURT:  What number is that?

 4              REPORTER:  It's number three, Judge.

 5   A.   Yes, sir.

 6   BY MR. STOKES:

 7   Q.   And what is it?

 8   A.   A laboratory report, a copy of a laboratory report

 9   that was sent back to the Greenville Police Department.

10   It's addressed to me.

11   Q.   So would it have been a report that supposedly

12   would have come back to you?

13   A.   Yes, sir.

14   Q.   Is it dealing with the handwipings that have been

15   mentioned?

16   A.   Yes, sir.

17   Q.   Have you had time to read it?  Would you like to

18   have a second to read it?

19   A.   Please.

20   Q.   Go ahead.

21   A.   - (Document read by witness.)  Okay.

22   Q.   Did the analysis by SBI lab of the handwipings of

23   George Radcliffe state that they could not eliminate the

24   possibility that Mr. Radcliffe had fired the weapon?

25   A.   That's what the report says, yes, sir.
```

Sharpe 000270

J.A. 2186

270

```
1    Q.    Okay.  Do you have all of your original notes from
2    this investigation with you?
3    A.    I do.
4    Q.    Is it a whole lot of pages?
5    A.    I have the interview with Dantae Sharpe on 4-7-94
6    and an interview of Mark Joyner on the same date.
7    Everything else are copies from the lead detective.
8    Q.    Do you have any of the interviews with all of the
9    people that you talked to down in that area?
10   A.    No, sir.  We don't write up interviews with people
11   that are not affected unless they have some information
12   that will lead us to a suspect or that would be
13   pertinent in the investigation.
14   Q.    So unless it leads you to a guilty party, you
15   don't write it down?
16   A.    Not normally, no, sir.
17   Q.    Thank you, Mr. Best.
18            MR. STOKES:  That will be all at this time.
19   REDIRECT EXAMINATION BY MR. EVERETT:
20   Q.    Briefly, Mr. Best.  Do you still have the
21   defendant's exhibit he just showed you?
22   A.    No, sir, I do not.
23   Q.    Where is that --  I believe you read it as
24   Defendant's Exhibit 3, the gunshot residue analysis for
25   George Edward Radcliffe.
```

271

```
 1   A.     Yes, sir.

 2   Q.     Would you please read the results of the analysis?

 3   A.     "Barium antimony lead indicative of gunshot

 4   residue was not present in significant concentrations on

 5   the  handwiping submitted by -- from the subject.  It is

 6   noted, however, that this does not eliminate the

 7   possibility that the subject could have fired a gun."

 8   Q.     Mr. Best, have you in the past sent items off,

 9   handwipings off for analysis?

10   A.     Many times, yes, sir.

11   Q.     Have you ever seen one that did not have that

12   statement in there?

13   A.     This is pretty much common practice or the same

14   sentence or whatever the wording would be.

15   Q.     I mean, what it says, they did not find barium

16   antimony lead in significant enough portions to say he

17   fired a gun?

18   A.     That's correct.  I think this is more or less a

19   form sentence that they always use in gunshot residues.

20   Q.     Because if the guy had washed his hands or

21   something, it wouldn't be on there?

22   A.     Correct.

23   Q.     And normally the gunshot residues are people who

24   -- that you think may have shot a gun or something?

25   A.     That's correct.  But we always do one on victims
```

Sharpe 000272

J.A. 2188

272

```
 1   in gunshots.
 2   Q.    And, also, Mr. Best, that in the past victims who
 3   have held their hands up or like this (indicating) also
 4   get residue on them?
 5   A.    It's possible, yes, sir.
 6   Q.    Have you in the past investigated cases where
 7   shell casings were not found that should have been
 8   there?
 9   A.    Many times.
10   Q.    Do you as a police officer know how many vehicles
11   traveled down 6th Street at the time George Radcliffe
12   was shot until the time the police blocked it off?
13   A.    I do not.
14   Q.    How do you secure a whole three-city block area?
15   A.    Not very easily.  I wasn't there on the night.
16   From the pictures and from talking to several of the
17   officers, that whole area was not blocked off.  Just the
18   area involved there at 6th and Sheppard.  Because at
19   first it was called in as an auto accident.
20   Q.    And it later expanded?
21   A.  ·  That's correct.
22   Q.    Now, I understand you told Mr. Stokes that
23   Beatrice Stokes was here looking this way.  She told you
24   that?
25   A.    She said she walked up from Sheppard and Douglas,
```

**J.A. 2189**

273

```
 1   which would be at the top.

 2   Q.    Douglas is up here?

 3   A.    That's correct.

 4   Q.    And that the truck was somewhere that way?

 5   A.    That's correct.  When she first heard the

 6   argument, it was farther back down Sheppard, she kept on

 7   walking.  And by the time she got there is when the

 8   gunshot took place.

 9   Q.    And Charlene was here looking this way?

10   A.    That's correct.

11        MR. EVERETT:  No further questions.

12   RECROSS-EXAMINATION BY MR. STOKES:

13   Q.    And Charlene never mentioned Beatrice and Beatrice

14   never mentioned seeing Charlene, either one?

15   A.    No, sir.

16   Q.    Now, disregarding all the other handwiping cases

17   you've been in with SBI results, the converse in that

18   statement is also true that it appears that the barium

19   and the other chemicals were present on his hands in

20   some concentration but not a significant concentration.

21   Does it not appear to say that also?

22   A.    Depending on how you read the sentence.  It says

23   that they were not present in significant

24   concentrations.  But this is the same form sentence or

25   statement that they always send in any gunshot residue
```

274

1   kit examination that a comparison is done that is not

2   one hundred percent -- I guess what I'm trying to say is

3   that if it's not reportable, then they won't put it on

4   the paper.

5   Q.    And you can read it the other way that there was

6   some there, and it wasn't in significant enough quantity

7   for them to make an opinion?

8   A.    Yes, sir.

9   Q.    You can read it both ways, can't you, Mr. Best?

10  A.    Yes, you could.

11  Q.    Thank you.

12             THE COURT:  You may step down.  Call your

13  next witness.

14             MR. EVERETT:  Carolyn Melvin.

15                  ********

16  CAROLYN MELVIN, being first duly sworn, was examined and

17  testified as follows during DIRECT EXAMINATION by

18  MR. EVERETT:

19  Q.    State your name for the Court.

20  A.    Detective Carolyn Melvin.

21  Q.    Ms. Melvin, where are you employed?

22  A.    Greenville Police Department.

23  Q.    And in what capacity?

24  A.    As a major crime investigator.

25  Q.    And were you so employed and working during the

J.A. 2191

275

1    month of February 1994?

2    A.    Yes.

3    Q.    You were the lead detective on this case?

4    A.    Yes.

5    Q.    Did you respond to the scene on February 11?

6    A.    Yes, sir.

7    Q.    And was Mr. Radcliffe, the deceased, there when

8    you got there?

9    A.    No.  They had transported his body.

10   Q.    You learned that he had died?

11   A.    Yes.

12   Q.    All right.  Tell us about the -- your knowledge of

13   this area.  Is this an area that you have traveled

14   through and passed prior to that day?

15   A.    Yes.

16   Q.    Are you familiar with Dantae Sharpe?

17   A.    Yes.

18   Q.    His family?

19   A.    Yes.

20   Q.    Mark Joyner?

21   A.    - Yes.

22   Q.    During this period of time, February 11 and

23   preceding February 11, what was Dantae Sharpe doing for

24   a living?

25   A.    Selling drugs.

J.A. 2192

276

```
 1   Q.    And do you know where he was living at that time?
 2   A.    Well, he had -- there was a residence on 14th
 3   Street which he was frequenting and then again his
 4   mother's house at 1202 Farmville Boulevard.  So he would
 5   commute between the two houses.
 6   Q.    Now, 14th -- the house he was staying at, 14th
 7   Street, that's not showing on this drawing?
 8   A.    Well, the very end.  If you would -- this right
 9   here being 6th Street, if you make this right turn, I
10   want to say midway, you may be able to squeeze in at the
11   very end.  It's a duplex, white duplex.
12   Q.    And are you familiar with the vehicles that were
13   parked there prior to February 11?
14   A.    Some.
15   Q.    Do you know -- do you have any description of any
16   vehicles that you can remember?
17   A.    I know there was a white sports vehicle and a red.
18   And I think Dantae drove an older car, a larger car.
19   Prior to this he changed, and I think he bought a BMW.
20   Q.    Prior to February 11 he was driving a BMW?
21   A.    I think prior to that he purchased a BMW.
22   Q.    Had no job?
23   A.    No.
24   Q.    What was Mr. -- the defendant's area that he sold
25   drugs in?  What was the area if you know?
```

Sharpe 000277

J.A. 2193

277

```
 1   A.    Well, he started off at that duplex on 14th
 2   Street, that visibly you would see him and his boys.
 3   And then approximately six weeks prior to this murder I
 4   began to see them hanging at 6th and Roosevelt and 6th
 5   and McKinley.  And what they would do, some would be on
 6   a porch and across the street in a field area and there
 7   would be Mark Joyner and some of the guys sitting out
 8   there waiting for traffic.
 9   Q.    Were these guys that you saw Dantae -- were they
10   family members?
11   A.    Yes.
12   Q.    And from your observations how were the drugs
13   sold?
14   A.    I'm not too familiar with how or I probably would
15   have arrested them.  But they were staying outside and
16   one would pretty much solicit the buyers and then the
17   other one make the purchase.
18   Q.    They would go to the cars that went by?
19   A.    Yes.
20   Q.    People would drive through?
21   A.    Yes.
22   Q.    All right.  Were any other houses in this area
23   that you saw Mr. Sharpe, the defendant, frequent?
24   A.    None other than the one at 14th and 6th and
25   McKinley actually on the porch?
```

Sharpe 000278

J.A. 2194

278

1   Q.    Were there any other groups of people that sold

2   drugs in this area?

3   A.    Well, you may have a couple of users who just

4   really for the habit will sell bags and they may be

5   holding enough bags for the habit but no known drugs

6   dealers in that area.

7   Q.    Now, did it come a time that you and Mr. Best

8   spoke to Charlene Johnson?

9   A.    Yes.

10   Q.    And were you -- were y'all together when the first

11   interview was conducted?

12   A.    Yes.

13   Q.    And would you -- the statement that Mr. Best read,

14   is that the statement you recall her giving?

15   A.    Yes.

16   Q.    And have you had contact with her since then?

17   A.    Yes.

18   Q.    Has she ever waivered in her statement to you?

19   A.    No.

20   Q.    Have you ever offered her any money?

21   A.    No.

22   Q.    Have you ever heard her ask for any money?

23   A.    No.

24   Q.    In fact, you have talked to her about the

25   importance of telling the truth?

J.A. 2195

279

1    A.    Yes.

2    Q.    And since your interview with her back in April of

3    1994, has she ever told you anything different than what

4    she told the court yesterday?

5    A.    No.

6    Q.    Now, you did not know Beatrice Stokes?

7    A.    No.

8    Q.    Because you didn't work the case that Mr. Best had

9    worked, I believe?

10   A.    No.

11   Q.    Have you ever seen the defendant with a firearm?

12   A.    I've investigated cases where it's alleged that

13   he's had a firearm?

14   Q.    Never actually seen it?

15   A.    No.

16   Q.    Because he wouldn't be showing it to you, would

17   he?

18   A.    No.

19   Q.    All right.  Tell us about what happened when you

20   and Mr. Best walked door to door that day?

21   A.    -  If I'm not mistaken, Mr. Vines and Ms. Stewart,

22   Martha Stewart, are the only two interviews that we were

23   able to get.  And that night that I was called out, I

24   interviewed Marciana.

25   Q.    You can't find Ms. Stewart now, can you?

Sharpe 000280

J.A. 2196

280

```
 1   A.    No.
 2   Q.    Anyone else offered to help you or help you -- say
 3   they saw anyone or anything?
 4   A.    No.
 5   Q.    Well, did everybody seem to realize that a
 6   homicide occurred here?
 7   A.    It's a big factor there.  The less you know, the
 8   safer you'll be.
 9   Q.    Okay.  And you saw a lot of shell casings on the
10   ground also?
11   A.    Yes.
12           MR. EVERETT:  No further questions.
13           THE COURT:  Cross-examination.
14           MR. STOKES:  Thank you, Your Honor.
15   CROSS-EXAMINATION BY MR. STOKES:
16   Q.    Now, Ms. Melvin, you've known drug people that use
17   drugs, addicted to drugs and don't have drugs sometimes,
18   they'll do anything to get drugs, won't they?
19   A.    Yes.
20   Q.    They will steal, lie, cheat, do whatever it takes?
21   A.    (Witness nodding head.)
22   Q.    Is that true?
23   A.    What's the question?
24   Q.    That a drug addict, drug user who doesn't have
25   drugs, they'll steal, lie cheat, do a whole lot of
```

281

1   things to get drugs, won't they?

2   A.    Yes, some will.

3   Q.    And, now, you say you didn't talk to Beatrice

4   Stokes, you talked to Charlene Johnson?

5   A.    Yes.

6   Q.    And even though you emphasized to her about

7   telling the truth, you were not out there that night,

8   were you?  You don't know what she saw, if anything, do

9   you, of your own knowledge?

10  A.    No.

11  Q.    And as matter of fact, in the courts it's rare to

12  get people from the street or especially drug dealers

13  from the street to testify in any kind of fashion in a

14  courtroom, isn't it?

15  A.    True.

16  Q.    You'd love to be able to talk to a whole lot of

17  those drug dealers out on the street and then they're up

18  there on the stand and you can have the District

19  Attorney ask him a lot of questions about things about

20  where they got the drugs and things like that, wouldn't

21  you?

22  A.    I work homicide.

23  Q.    Well, you'd love to have people up there that you

24  think might be connected to a homocide to ask them

25  questions about things, wouldn't you?

Sharpe 000282

J.A. 2198

282

```
 1   A.    Yes.

 2   Q.    And the officers who work drugs love to have them

 3   up there asking about drug dealing, wouldn't they?

 4   A.    Yes.

 5   Q.    And if you received information from someone on

 6   the stand that would lead you to the commission of a

 7   crime, do you believe that you would arrest that person

 8   if they were guilty?

 9   A.    I would investigate it to ascertain if they were

10   guilty.

11   Q.    And if you found there to be probable cause you

12   would indict that person, would you not?

13   A.    Yes.

14   Q.    Dantae Sharpe had a reputation for knowing a whole

15   lot about drug dealing down in that area, doesn't he?

16   A.    Yes.

17   Q.    And in your opinion he could really enlighten

18   everybody about a lot of who the dealers are and

19   everything else that goes on in that area, don't you

20   think?

21   A.  - What are you asking?

22   Q.    Do you think that if you or some other Greenville

23   police officers that deal specifically with drugs had an

24   opportunity to talk to Dantae Sharpe, he, through his

25   talking, could enlighten the Greenville Police
```

J.A. 2199

283

1   Department a tremendous amount about the drug trade and

2   traffic along 6th Street, McKinley, Sheppard and on down

3   in that area, 5th Street, 14th Street intersection,

4   Hannah's and down in that area, wouldn't he?

5   A.    I guess.

6   Q.    And it would cover a long span of time being a

7   couple years, wouldn't it?

8   A.    I don't know.

9   Q.    How long have you known this young man to be out

10  on the street?

11  A.    Maybe in the last couple of years; I'm not sure.

12  Q.    Approximately two years?

13  A.    Maybe the last two, yeah.  Two or three.

14  Q.    And, now, these people down in this area, these

15  drug dealers and all, do they have a reputation of

16  working together or dealing among themselves?

17  A.    No.  You will find one large group who pretty much

18  owns that area.  They will be enforcing whatever rules

19  they would like to enforce.  And then you have the

20  stragglers, the ones who are just there for a habit.

21  They can't be trusted with a large quantity of drugs

22  because they will use it.  That particular area was the

23  Sharps.

24  Q.    When you say the "Sharps," you're talking about

25  the Sharpe family?

284

1   A.     Dantae and his brothers and cousins.

2   Q.     And a lot of -- in your opinion a lot of

3   conspiracy goes on about eliciting drugs and things, a

4   lot of stolen goods and things like that passing in and

5   out through that area among those larger groups of

6   people?

7   A.     I'm not sure about the stolen property.  I know

8   about the drugs.

9   Q.     And these large groups of people, you would

10  consider almost to be organized, wouldn't you?

11  A.     They're pretty organized.

12  Q.     If it was in a large city, would it be fair to

13  call it a turf, a gang turf?

14  A.     I wouldn't consider it a gang or turf, but they're

15  organized.

16  Q.     Would it be comparable in a large city to an

17  organized gang or on their turf?  Is that what you're

18  saying the Sharps' area was their turf, so to speak,

19  their area?

20  A.     I think in larger cities they're a lot more

21  violent.

22  Q.     Yes, ma'am.

23  A.     It may be the beginning of one, but not

24  necessarily tagged to that.

25  Q.     You feel like Dantae Sharpe knows everything that

285

1  had gone on within the Sharpe group up until that time,

2  pretty much?

3  A.    He would have been in a position to know.

4  Q.    He would be in a position to have a lot of

5  knowledge that the Greenville Police Department would

6  like to have, would he not?

7  A.    I'm not understanding your question as far as his

8  knowledge and the Greenville Police Department.

9  Q.    He would have been in a position back in February

10  of '94 or earlier to have had a lot of knowledge within

11  the Sharpe group dealing with crimes that had been

12  committed and not solved that the Greenville Police

13  Department would have liked to have had access to, would

14  he not?

15  A.    I'm sure he was in a position.

16  Q.    To have knowledge about unsolved crimes?

17  A.    I would assume.

18  Q.    And you say you're sure he would be in that

19  particular position; is that right?

20  A.    Most people that are on the street whether they're

21  involved in drugs or not are in positions to have

22  knowledge that as a law enforcement officer you may not

23  know, not specifically Dantae Sharpe.

24  Q.    And having that knowledge of crimes a lot of times

25  means some sort of involvement in it, doesn't it?

286

1   A.   Not necessarily.

2   Q.   Sometimes it does?

3   A.   No, not necessarily.

4   Q.   Not necessarily but it could happen?

5   A.   I think you can use that statement with just about

6   anything that could happen.  I've dealt with people who

7   were not involved but had knowledge.

8   Q.   And you dealt with people who were involved and

9   had knowledge?

10  A.   Yes, sir.

11  Q.   And those people when you found out they were

12  involved, you indicted them, didn't you?

13  A.   No, not necessarily.

14  Q.   But you usually did.  When you found out they

15  broke the law, you arrested them?

16  A.   Yes.

17  Q.   Because you didn't let somebody you knew break the

18  law slide, did you?

19  A.   No.

20  Q.   Thank you, Ms. Melvin.

21           MR. EVERETT:  No further questions.

22           THE COURT:  Thank you, ma'am.  You may step

23  down.  Call your next witness.

24           MR. EVERETT:  Judge, could I publish the

25  photographs at this time?

287

1          MR. EVERETT:  Which ones haven't been

2    published?

3          MR. EVERETT:  None.  I mean, physically

4    published so they can look at them.

5          THE COURT:  All right.

6          MR. EVERETT:  Physically publish them so

7    they can look at them individually.

8          THE COURT:  If you think they need to see

9    them again.

10          MR. EVERETT:  Judge, it's hard for them all

11    to see by holding them up.

12          COURT:  All right.  Give them to the

13    bailiff.

14          (Exhibits published to the jury.)

15          THE COURT:  Any further evidence?

16    MR. EVERETT:  The State rests.

17          THE COURT:  We need to take up some other

18    matters out of your presence.  And I'm not sure how

19    long they'll take.  Probably close to 5:00 though.  So

20    rather than sending you to your jury room, I'm going to

21    let you go for the evening while I take up some of

22    these other matters out of your presence.

23          During the evening recess, again I remind

24    you not to discuss the case among yourselves or form

25    any kind of opinion about it or allow anyone else to

288

```
 1    discuss it with you.  Don't read or listen to or watch
 2    any news accounts of this trial, if there are any
 3    accounts.  Don't go to the vicinity of Sheppard or 6th
 4    Street in Greenville.

 5              When you come back tomorrow morning, if you
 6    would, convene in your jury room rather than in here
 7    and I'll send for you and bring you in here when we're
 8    ready.  You may leave now.  And I'll ask that you be
 9    back in your jury room tomorrow morning at 9:30.
10    Everyone else remain seated while the jury leaves.
11    (Jury out.)

12              THE COURT:  Let the record reflect the jury
13    is absent from the courtroom.  Mr. Stocks, I'll be glad
14    to hear your motion.

15              MR. STOKES:  All right, sir.  Judge, since
16    -- because of the heat and the lateness and the
17    tiredness, would Your Honor consider waiting until in
18    the morning to hear that motion?

19              THE COURT:  No.  I'm ready to hear it now.

20              MR. STOKES:  Okay.  May I proceed, Your
21    Honor?

22              THE COURT:  Yes, sir.

23              MR. STOKES:  Rose, would you be sworn and
24    take the stand please.

25                        ********
```

289

1    JOHNNY ROSE, being first duly sworn, was examined and

2    testified as follows during VOIR DIRE EXAMINATION by

3    MR. STOKES:

4            THE COURT:  Which motion are we proceeding

5    on?

6            MR. STOKES:  This is the one dealing with

7    Charlene Johnson's statements and the -- that one.

8            THE COURT:  All right.  Yes, I've got it.

9    BY MR. STOKES:

10   Q.    Could you state your name, please, sir?

11   A.    Johnny Rose.

12   Q.    Where do you live, Mr. Rose?

13   A.    In Greenville, North Carolina, 104 Pinehurst

14   Drive.

15   Q.    And how are you employed?

16   A.    Self-employed as a private investigator and owner

17   and operator of a security company here in town.

18   Q.    And pursuant to a court order, were you employed

19   in this case to assist with the preparation of the

20   defense of Dantae Sharpe?

21   A.  - Yes, I was, and so notified by you.

22   Q.    And in that connection did you come to learn of

23   possibly unknown witnesses that the State of North

24   Carolina may have?

25   A.    Yes.

**J.A. 2206**

290

1    Q.    And how many of these witnesses did you come to

2    learn or come to believe there existed?

3    A.    Through my investigations and information

4    gathering at or near the intersection of 6th and

5    Sheppard, two persons were revealed to me.  One by a

6    partial name and then later by a her full name.  That

7    being Charlene Johnson.  The other one I was not made

8    aware of the name.

9    Q.    At any time during your investigation did you

10   ever, until today, learn that person's name, the second?

11   A.    I did not.

12   Q.    And did you at my instruction attempt to find and

13   interview these two witnesses?

14   A.    Yes, I did.  Knowing full well we had a partial

15   name on one and not any name on the other.

16   Q.    And what did you do in order to locate these

17   people and interview them?

18   A.    I went to the location of the crime scene.  And to

19   my best recollection, I've been down there nine times,

20   day and night since this case started, maybe more.

21   Q.    - And approximately how many people do you reckon

22   you tried to talk to down in that area in those eight or

23   nine times you were down there?

24   A.    To the best my recollection, I probably talked to

25   20 or 25 people approximately.

J.A. 2207

291

1   Q.    Did they appear to be both residents down there

2   and street people that you talked to?

3   A.    That's correct.

4   Q.    And approximately how many hours did you spend

5   right there in that area trying to ascertain the

6   location of these two witnesses?

7   A.    Well, that may be difficult to answer, Mr. Stokes,

8   because I was doing other things in combination with it.

9   But totally, I spent probably 10 to 12 hours down there.

10  Probably half that time was spent trying to determine

11  the name of the second and the location of the one that

12  we had the name of.

13  Q.    So with the first one, you got a full name of

14  Charlene Johnson?

15  A.    That's correct.

16  Q.    Were you ever able to locate her or her residence?

17  A.    No, I was not.

18  Q.    Did you make diligent efforts to locate her

19  residence?

20  A.    I did on -- in the area described in the crime

21  scene area.

22  Q.    And do you know of anything else that you could

23  have done in order to attempt to locate either these

24  people and interview them?

25  A.    Well, I know what I did do.  I passed out about 15

292

1    or 20 additional business cards of people who wouldn't

2    talk then and told them if they heard of anything or

3    heard of anybody that saw the crime, they would give me

4    a call.  And as a result of passing out those business

5    cards, I did not receive a call except for one

6    gentleman.  He was -- did not identify Johnson by name.

7    He identified another person by name.

8    Q.    And was that other person Beatrice Stokes?

9    A.    No, it was not the other person identified.

10   Q.    Everybody down there knew how to get up with you?

11   A.    The ones that I gave the business card.  That's

12   correct.  They also knew that I was working for you.

13   And I said if they did not call me, call you.

14   Q.    Did they also know that you were trying to help

15   Dantae Sharpe?

16   A.    Yes, they did.  I told them that early on, all of

17   them.

18   Q.    During that entire time that you were down there,

19   did you see any other white men out there?

20   A.    Yes, I did.  Young and old and in between.

21   Q.    White people?

22   A.    Other white people now?

23   Q.    Yes, sir.

24   A.    No, except the one I carried down with me to help

25   on the crime scene.

293

1   Q.    So anybody down there would have recognized you or

2   your car as many times as you were down there?

3   A.    That's correct.  They got used to seeing me after

4   a while.

5   Q.    Thank you, Mr. Rose.

6             THE COURT:  Does the State have any

7   questions?

8   VOIR DIRE EXAMINATION BY MR. EVERETT:

9   Q.    Mr. Rose, isn't it true that the attorney and you

10  both knew her name as Charlene Johnson, the fact that

11  she was the victim in this assault in 1994 and it was in

12  all the papers that she was a victim in the assault?

13  A.    Actually I didn't know the name because I hadn't

14  kept up with it, Clark.

15  Q.    Well, I mean, the fact that she was over at the

16  courtside every morning, I mean.  She wasn't a lost

17  person, Charlene Johnson?

18  A.    No.  She wasn't as far as I was concerned.

19  Q.    But as far as you know, you never talked to her

20  and she never told you that she was hiding from you or

21  anything like that?

22  A.    No.  She did not tell me that.

23  Q.    And Beatrice Stokes, you never talked to her?

24  A.    Never knew the name of the second person.

25  Q.    Who is the other person you're talking about, some

294

```
 1   other person.
 2   A.    I was given a name down there of somebody who saw
 3   her.
 4   Q.    Who was that person?
 5   A.    Mabel Daniels.
 6   Q.    Were you able to find her?
 7   A.    No, I didn't.  No address.
 8   Q.    That's pretty common, isn't it, in your line of
 9   work?
10   A.    Down there it is, yes, sir.  And in my previous
11   line of work as well.  She was supposed to have been
12   hanging out at a house down there.  And I passed by the
13   house eight or nine times and never saw her.
14   Q.    Okay.  I don't have any further questions.  Thank
15   you.
16   VOIR DIRE BY MR. STOKES:
17   Q.    Mr. Rose, what was your previous line of work?
18   A.    18 years experience in the police work.
19   Q.    How long have you been a private investigator?
20   A.    Five years, sir.
21   Q.    Total of 23 years?
22   A.    That's correct.
23   Q.    Thank you.
24         THE COURT:  You may step down, sir.  Thank
25   you.
```

295

```
 1              Any further evidence for the defendant?

 2              MR. STOKES:  Nothing except, Your Honor, I

 3    have some cases that I would like to hand up that have

 4    been shepardized.  State v. Pinch, 1982; State v.

 5    Wilson, 1984; State v. Mason, 1978; United States v.

 6    White, which is cited in the North Carolina cases.  If

 7    I might approach the bench and hand them up.

 8              THE COURT:  Sure.

 9              MR. STOKES:  And I would like to be heard

10    very briefly.

11              THE COURT:  All right.  Go ahead.

12              MR. STOKES:  Judge, I believe that in the

13    case law -- I believe that it is permissible for the

14    State to keep the identity of their witnesses secret.

15    I think that's well-established law.  I believe it to

16    be law that is probably good law.  Mr. Everett, has

17    stated on the record the reason for his concern in

18    keeping these witnesses secret, and I can understand

19    that.  And the case law, as I understand it, also says

20    that the State is not required even upon motion of the

21    defendant to produce a witness for the defendant to

22    interview.  I also believe that it is not improper for

23    the State of North Carolina or its officers through law

24    enforcement to advise a witness that they do not have

25    to answer any questions from anybody else if they don't
```

296

1   want to.  But I believe that through those three North

2   Carolina cases and the federal case, that it is

3   improper and not permissible for the government to tell

4   a witness not to talk to anyone else about this case.

5           As I recall Charlene Johnson's testimony,

6   the end of my cross and going from memory of the

7   questioning and answer, that I recall, she said that

8   somebody -- and she could not remember who, whether it

9   was in the District Attorney's Office or the Greenville

10  Police Department, but one of those organizations, that

11  someone who dealt with her told her not to talk to

12  anyone else about this case.

13          Now, up to that point, I don't believe the

14  government crosses the line.  I believe they can do

15  those things about not having to produce a witness or

16  their name or something like that.  But when the

17  government tells their witness you're not to talk to

18  anybody if they come to talk to you, then I believe

19  they cross the line.  And because then the defense is

20  precluded completely and stopped dead in its tracks in

21  its investigation and preparation for trial to locate

22  witnesses and at least to attempt to question them.  I

23  believe that the case law says the defendant must make

24  diligent and reasonable attempts to locate these

25  people.

Sharpe 000297

J.A. 2213

297

```
 1              I believe that the private investigator with
 2    23 years of law enforcement, private investigation
 3    experience, made the best attempts he come possibly
 4    make in locating these two people down in the area that
 5    they probably frequented.  But even had he found
 6    Charlene Jones (sic), Charlene Jones (sic) had been
 7    told not to talk to anybody.  She wasn't told Charlene,
 8    "You can refuse to talk to somebody if you want to, you
 9    don't have to talk to them if you don't want to.
10    That's your choice."  That isn't what she was told.
11              Under sworn testimony under oath, she says
12    somebody from the District Attorney's Office or
13    Greenville Police Department, she doesn't remember who,
14    told her not to talk to anybody else.  That's where I
15    think they stepped over the line.  And I'm hoping that
16    Your Honor would grant this motion.  And I would ask as
17    a remedy that the entire testimony of Charlene Johnson
18    be stricken from the record and Your Honor so instruct
19    the jury to disregard her testimony.
20              And I believe that if you read all those
21    cases together, you'd start getting a picture and a
22    list of what is permissible.  And it goes to a point.
23    And then they say, well, we think that after this
24    point, it would be impermissible to do.  I think these
25    cases deal with the points that they say are
```

298

1    permissible.  But I think in the dictum, the courts in

2    those cases get to a point that they tell what conduct

3    would not be permissible.  Thank you, Your Honor.

4              THE COURT:  Does the State want to be heard?

5              MR. EVERETT:  Judge, at this point I would

6    just say they have not carried the burden in his motion

7    in that Charlene Johnson has not refused to talk to

8    anyone.  I'm familiar with the case law.  I've heard it

9    argued one other time.  And as I recall, it's one where

10   they went to the person and the person refused to talk

11   because the police officer had told them not to.  This

12   is one where they never got there.  Charlene Johnson

13   was not found.  I can't help that they didn't find her,

14   but she certainly never refused to talk to anybody.

15             If, Your Honor, rules they have gone forward

16   enough, I certainly want the opportunity to put on

17   evidence.  I don't think I should have to do that at

18   this point.

19             THE COURT:  With regard to the defendant's

20   motion to strike the testimony of Charlene Johnson, the

21   Court finds as a fact that Charlene Johnson never

22   refused to talk to the defendant, the defendant's

23   attorney or the defendant's private investigator; that

24   in fact Charlene Johnson was never contacted because

25   she could not be located by either the defendant's

299

1    attorney or the defendant's private investigator and,

2    therefore, anything she may or may not have been told

3    by some agent of the State is of no consequence.  And

4    the Court upon these findings of facts concludes that

5    the defendant has not carried its burden of proof in

6    this particular motion to strike the testimony of

7    Charlene Johnson and orders that the motion be, and the

8    same is, hereby denied.

9              MR. STOKES:  Now, Your Honor, unless I'm

10   mistaken, the only part of any motions by the defendant

11   remains, and I stand to be corrected on this, is that

12   dealing with the interview statement taken by Mr. Best

13   of my client.  And I suppose at this point, we've still

14   not reached a bridge.  They rested their case and have

15   not covered that statement.  So that portion of the

16   motion has never come into play.  And if it would come

17   into play later on, I would ask Your Honor to reserve

18   ruling on that motion to see if we ever get to that

19   bridge and cross that bridge when we get to it later

20   on.

21              THE COURT:  All right.

22              MR. STOKES:  If that would be permissible

23   with the Court.

24              MR. EVERETT:  That's fine.

25              THE COURT:  We don't know whether he's going

Sharpe 000300

J.A. 2216

300

1    to testify.

2              MR. STOKES: That's correct. And, so, I

3    believe that's all the motions that I have pending. I

4    don't believe there is anything else. I don't think

5    so. I don't wish to be heard any further at this time

6    on any motions, Your Honor.

7              THE COURT: All right. Is there anything

8    further before we take our recess?

9              MR. EVERETT: Judge, I would, based on the

10   defendant's motion to sequester our witnesses in which

11   we have honored, I think in every witness we have put

12   on with exception of the two investigators, we would

13   request the Court to enter the same order for the

14   defendant's witnesses if he chooses to put on any

15   evidence.

16             THE COURT: You want to be heard on that

17   motion, Mr. Stokes?

18             MR. STOKES: No, sir. I would like to thank

19   Mr. Everett on record for complying with that without

20   the necessity of the Court ordering it, Your Honor.

21   I'll be happy to sequester my witnesses should I put

22   them on tomorrow. May I inquire of the Court exactly

23   how I should do this sequestration?

24             THE COURT: Is there any particular place or

25   room in the courthouse? I'm not familiar with the

301

```
1    courthouse, the facilities here.

2              MR. EVERETT:  Judge, I don't have any

3    problem -- I mean, there's a witness lobby.

4              MR. STOKES:  If I could just keep my

5    witnesses that I plan to use in the witness lobby and

6    bring them in one at a time and use them and then let

7    them stay in the courtroom if they wish.

8              THE COURT:  That will be fine.  After they

9    testify they could stay in the courtroom.

10              MR. STOKES:  Yes, sir.  If the State doesn't

11   have any problem.  That's usually the State's witness

12   lobby --

13              MR. EVERETT:  You can shut that door.  That

14   other door is usually opened.  That way I don't see any

15   problem.

16              MR. STOKES:  And I wouldn't have any

17   problem.  And would probably prefer that when we shut

18   this door next to the jury room, that that door to the

19   witness lobby be locked.

20              MR. EVERETT:  That's fine.

21              MR. STOKES:  So there will not be any

22   appearance of impropriety.

23              THE COURT:  I will allow the State's motion

24   to sequester the defendant's witnesses and to direct

25   the bailiff to make the necessary arrangements for
```

J.A. 2218

302

```
 1    their accommodation.

 2              MR. STOKES:  And, Your Honor, I will speak

 3    with Mr. Buck in the morning before court to make those

 4    arrangements.

 5              THE COURT:  That'd be fine.

 6              Take a recess until 9:30.

 7    (Overnight recess.)

 8              THE COURT:  Is there anything else we need

 9    to take up before we bring the jury back?

10              MR. STOKES:  I would like to go and check to

11    make sure all of my witnesses are here.  It will take

12    me thirty seconds to walk over there and look.

13              (Counsel left courtroom and returned.)

14              THE COURT:  All right.  Sheriff, let's bring

15    the jury back in.

16    (Jury in.)

17              THE COURT:  All right.  Mr. Stokes, first of

18    all, do you care to make an opening statement?

19              MR. STOKES:  No, sir, I do not.

20              THE COURT:  You can call your first witness.

21              MR. STOKES:  Thank you, Your Honor.

22                        ********

23    PATRICIA ANN WARD, being first duly sworn, was examined

24    and testified as follows during DIRECT EXAMINATION by

25    MR. STOKES:
```

J.A. 2219

303

```
 1                MR. STOKES:  May I proceed, Your Honor?

 2                THE COURT:  Yes, sir.

 3   BY MR. STOKES:

 4   Q.    Could you state your name and address for the

 5   Court please, ma'am?

 6   A.    Patricia Ann Ward, 2827 Old River Road.

 7   Q.    Were you living at that address on February 11,

 8   1994?

 9   A.    No, I wasn't.

10   Q.    Where were you living at that time?

11   A.    606-E West 14th Street.

12   Q.    And is that in an area that has a nickname or

13   name?

14   A.    It's called New Town.

15   Q.    New Town?

16   A.    Yes.

17   Q.    And that's because -- it's called New Town

18   Projects?

19   A.    Yes.

20   Q.    Ms. Ward, what do you do?

21   A.    I'm a full-time student and work at Food Lion.

22   Q.    Where are you a student at?

23   A.    PCC.

24   Q.    How long have you been attending Pitt Community

25   College?
```

304

```
 1   A.   I'll graduate this fall with my second degree.

 2   Q.   What is your first-degree in?

 3   A.   Surgical technology.

 4   Q.   And what will your second degree be in?

 5   A.   Medical assistant.

 6   Q.   Do you happen to know your grade point average?

 7   A.   I have an A average.

 8   Q.   Ms. Ward, have you ever been convicted of any

 9   crime?

10   A.   Yes.

11   Q.   And what are they?

12   A.   Misdemeanor larceny.

13   Q.   And when was that?

14   A.   Seven years ago.

15   Q.   And could you relate some facts about that very

16   briefly?

17   A.   It was for something like a Tupperware thing where

18   you order stuff and you give it back to the people.

19   Well, at the time my lights got cut off, and I took the

20   money and paid my light bill with it and didn't pay it

21   back in time.

22   Q.   How many children do you have?

23   A.   I have eight children.

24   Q.   Were they living with you at home a couple of

25   years ago?
```

305

```
 1   A.   Six of them.

 2   Q.   Six of them were there when this larceny occurred?

 3   A.   Yes.

 4   Q.   Is that all you've ever been convicted of?

 5   A.   Other than worthless check.

 6   Q.   How many worthless checks?

 7   A.   It's been over twenty years, I don't remember.

 8   Q.   Now, Ms. Ward, I direct your attention to the date

 9   of February 11, 1994, did you see the defendant Dantae

10   Ward (sic) in the early evening hours around dark or

11   after dark that evening?

12   A.   Yes.

13   Q.   And where did you see him?

14   A.   At my house.

15   Q.   And approximately what time that evening did you

16   see him?

17   A.   Around 8:15.

18   Q.   And how do you recall it being 8:15 on that night?

19   A.   Because he interrupted my favorite TV show.

20   Q.   What's your favorite TV show?

21   A.   "Sisters."

22   Q.   And when he came to your house about 8:15, what

23   occurred?

24   A.   He got something to eat.

25   Q.   He came in and ate?
```

Sharpe 000306

**J.A. 2222**

306

```
 1    A.    Yes.

 2    Q.    And was it already on the table?

 3    A.    No.  I had to heat it up for him and fix his

 4    plate.

 5    Q.    You recall what it was that you served?

 6    A.    That night I had cooked rice and cube steak.

 7    Q.    Okay. Did he eat?

 8    A.    Yes.

 9    Q.    And do you recall approximately how long he stayed

10    at your house that night?

11    A.    He stayed to my house approximately a quarter to

12    nine.

13    Q.    And did he leave your house at a quarter to nine?

14    A.    Yes, he did.

15    Q.    And do you know where Mr. Sharpe went?

16    A.    Yes, I do.

17    Q.    Where did he go?

18    A.    He went next door.

19    Q.    And who lives next door to you?

20    A.    Patricia Hicks.

21    Q.    And after he went next door did you see him any

22    more?

23    A.    No.

24          MR. STOKES:  I have no further questions of

25    this witness at this time.
```

Sharpe-000307

J.A. 2223

307

```
 1              THE COURT:  Cross-examination.

 2   CROSS-EXAMINATION BY MR. EVERETT:

 3   Q.    Ms. Vines?

 4   A.    My name is Ward.

 5   Q.    I'm sorry.  Ms. Ward.  You now, as I understand,

 6   don't live over there any more?

 7   A.    No, I do not.

 8   Q.    Did you hear any gunshots that night?

 9   A.    Where I stayed at I couldn't hear no gunshots.

10   And I'm a night person.  I goes in my house around 7:00,

11   and I don't hang outside that much, and I wouldn't have

12   heard it anyway.

13   Q.    Did you hear any ambulances that night?

14   A.    No, I did not.

15   Q.    Somebody came to your house and said that a man

16   had been shot over there on 6th Street, didn't they?

17   A.    No, they did not.  I heard it on the news.

18   Q.    When did you hear it?

19   A.    I heard it when they had a news flash.

20   Q.    Are you related to Mr. Sharpe?

21   A.  - Yes, I am.

22   Q.    How is it that you're related to him?

23   A.    He's my nephew.

24   Q.    Okay.  So he came over and you cooked supper for

25   him?
```

J.A. 2224

308

| | | |
|---|---|---|
| 1 | A. | No.  He came over about like he does every night |
| 2 | and -- | |
| 3 | Q. | And eats? |
| 4 | A. | Yes, he does. |
| 5 | Q. | At that time where was he living? |
| 6 | A. | With his mother. |
| 7 | Q. | Where does she live? |
| 8 | A. | On Farmville Boulevard. |
| 9 | Q. | Farmville Boulevard.  Is there some landmark that |
| 10 | we all would know about where she lives? | |
| 11 | A. | You know where the First Citizens Bank is, don't |
| 12 | you?  Well, that's Farmville Boulevard. | |
| 13 | Q. | Does she live near there? |
| 14 | A. | Not far, about a block from there. |
| 15 | Q. | How far does she live from where you lived? |
| 16 | A. | Walking I can get to her house in eight or nine |
| 17 | minutes if I put my mind to it. | |
| 18 | Q. | And Dantae Sharpe came to West 14th Street just |
| 19 | about every night? | |
| 20 | A. | Yes, he did. |
| 21 | Q. | . And he ate supper with you sometimes? |
| 22 | A. | He ate with me or my neighbor? |
| 23 | Q. | Who is your neighbor? |
| 24 | A. | Patricia Hicks. |
| 25 | Q. | Is she related to him? |

J.A. 2225

309

```
 1    A.    No, she's not.

 2    Q.    But he ate there also?

 3    A.    He ate there, but I don't know whether he ate

 4    there that night or not.

 5    Q.    How far is -- tell us -- of course, where you

 6    lived then is not on this diagram?

 7    A.    No, it's not.

 8    Q.    Would it be up or down that diagram?

 9    A.    To tell you the truth, I can't read that diagram.

10    And where I stay at is where Garrison Evans Lumber

11    Supply Company is at.

12    Q.    All right.  Now, how did Mr. Sharpe get to your

13    house that night?

14    A.    He drove.

15    Q.    What did he drive?

16    A.    His mother's car.

17    Q.    What did she drive?

18    A.    A Volvo.

19    Q.    Do you know how old he was at that time?

20    A.    With eight children, that's all the age I can keep

21    up with.

22    Q.    He was over 16 obviously?

23    A.    Yeah, he was over 16.

24    Q.    Was he as old as twenty?

25    A.    I don't know.
```

J.A. 2226

310

```
 1    Q.    Do you know what he was doing for a living then?
 2    A.    No, I do not.  All I know is what I've been
 3    hearing.
 4    Q.    Did you ever see him drive any other cars rather
 5    than his mother's?
 6    A.    He drove his mother's other car.
 7    Q.    What was that?
 8    A.    A BMW.
 9    Q.    Okay.  Any other cars?
10    A.    He drove my son's car sometimes.
11    Q.    Who is your son?
12    A.    Andre and Autry Sharpe.
13    Q.    Andre and Autry Sharpe?
14    A.    Yes.
15    Q.    And were they living with you then?
16    A.    No, they was not.
17    Q.    Where were they living?
18    A.    My sister's.
19    Q.    They were living with Dantae's mother?
20    A.    Yes, they were.
21    Q.    They're sometimes -- some people get those
22    confused.  Think they're brothers, don't they,
23    sometimes?
24    A.    Get who confused?
25    Q.    Dantae and Autry?
```

311

```
 1    A.    Yes.

 2    Q.    They hang together.

 3    A.    Yes.

 4    Q.    And Andre, Autry, and Dantae hang together?

 5    A.    Yes.

 6    Q.    They hung around your house, didn't they?

 7    A.    Yeah.  They came to my house too, yeah.

 8    Q.    What was Andre and Autry doing then?  What were

 9    they doing for a living?

10    A.    I don't know.  Andre was going to school.

11    Q.    How about Autry?

12    A.    I cannot speak for Autry because he stay with my

13    sister, and he didnt' come around as much as Andre did.

14    Q.    You know Michael Joyner?

15    A.    I've heard of him, seen him a couple of times.

16    Q.    I'm sorry.  I meant Mark Joyner.  Excuse me.

17    A.    I've heard of him and seen him a couple of times.

18    Q.    That's who you knew I was talking about?

19    A.    Yes.  But I know Michael Joyner, too, the ball

20    player.

21    Q.    Oh, you know him?

22    A.    Yeah.

23    Q.    Good.  At 8:45 when he left your house, did you

24    see him anymore that night?

25    A.    No, I did not.
```

J.A. 2228

312

1   Q.    You went back in your house, shut the door?

2   A.    I went back in the house to see if my story was

3   still on.  It was gone, and I went to bed.

4   Q.    This is "Sisters"?

5   A.    Yes, it is.

6   Q.    And that comes on what channel?

7   A.    23.

8   Q.    23?

9   A.    It's a cable channel.

10  Q.    And it comes on at?

11  A.    8:00.

12  Q.    8:00.  Okay.  So he came at a quarter after eight

13  and you spent fifteen minutes cooking him --

14  A.    I didn't have to cook.  I just heated up what I

15  had in the microwave.

16  Q.    All right.  You fixed him supper anyway.  I'm not

17  trying to trick you, ma'am.

18  A.    Yes.

19  Q.    And he ate his supper, and you didn't see him any

20  more after 8:45?

21  A.    No, I did not.

22  Q.    There came a time that you then saw on the news

23  that this man was shot?

24  A.    Yes.

25  Q.    And then two months later your nephew was

**J.A. 2229**

313

1  arrested?

2  A.    Yes.

3  Q.    The conviction that Mr. Stokes asked you about,

4  you were working for -- as a Tupperware distributor?

5  A.    It wasn't Tupperware. It was something like home

6  decorations.

7  Q.    And people gave you money to do something for

8  them?

9  A.    Yes.

10 Q.    And you took their money and used it for yourself?

11 A.    I paid my light bill, yeah.

12 Q.    And didn't pay them back?

13 A.    I didn't pay them back in time. No, I did not.

14 Q.    And I believe you told Mr. Stokes the only other

15 conviction was worthless checks?

16 A.    Yes.

17 Q.    That was back in the mid '80s sometime, is that

18 right, '85, '86?

19 A.    Yes.

20        MR. EVERETT:  May I have one moment, Judge.

21 Q.  - After Dantae was arrested, when did you go to the

22 police and say it wasn't him?

23 A.    After he was picked up.

24 Q.    And you went to the police and you gave them a

25 statement?

J.A. 2230

314

1   A.    I went to y'all and tried to give y'all a

2   statement, but y'all refused to take it.

3   Q.    You went to us and told us all this stuff?

4   A.    Yes, I did.

5   Q.    And told us he'd been there at 8:45, right?

6   A.    I told you he came to my house around 8:00, a

7   little after, about 8:15.

8   Q.    And when -- do you remember when that was, ma'am?

9   A.    All I know it was in -- it was either April or

10  March.  No, I don't.  I can't recall the exact date.

11  Q.    All right.  Thank you, ma'am.

12           THE COURT:  Any redirect?

13           MR. STOKES:  No, sir.

14           THE COURT:  You may step down.  Call your

15  next witness.

16           MR. STOKES:  Patricia Hicks, Your Honor.  I

17  have to get her.

18           THE COURT:  Come right up here, Ms. Hicks.

19  Take the Bible and raise your right hand.

20                    ********

21  PATRICIA HICKS, being first duly sworn, was examined and

22  testified as follows during DIRECT EXAMINATION by

23  MR. STOKES:

24           MR. STOKES:  May I proceed, Your Honor?

25           THE COURT:  Yes.

J.A. 2231

315

```
 1   BY MR. STOKES:
 2   Q.    Could you state your name for the Court, please,
 3   ma'am?
 4   A.    Patricia Hicks.
 5   Q.    And where do you live, Ms. Hicks?
 6   A.    606-D West 14th Street.
 7   Q.    And what is that area known as?
 8   A.    New Town.
 9   Q.    And is that an area near Garris and Evans Lumber
10   Company, across the street from it?
11   A.    Yes.
12   Q.    The New Town being the new project area?
13   A.    Yes, sir.
14   Q.    Do you hold any position within that area?
15   A.    Yes, I do.
16   Q.    And what is that position?
17   A.    President of New Town.
18   Q.    And what does that mean that you do?
19   A.    If anything goes wrong in New Town, it would come
20   to me before it go to the housing authority.  If I'm in
21   the vicinity at that time, I would go and try to handle
22   it myself.
23   Q.    So if the tenant has a problem, they come to you.
24   And you're sort of a mediator between you and the
25   housing authority of Greenville?
```

J.A. 2232

316

```
 1   A.      Uh-huh.

 2   Q.      Ms. Hicks, have you ever been convicted of any

 3   crime whatsoever?

 4   A.      No.

 5   Q.      Do you know Dantae Sharpe?

 6   A.      Yes, I do.

 7   Q.      Now, did you see -- directing your attention to

 8   the date of February 11, 1994, did you see Dantae Sharpe

 9   in the evening hours of that day?

10   A.      Yes, I did.

11   Q.      And approximately what time was it that you saw

12   him?

13   A.      Around eight, 8:10, 8:15.

14   Q.      And where did you see him at eight, 8:10, 8:15?

15   A.      He knocked on my neighbor's door.

16   Q.      And how was it that you saw him knocking -- and

17   which neighbor is this we're talking about?

18   A.      Patricia Ward.

19   Q.      And how did you happen to see him knocking on the

20   door?

21   A.  _   I was standing outside on my back porch.

22   Q.      What did you see Mr. Sharpe do?

23   A.      He knocked on the door, and she came to the door,

24   and he went inside her house.

25   Q.      Okay.  And did you see him again after that?
```

317

```
 1   A.    Yes, I did.

 2   Q.    And approximately what time was it then?

 3   A.    He came over to my house about 9:00.

 4   Q.    And how long did he stay at your house?

 5   A.    About 45 minutes.

 6   Q.    And Ms. Hicks, what do you do for a living?

 7   A.    Nothing right now.  I was a student, and I left

 8   school so my daughter can go back.  I pay for her to go

 9   to school.

10   Q.    Your daughter lives with you?

11   A.    (Witness nodding head.)

12   Q.    And you say that Mr. Sharpe stayed in your

13   residence approximately 45 minutes before he left?

14   A.    Uh-huh.

15   Q.    About what time do you recall him leaving your

16   residence?

17   A.    He left my house about 9:45, 9:50.

18   Q.    Could you describe his demeanor and how he was

19   acting when he was at your house?

20   A.    We were talking, laughing.  He was concerned

21   mostly about me because I was upset that night.

22   Q.    And did there come a time after 9:45 or so that

23   night that you saw him again?

24   A.    Yes.

25   Q.    And approximately what time was that?
```

J.A. 2234